United States District Court
Southern District of Texas
FILED

NOV - 7 2003

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DANIEL E. DAVIS AND DAVCRANE, INC. §
§
VS. §        CIVIL ACTION
§        NO. B-03 - 206
FINNING INTERNATIONAL INC. §
§

PLAINTIFFS' PETITION FOR TEMPORARY INJUNCTION
AND ORGINAL COMPLAINT

COME NOW, Daniel E. Davis and DavCrane, Inc., hereinafter referred to as

Plaintiffs complaining of the Defendant Finning International, Inc. hereinafter also

referred to as Defendant, and for cause of action would respectfully show this Court the

following:

I.

PARTIES

1.1    Plaintiffs are residents of Cameron County, Texas and are citizens of the

State of Texas.

1.2    Defendant Finning International, Inc. is a foreign corporation

incorporated under the laws of Canada, doing business in the United States Southern

District of the State of Texas and deriving substantial profits from its business in the

U.S. Southern District in the State of Texas. Finning International, Inc. may be served

with process by serving Mr. Mel Ternan at 16830 -- 107th Avenue, Edmonton, Alberto,

T5 4C3 Canada, fax number (780) 930-4891 or Mr. John T. Struthers, Corporate

Secretary at Finning International, Inc., Suite 1000, Park Place, 666 Burred Street,

Vancouver, British Columbia V6C2X8, fax number (604) 331-4887. Additionally,

defendant Finning International, Inc. maintains Texas counsel, Mr. Mark S. Finkelstein,

1

Shannon, Martin, Finkelstein & Sayre, P.C., 2400 Two Houston Center, 909 Fannin Street, Houston, Texas 77010. His telephone number is (713) 646-5503 and fax number is (713) 752-0337. Citation will also be issued as to defendant through their counsel and served as well as an immediate courtesy copy of this petition and complaint so that defendant may receive any notice regarding the hearing on temporary injunction.

## II.

## JURISDICTION AND VENUE

2.1    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a), because this action, has an amount in controversy in excess of $75,000 and is between citizens of different states.

2.2    This Court has personal jurisdiction over Finning International, Inc. because they do business in the United States Southern District of Texas, including business with Daniel E. Davis and DavCrane, Inc. which is located in Harlingen, Texas, and have sufficient contacts with the U.S. Southern District of Texas, both generally and with regard to this specific action, so that the exercise of personal jurisdiction over them is proper.

2.3    This is a proper venue, pursuant to 28 U.S.C. § 1391(a), because it is the District in which a substantial part of the events or omissions giving rise to the claim occurred in that the events happened in Cameron County, Texas which is within the Southern District of Texas, Brownsville Division.

## III.

## TEMPORARY INJUNCTION

3.1    Daniel E. Davis and DavCrane Inc. are in the business of designing, developing and manufacturing telehandler all-terrain cranes, lattice and telescopic boom crawler cranes, excavator based pipe layers and their related equipment, and

2

have designed, developed and manufactured the cranes and pipelayers. Defendant Finning International, Inc. has bound itself to pay the overhead for such manufacturing operations, along with other responsibilities. Daniel E. Davis is in possession of four units of its manufactured heavy equipment which are located in Harlingen, Texas. Those machines are manufactured and are ready for sale. These machines are manufactured on a no profit basis by Plaintiffs. Because of defendant Finning's ongoing refusal to pay the continuing overhead for the continued manufacture of the heavy equipment machines, it is necessary that those machines in inventory be immediately sold and the sale proceeds put back into the manufacturing operations so as to prevent the manufacturing operations from failing to meet its ongoing overhead and financial obligations. Further, Daniel E. Davis is in possession of five all-terrain crane units that are partially complete. The five all-terrain cranes vary in completion from 75% to 95%. But Daniel E. Davis and DavCrane, Inc. cannot complete the units because of defendant Finning's ongoing refusal to pay the continuing overhead.

3.2     Daniel E. Davis and DavCrane, Inc. will suffer irreparable harm if defendant Finning International, Inc. is not enjoined during the pendency of this lawsuit from interfering with the reasonable sale of the existing inventory with the proceeds of such sale to be returned to the manufacturing operations. Because Finning International, Inc. has failed to continue paying the overhead of the manufacturing operations, injury is ongoing and eminent in affecting the manufacturing plant from meeting its overhead and financial obligations. A failure to meet such financial obligations and ongoing overhead expense will cause irreparable harm to Davis and DavCrane, Inc. and probably lead to its insolvency. Absent the granting of a temporary injunction by this court, there is no adequate remedy at law to protect Daniel E. Davis

and DavCrane, Inc. in the manufacturing operations and thus, the temporary injunction order sought is both necessary and equitable.

3.3    There is a substantial likelihood that plaintiffs will prevail on the merits because the defendant has caused torts to be committed against Daniel E. Davis and DavCrane, Inc. as well as breaches of terms of the contract existing between Daniel E. Davis and Finning International, Inc..

3.4    The harm faced by Daniel E. Davis and DavCrane, Inc. outweighs the harm that would be sustained by Finning International, Inc. if the preliminary injunction were granted allowing the sale of the now existing inventory. Daniel E. Davis and DavCrane, Inc. will submit a full and detailed accounting of such sales to Finning International, Inc. and if appropriate to this court, within ten (10) business days of the sale. Additionally, the proceeds of the sale of the inventory will only be used to meet the continuing overhead and debt service of the manufacturing operations during the pendency of the injunction.

3.5    Issuance of a preliminary injunction would not adversely affect public interest and public policy because such an injunction prohibiting interference with sale of the now existing inventory would allow the manufacturing facility to maintain its payroll and keep people employed, when it is in fact the acts of the Defendant Finning International, Inc. in tort and in breach of contract that have put this business operation in immediate irreparable risk of harm. Injunctive relief is sought so that justice may be done and to preserve the status quo both in the interim and after final trial; injunctive relief is not sought to injure Finning International, Inc.

3.6    Daniel E. Davis and DavCrane Co., Inc. is willing to post a bond that is appropriate as to the value of such inventory to be sold, with the conditions set out by

4

the court for the immediate and proper accounting for any sale of the deemed inventory.

3.7    Plaintiffs ask the court to set their application for preliminary injunction for hearing at the earliest possible time and, after hearing the request, issue a preliminary injunction against defendant Finning International, Inc.

3.8    Plaintiffs Daniel E. Davis and DavCrane Co., Inc. additionally seek the temporary injunction order from this Honorable Court prohibiting Finning International, Inc. from:

1.    Threatening to interfere with Plaintiffs' sale of the now existing inventory;

2.    Instituting any action in this or any other county or court attempting to obtain temporary or permanent order(s) concerning this litigation;

3.    Molesting or disturbing the peace of the plaintiffs by continuing to attempt to prevent Daniel E. Davis and DavCrane, Inc. from selling at reasonable prices the now existing inventory;

4.    Engaging in unreasonable or unnecessary acts intending to interfere with the reasonable sale of the now existing inventory; and,

5.    Doing anything calculated to embarrass, harass, molest, and/or injure plaintiffs' rights or humiliate plaintiffs.

## TORT CLAIMS

## IV.

### Statutory Fraud

4.1    Daniel E. Davis, DavCrane, Inc. and Finning International, Inc. entered into a Letter of Intent dated June 18, 2002, regarding the grant by Daniel E. Davis to Finning International, Inc. of exclusive distribution rights to certain products known as telehandler all-terrain cranes, lattice and telescopic boom crawler cranes, excavator

based pipe layers and their related equipment using Davis' property and proprietary know-how, including any patents, patent applications, drawings (including assembly drawings), copyrights and other intellectual property rights. Attached hereto as Exhibit 1 is the Letter of Intent.   In such Letter of Intent the defendant Finning International, Inc. made false representations and/or promises for the purpose of inducing plaintiff Daniel E. Davis and DavCrane, Inc. to enter into a contract. Defendant Finning International, Inc. intended that Daniel E. Davis and/or DavCrane, Inc. would rely on the false representations contained in the Letter of Intent.

4.2     Such misrepresentations included but were not limited to, that Finning International, Inc. was to use its best efforts and exclusively market and sell worldwide the products described above. Additionally, Finning International, Inc. misrepresented that it would pay all overhead costs to the plaintiffs Daniel E. Davis and/or DavCrane, Inc. for the manufacturing facility of the above-described products. The Defendant either intended or had reason to expect that the plaintiffs would enter into a contract in reliance on the above-described misrepresentations. In fact, plaintiffs reasonably relied upon defendant Finning's false representations and/or promises by entering into a contract with Finning dated July 15, 2002.

4.3     Such statutory fraud in the inducement is violative of Texas Business and Commerce Code Section 27.01 (a)(1)(A) and (B), (a)(2)(C) and (D).    These false representations and/or promises caused plaintiffs injuries and plaintiff sues for his actual damages as a result of such false representations and/or promises inducing plaintiffs to enter into the contract. Such actual damages are permitted pursuant to Texas Business and Commerce Code Section 27.01 (b).

4.4     Additionally, plaintiffs seek exemplary damages from Defendant Fininning International, Inc. who made such false representation and/or promises

6

because of defendant's actual awareness of the falsity of such representations and/or promises. In that regard, plaintiff would show that defendant Finining International, Inc. had actual awareness not only in knowing what it was doing but knowing that it was doing things that were false, deceptive, and/or unfair and deciding to proceed with such false representations and/or promises. Plaintiff would show by clear and convincing evidence that defendant Finning International, Inc.'s objective manifestations show that it acted with actual awareness all in violation of Texas Business and Commerce Code Section 27.01 (c).

## V.

### Common law Fraud

5.1    Plaintiff Daniel E. Davis and DavCrane, Inc. additionally plead common law fraud, in that defendant Finning International, Inc. made fraudulent misrepresentations that Finning International, Inc. intended for the plaintiffs to rely on such misrepresentations. Defendant Finning International, Inc. either intended or had reason to expect that the plaintiffs would act or refrain from acting in reliance of those representations. The defendant Finning International Inc. desired to cause the consequences of its acts to be that Davis would be excluded from participating in the profitability of its property or property rights as they were incorporated into the manufacture of heavy equipment for sale to the public. Alternatively, defendant Finning International, Inc. believed that the above described consequences were substantially certain to result from its fraudulent misrepresentations. More specifically, the defendant Finning International, Inc. had information from which a reasonable person would conclude the results described above would follow.

5.2    As expected the plaintiffs Daniel E. Davis and DavCrane, Inc. relied on the false representations to their detriment. Plaintiff would show that their reliance was

both actual and justifiable. Based upon the representations of the defendant, plaintiffs acted on such representations because they believed such false representations and acted upon it by entering into a contract dated July 15, 2002, as hereinafter referred to. Plaintiff would further show that they in their experience as business people acted as reasonable business people and would reasonably enter into such contractual agreement.

5.3    However, such misrepresentations as described above changed plaintiffs' position for the worse and caused them injury. As such it was reasonably foreseeable by defendants that plaintiffs would suffer direct damages as a result of the defendant's wrongful acts and such is presumed by the law.    Additionally, plaintiffs seek consequential damages and would show that the fraud perpetrated upon plaintiffs proximately caused its damages. Additionally plaintiffs would show that the fraud by defendant was a substantial factor in bringing about such damages, without which the damages would not have occurred, and that such was reasonably foreseeable to defendant as an entity of ordinary intelligence would have foreseen that the damages might result from their fraud.

5.4    Additionally plaintiff Daniel E. Davis sues for the mental anguish damages occasioned by such fraud by the defendants. Plaintiffs also seek to recover exemplary damages and would prove such right by clear and convincing evidence.

## VI.

## TORTIOUS INTERFERENCE WITH EXISTING CONTRACT

6.1    Plaintiff Daniel E. Davis and DavCrane, Inc. would show that they had valid existing contracts for the sale of the products described above and that defendant Finning International Inc. willfully and intentionally interfered with such contracts. As a result of such interference by such defendant, plaintiffs were caused to suffer injury

and incurred actual damages and/or losses.    Plaintiff would show that the defendant Finning International, Inc. either had actual knowledge of the contracts and of the plaintiffs' interest in them or, had knowledge of such facts and circumstances that would lead a reasonable person to believe that there were contracts in which the plaintiffs had an interest.    Plaintiff would further show that defendant Finning International, Inc. tortiously interfered with such contracts and that such acts were intentional in that the defendant wanted to cause the consequences of Davis losing its ability to manufacture for sale and to market its designs, patents and/or property rights and/or that the defendant knew that such consequences were substantially certain to result from the defendant's tortious acts.

6.2    The plaintiffs would show that the defendant Finning International, Inc.'s conduct constitutes a knowing inducement and/or hinderance. The defendant Finning International, Inc.'s tortious interference was occasioned by the defendant occasioning interference with the plaintiffs' performance of its contract either by preventing the performance or making plaintiffs' performance impossible or more burdensome, difficult, or expensive.

