**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

United States District Court
Southern District of Texas
FILED

**DEC 0 8 2003**

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| DANIEL E. DAVIS AND | § | |
| DAVCRANE, INC. | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-03-206 |
| | § | |
| FINNING INTERNATIONAL, INC. | § | |

**FINNING INTERNATIONAL, INC.'S**
**EXPEDITED MOTION TO STAY OR CONTINUE HEARING OF DECEMBER 11, 2003**
**ON PLAINTIFFS' APPLICATION FOR TEMPORARY INJUNCTION**

Defendant, Finning International, Inc. ("Finning"), requests an expedited consideration of this motion, and in support thereof, states as follows:

1.      This suit was filed on November 7, 2003. On December 1, 2003, Finning served, pursuant to Rule 12(b), a Motion to Stay Suit Pending Arbitration; Motion to Stay or Dismiss due to Prior-Filed Action; Motion to Dismiss for Insufficient Service of Process; and, Subject Thereto, Motion to Transfer Venue ("Finning's Motion"). The Clerk's docket sheet reflects that Finning's Motion was filed and docketed on December 2, 2003.

2.      On December 3, 2003, an Order was entered setting a hearing on Plaintiffs' Application for Temporary Injunction, for December 11, 2003, at 10:30 a.m. The Order was telecopied to Finning on Friday, December 5, 2003, only three (3) business days prior to the date set for the temporary injunction hearing. Finning is concerned that the Court was not cognizant of Finning's Motion at the time of the scheduling of the December 11, 2003 hearing, especially because the Order was transmitted to Mr. Mark Finkelstein, who, while a member of this law firm, was only identified as Finning's counsel by Plaintiffs (and the Order was not transmitted to the undersigned, who filed Finning's Motion).

3.      More importantly, as discussed in Finning's Motion, a copy of which is attached hereto and incorporated herein, Plaintiffs' lawsuit is in contravention of the parties' agreement to arbitrate their dispute in Houston, Texas, and, as Plaintiffs are aware, the arbitration proceeding had been initiated and was pending before they filed the instant suit. Consequently, any determination of the merits of the Plaintiffs' claims should be made by the arbitrator and not by the Court.

4.      In addition, as is also described in Finning's Motion, Finning had filed a lawsuit in federal district court in Houston against these Plaintiffs before Plaintiffs filed their lawsuit in this Court. The Houston court has prior jurisdiction over the parties' dispute. To the extent that the Plaintiffs seek injunctive relief, they should proceed in the federal court in which the first suit was filed, the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. H-03-5080, *Finning International, Inc. v. Daniel E. Davis and Davcrane, Inc.* (the "Houston Suit"), which suit is pending before the Honorable Nancy F. Atlas. In that proceeding Finning already has placed before that court the question of what interim relief, if any, is appropriate pending the completion of the arbitration.

5.      Finning therefore requests that this Court stay or continue the hearing set for December 11, 2003, until Finning's Motion filed on December 2, 2003 in this Court has been considered. Judicial economy and fairness to the parties supports such a stay or continuance, in several respects. First, Plaintiffs would not be significantly prejudiced by a short continuance, given that they did not even seek a temporary restraining order and therefore cannot credibly argue that a matter of a week or two would be significant to them. Indeed, Plaintiffs have not even properly served process on Finning, whereas Finning has properly served Plaintiffs with the Houston Suit.

6.     On the other hand, Finning would be significantly prejudiced by the hearing of December 11 going forward. Finning, a Canadian corporation, has previously retained counsel in Canada for purposes of representing it in the parties' arbitration. Attached hereto is the affidavit of Finning's arbitration counsel, Gerald W. Ghikas, Q.C., of the firm Borden Ladner Gervais LLP, Vancouver, B.C., Canada. Mr. Ghikas has expended considerable time and effort preparing to address the parties' dispute in the context of their arbitration, in accordance with the rules of the American Arbitration Association governing international arbitrations. Mr. Ghikas should be afforded the opportunity to present Finning's case on the merits in the proper forum. Further, Mr. Ghikas' affidavit establishes that the parties' arbitration has been properly commenced, and that it is well-known to the Plaintiffs. Without doubt, the Plaintiffs are simply trying to maneuver around the legal mandate to arbitrate, and Finning respectfully requests that this Court refuse to allow such action.

WHEREFORE, Finning International, Inc. requests that the Court grant its Expedited Motion to Stay or Continue Hearing of December 11, 2003, on Plaintiffs' Application for Temporary Injunction.

Respectfully submitted,

Jeffery R. Koch (by permission /RM)
Jeffery R. Koch
Texas Bar No. 11645250
2400 Two Houston Center
909 Fannin Street
Houston, Texas 77010
(713) 646-5593 (Telephone)
(713) 752-0337 (Facsimile)

ATTORNEY FOR DEFENDANT

- 3 -

OF COUNSEL:

SHANNON, MARTIN, FINKELSTEIN & SAYRE
A Professional Corporation
Mark S. Finkelstein
Texas Bar No. 07015100
S.D. Tex. No. 5543
2400 Two Houston Center
909 Fannin Street
Houston, Texas 77010
(713) 646-5503 (Telephone)
(713) 752-0337 (Facsimile)

## CERTIFICATE OF CONFERENCE

On this the 8th day of December 2003, the undersigned contacted Plaintiffs' counsel by telephone to confer over the substance of this motion. I discussed the matter with Ray Marchan, who stated that Plaintiffs are not agreeable to a continuance.

Jeffery R. Koch

## CERTIFICATE OF SERVICE

On this the 8th day of December 2003, the undersigned caused this motion to be served upon counsel for the Plaintiffs by both telecopy and certified mail, return receipt requested.

Jeffery R. Koch

- 4 -

# EXHIBITS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DANIEL E. DAVIS AND | § | |
| DAVCRANE, INC. | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-03-206 |
| | § | |
| FINNING INTERNATIONAL, INC. | § | |

### FINNING INTERNATIONAL, INC.'S
### (1) MOTION TO STAY SUIT PENDING ARBITRATION;
### (2) MOTION TO STAY OR DISMISS DUE TO PRIOR-FILED ACTION;
### (3) MOTION TO DISMISS FOR INSUFFICIENT SERVICE OF PROCESS;
### AND, SUBJECT THERETO,
### (4) MOTION TO TRANSFER VENUE

Defendant, Finning International, Inc. ("Finning"), in response to Plaintiffs' Petition For

Temporary Injunction and Original Complaint (the "Complaint") filed by Plaintiffs Daniel E.

Davis ("Davis") and Davcrane, Inc. ("Davcrane") (collectively, "Plaintiffs"), files this Motion to

Stay Suit Pending Arbitration; Motion to Stay or Dismiss due to Prior-Filed Action; Motion to

Dismiss for Insufficient Service of Process; and, Subject Thereto, Motion to Transfer Venue.

### SUMMARY OF MOTION

1.      The present dispute involves an agreement between the parties that includes an

arbitration provision.    Finning invoked the arbitration provision in September 2003.    The

Plaintiffs by this action are blatantly attempting to circumvent the arbitration provision and

ignore the parties' agreement.  As a matter of exceedingly well-established law, the arbitration

provision should be given effect and the present action should not proceed.    Further, in

anticipation that Plaintiffs might file suit to try to avoid arbitration, Finning filed suit to compel



arbitration in federal court in the Southern District of Texas, Houston Division, prior to the filing of the present suit. Accordingly, to the extent that any federal court should address the parties' dispute, the proper court to do so is the federal court in Houston, where the first suit was filed. Finally, both venue and service of process are not proper in the present case. Finning therefore requests that the present case be stayed or dismissed, or in the alternative that venue be transferred to the proper venue in the Houston Division of the Southern District of Texas. The Plaintiffs have improperly invoked the jurisdiction of this Court despite the parties' clear agreement to arbitrate their dispute, and Finning respectfully requests that the Court refuse to allow the Plaintiffs to ignore their agreement.

## MOTION TO STAY SUIT PENDING ARBITRATION

2.    **Chronology and Key Facts in the Present Dispute.** On July 15, 2002, Davis entered into a Distributor Agreement with Finning which, among other things, granted Finning the exclusive right to market, distribute and sell certain heavy equipment products that are generally referred to as the DCI cranes and lifting equipment. This equipment was to be assembled by Plaintiffs utilizing their patented technology, in combination with Caterpillar crane components which were to be supplied by Finning. Part 14.1 of the Distributor Agreement provides:

> **Any dispute or controversy arising out of or in connection with this Agreement** or its performance, including without limitation the validity, scope, meaning, construction, interpretation or application of this Agreement or any provision of this Agreement **will be submitted to final and binding arbitration by a single** arbitrator.

(emphasis added).

2

The Distributor Agreement is lengthy, and it includes provisions by which Finning agreed to advance $1.5 million dollars to the Plaintiffs in the form of a facilities loan and to pay particular overhead costs. The Plaintiffs were required, among other things, to: (a) control the manufacturing costs that would be borne by Finning, including providing an estimate of overhead costs in advance of each manufacturing period; (b) assemble the equipment in a timely fashion; and (c) maintain solvent operations. The Plaintiffs also agreed to turn the DCI cranes over to Finning upon completion, and they agreed to various security provisions so that title to much of the equipment is held by Finning. Further, as part of its rights, Finning has the right to possession and ownership of the equipment, the patent technology, and the manufacturing facility if Davis commits an event of default under the Agreement and such default is not timely cured.

3.     On September 18, 2003, Finning initiated an arbitration under the auspices of the International Arbitration Rules of the American Arbitration Association. Finning's notice of arbitration was sent to the American Arbitration Association and to Davis and his counsel. As set forth therein, Finning contends that the terms of the Distributor Agreement have been breached in numerous respects. The American Arbitration Association proceeded to initiate the arbitration, as reflected by their acknowledgment notice dated September 23, 2003, which was also sent to Davis and his counsel. Davis' counsel subsequently notified the American Arbitration Association that he would be withdrawing as Davis' counsel for purposes of the arbitration. The parties, both before and thereafter, held various discussions to determine whether their dispute might be resolved without the need for the arbitration, but such discussions were unsuccessful.

3

4.      On November 5, 2003, Finning filed suit in the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. H-03-5080, *Finning International Inc. v. Daniel E. Davis and Davcrane, Inc.* (the "Houston Suit"), which suit is pending before the Honorable Nancy F. Atlas. In the Houston Suit, Finning seeks to compel arbitration, to preserve the equipment and related property in the interim, and to enforce any award of the arbitration when such is rendered. Service of process of the Houston Suit was made by personal delivery on Davis, both for himself and as designated agent for Davcrane, on November 21, 2003.

5.      On November 7, 2003, Plaintiffs filed the present suit. In the present suit, the parties are identical to those in the Houston Suit. The claims made by Plaintiffs in this suit are based on the identical facts set forth in the Houston Suit. The Plaintiffs faxed a copy of the present suit to representatives of Finning, but proper service has yet to be made.

6.      A certified copy of the Complaint in the Houston Suit is attached to this Motion as "**Exhibit 1.**" Attached to that Complaint are the following: Exhibit A is a copy of the Distributor Agreement and ancillary security documents agreed to by the parties (the "Agreement"); Exhibit C is a copy of the Notice of Arbitration submitted by Finning on September 18, 2003; and Exhibit D is the American Arbitration Association's acknowledgment of the initiation of the arbitration, dated September 23, 2003.

7.      **Legal Authority for Stay of Present Suit.** By their commencement of the present action in this Court, despite Finning's invocation of the arbitration proceedings pursuant to the parties' Agreement, Plaintiffs blatantly attempt to maneuver around the legal requirement for arbitration mandated by both federal and Texas law. The extensive statutory and decisional

4

law in support of enforcement of the arbitration process leaves no room for doubt that the present suit should not continue.

8.      First, the statutory basis for arbitration under both federal and Texas law provides that this suit should be stayed. The Federal Arbitration Act, 9 U.S.C. §3, provides that

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties, stay the trial of the action until such arbitration has been had in accordance with the terms of the arbitration.

Similarly, the Texas Arbitration Act, TEX. CIV. PRAC. & REM. CODE § 172.174, provides that

> On request of a party, a court in which a pending judicial proceeding is being brought by a party to an arbitration agreement to obtain relief with respect to a matter covered by the arbitration agreement shall ... stay the judicial proceeding; and ... refer the parties to arbitration.

The statutes are therefore clear that the present case should be stayed.

9.      The caselaw holds in accordance with the statutes, and further demonstrates that attempts by creative plaintiffs to frame their pleadings as tort claims to avoid arbitration will not be tolerated. The general rule is that when a party seeking to compel arbitration demonstrates that the parties entered into a valid arbitration agreement, and the claim at issue falls within the scope of the agreement, the court should compel arbitration. *See First Options, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995); *AT&T Tech., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 648-49 (1986).

10.     The Plaintiffs' own Complaint in this action shows clearly that this dispute arises out of the Agreement entered into by Finning and Plaintiffs. The Complaint recites that the gravamen of the Plaintiffs' claim is that Finning allegedly did not perform in accordance with the

5

parties' Agreement.  Indeed, the Plaintiffs attach a copy of the parties' Agreement as Exhibit 2 to

their Complaint, and state, on page 16 that

> The parties entered into a contract on July 15, 2002 …. The parties
> admitted that there was mutual consideration for the contract and
> therefore all conditions precedent have been met.  The parties also
> agree that the contract shall be governed and interpreted with the laws
> in force within the State of Texas …. During the year of 2002,
> Defendant Finning International, Inc., fully paid the overhead
> production costs.  However, Defendant Finning International, Inc.
> breached the contract by withholding during the year of 2003 such
> overhead production costs.

Based upon these factual allegations, the Plaintiffs seek relief under several tort theories as well

as for breach of contract.  While Plaintiffs include both contract and tort claims in their suit, the

inclusion of tort claims does nothing to remove the dispute from the mandates of arbitration.

*Mar-Len of Louisiana, Inc. v. Parsons-Gilbane*, 773 F.2d 633, 636 (5th Cir. 1985) (fraudulent

inducement claim held arbitrable where contract called for arbitration of any dispute "with

respect to the interpretation or performance of the contract"); *In re FirstMerit Bank, N.A.*, 52

S.W.3d 749 (Tex. 2001) (fraudulent inducement claim is subject to arbitration where arbitration

clause implicated the interpretation, validity, performance, or breach of the contract.)  Further,

any doubt as to whether a dispute falls with the scope of an arbitration clause is resolved in favor

of arbitration.  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

The arbitration provision in the parties' Agreement, as quoted above, is more inclusive than

those referenced by the Fifth Circuit and the Texas Supreme Court, and accordingly there is no

question that the Plaintiffs' claims in this case fall under the parties' arbitration agreement.