6.3    Such tortious interference by defendants caused plaintiffs actual damage and/or loss and as such Defendant Finning International, Inc. is liable for the pecuniary loss of the contracts tortiously interfered with, and as such the plaintiff is entitled to be placed in the same economic position the plaintiffs would have been in, had the contracts not been breached by defendant's tortious interference. Additionally plaintiffs seek to recover those damages including mental anguish, injury to reputation, as well as any lost profits.

## VII.

## TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTS

7.1    Plaintiffs would show that there was a reasonable probability that they would have entered into other business relationships with third persons and that the defendant intentionally interfered with such relationship. Such conduct by defendant Finning International, Inc. is independently tortious and/or unlawful which proximately caused injury to the plaintiffs in that they suffered actual damages and/or losses.

7.2    Plaintiff would show that they had business relations that had not been reduced to contracts and/or continuing business relations that were not yet formalized by written contracts. It was reasonably probable considering all the facts and circumstances relating to these prospective contracts to have been made but for the tortious interference of the defendant Finning International, Inc.

7.3    Such acts by defendants intentionally interfered with the prospective contracts with plaintiffs in that defendant Finning International, Inc. desired to bring about the interference and/or it knew that its interference was certain or substantially certain to occur as a result of its misconduct.   As such, the tortious interference by defendant with the prospective contracts have caused plaintiffs to suffer actual damages and/or losses including but not limited to damages for lost benefits of the contracts; damages for personal injury including mental anguish and injury to reputation; and plaintiffs lost profits.

## VIII.

### CIVIL CONSPIRACY

8.1    The plaintiffs would show that the defendant Finning, International, Inc. has engaged in a civil conspiracy to affect plaintiffs rights as well as rights of others similarly situated. Defendant Finning International, Inc. as well as other manufacturers of heavy equipment, have large and valuable inventories of heavy equipment that

would become obsolete or greatly diminish in value should plaintiff Daniel E. Davis and/or DavCrane, Inc. patent, design and/or intellectual property continue to be successfully produced. In essence, plaintiffs' designs and patents as well as its intellectual property, allowed the use of one power plant for heavy equipment to do the functions of two separate pieces of heavy equipment. This efficiency and economies of scale were realized by defendant and others, and as such, defendant Finning International, Inc. conspired with others to thwart the introduction of these new designs, patents and intellectual property by committing fraudulent acts and misrepresentations inducing plaintiff Daniel E. Davis and DavCrane, Inc. to enter into contract. The defendant Finning International, Inc. knew that the continued production of the successful designs were dependent upon them providing the overhead cost for production. Finning International Inc. in furtherance of this conspiracy withdrew its continued provision of overhead cost for production so as to prevent Plaintiffs' designs, patents and/or intellectual property from entering the market successfully, to the benefit of Finning International Inc. and others by preserving their market share and a profitability of their existing products.

8.2    Additionally, plaintiffs would show that in fact the models now being produced by defendant Finning International Inc. and others, which would become obsolete and/or greatly diminished in value should plaintiffs Daniel E. Davis and DavCrane, Inc.'s designs, patents and intellectual property continue in production, failed to meet the industry standards for safety. On the other hand, the current designs, patents and/or intellectual property of Daniel E. Davis and DavCrane, Inc. have met and exceeded the industry standards for safety. The civil conspiracy between Finning International, Inc. and others is intentionally preventing the implementation and use of

heavy equipment that meets industry safety standards which works for the good and benefit of all those using such machines and to the public in general.

8.3    The Plaintiffs would show that the heavy equipment industry has a history of resisting proposed safety standards and effectively utilizing the political process and their economic power to minimize the resulting economic cost that adoption of realistic minimum safety standards would naturally entail.

8.4    Profit has had priority over safety during the heavy equipment industry's years of operation. The priority has been reflected by the deliberate pattern of conduct by the Defendant for many years.

8.5    The Defendant's lack of safety is the direct result of a conspiracy by said heavy equipment companies to control the adoption of the minimum regulatory standards and to act in concert to restrict, delay, or defeat proposals for stronger standards that provide the public safe use of heavy equipment to enhance survivability and insure reduction of catastrophic injuries and death to the public.

8.6    Said covert and overt conspiracy is and has been manifested by, but is not limited to, some of the following particulars:

(a)    Organizing and actively joint venturing in seizing and maintaining control over the industry trade organizations by various methods including control of grants and other influencing acts.

(b)    Actively influencing the Regulatory Agencies by asserting political pressure on elected, appointed or employed officials to achieve the conspiratorial goals.

(c)    By acting in concert with other heavy equipment companies to ensure appointment of sympathetic political appointees to the regulatory

agencies charged with adopting minimum safety standards related to proper use of heavy equipment.

(d)    In recruiting and employing members of Regulatory Agencies to assist in the goal of obstruction and opposing adoption of new and more stringent standards, or to delay the adoption of such standards, and/or minimize any meaningful changes to existing standards.

(e)    By having trade organizations they control act in concert with said defendant company and others whether covertly or overtly, in recommending and submitting to the regulatory agencies reasons for delay for adopting new standards, for changes, modifications or adoptions of existing minimum standards.

(f)    By actively delaying, obstructing, and opposing litigation discovery efforts by victims who have been injured as a result of the dangerous conditions who seek redress in the courts. This has been virtually universal to all heavy equipment cases in litigation for a number of years. These tactics frustrate the process of discovery, make the cost of litigation prohibitive, and furthers the aims and economic objectives of the conspirators.

(g)    Concealing from their own employees, the public, from injured persons, and from governmental entities information regarding accidents all in violation of their common law duty to act with reasonable care.

(h)    Concealment of several thousand pages of evaluation, statistics, information, and documents regarding the lack of safety of heavy equipment.

(i)    Engaging in advertising, informational and propaganda programs which expressly and by implication misrepresent that their heavy equipment is safe and not deadly.

13

8.7    The conspiracy (among otherwise vigorous competitor s) was predicated solely on economic self-interest whereon profit was a priority over safety to the public. The actions of the conspirators, including the Defendant herein, has been successful in influencing the standards adopted, as well as delaying adoption of standards addressing Defendant's own knowledge of long standing known deficiencies and dangerous conditions constituting unnecessary hazardous risks to the public.

8.8    Such conspiracy was a proximate cause of the injuries to Daniel E. Davis and DavCrane, Inc. and of the damages suffered by Plaintiffs.

## IX.

### Willful Acts or Omissions, Gross Neglect, and Malice

9.1    Finning International, Inc. committed willful acts or omissions, gross neglect, fraud, and/or malice, which were a proximate cause of injuries to Plaintiffs and the damages of Plaintiffs, and for which Plaintiffs are entitled to recover punitive damages, pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code.

## X.

### OUTRAGE

10.1    The conduct of defendants and their agents, set out above, were carried out wilfully, maliciously, oppressively, and constituted such an entire want of care as to constitute a conscious indifference to the rights or welfare of these plaintiffs. Such conduct was outrageous as defined by Texas common law, and Plaintiffs are hereby entitled to recover exemplary damages to deter such cruel and undignified procedures by the defendants and defendant's agents in the future. In this connection, Plaintiffs will show that their treatment by the defendant caused their suffering of immeasurable dimensions.

14

10.2   The total want of care and the utter disregard of duty, while the Defendant knew of its intentional, fraudulent, misrepresentative, tortious and/or conspiratorial acts exhibits and reflects a total want of care, and a conscious and willful indifference to Daniel E. Davis, DavCrane, Inc. and others similarly situated.  The nature, scope and extent of the operation of Defendant Finning International, Inc. and others manufacturers, exporters, importers, distributors, sellers, and deliverers of heavy equipment require a significant award of punitive and/or exemplary damages if said Defendant Finning International, Inc. and other similarly entities are to take heed and be influenced by said award, to conduct their business with due regard and concern.

10.3   Even though, previous litigation of claims against manufacturers, exporters, importers, distributors, sellers and/or deliverers of heavy equipment have resulted in the awarding of tens of millions of dollars in punitive and/or exemplary damages for such intentional, fraudulent, misrepresentative, tortious and/or conspiratorial acts, such manufacturers, exporters, importers, distributors, sellers, and/or deliverers continue to ignore the safety of humans and such companies continue to place profits over the lives of people.  Thus even greater sums must be assessed against this Defendant to change its conscious indifference in promoting and persisting to conduct themselves in such an intentional, fraudulent, misrepresentative, tortious and/or conspiratorial manner.

10.4   Accordingly, plaintiffs request that exemplary damages be awarded against the defendant in amounts which exceed the minimum jurisdictional requirements of this Court, and asks the jury to consider the following facts in awarding exemplary damages:  awarding damages for punishment of the defendants; to compensate for inconvenience, to compensate for attorney's fees ; for expenses of litigation; and, to serve as an example to others.

15

## XI.

### CONTRACTUAL CLAIMS

11.1    The parties entered into a contract on July 15, 2002, attached hereto as Exhibit 2.    The contract described the parties as follows: "DANIEL E. DAVIS businessperson having an address at P. O. Box 2427, Harlingen, Texas 78551, USA ("Davis") and FINNING INTERNATIONAL, INC. a corporation incorporated under the laws of Canada, having an address at 16830 – 107th Avenue, Edmonton, Alberta, T5P 4C3, Canada ("Finning")." The parties admitted that Davis had developed and owns all of the property and proprietary know-how, including any patents, patent applications, drawings (including assembly drawings), copyrights and other intellectual property rights used by Davis in relation to the special assembly of the telehandler all-terrain cranes, lattice and telescopic boom crawler cranes, excavator based pipelayers and their related equipment. Defendant Finning International, Inc. admitted it, either directly or indirectly through its affiliates and subsidiaries, has the infrastructure to sell and distribute the products worldwide manufactured and assembled as described above.

11.2    The parties admitted that there was mutual consideration for the contract and therefore all conditions precedent have been met. The parties also agreed that the contract shall be governed and interpreted with the laws in force within the State of Texas. The contract provided for a minimum term of ten (10) years with the possibility of renewals. Relevant portions of the contract required Plaintiffs Daniel E. Davis and DavCrane, Inc. to obtain and/or build a facility and manufacture and assemble the above described heavy equipment products to meet the demand of the parties. The manufactured product demand was set out as 92 separate produced units annually such terms were contained in and referred to as Schedule A to the contract.

11.3    Because of its position, as the world's largest Caterpillar distributor, defendant Finning International, Inc. was required to provide all the major components for the manufactured products. Additionally, the defendant Finning International, Inc. was to provide amongst other things, all overhead costs for the production of the equipment, marketing and distribution. During the year of 2002, Defendant Finning International, Inc. fully paid the overhead production costs. However, Defendant Finning International, Inc. breached the contract by withholding during the year of 2003 such overhead production costs to the extent that plaintiff Daniel E. Davis and DavCrane, Inc. can no longer continue production. However, there are four completed units ready for sale at this time.

11.4    In addition to the pre-contract fraudulent, intentional, misrepresentative, tortious and conspiratorial acts of defendant Finning International Inc preceding and inducing plaintiffs' entry into the above-described contract, defendants breached the terms of the contract and have caused additional damages to plaintiffs as to the value of the contract between the parties itself. Those breaches include but are not limited to failing to pay the overhead cost and failing to use its best and/or reasonable efforts to distribute and promote the new heavy equipment products worldwide.

11.5    The damages include the overhead cost of the initial ten year term, marketing promotion, and distribution cost of the product over such term, as well as, any contracted for profit sharing, royalties, and commissions.

## XII.

## PUNITIVE DAMAGES

12.1    Because Defendant is guilty of gross neglect and malice, said Defendant should have punitive damages assessed against it in an amount deemed appropriate by the jury.

## XIII.

## PRE-JUDGMENT AND POST-JUDGMENT INTEREST

13.1    Plaintiffs seek pre-judgment and post-judgment interest as provided by law.

## XIV.

## CONSTITUTIONAL ALLEGATIONS

14.1    Plaintiffs alleges that the provision within Section 41.008(b) of the Texas Civil Practice and Remedies Code limiting the amount of exemplary damages assessed against a defendant to two times the amount of economic damages plus an amount equal to any non-economic damages found by the jury, not to exceed $750,000, or $200,000, whichever is greater, is unconstitutional, as it is in violation of (1) Section One of the Fourteenth Amendment of the Constitution of the United States, which guarantees due process and equal protection of the laws; (2) Article I, Section 3 of the Texas Constitution, which guarantees equal protection of the laws; (3) Article I, Section 13 of the Texas Constitution, which guarantees access to open courts for every person for an injury done him, and that each such person shall have remedy by due course of law; (4) Article I, Section 19 of the Texas Constitution, which guarantees due course of the law; (5) Article II, Section 1 of the Texas Constitution, which prohibits any one of the three branches of government from exercising any power properly attached to either of the others, specifically, prohibiting the legislature from exercising power properly attached to the judiciary; (6) Article III, Section 56 of the Texas Constitution, which prohibits the legislature from passing any local or special law authorizing limitation of civil actions; and (7) Article I, Section 515 and Article V, Section 10 of the Texas Constitution, which guarantee the right to a trial in civil cases.