Plaintiffs' instant suit should therefore be stayed pending the resolution of the arbitration

proceeding.

6

## MOTION TO STAY OR DISMISS SUIT DUE TO PRIOR-FILED ACTION

11.     In the alternative, Finning asks the Court to stay or dismiss this suit due to the prior filing of the Houston Suit, which is pending in a sister federal court covering the same parties and subject matter as is involved in the instant suit.  Prior to Plaintiffs' filing of the present lawsuit, Finning had filed on November 5, 2003, a separate but related lawsuit in the Houston Division of the United States District Court for the Southern District of Texas, seeking to compel arbitration, to preserve the equipment and related property in the interim, and to enforce any award of the arbitration when such is rendered.  *See* "**Exhibit 1,**" attached hereto, the certified copy of the Complaint filed in the Houston Suit.

12.     This Court has broad power to control its docket by staying or dismissing a suit when such suit covers the same subject matter as a prior-filed federal suit. *Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931, 937-38 (Fed. Cir. 1993); *Schnadig Corp. v. Collezione Europa U.S.A.*, 2001 U.S. Dist. LEXIS 9208 (N.D. Ill. 2001).

13.     The Fifth Circuit adheres to the general rule that the court in which an action is filed first is the appropriate court to determine whether subsequently filed cases involving substantially similar issues should proceed.  *See West Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 728 (5th Cir. 1985); *Mann Mfg., Inc. v. Hortex, Inc.*, 439 F.2d 403, 408 (5th Cir. 1971); *Save Power v. Syntek Fin. Corp*, 121 F.3d 947, 950 (5th Cir. 1997).  The "first to file" rule is grounded in principles of comity and sound judicial administration.  "The federal courts long have recognized that the principle of comity requires federal district courts—courts of coordinate jurisdiction and equal rank—to exercise care to avoid interference with each other's affairs." *West Gulf*, 751 F.2d at 728.  "The concern manifestly is to avoid the waste of

7

duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result." *Id.* at 729; *see also Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817-20 (1976). This concern applies where related cases are pending before two judges in the same district, as is the case here, as well as where related cases have been filed in different districts. *See Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 961 F.2d 1148, 1161 n.28 (5th Cir. 1992) ("The same concern with avoiding duplicative litigation is present where similar suits have been filed in two courts within the same district.").

14.    The Fifth Circuit has explained that, "under the first-to-file rule, when related cases are pending before two federal courts, the court in which the case was last filed may refuse to hear it if the issues raised by the cases substantially overlap." *Cadle Co. v. Whataburger of Alice, Inc.* 174 F.3d 599, 603 (5th Cir. 1999). The second-filed court should transfer an action to the first-filed court if it determines the substantive issues in the two actions might substantially overlap. *Id.* at 606. The two actions need not be identical. *Syntek Fin. Corp.,* 121 F.3d at 950; *Mann Mfg., Inc. v. Hortex, Inc.,* 439 F.2d 403, 407 (5th Cir. 1971). Regardless of whether or not the suits here are identical, "if they overlap on the substantive issues, the cases would be required to be consolidated in . . . the jurisdiction first seized of the issues." *Mann Mfg.,* 439 F.2d at 408 n.6.

15.    Plaintiffs, by their own pleadings asserting a breach of contract claim, judicially admit to the existence of a valid contract between the parties. *See* Complaint at 16. In their Complaint, Plaintiffs refer this Court to the same Distributor Agreement pursuant to which provisions Finning initiated the arbitration proceedings against Plaintiffs. The parties are the same in both suits. Both suits arise out of the same operative facts. In such a circumstance, the

8

present suit should be stayed or dismissed, so that the Houston Suit may proceed, as a matter of comity between the Courts and the wise use of judicial resources.

## MOTION TO DISMISS FOR INSUFFICIENT SERVICE OF PROCESS

16.     Finning also files this motion to dismiss for defective service, as authorized by Federal Rule of Civil Procedure 12(b)(4) and (5).   When service of process is insufficient, the Court may dismiss the suit or quash the service.   *See Adams v. AlliedSignal Gen. Aviation Avionics*, 74 F.3d 882, 886 (8th Cir. 1996).

17.     In this case, the Plaintiff served the Complaint and accompanying summons (the "Summons") by facsimile transmission on Finning International, Inc.  This method of service is not in compliance with the requirements for service of process pursuant to Rule 4 of the Federal Rules of Civil Procedure.   Because Finning is a corporation, the general rule pursuant to Rule 4(h)(1) requires that service be made "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process."  FED. R. CIV. P. 4(h)(1).   However, Plaintiffs failed to serve Finning in accordance with Rule 4 because they sent the Summons and Complaint by facsimile transmission.

18.     In addition, because Finning is incorporated under the laws of Canada, with its principal place of business in Vancouver, British Columbia, and does not maintain a registered agent in the State of Texas, service of process must be made pursuant to Rule 4(f)(1) and 4(h)(2). These rules provide, in pertinent part, that service must be by any internationally agreed means reasonably calculated to give notice, such as those means authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters

9

(the "Convention"). *See* FED. R. CIV. P. 4(f)(1). Because Canada and the United States are both signatories to the Convention, service of process must be accomplished pursuant to the Convention.

19.     The Hague Convention allows a signatory to modify or object to the articles of the Convention, and therefore it is necessary to consult the Hague Conference on Private International Law to determine how Canada applies the Convention. However, Plaintiffs failed to serve Finning in compliance with the articles of the Convention. Plaintiffs chose an improper method of service. Service by facsimile is not a proper method of service under the Convention. Finning therefore was not served in accordance with the requirements of the Convention, made applicable to this proceeding pursuant to Rules 4(f)(2) and 4(f)(1) of the Federal Rules of Civil Procedure.

20.     Despite the liberal service requirements of the Federal Rules of Civil Procedure, the method of service chosen simply was not valid, and service should be quashed. *See United States v. Mollenhauer Labs., Inc.*, 267 F.2d 260, 262 (7th Cir. 1959) (establishing that the liberal construction rule "cannot be utilized as a substitute for the plain legal requirements as to the manner in which service of process may be had"). As service of the Summons and Complaint was invalid, service should be quashed. In the alternative, the Complaint should be dismissed. *See Montgomery, Zuckman, Davis, Inc. v. Diepenbrock*, 698 F.Supp. 1453, 1460 (S.D. Ind. 1988) (recognizing that the court could not disregard the formal requirements of Fed. R. Civ. P. 4).

## MOTION TO TRANSFER VENUE

21.     In the alternative, Finning asks the Court to transfer venue of this action to the Houston Division for the Southern District of Texas. Section 14.1 of the Distributor Agreement

10

provides: "**The place of arbitration will be Houston, Texas.**" The venue provision of the Convention on the Recognition and Enforcement of Foreign Arbitral Award, 9 U.S.C. §204, provides that venue is permissible in the district and division which "embraces the place designated in the agreement as the place of arbitration."

22.     Finning filed the Houston Suit in the Houston Division of the Southern District of Texas for the purpose of invoking that court's equitable powers to compel Plaintiffs to arbitration, and because that is the district and division where arbitration was to take place pursuant to the parties' contract. As the court sitting in the district and division of the agreed upon location of arbitration, venue in the Houston division is more proper in the interest of justice. *See* 28 U.S.C. § 1404(a); TEX. CIV. PRAC. & REM. CODE. § 172.174 (Vernon 2002).

23.     In addition, Plaintiffs attempt to circumvent Finning's choice of venue by the filing of this instant suit in the Brownsville Division. Under the "first to file" rule discussed *supra*, Finning is entitled to have the court in Houston determine whether the dispute between the parties should proceed to arbitration. The first to file rule is not to be applied mechanically, but the party that seeks to deviate from the rule has the burden of demonstrating that circumstances justifying an exception exist. *See Transatlantic Reinsurance Co. v. Cont'l Ins. Co.*, No. 03 Civ. 3227, slip op, 2003 U.S. Dist. LEXIS 20933 at *3 (S.D.N.Y. Nov. 20, 2003). Plaintiffs have not provided any support why their suit should proceed in the Brownsville division, a venue that is not specified in the parties' Distributor Agreement, nor appropriate given the arbitration proceeding currently pending in Houston. TEX. CIV. PRAC. & REM. CODE. § 171.024 (Vernon 2002). Plaintiffs have simply offered no reason for their choice of forum, as opposed to the first-filed suit proceeding in the Houston Division for the purpose of compelling Plaintiffs to arbitrate.

24.     Transfer is particularly appropriate where there is a pending lawsuit in the transferee district involving the same facts, transactions or occurrences. *Id.* at *18. Finning believes that the Houston court will be in a better position to determine whether this action should be consolidated with the pending action or dismissed. Because the Court may transfer venue upon motion, any action, suit or proceeding of a civil nature from the division in which pending, to any other division in the same district, the Court should grant Finning's motion to transfer venue. *See* 28 U.S.C. § 1404 (b).

WHEREFORE, Finning International, Inc. requests that the Court grant its Motion to Stay Suit Pending Arbitration; Motion to Stay or Dismiss due to Prior-Filed Action; Motion to Dismiss for Insufficient Service of Process; and, Subject Thereto, Motion to Transfer Venue.

Respectfully submitted,

_____

Jeffery R. Koch
Texas Bar No. 11645250
2400 Two Houston Center
909 Fannin Street
Houston, Texas 77010
(713) 646-5593 (Telephone)
(713) 752-0337 (Facsimile)

ATTORNEY FOR DEFENDANT

12

OF COUNSEL:

SHANNON, MARTIN, FINKELSTEIN & SAYRE
A Professional Corporation
Mark S. Finkelstein
Texas Bar No. 07015100
S.D. Tex. No. 5543
2400 Two Houston Center
909 Fannin Street
Houston, Texas 77010
(713) 646-5503 (Telephone)
(713) 752-0337 (Facsimile)

**Exhibits:**

1:    Complaint in Civil Action No. H-03-5080, *Finning International Inc. v. Daniel E. Davis and Davcrane, Inc.* pending before the Honorable Nancy F. Atlas.


**CERTIFICATE OF SERVICE**

On this the 1st day of December 2003, the undersigned caused this motion to be served upon counsel for the Plaintiffs by both telecopy and certified mail, return receipt requested.


Jeffery R. Koch

13

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| Daniel E. Davis and Davcrane, Inc. | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. B-03-206 |
| | § | |
| Finning International Inc., | § | |
| | § | |
| | § | |
| Defendant. | § | |

## AFFIDAVIT OF GERALD W. GHIKAS

Before me, the undersigned authority, did personally appear GERALD W. GHIKAS, who being duly sworn, stated and deposed under oath the following declaration:

1.    My name is Gerald W. Ghikas.  I am a partner in the law firm of Borden Ladner Gervais, LLP, whose business address is 1200 – 200 Burrard Street, Vancouver, B.C., Canada, V7X 1T2.  I am a resident of the Province of British Columbia.  I am over the age of eighteen (18) years, am competent to testify, have never been convicted of a crime, and am in no way disqualified to make this Affidavit.  I have personal knowledge of every fact contained in this Affidavit and they are all true and correct.



2. I am counsel for the defendant, Finning International Inc., as the claimant in an international commercial arbitration wherein the plaintiff, Daniel E. Davis, is named as respondent.

3. I attended the University of Calgary at Calgary Alberta from 1967 to 1970 and earned a Bachelor of Arts Degree in 1970. I then attended the University of British Columbia Law School from 1970 to 1973 and obtained a Bachelor of Laws degree in 1973. After serving for one year as an articled law student I was admitted to the Bar of British Columbia as a barrister and admitted to the Law Society of British Columbia as a solicitor in May 1974. I have since been admitted to the Bars of the Province of Alberta and the Yukon Territory. I am a member in good standing in both Provinces and the Yukon Territory.

4. I am a member of the Canadian Bar Association and an associate member of the American Bar Association. I have been appointed as Queen's Counsel by the Attorney General of British Columbia. I am a Fellow of the American College of Trial Lawyers and a Fellow of the Chartered Institute of Arbitrators. My practice centers on litigation in the courts of British Columbia with occasional appearances in other jurisdictions in Canada, and on acting as counsel in international and domestic commercial arbitrations. I have also been appointed as arbitrator in such matters on a number of occasions and my name appears on the rosters of arbitrators of a number of national and international institutions.

5. I have personal knowledge of the facts being described herein by virtue of my representation of my client, Finning International Inc.

- 2 -

Document: 1214823:01

6.   Attached and marked as Exhibit "A" to this my affidavit is a true copy of a notice of arbitration dated September 16, 2003 that I prepared.   As set out in the notice of arbitration, the arbitration relates to various disputes arising under the Distributor Agreement which is attached to it as Exhibit "A".   The agreement to arbitrate is at Section 14.1 of the Distributor Agreement.

7.   The agreement to arbitrate requires that the arbitration take place under the International Arbitration Rules of the American Arbitration Association ("AAA"). Article 2(1) of those Rules provides:

> The party initiating arbitration ("claimant") shall give written notice of arbitration to the administrator and at the same time to the party against whom a claim is being made ("respondent").

8.   On September 18, 2003 I caused to be sent by fax and by courier, to the addresses for delivery set out in Section 16.7 of the Distributor Agreement, a letter enclosing the notice of arbitration.   Attached and marked Exhibit "B" to this my affidavit is a true copy of my letter of September 18, 2003 that I sent to Daniel E. Davis and copies of which were sent to Alton W. Payne, Dennis Sanchez and Mark Finkelstein, as indicated.

9.   On behalf of Finning International Inc., I retained the firm of Shannon, Martin, Finkelstein & Sayre to assist me in the conduct of the arbitration.   Attached and marked Exhibit "C" to this my affidavit is a true copy of a letter dated September 18, 2003 sent by Mark S. Finkelstein to the AAA enclosing five copies of the arbitration notice and the required cheque in payment of the AAA filing fee.

- 3 -

10.    Attached and marked as Exhibit "D" to this my affidavit is a true copy of a letter dated September 23, 2003 that I received from the International Centre for Dispute Resolution of the AAA confirming the commencement of the arbitration and, amongst other things, scheduling the first administrative conference call for October 1, 2003. The handwritten notations on the document are my own.