## XV.

18

## CONDITIONS PRECEDENT

15.1    All conditions precedent to Plaintiffs' right to recover herein and to Defendant's liability have been performed or have occurred.

## XVI.

## JURY DEMAND

16.1    Plaintiffs request a trial by jury.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs request that the Defendant be duly cited in terms of law to appear and answer herein and that upon trial hereof plaintiffs have judgment against said Defendant in an amount in excess of the minimum jurisdictional limits of this court with pre-judgment interest and interest thereof at the legal rate in addition thereto, plaintiffs seek exemplary and/or punitive damages against the defendant together with post judgment interest on said judgment at the highest legal rate until paid, attorneys fees, for costs of court in their behalf expended, and for such other and further relief, special and general, at law and/or in equity, to which they may show themselves justly entitled.

19

Respectfully submitted this the _____ 7 _____ day of November, 2003.

WATTS LAW FIRM, L.L.P.
1926 E. Elizabeth
Brownsville, Texas 78520
(956) 544-0500
(956) 541-0255 FAX

MIKAL C. WATTS
State Bar No. 20981820
Federal I.D. No. 12419

RAY R. MARCHAN
State Bar No. 12969050
Federal I.D. No. 9522
For the Firm

ALTON W. PAYNE
State Bar No. 15649450
Federal I.D. No. 2025
5001 Bissonnet, Suite 200
Bellaire, TX 77401
(713)840-8008
(713)840-8088

**Counsel for Plaintiffs** *Daniel E. Davis and DavCrane, Inc*

## <u>VERIFICATION</u>

STATE OF TEXAS          §
                        §
COUNTY OF CAMERON       §

BEFORE ME, the undersigned Notary Public, on this day personally appeared Daniel E. Davis who, after being by me first duly sworn, deposed and stated that:

"I am the Plaintiff in the above-styled and numbered cause;

I am over the age of 18 years of age and not disqualified by law to make this affidavit.

I have read the foregoing Plaintiff's Petition for Temporary Injunction and Original Complaint; and that the statements contained therein are true and correct to my personal knowledge.

The copy of the documents attached hereto as Exhibit "1" and Exhibit "2" are authentic true and correct copies of the original.

_____
DANIEL E. DAVIS

SUBSCRIBED AND SWORN TO before me this ___7___ day of November, 2003.

YESENIA AGUIRRE
Notary Public, State of Texas
My Commission Expires
February 17, 2004

_____
Notary Public, State of Texas



**FINNING (CANADA)**
www.finning.ca



Head Office: 16830 - 107 Avenue, Edmonton, AB, Canada  T5P 4C3
Phone: (780) 930-4800  Fax: (780) 930-4801

June 18, 2002

**CONFIDENTIAL**

Daniel E. Davis
2526 Airline Drive
107-108 Farmers Mktg. Assn. Of Houston Bldg.
Houston, TX  77009

Dear Daniel:

<u>Re:  Proposed Strategic Alliance</u>

This letter of intent (the *"LOI"*) outlines our understanding of the principal terms under which Finning International Inc. (*"Finning"*) is prepared to become the exclusive distributor of certain products which are assembled utilizing your technology.

Your technology (the *"Technology"*) will include all of your property and proprietary know-how, including any patents, patent applications, drawings including assembly drawings, copyrights and other intellectual property rights, relating to the special assembly of the following products: telehandler all-terrain cranes, the lattice and telescopic boomed crawler cranes and the excavator based pipelayers and other similar products comprising your Technology (the *"Product Lines"*).  The Product Lines, however, shall not extend to any marine or offshore related products which utilize the Technology.

Except for the following terms under the heading "Binding Terms," this LOI will be a non-binding letter of intent until a definitive agreement (the *"Agreement"*) is executed by us. Other than the existing confidentiality agreement, there are no other written or oral agreements or understandings between us relating to the subject matter of this letter.

Finning (Canada) is a division of Finning International Inc.



*Exhibit "1"*

**BINDING TERMS**

1.    **Confidentiality**: Each of us will: (a) only use the other party's confidential information solely as necessary to evaluate this proposed strategic alliance and commercial venture; (b) take reasonable efforts to protect the other party's confidential information; and (c) not disclose the other party's confidential information except to employees and professional advisors who have a need to know such confidential information and who have signed confidentiality agreements or have obligations of confidentiality similar to those in this letter. Neither of us will disclose to anyone the terms of this letter or the Agreement or any drafts of the Agreement, or the details of any negotiations or discussions between us.

2.    **Exclusive Negotiations**: Until this LOI is terminated: (i) Daniel Davis (*"Davis"*) will not directly or indirectly negotiate with any other person regarding a strategic alliance, joint venture or co-ownership type agreement regarding the commercial development of the Technology or the marketing and sale of the Product Lines; (ii) the parties will diligently proceed to negotiate and use reasonable commercial efforts to enter into a formal, binding Agreement based on the principles described in this LOI.

3.    **Davis Warranties**: Davis warrants that he is the owner of the Technology, and no third party is asserting against Davis a claim of superior, joint or common ownership, including any claim of right or license that allows the third party to use the Technology, except for the nonexclusive license to Favelle Favco Cranes (USA) Inc. which is limited to U.S. Patent No. 6,003,252 as issued to Daniel E. Davis (the *"Favelle Licence"*). Further, Davis warrants that he has the drawings, engineering and related materials and expertise sufficient for him to manufacture and/or assemble the Product Lines.

4.    **Advance on Facility**: If the Tex-Steel facility in Harlingen, Texas is available at the time of signing this letter, Finning shall provide Davis with a $100,000 advance on the Facility Loan, as defined herein, to secure for purchase the Tex-Steel facility. Davis will use reasonable efforts to negotiate with the vendor of the Facility to make the deposit or advance refundable if the Facility transaction does not proceed.

If this MOU is terminated and an Agreement is not signed, and the Facility deposit is not refunded to Davis and in turn to Finning, the $100,000 advance by Finning will be applied as a credit against future purchases by Finning of products from Davis or affiliate.

-2-

NON-BINDING TERMS

1.  **Parties:**  The Agreement will be between Finning and Davis unless Davis chooses to use a corporate entity of some kind, such as for example, "DavCrane," in which case Davis and DavCrane will each be a party to the Agreement and references to Davis in this letter will apply equally to DavCrane.  Where Davis operates through DavCrane, Davis will grant to DavCrane all necessary rights in the Technology and the Product Lines as may be reasonably necessary to facilitate the performance by DavCrane of its obligations under the Agreement.

2.  **Distribution of Products:**  Through the strategic commercial alliance established by the Agreement, the parties will work together to further commercially develop, market and distribute the Product Lines as follows:

   2.1  **Owner of Technology:** Davis will continue to be the sole and exclusive owner of the Technology which he will use for the sole purpose of manufacturing and assembling the Product Lines.  These Products will be exclusively marketed, sold and distributed by Finning and Davis according to the terms described below.

   Davis will reaffirm and provide appropriate representations and warranties to Finning that he owns or holds all of the intellectual property and other rights to the Technology and Product Lines necessary to fulfil his obligations under the Agreement and that Davis has not entered into any other agreements that would prevent him from entering into or performing his obligations under the Agreement, subject, however, to the Favelle Licence.

   2.2  **Exclusive Distributor:**  Finning will become the exclusive, world-wide distributor of the Product Lines and any related product which uses the Technology.  In accordance with paragraph 4, Finning will provide financing to Davis to assist with the fabrication and assembly of the Product Lines.  Davis retains, for himself and his marketing agents, the unrestricted, irrevocable right to market, sell and distribute only through Finning the Product Lines on the commission basis described in paragraph 3.3.

   2.3  **Product Line Manufacturing:**  The Product Lines will be manufactured or assembled by DavCrane for marketing and distribution by Finning according to the following principles:

   (a)  **Facility:** Davis will build or purchase a manufacturing facility (the "*Facility*") capable of: (i) producing sufficient quantities of the products from the Product Lines to meet Finning's projected demand and quality control requirements; (ii) performing ongoing testing and quality assurance; and (iii) researching further developments and improvements to the Product Lines and related future products and technologies. Preferably, the Tex-Steel facility in Harlingen, Texas will be purchased with the Facility Loan.

   (b)  **Product Cost:**  Finning will purchase and deliver to Davis all major manufacturing components ("Finning Costs") from Caterpillar or other mutually agreeable third party suppliers for use in the production of the Product Lines at the lowest cost reasonably attainable using the targeted amounts as contemplated in Schedule A as a guide. Finning and

- 3 -

Davis shall each have the right to investigate and negotiate supply pricing with the third party suppliers for the Finning Costs. All purchases of Finning Costs shall be made by Finning.

Davis will purchase all the minor components, labor, liability insurance, warranty allowances and the like ("Davis Costs") at the lowest cost reasonably attainable using the targeted amounts as contemplated in Schedule A as a guide. Finning will pay Davis for the monthly "Manufacturing Overhead Costs" which comprise utilities, costing, engineering, drafting, accounting and all costs associated with the administration of the manufacturing in general and Finning will pay Davis for the Davis Costsper unit. The Davis Costs per unit is paid by Finning to Davis upon assembly of each unit. The cost of producing a product in the Product Lines, includes the Finning Costs, the Davis Costs per unit and the Manufacturing Overhead Costs per unit, the total of which is referred to as the "Product Cost." The Product Costs will be reviewed on a periodic basis, upon request by either party, to  maintain the  most cost effective method of manufacturing the Products.

Attached Appendix "A" is a detailed breakdown of the estimated Product Costs. Finning will retain title to all components and parts purchased by Finning and will retain title to such components and parts, together with the finished Product, until resold to the  end use customer.

(c)    **Running Royalty:** Upon receipt of the proceeds from the sale of each Product, Davis will earn a running royalty equal to six percent (6%) of the Product Cost (the "*Running Royalty*") . The Running Royalty and the Product Cost plus unrecovered freight and transportation for each unit are collectively the "Landed Dealer Cost." Finning will retain 50% of the Running Royalty until the Distribution/Licensing Fee is reduced to $1,000,000.    The remaining balance of the Running Royalty will be paid by Finning to Davis upon receipt of the proceeds from the sale of each product.

(d)    **Manufacturers' Warranties:** Davis and Finning will cooperate together to cause all manufacturers warranties to be passed through to the end  use customer on all equipment, components and parts comprising the Product Lines. DavCrane will provide a customary warranty on the manufacturing and assembly services provided in relation to the Product Lines.

3.    **Distribution Rights:** Except for Davis' distribution rights as defined in section 2.2, Finning will have the exclusive, world-wide right to market, sell and distribute the Product Lines as follows:

3.1    **Product Price:** Finning and Davis will consult to determine a range of prices at which Finning may sell the products depending on applicable market conditions and geographic area.  Finning will consult with Davis before selling any product outside of the predetermined price range. Finning will make the final determination of selling price based on input from Davis and on market conditions endeavouring at all times to maximize the selling price for all Product Lines.

**3.2    Marketing Fee:** To the extent the sales price of a product (the *"Sale Price"*) exceeds the Landed Dealer Cost: (i)Finning will retain the gross margin from the sale up to and including 20% of the Sale Price (hereafter the *"Marketing Fee"*); (ii) any remaining revenue will be divided 25% to Finning and 75% to Davis, and after an allowance for income taxes, Davis' 75% share will be used to repay the Facility Loan, and upon full repayment of the Facility Loan, Davis shall receive his 75% share.

**3.3    Referral Commission:** Davis, or his marketing agent, must process all sales and prospects for the sale of a Product from the Product Lines through Finning; and for referrals that result in the sale of that Product within six months of the referral to Finning (and which are independent of any pre-existing relationship with Finning), Finning shall pay to Davis a referral commission of 5% of the Sales Price for each product sold which represents the total compensation of any kind to Davis or his agents (*"Referral Commission"*). Davis and his marketing agents shall provide the completed sales order and all sales documents required to finalise the sale. Finning shall make an affirmative, concerted effort to complete the sale for all referrals received from Davis, or his agent.

**3.4    No Licences:** Except as provided with respect to (i) the Favelle Licence and (ii) this LOI or the Agreement, Davis will not grant any licenses or other rights in the Technology or the Product Lines to any third party without the agreement of Finning.