11.    Shortly after receipt of the AAA's September 23, 2003 letter I received a telephone call from Alton W. Payne who advised me that he acted for the respondent, Daniel E. Davis. Mr. Payne suggested, and I agreed, that the first administrative conference call with the AAA should be deferred until October 10th. Attached and marked as Exhibit "E" to this my affidavit is a true copy of a letter dated September 24, 2003 from Tom Simotas, International Case Manager at the AAA confirming the rescheduling of the administrative conference call to October 10, 2003.

12.    On October 10, 2003 I participated in an administrative conference call with Tom Simotas and Michael Namias of the AAA and Alton W. Payne, as counsel for the respondent, Daniel E. Davis. During the telephone conference we discussed what qualifications should be looked for in an arbitrator. Mr. Payne and I on behalf of our respective clients agreed that he and I should attempt to agree on an arbitrator acceptable to both parties before turning to the AAA to make an appointment. We asked the AAA to deliver to us a list of names to assist in that process, without formally engaging the AAA's "list and strike" process. Attached and marked as Exhibit "F" to this my affidavit is a true copy of a letter dated October 15, 2003 that I received from Tom Simotas of the AAA confirming the results of the October 10, 2003 administrative conference call and noting that the deadline for the respondent, Daniel E. Davis, to submit its answer and/or counterclaim was October 23, 2003.

- 4 -

13.    On October 20, 2003 I received from the AAA a list of ten potential arbitrators for review.

14.    Before I had an opportunity to discuss the list of arbitrators with Mr. Payne, I was advised by Mr. Payne that he would no longer be the attorney in charge for the arbitration. Mr. Payne subsequently confirmed that by letter to the AAA. Attached and marked as Exhibit "G" to this my affidavit is a true copy of Mr. Payne's letter to Tom Simotas of the AAA dated October 23, 2003.

15.    Since the withdrawal of Mr. Payne as counsel for the respondent, Daniel E. Davis, I have heard nothing from Mr. Payne or Mr. Davis or any other counsel on his behalf with respect to the arbitration proceedings. As a result it was not possible for me to reach any agreement concerning the appointment of an arbitrator. In the absence of agreement by the parties on the appointment of an arbitrator, on November 24, 2003 the AAA delivered a list of arbitrators pursuant to its "list and strike" process. Attached and marked as Exhibit "H" to this my affidavit is a true copy of a letter from Tom Simotas of the AAA dated November 24, 2003 (excluding enclosures).

16.    On December 8, 2003 I will deliver to the AAA my client's selections for arbitrator.

17.    No statement of defence or counterclaim has been submitted by the respondent, Daniel E. Davis, although the time for doing so expired on October 23, 2003. Upon

- 5 -

Document: 1214823:01

the appointment by an arbitrator by the AAA I propose to convene a pre-hearing conference and to make arrangements for the arbitration to proceed in any event.

Further, Affiant saith not.

_____
Gerald W. Ghikas, Q.C.
BORDEN LADNER GERVAIS LLP

SWORN TO AND SUBSCRIBED BEFORE ME on December __5__, 2003, to certify which witness my hand and seal of office.

_____
Notary Public, Province of British Columbia

GORDON R. JOHNSON
BARRISTER & SOLICITOR
900 Waterfront Centre, 200 Burrard Street
P.O. Box 48600, Vancouver, Canada V7X 1T2
(604) 640-4117

Document: 1214823:01

- 6 -

# IN THE MATTER OF AN INTERNATIONAL COMMERCIAL ARBITRATION

BETWEEN:

FINNING INTERNATIONAL INC. (FINNING)

CLAIMANT

AND:

DANIEL E. DAVIS (DAVIS)

RESPONDENT

## NOTICE OF ARBITRATION
### PURSUANT TO THE INTERNATIONAL ARBITRATION RULES
### OF THE AMERICAN ARBITRATION ASSOCIATION

The Claimant, Finning, a party to an arbitration agreement contained in a written contract dated July 15, 2002 and providing for arbitration under the *International Arbitration Rules* of the American Arbitration Association, hereby demands arbitration thereunder.

### THE NAMES AND ADDRESSES OF THE PARTIES:

This is Exhibit "___" referred to in the affidavit of _Gerald W Ghikas_ made before me on _Dec 5_ 20_03_

_____
A Commissioner for taking Affidavits for British Columbia

| Claimant: | Respondent: |
|---|---|
| Finning International Inc. | Daniel E. Davis |
| 16830 – 107th Avenue | P.O. Box 2427 |
| Edmonton, Alberta, | Harlingen, Texas |
| T5P 4C3 Canada | 78551 USA |

| | | | |
|---|---|---|---|
| Telephone: | (780) 930 4878 | Telephone: | |
| Fax: | (780) 930-4891 | Fax: | (956) 399-9174 |

**Claimant's Representatives:**
Canadian Counsel: Gerald W. Ghikas, Q.C.
Borden Ladner Gervais LLP
1200 Waterfront Centre
200 Burrard Street
P.O. Box 48600
Vancouver, British Columbia
V7X 1T2 Canada

**Respondent's Representatives**
Dennis Sanchez
Sanchez, Whittington, Janis & Zabarte, LLP
100 North Expressway 83
Brownsville, Texas
78521-2284 USA

| | | | |
|---|---|---|---|
| Telephone: | (604) 640-4112 | Telephone: | (956) 546-3731 |
| Fax: | (604) 622-5812 | Fax: | (956) 546-3765 |

Texas Counsel: Mark S. Finkelstein
Shannon, Martin, Finkelstein & Sayer, P.C.
2400 Two Houston Center
909 Fannin Street
Houston, Texas 77010 USA

Alton W. Payne
5001 Bissonnet, Suite 200
Bellaire, Texas
77401 USA

| | | | |
|---|---|---|---|
| Telephone: | (713) 646-5503 | Telephone: | (713) 840-8008 |
| Fax: | (713) 752-0337 | Fax: | (713) 840-8088 |

Document: 1172180:01

- 1 -

DATED at the City of Vancouver, British Columbia, this 16 day of September, 2003.

Gerald W. Ghikas, Q.C.
Canadian Counsel and Representative
for the Claimant, Finning International Inc.

EXHIBIT "A"

DISTRIBUTOR AGREEMENT

**THIS DISTRIBUTOR AGREEMENT** dated July 15 2002, is made between **DANIEL E. DAVIS**, businessperson having an address at P.O. Box 2427, Harlingen, Texas, 78551, USA ("Davis") and **FINNING INTERNATIONAL INC.**, a corporation incorporated under the laws of Canada, having an address at 16830 – 107th Avenue, Edmonton, Alberta, T5P 4C3, Canada ("Finning").

**WHEREAS:**

A.    Davis had developed and owns the Technology (defined below) regarding the special assembly of the Product Lines (defined below);

B.    Finning, either directly or indirectly through its affiliates and subsidiaries, has the infrastructure to sell and distribute the Distributed Products (defined below) to end-user customers;

C.    Davis and Finning entered into a Letter of Intent dated June 18, 2002, regarding the grant by Davis to Finning of exclusive distribution rights to the Product Lines using the Technology and other related matters (the "LOI"); and

D.    Davis and Finning now wish to enter into this Agreement to supersede and replace the LOI;

**NOW, THEREFORE THIS AGREEMENT WITNESS** that in consideration of the premises, mutual covenants and agreements contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is acknowledged by the parties hereto (the "Parties"), the Parties covenant and agree as follows:

1.    **INTERPRETATION**

1.1    **Definitions:** As used in this Agreement, the term:

"**Agreement**," "**this Agreement**," "**the Agreement**," "**hereto**," "**herein**," "**hereby**," "**hereunder**" and similar expressions mean or refer to this Agreement as amended from time to time and any indenture, agreement or instrument supplemental or ancillary hereto and the expressions "Article," "Section" and "Schedule" followed by a number or letter mean and refer to the specified Article, Section or Schedule of this Agreement;

"**Assignment of Royalties**" has the meaning ascribed thereto in Section 6.7(c);

"**Books and Records**" means, with respect to each Party, the books and records of that Party relating to the Distributed Products and costs associated therewith, including financial, operations and sales books, books of account, sales and purchase records, lists of customers, business reports and plans;

"**Business Day**" means any day, other than a Saturday, Sunday or a statutory holiday anywhere in Canada or the United States of America;

"**Claim**" means any claim, demand, action, cause of action, damage, loss, costs, liability or expense, including reasonable professional fees and all costs incurred in investigating or pursuing any of the foregoing or any proceeding relating to any of the foregoing;

- 1 -

"**Confidential Information**" means all information provided by one Party (the "**Disclosing Party**") to the other Party (the "**Receiving Party**") in connection with this Agreement and includes, but is not limited to, specifications, designs, drawings, sketches, models, test results, current and forecasted data, reports, records, discoveries, ideas, inventions, concepts, techniques, methods, source code, project code, source listings, program listings, documentation, diagrams, flow charts, research and development data, processes, procedures, formulas, know how, marketing techniques, customer and supplier lists and other proprietary rights, communicated in any medium. Confidential Information also includes the existence of any terms of the LOI and this Agreement. Confidential Information does not include information that:

(i)     is already known to the Receiving Party from a source which is not prohibited from disclosure as evidenced by written or other dated tangible records;

(ii)    is in the public domain at the time it is disclosed or becomes publicly available after disclosure, other than by breach of this Agreement;

(iii)   is independently and lawfully developed by the Receiving Party completely without reference to the Confidential Information, or with respect to Finning, the Technology, as evidenced by written or other tangible records; or

(iv)   is disclosed without restriction to the Receiving Party in good faith by a third party (other than Caterpillar or its affiliates) who is in lawful possession of the information and who has the right to make the disclosure, or is disclosed by the Receiving Party after receiving written approval from the Disclosing Party;

"**Davis Costs**" means the actual costs paid by Davis to his suppliers and employees for the Minor Components and the assembly of the Major and Minor Components as evidenced by the Books and Records of Davis;

"**Davis Insolvency Event**" has the meaning ascribed thereto in Section 7.1(o);

"**Davis Payment**" has the meaning ascribed thereto in Section 5.5(b);

"**Distributed Products**" means Product Lines manufactured and assembled using, containing or incorporating the Technology;

"**Distribution and Licensing Fee**" has the meaning ascribed thereto in Section 5.1;

"**Due Diligence Completion Date**" has the meaning ascribed thereto in Article 15;

"**Encumbrance**" has the meaning ascribed thereto in Section 7.1(e);

"**Estimated Manufacturing Overhead Costs**" has the meaning ascribed thereto in Section 5.3;

"**Estimated Production Quantity**" has the meaning ascribed thereto in Section 5.3;

"**Event of Default**" means the breach by a Party of any covenant, representation or warranty made by that Party under this Agreement or the Security Documents, or the failure of that Party to perform any of his or its obligations under this Agreement or the Security Documents;

"**Facility**" has the meaning ascribed thereto in Section 3.1;

-2-

"**Facility Loan**" has the meaning ascribed thereto in Section 6.1;

"**Favelle Licence**" means the non-exclusive licence granted by Davis to Favelle Favco Cranes (USA) Inc. relating to U.S. Patent No. 6,003,252;

"**Fee Refund**" has the meaning ascribed thereto in Section 5.1;

"**Finning Costs**" means the actual costs paid by Finning to its suppliers, as evidenced by the Books and Records of Finning, for the Major Components;

"**Finning Insolvency Event**" has the meaning ascribed thereto in Section 7.2(c);

"**Force Majeure**" means an event or circumstances that is beyond the reasonable control of a Party and that prevents or delays that Party in the performance or observance of any of, or all, its obligations under of this Agreement, including without limitation, acts or omissions of the other or a third party, acts of civil or military authority, strikes, lockouts, embargoes, insurrections or acts of God;

"**Governmental Authorities**" means any government, regulatory authority, governmental department, agency, commission, board, tribunal, or court or other law, rule or regulation-making entity having or purporting to have jurisdiction on behalf of any nation, state or other subdivision of this Agreement or any municipality, district or other subdivision of this Agreement;

"**Gross Margin**" has the meaning ascribed thereto in Section 5.5;

"**Initial Term**" has the meaning ascribed thereto in Section 2.3;

"**Intellectual Property Rights**" will include all intangible, intellectual, proprietary and industrial property rights of any nature and all intangible embodiments and derivative works thereof, including without limitation, (i) all trade-marks, trade names, slogans, domain names, URLs or logos; (ii) all copyrights, moral rights and other rights in works of authorship; (iii) all patents and patent applications, patentable ideas, algorithms, developments, discoveries, inventions, improvements, innovations; (iv) all know-how and trade secrets; and (v) all registrations, applications, renewals, extensions, continuations, divisions or reissues thereof now or hereafter in force (including any rights in any of the foregoing);

"**Landed Dealer Cost**" means the sum of the Product Cost, Running Royalty and unrecovered freight and transportation costs applicable to each Distributed Product, including without limitation shipping, delivery, transportation and insurance costs pursuant to Sections 4.2 and 4.3;

"**Laws**" means all applicable laws, by-laws, rules, regulations, orders, ordinances, and judgements or other requirements of any Governmental Authority that in each case, have legally binding effect;

"**LIBOR**" means the London InterBank Offered Rate as published by the British Bankers' Association from time to time;

"**LOI**" has the meaning ascribed thereto in Recital C;

"**Major Components**" means, with respect to each Distributed Product, all significant physical parts for the Distributed Products that are purchased by Finning; .