**4.    Finning Financing:** Subject to the achievement of certain milestones Finning will provide financing to Davis as follows:

**4.1    Distribution/Licensing Fee:** Subject to Finning completing reasonable due diligence on the Technology prior to July 15, 2002, Finning shall pay Davis USD$1,500,000 as a distribution and licensing fee (the *"Distribution/Licensing Fee"*) to acquire the world-wide, exclusive distributorship rights to the Product Lines, and to acquire the license to the Technology including the rights to use, sell, lease, distribute and otherwise dispose of the Product Lines comprising the Technology. In addition to the rights granted by Davis to Finning in this paragraph, Davis agrees to use the Distribution/Licensing Fee, in part and pursuant to his sole discretion, to protect his Technology for the benefit of Finning and to further develop the Product Lines. One-third of the Distribution/Licensing Fee ($500,000) will be re-funded using 50% of the Running Royalty paid to Davis. If Davis breaches a material manufacturing obligation, and fails to remedy such breach within a reasonable period, then Finning will have the right to take over all rights of manufacturing and distribution.

**4.2    Facility Loan:** Finning will provide Davis a USD$1,500,000 loan in the form of a line of credit (the *"Facility Loan"*). The Facility Loan proceeds will be used, as Davis may determine, exclusively for the purposes of equipping and either (i) purchasing and making improvements to an existing manufacturing facility or (ii) constructing a new manufacturing facility capable of fabrication of certain components, the assembly of the third party components, and the completion of the units of the Product Lines.

- 5 -

The Facility Loan is repayable in accordance with paragraph 3.2 and  in full after five (5) years or earlier pursuant to paragraph 5, with overdue interest at the rate of _ %. The Facility Loan shall be used if, as Davis may determine, there is no other reasonable and readily available source of funds. Each draw against this loan facility must have supporting backup for the stated cash requirement. The unused portion of the Facility Loan will automatically revert to Finning. Pursuant to paragraph 4 of the Binding Terms section, Finning shall provide Davis with a $100,000 advance on the Facility Loan to secure for purchase the Tex-Steel facility.

4.3     **Security:** Davis will grant to Finning a registrable security interest over: (i) DavCrane and all of its assets, including a mortgage on the Facility and improvements (if applicable); (ii) a collateral assignment of all royalties and income to  be derived from the Technology; (iii) a collateral assignment of all royalties and income to  be derived from the Product Lines (the *"Security"*); (iv) take a chattel mortgage on any tooling or equipment purchased for the facility with the proceeds of the Facility Loan to secure  the repayment of the Facility Loan, and (v) the Technology. The security interest in the Technology will be subject to an ongoing automatic right of reversion in favour of Davis for a period of 10 years. If at any time during this [10 year] period Davis redeems and pays out the full amount of the outstanding amount of the Facility Loan hereunder the ownership of the Technology shall automatically revert to Davis.  Finning shall execute such documents and take further steps as may be reasonably required to perfect this reversion of ownership at that time.

4.4     **Use of Funds:** Davis will use the Facility Loan, and any advances made under the associated Line of Credit, for the sole purpose of acquiring the facility and equipping the facility. Davis shall not use any of the funds advanced under the Facility Loan or credit facilities for any other purpose whatsoever.

5.     **Disposition of Technology or Product Lines:** For Davis to sell,  license, assign, transfer or otherwise dispose of any of his rights in or to the Technology or to  any one or more of the Product Lines, or any rights under the Agreement, he must first: (i) offer Finning a right of first refusal to purchase such rights on the same terms and conditions as offered to and accepted by the proposed third party purchaser; and (ii) repay the Facility Loan in full.  As a distributorship cancellation fee, Finning will receive twenty-five percent (25%) of any  proceeds from the sale, assignment or transfer of any of Davis' rights in or to any one or more  of the Product Lines, or any rights under the Agreement. However, if the parties mutually agree to sell rights in the Technology, then Davis would be required to repay only  a reasonable portion of the Facility Loan.

6.     **Protection of Intellectual Property:**  Davis will obtain patent and other intellectual property registrations and protections in each additional country as  reasonably requested by Finning for the Technology. Nothing in this paragraph shall be interpreted to mean that Finning has any obligation to participate or support in any way in the defence or opposition to any claim that may be made by any person against the Technology and/or against Davis in respect of his rights in the Technology. The parties agree to share  equally in the cost of protecting the intellectual property included in the Product Line, and to  consult with each other to formulate a plan and effect the optimal protection at reasonable expense.

- 6 -

7.    **Tax Efficiency:**  Finning and Davis and their representatives will work cooperatively together to structure this strategic alliance and the related agreements in as tax efficient manner as is reasonably and lawfully possible.

8.    **Term:**   The term of the Agreement (including renewal rights) will be set out in the formal agreement.

9.    **Closing:**  The Agreement will be executed on or before July 15, 2002. If the parties have not executed the Agreement on or before July 15, 2002, this Letter of Intent, without any further action on the part of either party, shall terminate and be of no further force or effect.

10.    **Currency:** All funds referred to in this letter are United States dollars.

Please confirm your acceptance of the above terms and principles by signing a duplicate of this letter in the space provided below.

Yours very truly,

FINNING INTERNATIONAL INC.

By: _____          Date: _June 18/02_

  Chris Hayman, Controller

By: _____          Date: _June 18/02_  —

  Andy Fraser, Vice President, Operations
  and Customer Relations


DANIEL E. DAVIS

_____          Date:_____

# DISTRIBUTOR AGREEMENT

**THIS DISTRIBUTOR AGREEMENT** dated July 15 2002, is made between **DANIEL E. DAVIS,** businessperson having an address at P.O. Box 2427, Harlingen, Texas, 78551, USA ("Davis") and **FINNING INTERNATIONAL INC.,** a corporation incorporated under the laws of Canada, having an address at 16830 – 107th Avenue, Edmonton, Alberta, T5P 4C3, Canada ("Finning").

**WHEREAS:**

A.          Davis had developed and owns the Technology (defined below) regarding the special assembly of the Product Lines (defined below);

B.          Finning, either directly or indirectly through its affiliates and subsidiaries, has the infrastructure to sell and distribute the Distributed Products (defined below) to end-user customers;

C.          Davis and Finning entered into a Letter of Intent dated June 18, 2002, regarding the grant by Davis to Finning of exclusive distribution rights to the Product Lines using the Technology and other related matters (the "**LOI**"); and

D.          Davis and Finning now wish to enter into this Agreement to supersede and replace the LOI;

**NOW, THEREFORE THIS AGREEMENT WITNESS** that in consideration of the premises, mutual covenants and agreements contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is acknowledged by the parties hereto (the "**Parties**"), the Parties covenant and agree as follows:

1.          **INTERPRETATION**

1.1          **Definitions:** As used in this Agreement, the term:

"**Agreement,**" "**this Agreement,**" "**the Agreement,**" "**hereto,**" "**herein,**" "**hereby,**" "**hereunder**" and similar expressions mean or refer to this Agreement as amended from time to time and any indenture, agreement or instrument supplemental or ancillary hereto and the expressions "Article," "Section" and "Schedule" followed by a number or letter mean and refer to the specified Article, Section or Schedule of this Agreement;

"**Assignment of Royalties**" has the meaning ascribed thereto in Section 6.7(c);

"**Books and Records**" means, with respect to each Party, the books and records of that Party relating to the Distributed Products and costs associated therewith, including financial, operations and sales books, books of account, sales and purchase records, lists of customers, business reports and plans;

"**Business Day**" means any day, other than a Saturday, Sunday or a statutory holiday anywhere in Canada or the United States of America;

"**Claim**" means any claim, demand, action, cause of action, damage, loss, costs, liability or expense, including reasonable professional fees and all costs incurred in investigating or pursuing any of the foregoing or any proceeding relating to any of the foregoing;

- 1 -


Exhibit 2

"**Confidential Information**" means all information provided by one Party (the "**Disclosing Party**") to the other Party (the "**Receiving Party**") in connection with this Agreement and includes, but is not limited to, specifications, designs, drawings, sketches, models, test results, current and forecasted data, reports, records, discoveries, ideas, inventions, concepts, techniques, methods, source code, project code, source listings, program listings, documentation, diagrams, flow charts, research and development data, processes, procedures, formulas, know how, marketing techniques, customer and supplier lists and other proprietary rights, communicated in any medium. Confidential Information also includes the existence of any terms of the LOI and this Agreement. Confidential Information does not include information that:

(i)    is already known to the Receiving Party from a source which is not prohibited from disclosure as evidenced by written or other dated tangible records;

(ii)   is in the public domain at the time it is disclosed or becomes publicly available after disclosure, other than by breach of this Agreement;

(iii)  is independently and lawfully developed by the Receiving Party completely without reference to the Confidential Information, or with respect to Finning, the Technology, as evidenced by written or other tangible records; or

(iv)   is disclosed without restriction to the Receiving Party in good faith by a third party (other than Caterpillar or its affiliates) who is in lawful possession of the information and who has the right to make the disclosure, or is disclosed by the Receiving Party after receiving written approval from the Disclosing Party;

"**Davis Costs**" means the actual costs paid by Davis to his suppliers and employees for the Minor Components and the assembly of the Major and Minor Components as evidenced by the Books and Records of Davis;

"**Davis Insolvency Event**" has the meaning ascribed thereto in Section 7.1(c);

"**Davis Payment**" has the meaning ascribed thereto in Section 5.5(b);

"**Distributed Products**" means Product Lines manufactured and assembled using, containing or incorporating the Technology;

"**Distribution and Licensing Fee**" has the meaning ascribed thereto in Section 5.1 ;

"**Due Diligence Completion Date**" has the meaning ascribed thereto in Article 15 ;

"**Encumbrance**" has the meaning ascribed thereto in Section 7.1(e);

"**Estimated Manufacturing Overhead Costs**" has the meaning ascribed thereto in Section 5.3;

"**Estimated Production Quantity**" has the meaning ascribed thereto in Section 5.3;

"**Event of Default**" means the breach by a Party of any covenant, representation or warranty made by that Party under this Agreement or the Security Documents, or the failure of that Party to perform any of his or its obligations under this Agreement or the Security Documents;

"**Facility**" has the meaning ascribed thereto in Section 3.1;

- 2 -

"**Facility Loan**" has the meaning ascribed thereto in Section 6.1;

"**Favelle Licence**" means the non-exclusive licence granted by Davis to Favelle Favco Cranes (USA) Inc. relating to U.S. Patent No. 6,003,252;

"**Fee Refund**" has the meaning ascribed thereto in Section 5.1;

"**Finning Costs**" means the actual costs paid by Finning to its suppliers, as evidenced by the Books and Records of Finning, for the Major Components;

"**Finning Insolvency Event**" has the meaning ascribed thereto in Section 7.2(c);

"**Force Majeure**" means an event or circumstances that is beyond the reasonable control of a Party and that prevents or delays that Party in the performance or observance of any of, or all, its obligations under of this Agreement, including without limitation, acts or omissions of the other or a third party, acts of civil of military authority, strikes, lockouts, embargoes, insurrections or acts of God;

"**Governmental Authorities**" means any government, regulatory authority, governmental department, agency, commission, board, tribunal, or court or other law, rule or regulation-making entity having or purporting to have jurisdiction on behalf of any nation, state or other subdivision of this Agreement or any municipality, district or other subdivision of this Agreement;

"**Gross Margin**" has the meaning ascribed thereto in Section 5.5;

"**Initial Term**" has the meaning ascribed thereto in Section 2.3;

"**Intellectual Property Rights**" will include all intangible, intellectual, proprietary and industrial property rights of any nature and all intangible embodiments and derivative works thereof, including without limitation, (i) all trade-marks, trade names, slogans, domain names, URLs or logos; (ii) all copyrights, moral rights and other rights in works of authorship; (iii) all patents and patent applications, patentable ideas, algorithms, developments, discoveries, inventions, improvements, innovations; (iv) all know-how and trade secrets; and (v) all registrations, applications, renewals, extensions, continuations, divisions or reissues thereof now or hereafter in force (including any rights in any of the foregoing);

"**Landed Dealer Cost**" means the sum of the Product Cost, Running Royalty and unrecovered freight and transportation costs applicable to each Distributed Product, including without limitation shipping, delivery, transportation and insurance costs pursuant to Sections 4.2 and 4.3;

"**Laws**" means all applicable laws, by-laws, rules, regulations, orders, ordinances, and judgements or other requirements of any Governmental Authority that in each case, have legally binding effect;

"**LIBOR**" means the London InterBank Offered Rate as published by the British Bankers' Association from time to time;

"**LOI**" has the meaning ascribed thereto in Recital C;

"**Major Components**" means, with respect to each Distributed Product, all significant physical parts for the Distributed Products that are purchased by Finning;