"**Manufacturing Overhead Costs**" means Davis' reasonable overhead and administration costs pertaining to the manufacture or assembly of the Distributed Products, including without limitation,

- 3 -

utilities, costing, engineering services, insurance, interest, drafting and accounting services, but will not include capital costs;

"**Marketing Fee**" has the meaning ascribed thereto in Section 5.5(a);

"**Minor Components**" means all necessary parts, equipment and services other than the Major Components, necessary to transform the Major Components into Distributed Products and to deliver such Distributed Products to Finning or its customers, and will include without limitation, labour, insurance, warranty allowances and transportation costs, but will not include any costs comprising Manufacturing Overhead Costs;

"**Mortgage**" has the meaning ascribed thereto in Section 6.7(b);

"**Notice**" means a notice given in the manner required by Section 16.7 of this Agreement;

"**Per Unit EMOC**" has the meaning ascribed thereto in Section 5.3;

"**Period**" has the meaning ascribed thereto in Section 5.3;

"**Person**" means an individual, corporation, partnership, venture, association, unincorporated organization, other entity or group, or Governmental Authority;

"**Product Lines**" means telehandler all-terrain cranes, lattice and telescopic boomed crawler cranes, excavator based pipelayers and related equipment or products, and includes any current or future similar products, but specifically excludes any marine or offshore products;

"**Product Cost**" means the sum of the Finning Costs, Davis Costs and the Manufacturing Overhead Costs applicable to each Distributed Product, or the analogous calculation for any Replacement Product;

"**Referral**" has the meaning ascribed thereto in Section 2.2;

"**Referral Commission**" has the meaning ascribed thereto in Section 5.6;

"**Renewal Term**" has the meaning ascribed thereto in Section 2.3;

"**Replacement Product**" means any product sold by Finning, anywhere other than in Canada, England and Chile, in place of a Distributed Product to a Person referred by Davis or his agent to Finning;

"**Returned Product**" has the meaning ascribed thereto in Section 5.7;

"**Running Royalty**" has the meaning ascribed thereto in Section 5.4;

"**Sale Price**" has the meaning ascribed thereto in Section 5.5;

"**Security Agreement**" has the meaning ascribed thereto in Section 6.7(a);

"**Security Documents**" has the meaning ascribed thereto in Section 6.7(c);

"**Specifications**" means, with respect to any Distributed Product, any specifications provided by or to Davis, to or by the manufacturer of any Major Components or Minor Components related to that Distributed Product;

- 4 -

Document: 1005628:05

"**Technology**" means all of the property and proprietary know-how, including any patents, patent applications, drawings (including assembly drawings), copyrights and other intellectual property rights used by Davis in relation to the special assembly of the Product Lines, including without limitation the items described in the attached Schedule B and any present or future improvements or enhancements thereto; and

"**Term**" means the Initial Term and any Renewal Terms described in Section 2.3.

1.2 **Schedules:** The following Schedules are incorporated into and form part of this Agreement:

| Schedule | | Description |
|---|---|---|
| Schedule A | - | Product Cost Summary |
| Schedule B | - | Technology |
| Schedule C | - | Davis' Warranty on Distributed Products |

1.3 **Division, Headings:** The division of this Agreement into Articles, Sections and Subsections and the insertion of headings are for convenience of reference only and will not affect the construction or interpretation of this Agreement.

1.4 **Gender and Number:** Unless the context otherwise requires, words importing the singular include the plural and vice versa and words importing gender include all genders.

1.5 **Invalidity of Provisions:** The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of any other provision of this Agreement and any such invalid or unenforceable provisions will be deemed to be severable. If any provision is declared to be invalid or unenforceable, the Parties agree to meet within thirty (30) days after any declaration of invalidity to renegotiate in good faith a valid amendment of the Agreement representing, as much as reasonably possible, the original intentions of the Parties.

1.6 **Currency:** Unless otherwise stated, all amounts in this Agreement are stated in United States' Dollars (US$).

1.7 **Accounting Principles:** In the absence of a specific provision in of this Agreement providing otherwise (expressly or by implication), financial or accounting determinations and calculations will be made in accordance with generally accepted accounting principles applicable in the United States.

1.8 **Calculation of Time:** Unless otherwise specified, time periods within or following which any act is to be done will be calculated by excluding the day on which the period commences and including the day on which the period ends.

1.9 **Business Day:** In the event that any action to be taken under this agreement falls on a day that is not a Business Day, then such action will be taken on the next succeeding Business Day.

1.10 **Inclusion:** Where the words "including" or "includes" appear in of this Agreement, they mean "including (or includes) without limitation".

- 5 -

Document: 1005628:05

1.11 **Governing Law:** This Agreement will be governed by and interpreted and construed in accordance with the laws in force in the State of Texas USA.

## 2. DISTRIBUTORSHIP AND TERM

2.1 **Grant of Distributorship:** Subject to Sections 2.2, 5.1, Article 15 and the Favelle Licence, Davis hereby grants to Finning the exclusive right to market, distribute and sell the Distributed Products throughout the world, and Finning hereby agrees to act as the exclusive distributor of Davis with respect to the Distributed Products, in accordance with the terms and conditions set forth in of this Agreement.

2.2 **Reservation of Rights / Referrals:** Notwithstanding Section 2.1, Davis may, by himself or through his agents, market the Distributed Products throughout the world. Davis or his agents will refer to Finning all prospective distributions and sales of Distributed Products that Davis or his agents solicit or procure (each, a "Referral"). Davis or his agents will prepare all sales orders and sales documents required by Finning in order for Finning to complete a sale from a Referral. Finning will use reasonable commercial efforts to complete all possible sales of Distributed Products from each Referral. Notwithstanding the foregoing, Davis will not, by himself or through his agents, conclude any sale for any Distributed Product, hold himself out as an agent of Finning, purport to have authority to bind Finning contractually or otherwise, or actually have authority to bind Finning contractually or otherwise. In consideration of Davis or his agents making Referrals, Finning will pay Davis the Referral Commission in accordance with Section 5.6.

2.3 **Term:** This Agreement will commence on the day and year first above written and will subsist for an initial term of 10 years (the "Initial Term"). Upon the expiry of the Initial Term or any Renewal Term, this Agreement will automatically renew for successive 5 year terms (each, a "Renewal Term") unless either Party delivers to the other Party written Notice of non-renewal not less than 60 days prior to the expiry of then current Initial Term or Renewal Term, as applicable. This Agreement will not be terminated except as provided in Articles 12 and 15.

## 3. PRODUCTION OF DISTRIBUTED PRODUCTS

3.1 **Facility:** Davis will build as soon as reasonably practicable or acquire the Tex-Steel facility located in Harlingen, Texas not later than August 12, 2002, or another manufacturing facility as soon as reasonably practicable (the "Facility") capable of accommodating in an efficient and effective manner:

    (a) the manufacture and assembly of the Distributed Products by Davis in a quantity sufficient to meet the projected demand of the parties and the quality control requirements mandated by manufacturers and suppliers of the Major Components;

    (b) the performance by Davis of ongoing testing and quality assurance of the Distributed Products; and

    (c) the researching further developments and improvements to the Technology, the Distributed Products and related technology and products.

3.2 **Supply of Major Components:** Finning will purchase for its own account and deliver to Davis, FOB Harlingen, Cameron County, Texas, all Major Components from Caterpillar or other suppliers as may be mutually agreed between the Parties from time to time, for use in the manufacture

- 6 -

and assembly of the Distributed Products by Davis. The Parties will cooperate and use reasonable commercial efforts to assist Finning in obtaining the Major Components at the lowest price possible, using the targeted amounts described in the attached Schedule A as a guide. Finning will coordinate with Davis the purchase and delivery of the Major Components in accordance with Article 4. As between the Parties, Davis will be the original equipment manufacturer of record for the Distributed Products.

3.3      **Supply of Minor Components:** Davis will purchase or provide for its own account all Minor Components at the lowest possible price obtainable by Davis though reasonable commercial efforts, using the amounts described in the attached Schedule A as a guide. Davis will coordinate with Finning the purchase and provision of the Minor Components in accordance with Article 4.

3.4      **Minimizing Costs:** The Parties will periodically review the Product Costs and will cooperate and use reasonable commercial efforts to minimize the Product Costs and to obtain the most cost effective method of manufacturing and assembling the Distributed Products.

3.5      **Manufacturing and Assembly:** Subject to Article 4, upon receipt of Major Components from Finning or its suppliers, Davis will manufacture and assemble the Distributed Products to which the Major Components pertain. Davis will manufacture and assemble the Distributed Products in a prompt, timely and efficient manner and will produce such Distributed Products to meet Finning's demand for the same, provided that Davis will have no obligation to manufacture and assemble any Distributed Product unless and until Finning, or its suppliers, have delivered to Davis the Major Components for that Distributed Product.

3.6      **Title and Risk of Loss:** Title to all Major Components and Distributed Products will at all times remain with Finning, its suppliers or its customers. Risk of loss to all Major Components will pass to Davis upon Finning or its suppliers delivering the Major Components to Davis and will remain with Davis until the Major Components are either:

(a)      manufactured and assembled into Distributed Products and such Distributed Products are delivered by Davis to Finning or Finning's customers in accordance with Article 4; or

(b)      the Major Components are returned to Finning or its suppliers on such terms as the Parties may agree from time to time.

Davis will purchase and maintain throughout the Term such insurance to protect against risk of loss to the Major Components and the Distributed Products as Finning may reasonably require from time to time. All insurance coverage that Finning requires Davis to maintain will be carried with insurer(s) reasonably acceptable to Finning. Davis will submit policies and/or certificates of insurance evidencing the required insurance coverage (which will include an agreement by the insurer not to cancel or alter its coverage except upon thirty (30) days prior written Notice to Finning) to Finning for its approval before entering into performance of this Agreement. The insurance coverage secured by Davis under this Agreement will be primary and non-contributing with any similar insurance that may be maintained or provided by Finning, and any certificate furnished by Davis will be endorsed to so state.

3.7      **Pricing:** The Parties periodically will consult with each other to establish a range of prices at which Finning will endeavour to sell the Distributed Products having regard to applicable market conditions and geographic locations. Finning will consult with Davis before selling any Distributed Product at a price outside the previously agreed upon price range for that Distributed Product. Notwithstanding the foregoing, Finning will, in its sole discretion after considering Davis' advice, finally

determine the price at which it sells any Distributed Product, provided however, that Finning will endeavour to maximize the Sale Price for all Distributed Products.

### 4.    ORDERS AND DELIVERY OF DISTRIBUTED PRODUCTS

**4.1    Orders for Distributed Products:** Finning will, from time to time, deliver to Davis written orders for Distributed Products, specifying the type and quantity of Distributed Products ordered, the Person and location to which the Distributed Products are to be delivered upon completion, the required delivery date for the Distributed Products, and such other details reasonably required to process and fulfil such an order. Upon Finning delivering an order to Davis for Distributed Products, Finning will arrange for all Major Components related to that order to be delivered to Davis at the Facility. Upon receipt of such Major Components by Davis at the Facility, Davis will manufacture and assemble the Distributed Products specified in that order in accordance with that order and will promptly notify Finning upon the completion of the Distributed Products.

**4.2    Delivery of Distributed Product:** At Finning's cost, Davis will deliver completed Distributed Products to the Person, at the location and on the date specified by Finning in each order, provided however, that the specified delivery date will not be less than 60 calendar days from the date on which the Major Components related to that order were delivered to Davis at the Facility. The Parties will cooperate and coordinate the order and delivery of Distributed Products, Major Components and Minor Components in order to efficiently fulfil Finning's demand for Distributed Products in a timely and cost-effective manner.

**4.3    Transportation, Insurance and Shipping Documents:** At Finning's cost, Davis will be responsible for arranging all transportation for Distributed Products from the Facility to the delivery location specified in each order and will also procure insurance for the Distributed Products against the risks of transportation with a well-rated insurance company approved by Finning acting reasonably. Davis will be responsible for preparing or causing to be prepared all documents and invoices necessary for transportation of the Distributed Products.

### 5.    PAYMENTS

**5.1    Distribution and Licensing Fee:** Upon Finning's obligations under this Section 5.1 commencing and becoming of full force and effect pursuant to Article 15, and in consideration of Davis granting Finning the rights in Section 2.1, Finning will pay Davis US$1,500,000 (the "Distribution and Licensing Fee") by initiating a wire transfer of the Distribution and Licensing Fee to an account specified by Davis. Davis will refund one third of the Distribution and Licensing Fee (US$500,000) to Finning by Davis directing Finning to retain 50% of the Running Royalty in accordance with Section 5.4 (the "Fee Refund"). Davis will use a portion of the Distribution and Licensing Fee to protect the Technology for the benefit of Finning and to further develop the Technology and the Distributed Products.

**5.2    Davis Costs:** Finning will pay Davis the Davis Costs applicable to each Distributed Product within 15 Business Days of Davis advising Finning that the Distributed Product is fully manufactured and assembled in accordance with this Agreement, conforms to the Specifications and is ready to be shipped to a customer. In the event Davis does not have sufficient operating capital to finance the Davis Costs, upon the request of Davis, Finning will consider advancing funds to Davis for this purpose upon such terms as the Parties may from time to time agree, provided that nothing in this Section 5.2 will be construed as requiring Finning to advance any funds to Davis.

- 8 -

**5.3**     **Manufacturing Overhead Costs:**  Before the start of each calendar quarter during the Term or before the start of such other period of time as the Parties may agree (each, a "Period"), the Parties will agree upon the estimated Manufacturing Overhead Costs for that Period (the "Estimated Manufacturing Overhead Costs") together with the estimated number of Distributed Products to be manufactured and assembled by Davis during that Period (the "Estimated Production Quantity"). Each time Finning orders a Distributed Product, Finning will pay Davis the Estimated Manufacturing Overhead Costs divided by the Estimated Production Quantity (the "Per Unit EMOC"). As soon as reasonably practicable after the end of each Period, the Parties will calculate the actual Manufacturing Overhead Costs for that Period. The Parties will adjust the Per Unit EMOC for each Period up or down by the amount by which the aggregate Per Unit EMOC paid by Finning to Davis during the immediately previous Period is less than or exceeds the actual Manufacturing Overhead Costs for that Period, respectively. It is the intention of the Parties that the Per Unit EMOC will be adjusted each Period pursuant to this Section 5.3 so that the aggregate Per Unit EMOC paid by Finning to Davis throughout the Term is equal to the aggregate Manufacturing Overhead Costs throughout the Term, on a Period by Period basis.

**5.4**     **Running Royalty:**  Within 10 Business Days of Finning receiving the Sale Price in full from a customer with respect to the initial sale of a Distributed Product, Finning will pay Davis a running royalty equal to six percent (6%) of the Product Cost for that Distributed Product (the "Running Royalty"). Notwithstanding the foregoing, Davis irrevocably directs Finning to withhold 50% of the Running Royalty and credit it towards the Fee Refund until Davis has paid Finning the Fee Refund in full totalling $500,000. For greater certainty, the Parties agree that Davis will only receive a Running Royalty with respect to the first sale of each particular Distributed Product to a customer, and will not be entitled to, and Finning will not pay Davis, any Running Royalty with respect to the resale or any subsequent sale of that particular Distributed Product by the customer, Finning or any other Person, whether or not that particular Distributed Product becomes a Returned Product.

**5.5**     **Marketing Fee:**  To the extent that the price for which Finning sells a Distributed Product to a customer (the "Sale Price") exceeds the Landed Dealer Cost for that Distributed Product (the difference being the "Gross Margin"):

   (a)     Finning will retain that portion of the Gross Margin up to an amount equal to 20% of the Sale Price (the "Marketing Fee"); and

   (b)     Finning will pay Davis within 15 Business Days of Finning receiving the Sale Price in full from the customer, 75% of any portion of the Gross Margin remaining after Finning has retained the Marketing Fee (the "Davis Payment"). At any and all times while there is an outstanding balance under the Facility Loan, Davis hereby irrevocably directs Finning to retain 60% of the Davis Payment owing by Finning to Davis in accordance with this Section 5.5 and apply such amount to payment by Davis of the Facility Loan until the Facility Loan is repaid in full.