"**Manufacturing Overhead Costs**" means Davis' reasonable overhead and administration costs pertaining to the manufacture or assembly of the Distributed Products, including without limitation,

- 3 -

utilities, costing, engineering services, insurance, interest, drafting and accounting services, but will not include capital costs;

"**Marketing Fee**" has the meaning ascribed thereto in Section 5.5(a);

"**Minor Components**" means all necessary parts, equipment and services other than the Major Components, necessary to transform the Major Components into Distributed Products and to deliver such Distributed Products to Finning or its customers, and will include without limitation, labour, insurance, warranty allowances and transportation costs, but will not include any costs comprising Manufacturing Overhead Costs;

"**Mortgage**" has the meaning ascribed thereto in Section 6.7(b);

"**Notice**" means a notice given in the manner required by Section 16.7 of this Agreement;

"**Per Unit EMOC**" has the meaning ascribed thereto in Section 5.3;

"**Period**" has the meaning ascribed thereto in Section 5.3;

"**Person**" means an individual, corporation, partnership, venture, association, unincorporated organization, other entity or group, or Governmental Authority;

"**Product Lines**" means telehandler all-terrain cranes, lattice and telescopic boomed crawler cranes, excavator based pipelayers and related equipment or products, and includes any current or future similar products, but specifically excludes any marine or offshore products;

"**Product Cost**" means the sum of the Finning Costs, Davis Costs and the Manufacturing Overhead Costs applicable to each Distributed Product, or the analogous calculation for any Replacement Product;

"**Referral**" has the meaning ascribed thereto in Section 2.2;

"**Referral Commission**" has the meaning ascribed thereto in Section 5.6;

"**Renewal Term**" has the meaning ascribed thereto in Section 2.3;

"**Replacement Product**" means any product sold by Finning, anywhere other than in Canada, England and Chile, in place of a Distributed Product to a Person referred by Davis or his agent to Finning;

"**Returned Product**" has the meaning ascribed thereto in Section 5.7;

"**Running Royalty**" has the meaning ascribed thereto in Section 5.4;

"**Sale Price**" has the meaning ascribed thereto in Section 5.5;

"**Security Agreement**" has the meaning ascribed thereto in Section 6.7(a);

"**Security Documents**" has the meaning ascribed thereto in Section 6.7(c);

"**Specifications**" means, with respect to any Distributed Product, any specifications provided by or to Davis, to or by the manufacturer of any Major Components or Minor Components related to that Distributed Product;

- 4 -

"**Technology**" means all of the property and proprietary know-how, including any patents, patent applications, drawings (including assembly drawings), copyrights and other intellectual property rights used by Davis in relation to the special assembly of the Product Lines, including without limitation the items described in the attached Schedule B and any present or future improvements or enhancements thereto; and

"**Term**" means the Initial Term and any Renewal Terms described in Section 2.3.

**1.2**     **Schedules:**   The following Schedules are incorporated into and form part of this Agreement:

| Schedule | | Description |
|---|---|---|
| Schedule A | - | Product Cost Summary |
| Schedule B | - | Technology |
| Schedule C | - | Davis' Warranty on Distributed Products |

**1.3**          **Division, Headings:**   The division of this Agreement into Articles, Sections and Subsections and the insertion of headings are for convenience of reference only and will not affect the construction or interpretation of this Agreement.

**1.4**          **Gender and Number:**   Unless the context otherwise requires, words importing the singular include the plural and vice versa and words importing gender include all genders.

**1.5**          **Invalidity of Provisions:**   The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of any other provision of this Agreement and any such invalid or unenforceable provisions will be deemed to be severable. If any provision is declared to be invalid or unenforceable, the Parties agree to meet within thirty (30) days after any declaration of invalidity to renegotiate in good faith a valid amendment of the Agreement representing, as much as reasonably possible, the original intentions of the Parties.

**1.6**          **Currency:**   Unless otherwise stated, all amounts in this Agreement are stated in United States' Dollars (US$).

**1.7**          **Accounting Principles:**   In the absence of a specific provision in of this Agreement providing otherwise (expressly or by implication), financial or accounting determinations and calculations will be made in accordance with generally accepted accounting principles applicable in the United States.

**1.8**          **Calculation of Time:**   Unless otherwise specified, time periods within or following which any act is to be done will be calculated by excluding the day on which the period commences and including the day on which the period ends.

**1.9**          **Business Day:**   In the event that any action to be taken under this agreement falls on a day that is not a Business Day, then such action will be taken on the next succeeding Business Day.

**1.10**          **Inclusion:**   Where the words "including" or "includes" appear in of this Agreement, they mean "including (or includes) without limitation".

- 5 -

**1.11**      **Governing Law:** This Agreement will be governed by and interpreted and construed in accordance with the laws in force in the State of Texas USA.

**2.**      **DISTRIBUTORSHIP AND TERM**

**2.1**      **Grant of Distributorship:** Subject to Sections 2.2, 5.1, Article 15 and the Favelle Licence, Davis hereby grants to Finning the exclusive right to market, distribute and sell the Distributed Products throughout the world, and Finning hereby agrees to act as the exclusive distributor of Davis with respect to the Distributed Products, in accordance with the terms and conditions set forth in of this Agreement.

**2.2**      **Reservation of Rights / Referrals:** Notwithstanding Section 2.1, Davis may, by himself or through his agents, market the Distributed Products throughout the world. Davis or his agents will refer to Finning all prospective distributions and sales of Distributed Products that Davis or his agents solicit or procure (each, a **"Referral"**). Davis or his agents will prepare all sales orders and sales documents required by Finning in order for Finning to complete a sale from a Referral. Finning will use reasonable commercial efforts to complete all possible sales of Distributed Products from each Referral. Notwithstanding the foregoing, Davis will not, by himself or through his agents, conclude any sale for any Distributed Product, hold himself out as an agent of Finning, purport to have authority to bind Finning contractually or otherwise, or actually have authority to bind Finning contractually or otherwise. In consideration of Davis or his agents making Referrals, Finning will pay Davis the Referral Commission in accordance with Section 5.6.

**2.3**      **Term:** This Agreement will commence on the day and year first above written and will subsist for an initial term of 10 years (the **"Initial Term"**). Upon the expiry of the Initial Term or any Renewal Term, this Agreement will automatically renew for successive 5 year terms (each, a **"Renewal Term"**) unless either Party delivers to the other Party written Notice of non-renewal not less than 60 days prior to the expiry of then current Initial Term or Renewal Term, as applicable. This Agreement will not be terminated except as provided in Articles 12 and 15.

**3.**      **PRODUCTION OF DISTRIBUTED PRODUCTS**

**3.1**      **Facility:** Davis will build as soon as reasonably practicable or acquire the Tex-Steel facility located in Harlingen, Texas not later than August 12, 2002, or another manufacturing facility as soon as reasonably practicable (the "Facility") capable of accommodating in an efficient and effective manner:

>      (a)      the manufacture and assembly of the Distributed Products by Davis in a quantity sufficient to meet the projected demand of the parties and the quality control requirements mandated by manufacturers and suppliers of the Major Components;

>      (b)      the performance by Davis of ongoing testing and quality assurance of the Distributed Products; and

>      (c)      the researching further developments and improvements to the Technology, the Distributed Products and related technology and products.

**3.2**      **Supply of Major Components:** Finning will purchase for its own account and deliver to Davis, FOB Harlingen, Cameron County, Texas, all Major Components from Caterpillar or other suppliers as may be mutually agreed between the Parties from time to time, for use in the manufacture

and assembly of the Distributed Products by Davis. The Parties will cooperate and use reasonable commercial efforts to assist Finning in obtaining the Major Components at the lowest price possible, using the targeted amounts described in the attached Schedule A as a guide. Finning will coordinate with Davis the purchase and delivery of the Major Components in accordance with Article 4. As between the Parties, Davis will be the original equipment manufacturer of record for the Distributed Products.

**3.3**        **Supply of Minor Components:**  Davis will purchase or provide for its own account all Minor Components at the lowest possible price obtainable by Davis though reasonable commercial efforts, using the amounts described in the attached Schedule A as a guide. Davis will coordinate with Finning the purchase and provision of the Minor Components in accordance with Article 4.

**3.4**        **Minimizing Costs:**  The Parties will periodically review the Product Costs and will cooperate and use reasonable commercial efforts to minimize the Product Costs and to obtain the most cost effective method of manufacturing and assembling the Distributed Products.

**3.5**        **Manufacturing and Assembly:**  Subject to Article 4, upon receipt of Major Components from Finning or its suppliers, Davis will manufacture and assemble the Distributed Products to which the Major Components pertain. Davis will manufacture and assemble the Distributed Products in a prompt, timely and efficient manner and will produce such Distributed Products to meet Finning's demand for the same, provided that Davis will have no obligation to manufacture and assemble any Distributed Product unless and until Finning, or its suppliers, have delivered to Davis the Major Components for that Distributed Product.

**3.6**        **Title and Risk of Loss:**  Title to all Major Components and Distributed Products will at all times remain with Finning, its suppliers or its customers. Risk of loss to all Major Components will pass to Davis upon Finning or its suppliers delivering the Major Components to Davis and will remain with Davis until the Major Components are either:

(a)        manufactured and assembled into Distributed Products and such Distributed Products are delivered by Davis to Finning or Finning's customers in accordance with Article 4; or

(b)        the Major Components are returned to Finning or its suppliers on such terms as the Parties may agree from time to time.

Davis will purchase and maintain throughout the Term such insurance to protect against risk of loss to the Major Components and the Distributed Products as Finning may reasonably require from time to time. All insurance coverage that Finning requires Davis to maintain will be carried with insurer(s) reasonably acceptable to Finning. Davis will submit policies and/or certificates of insurance evidencing the required insurance coverage (which will include an agreement by the insurer not to cancel or alter its coverage except upon thirty (30) days prior written Notice to Finning) to Finning for its approval before entering into performance of this Agreement. The insurance coverage secured by Davis under this Agreement will be primary and non-contributing with any similar insurance that may be maintained or provided by Finning, and any certificate furnished by Davis will be endorsed to so state.

**3.7**        **Pricing:**  The Parties periodically will consult with each other to establish a range of prices at which Finning will endeavour to sell the Distributed Products having regard to applicable market conditions and geographic locations. Finning will consult with Davis before selling any Distributed Product at a price outside the previously agreed upon price range for that Distributed Product. Notwithstanding the foregoing, Finning will, in its sole discretion after considering Davis' advice, finally

- 7 -

determine the price at which it sells any Distributed Product, provided however, that Finning will endeavour to maximize the Sale Price for all Distributed Products.

**4.**          **ORDERS AND DELIVERY OF DISTRIBUTED PRODUCTS**

**4.1**          **Orders for Distributed Products:**  Finning will, from time to time, deliver to Davis written orders for Distributed Products, specifying the type and quantity of Distributed Products ordered, the Person and location to which the Distributed Products are to be delivered upon completion, the required delivery date for the Distributed Products, and such other details reasonably required to process and fulfil such an order.  Upon Finning delivering an order to Davis for Distributed Products, Finning will arrange for all Major Components related to that order to be delivered to Davis at the Facility.  Upon receipt of such Major Components by Davis at the Facility, Davis will manufacture and assemble the Distributed Products specified in that order in accordance with that order and will promptly notify Finning upon the completion of the Distributed Products.

**4.2**          **Delivery of Distributed Product:**  At Finning's cost, Davis will deliver completed Distributed Products to the Person, at the location and on the date specified by Finning in each order, provided however, that the specified delivery date will not be less than 60 calendar days from the date on which the Major Components related to that order were delivered to Davis at the Facility. The Parties will cooperate and coordinate the order and delivery of Distributed Products, Major Components and Minor Components in order to efficiently fulfil Finning's demand for Distributed Products in a timely and cost-effective manner.

**4.3**          **Transportation, Insurance and Shipping Documents:** At Finning's cost, Davis will be responsible for arranging all transportation for Distributed Products from the Facility to the delivery location specified in each order and will also procure insurance for the Distributed Products against the risks of transportation with a well-rated insurance company approved by Finning acting reasonably. Davis will be responsible for preparing or causing to be prepared all documents and invoices necessary for transportation of the Distributed Products.

**5.**          **PAYMENTS**

**5.1**          **Distribution and Licensing Fee:**  Upon Finning's obligations under this Section 5.1 commencing and becoming of full force and effect pursuant to Article 15, and in consideration of Davis granting Finning the rights in Section 2.1, Finning will pay Davis US$1,500,000 (the "**Distribution and Licensing Fee**") by initiating a wire transfer of the Distribution and Licensing Fee to an account specified by Davis.  Davis will refund one third of the Distribution and Licensing Fee (US$500,000) to Finning by Davis directing Finning to retain 50% of the Running Royalty in accordance with Section 5.4 (the "**Fee Refund**").  Davis will use a portion of the Distribution and Licensing Fee to protect the Technology for the benefit of Finning and to further develop the Technology and the Distributed Products.