**5.6**     **Referral Commission:**  In addition to other amounts contemplated in this Agreement, Finning will pay Davis a referral commission equal to 5% of the Sales Price for each Distributed Product or Replacement Product sold by Finning arising from a Referral within 6 months of Davis making the Referral, provided that all such sales must arise independent from any pre-existing relationship that any such customer had with Finning, as evidenced in Finning's Books and Records, for each product in the Product Lines (the "Referral Commission"). In order for Davis to be eligible for a Referral Commission with respect to any Distributed Product, Davis or his marketing agents must complete and deliver to Finning the sales order and all other sales documents required by Finning to finalise the sale of that

- 9 -

Distributed Product. Finning will pay Davis the Referral Commission applicable to each Distributed Product sold within 15 Business Days of Finning rendering an invoice to the customer with respect to that Distributed Product.

**5.7**      **Reversal of Sales:**  Notwithstanding any other provision of this Agreement, if a customer reverses the purchase of a Distributed Product from Finning and returns that Distributed Product to Finning or its agents (each, a "Returned Product"), Davis will not be entitled to the Referral Commission, if applicable, with respect to that Returned Product. If Finning has paid Davis the Referral Commission with respect to a Returned Product, Davis will refund the Referral Commission so paid by Finning with respect to that Returned Product within 15 Business Days of Finning advising Davis that the customer has returned that Returned Product, by either paying Finning such Referral Commission or by issuing Finning a credit equal to the amount of such Referral Commission, as Finning may direct in its discretion.

**6.**      **FINNING FINANCING**

**6.1**      **Facility Loan:**  Finning will make available to Davis, and Davis will borrow from Finning, up to the principal amount of US$1,500,000 (the "Facility Loan"), upon the terms and conditions set out in this Agreement. The Facility Loan will not bear interest from the date of advance until July 15, 2007. The Facility Loan will bear interest after July 15, 2007 in accordance with Section 6.5.

**6.2**      **Purpose:**  Davis will use the Facility Loan exclusively for the purposes of building, acquiring or equipping the Facility and for no other purpose.

**6.3**      **Advance of Funds:**  Davis may draw against the Facility Loan and Finning will advance Davis funds under the Facility Loan only in accordance with the provisions of Article 6. Each time Davis wishes to draw against the Facility Loan, he will make a request to Finning in writing specifying the amount and the date on which he wishes Finning to advance him funds under the Facility Loan, which date will not be less than 15 Business Days after the date on which Davis delivers the request to Finning. Concurrently with Finning making any advance under the Facility Loan, Davis will execute such documents as Finning may reasonably require to evidence the portion of the Facility Loan to be advanced. Notwithstanding the foregoing, Finning will not be required to advance Davis funds under the Facility Loan if:

(a)      Davis has not executed and delivered to Finning the Security Documents in accordance with Section 6.7;

(b)      Davis has committed an Event of Default;

(c)      in the reasonable opinion of Finning, there has been any material adverse change in the business, assets or financial condition of Davis; or

(d)      there is any action, proceeding or investigation pending or threatened against Davis, which would in the reasonable opinion of Finning, if successful, have a material adverse effect on Davis' ability to repay the Facility Loan under the terms of this Agreement.

**6.4**      **Acknowledgement of Previous Advance:**  Davis acknowledges that Finning previously advanced Davis US$100,000 on June 18, 2002, pursuant to the LOI. Davis agrees that this US$100,000

- 10 -

will be deemed to be an advance under the Facility Loan and will be subject to the provisions of this Agreement.

6.5       **Repayment of Facility Loan:** Subject to Sections 5.5, 6.6, 11.1, 12.1 and Article 15, the outstanding balance of the Facility Loan will become immediately due and payable, and Davis will pay Finning the outstanding balance of the Facility Loan in full, on or before July 15, 2007; and if the Facility Loan is not paid to Finning in full on or before July 15, 2007, then interest will accrue at an interest rate equal to LIBOR + 5% on the outstanding balance of the Facility Loan from July 15, 2007 until the Facility Loan and interest are paid in full.

6.6       **Prepayment:** Notwithstanding Section 6.5, Davis may at any time repay Finning the whole or from time to time any part of the outstanding balance of the Facility Loan without notice, bonus or penalty. Any payments so received by Finning will be applied firstly to any accrued and unpaid interest, and secondly to the unpaid balance of the principal then outstanding.

6.7       **Security:** As security for repayment of the Facility Loan, Finning will, as soon as reasonably practicable after the date of this Agreement, deliver to Davis for his approval the documents listed in this Section 6.7, and upon such approval, Davis will:

    (a)     execute and deliver to Finning a security agreement (the "**Security Agreement**") granting Finning a first charge security interest over:

        (i)     all of Davis' equipment and tooling to be purchased with the proceeds of the Facility Loan; and

        (ii)     the Technology (and Finning acknowledges that the Technology, by its definition, does not relate to the special assembly of any marine or offshore products);

    in a form acceptable to Finning, provided that the security interest granted to Finning in the Technology will be subject to an ongoing automatic right of reversion in favour of Davis for a period of 10 years commencing from the date of the Security Agreement. If at any time during this 10 year period Davis pays Finning in full the outstanding balance of the Facility Loan (including all accrued interest thereon, if any), the ownership of the Technology will automatically revert to Davis. Finning agrees to execute such documents and take further steps as may be reasonably required to perfect this reversion of ownership at that time;

    (b)     immediately upon the later of Davis acquiring the Facility or executing this Agreement, Davis will execute and deliver to Finning a mortgage, in a registrable form acceptable to Finning, together with all other related documents Finning determines are necessary for registering the same, granting Finning a first mortgage over the Facility (the "**Mortgage**"); and

    (c)     execute and deliver to Finning a collateral assignment of all royalties and income to be derived by Davis from the Technology or the Distributed Products, in a form acceptable to Finning (the "**Assignment of Royalties**", together with the Security Agreement and Mortgage, the "**Security Documents**").

- 11 -

6.8      **Compliance with Finning's Policies:** Davis will comply promptly with any and all reasonable policies and other guidelines of Finning with respect to Distributed Products of which Finning will give Davis upon execution of this Agreement.

6.9      **Initial Advance of Funds:** The Parties will use reasonable commercial efforts to complete and execute the Security Documents as soon as reasonably practicable, but in any event not later than August 1, 2002. Subject to Section 6.3, Finning will advance US$750,000 under the Facility Loan to Davis by initiating a wire transfer of such funds to an account specified by Davis not later than August 1, 2002.

## 7.     REPRESENTATIONS, WARRANTIES AND COVENANTS

7.1      **Davis Representations, Warranties and Covenants:** Davis represents, warrants and covenants to and with Finning, with the intention that Finning is relying upon these representations, warranties and covenants in entering into this Agreement, that except as otherwise expressly provided for in this Agreement, now and at all times throughout the Term:

    (a)     Davis has the requisite power, authority and approvals to enter into, execute and deliver this Agreement, the Security Documents and to perform his respective obligations under this Agreement and the Security Documents;

    (b)     the execution and delivery of this Agreement and the Security Documents and the performance by Davis of his obligations under this Agreement and the Security Documents will not conflict with or constitute a breach of or default under any outstanding contract, commitment or agreement to which Davis is a party or to which the Technology or Distributed Products are subject, or limit, restrict or impair the rights granted to Finning under this Agreement and the Security Documents;

    (c)     Davis is not bankrupt or insolvent, no receiver, receiver-manager, receiver and manager, or liquidator has been appointed over any part of the property of Davis, no proceeding has been commenced by or against Davis under any bankruptcy, arrangement, reorganization, dissolution, liquidation, insolvency or similar law for the relief of or otherwise affecting creditors of Davis, or by or against any guarantor or surety for Davis, and no writ of execution, warrant, attachment, sequestration, levy, third party demand, notice of intention to enforce security or garnishment or similar process has been issued against Davis or any of Davis' property (each, a "Davis Insolvency Event");

    (d)     Davis is not aware of any basis for a Davis Insolvency Event to occur;

    (e)     Davis is the sole and exclusive legal and beneficial owner of the Technology, free and clear of all mortgages, assignments of rents, leases, licenses, charges, security interests, hypothecs, liens, options to acquire any interest in, claims, judgments or any other form of encumbrance (each, an "Encumbrance") other than the Favelle Licence and any security or rights granted to Finning pursuant to this Agreement;

    (f)     other than the Favelle Licence, Davis has not granted and no third party has any rights or anything capable of becoming a right, to use the Technology or to distribute, market or sell the Distributed Products;

- 12 -

(g)     to the best of Davis' knowledge after making due enquiry, the Technology does not infringe any Intellectual Property Rights of any Person;

(h)     upon executing and delivering the Mortgage in accordance with Section 6.7, Davis will be the registered and beneficial owner of the Facility, free and clear of all financial Encumbrances other than the Mortgage;

(i)     the Major Components, Minor Components and Technology, together with Davis' skills and all drawings, specifications, engineering and related materials in his possession, are sufficient to enable him to manufacture or assemble the Distributed Products in a safe and competent manner;

(j)     all Distributed Products will be manufactured and assembled by Davis in a prompt, efficient, skilful and careful manner in accordance with North American industry standards for the manufacture and assembly of similar equipment, and in compliance with all applicable Laws;

(k)     upon being delivered by Davis to Finning or its customers in accordance with Article 4, all Distributed Products will conform to the Specifications, will be new (except to the extent that the Major Components, when delivered to Davis by Finning, are not new), of merchantable quality and will be fit for their intended purpose;

(l)     Davis will only use the Technology for the purposes of manufacturing and assembling the Product Lines;

(m)     Davis will not grant any license or other rights in the Technology for the Product Lines to any Person without Finning's prior written consent;

(n)     Davis will not permit any Encumbrance to exist on any of its property or assets, including the Facility, Technology and Minor Components, except as expressly contemplated in this Agreement or as otherwise approved by Finning in writing; and

(o)     Davis will obtain and maintain in full force and effect throughout the Term, at its own expense, any and all permits, approvals and licenses required by any Governmental Authorities relating to the manufacture and assembly of the Distributed Products at the Facility.

7.2     **Finning Representations, Warranties and Covenants:**  Finning represents, warrants and covenants to and with Davis, with the intention that Davis is relying upon these representations, warranties and covenants in entering into this Agreement, that except as otherwise expressly provided for in this Agreement, now and at all times throughout the Term:

(a)     Finning has the requisite power, authority and approvals to enter into, execute and deliver this Agreement and to perform its respective obligations under this Agreement;

(b)     the execution and delivery of this Agreement and the performance by Finning of its obligations under this Agreement will not conflict with or constitute a breach of or default under any outstanding contract, commitment or agreement to which Finning is a party, or limit, restrict or impair the rights granted to Davis under this Agreement;

- 13 -

(c) Finning is not bankrupt or insolvent, no receiver, receiver-manager, receiver and manager, or liquidator has been appointed over any part of the property of Finning, no proceeding has been commenced by or against Finning under any bankruptcy, arrangement, reorganization, dissolution, liquidation, insolvency or similar law for the relief of or otherwise affecting creditors of Finning, or by or against any guarantor or surety for Finning, and no writ of execution, warrant, attachment, sequestration, levy, third party demand, notice of intention to enforce security or garnishment or similar process has been issued against Finning or any of Finning's property (each, a "Finning Insolvency Event");

(d) Finning is not aware of any basis for a Finning Insolvency Event to occur;

(e) Finning will not grant any rights in this Agreement to any Person without Davis' prior written consent;

(f) Finning will not permit any Encumbrance to exist on or with respect to this Agreement;

(g) Finning will obtain and maintain in full force and effect throughout the Term, at its own expense, any and all permits, approvals and licenses required by any Governmental Authorities relating to the sale or distribution of the Distributed Products;

(h) Subject to Sections 6.7, 12.1 and the Security Documents, Finning acknowledges that Davis is the sole and exclusive owner of the Technology and that Finning will not challenge, in any forum, Davis' right of ownership over the Technology;

(i) Any improvement or enhancement to the Technology will be the sole and exclusive property of Davis;

(j) Finning will use reasonable commercial efforts to complete the sale for all referrals received from Davis or his agent; and

(k) Finning will use reasonable commercial efforts to market and sell the Distributed Products within the Product Lines throughout the world.

8. **DISTRIBUTED PRODUCT WARRANTIES**

The Parties will cooperate and use reasonable commercial efforts to cause all warranties offered by manufacturers of the Major Components to be passed on to and for the benefit of Finning's end-use customers. Davis will, at its own expense, provide or cause DAVCRANE Inc. to provide, all customers who purchase a Distributed Product through Finning with a warranty that the manufacturing and assembling performed by Davis will be free from defects in accordance with the provisions in the attached Schedule C.

9. **CONFIDENTIALITY**

9.1 Confidentiality: Unless otherwise agreed upon in writing between the Parties or as required by law or stock exchange requirements, a Receiving Party will keep all Confidential Information which is disclosed to it by a Disclosing Party under this Agreement confidential and will not disclose the Confidential Information to any third party. The Receiving Party will not reproduce any Confidential Information supplied to it in any form except as required to accomplish the purpose of and in accordance with the terms of this Agreement. The Receiving Party will provide the same care to avoid disclosure or

- 14 -

unauthorized use of Confidential Information as it provides to protect its own similar proprietary information but in no event will the Receiving Party fail to use reasonable commercial efforts and take reasonable care under the circumstances to avoid disclosure or unauthorized use of Confidential Information. Confidential Information, unless otherwise specified in writing: (a) will remain the property of the Disclosing Party; (b) will be used by the Receiving Party only for the purposes of any work under this Agreement; and (c) which is in tangible form, including all copies of such information, will be returned to the Disclosing Party or destroyed (as the Disclosing Party may direct) after the Receiving Party's need for it has expired or upon request of the Disclosing Party, and, in any event, upon termination or expiry of this Agreement.

9.2        **Disclosure Required By Law:**  The Receiving Party will not be in breach of its obligation not to disclose Confidential Information of the Disclosing Party if that disclosure is required by law, a court order or a stock exchange having authority over the Receiving Party, provided that the Receiving Party gives the Disclosing Party as much Notice as is reasonably in the circumstances prior to disclosing any Confidential Information and the Receiving Party co-operates with the Disclosing Party in any application, proceedings or other action the Disclosing Party may undertake to obtain a protective order or other means of protecting the confidentiality of the Confidential Information required to be disclosed.