**5.2**          **Davis Costs:**  Finning will pay Davis the Davis Costs applicable to each Distributed Product within 15 Business Days of Davis advising Finning that the Distributed Product is fully manufactured and assembled in accordance with this Agreement, conforms to the Specifications and is ready to be shipped to a customer. In the event Davis does not have sufficient operating capital to finance the Davis Costs, upon the request of Davis, Finning will consider advancing funds to Davis for this purpose upon such terms as the Parties may from time to time agree, provided that nothing in this Section 5.2 will be construed as requiring Finning to advance any funds to Davis.

- 8 -

**5.3**        **Manufacturing Overhead Costs:**  Before the start of each calendar quarter during the Term or before the start of such other period of time as the Parties may agree (each, a "**Period**"), the Parties will agree upon the estimated Manufacturing Overhead Costs for that Period (the "**Estimated Manufacturing Overhead Costs**") together with the estimated number of Distributed Products to be manufactured and assembled by Davis during that Period (the "**Estimated Production Quantity**"). Each time Finning orders a Distributed Product, Finning will pay Davis the Estimated Manufacturing Overhead Costs divided by the Estimated Production Quantity (the "**Per Unit EMOC**"). As soon as reasonably practicable after the end of each Period, the Parties will calculate the actual Manufacturing Overhead Costs for that Period. The Parties will adjust the Per Unit EMOC for each Period up or down by the amount by which the aggregate Per Unit EMOC paid by Finning to Davis during the immediately previous Period is less than or exceeds the actual Manufacturing Overhead Costs for that Period, respectively. It is the intention of the Parties that the Per Unit EMOC will be adjusted each Period pursuant to this Section 5.3 so that the aggregate Per Unit EMOC paid by Finning to Davis throughout the Term is equal to the aggregate Manufacturing Overhead Costs throughout the Term, on a Period by Period basis.

**5.4**        **Running Royalty:**  Within 10 Business Days of Finning receiving the Sale Price in full from a customer with respect to the initial sale of a Distributed Product, Finning will pay Davis a running royalty equal to six percent (6%) of the Product Cost for that Distributed Product (the "**Running Royalty**"). Notwithstanding the foregoing, Davis irrevocably directs Finning to withhold 50% of the Running Royalty and credit it towards the Fee Refund until Davis has paid Finning the Fee Refund in full totalling $500,000. For greater certainty, the Parties agree that Davis will only receive a Running Royalty with respect to the first sale of each particular Distributed Product to a customer, and will not be entitled to, and Finning will not pay Davis, any Running Royalty with respect to the resale or any subsequent sale of that particular Distributed Product by the customer, Finning or any other Person, whether or not that particular Distributed Product becomes a Returned Product.

**5.5**        **Marketing Fee:**  To the extent that the price for which Finning sells a Distributed Product to a customer (the "**Sale Price**") exceeds the Landed Dealer Cost for that Distributed Product (the difference being the "**Gross Margin**"):

(a)        Finning will retain that portion of the Gross Margin up to an amount equal to 20% of the Sale Price (the "**Marketing Fee**"); and

(b)        Finning will pay Davis within 15 Business Days of Finning receiving the Sale Price in full from the customer, 75% of any portion of the Gross Margin remaining after Finning has retained the Marketing Fee (the "**Davis Payment**"). At any and all times while there is an outstanding balance under the Facility Loan, Davis hereby irrevocably directs Finning to retain 60% of the Davis Payment owing by Finning to Davis in accordance with this Section 5.5 and apply such amount to payment by Davis of the Facility Loan until the Facility Loan is repaid in full.

**5.6**        **Referral Commission:**  In addition to other amounts contemplated in this Agreement, Finning will pay Davis a referral commission equal to 5% of the Sales Price for each Distributed Product or Replacement Product sold by Finning arising from a Referral within 6 months of Davis making the Referral, provided that all such sales must arise independent from any pre-existing relationship that any such customer had with Finning, as evidenced in Finning's Books and Records, for each product in the Product Lines (the "**Referral Commission**"). In order for Davis to be eligible for a Referral Commission with respect to any Distributed Product, Davis or his marketing agents must complete and deliver to Finning the sales order and all other sales documents required by Finning to finalise the sale of that

- 9 -

Distributed Product. Finning will pay Davis the Referral Commission applicable to each Distributed Product sold within 15 Business Days of Finning rendering an invoice to the customer with respect to that Distributed Product.

**5.7**  **Reversal of Sales:** Notwithstanding any other provision of this Agreement, if a customer reverses the purchase of a Distributed Product from Finning and returns that Distributed Product to Finning or its agents (each, a "**Returned Product**"), Davis will not be entitled to the Referral Commission, if applicable, with respect to that Returned Product. If Finning has paid Davis the Referral Commission with respect to a Returned Product, Davis will refund the Referral Commission so paid by Finning with respect to that Returned Product within 15 Business Days of Finning advising Davis that the customer has returned that Returned Product, by either paying Finning such Referral Commission or by issuing Finning a credit equal to the amount of such Referral Commission, as Finning may direct in its discretion.

**6.**  **FINNING FINANCING**

**6.1**  **Facility Loan:** Finning will make available to Davis, and Davis will borrow from Finning, up to the principal amount of US$1,500,000 (the "**Facility Loan**"), upon the terms and conditions set out in this Agreement. The Facility Loan will not bear interest from the date of advance until July 15, 2007. The Facility Loan will bear interest after July 15, 2007 in accordance with Section 6.5.

**6.2**  **Purpose:** Davis will use the Facility Loan exclusively for the purposes of building, acquiring or equipping the Facility and for no other purpose.

**6.3**  **Advance of Funds:** Davis may draw against the Facility Loan and Finning will advance Davis funds under the Facility Loan only in accordance with the provisions of Article 6. Each time Davis wishes to draw against the Facility Loan, he will make a request to Finning in writing specifying the amount and the date on which he wishes Finning to advance him funds under the Facility Loan, which date will not be less than 15 Business Days after the date on which Davis delivers the request to Finning. Concurrently with Finning making any advance under the Facility Loan, Davis will execute such documents as Finning may reasonably require to evidence the portion of the Facility Loan to be advanced. Notwithstanding the foregoing, Finning will not be required to advance Davis funds under the Facility Loan if:

(a)  Davis has not executed and delivered to Finning the Security Documents in accordance with Section 6.7;

(b)  Davis has committed an Event of Default;

(c)  in the reasonable opinion of Finning, there has been any material adverse change in the business, assets or financial condition of Davis; or

(d)  there is any action, proceeding or investigation pending or threatened against Davis, which would in the reasonable opinion of Finning, if successful, have a material adverse effect on Davis' ability to repay the Facility Loan under the terms of this Agreement.

**6.4**  **Acknowledgement of Previous Advance:** Davis acknowledges that Finning previously advanced Davis US$100,000 on June 18, 2002, pursuant to the LOI. Davis agrees that this US$100,000

- 10 -

will be deemed to be an advance under the Facility Loan and will be subject to the provisions of this Agreement.

**6.5**          **Repayment of Facility Loan:**  Subject to Sections 5.5, 6.6, 11.1, 12.1 and Article 15, the outstanding balance of the Facility Loan will become immediately due and payable, and Davis will pay Finning the outstanding balance of the Facility Loan in full, on or before July 15, 2007; and if the Facility Loan is not paid to Finning in full on or before July 15, 2007, then interest will accrue at an interest rate equal to LIBOR + 5% on the outstanding balance of the Facility Loan from July 15, 2007 until the Facility Loan and interest are paid in full.

**6.6**          **Prepayment:**  Notwithstanding Section 6.5, Davis may at any time repay Finning the whole or from time to time any part of the outstanding balance of the Facility Loan without notice, bonus or penalty.  Any payments so received by Finning will be applied firstly to any accrued and unpaid interest, and secondly to the unpaid balance of the principal then outstanding.

**6.7**          **Security:**  As security for repayment of the Facility Loan, Finning will, as soon as reasonably practicable after the date of this Agreement, deliver to Davis for his approval the documents listed in this Section 6.7, and upon such approval, Davis will:

(a)      execute and deliver to Finning a security agreement (the **"Security Agreement"**) granting Finning a first charge security interest over:

(i)      all of Davis' equipment and tooling to be purchased with the proceeds of the Facility Loan; and

(ii)      the Technology (and Finning acknowledges that the Technology, by its definition, does not relate to the special assembly of any marine or offshore products);

in a form acceptable to Finning, provided that the security interest granted to Finning in the Technology will be subject to an ongoing automatic right of reversion in favour of Davis for a period of 10 years commencing from the date of the Security Agreement.  If at any time during this 10 year period Davis pays Finning in full the outstanding balance of the Facility Loan (including all accrued interest thereon, if any), the ownership of the Technology will automatically revert to Davis.  Finning agrees to execute such documents and take further steps as may be reasonably required to perfect this reversion of ownership at that time;

(b)      immediately upon the later of Davis acquiring the Facility or executing this Agreement, Davis will execute and deliver to Finning a mortgage, in a registrable form acceptable to Finning, together with all other related documents Finning determines are necessary for registering the same, granting Finning a first mortgage over the Facility (the **"Mortgage"**); and

(c)      execute and deliver to Finning a collateral assignment of all royalties and income to be derived by Davis from the Technology or the Distributed Products, in a form acceptable to Finning (the **"Assignment of Royalties"**, together with the Security Agreement and Mortgage, the **"Security Documents"**).

- 11 -

**6.8**     **Compliance with Finning's Policies:** Davis will comply promptly with any and all reasonable policies and other guidelines of Finning with respect to Distributed Products of which Finning will give Davis upon execution of this Agreement.

**6.9**     **Initial Advance of Funds:** The Parties will use reasonable commercial efforts to complete and execute the Security Documents as soon as reasonably practicable, but in any event not later than August 1, 2002. Subject to Section 6.3, Finning will advance US$750,000 under the Facility Loan to Davis by initiating a wire transfer of such funds to an account specified by Davis not later than August 1, 2002.

**7.**     **REPRESENTATIONS, WARRANTIES AND COVENANTS**

**7.1**     **Davis Representations, Warranties and Covenants:** Davis represents, warrants and covenants to and with Finning, with the intention that Finning is relying upon these representations, warranties and covenants in entering into this Agreement, that except as otherwise expressly provided for in this Agreement, now and at all times throughout the Term:

    (a)     Davis has the requisite power, authority and approvals to enter into, execute and deliver this Agreement, the Security Documents and to perform his respective obligations under this Agreement and the Security Documents;

    (b)     the execution and delivery of this Agreement and the Security Documents and the performance by Davis of his obligations under this Agreement and the Security Documents will not conflict with or constitute a breach of or default under any outstanding contract, commitment or agreement to which Davis is a party or to which the Technology or Distributed Products are subject, or limit, restrict or impair the rights granted to Finning under this Agreement and the Security Documents;

    (c)     Davis is not bankrupt or insolvent, no receiver, receiver-manager, receiver and manager, or liquidator has been appointed over any part of the property of Davis, no proceeding has been commenced by or against Davis under any bankruptcy, arrangement, reorganization, dissolution, liquidation, insolvency or similar law for the relief of or otherwise affecting creditors of Davis, or by or against any guarantor or surety for Davis, and no writ of execution, warrant, attachment, sequestration, levy, third party demand, notice of intention to enforce security or garnishment or similar process has been issued against Davis or any of Davis' property (each, a **"Davis Insolvency Event"**);

    (d)     Davis is not aware of any basis for a Davis Insolvency Event to occur;

    (e)     Davis is the sole and exclusive legal and beneficial owner of the Technology, free and clear of all mortgages, assignments of rents, leases, licenses, charges, security interests, hypothecs, liens, options to acquire any interest in, claims, judgments or any other form of encumbrance (each, an **"Encumbrance"**) other than the Favelle Licence and any security or rights granted to Finning pursuant to this Agreement;

    (f)     other than the Favelle Licence, Davis has not granted and no third party has any rights or anything capable of becoming a right, to use the Technology or to distribute, market or sell the Distributed Products;

- 12 -

(g)     to the best of Davis' knowledge after making due enquiry, the Technology does not infringe any Intellectual Property Rights of any Person;

(h)     upon executing and delivering the Mortgage in accordance with Section 6.7, Davis will be the registered and beneficial owner of the Facility, free and clear of all financial Encumbrances other than the Mortgage;

(i)     the Major Components, Minor Components and Technology, together with Davis' skills and all drawings, specifications, engineering and related materials in his possession, are sufficient to enable him to manufacture or assemble the Distributed Products in a safe and competent manner;

(j)     all Distributed Products will be manufactured and assembled by Davis in a prompt, efficient, skilful and careful manner in accordance with North American industry standards for the manufacture and assembly of similar equipment, and in compliance with all applicable Laws;

(k)     upon being delivered by Davis to Finning or its customers in accordance with Article 4, all Distributed Products will conform to the Specifications, will be new (except to the extent that the Major Components, when delivered to Davis by Finning, are not new), of merchantable quality and will be fit for their intended purpose;

(l)     Davis will only use the Technology for the purposes of manufacturing and assembling the Product Lines;

(m)     Davis will not grant any license or other rights in the Technology for the Product Lines to any Person without Finning's prior written consent;

(n)     Davis will not permit any Encumbrance to exist on any of its property or assets, including the Facility, Technology and Minor Components, except as expressly contemplated in this Agreement or as otherwise approved by Finning in writing; and

(o)     Davis will obtain and maintain in full force and effect throughout the Term, at its own expense, any and all permits, approvals and licenses required by any Governmental Authorities relating to the manufacture and assembly of the Distributed Products at the Facility.