10.        **INTELLECTUAL PROPERTY RIGHTS**

10.1        **Protection of Intellectual Property Rights:**  Davis will obtain patent and other Intellectual Property Rights' registrations and protections in each additional country as reasonably requested by Finning for the Technology.  The Parties agree to share equally in the cost of expanding protection of the Intellectual Property Rights included in the Distributed Products in additional countries, and to consult with each other to formulate a plan and effect the optimal protection at reasonable expense. Nothing in this paragraph will be interpreted to require Finning to participate, support or financially contribute in any way in or to the defence or opposition to any Claim that may be made by any Person against the Technology and/or against Davis in respect of his rights in the Technology.

10.2        **Notification of Intellectual Property Disputes:**  The Parties will promptly notify each other of any existing, expected or threatened dispute with any third Person, which comes to their attention regarding the Technology, or any Intellectual Property Rights relating to the Distributed Products, or of any act or event which may negatively affect the Parties or the sale of the Distributed Products.

10.3        **Notice of Infringements by Third Parties:**  Finning will promptly inform Davis of all instances of which it may have knowledge which constitute or could constitute an infringement of the Technology.

11.        **DISPOSITION OF TECHNOLOGY**

11.1        **Prohibition / Facility Loan:**  Davis will not sell, license, assign, transfer, encumber or otherwise dispose of any of his rights in or to the Technology or the Distributed Products to any Person, including any sale, license, assignment, transfer, encumbrance or disposition made pursuant to Section 11.2, while there is any outstanding balance owing to Finning under the Facility Loan.

11.2        **Right of First Refusal:**  If Davis wishes to sell, license, assign, transfer, encumber or otherwise dispose of any of his rights in or to the Technology or the Distributed Products to any Person other than Finning, Davis will, in writing, first offer Finning to acquire such rights on the same terms being offered to or by that other Person.  If within 30 calendar days of receiving such an offer from Davis,

- 15 -

Finning does not deliver to Davis written Notice of its intention to acquire such rights on such terms, Davis will be free to dispose of such rights, subject to Finning's rights in and to the Technology and the Distributed Products under this Agreement, within 30 calendar days on such terms to the other Person upon paying Finning 25% of the proceeds of such disposition as a distributorship cancellation fee. Notwithstanding the foregoing, the Parties may, by mutual agreement, dispose of all or any portion of the Technology or the Distributed Products.

## 12.    EVENTS OF DEFAULT AND TERMINATION

12.1    **Event of Default by Davis:**  If Davis has committed an Event of Default and fails to cure such Event of Default within 30 Business Days of Finning delivering Notice of the same to Davis, Finning may do any or all of the following:

    (a)    terminate this Agreement forthwith in its entirety without prejudice, however, to any rights it may have against Davis arising prior to termination;

    (b)    declare the outstanding balance of the Facility Loan to be immediately due and payable by Davis and exercise any and all rights Finning may have at law, in equity or pursuant to this Agreement or the Security Documents; and

    (c)    take possession of the Facility, Technology, Major Components, Minor Components and Distributed Products and conduct manufacturing and assembly of the Distributed Products itself.

12.2    **Event of Default by Finning:**  If Finning has committed an Event of Default and fails to cure such Event of Default within 30 Business Days of Davis delivering Notice of the same to Finning, Davis may terminate this Agreement forthwith in its entirety without prejudice, however, to any rights it may have against Finning arising prior to termination.

## 13.    FORCE MAJEURE

13.1    **Relief:**  If a Party is prevented or delayed in performing or observing its obligations under of this Agreement by Force Majeure, the time for performance of those obligations is deferred for the duration of the event or circumstance of Force Majeure.

13.2    **Notice:**  A Party that is prevented or delayed by Force Majeure and that seeks relief under this Article 13 must give written Notice to the other Party as soon as possible after the event or circumstance of Force Majeure is known to the first Party, and in any event not later than two (2) Business Days after the date when that event or circumstance is known to the first Party. A Party that has given Notice of an event or circumstance of Force Majeure will give Notice to the other Party of the cessation of that event or circumstance promptly after cessation is known to the first Party.

13.3    **Mitigation:**  If Notice is given by either Party of an event or circumstance of Force Majeure, each Party will exercise reasonable commercial efforts to avoid, or minimize any delay occasioned thereby, provided that a Party prevented or delayed by a strike, lockout or labour disturbance or slowdown will not be required to settle that matter other than on terms acceptable to it in its discretion. The Parties will meet promptly after any Notice is given under Section 13.2, and from time to time thereafter during the continuance of any event or circumstance of Force Majeure, to discuss and endeavour in good faith to agree upon measures to be taken by either or both Parties to avoid, or minimize any delay, occasioned by that event or circumstance of Force Majeure.

- 16 -

13.4        **Resumption of Performance:**  A Party that is prevented or delayed in the performance or observance of its obligations under of this Agreement by Force Majeure will resume promptly the performance and observance of those obligations after cessation of the event or circumstance of Force Majeure.

**14.**        **DISPUTE RESOLUTION/REMEDIES**

14.1        **Dispute:**  Any dispute or controversy arising out of or in connection with this Agreement or its performance, including without limitation the validity, scope, meaning, construction, interpretation or application of this Agreement or any provision of this Agreement will be submitted to final and binding arbitration by a single arbitrator.  The arbitration will be administered by the American Arbitration Association in accordance with its International Arbitration Rules.  The place of arbitration will be Houston, Texas.  The Parties will instruct the arbitrator that the Parties desire any arbitration proceedings to be completed as expeditiously as possible.  A Party may enter any judgment rendered by the arbitrator in and by any court having jurisdiction.  Notwithstanding any provision in this Agreement, neither Party will be entitled to claim, and the arbitrator will not award, punitive, special or other damages in excess of actual damages sustained by a Party.  The arbitrator may award costs for reasonable attorney's fees.

14.2        **Equitable Remedies:**  Nothing in the Agreement is intended to prevent or limit a Party's access to injunction or other equitable or mandatory relief before the arbitrator.  Each of the Parties acknowledges and agrees that any breach by the other Party of any of its obligations under of this Agreement may result in immediate and irreparable harm to the other Party, and that in the event of such a breach, the other Party will be entitled to interim and interlocutory injunctive relief without being required to prove irreparable harm or to post security.

14.3        **Damages:**  Subject to the limitations contained in Section 14.1, nothing else in this Agreement will be construed so as to prevent or restrict either Party from exercising any right to claim damages against the other Party by reason of any breach of or default under of this Agreement by the other Party.

14.4        **Remedies Non-Exclusive:**  All rights and remedies provided hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

**15.**        **DUE DILIGENCE**

        The rights and obligations of the Parties under this Agreement will not commence and will be of no force and effect unless and until Finning has completed due diligence on the Technology as it deems necessary, which Finning will do on or before July 22, 2002 (the "Due Diligence Completion Date"), and Finning is satisfied, in its sole discretion, as to the composition, status and integrity of the Technology.  If Finning is, in its sole discretion, not satisfied as to the composition, status and integrity of the Technology, Finning may terminate this Agreement by delivering a written Notice of termination to Davis on or before the Due Diligence Completion Date, whereupon this Agreement will terminate and the US$100,000 advanced by Finning to Davis pursuant to the LOI will be applied as a credit against future purchases by Finning of products from Davis or an affiliate of Davis.  If Finning does not deliver a written Notice of termination to Davis on or before the Due Diligence Completion Date, the rights and obligations of the Parties under this Agreement will commence and will be of full force and effect at 12:01 a.m. Pacific Daylight Time on July 23, 2002.

- 17 -

16.    **GENERAL**

16.1    **Further Assurances:** The Parties agree that they or their respective heirs, executors, administrators, personal representatives, successors or permitted assigns will execute and deliver such further and other instruments, agreements and writings and will cause such meetings to be held, resolutions passed and by-laws enacted, exercise their vote and influence, do and perform and cause to be done and performed, such further and other acts and things that may be necessary or desirable in order to give full effect to of this Agreement and every part of it.

16.2    **Withholdings:** Notwithstanding any provision in this Agreement, each Party will deduct from and remit to the appropriate Governmental Authorities within the time required by Law, all amounts that the Party is required to withhold and remit pursuant to all applicable Laws with respect to any payment made under this Agreement.

16.3    **Relationship:** The relationship between Davis and Finning is solely that of independent contractors, and nothing in of this Agreement will cause Davis to be considered an agent, employee, joint venturer or legal representative of Finning; nor will Davis hold itself out as an agent, employee, joint venturer or legal representative of Davis. Davis will have no authority to bind or commit Finning in any manner or for any purpose whatsoever and will not undertake any obligation or responsibility, express or implied, on behalf of or in the name of Finning. This Agreement creates no joint ventures, or partnerships or principal/agent relationships between the Parties. Finning will under no circumstances be liable for any acts committed by Davis or his employees, agents, or representatives. Davis will under no circumstances be liable for any acts committed by Finning or its officers, directors, employees, agents or representatives.

16.4    **Time of Essence:** Time will be of the essence of this Agreement and of every part of this Agreement and no extension or variation of this Agreement will operate as a waiver of this provision.

16.5    **Successors and Assigns:** This Agreement will enure to the benefit of and be binding upon the Parties hereto, and their respective heirs, executors, administrators, personal representatives, successors or permitted assigns.

16.6    **No Waiver:** A waiver by either Party of any of its rights hereunder or the performance by the other Party of any obligation hereunder will be without prejudice to all or any of the other rights of the Party hereunder so waiving and will not constitute a waiver of any such other right or, in any other instance, of the right so waived, or a waiver of the performance by the other Party of any other obligations hereunder or the performance, in any other instance, of the obligations so waived.

16.7    **Notice:** Any Notice, consent, authorization, direction or other communication required or permitted to be given hereunder will be in writing and will be delivered either by personal delivery, courier, facsimile or similar telecommunications device and addressed as follows:

(a)    in the case of the Davis, to it at:

Daniel E. Davis
P.O. Box 2427
Harlingen, Texas 78551
Fax: (956) 399-9174

- 18 -

Document: 1005628:05

With copies to:

Alton W. Payne
5001 Bissonnet, Suite 200
Bellaire, TX 77401
Fax: (713) 840-8088 / (713) 661-6001

Dennis Sanchez
Sanchez, Whittington, Janis & Zabarte, L.L.P.
100 North Expressway 83
Brownsville, Texas 78521-2284
Fax: (956) 546-3765

(b)    in the case of the Finning, to it at:

Finning International Inc.
16830 – 107th Avenue
Edmonton, Alberta T5P 4C3

Attention:    Mel Terren

Fax: (780) 930-4891

With a copy to:

Finning International Inc.
Suite 1000
Park Place
666 Burrard Street
Vancouver, British Columbia V6C 2X8

Attention:    John T. Struthers, Corporate Secretary

Fax: (604) 331-4887

Any Notice, consent, authorization, direction or other communication delivered as aforesaid will be deemed to have been effectively delivered and received, if sent by facsimile or similar telecommunications device on the calendar day next following receipt of such transmission or, if delivered, to have been delivered and received on the date of such delivery provided, however, that if such date is not a Business Day then it will be deemed to have been delivered and received on the Business Day next following such delivery. Either Party may change its address for service by Notice delivered as aforesaid.

16.8    Entire Agreement: This Agreement and the Security Documents constitute the entire agreement between the Parties hereto pertaining to the subject matter of this Agreement and supersedes all prior and contemporaneous agreement, understandings, negotiation and discussions, whether oral or written (including without limitation, the LOI), of the Parties, and there are no representations, warranties or other agreements between the Parties in connection with the subject matter of this Agreement except as expressly set forth in such agreements. No supplement, modification, waiver, qualification or termination of this Agreement will be binding unless in writing and executed by the Parties to be bound thereby.

- 19 -

16.9       Amendments to Agreement: This Agreement may be amended only by written instrument executed by all Parties hereto.

16.10       Assignment: Neither Party may assign or transfer this Agreement or any of his or its rights and obligations hereunder without the prior written consent of the other Party.

16.11       Survival: Sections 3.6 (Title and Risk of Loss), Articles 7 (Representations, Warranties and Covenants), 9 (Confidentiality), 12 (Events Of Default And Termination) and 16 (General), together with all provisions necessary for the enforcement and interpretation thereof, will survive the expiry or termination of this Agreement howsoever caused, and will continue in full force and effect subsequent to and notwithstanding such expiry or termination until they are satisfied or by their nature expire.

16.12       Counterparts: This Agreement may be executed by the Parties in separate counterparts each of which when so executed and delivered will be an original, but all such counterparts will together constitute one and the same instrument.

      IN WITNESS WHEREOF, the Parties hereto have duly caused of this Agreement to be executed on the date first written above.

SIGNED, SEALED AND DELIVERED by
DANIEL E. DAVIS in the presence of:

_Laura A. Ols_                )
Witness                     )    _Daniel E. Davis_ (seal)
                          )    DANIEL E. DAVIS

FINNING INTERNATIONAL INC.

By: _____
     Authorized Signatory

- 20 -

Document: 100942635

## SCHEDULE A

### Product Cost Summary

This Agreement is based on the following estimated cost breakdown. The Parties expect changes during negotiations with suppliers. The intent of both Parties is to eliminate all unnecessary costs, and to cooperate fully to achieve the lowest cost of production, while maintaining a quality product.

These costs are based on the Cost sheets presented to me on May 11, 2002, and on further details developed by Davis and presented on June 9, 2002.