7.2     **Finning Representations, Warranties and Covenants**: Finning represents, warrants and covenants to and with Davis, with the intention that Davis is relying upon these representations, warranties and covenants in entering into this Agreement, that except as otherwise expressly provided for in this Agreement, now and at all times throughout the Term:

(a)     Finning has the requisite power, authority and approvals to enter into, execute and deliver this Agreement and to perform its respective obligations under this Agreement;

(b)     the execution and delivery of this Agreement and the performance by Finning of its obligations under this Agreement will not conflict with or constitute a breach of or default under any outstanding contract, commitment or agreement to which Finning is a party, or limit, restrict or impair the rights granted to Davis under this Agreement;

- 13 -

(c)    Finning is not bankrupt or insolvent, no receiver, receiver-manager, receiver and manager, or liquidator has been appointed over any part of the property of Finning, no proceeding has been commenced by or against Finning under any bankruptcy, arrangement, reorganization, dissolution, liquidation, insolvency or similar law for the relief of or otherwise affecting creditors of Finning, or by or against any guarantor or surety for Finning, and no writ of execution, warrant, attachment, sequestration, levy, third party demand, notice of intention to enforce security or garnishment or similar process has been issued against Finning or any of Finning's property (each, a "**Finning Insolvency Event**");

(d)    Finning is not aware of any basis for a Finning Insolvency Event to occur;

(e)    Finning will not grant any rights in this Agreement to any Person without Davis' prior written consent;

(f)    Finning will not permit any Encumbrance to exist on or with respect to this Agreement;

(g)    Finning will obtain and maintain in full force and effect throughout the Term, at its own expense, any and all permits, approvals and licenses required by any Governmental Authorities relating to the sale or distribution of the Distributed Products;

(h)    Subject to Sections 6.7, 12.1 and the Security Documents, Finning acknowledges that Davis is the sole and exclusive owner of the Technology and that Finning will not challenge, in any forum, Davis' right of ownership over the Technology;

(i)    Any improvement or enhancement to the Technology will be the sole and exclusive property of Davis;

(j)    Finning will use reasonable commercial efforts to complete the sale for all referrals received from Davis or his agent; and

(k)    Finning will use reasonable commercial efforts to market and sell the Distributed Products within the Product Lines throughout the world.

**8.        DISTRIBUTED PRODUCT WARRANTIES**

The Parties will cooperate and use reasonable commercial efforts to cause all warranties offered by manufacturers of the Major Components to be passed on to and for the benefit of Finning's end-use customers. Davis will, at its own expense, provide or cause DAVCRANE Inc. to provide, all customers who purchase a Distributed Product through Finning with a warranty that the manufacturing and assembling performed by Davis will be free from defects in accordance with the provisions in the attached Schedule C.

**9.        CONFIDENTIALITY**

**9.1        Confidentiality:** Unless otherwise agreed upon in writing between the Parties or as required by law or stock exchange requirements, a Receiving Party will keep all Confidential Information which is disclosed to it by a Disclosing Party under this Agreement confidential and will not disclose the Confidential Information to any third party. The Receiving Party will not reproduce any Confidential Information supplied to it in any form except as required to accomplish the purpose of and in accordance with the terms of this Agreement. The Receiving Party will provide the same care to avoid disclosure or

- 14 -

unauthorized use of Confidential Information as it provides to protect its own similar proprietary information but in no event will the Receiving Party fail to use reasonable commercial efforts and take reasonable care under the circumstances to avoid disclosure or unauthorized use of Confidential Information. Confidential Information, unless otherwise specified in writing: (a) will remain the property of the Disclosing Party; (b) will be used by the Receiving Party only for the purposes of any work under this Agreement; and (c) which is in tangible form, including all copies of such information, will be returned to the Disclosing Party or destroyed (as the Disclosing Party may direct) after the Receiving Party's need for it has expired or upon request of the Disclosing Party, and, in any event, upon termination or expiry of this Agreement.

9.2         **Disclosure Required By Law:**    The Receiving Party will not be in breach of its obligation not to disclose Confidential Information of the Disclosing Party if that disclosure is required by law, a court order or a stock exchange having authority over the Receiving Party, provided that the Receiving Party gives the Disclosing Party as much Notice as is reasonably in the circumstances prior to disclosing any Confidential Information and the Receiving Party co-operates with the Disclosing Party in any application, proceedings or other action the Disclosing Party may undertake to obtain a protective order or other means of protecting the confidentiality of the Confidential Information required to be disclosed.

## 10.        **INTELLECTUAL PROPERTY RIGHTS**

10.1         **Protection of Intellectual Property Rights:**    Davis will obtain patent and other Intellectual Property Rights' registrations and protections in each additional country as reasonably requested by Finning for the Technology. The Parties agree to share equally in the cost of expanding protection of the Intellectual Property Rights included in the Distributed Products in additional countries, and to consult with each other to formulate a plan and effect the optimal protection at reasonable expense. Nothing in this paragraph will be interpreted to require Finning to participate, support or financially contribute in any way in or to the defence or opposition to any Claim that may be made by any Person against the Technology and/or against Davis in respect of his rights in the Technology.

10.2         **Notification of Intellectual Property Disputes:**    The Parties will promptly notify each other of any existing, expected or threatened dispute with any third Person, which comes to their attention regarding the Technology, or any Intellectual Property Rights relating to the Distributed Products, or of any act or event which may negatively affect the Parties or the sale of the Distributed Products.

10.3         **Notice of Infringements by Third Parties:**    Finning will promptly inform Davis of all instances of which it may have knowledge which constitute or could constitute an infringement of the Technology.

## 11.        **DISPOSITION OF TECHNOLOGY**

11.1         **Prohibition / Facility Loan:**    Davis will not sell, license, assign, transfer, encumber or otherwise dispose of any of his rights in or to the Technology or the Distributed Products to any Person, including any sale, license, assignment, transfer, encumbrance or disposition made pursuant to Section 11.2, while there is any outstanding balance owing to Finning under the Facility Loan.

11.2         **Right of First Refusal:**    If Davis wishes to sell, license, assign, transfer, encumber or otherwise dispose of any of his rights in or to the Technology or the Distributed Products to any Person other than Finning, Davis will, in writing, first offer Finning to acquire such rights on the same terms being offered to or by that other Person. If within 30 calendar days of receiving such an offer from Davis,

- 15 -

Finning does not deliver to Davis written Notice of its intention to acquire such rights on such terms, Davis will be free to dispose of such rights, subject to Finning's rights in and to the Technology and the Distributed Products under this Agreement, within 30 calendar days on such terms to the other Person upon paying Finning 25% of the proceeds of such disposition as a distributorship cancellation fee. Notwithstanding the foregoing, the Parties may, by mutual agreement, dispose of all or any portion of the Technology or the Distributed Products.

## 12.        EVENTS OF DEFAULT AND TERMINATION

**12.1**         **Event of Default by Davis:** If Davis has committed an Event of Default and fails to cure such Event of Default within 30 Business Days of Finning delivering Notice of the same to Davis, Finning may do any or all of the following:

> (a)      terminate this Agreement forthwith in its entirety without prejudice, however, to any rights it may have against Davis arising prior to termination;

> (b)      declare the outstanding balance of the Facility Loan to be immediately due and payable by Davis and exercise any and all rights Finning may have at law, in equity or pursuant to this Agreement or the Security Documents; and

> (c)      take possession of the Facility, Technology, Major Components, Minor Components and Distributed Products and conduct manufacturing and assembly of the Distributed Products itself.

**12.2**         **Event of Default by Finning:** If Finning has committed an Event of Default and fails to cure such Event of Default within 30 Business Days of Davis delivering Notice of the same to Finning, Davis may terminate this Agreement forthwith in its entirety without prejudice, however, to any rights it may have against Finning arising prior to termination.

## 13.        FORCE MAJEURE

**13.1**         **Relief:** If a Party is prevented or delayed in performing or observing its obligations under of this Agreement by Force Majeure, the time for performance of those obligations is deferred for the duration of the event or circumstance of Force Majeure.

**13.2**         **Notice:** A Party that is prevented or delayed by Force Majeure and that seeks relief under this Article 13 must give written Notice to the other Party as soon as possible after the event or circumstance of Force Majeure is known to the first Party, and in any event not later than two (2) Business Days after the date when that event or circumstance is known to the first Party. A Party that has given Notice of an event or circumstance of Force Majeure will give Notice to the other Party of the cessation of that event or circumstance promptly after cessation is known to the first Party.

**13.3**         **Mitigation:** If Notice is given by either Party of an event or circumstance of Force Majeure, each Party will exercise reasonable commercial efforts to avoid, or minimize any delay occasioned thereby, provided that a Party prevented or delayed by a strike, lockout or labour disturbance or slowdown will not be required to settle that matter other than on terms acceptable to it in its discretion. The Parties will meet promptly after any Notice is given under Section 13.2, and from time to time thereafter during the continuance of any event or circumstance of Force Majeure, to discuss and endeavour in good faith to agree upon measures to be taken by either or both Parties to avoid, or minimize any delay, occasioned by that event or circumstance of Force Majeure.

- 16 -

**13.4** **Resumption of Performance:** A Party that is prevented or delayed in the performance or observance of its obligations under of this Agreement by Force Majeure will resume promptly the performance and observance of those obligations after cessation of the event or circumstance of Force Majeure.

**14.** **DISPUTE RESOLUTION/REMEDIES**

**14.1** **Dispute:** Any dispute or controversy arising out of or in connection with this Agreement or its performance, including without limitation the validity, scope, meaning, construction, interpretation or application of this Agreement or any provision of this Agreement will be submitted to final and binding arbitration by a single arbitrator. The arbitration will be administered by the American Arbitration Association in accordance with its International Arbitration Rules. The place of arbitration will be Houston, Texas. The Parties will instruct the arbitrator that the Parties desire any arbitration proceedings to be completed as expeditiously as possible. A Party may enter any judgment rendered by the arbitrator in and by any court having jurisdiction. Notwithstanding any provision in this Agreement, neither Party will be entitled to claim, and the arbitrator will not award, punitive, special or other damages in excess of actual damages sustained by a Party. The arbitrator may award costs for reasonable attorney's fees.

**14.2** **Equitable Remedies:** Nothing in the Agreement is intended to prevent or limit a Party's access to injunction or other equitable or mandatory relief before the arbitrator. Each of the Parties acknowledges and agrees that any breach by the other Party of any of its obligations under of this Agreement may result in immediate and irreparable harm to the other Party, and that in the event of such a breach, the other Party will be entitled to interim and interlocutory injunctive relief without being required to prove irreparable harm or to post security.

**14.3** **Damages:** Subject to the limitations contained in Section 14.1, nothing else in this Agreement will be construed so as to prevent or restrict either Party from exercising any right to claim damages against the other Party by reason of any breach of or default under of this Agreement by the other Party.

**14.4** **Remedies Non-Exclusive:** All rights and remedies provided hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

**15.** **DUE DILIGENCE**

The rights and obligations of the Parties under this Agreement will not commence and will be of no force and effect unless and until Finning has completed due diligence on the Technology as it deems necessary, which Finning will do on or before July 22, 2002 (the "**Due Diligence Completion Date**"), and Finning is satisfied, in its sole discretion, as to the composition, status and integrity of the Technology. If Finning is, in its sole discretion, not satisfied as to the composition, status and integrity of the Technology, Finning may terminate this Agreement by delivering a written Notice of termination to Davis on or before the Due Diligence Completion Date, whereupon this Agreement will terminate and the US$100,000 advanced by Finning to Davis pursuant to the LOI will be applied as a credit against future purchases by Finning of products from Davis or an affiliate of Davis. If Finning does not deliver a written Notice of termination to Davis on or before the Due Diligence Completion Date, the rights and obligations of the Parties under this Agreement will commence and will be of full force and effect at 12:01 a.m. Pacific Daylight Time on July 23, 2002.