### PRODUCT COST SUMMARY

| PRODUCT LINE | TH63 - 9 TON | 320B - 28 TON | 325B - 38 TON | 325B - 50 TON | 325B - PIPELAYER |
|---|---|---|---|---|---|
| UNIT VOLUME / YEAR | 50 | 12 | 12 | 6 | 12 |
| SELLING PRICE | $150,000 | $310,000 | $385,000 | $525,000 | $425,000 |
| SALES VOLUME | $7,500,000 | $3,720,000 | $4,620,000 | $3,150,000 | $5,100,000 |
| MANUFACTURING COST | | | | | |
| Caterpillar Components | $45,000 | $123,690 | $144,409 | $167,600 | $185,000 |
| Manitex components | $38,500 | $27,492 | $43,594 | nil | nil |
| Other Mfr's | $4,700 | $15,877 | $17,067 | $69,470 | $44,000 |
| Freight | $ 6,500 | $12,792 | $13,392 | $8,500 | $14,000 |
| FINNING | $94,700 | $179,851 | $218,462 | $245,570 | $243,000 |
| SHOP COSTS | | | | | |
| Components | $7,328 | $14,079 | $14,659 | $33,536 | $22,537 |
| Labour | $6,116 | $16,936 | $21,449 | $94,481 | $20,935 |
| Insurance / Warranty | $3,876 | $6,698 | $8,491 | $23,631 | $8,043 |
| Sub Total - DavCrane | $17,320 | $37,713 | $44,599 | $151,648 | $51,515 |
| MFG OVERHEAD | $6,076 | $9,999 | $12,282 | $16,547 | $9,999 |
| DAVCRANE | $23,396 | $47,712 | $56,881 | $168,195 | $61,514 |
| TOTAL | $118,096 | $227,563 | $275,343 | $413,765 | $304,514 |
| ROYALTY - 6% | $7,086 | $13,654 | $16,521 | $24,826 | $18,271 |
| COST TO FINNING | $125,182 | $241,217 | $291,864 | $438,591 | $322,785 |
| Manufacturing Overhead (Annual) | $303,800 | $119,988 | $147,384 | $99,282 | $119,988 |

NOTE: Mfg OH budget is based on these HEX based units only

| | |
|---|---|
| Annual for 42 units | $486,642 |
| Monthly | $40,553.50 |

-21-

**SCHEDULE B**

**Technology**

**CONFIDENTIAL**
**PATENT AND PATENT APPLICATIONS:**

U.S. Patent No. 6,003,252 issued to Daniel E. Davis.

Patent Application entitled Piplayer-Crane- Apparatus and Method.

Patent Application entitled Telehandler-Crane- Apparatus.

Patent Application entitled Universal Excavator Boom Attachment and Method.

Additional patent applications are to be filed.

**CONFIDENTIAL**
**DESIGN AND MANUFACTURING DRAWINGS:**

**9 TON TELEHANDLER DRAWINGS:**
303 drawings bearing drawing numbers 9-2-001 to 9-6-002.
General Arrangement   9T GA

**28 TON CRANE DRAWINGS:**
301 drawings bearing drawing numbers 28-2-001 to 28-6-009 and 5002668.001 to
5002669-023.

| | |
|---|---|
| General Arrangement | 28T GA |
| Adaptor Weldment | Bill of Material #28-5-001 |
| Manitex | Bill of Material #6000740.023 |
| Braden | Bill of Material #FD12C (General Dimensions) |

CIPI Group Numbers:

| | |
|---|---|
| - 9Q5972 | Upper Structure Bill of Material |
| - 1176346 | Optional Third pedal |
| - 1263784 | Optional Guard |
| - 1204955 | Optional Guard |
| - 1263799 | Optional High Ambient Cooling |
| - 1114696 | Optional Travel alarm |
| - 152 8744 | VG Lower Bill of Material |

- 22 -

**38 TON CRANE DRAWINGS:**
16 drawings bearing
drawing numbers 38-4-011 to 38-5-159 and B5303.001.

| | |
|---|---|
| General Arrangement | 38T GA |
| Adaptor Weldment | Bill of Material #38-5-100 |
| | #38-5-130 |
| | #38-5-129 |
| | #38-5-142 |
| Manitex | Bill of Material #6000740.021 |
| Braden | Bill of Material #PD15   (General Dimensions) |

**CIPI Group Number:**
- 9Q5973         Upper Structure  Bill of Material

- 152 8744       VG Lower Bill of Material

**SIDE-BOOM (PIPELAYER) DRAWINGS:**
Same 317 drawings listed for 28/38 Ton Cranes plus additional drawings for the
A-frame and relate components.

**60 TON CRANE DRAWINGS:**
211 drawings bearing drawing numbers 20.0001.000-00 to 64.1100.000-00 and
9001.000.000-00 to 99.3000.502-000 and 9901.000.000 to 9904.000.000.

| | |
|---|---|
| General Arrangement | 5911.50.000.001.000 |
| Adaptor Weldment | Bill of Material #5911.40.1100.000 |
| Braden | Bill of Material #CH185   (General Dimensions) |

**CIPI Group Number:**
- 9Q5964         Upper Structure  Bill of Material

- 9Q5965         VG Lower Bill of Material
  (Includes 163-4828)

- 23 -

Document: 1003528:01

## SCHEDULE C

### Davis' Warranty on Distributed Products

DAVCRANE INC. warrants its products to be free from defects in material and workmanship for a period of twelve (12) months from the date of being placed in operation and not exceeding eighteen (18) months from date of delivery of the product to the original Purchaser user. The obligation of DAVCRANE INC. (herein after called the Company) includes any part of the product which in the Company's opinion is defective in material and workmanship. All costs of shipping the product to and from the Company's factory shall be to the Purchaser's account. No claim will be allowed by the Company unless such claim is submitted in writing to the Company within thirty (30) days of the date of discovery of the defect(s).

This warranty shall not apply to products which have been operated in a manner other than recommended by the Company or which has been misused or neglected or damaged through an accident or which has been repaired, altered or modified or used in any manner which in the Company's opinion adversely affects its performance.

This warranty and the Company's obligation hereunder is in lieu of all other warranties, expressed or implied, including without limitation the implied warranties of merchantability and fitness for a particular purpose and all direct, indirect or consequential damages with respect to the sale or use of its products.

No person is authorised to change or otherwise modify this warranty or assume any other liability on behalf of the Company unless such change modification of assumption is made in writing and signed by an officer of this Company.

Any item of the product not manufactured by the Company shall not be covered by this warranty or the implied warranties of merchantability and fitness for a particular purpose of any other warranty from the Company; such items being subject to the warranties of their respective manufacturers.



**BORDEN**
**LADNER**
**GERVAIS**

Borden Ladner Gervais LLP
Lawyers • Patent & Trade-Mark Agents
1200 Waterfront Centre
200 Burrard Street, P.O. Box 48600
Vancouver, B.C., Canada V7X 1T2
tel: (604) 687-5744   fax (604) 687-1415
www.blgcanada.com

September 18, 2003

FILE NO: 501177/019363

**COPY**

GERALD W. GHIKAS, Q.C.
direct tel: (604) 640-4112
direct fax: (604) 622-5812
email: gghikas@blgcanada.com

**VIA FAX: (956) 399-9174**
**Original VIA COURIER**

This is Exhibit " B " referred to in the
affidavit of Gerald W. Ghikas
made before me on Dec 5 2003

A Commissioner for taking Affidavits
for British Columbia

Daniel E. Davis
P.O. Box 2427
Harlingen, Texas
78551 USA

Dear Sirs/Mesdames:

RE:   In the Matter of an International Commercial
     Arbitration
     Between Finning International Inc. (Finning)
     and Daniel E. Davis (Davis)
     pursuant to the International Arbitration Rules
     of the American Arbitration Association

       We enclose for delivery to you pursuant to Article 14.1 of the
Agreement, a notice of arbitration that we have filed with the American Arbitration
Association at their Dallas, Texas Case Management Centre with a request that it
commence administration of this arbitration.

       We assume that you will appoint counsel. As required by the
Agreement we are delivering copies of this communication and enclosures to Alton
W. Payne and Dennis Sanchez. We have assume that Mr. Payne will represent you as
your attorney for the purposes of this arbitration. If you intend to appoint another
attorney, please provide us with that attorney's contact particulars.

       Yours truly,

       Borden Ladner Gervais LLP

       By:

       Gerald W. Ghikas

GWG/mm
Enclosure

VANCOUVER • TORONTO • OTTAWA • MONTRÉAL • CALGARY

cc     Alton W. Payne (by fax with enclosures)
5001 Bissonnet, suite 200
Bellaire, Texas
77401  USA

Dennis Sanchez (by fax with enclosures)
Sanchez, Whittington, Janis & Zabarte, LLP
100 North Expressway 83
Brownsville, Texas
78521-2284  USA

cc     Mark Finkelstein
Shannon, Martin, Finkelstein & Sayre, P.C.
2400 Two Houston Centre
909 Fannin Street
Houston, Texas
USA 77010

bcc   Mel Ternan
bcc   Joel Harrod

Document: 1172578:01

## IN THE MATTER OF AN INTERNATIONAL COMMERCIAL ARBITRATION

BETWEEN:

### FINNING INTERNATIONAL INC. (FINNING)

CLAIMANT

AND:

### DANIEL E. DAVIS (DAVIS)

RESPONDENT

## NOTICE OF ARBITRATION
### PURSUANT TO THE INTERNATIONAL ARBITRATION RULES
### OF THE AMERICAN ARBITRATION ASSOCIATION

The Claimant, Finning, a party to an arbitration agreement contained in a written contract dated July 15, 2002 and providing for arbitration under the *International Arbitration Rules* of the American Arbitration Association, hereby demands arbitration thereunder.

### THE NAMES AND ADDRESSES OF THE PARTIES:

| Claimant: | Respondent: |
|---|---|
| Finning International Inc. | Daniel E. Davis |
| 16830 – 107ᵗʰ Avenue | P.O. Box 2427 |
| Edmonton, Alberta, | Harlingen, Texas |
| T5P 4C3 Canada | 78551 USA |

| | | | |
|---|---|---|---|
| Telephone: | (780) 930 4878 | Telephone: | |
| Fax: | (780) 930-4891 | Fax: | (956) 399-9174 |

**Claimant's Representatives:**
Canadian Counsel: Gerald W. Ghikas, Q.C.
Borden Ladner Gervais LLP
1200 Waterfront Centre
200 Burrard Street
P.O. Box 48600
Vancouver, British Columbia
V7X 1T2 Canada

**Respondent's Representatives**
Dennis Sanchez
Sanchez, Whittington, Janis & Zabarte, LLP
100 North Expressway 83
Brownsville, Texas
78521-2284 USA

| | | | |
|---|---|---|---|
| Telephone: | (604) 640-4112 | Telephone: | (956) 546-3731 |
| Fax: | (604) 622-5812 | Fax: | (956) 546-3765 |

Texas Counsel: Mark S. Finkelstein
Shannon, Martin, Finkelstein & Sayre, P.C.
2400 Two Houston Center
909 Fannin Street
Houston, Texas   77010  USA

Alton W. Payne
5001 Bissonnet, Suite 200
Bellaire, Texas
77401  USA

| | | | |
|---|---|---|---|
| Telephone: | (713) 646-5503 | Telephone: | (713) 840-8008 |
| Fax: | (713) 752-0337 | Fax: | (713) 840-8088 |

Document: 1172160:01

- 1 -

## DESCRIPTION OF THE CLAIM AND SUPPORTING FACTS:

1.     The claimant, Finning, is a company incorporated under the laws of Canada having an address at 16830 – 107th Avenue, Edmonton, Alberta, Canada.

2.     The respondent, Davis, is a businessperson having an address at P.O. Box 2427 Harlingen, Texas, U.S.A.

3.     Davis and Finning entered into a Distributor Agreement (the "Agreement") dated July 15, 2002.

4.     In and by the Agreement, Davis agreed to manufacture and assemble from components supplied in part by Finning certain cranes and related products (the "Distributed Products") and agreed that Finning was to have the exclusive right to market, distribute and sell throughout the world.

5.     The Agreement further provided:
   (a)     That Davis would manufacture and assemble the Distributed Products in a prompt, timely and efficient manner and would produce Distributed Products to meet Finning's demand for same;
   (b)     That title to Distributed Products at all times would remain with Finning, its suppliers or its customers;
   (c)     That Davis would deliver completed Distributed Products to the person, at the location and on the date specified by Finning;
   (d)     That all Distributed Products would be manufactured and assembled by Davis in a prompt, efficient, skilful and careful manner in accordance with North American industry standards for the manufacture and assembly of similar equipment and in compliance with all applicable laws.

6.     Davis has wrongfully breached and repudiated the Agreement.  Without limitation, the breaches and repudiations of Davis include:
   (a)     Davis has failed to manufacture and assemble the Distributed Products in a prompt, timely and efficient manner and produce Distributed Products to meet Finning's demand for same;
   (b)     Davis has failed to deliver completed Distributed Products belonging to Finning to Finning or to the person, at the location and on the date specified by Finning;
   (c)     Davis has failed to have all Distributed Products manufactured and assembled in a prompt, efficient, skilful and careful manner in accordance with North American industry

- 2 -

standards for the manufacture and assembly of similar equipment and in compliance with all applicable laws.

7.     Davis has, without justification, delivered to Finning a purported Notice of Default stating that, unless Finning cures the certain alleged "defaults" the Agreement will be terminated within 30 days, and has otherwise clearly evinced his intention to bring the Agreement to an end and not to perform his obligations thereunder.

8.     The Agreement provides that any breach by Davis of any covenant representation or warranty made by him under the Agreement, or any failure of Davis to perform any of his obligations under the Agreement or related Security Documents, is an Event of Default. The Agreement further provides that if Davis commits an event of default and fails to cure such event of default within 30 Business Days of Finning delivering notice of same to Davis, Finning may do any or all of the following:

    (a)     Terminate the Agreement forthwith in its entirety without prejudice to any rights it may have against Davis arising prior to termination;

    (b)     Declare the outstanding balance of the Facility Loan to be immediately due and payable by Davis and exercise any and all rights Finning may have at law, in equity or pursuant to the Agreement or the Security Documents; and

    (c)     Take possession of the "Facility", "Technology", "Major Components", "Minor Components" and Distributed Products (all as defined in the Agreement) and conduct manufacturing and assembly of the "Distributed Products" itself.

9.     The Agreement further provides that the rights and remedies provided thereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

10.     By virtue of the breaches and repudiation of the Agreement, on August 11, 2003 Finning delivered a Notice of Default to Davis. Finning has not yet made an election to terminate the Agreement or to accept Davis' repudiation of the Agreement.

11.     As a result of Davis' breaches of the contract and his wrongful repudiation thereof, Finning has suffered and will continue to suffer loss, damages and expense.