- 17 -

16.            **GENERAL**

**16.1**            **Further Assurances:** The Parties agree that they or their respective heirs, executors, administrators, personal representatives, successors or permitted assigns will execute and deliver such further and other instruments, agreements and writings and will cause such meetings to be held, resolutions passed and by-laws enacted, exercise their vote and influence, do and perform and cause to be done and performed, such further and other acts and things that may be necessary or desirable in order to give full effect to of this Agreement and every part of it.

**16.2**            **Withholdings:** Notwithstanding any provision in this Agreement, each Party will deduct from and remit to the appropriate Governmental Authorities within the time required by Law, all amounts that the Party is required to withhold and remit pursuant to all applicable Laws with respect to any payment made under this Agreement.

**16.3**            **Relationship:** The relationship between Davis and Finning is solely that of independent contractors, and nothing in of this Agreement will cause Davis to be considered an agent, employee, joint venturer or legal representative of Finning; nor will Davis hold itself out as an agent, employee, joint venturer or legal representative of Davis. Davis will have no authority to bind or commit Finning in any manner or for any purpose whatsoever and will not undertake any obligation or responsibility, express or implied, on behalf of or in the name of Finning. This Agreement creates no joint ventures, or partnerships or principal/agent relationships between the Parties. Finning will under no circumstances be liable for any acts committed by Davis or his employees, agents, or representatives. Davis will under no circumstances be liable for any acts committed by Finning or its officers, directors, employees, agents or representatives.

**16.4**            **Time of Essence:** Time will be of the essence of this Agreement and of every part of this Agreement and no extension or variation of this Agreement will operate as a waiver of this provision.

**16.5**            **Successors and Assigns:** This Agreement will enure to the benefit of and be binding upon the Parties hereto, and their respective heirs, executors, administrators, personal representatives, successors or permitted assigns.

**16.6**            **No Waiver:** A waiver by either Party of any of its rights hereunder or the performance by the other Party of any obligation hereunder will be without prejudice to all or any of the other rights of the Party hereunder so waiving and will not constitute a waiver of any such other right or, in any other instance, of the right so waived, or a waiver of the performance by the other Party of any other obligations hereunder or the performance, in any other instance, of the obligations so waived.

**16.7**            **Notice:** Any Notice, consent, authorization, direction or other communication required or permitted to be given hereunder will be in writing and will be delivered either by personal delivery, courier, facsimile or similar telecommunications device and addressed as follows:

(a)        in the case of the Davis, to it at:

Daniel E. Davis
P.O. Box 2427
Harlingen, Texas 78551
Fax: (956) 399-9174

- 18 -

With copies to:

Alton W. Payne
5001 Bissonnet, Suite 200
Bellaire, TX 77401
Fax: (713) 840-8088 / (713) 661-6001

Dennis Sanchez
Sanchez, Whittington, Janis & Zabarte, L.L.P.
100 North Expressway 83
Brownsville, Texas 78521-2284
Fax: (956) 546-3765

(b)    in the case of the Finning, to it at:

Finning International Inc.
16830 – 107th Avenue
Edmonton, Alberta T5P 4C3

Attention:    Mel Ternan

Fax: (780) 930-4891

With a copy to:

Finning International Inc.
Suite 1000
Park Place
666 Burrard Street
Vancouver, British Columbia V6C 2X8

Attention:    John T. Struthers, Corporate Secretary

Fax: (604) 331-4887

    Any Notice, consent, authorization, direction or other communication delivered as aforesaid will be deemed to have been effectively delivered and received, if sent by facsimile or similar telecommunications device on the calendar day next following receipt of such transmission or, if delivered, to have been delivered and received on the date of such delivery provided, however, that if such date is not a Business Day then it will be deemed to have been delivered and received on the Business Day next following such delivery. Either Party may change its address for service by Notice delivered as aforesaid.

16.8    **Entire Agreement:** This Agreement and the Security Documents constitute the entire agreement between the Parties hereto pertaining to the subject matter of this Agreement and supersedes all prior and contemporaneous agreement, understandings, negotiation and discussions, whether oral or written (including without limitation, the LOI), of the Parties, and there are no representations, warranties or other agreements between the Parties in connection with the subject matter of this Agreement except as expressly set forth in such agreements. No supplement, modification, waiver, qualification or termination of this Agreement will be binding unless in writing and executed by the Parties to be bound thereby.

- 19 -

**16.9      Amendments to Agreement:** This Agreement may be amended only by written instrument executed by all Parties hereto.

**16.10      Assignment:** Neither Party may assign or transfer this Agreement or any of his or its rights and obligations hereunder without the prior written consent of the other Party.

**16.11      Survival:** Sections 3.6 (Title and Risk of Loss), Articles 7 (Representations, Warranties and Covenants), 9 (Confidentiality), 12 (Events Of Default And Termination) and 16 General), together with all provisions necessary for the enforcement and interpretation thereof, will survive the expiry or termination of this Agreement howsoever caused, and will continue in full force and effect subsequent to and notwithstanding such expiry or termination until they are satisfied or by their nature expire.

**16.12      Counterparts:** This Agreement may be executed by the Parties in separate counterparts each of which when so executed and delivered will be an original, but all such counterparts will together constitute one and the same instrument.

**IN WITNESS WHEREOF,** the Parties hereto have duly caused of this Agreement to be executed on the date first written above.

SIGNED, SEALED AND DELIVERED by          )
DANIEL E. DAVIS in the presence of:            )
                                                                     )
_____          )     _____ (seal)
Witness                                                        )     **DANIEL E. DAVIS**

**FINNING INTERNATIONAL INC.**

By: _____
       **Authorized Signatory**

- 20 -

Document: 1005628:05

## SCHEDULE A

### Product Cost Summary

This Agreement is based on the following estimated cost breakdown. The Parties expect changes during negotiations with suppliers. The intent of both Parties is to eliminate all unnecessary costs, and to cooperate fully to achieve the lowest cost of production, while maintaining a quality product.

These costs are based on the Cost sheets presented to me on May 11, 2002, and on further details developed by Davis and presented on June 9, 2002.

### PRODUCT COST SUMMARY

| PRODUCT LINE | TH63 - 9 TON | 320B - 28 TON | 325B - 38 TON | 325B - 50 TON | 325B - PIPELAYER |
|---|---|---|---|---|---|
| UNIT VOLUME / YEAR | 50 | 12 | 12 | 6 | 12 |
| SELLING PRICE | $150,000 | $310,000 | $385,000 | $525,000 | $425,000 |
| SALES VOLUME | $7,500,000 | $3,720,000 | $4,620,000 | $3,150,000 | $5,100,000 |
| MANUFACTURING COST | | | | | |
| Caterpillar Components | $45,000 | $123,690 | $144,409 | $167,600 | $185,000 |
| Manitex components | $38,500 | $27,492 | $43,594 | nil | nil |
| Other Mfr's | $4,700 | $15,877 | $17,067 | $69,470 | $44,000 |
| Freight | $ 6,500 | $12,792 | $13,392 | $8,500 | $14,000 |
| FINNING | $94,700 | $179,851 | $218,462 | $245,570 | $243,000 |
| SHOP COSTS | | | | | |
| Components | $7,328 | $14,079 | $14,659 | $33,536 | $22,537 |
| Labour | $6,116 | $16,936 | $21,449 | $94,481 | $20,935 |
| Insurance / Warranty | $3,876 | $6,698 | $8,491 | $23,631 | $8,043 |
| Sub Total - DavCrane | $17,320 | $37,713 | $44,599 | $151,648 | $51,515 |
| MFG OVERHEAD | $6,076 | $9,999 | $12,282 | $16,547 | $9,999 |
| DAVCRANE | $23,396 | $47,712 | $56,881 | $168,195 | $61,514 |
| TOTAL | $118,096 | $227,563 | $275,343 | $413,765 | $304,514 |
| ROYALTY - 6% | $7,086 | $13,654 | $16,521 | $24,826 | $18,271 |
| COST TO FINNING | $125,182 | $241,217 | $291,864 | $438,591 | $322,785 |
| Manufacturing Overhead (Annual) | $303,800 | $119,988 | $147,384 | $99,282 | $119,988 |

| | | |
|---|---|---|
| NOTE: Mfg OH budget is based on these HEX based units only | Annual for 42 units | $486,642 |
| | Monthly | $40,553.50 |

- 21 -

**SCHEDULE B**

**Technology**

CONFIDENTIAL
PATENT AND PATENT APPLICATIONS:

U.S. Patent No. 6,003,252 issued to Daniel E. Davis.

Patent Application entitled Piplayer-Crane- Apparatus and Method.

Patent Application entitled Telehandler-Crane- Apparatus.

Patent Application entitled Universal Excavator Boom Attachment and Method.

Additional patent applications are to be filed.

CONFIDENTIAL
DESIGN AND MANUFACTURING DRAWINGS:

9 TON TELEHANDLER DRAWINGS:
303 drawings bearing drawing numbers 9-2-001 to 9–6-002.
General Arrangement   9T  GA

28 TON CRANE DRAWINGS:
301 drawings bearing drawing numbers 28-2-001 to 28-6-009 and 5002668.001 to
5002669-023.
General Arrangement   28T  GA
Adaptor Weldment          Bill of Material #28-5-001
Manitex                         Bill of Material #6000740.023
Braden                          Bill of Material #PD12C  (General Dimensions)

CIPI Group Numbers:
 - 9Q5972                     Upper Structure Bill of Material
          - 1176346          Optional Third pedal
          - 1263784          Optional Guard
          - 1204955          Optional Guard
          - 1263799          Optional High Ambient Cooling
          - 1114696          Optional Travel alarm
 - 152 8744                   VG Lower Bill of Material

- 22 -

**38 TON CRANE DRAWINGS:**
16 drawings bearing
drawing numbers 38-4-011 to 38-5-159 and B5303.001.

| | |
|---|---|
| General Arrangement | 38T GA |
| Adaptor Weldment | Bill of Material #38-5-100 |
| | #38-5-130 |
| | #38-5-129 |
| | #38-5-142 |
| Manitex | Bill of Material #6000740.021 |
| Braden | Bill of Material #PD15   (General Dimensions) |

**CIPI Group Number:**
- 9Q5973        Upper Structure Bill of Material

- 152 8744        VG Lower Bill of Material


**SIDE-BOOM (PIPELAYER) DRAWINGS:**
Same 317 drawings listed for 28/38 Ton Cranes plus additional drawings for the
A-frame and relate components.


**60 TON CRANE DRAWINGS:**
211 drawings bearing drawing numbers 20.0001.000-00 to 64.1100.000-00 and
9001.000.000-00 to 99.3000.502-000 and 9901.000.000 to 9904.000.000.

| | |
|---|---|
| General Arrangement | 5911.50.000.001.000 |
| Adaptor Weldment | Bill of Material #5911.40.1100.000 |
| Braden | Bill of Material #CH185   (General Dimensions) |

**CIPI Group Number:**
- 9Q5964        Upper Structure Bill of Material

- 9Q5965        VG Lower Bill of Material
  (Includes 163-4828)

- 23 -

## SCHEDULE C

### Davis' Warranty on Distributed Products

DAVCRANE INC. warrants its products to be free from defects to material and workmanship for a period of twelve (12) months from the date of being placed in operation and not exceeding eighteen (18) months from date of delivery of the product to the original Purchaser user. The obligation of DAVCRANE INC. (herein after called the Company) includes any part of the product which in the Company's opinion is defective in material and workmanship. All costs of shipping the product to and from the Company's factory shall be to the Purchaser's account. No claim will be allowed by the Company unless such claim is submitted in writing to the Company within thirty (30) days of the date of discovery of the defect(s).

This warranty shall not apply to products which have been operated in a manner other than recommended by the Company or which has been misused or neglected or damaged through an accident or which has been repaired, altered or modified or used in any manner which in the Company's opinion adversely affects its performance.

This warranty and the Company's obligation hereunder is in lieu of all other warranties, expressed or implied, including without limitation the implied warranties of merchantability and fitness for a particular purpose and all direct, indirect or consequential damages with respect to the sale or use of its products.

No person is authorised to change or otherwise modify this warranty or assume any other liability on behalf of the Company unless such change modification of assumption is made in writing and signed by an officer of this Company.

Any item of the product not manufactured by the Company shall not be covered by this warranty or the implied warranties of merchantability and fitness for a particular purpose of any other warranty from the Company, such items being subject to the warranties of their respective manufacturers.