## RELIEF OR REMEDY SOUGHT AND AMOUNT CLAIMED:

12.     Finning claims against Davis for an Award:

    (a)     Declaring that Davis has wrongfully breached and repudiated the Agreement; and

- 3 -

(b)    Directing Davis to deliver all completed Distributed Products to Finning in accordance with the Agreement;

(c)    Requiring Davis to account to Finning for all monies received by Davis from Finning under the Agreement and all expenses purported to be incurred by Davis for reimbursement by Finning under the Agreement;

(d)    Should Davis fail to cure his defaults under the Agreement within 30 Business Days of Finning's Notice of Default, and should Finning thereafter elect to seek such remedy:

(i)    Declaring that the Agreement is terminated in its entirety without prejudice to any rights Finning may have against Davis arising prior to termination; and, or alternatively,

(ii)    Declaring that the outstanding balance of the Facility Loan is due and payable by Davis and directing Davis to pay to Finning the full outstanding balance of the Facility Loan, and interest; and, or alternatively,

(iii)    Declaring that Finning is entitled to take possession of the "Facility, Technology, Major Components, Minor Components and Distributed Products" and to conduct manufacturing and assembly of the Distributed Product itself, and order Davis to deliver up possession to Finning accordingly, and to take such other steps as may reasonably be required to that end;

(e)    Further, or alternatively, such interim measures of protection as may be appropriate and such further or other awards as may be appropriate.

13.    The amount claimed by Finning against Davis is US$10 million.


**OTHER MATTERS:**


14.    Attached to and forming part of this notice of arbitration is a true copy of the Agreement, Article 14.1 of which is the agreement of Finning and Davis to arbitrate any dispute or controversy arising out of or in connection with the Agreement or its performance. The Agreement requires that disputes be resolved by a single arbitrator and that the place of arbitration will be Houston, Texas.

Davis is hereby notified that copies of the arbitration agreement and this demand are being filed with the American Arbitration Association at its Houston, Texas case management centre with a request that it commence administration of the arbitration. Under the Rules, you may file an answering statement within the time frame specified in the Rules, after notice from the administrator.

Document: 1172180:01

DATED at the City of Vancouver, British Columbia, this 16 day of September, 2003.

Gerald W. Ghikas, Q.C.
Canadian Counsel and Representative
for the Claimant, Finning International Inc.

- 5 -

# SHANNON, MARTIN, FINKELSTEIN & SAYRE

A Professional Corporation
ATTORNEYS AT LAW

2400 TWO HOUSTON CENTER
909 FANNIN STREET
HOUSTON, TEXAS 77010

Sender's Direct Line
(713) 646-5503

E-Mail:
mfinkelstein@smfs.com

September 18, 2003

American Arbitration Association
Central Case Management Center
1750 Two Galleria Tower
13455 Noel Road
Dallas, Texas 75240-6636
Attention: Molly Bargenquest, Vice-President
Case Management Center

*Via Overnight Courier*

This is Exhibit "S" referred to in the affidavit of Gerald W. Obikas made before me on Dec 5 2003

A Commissioner for taking Affidavits for British Columbia

Re:   In the Matter of an International Commercial Arbitration Between Finning International Inc. ("Finning") and Daniel E. Davis ("Davis") pursuant to the International Arbitration Rules of the American Arbitration Association

Dear Sirs/Mesdames:

We are assisting the Canadian counsel and Representative of the claimant, Finning. We enclose five copies of a demand for arbitration, the original of which has been delivered by fax and courier to the respondent, Daniel E. Davis (Davis). Also enclosed is a check in the amount of $10,000 in payment of the required filing fee.

Finning and Davis are parties to a distributor agreement made as of July 15, 2002 (the Agreement) a copy of which is attached to the demand for arbitration as Exhibit "A". The dispute resolution provision appears at Article 14, page 17, requiring arbitration to be conducted in Houston, Texas pursuant to the AAA's *International Arbitration Rules*, before a single arbitrator.

We ask that your communications be directed to the claimant's Canadian counsel at the address shown on the arbitration notice, with a copy to us.

Please contact me if you have any questions or concerns. I thank you in advance for your assistance.

Very truly yours,

SHANNON, MARTIN, FINKELSTEIN & SAYRE
A Professional Corporation

By:  *Mark S. Finkelstein*
Mark S. Finkelstein

Enclosures

American Arbitration Association
Attn:  Molly Bargenquest, VP
September 18, 2003
Page 2


c:     American Arbitration Association (w/o encl.)
       Regional Liaison
       1331 Lamar, Suite 1180
       Houston, Texas  77002
       **Attention: Ms. Carol Buchanan**

       Gerald W. Ghikas, Q.C. (w/o encl.)                   *Via Electronic Mail*
       Jonathan K.M. Jeake
       Borden Ladner Gervais LLP
       1200 Burrard Street
       P. O. Box 48600
       Vancouver, B.C., V7X1T2

# I|C
# D|R

International Centre
for Dispute Resolution

Luis M. Martinez, Esq.  Vice President

1633 Broadway  Floor 10  New York, NY  10019-6708
Tel: 212.484.4181   Fax: 212.246.7274   www.icdr.org

September 23, 2003

## VIA FEDERAL EXPRESS

Mark S. Finkelstein, Esq.
Shannon, Martin, Finkelstein & Sayre
2400 Two Houston Center
909 Fannin Street
Houston, TX 77010

Gerald W. Ghikas, Q.C.
1200 Waterfront Centre
200 Burrard Street, P.O. Box 48600
Vancouver, B.C. V7X 1T2

Dennis Sanchez, Esq.
Sanchez Whittington, Janis & Zabarte, LLP
100 N. Expressway 83
Bronxville, TX 78521-2284

Alton W. Payne
5001 Bissonnet, Suite 200
Bellaire, TX 77401

This is Exhibit "D" referred to in the
affidavit of Gerald W. Ghikas
made before me on Dec 5 2003

_____
A Commissioner for taking Affidavits
for British Columbia

Re: 50 T 181 00451 03
    Finning International Inc.
    vs
    Daniel E. Davis

Dear Parties:

This will acknowledge receipt by the International Centre for Dispute Resolution on September 22, 2003 from Claimant of a Demand for Arbitration dated September 16, 2003 of a controversy arising out of a contract between the above-captioned parties, containing a clause providing for administration by this Association. We understand that a copy was sent to Respondent. A copy of our International Arbitration Rules is enclosed.

Pursuant to Article 3, within thirty days of the date of this letter, a Respondent shall file a statement of defense in writing with the Claimant and this Association. If Respondent wishes to counterclaim, file three copies of same with the appropriate administrative fee and send a copy directly to Claimant.

Claimant has requested that the hearing be held in Houston, Texas, USA. Please review Article 13 of the Rules regarding the locale of hearings.

This will also serve to confirm your participation in an Administrative Conference Call on October 1, 2003 at 3:00pm EDT, New York. The purpose of this call is to address matters that will assist the Association in administering your case as efficiently and expeditiously as possible. The Association has found that such calls greatly improve the administrative process. Please be prepared to discuss the following items.

Whether mediation or other methods of dispute resolution might be appropriate.

A Division of the American Arbitration Association

As an option for resolution of this dispute, we propose mediation, as outlined in the enclosed Commercial Mediation Rules. It is our experience that mediation is expeditious, cost saving and highly successful. No additional administrative fee will be required for this process in the event the Parties desire to first attempt to mediate this dispute. Please note that the process is non-binding and the Parties must consent to these procedures.

Please provide a brief description of the case, the specification of the claims and the anticipated length of hearing.

Briefly comment on what type of arbitrator expertise you believe would be most valuable for this type of dispute and to discuss the number of arbitrators for this matter and the method of their appointment.

Parties are advised to consider the information to be exchanged during the arbitral proceedings. Please note that at this stage all discovery will be voluntary and any difficulties that may arise will be decided by the arbitrator(s) once appointed.

Parties are also encouraged to prepare a stipulation for uncontested facts, which will be reviewed by the arbitrator(s) again, once appointed.

Please limit your discussions to the administrative process. Any discussions regarding issues of arbitrability or the merits of the dispute should be reserved for the arbitrator(s). Once appointed we will schedule the preliminary hearing where all substantive matters will be brought to the attention of the arbitrator(s). It should be noted that failure to participate in the arbitral proceedings will not prevent the arbitrator(s) from issuing an arbitration award that may be enforced pursuant to the New York Convention.

The call will be initiated by our office on that date. If the Parties are not able to participate on the scheduled date of the call, we kindly request that the parties mutually agree on an alternate date and advise the undersigned so that the call may be scheduled accordingly.

The Association encloses herewith to each Party a form entitled 'Checklist for Conflicts' and requests that each Party fill out the document with the required information and return it to this office by October 23, 2003. It will be treated as confidential information, and not required to be exchanged by the Parties, unless the Parties agree otherwise. This is only a preliminary list to identify potential witnesses and for the arbitrator to perform a conflict's check. It will not commit the Parties at this point.

This matter is now being administered by the International Centre for Dispute Resolution of the American Arbitration Association in New York City, and has been assigned to Tom Simotas (212-484-4086). Please address all future correspondence to him. In the event I can be of assistance throughout the administration of this matter and to respond to any questions or issues that may arise, regarding the administrative process, please feel free to contact me directly. My contact information is set forth below. Please note that all our case administrators are supervised by multilingual attorneys trained in international arbitration and mediation. We look forward to working with you and to providing you with assistance during your participation in the arbitral process.

Thank you for selecting the International Centre for Dispute Resolution, a leader in worldwide alternative dispute resolution.

Sincerely,

Michael Namias
ICDR Team Leader
International Centre for Dispute Resolution
212-484-4170
Namiasm@adr.org



**I C**
**D R**

International Centre
for Dispute Resolution

Luis M. Martinez, Esq. *Vice President*

1633 Broadway Floor 10 New York, NY 10019-6708
Tel: 212.484.4181 Fax: 212.246.7274 www.icdr.org

September 24, 2003

**VIA FACSIMILE ONLY**

Mark S. Finkelstein, Esq.
Shannon, Martin, Finkelstein & Sayre
2400 Two Houston Center
909 Fannin Street
Houston, TX 77010

Gerald W. Ghikas, Q.C.
1200 Waterfront Centre
200 Burrard Street, P.O. Box 48600
Vancouver, B.C. V7X 1T2

Alton W. Payne, Esq.
Law Offices of Alton W. Payne
5001 Bissonnet, Suite 200
Bellaire, TX 77401

Re: 50 T 181 00451 03
      Finning International Inc.
      vs
      Daniel E. Davis

This is Exhibit " E " referred to in the
affidavit of Gerald W. Ghikas
made before me on Dec 5 20 03
_____
A Commissioner for taking Affidavits
for British Columbia

Dear Parties:

We note that the parties have agreed to reschedule the administrative conference call for October 10, 2003 at 5:00 PM EDT (4:00 PM CDT, 2:00 PM PDT). We have updated our file accordingly and made the necessary arrangements.

My file indicates that Mr. Finkelstein and Mr. Ghikas will be participating on the aforementioned conference call on behalf of Claimant and Mr. Payne will be participating on behalf of Respondent.

Please notify the undersigned if any changes need to be made.

Sincerely,

Tom Simotas
International Case Manager
212 484 4086
Simotast@adr.org

Michael Nemias
Team Leader
212 484 4170
Nemiasm@adr.org

*A Division of the American Arbitration Association*



**I C**
**D R**
International Centre
for Dispute Resolution

Luis Martinez
Vice President
Steve Kim
Assistant Vice President

1633 Broadway, 10th Floor, New York, NY 10019
telephone: 212-484-4181 facsimile: 212-246-7274
internet: http://www.adr.org/ICDR

October 15, 2003

<u>**VIA FACSIMILE ONLY**</u>

Gerald W. Ghikas, Q.C.
1200 Waterfront Centre
200 Burrard Street, P.O. Box 48600
Vancouver, B.C. V7X 1T2

Alton W. Payne, Esq.
5001 Bissonnet, Suite 200
Bellaire, TX 77401

Re: 50 T 181 00451 03
    Finning International Inc.
    vs
    Daniel E. Davis

> This is Exhibit " E " referred to in the
> affidavit of Gerald W. Ghikas
> made before me on Dec 5 20 03
>
> _____
> A Commissioner for taking Affidavits
> for British Columbia

Dear Counsel:

This will serve to confirm that an administrative conference call took place on October 10, 2003, wherein the following matters were discussed. Participating on the call were Gerald W. Ghikas representing the Claimant and Alton W. Payne representing the Respondent.

Although mediation was discussed, the parties felt that mediation was not an option at this time.

The parties agreed that the arbitration would be heard by a sole arbitrator.

The parties agreed that the arbitration would be held in Houston, TX.

The parties agreed that the list of potential arbitrators sent by the ICDR would be used as a resource tool. Absent a mutual agreement on the selection of an arbitrator, the list method will be employed to yield an arbitrator.

Pursuant to party agreement, please be advised that the deadline for Respondent to submit its Answer and/or Counterclaim is October 23, 2003.

The parties were advised to specify the monetary amount of the claim, to commence the process of discovery and to prepare a stipulation of uncontested facts.

Sincerely,

Tom Simotas
International Case Manager
212 484 4086
Simotasat@adr.org

*A Division of the American Arbitration Association*

Michael Namias
Team Leader
212 484 4170
Namiasm@adr.org

LAW OFFICES OF

ALTON W. PAYNE, J.D., PH.D.

*Attorneys at Law*

5001 BISSONNET, SUITE 200

BELLAIRE, TEXAS 77401

October 23, 2003

TELEPHONE (713) 840-8006
TELEFAX (713) 840-8088
EMAIL alwpayne@earthlink.net

INTELLECTUAL PROPERTY AND
TECHNOLOGY-RELATED LAW
MEDIATION-ARBITRATION

Via EMAIL
*simotasat@adr.org*
and TELEFAX
212-246-7274

This is Exhibit " 6 " referred to in the
affidavit of Gerald W. Ghikas
made before me on Dec 5, 2003
_____
A Commissioner for taking Affidavits
for British Columbia

Tom Simotas
International Center for Dispute Resolution
American Arbitration Association
1633 Broadway, 10th Floor
New York, NY 10019

    Re:    <u>Case No. 50 T 181 00451 03: Finning International Inc. -vs- Daniel E. Davis</u>

Dear Mr. Simotas:

    Last Friday, October 17, 2003, I notified Mel Ternan at Finning as well as Finning's counsel by telephone that I will no longer be the attorney-in-charge for the captioned matter. Therefore, no answer can be filed at this time. New attorneys for Mr. Davis will be appointed as soon as possible.

    When the new attorneys are appointed, they will take whatever action is appropriate, which may include filing an answer in the captioned matter. Until the substitute counsel are appointed, please continue to send me correspondence and I will maintain the file and see that everything is appropriately passed along.

    If you have any questions, please contact me. I appreciate your continued cooperation in this matter.

               Yours truly,

               Alton W. Payne

cc: Gerald W. Ghikas, Q.C. (via Fax 604-622-5812)