United States District Court
Southern District of Texas
FILED

JAN 1 3 2004

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| FINNING INTERNATIONAL INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-03-5080 |
| | § | HONORABLE NANCY F. ATLAS |
| DANIEL E. DAVIS and | § | |
| DAVCRANE, INC., | § | |
| | § | |
| Defendants. | § | |

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DANIEL E. DAVIS and DAVCRANE, INC. | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. B-03-206 |
| | § | HONORABLE ANDREW S. HANEN |
| FINNING INTERNATIONAL, INC. | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF'S MOTION TO CONSOLIDATE

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff, Finning International, Inc. ("Finning") moves the Court to consolidate two civil actions pending in two different courts within the United States District Court for the Southern District of Texas. The two cases should be consolidated in Houston under Civil Action H-03-5080, for the reasons explained below.

## I. Procedural Status of the Dispute.

1.     Finning filed the present suit on November 5, 2003, and seeks to compel Defendants Daniel E. Davis and Davcrane, Inc. (collectively "Defendants") to arbitrate the parties' dispute, in accordance with the arbitration provisions contained within a detailed Distributor Agreement entered into between the parties. Finning also seeks to preserve disputed assets pending the conclusion of the arbitration. Although the Defendants initially indicated an intent to participate in the arbitration, which was commenced under the auspices of the American Arbitration Association on September 18, 2003, the Defendants subsequently failed to retain counsel for the arbitration. Shortly thereafter, the Defendants indicated an intent to file suit and to sell some of the assets subject to the Distributor Agreement. The Defendants have been served and have now filed an answer in the present case. For purposes of this motion, the present case will be referred to as the "Houston suit."

2.     On November 7, 2003, after Finning filed its action, the Defendants filed a separate suit against Finning in the Brownsville Division of the United States District Court for the Southern District of Texas, Civil Action No. B-03-206, now pending before the Honorable Andrew S. Hanen (the "Brownsville suit"). In the Brownsville suit, the Defendants seek to obtain damages from Finning based on allegations that Finning breached the Distributor Agreement and acted tortiously in connection with the agreement.

3.     On December 2, 2003, Finning filed a comprehensive Rule 12(b) motion in response to the Brownsville suit, in which Finning asserted that the Brownsville suit should be dismissed, stayed, or transferred. Finning asserted, among other things, that the Houston suit should take priority over the Brownsville suit due to the first-to-file doctrine, and that the parties' arbitration compels at least a stay of the Brownsville suit. A copy of Finning's motion in the Brownsville suit is attached to this motion as "Exhibit 1." Finning's motion is currently pending in the Brownsville suit.

## II. The Houston Suit and the Brownsville Suit involve Identical Parties and the Same Dispute, and the Cases should be Consolidated.

4.      Requests for consolidation are controlled by Federal Rule of Civil Procedure 42(a) and Local Rule 7.6.  Pursuant to the local rule, the motion for consolidation is to be filed in the docket of the case filed first, which is this matter is the Houston suit.  Rule 42(a), sets forth the requirements for consolidation as follows:

> When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

5.      The following comparison of the two cases demonstrates that consolidation should be ordered in this matter:

**a.      The cases are pending in two different courts within the same judicial district and they involve identical parties.**

As reflected in the case styles, both cases are pending in the United States District Court for the Southern District of Texas.  Further, although consolidation does not require perfect identity of the parties, in this matter both suits name exactly the same parties.

**b.      The cases involve common issues of law.**

Both cases involve the same dispute.  In the Houston case, Finning has asked that the Court compel an arbitration agreed to by the parties in a Distributor Agreement, and protect assets subject to such arbitration.  In the Brownsville case, the Defendants ask that the Court award damages based upon the Distributor Agreement and upon torts allegedly committed in connection with the Agreement.  Defendants also ask for injunctive relief concerning the assets that are the subject of the Distributor Agreement.  The legal effect of the parties' arbitration agreement will have to be addressed in both suits, as will the protection or disposition of the assets that are subject to the dispute.  Attached

as Exhibits 2 and 3 to this Motion are the Complaints filed in the respective suits, which reflect the commonality of the parties' dispute.

    **c.**    **The cases involve common issues of fact.**

The central fact issue in both cases involves the parties' performance under the Distributor Agreement. That performance, and the legal interpretation of the agreement, will determine the parties' respective claims of contract breach and tortious conduct in connection with the agreement. A brief chronology of the relevant facts will quickly show that both suits depend entirely upon the Distributor Agreement.

    **i.**    On July 15, 2002, the parties entered into the Distributor Agreement, which, among other things, granted Finning the exclusive right to market, distribute and sell certain heavy equipment products that are generally referred to as the DCI cranes and lifting equipment. This equipment was to be assembled by Defendants utilizing their patented technology, in combination with Caterpillar crane components which were to be supplied by Finning.

    **ii.**    Part 14.1 of the Distributor Agreement provides:

> **Any dispute or controversy arising out of or in connection with this Agreement** or its performance, including without limitation the validity, scope, meaning, construction, interpretation or application of this Agreement or any provision of this Agreement **will be submitted to final and binding arbitration** by a single arbitrator.

(emphasis added).

The Distributor Agreement is lengthy, and it includes provisions governing Finning's advance of $1.5 million dollars to the Defendants in the form of a facilities loan, and payment of an additional $1.5 million as a distribution fee. Finning also agreed to pay particular overhead costs. The Defendants were required, among other things, to: (a) control the manufacturing

costs that would be borne by Finning, including providing an estimate of overhead costs in advance of each manufacturing period; (b) assemble the equipment in a timely fashion; and (c) maintain solvent operations.  The Defendants also agreed to turn the DCI cranes over to Finning upon completion, and they agreed to various security provisions so that title to much of the equipment is held by Finning.

     **iii.**     On September 18, 2003, Finning initiated an arbitration under the auspices of the International Arbitration Rules of the American Arbitration Association.   As set forth therein, Finning contends that the terms of the Distributor Agreement have been breached in numerous respects.   Defendants' counsel initially participated in the initiation of the arbitration, but subsequently notified the American Arbitration Association that he would be withdrawing as counsel in the arbitration.

     **iv.**     Both parties then proceeded to file suit.  The Defendants' Complaint in the Brownsville action shows clearly that this dispute arises out of the Distributor Agreement. The gravamen of the Defendants' claim is that Finning allegedly did not perform in accordance with the parties' Agreement.  Indeed, the Plaintiffs attach a copy of the parties' Agreement as Exhibit 2 to their Complaint, and state, on page 16 that

> The parties entered into a contract on July 15, 2002 …. The parties admitted that there was mutual consideration for the contract and therefore all conditions precedent have been met. The parties also agree that the contract shall be governed and interpreted with the laws in force within the State of Texas …. During the year of 2002, Defendant Finning International, Inc., fully paid the overhead production costs.  However, Defendant Finning International, Inc. breached the contract by withholding during the year of 2003 such overhead production costs.

While Defendants also assert various tort claims related to the agreement, such as fraud-in-the-inducement, such claims cannot prevail if Finning's interpretation of the agreement is

correct. Defendants' tort claims are premised upon Finning acting improperly under Defendants' interpretation of the agreement.

### d.    The Brownsville suit must be stayed, dismissed, or transferred under the arbitration statutes.

In addition to the normal factors weighing in favor of consolidation, the Brownsville suit cannot be maintained independently, given the parties' agreement to arbitrate. The statutes enforcing arbitration agreements are clear that a suit must be stayed or dismissed if it would prevent the arbitration from proceeding. The Federal Arbitration Act, 9 U.S.C. §3, provides that

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties, stay the trial of the action until such arbitration has been had in accordance with the terms of the arbitration.

Similarly, the Texas Arbitration Act, TEX. CIV. PRAC. & REM. CODE § 172.174, provides that

> On request of a party, a court in which a pending judicial proceeding is being brought by a party to an arbitration agreement to obtain relief with respect to a matter covered by the arbitration agreement shall ... stay the judicial proceeding; and ... refer the parties to arbitration.

*See, Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *AT&T Tech., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 648-49 (1986); *Mar-Len of Louisiana, Inc. v. Parsons-Gilbane*, 773 F.2d 633, 636 (5th Cir. 1985) (fraud-in-the-inducement case.). The only exception is for suits, such as the Houston suit, which are brought to compel or enforce arbitration and to protect the disputed assets in the interim. TEX. CIV. PRAC. & REM. CODE § 172.175. As a result, the Brownsville suit should not proceed in any way, and the consolidation of the two suits into

one proceeding makes sense as a procedure to facilitate the parties' arbitration with the appropriate

Court maintaining jurisdiction to aid in the arbitration.

**e.    Consolidation will conserve judicial resources.**

There is no reason to have two cases proceed when they both concern the same parties and the

same dispute. Both cases have been filed recently, and no discovery has yet occurred. Both cases are

subject to the same procedural issues concerning the effect of the parties' arbitration on the suits.

### III.  Conclusion.

6.    The present situation is a classic example of why cases should be consolidated.  The

parties' dispute in both the Houston suit and the Brownsville suit is identical, as are the parties

themselves.  The determinative facts are the same.  The procedural issues are the same.  There is

simply no reason to have multiple proceedings that will needlessly require added judicial resources.

WHEREFORE, PREMISES CONSIDERED, Finning respectfully requests that this Court

grant Finning's motion seeking the consolidation of the Brownsville suit with the present action, and

grant such other just relief.

Respectfully submitted,

Jeffery R. Koch
Texas Bar No. 11645250
2400 Two Houston Center
909 Fannin Street
Houston, Texas  77010
(713) 646-5593 (Telephone)
(713) 752-0337 (Facsimile)

**ATTORNEY FOR PLAINTIFF**

OF COUNSEL:

SHANNON, MARTIN, FINKELSTEIN & SAYRE
A Professional Corporation
Mark S. Finkelstein
Texas Bar No. 07015100
S.D. Tex. No. 5543
2400 Two Houston Center
909 Fannin Street
Houston, Texas 77010
(713) 646-5503 (Telephone)
(713) 752-0337 (Facsimile)

## CERTIFICATE OF CONFERENCE

On this the 12th day of January 2004, the undersigned contacted Defendants' counsel to confer over the substance of this motion. I contacted Ray Marchan, who indicated that he is opposed to this motion.

Jeffery R. Koch

## CERTIFICATE OF SERVICE

I hereby certify that on this _12th_ day of January, 2004, I caused a true copy of the foregoing Plaintiff's Motion to Consolidate to be served by certified mail, return receipt requested upon Ray R. Marchan, Mikal C. Watts, Watts Law Firm, L.L.P., 1926 E. Elizabeth, Brownsville, Texas 78520 and Alton W. Payne, Law Offices of Alton W. Payne, 5001 Bissonnet, Suite 200, Bellaire, TX 77401, counsel for Plaintiffs, Daniel E. Davis and Davcrane, Inc.

Jeffery R. Koch

-8-

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

DEC 0 2 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| DANIEL E. DAVIS AND | § | |
| DAVCRANE, INC. | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-03-206 |
| | § | |
| FINNING INTERNATIONAL, INC. | § | |

FINNING INTERNATIONAL, INC.'S
(1) MOTION TO STAY SUIT PENDING ARBITRATION;
(2) MOTION TO STAY OR DISMISS DUE TO PRIOR-FILED ACTION;
(3) MOTION TO DISMISS FOR INSUFFICIENT SERVICE OF PROCESS;
AND, SUBJECT THERETO,
(4) MOTION TO TRANSFER VENUE

Defendant, Finning International, Inc. ("Finning"), in response to Plaintiffs' Petition For
Temporary Injunction and Original Complaint (the "Complaint") filed by Plaintiffs Daniel E.
Davis ("Davis") and Davcrane, Inc. ("Davcrane") (collectively, "Plaintiffs"), files this Motion to
Stay Suit Pending Arbitration; Motion to Stay or Dismiss due to Prior-Filed Action; Motion to
Dismiss for Insufficient Service of Process; and, Subject Thereto, Motion to Transfer Venue.

## SUMMARY OF MOTION

1.    The present dispute involves an agreement between the parties that includes an
arbitration provision.   Finning invoked the arbitration provision in September 2003.   The
Plaintiffs by this action are blatantly attempting to circumvent the arbitration provision and
ignore the parties' agreement.  As a matter of exceedingly well-established law, the arbitration
provision should be given effect and the present action should not proceed.   Further, in
anticipation that Plaintiffs might file suit to try to avoid arbitration, Finning filed suit to compel



EXHIBIT
1

arbitration in federal court in the Southern District of Texas, Houston Division, prior to the filing of the present suit.  Accordingly, to the extent that any federal court should address the parties' dispute, the proper court to do so is the federal court in Houston, where the first suit was filed. Finally, both venue and service of process are not proper in the present case.  Finning therefore requests that the present case be stayed or dismissed, or in the alternative that venue be transferred to the proper venue in the Houston Division of the Southern District of Texas.  The Plaintiffs have improperly invoked the jurisdiction of this Court despite the parties' clear agreement to arbitrate their dispute, and Finning respectfully requests that the Court refuse to allow the Plaintiffs to ignore their agreement.

**MOTION TO STAY SUIT PENDING ARBITRATION**

2.    **Chronology and Key Facts in the Present Dispute.**  On July 15, 2002, Davis entered into a Distributor Agreement with Finning which, among other things, granted Finning the exclusive right to market, distribute and sell certain heavy equipment products that are generally referred to as the DCI cranes and lifting equipment.  This equipment was to be assembled by Plaintiffs utilizing their patented technology, in combination with Caterpillar crane components which were to be supplied by Finning.  Part 14.1 of the Distributor Agreement provides:

> **Any dispute or controversy arising out of or in connection with this Agreement** or its performance, including without limitation the validity, scope, meaning, construction, interpretation or application of this Agreement or any provision of this Agreement **will be submitted to final and binding arbitration** by a single arbitrator.

(emphasis added).

2

The Distributor Agreement is lengthy, and it includes provisions by which Finning agreed to advance $1.5 million dollars to the Plaintiffs in the form of a facilities loan and to pay particular overhead costs. The Plaintiffs were required, among other things, to: (a) control the manufacturing costs that would be borne by Finning, including providing an estimate of overhead costs in advance of each manufacturing period; (b) assemble the equipment in a timely fashion; and (c) maintain solvent operations. The Plaintiffs also agreed to turn the DCI cranes over to Finning upon completion, and they agreed to various security provisions so that title to much of the equipment is held by Finning. Further, as part of its rights, Finning has the right to possession and ownership of the equipment, the patent technology, and the manufacturing facility if Davis commits an event of default under the Agreement and such default is not timely cured.

3.    On September 18, 2003, Finning initiated an arbitration under the auspices of the International Arbitration Rules of the American Arbitration Association. Finning's notice of arbitration was sent to the American Arbitration Association and to Davis and his counsel. As set forth therein, Finning contends that the terms of the Distributor Agreement have been breached in numerous respects. The American Arbitration Association proceeded to initiate the arbitration, as reflected by their acknowledgment notice dated September 23, 2003, which was also sent to Davis and his counsel. Davis' counsel subsequently notified the American Arbitration Association that he would be withdrawing as Davis' counsel for purposes of the arbitration. The parties, both before and thereafter, held various discussions to determine whether their dispute might be resolved without the need for the arbitration, but such discussions were unsuccessful.

3

4.      On November 5, 2003, Finning filed suit in the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. H-03-5080, *Finning International Inc. v. Daniel E. Davis and Davcrane, Inc.* (the "Houston Suit"), which suit is pending before the Honorable Nancy F. Atlas.  In the Houston Suit, Finning seeks to compel arbitration, to preserve the equipment and related property in the interim, and to enforce any award of the arbitration when such is rendered.  Service of process of the Houston Suit was made by personal delivery on Davis, both for himself and as designated agent for Davcrane, on November 21, 2003.

5.      On November 7, 2003, Plaintiffs filed the present suit.  In the present suit, the parties are identical to those in the Houston Suit.  The claims made by Plaintiffs in this suit are based on the identical facts set forth in the Houston Suit.  The Plaintiffs faxed a copy of the present suit to representatives of Finning, but proper service has yet to be made.

6.      A certified copy of the Complaint in the Houston Suit is attached to this Motion as "Exhibit 1."  Attached to that Complaint are the following:  Exhibit A is a copy of the Distributor Agreement and ancillary security documents agreed to by the parties (the "Agreement"); Exhibit C is a copy of the Notice of Arbitration submitted by Finning on September 18, 2003; and Exhibit D is the American Arbitration Association's acknowledgment of the initiation of the arbitration, dated September 23, 2003.

7.      **Legal Authority for Stay of Present Suit.**  By their commencement of the present action in this Court, despite Finning's invocation of the arbitration proceedings pursuant to the parties' Agreement, Plaintiffs blatantly attempt to maneuver around the legal requirement for arbitration mandated by both federal and Texas law.  The extensive statutory and decisional

4

law in support of enforcement of the arbitration process leaves no room for doubt that the present

suit should not continue.

8.    First, the statutory basis for arbitration under both federal and Texas law provides

that this suit should be stayed.  The Federal Arbitration Act, 9 U.S.C. §3, provides that

> If any suit or proceeding be brought in any of the courts of the United
> States upon any issue referable to arbitration under an agreement in
> writing for such arbitration, the court in which such suit is pending,
> upon being satisfied that the issue involved in such suit or proceeding
> is referable to arbitration under such an agreement, shall on application
> of one of the parties, stay the trial of the action until such arbitration
> has been had in accordance with the terms of the arbitration.

Similarly, the Texas Arbitration Act, TEX. CIV. PRAC. & REM. CODE § 172.174, provides that

> On request of a party, a court in which a pending judicial proceeding is
> being brought by a party to an arbitration agreement to obtain relief
> with respect to a matter covered by the arbitration agreement shall ...
> stay the judicial proceeding; and ... refer the parties to arbitration.

The statutes are therefore clear that the present case should be stayed.

9.    The caselaw holds in accordance with the statutes, and further demonstrates that

attempts by creative plaintiffs to frame their pleadings as tort claims to avoid arbitration will not

be tolerated.  The general rule is that when a party seeking to compel arbitration demonstrates

that the parties entered into a valid arbitration agreement, and the claim at issue falls within the

scope of the agreement, the court should compel arbitration.  *See First Options, Inc. v. Kaplan*,

514 U.S. 938, 943 (1995); *AT&T Tech., Inc. v. Communications Workers of Am.*, 475 U.S. 643,

648-49 (1986).

10.    The Plaintiffs' own Complaint in this action shows clearly that this dispute arises

out of the Agreement entered into by Finning and Plaintiffs.  The Complaint recites that the

gravamen of the Plaintiffs' claim is that Finning allegedly did not perform in accordance with the

5

parties' Agreement.  Indeed, the Plaintiffs attach a copy of the parties' Agreement as Exhibit 2 to their Complaint, and state, on page 16 that

> The parties entered into a contract on July 15, 2002 .... The parties admitted that there was mutual consideration for the contract and therefore all conditions precedent have been met.  The parties also agree that the contract shall be governed and interpreted with the laws in force within the State of Texas .... During the year of 2002, Defendant Finning International, Inc., fully paid the overhead production costs.  However, Defendant Finning International, Inc. breached the contract by withholding during the year of 2003 such overhead production costs.

Based upon these factual allegations, the Plaintiffs seek relief under several tort theories as well as for breach of contract.  While Plaintiffs include both contract and tort claims in their suit, the inclusion of tort claims does nothing to remove the dispute from the mandates of arbitration. *Mar-Len of Louisiana, Inc. v. Parsons-Gilbane*, 773 F.2d 633, 636 (5th Cir. 1985) (fraudulent inducement claim held arbitrable where contract called for arbitration of any dispute "with respect to the interpretation or performance of the contract"); *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749 (Tex. 2001) (fraudulent inducement claim is subject to arbitration where arbitration clause implicated the interpretation, validity, performance, or breach of the contract.)  Further, any doubt as to whether a dispute falls with the scope of an arbitration clause is resolved in favor of arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). The arbitration provision in the parties' Agreement, as quoted above, is more inclusive than those referenced by the Fifth Circuit and the Texas Supreme Court, and accordingly there is no question that the Plaintiffs' claims in this case fall under the parties' arbitration agreement. Plaintiffs' instant suit should therefore be stayed pending the resolution of the arbitration proceeding.

## MOTION TO STAY OR DISMISS SUIT DUE TO PRIOR-FILED ACTION

11.    In the alternative, Finning asks the Court to stay or dismiss this suit due to the

prior filing of the Houston Suit, which is pending in a sister federal court covering the same

parties and subject matter as is involved in the instant suit.  Prior to Plaintiffs' filing of the

present lawsuit, Finning had filed on November 5, 2003, a separate but related lawsuit in the

Houston Division of the United States District Court for the Southern District of Texas, seeking

to compel arbitration, to preserve the equipment and related property in the interim, and to

enforce any award of the arbitration when such is rendered.  *See* "**Exhibit 1**," attached hereto,

the certified copy of the Complaint filed in the Houston Suit.

12.    This Court has broad power to control its docket by staying or dismissing a suit

when such suit covers the same subject matter as a prior-filed federal suit.  *Genentech, Inc. v. Eli*

*Lilly & Co.,* 998 F.2d 931, 937-38 (Fed. Cir. 1993); *Schnadig Corp. v. Collezione Europa U.S.A.,*

2001 U.S. Dist. LEXIS 9208 (N.D. Ill. 2001).

13.    The Fifth Circuit adheres to the general rule that the court in which an action is

filed first is the appropriate court to determine whether subsequently filed cases involving

substantially similar issues should proceed.  *See West Gulf Maritime Ass'n v. ILA Deep Sea*

*Local 24,* 751 F.2d 721, 728 (5th Cir. 1985); *Mann Mfg., Inc. v. Hortex, Inc.,* 439 F.2d 403, 408

(5th Cir. 1971); *Save Power v. Syntek Fin. Corp,* 121 F.3d 947, 950 (5th Cir. 1997).  The "first to

file" rule is grounded in principles of comity and sound judicial administration.  "The federal

courts long have recognized that the principle of comity requires federal district courts—courts

of coordinate jurisdiction and equal rank—to exercise care to avoid interference with each other's

affairs." *West Gulf,* 751 F.2d at 728.  "The concern manifestly is to avoid the waste of

7

duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result." *Id.* at 729; *see also Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817-20 (1976). This concern applies where related cases are pending before two judges in the same district, as is the case here, as well as where related cases have been filed in different districts. *See Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148, 1161 n.28 (5th Cir. 1992) ("The same concern with avoiding duplicative litigation is present where similar suits have been filed in two courts within the same district.").

14.    The Fifth Circuit has explained that, "under the first-to-file rule, when related cases are pending before two federal courts, the court in which the case was last filed may refuse to hear it if the issues raised by the cases substantially overlap." *Cadle Co. v. Whataburger of Alice, Inc.* 174 F.3d 599, 603 (5th Cir. 1999). The second-filed court should transfer an action to the first-filed court if it determines the substantive issues in the two actions might substantially overlap. *Id.* at 606. The two actions need not be identical. *Syntek Fin. Corp.*, 121 F.3d at 950; *Mann Mfg., Inc. v. Hortex, Inc.*, 439 F.2d 403, 407 (5th Cir. 1971). Regardless of whether or not the suits here are identical, "if they overlap on the substantive issues, the cases would be required to be consolidated in . . . the jurisdiction first seized of the issues." *Mann Mfg.*, 439 F.2d at 408 n.6.

15.    Plaintiffs, by their own pleadings asserting a breach of contract claim, judicially admit to the existence of a valid contract between the parties. *See* Complaint at 16. In their Complaint, Plaintiffs refer this Court to the same Distributor Agreement pursuant to which provisions Finning initiated the arbitration proceedings against Plaintiffs. The parties are the same in both suits. Both suits arise out of the same operative facts. In such a circumstance, the

8

present suit should be stayed or dismissed, so that the Houston Suit may proceed, as a matter of comity between the Courts and the wise use of judicial resources.

## MOTION TO DISMISS FOR INSUFFICIENT SERVICE OF PROCESS

16.     Finning also files this motion to dismiss for defective service, as authorized by Federal Rule of Civil Procedure 12(b)(4) and (5).  When service of process is insufficient, the Court may dismiss the suit or quash the service.  *See Adams v. AlliedSignal Gen. Aviation Avionics*, 74 F.3d 882, 886 (8th Cir. 1996).

17.     In this case, the Plaintiff served the Complaint and accompanying summons (the "Summons") by facsimile transmission on Finning International, Inc.  This method of service is not in compliance with the requirements for service of process pursuant to Rule 4 of the Federal Rules of Civil Procedure.  Because Finning is a corporation, the general rule pursuant to Rule 4(h)(1) requires that service be made "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process."  FED. R. CIV. P. 4(h)(1).  However, Plaintiffs failed to serve Finning in accordance with Rule 4 because they sent the Summons and Complaint by facsimile transmission.

18.     In addition, because Finning is incorporated under the laws of Canada, with its principal place of business in Vancouver, British Columbia, and does not maintain a registered agent in the State of Texas, service of process must be made pursuant to Rule 4(f)(1) and 4(h)(2).  These rules provide, in pertinent part, that service must be by any internationally agreed means reasonably calculated to give notice, such as those means authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters

9

(the "Convention"). *See* FED. R. CIV. P. 4(f)(1). Because Canada and the United States are both signatories to the Convention, service of process must be accomplished pursuant to the Convention.

19.     The Hague Convention allows a signatory to modify or object to the articles of the Convention, and therefore it is necessary to consult the Hague Conference on Private International Law to determine how Canada applies the Convention. However, Plaintiffs failed to serve Finning in compliance with the articles of the Convention. Plaintiffs chose an improper method of service. Service by facsimile is not a proper method of service under the Convention. Finning therefore was not served in accordance with the requirements of the Convention, made applicable to this proceeding pursuant to Rules 4(f)(2) and 4(f)(1) of the Federal Rules of Civil Procedure.

20.     Despite the liberal service requirements of the Federal Rules of Civil Procedure, the method of service chosen simply was not valid, and service should be quashed. *See United States v. Mollenhauer Labs., Inc.*, 267 F.2d 260, 262 (7th Cir. 1959) (establishing that the liberal construction rule "cannot be utilized as a substitute for the plain legal requirements as to the manner in which service of process may be had"). As service of the Summons and Complaint was invalid, service should be quashed. In the alternative, the Complaint should be dismissed. *See Montgomery, Zuckman, Davis, Inc. v. Diepenbrock*, 698 F.Supp. 1453, 1460 (S.D. Ind. 1988) (recognizing that the court could not disregard the formal requirements of Fed. R. Civ. P. 4).

## MOTION TO TRANSFER VENUE

21.     In the alternative, Finning asks the Court to transfer venue of this action to the Houston Division for the Southern District of Texas. Section 14.1 of the Distributor Agreement

provides: "**The place of arbitration will be Houston, Texas.**"  The venue provision of the Convention on the Recognition and Enforcement of Foreign Arbitral Award, 9 U.S.C. §204, provides that venue is permissible in the district and division which "embraces the place designated in the agreement as the place of arbitration."

22.    Finning filed the Houston Suit in the Houston Division of the Southern District of Texas for the purpose of invoking that court's equitable powers to compel Plaintiffs to arbitration, and because that is the district and division where arbitration was to take place pursuant to the parties' contract.  As the court sitting in the district and division of the agreed upon location of arbitration, venue in the Houston division is more proper in the interest of justice. *See* 28 U.S.C. § 1404(a); TEX. CIV. PRAC. & REM. CODE. § 172.174 (Vernon 2002).

23.    In addition, Plaintiffs attempt to circumvent Finning's choice of venue by the filing of this instant suit in the Brownsville Division.  Under the "first to file" rule discussed *supra*, Finning is entitled to have the court in Houston determine whether the dispute between the parties should proceed to arbitration.  The first to file rule is not to be applied mechanically, but the party that seeks to deviate from the rule has the burden of demonstrating that circumstances justifying an exception exist. *See Transatlantic Reinsurance Co. v. Cont'l Ins. Co.*, No. 03 Civ. 3227, slip op, 2003 U.S. Dist. LEXIS 20933 at *3 (S.D.N.Y. Nov. 20, 2003).  Plaintiffs have not provided any support why their suit should proceed in the Brownsville division, a venue that is not specified in the parties' Distributor Agreement, nor appropriate given the arbitration proceeding currently pending in Houston.  TEX. CIV. PRAC. & REM. CODE. § 171.024 (Vernon 2002).  Plaintiffs have simply offered no reason for their choice of forum, as opposed to the first-filed suit proceeding in the Houston Division for the purpose of compelling Plaintiffs to arbitrate.

24.    Transfer is particularly appropriate where there is a pending lawsuit in the transferee district involving the same facts, transactions or occurrences. *Id.* at *18. Finning believes that the Houston court will be in a better position to determine whether this action should be consolidated with the pending action or dismissed. Because the Court may transfer venue upon motion, any action, suit or proceeding of a civil nature from the division in which pending, to any other division in the same district, the Court should grant Finning's motion to transfer venue. *See* 28 U.S.C. § 1404 (b).

WHEREFORE, Finning International, Inc. requests that the Court grant its Motion to Stay Suit Pending Arbitration; Motion to Stay or Dismiss due to Prior-Filed Action; Motion to Dismiss for Insufficient Service of Process; and, Subject Thereto, Motion to Transfer Venue.

Respectfully submitted,

Jeffery R. Koch
Texas Bar No. 11645250
2400 Two Houston Center
909 Fannin Street
Houston, Texas 77010
(713) 646-5593 (Telephone)
(713) 752-0337 (Facsimile)

ATTORNEY FOR DEFENDANT

12

OF COUNSEL:

SHANNON, MARTIN, FINKELSTEIN & SAYRE
A Professional Corporation
Mark S. Finkelstein
Texas Bar No. 07015100
S.D. Tex. No. 5543
2400 Two Houston Center
909 Fannin Street
Houston, Texas  77010
(713) 646-5503 (Telephone)
(713) 752-0337 (Facsimile)

**Exhibits:**

1:    Complaint in Civil Action No. H-03-5080, *Finning International Inc. v. Daniel E. Davis and Davcrane, Inc.* pending before the Honorable Nancy F. Atlas.

**CERTIFICATE OF SERVICE**

On this the 1st day of December 2003, the undersigned caused this motion to be served upon counsel for the Plaintiffs by both telecopy and certified mail, return receipt requested.

Jeffery R. Koch

13



UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
FILED

NOV - 5 2003

Michael N. Milby, Clerk of Court

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **FINNING INTERNATIONAL INC.,** | § |
| | § |
| **Plaintiff,** | § |
| | § |
| **V.** | § |
| | § |
| **DANIEL E. DAVIS and** | § |
| **DAVCRANE, INC.,** | § |
| | § |
| **Defendants.** | § |

# H-03 -5080

CIVIL ACTION NO. _____

## PLAINTIFF'S ORIGINAL COMPLAINT

Finning International Inc., Plaintiff, complaining of Daniel E. Davis and Davcrane, Inc.,

Defendants, files this Original Complaint, and for cause of action shows the following:

### PARTIES

1.     Finning International Inc. ("Finning") is a corporation incorporated under the

laws of Canada, with its principal place of business in Vancouver, British Columbia. Finning

has qualified as a foreign corporation licensed to do business in the state of Texas.

2.     Daniel E. Davis ("Davis") is an individual domiciled in the state of Texas. Davis

may be served with process at his business office, at 115 East Van Buren Avenue, Harlingen,

Texas 78550.

3.     Davcrane, Inc. ("Davcrane") is a Texas corporation with its principal place of

business in Harlingen, Cameron County, Texas. Davcrane has appointed Daniel E. Davis as its



**EXHIBIT**
**1**

TRUE COPY I CERTIFY
ATTEST: 11-24-03
MICHAEL N. MILBY, Clerk of Court
By_____
Deputy Clerk

agent for service of process.  Davcrane may be served with process at 115 East Van Buren Avenue, Harlingen, Texas 78550.

4.    The Court's Procedures and Order for Conference are also being served herewith upon each Defendant.

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction over Finning's claims under 9 U.S.C. §203 because this suit involves an arbitration conducted in accordance with the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, pursuant to 9 U.S.C. § 201, *et seq.* This Court also has jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and is between a citizen of a foreign state and a citizen of the forum state.  The Court also has jurisdiction because the matter involves an international arbitration and alienage jurisdiction, under 28 U.S.C. § 1332(a)(2). Further, the matter involves, among other things, patent rights and therefore involves federal question jurisdiction under 28 U.S.C. § 1338.

6.    This Court has personal jurisdiction over each of the Defendants because Finning's causes of action arise from or are connected with acts of each of the Defendants purposely done in Texas, and/or transactions consummated by them in Texas.

7.    Venue is proper in this district pursuant to 9 U.S.C. § 204, because the parties have entered into a written contract providing for arbitration in this district.  Venue is also proper in this district by 28 U.S.C. § 1391(a)(2) by virtue of the fact that the transactions made the basis of this suit were accomplished, and a substantial part of the events or omissions giving rise to the claims occurred, in this judicial district.

## FACTS

8.    **The Parties.** Finning is a company that sells, rents, finances and provides support services for heavy equipment bearing the Caterpiller brand.  Davis and Davcrane are engaged in the manufacture of cranes and lifting equipment.  Davis is the president of Davcrane.  As a part of its business, Finning serves as the exclusive worldwide dealer of DCI cranes and lifting equipment.  The DCI cranes and equipment are built by Davcrane based upon Caterpiller equipment supplied by Finning to Davcrane.

9.    **The Parties' Contracts.**  On July 15, 2002, Davis entered into a Distributor Agreement with Finning (the "Agreement.")  The Agreement granted Finning the exclusive right to market, distribute and sell the product lines that are generally referred to as the DCI cranes and lifting equipment, which were to be manufactured by the Defendants utilizing patented technology held by Davis.  Finning agreed, among other things, to supply the major Caterpiller crane components involved in the manufacture of the DCI equipment, and to front Davis $1.5 million dollars in the form of a facilities loan.  Davis and Davcrane agreed, among other things, to manufacture the DCI cranes and to turn them over to Finning upon completion.  Davis and Davcrane further agreed to various security provisions so that title to much of the equipment is held by Finning.  Further, as part of its rights, Finning has the right to possession and ownership of the equipment, the patent technology, and the manufacturing facility if Davis commits an event of default under the Agreement and such default is not timely cured.  A true and correct copy of the Agreement, with the related security agreements and ancillary documents, is attached as Exhibit A to this Complaint.

10.    **The Defaults by the Defendants.**  Under the Agreement, Davis is required, among other things, to:  (a) control the manufacturing costs that will be borne by Finning,

including providing an estimate of overhead costs in advance of each manufacturing period; (b) assemble the equipment in a timely fashion; and (c) maintain solvent operations.

11.    Davis is in breach of these obligations under the Agreement. In a letter from Davis' counsel it is further acknowledged that Davis plans to "wind down" the business, in a blatant default of yet other obligations under the Agreement. A true and correct copy of this notice from Davis' counsel is attached as Exhibit B.

12.    In an attempt to limit the scope of the parties' dispute, Finning and the Defendants agreed, on an interim basis, for the Defendants to turn over two of the cranes to Finning in exchange for Finning remitting additional funds to the Defendants. Finning made such remittance but the Defendants have reneged on this supplemental interim agreement, in further breach of their contractual obligations. Similarly, a supplemental agreement was made whereby one fully functional crane would be delivered for use by Finning at a trade show, in exchange for remittance of $50,000 by Finning to the Defendants (with a reservation of all rights). While the crane was released from the Defendants, it was far from functional, with a resulting negative effect at the trade show. The Defendants have subsequently admitted that significant additional work was needed to make the crane functional.

13.    **The Arbitration Proceeding.** Under the Agreement, and pursuant to both federal and Texas law, Finning has invoked the contractual arbitration provision. Attached as Exhibit C is a copy of the Notice of Arbitration sent by counsel for Finning to the Defendants and their counsel. Attached as Exhibit D is the notice issued by the American Arbitration Association in furtherance of the arbitration.

14.    While the arbitration proceeding is pending, the cranes and related property that are in Davis' and Davcrane's possession should be safeguarded, if not simply turned over to

-4-

Finning.  Pursuant to Tex. Civ. Prac. & Rem. Code § 172.175, this Court has authority to issue orders to protect the property that is the subject of the arbitration.  Further, pursuant to Article 21(3) of the International Arbitration Rules of the American Arbitration Association, adopted by the parties by virtue of the Agreement, a request for interim measures by the Court is compatible with the agreement to arbitrate and is not a waiver of the right to arbitrate.  Attached as Exhibit E is a list of the property that is in Davis and Davcrane's custody, but which should be turned over to Finning or at a minimum protected from harm or disposition by Davis and Davcrane.

15.    If possession of the property is not returned to Finning, then a Court order should issue requiring that the equipment be maintained safely in a facility that is subject to Finning's periodic inspection.  On information and belief, the Defendants have sold some of the equipment to a third party, and further disposition of the equipment should be halted.

### COUNT 1 - APPLICATION FOR AID OF ARBITRATION

16.    Finning repeats and incorporates by reference all of its allegations in paragraphs 1 through 15.

17.    Finning requests that this Court take jurisdiction to compel the arbitration and to confirm and enforce any award of the arbitration when such is rendered.

### COUNT 2 - APPLICATION FOR INTERIM RELIEF
### PENDING ARBITRATION

18.    Finning repeats and incorporates by reference all of its allegations in paragraphs 1 through 17.

19.    Finning requests this Court to issue an injunction, prohibiting Davis and Davcrane, and its or their representative and affiliates, and any persons acting in concert with them, from interfering with Finning's repossession of the DCI equipment.  In the alternative, Finning requests that the Court order the same parties to maintain the equipment in a segregated location, with free access by Finning representatives upon advance notice of at least 24 hours, during the pendency of the arbitration.

20.    It is extremely likely that Finning will succeed on its claims, because Davis and Davcrane's actions are in direct breach of the Agreement and their supplemental contractual agreements.  Further, if the Defendants do not allow Finning access to the equipment, Finning is exposed to imminent harm and irreparable injury, because title to much of the equipment has remained in Finning and none of the equipment should be exposed to waste or attempted seizure by other creditors.  Further, there is no adequate remedy at law, because the prospect of recovery of monetary damages is unknown given the incalculable value of the equipment when turned over to Finning and marketed properly.  Finning has also been informed by the Defendants that they are winding down their operations, and therefore Defendants obviously do not need the equipment in conducting current operations.  Therefore any injury faced by Finning outweighs the injury, if any, that would be sustained by the Defendants if the injunctive relief is granted.

## RESERVATION OF RIGHTS

21.    Finning repeats and incorporates all of its allegations in paragraphs 1 through 20 by reference.

22.    Pursuant to the Agreement and the ancillary security documents, Finning has the

right to non-judicial foreclosure of its security interests.  Finning reserves its right to conduct such non-judicial proceedings, either separate from or in conjunction with any judicial foreclosure of such security interests.  Finning reserves its right to pursue any additional relief and specifically does not hereby elect an exclusive remedy and does not waive its right to seek other or additional relief.

**CONDITIONS PRECEDENT**

23.    Finning has performed all conditions precedent for recovery on its claims, or all such conditions have been satisfied.

**PRAYER**

24.    Finning prays that each of the Defendants be cited to appear and answer and that Finning have judgment against each of the Defendants, jointly and severally, for enforcement of the arbitration award, when rendered, and in the interim for injunctive relief, restraining the Defendants and their representatives and affiliates from hindering or otherwise interfering with Finning's possession of the facilities, equipment, and technology that are the subject of the parties' Agreement, or in the alternative, requiring that such property be safely maintained and segregated by the Defendants in a location that provides Finning with free inspection of the equipment on 24 hours notice.  Finning additionally prays for such further relief, both general and special, at law and in equity, to which it may be justly entitled.

Respectfully submitted,

Jeffery R. Koch
Texas Bar No. 11645250
2400 Two Houston Center
909 Fannin Street
Houston, Texas 77010
(713) 646-5503 (Telephone)
(713) 752-0337 (Facsimile)

ATTORNEY FOR PLAINTIFF

OF COUNSEL:

SHANNON, MARTIN, FINKELSTEIN & SAYRE
A Professional Corporation
Mark S. Finkelstein
Texas Bar No. 07015100
S.D. Tex. No. 5543
2400 Two Houston Center
909 Fannin Street
Houston, Texas 77010
(713) 646-5503 (Telephone)
(713) 752-0337 (Facsimile)

**Exhibits:**   A   Distributor Agreement, with ancillary documents.
                B   Letter from Defendant's counsel.
                C   Letter from Finning's counsel initiating arbitration.
                D   Notice from American Arbitration Association.
                E   List of property subject to Finning's possessory or security rights.

# DISTRIBUTOR AGREEMENT

**THIS DISTRIBUTOR AGREEMENT** dated July 15 2002, is made between **DANIEL E. DAVIS**, businessperson having an address at P.O. Box 2427, Harlingen, Texas, 78551, USA ("**Davis**") and **FINNING INTERNATIONAL INC.**, a corporation incorporated under the laws of Canada, having an address at 16830 – 107th Avenue, Edmonton, Alberta, T5P 4C3, Canada ("**Finning**").

**WHEREAS:**

A.          Davis had developed and owns the Technology (defined below) regarding the special assembly of the Product Lines (defined below);

B.          Finning, either directly or indirectly through its affiliates and subsidiaries, has the infrastructure to sell and distribute the Distributed Products (defined below) to end-user customers;

C.          Davis and Finning entered into a Letter of Intent dated June 18, 2002, regarding the grant by Davis to Finning of exclusive distribution rights to the Product Lines using the Technology and other related matters (the "**LOI**"); and

D.          Davis and Finning now wish to enter into this Agreement to supersede and replace the LOI;

**NOW, THEREFORE THIS AGREEMENT WITNESS** that in consideration of the premises, mutual covenants and agreements contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is acknowledged by the parties hereto (the "**Parties**"), the Parties covenant and agree as follows:

1.          **INTERPRETATION**

1.1          **Definitions:** As used in this Agreement, the term:

"**Agreement,**" "**this Agreement,**" "**the Agreement,**" "**hereto,**" "**herein,**" "**hereby,**" "**hereunder**" and similar expressions mean or refer to this Agreement as amended from time to time and any indenture, agreement or instrument supplemental or ancillary hereto and the expressions "Article," "Section" and "Schedule" followed by a number or letter mean and refer to the specified Article, Section or Schedule of this Agreement;

"**Assignment of Royalties**" has the meaning ascribed thereto in Section 6.7(c);

"**Books and Records**" means, with respect to each Party, the books and records of that Party relating to the Distributed Products and costs associated therewith, including financial, operations and sales books, books of account, sales and purchase records, lists of customers, business reports and plans;

"**Business Day**" means any day, other than a Saturday, Sunday or a statutory holiday anywhere in Canada or the United States of America;

"**Claim**" means any claim, demand, action, cause of action, damage, loss, costs, liability or expense, including reasonable professional fees and all costs incurred in investigating or pursuing any of the foregoing or any proceeding relating to any of the foregoing;

Document: 1005628:05

**EXHIBIT**

"**Confidential Information**" means all information provided by one Party (the "Disclosing Party") to the other Party (the "Receiving Party") in connection with this Agreement and includes, but is not limited to, specifications, designs, drawings, sketches, models, test results, current and forecasted data, reports, records, discoveries, ideas, inventions, concepts, techniques, methods, source code, project code, source listings, program listings, documentation, diagrams, flow charts, research and development data, processes, procedures, formulas, know how, marketing techniques, customer and supplier lists and other proprietary rights, communicated in any medium. Confidential Information also includes the existence of any terms of the LOI and this Agreement. Confidential Information does not include information that:

(i)     is already known to the Receiving Party from a source which is not prohibited from disclosure as evidenced by written or other dated tangible records;

(ii)    is in the public domain at the time it is disclosed or becomes publicly available after disclosure, other than by breach of this Agreement;

(iii)   is independently and lawfully developed by the Receiving Party completely without reference to the Confidential Information, or with respect to Finning, the Technology, as evidenced by written or other tangible records; or

(iv)    is disclosed without restriction to the Receiving Party in good faith by a third party (other than Caterpillar or its affiliates) who is in lawful possession of the information and who has the right to make the disclosure, or is disclosed by the Receiving Party after receiving written approval from the Disclosing Party;

"**Davis Costs**" means the actual costs paid by Davis to his suppliers and employees for the Minor Components and the assembly of the Major and Minor Components as evidenced by the Books and Records of Davis;

"**Davis Insolvency Event**" has the meaning ascribed thereto in Section 7.1(c);

"**Davis Payment**" has the meaning ascribed thereto in Section 5.5(b);

"**Distributed Products**" means Product Lines manufactured and assembled using, containing or incorporating the Technology;

"**Distribution and Licensing Fee**" has the meaning ascribed thereto in Section 5.1;

"**Due Diligence Completion Date**" has the meaning ascribed thereto in Article 15;

"**Encumbrance**" has the meaning ascribed thereto in Section 7.1(e);

"**Estimated Manufacturing Overhead Costs**" has the meaning ascribed thereto in Section 5.3;

"**Estimated Production Quantity**" has the meaning ascribed thereto in Section 5.3;

"**Event of Default**" means the breach by a Party of any covenant, representation or warranty made by that Party under this Agreement or the Security Documents, or the failure of that Party to perform any of his or its obligations under this Agreement or the Security Documents;

"**Facility**" has the meaning ascribed thereto in Section 3.1;

- 2 -

"**Facility Loan**" has the meaning ascribed thereto in Section 6.1;

"**Favelle Licence**" means the non-exclusive licence granted by Davis to Favelle Favco Cranes (USA) Inc. relating to U.S. Patent No. 6,003,252;

"**Fee Refund**" has the meaning ascribed thereto in Section 5.1;

"**Finning Costs**" means the actual costs paid by Finning to its suppliers, as evidenced by the Books and Records of Finning, for the Major Components;

"**Finning Insolvency Event**" has the meaning ascribed thereto in Section 7.2(c);

"**Force Majeure**" means an event or circumstances that is beyond the reasonable control of a Party and that prevents or delays that Party in the performance or observance of any of, or all, its obligations under of this Agreement, including without limitation, acts or omissions of the other or a third party, acts of civil of military authority, strikes, lockouts, embargoes, insurrections or acts of God;

"**Governmental Authorities**" means any government, regulatory authority, governmental department, agency, commission, board, tribunal, or court or other law, rule or regulation-making entity having or purporting to have jurisdiction on behalf of any nation, state or other subdivision of this Agreement or any municipality, district or other subdivision of this Agreement;

"**Gross Margin**" has the meaning ascribed thereto in Section 5.5;

"**Initial Term**" has the meaning ascribed thereto in Section 2.3;

"**Intellectual Property Rights**" will include all intangible, intellectual, proprietary and industrial property rights of any nature and all intangible embodiments and derivative works thereof, including without limitation, (i) all trade-marks, trade names, slogans, domain names, URLs or logos; (ii) all copyrights, moral rights and other rights in works of authorship; (iii) all patents and patent applications, patentable ideas, algorithms, developments, discoveries, inventions, improvements, innovations; (iv) all know-how and trade secrets; and (v) all registrations, applications, renewals, extensions, continuations, divisions or reissues thereof now or hereafter in force (including any rights in any of the foregoing);

"**Landed Dealer Cost**" means the sum of the Product Cost, Running Royalty and unrecovered freight and transportation costs applicable to each Distributed Product, including without limitation shipping, delivery, transportation and insurance costs pursuant to Sections 4.2 and 4.3;

"**Laws**" means all applicable laws, by-laws, rules, regulations, orders, ordinances, and judgements or other requirements of any Governmental Authority that in each case, have legally binding effect;

"**LIBOR**" means the London InterBank Offered Rate as published by the British Bankers' Association from time to time;

"**LOI**" has the meaning ascribed thereto in Recital C;

"**Major Components**" means, with respect to each Distributed Product, all significant physical parts for the Distributed Products that are purchased by Finning;

"**Manufacturing Overhead Costs**" means Davis' reasonable overhead and administration costs pertaining to the manufacture or assembly of the Distributed Products, including without limitation,

- 3 -

utilities, costing, engineering services, insurance, interest, drafting and accounting services, but will not include capital costs;

"Marketing Fee" has the meaning ascribed thereto in Section 5.5(a);

"Minor Components" means all necessary parts, equipment and services other than the Major Components, necessary to transform the Major Components into Distributed Products and to deliver such Distributed Products to Finning or its customers, and will include without limitation, labour, insurance, warranty allowances and transportation costs, but will not include any costs comprising Manufacturing Overhead Costs;

"Mortgage" has the meaning ascribed thereto in Section 6.7(b);

"Notice" means a notice given in the manner required by Section 16.7 of this Agreement;

"Per Unit EMOC" has the meaning ascribed thereto in Section 5.3;

"Period" has the meaning ascribed thereto in Section 5.3;

"Person" means an individual, corporation, partnership, venture, association, unincorporated organization, other entity or group, or Governmental Authority;

"Product Lines" means telehandler all-terrain cranes, lattice and telescopic boomed crawler cranes, excavator based pipelayers and related equipment or products, and includes any current or future similar products, but specifically excludes any marine or offshore products;

"Product Cost" means the sum of the Finning Costs, Davis Costs and the Manufacturing Overhead Costs applicable to each Distributed Product, or the analogous calculation for any Replacement Product;

"Referral" has the meaning ascribed thereto in Section 2.2;

"Referral Commission" has the meaning ascribed thereto in Section 5.6;

"Renewal Term" has the meaning ascribed thereto in Section 2.3;

"Replacement Product" means any product sold by Finning, anywhere other than in Canada, England and Chile, in place of a Distributed Product to a Person referred by Davis or his agent to Finning;

"Returned Product" has the meaning ascribed thereto in Section 5.7;

"Running Royalty" has the meaning ascribed thereto in Section 5.4;

"Sale Price" has the meaning ascribed thereto in Section 5.5;

"Security Agreement" has the meaning ascribed thereto in Section 6.7(a);

"Security Documents" has the meaning ascribed thereto in Section 6.7(c);

"Specifications" means, with respect to any Distributed Product, any specifications provided by or to Davis, to or by the manufacturer of any Major Components or Minor Components related to that Distributed Product;

- 4 -

"**Technology**" means all of the property and proprietary know-how, including any patents, patent applications, drawings (including assembly drawings), copyrights and other intellectual property rights used by Davis in relation to the special assembly of the Product Lines, including without limitation the items described in the attached Schedule B and any present or future improvements or enhancements thereto; and

"**Term**" means the Initial Term and any Renewal Terms described in Section 2.3.

1.2     **Schedules:**   The following Schedules are incorporated into and form part of this Agreement:

| Schedule | | Description |
|----------|---|-------------|
| Schedule A | - | Product Cost Summary |
| Schedule B | - | Technology |
| Schedule C | - | Davis' Warranty on Distributed Products |

1.3     **Division, Headings:**   The division of this Agreement into Articles, Sections and Subsections and the insertion of headings are for convenience of reference only and will not affect the construction or interpretation of this Agreement.

1.4     **Gender and Number:**   Unless the context otherwise requires, words importing the singular include the plural and vice versa and words importing gender include all genders.

1.5     **Invalidity of Provisions:**   The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of any other provision of this Agreement and any such invalid or unenforceable provisions will be deemed to be severable. If any provision is declared to be invalid or unenforceable, the Parties agree to meet within thirty (30) days after any declaration of invalidity to renegotiate in good faith a valid amendment of the Agreement representing, as much as reasonably possible, the original intentions of the Parties.

1.6     **Currency:**   Unless otherwise stated, all amounts in this Agreement are stated in United States' Dollars (US$).

1.7     **Accounting Principles:**   In the absence of a specific provision in of this Agreement providing otherwise (expressly or by implication), financial or accounting determinations and calculations will be made in accordance with generally accepted accounting principles applicable in the United States.

1.8     **Calculation of Time:**   Unless otherwise specified, time periods within or following which any act is to be done will be calculated by excluding the day on which the period commences and including the day on which the period ends.

1.9     **Business Day:**   In the event that any action to be taken under this agreement falls on a day that is not a Business Day, then such action will be taken on the next succeeding Business Day.

1.10     **Inclusion:**   Where the words "including" or "includes" appear in of this Agreement, they mean "including (or includes) without limitation".

1.11        **Governing Law:**  This Agreement will be governed by and interpreted and construed in accordance with the laws in force in the State of Texas USA.

2.          <u>**DISTRIBUTORSHIP AND TERM**</u>

2.1         **Grant of Distributorship:**   Subject to Sections 2.2, 5.1, Article 15 and the Favelle Licence, Davis hereby grants to Finning the exclusive right to market, distribute and sell the Distributed Products throughout the world, and Finning hereby agrees to act as the exclusive distributor of Davis with respect to the Distributed Products, in accordance with the terms and conditions set forth in of this Agreement.

2.2         **Reservation of Rights / Referrals:**  Notwithstanding Section 2.1, Davis may, by himself or through his agents, market the Distributed Products throughout the world.  Davis or his agents will refer to Finning all prospective distributions and sales of Distributed Products that Davis or his agents solicit or procure (each, a **"Referral"**).  Davis or his agents will prepare all sales orders and sales documents required by Finning in order for Finning to complete a sale from a Referral.  Finning will use reasonable commercial efforts to complete all possible sales of Distributed Products from each Referral. Notwithstanding the foregoing, Davis will not, by himself or through his agents, conclude any sale for any Distributed Product, hold himself out as an agent of Finning, purport to have authority to bind Finning contractually or otherwise, or actually have authority to bind Finning contractually or otherwise. In consideration of Davis or his agents making Referrals, Finning will pay Davis the Referral Commission in accordance with Section 5.6.

2.3         **Term:**  This Agreement will commence on the day and year first above written and will subsist for an initial term of 10 years (the **"Initial Term"**).  Upon the expiry of the Initial Term or any Renewal Term, this Agreement will automatically renew for successive 5 year terms (each, a **"Renewal Term"**) unless either Party delivers to the other Party written Notice of non-renewal not less than 60 days prior to the expiry of then current Initial Term or Renewal Term, as applicable.  This Agreement will not be terminated except as provided in Articles 12 and 15.

3.          <u>**PRODUCTION OF DISTRIBUTED PRODUCTS**</u>

3.1         **Facility:**  Davis will build as soon as reasonably practicable or acquire the Tex-Steel facility located in Harlingen, Texas not later than August 12, 2002, or another manufacturing facility as soon as reasonably practicable (the **"Facility"**) capable of accommodating in an efficient and effective manner:

      (a)        the manufacture and assembly of the Distributed Products by Davis in a quantity sufficient to meet the projected demand of the parties and the quality control requirements mandated by manufacturers and suppliers of the Major Components;

      (b)        the performance by Davis of ongoing testing and quality assurance of the Distributed Products; and

      (c)        the researching further developments and improvements to the Technology, the Distributed Products and related technology and products.

3.2         **Supply of Major Components:**  Finning will purchase for its own account and deliver to Davis, FOB Harlingen, Cameron County, Texas, all Major Components from Caterpillar or other suppliers as may be mutually agreed between the Parties from time to time, for use in the manufacture

- 6 -

and assembly of the Distributed Products by Davis. The Parties will cooperate and use reasonable commercial efforts to assist Finning in obtaining the Major Components at the lowest price possible, using the targeted amounts described in the attached Schedule A as a guide. Finning will coordinate with Davis the purchase and delivery of the Major Components in accordance with Article 4. As between the Parties, Davis will be the original equipment manufacturer of record for the Distributed Products.

3.3      **Supply of Minor Components:** Davis will purchase or provide for its own account all Minor Components at the lowest possible price obtainable by Davis though reasonable commercial efforts, using the amounts described in the attached Schedule A as a guide. Davis will coordinate with Finning the purchase and provision of the Minor Components in accordance with Article 4.

3.4      **Minimizing Costs:** The Parties will periodically review the Product Costs and will cooperate and use reasonable commercial efforts to minimize the Product Costs and to obtain the most cost effective method of manufacturing and assembling the Distributed Products.

3.5      **Manufacturing and Assembly:** Subject to Article 4, upon receipt of Major Components from Finning or its suppliers, Davis will manufacture and assemble the Distributed Products to which the Major Components pertain. Davis will manufacture and assemble the Distributed Products in a prompt, timely and efficient manner and will produce such Distributed Products to meet Finning's demand for the same, provided that Davis will have no obligation to manufacture and assemble any Distributed Product unless and until Finning, or its suppliers, have delivered to Davis the Major Components for that Distributed Product.

3.6      **Title and Risk of Loss:** Title to all Major Components and Distributed Products will at all times remain with Finning, its suppliers or its customers. Risk of loss to all Major Components will pass to Davis upon Finning or its suppliers delivering the Major Components to Davis and will remain with Davis until the Major Components are either:

(a)      manufactured and assembled into Distributed Products and such Distributed Products are delivered by Davis to Finning or Finning's customers in accordance with Article 4; or

(b)      the Major Components are returned to Finning or its suppliers on such terms as the Parties may agree from time to time.

Davis will purchase and maintain throughout the Term such insurance to protect against risk of loss to the Major Components and the Distributed Products as Finning may reasonably require from time to time. All insurance coverage that Finning requires Davis to maintain will be carried with insurer(s) reasonably acceptable to Finning. Davis will submit policies and/or certificates of insurance evidencing the required insurance coverage (which will include an agreement by the insurer not to cancel or alter its coverage except upon thirty (30) days prior written Notice to Finning) to Finning for its approval before entering into performance of this Agreement. The insurance coverage secured by Davis under this Agreement will be primary and non-contributing with any similar insurance that may be maintained or provided by Finning, and any certificate furnished by Davis will be endorsed to so state.

3.7      **Pricing:** The Parties periodically will consult with each other to establish a range of prices at which Finning will endeavour to sell the Distributed Products having regard to applicable market conditions and geographic locations. Finning will consult with Davis before selling any Distributed Product at a price outside the previously agreed upon price range for that Distributed Product. Notwithstanding the foregoing, Finning will, in its sole discretion after considering Davis' advice, finally

-7-

determine the price at which it sells any Distributed Product, provided however, that Finning will endeavour to maximize the Sale Price for all Distributed Products.

## 4.    ORDERS AND DELIVERY OF DISTRIBUTED PRODUCTS

**4.1    Orders for Distributed Products:**  Finning will, from time to time, deliver to Davis written orders for Distributed Products, specifying the type and quantity of Distributed Products ordered, the Person and location to which the Distributed Products are to be delivered upon completion, the required delivery date for the Distributed Products, and such other details reasonably required to process and fulfil such an order.  Upon Finning delivering an order to Davis for Distributed Products, Finning will arrange for all Major Components related to that order to be delivered to Davis at the Facility.  Upon receipt of such Major Components by Davis at the Facility, Davis will manufacture and assemble the Distributed Products specified in that order in accordance with that order and will promptly notify Finning upon the completion of the Distributed Products.

**4.2    Delivery of Distributed Product:**  At Finning's cost, Davis will deliver completed Distributed Products to the Person, at the location and on the date specified by Finning in each order, provided however, that the specified delivery date will not be less than 60 calendar days from the date on which the Major Components related to that order were delivered to Davis at the Facility.  The Parties will cooperate and coordinate the order and delivery of Distributed Products, Major Components and Minor Components in order to efficiently fulfil Finning's demand for Distributed Products in a timely and cost-effective manner.

**4.3    Transportation, Insurance and Shipping Documents:**  At Finning's cost, Davis will be responsible for arranging all transportation for Distributed Products from the Facility to the delivery location specified in each order and will also procure insurance for the Distributed Products against the risks of transportation with a well-rated insurance company approved by Finning acting reasonably.  Davis will be responsible for preparing or causing to be prepared all documents and invoices necessary for transportation of the Distributed Products.

## 5.    PAYMENTS

**5.1    Distribution and Licensing Fee:**  Upon Finning's obligations under this Section 5.1 commencing and becoming of full force and effect pursuant to Article 15, and in consideration of Davis granting Finning the rights in Section 2.1, Finning will pay Davis US$1,500,000 (the "**Distribution and Licensing Fee**") by initiating a wire transfer of the Distribution and Licensing Fee to an account specified by Davis.  Davis will refund one third of the Distribution and Licensing Fee (US$500,000) to Finning by Davis directing Finning to retain 50% of the Running Royalty in accordance with Section 5.4 (the "**Fee Refund**").  Davis will use a portion of the Distribution and Licensing Fee to protect the Technology for the benefit of Finning and to further develop the Technology and the Distributed Products.

**5.2    Davis Costs:**  Finning will pay Davis the Davis Costs applicable to each Distributed Product within 15 Business Days of Davis advising Finning that the Distributed Product is fully manufactured and assembled in accordance with this Agreement, conforms to the Specifications and is ready to be shipped to a customer.  In the event Davis does not have sufficient operating capital to finance the Davis Costs, upon the request of Davis, Finning will consider advancing funds to Davis for this purpose upon such terms as the Parties may from time to time agree, provided that nothing in this Section 5.2 will be construed as requiring Finning to advance any funds to Davis.

-8-

5.3        **Manufacturing Overhead Costs:** Before the start of each calendar quarter during the Term or before the start of such other period of time as the Parties may agree (each, a "**Period**"), the Parties will agree upon the estimated Manufacturing Overhead Costs for that Period (the "**Estimated Manufacturing Overhead Costs**") together with the estimated number of Distributed Products to be manufactured and assembled by Davis during that Period (the "**Estimated Production Quantity**"). Each time Finning orders a Distributed Product, Finning will pay Davis the Estimated Manufacturing Overhead Costs divided by the Estimated Production Quantity (the "**Per Unit EMOC**"). As soon as reasonably practicable after the end of each Period, the Parties will calculate the actual Manufacturing Overhead Costs for that Period. The Parties will adjust the Per Unit EMOC for each Period up or down by the amount by which the aggregate Per Unit EMOC paid by Finning to Davis during the immediately previous Period is less than or exceeds the actual Manufacturing Overhead Costs for that Period, respectively. It is the intention of the Parties that the Per Unit EMOC will be adjusted each Period pursuant to this Section 5.3 so that the aggregate Per Unit EMOC paid by Finning to Davis throughout the Term is equal to the aggregate Manufacturing Overhead Costs throughout the Term, on a Period by Period basis.

5.4        **Running Royalty:** Within 10 Business Days of Finning receiving the Sale Price in full from a customer with respect to the initial sale of a Distributed Product, Finning will pay Davis a running royalty equal to six percent (6%) of the Product Cost for that Distributed Product (the "**Running Royalty**"). Notwithstanding the foregoing, Davis irrevocably directs Finning to withhold 50% of the Running Royalty and credit it towards the Fee Refund until Davis has paid Finning the Fee Refund in full totalling $500,000. For greater certainty, the Parties agree that Davis will only receive a Running Royalty with respect to the first sale of each particular Distributed Product to a customer, and will not be entitled to, and Finning will not pay Davis, any Running Royalty with respect to the resale or any subsequent sale of that particular Distributed Product by the customer, Finning or any other Person, whether or not that particular Distributed Product becomes a Returned Product.

5.5        **Marketing Fee:** To the extent that the price for which Finning sells a Distributed Product to a customer (the "**Sale Price**") exceeds the Landed Dealer Cost for that Distributed Product (the difference being the "**Gross Margin**"):

   (a)      Finning will retain that portion of the Gross Margin up to an amount equal to 20% of the Sale Price (the "**Marketing Fee**"); and

   (b)      Finning will pay Davis within 15 Business Days of Finning receiving the Sale Price in full from the customer, 75% of any portion of the Gross Margin remaining after Finning has retained the Marketing Fee (the "**Davis Payment**"). At any and all times while there is an outstanding balance under the Facility Loan, Davis hereby irrevocably directs Finning to retain 60% of the Davis Payment owing by Finning to Davis in accordance with this Section 5.5 and apply such amount to payment by Davis of the Facility Loan until the Facility Loan is repaid in full.

5.6        **Referral Commission:** In addition to other amounts contemplated in this Agreement, Finning will pay Davis a referral commission equal to 5% of the Sales Price for each Distributed Product or Replacement Product sold by Finning arising from a Referral within 6 months of Davis making the Referral, provided that all such sales must arise independent from any pre-existing relationship that any such customer had with Finning, as evidenced in Finning's Books and Records, for each product in the Product Lines (the "**Referral Commission**"). In order for Davis to be eligible for a Referral Commission

Distributed Product.  Finning will pay Davis the Referral Commission applicable to each Distributed Product sold within 15 Business Days of Finning rendering an invoice to the customer with respect to that Distributed Product.

5.7    **Reversal of Sales:**  Notwithstanding any other provision of this Agreement, if a customer reverses the purchase of a Distributed Product from Finning and returns that Distributed Product to Finning or its agents (each, a "**Returned Product**"), Davis will not be entitled to the Referral Commission, if applicable, with respect to that Returned Product.  If Finning has paid Davis the Referral Commission with respect to a Returned Product, Davis will refund the Referral Commission so paid by Finning with respect to that Returned Product within 15 Business Days of Finning advising Davis that the customer has returned that Returned Product, by either paying Finning such Referral Commission or by issuing Finning a credit equal to the amount of such Referral Commission, as Finning may direct in its discretion.

6.    **FINNING FINANCING**

6.1    **Facility Loan:**  Finning will make available to Davis, and Davis will borrow from Finning, up to the principal amount of US$1,500,000 (the "**Facility Loan**"), upon the terms and conditions set out in this Agreement.  The Facility Loan will not bear interest from the date of advance until July 15, 2007.  The Facility Loan will bear interest after July 15, 2007 in accordance with Section 6.5.

6.2    **Purpose:**  Davis will use the Facility Loan exclusively for the purposes of building, acquiring or equipping the Facility and for no other purpose.

6.3    **Advance of Funds:**  Davis may draw against the Facility Loan and Finning will advance Davis funds under the Facility Loan only in accordance with the provisions of Article 6.  Each time Davis wishes to draw against the Facility Loan, he will make a request to Finning in writing specifying the amount and the date on which he wishes Finning to advance him funds under the Facility Loan, which date will not be less than 15 Business Days after the date on which Davis delivers the request to Finning.  Concurrently with Finning making any advance under the Facility Loan, Davis will execute such documents as Finning may reasonably require to evidence the portion of the Facility Loan to be advanced.  Notwithstanding the foregoing, Finning will not be required to advance Davis funds under the Facility Loan if:

(a)    Davis has not executed and delivered to Finning the Security Documents in accordance with Section 6.7;

(b)    Davis has committed an Event of Default;

(c)    in the reasonable opinion of Finning, there has been any material adverse change in the business, assets or financial condition of Davis; or

(d)    there is any action, proceeding or investigation pending or threatened against Davis, which would in the reasonable opinion of Finning, if successful, have a material adverse effect on Davis' ability to repay the Facility Loan under the terms of this Agreement.

6.4    **Acknowledgement of Previous Advance:**  Davis acknowledges that Finning previously advanced Davis US$100,000 on June 18, 2002, pursuant to the LOI.  Davis agrees that this US$100,000

- 10 -

will be deemed to be an advance under the Facility Loan and will be subject to the provisions of this Agreement.

6.5        **Repayment of Facility Loan:** Subject to Sections 5.5, 6.6, 11.1, 12.1 and Article 15, the outstanding balance of the Facility Loan will become immediately due and payable, and Davis will pay Finning the outstanding balance of the Facility Loan in full, on or before July 15, 2007; and if the Facility Loan is not paid to Finning in full on or before July 15, 2007, then interest will accrue at an interest rate equal to LIBOR + 5% on the outstanding balance of the Facility Loan from July 15, 2007 until the Facility Loan and interest are paid in full.

6.6        **Prepayment:** Notwithstanding Section 6.5, Davis may at any time repay Finning the whole or from time to time any part of the outstanding balance of the Facility Loan without notice, bonus or penalty. Any payments so received by Finning will be applied firstly to any accrued and unpaid interest, and secondly to the unpaid balance of the principal then outstanding.

6.7        **Security:** As security for repayment of the Facility Loan, Finning will, as soon as reasonably practicable after the date of this Agreement, deliver to Davis for his approval the documents listed in this Section 6.7, and upon such approval, Davis will:

(a)     execute and deliver to Finning a security agreement (the "**Security Agreement**") granting Finning a first charge security interest over:

(i)     all of Davis' equipment and tooling to be purchased with the proceeds of the Facility Loan; and

(ii)    the Technology (and Finning acknowledges that the Technology, by its definition, does not relate to the special assembly of any marine or offshore products);

in a form acceptable to Finning, provided that the security interest granted to Finning in the Technology will be subject to an ongoing automatic right of reversion in favour of Davis for a period of 10 years commencing from the date of the Security Agreement. If at any time during this 10 year period Davis pays Finning in full the outstanding balance of the Facility Loan (including all accrued interest thereon, if any), the ownership of the Technology will automatically revert to Davis. Finning agrees to execute such documents and take further steps as may be reasonably required to perfect this reversion of ownership at that time;

(b)     immediately upon the later of Davis acquiring the Facility or executing this Agreement, Davis will execute and deliver to Finning a mortgage, in a registrable form acceptable to Finning, together with all other related documents Finning determines are necessary for registering the same, granting Finning a first mortgage over the Facility (the "**Mortgage**"); and

(c)     execute and deliver to Finning a collateral assignment of all royalties and income to be derived by Davis from the Technology or the Distributed Products, in a form acceptable to Finning (the "**Assignment of Royalties**", together with the Security Agreement and Mortgage, the "**Security Documents**").

- 11 -

**6.8**        **Compliance with Finning's Policies:**  Davis will comply promptly with any and all reasonable policies and other guidelines of Finning with respect to Distributed Products of which Finning will give Davis upon execution of this Agreement.

*6.9*        *Initial Advance of Funds:*  The Parties will use reasonable commercial efforts to complete and execute the Security Documents as soon as reasonably practicable, but in any event not later than August 1, 2002.  Subject to Section 6.3, Finning will advance US$750,000 under the Facility Loan to Davis by initiating a wire transfer of such funds to an account specified by Davis not later than August 1, 2002.

**7.**        <u>REPRESENTATIONS, WARRANTIES AND COVENANTS</u>

**7.1**        **Davis Representations, Warranties and Covenants:**  Davis represents, warrants and covenants to and with Finning, with the intention that Finning is relying upon these representations, warranties and covenants in entering into this Agreement, that except as otherwise expressly provided for in this Agreement, now and at all times throughout the Term:

(a)        Davis has the requisite power, authority and approvals to enter into, execute and deliver this Agreement, the Security Documents and to perform his respective obligations under this Agreement and the Security Documents;

(b)        the execution and delivery of this Agreement and the Security Documents and the performance by Davis of his obligations under this Agreement and the Security Documents will not conflict with or constitute a breach of or default under any outstanding contract, commitment or agreement to which Davis is a party or to which the Technology or Distributed Products are subject, or limit, restrict or impair the rights granted to Finning under this Agreement and the Security Documents;

(c)        Davis is not bankrupt or insolvent, no receiver, receiver-manager, receiver and manager, or liquidator has been appointed over any part of the property of Davis, no proceeding has been commenced by or against Davis under any bankruptcy, arrangement, reorganization, dissolution, liquidation, insolvency or similar law for the relief of or otherwise affecting creditors of Davis, or by or against any guarantor or surety for Davis, and no writ of execution, warrant, attachment, sequestration, levy, third party demand, notice of intention to enforce security or garnishment or similar process has been issued against Davis or any of Davis' property (each, a "**Davis Insolvency Event**");

(d)        Davis is not aware of any basis for a Davis Insolvency Event to occur;

(e)        Davis is the sole and exclusive legal and beneficial owner of the Technology, free and clear of all mortgages, assignments of rents, leases, licenses, charges, security interests, hypothecs, liens, options to acquire any interest in, claims, judgments or any other form of encumbrance (each, an "**Encumbrance**") other than the Favelle Licence and any security or rights granted to Finning pursuant to this Agreement;

(f)        other than the Favelle Licence, Davis has not granted and no third party has any rights or anything capable of becoming a right, to use the Technology or to distribute, market or sell the Distributed Products;

- 12 -

(g)     to the best of Davis' knowledge after making due enquiry, the Technology does not infringe any Intellectual Property Rights of any Person;

(h)     upon executing and delivering the Mortgage in accordance with Section 6.7, Davis will be the registered and beneficial owner of the Facility, free and clear of all financial Encumbrances other than the Mortgage;

(i)     the Major Components, Minor Components and Technology, together with Davis' skills and all drawings, specifications, engineering and related materials in his possession, are sufficient to enable him to manufacture or assemble the Distributed Products in a safe and competent manner;

(j)     all Distributed Products will be manufactured and assembled by Davis in a prompt, efficient, skilful and careful manner in accordance with North American industry standards for the manufacture and assembly of similar equipment, and in compliance with all applicable Laws;

(k)     upon being delivered by Davis to Finning or its customers in accordance with Article 4, all Distributed Products will conform to the Specifications, will be new (except to the extent that the Major Components, when delivered to Davis by Finning, are not new), of merchantable quality and will be fit for their intended purpose;

(l)     Davis will only use the Technology for the purposes of manufacturing and assembling the Product Lines;

(m)     Davis will not grant any license or other rights in the Technology for the Product Lines to any Person without Finning's prior written consent;

(n)     Davis will not permit any Encumbrance to exist on any of its property or assets, including the Facility, Technology and Minor Components, except as expressly contemplated in this Agreement or as otherwise approved by Finning in writing; and

(o)     Davis will obtain and maintain in full force and effect throughout the Term, at its own expense, any and all permits, approvals and licenses required by any Governmental Authorities relating to the manufacture and assembly of the Distributed Products at the Facility.

7.2     **Finning Representations, Warranties and Covenants:** Finning represents, warrants and covenants to and with Davis, with the intention that Davis is relying upon these representations, warranties and covenants in entering into this Agreement, that except as otherwise expressly provided for in this Agreement, now and at all times throughout the Term:

(a)     Finning has the requisite power, authority and approvals to enter into, execute and deliver this Agreement and to perform its respective obligations under this Agreement;

(b)     the execution and delivery of this Agreement and the performance by Finning of its obligations under this Agreement will not conflict with or constitute a breach of or default under any outstanding contract, commitment or agreement to which Finning is a party, or limit, restrict or impair the rights granted to Davis under this Agreement;

Document: 1005628:05

(c)     Finning is not bankrupt or insolvent, no receiver, receiver-manager, receiver and manager, or liquidator has been appointed over any part of the property of Finning, no proceeding has been commenced by or against Finning under any bankruptcy, arrangement, reorganization, dissolution, liquidation, insolvency or similar law for the relief of or otherwise affecting creditors of Finning, or by or against any guarantor or surety for Finning, and no writ of execution, warrant, attachment, sequestration, levy, third party demand, notice of intention to enforce security or garnishment or similar process has been issued against Finning or any of Finning's property (each, a "**Finning Insolvency Event**");

(d)     Finning is not aware of any basis for a Finning Insolvency Event to occur;

(e)     Finning will not grant any rights in this Agreement to any Person without Davis' prior written consent;

(f)     Finning will not permit any Encumbrance to exist on or with respect to this Agreement;

(g)     Finning will obtain and maintain in full force and effect throughout the Term, at its own expense, any and all permits, approvals and licenses required by any Governmental Authorities relating to the sale or distribution of the Distributed Products;

(h)     Subject to Sections 6.7, 12.1 and the Security Documents, Finning acknowledges that Davis is the sole and exclusive owner of the Technology and that Finning will not challenge, in any forum, Davis' right of ownership over the Technology;

(i)     Any improvement or enhancement to the Technology will be the sole and exclusive property of Davis;

(j)     Finning will use reasonable commercial efforts to complete the sale for all referrals received from Davis or his agent; and

(k)     Finning will use reasonable commercial efforts to market and sell the Distributed Products within the Product Lines throughout the world.

**8.      DISTRIBUTED PRODUCT WARRANTIES**

The Parties will cooperate and use reasonable commercial efforts to cause all warranties offered by manufacturers of the Major Components to be passed on to and for the benefit of Finning's end-use customers. Davis will, at its own expense, provide or cause DAVCRANE Inc. to provide, all customers who purchase a Distributed Product through Finning with a warranty that the manufacturing and assembling performed by Davis will be free from defects in accordance with the provisions in the attached Schedule C.

**9.      CONFIDENTIALITY**

9.1     **Confidentiality:** Unless otherwise agreed upon in writing between the Parties or as required by law or stock exchange requirements, a Receiving Party will keep all Confidential Information which is disclosed to it by a Disclosing Party under this Agreement confidential and will not disclose the Confidential Information to any third party. The Receiving Party will not reproduce any Confidential Information supplied to it in any form except as required to accomplish the purpose of and in accordance with the terms of this Agreement. The Receiving Party will provide the same care to avoid disclosure or

- 14 -

unauthorized use of Confidential Information as it provides to protect its own similar proprietary information but in no event will the Receiving Party fail to use reasonable commercial efforts and take reasonable care under the circumstances to avoid disclosure or unauthorized use of Confidential Information. Confidential Information, unless otherwise specified in writing: (a) will remain the property of the Disclosing Party; (b) will be used by the Receiving Party only for the purposes of any work under this Agreement; and (c) which is in tangible form, including all copies of such information, will be returned to the Disclosing Party or destroyed (as the Disclosing Party may direct) after the Receiving Party's need for it has expired or upon request of the Disclosing Party, and, in any event, upon termination or expiry of this Agreement.

9.2     **Disclosure Required By Law:**  The Receiving Party will not be in breach of its obligation not to disclose Confidential Information of the Disclosing Party if that disclosure is required by law, a court order or a stock exchange having authority over the Receiving Party, provided that the Receiving Party gives the Disclosing Party as much Notice as is reasonably in the circumstances prior to disclosing any Confidential Information and the Receiving Party co-operates with the Disclosing Party in any application, proceedings or other action the Disclosing Party may undertake to obtain a protective order or other means of protecting the confidentiality of the Confidential Information required to be disclosed.

10.     **INTELLECTUAL PROPERTY RIGHTS**

10.1     **Protection of Intellectual Property Rights:**  Davis will obtain patent and other Intellectual Property Rights' registrations and protections in each additional country as reasonably requested by Finning for the Technology.  The Parties agree to share equally in the cost of expanding protection of the Intellectual Property Rights included in the Distributed Products in additional countries, and to consult with each other to formulate a plan and effect the optimal protection at reasonable expense. Nothing in this paragraph will be interpreted to require Finning to participate, support or financially contribute in any way in or to the defence or opposition to any Claim that may be made by any Person against the Technology and/or against Davis in respect of his rights in the Technology.

10.2     **Notification of Intellectual Property Disputes:**  The Parties will promptly notify each other of any existing, expected or threatened dispute with any third Person, which comes to their attention regarding the Technology, or any Intellectual Property Rights relating to the Distributed Products, or of any act or event which may negatively affect the Parties or the sale of the Distributed Products.

10.3     **Notice of Infringements by Third Parties:**  Finning will promptly inform Davis of all instances of which it may have knowledge which constitute or could constitute an infringement of the Technology.

11.     **DISPOSITION OF TECHNOLOGY**

11.1     **Prohibition / Facility Loan:**  Davis will not sell, license, assign, transfer, encumber or otherwise dispose of any of his rights in or to the Technology or the Distributed Products to any Person, including any sale, license, assignment, transfer, encumbrance or disposition made pursuant to Section 11.2, while there is any outstanding balance owing to Finning under the Facility Loan.

11.2     **Right of First Refusal:**  If Davis wishes to sell, license, assign, transfer, encumber or otherwise dispose of any of his rights in or to the Technology or the Distributed Products to any Person other than Finning, Davis will, in writing, first offer Finning to acquire such rights on the same terms being offered to or by that other Person.  If within 30 calendar days of receiving such an offer from Davis,

- 15 -

Finning does not deliver to Davis written Notice of its intention to acquire such rights on such terms, Davis will be free to dispose of such rights, subject to Finning's rights in and to the Technology and the Distributed Products under this Agreement, within 30 calendar days on such terms to the other Person upon paying Finning 25% of the proceeds of such disposition as a distributorship cancellation fee. Notwithstanding the foregoing, the Parties may, by mutual agreement, dispose of all or any portion of the Technology or the Distributed Products.

## 12.    EVENTS OF DEFAULT AND TERMINATION

12.1        **Event of Default by Davis:** If Davis has committed an Event of Default and fails to cure such Event of Default within 30 Business Days of Finning delivering Notice of the same to Davis, Finning may do any or all of the following:

(a)    terminate this Agreement forthwith in its entirety without prejudice, however, to any rights it may have against Davis arising prior to termination;

(b)    declare the outstanding balance of the Facility Loan to be immediately due and payable by Davis and exercise any and all rights Finning may have at law, in equity or pursuant to this Agreement or the Security Documents; and

(c)    take possession of the Facility, Technology, Major Components, Minor Components and Distributed Products and conduct manufacturing and assembly of the Distributed Products itself.

12.2        **Event of Default by Finning:** If Finning has committed an Event of Default and fails to cure such Event of Default within 30 Business Days of Davis delivering Notice of the same to Finning, Davis may terminate this Agreement forthwith in its entirety without prejudice, however, to any rights it may have against Finning arising prior to termination.

## 13.    FORCE MAJEURE

13.1        **Relief:** If a Party is prevented or delayed in performing or observing its obligations under of this Agreement by Force Majeure, the time for performance of those obligations is deferred for the duration of the event or circumstance of Force Majeure.

13.2        **Notice:** A Party that is prevented or delayed by Force Majeure and that seeks relief under this Article 13 must give written Notice to the other Party as soon as possible after the event or circumstance of Force Majeure is known to the first Party, and in any event not later than two (2) Business Days after the date when that event or circumstance is known to the first Party. A Party that has given Notice of an event or circumstance of Force Majeure will give Notice to the other Party of the cessation of that event or circumstance promptly after cessation is known to the first Party.

13.3        **Mitigation:** If Notice is given by either Party of an event or circumstance of Force Majeure, each Party will exercise reasonable commercial efforts to avoid, or minimize any delay occasioned thereby, provided that a Party prevented or delayed by a strike, lockout or labour disturbance or slowdown will not be required to settle that matter other than on terms acceptable to it in its discretion. The Parties will meet promptly after any Notice is given under Section 13.2, and from time to time thereafter during the continuance of any event or circumstance of Force Majeure, to discuss and endeavour in good faith to agree upon measures to be taken by either or both Parties to avoid, or minimize any delay, occasioned by that event or circumstance of Force Majeure.

- 16 -

**13.4      Resumption of Performance:** A Party that is prevented or delayed in the performance or observance of its obligations under of this Agreement by Force Majeure will resume promptly the performance and observance of those obligations after cessation of the event or circumstance of Force Majeure.

## 14.      DISPUTE RESOLUTION/REMEDIES

**14.1      Dispute:** Any dispute or controversy arising out of or in connection with this Agreement or its performance, including without limitation the validity, scope, meaning, construction, interpretation or application of this Agreement or any provision of this Agreement will be submitted to final and binding arbitration by a single arbitrator. The arbitration will be administered by the American Arbitration Association in accordance with its International Arbitration Rules. The place of arbitration will be Houston, Texas. The Parties will instruct the arbitrator that the Parties desire any arbitration proceedings to be completed as expeditiously as possible. A Party may enter any judgment rendered by the arbitrator in and by any court having jurisdiction. Notwithstanding any provision in this Agreement, neither Party will be entitled to claim, and the arbitrator will not award, punitive, special or other damages in excess of actual damages sustained by a Party. The arbitrator may award costs for reasonable attorney's fees.

**14.2      Equitable Remedies:** Nothing in the Agreement is intended to prevent or limit a Party's access to injunction or other equitable or mandatory relief before the arbitrator. Each of the Parties acknowledges and agrees that any breach by the other Party of any of its obligations under of this Agreement may result in immediate and irreparable harm to the other Party, and that in the event of such a breach, the other Party will be entitled to interim and interlocutory injunctive relief without being required to prove irreparable harm or to post security.

**14.3      Damages:** Subject to the limitations contained in Section 14.1, nothing else in this Agreement will be construed so as to prevent or restrict either Party from exercising any right to claim damages against the other Party by reason of any breach of or default under of this Agreement by the other Party.

**14.4      Remedies Non-Exclusive:** All rights and remedies provided hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

## 15.      DUE DILIGENCE

The rights and obligations of the Parties under this Agreement will not commence and will be of no force and effect unless and until Finning has completed due diligence on the Technology as it deems necessary, which Finning will do on or before July 22, 2002 (the "**Due Diligence Completion Date**"), and Finning is satisfied, in its sole discretion, as to the composition, status and integrity of the Technology. If Finning is, in its sole discretion, not satisfied as to the composition, status and integrity of the Technology, Finning may terminate this Agreement by delivering a written Notice of termination to Davis on or before the Due Diligence Completion Date, whereupon this Agreement will terminate and the US$100,000 advanced by Finning to Davis pursuant to the LOI will be applied as a credit against future purchases by Finning of products from Davis or an affiliate of Davis. If Finning does not deliver a written Notice of termination to Davis on or before the Due Diligence Completion Date, the rights and obligations of the Parties under this Agreement will commence and will be of full force and effect at 12:01 a.m. Pacific Daylight Time on July 23, 2002.

- 17 -

16.    **GENERAL**

16.1    **Further Assurances:** The Parties agree that they or their respective heirs, executors, administrators, personal representatives, successors or permitted assigns will execute and deliver such further and other instruments, agreements and writings and will cause such meetings to be held, resolutions passed and by-laws enacted, exercise their vote and influence, do and perform and cause to be done and performed, such further and other acts and things that may be necessary or desirable in order to give full effect to of this Agreement and every part of it.

16.2    **Withholdings:** Notwithstanding any provision in this Agreement, each Party will deduct from and remit to the appropriate Governmental Authorities within the time required by Law, all amounts that the Party is required to withhold and remit pursuant to all applicable Laws with respect to any payment made under this Agreement.

16.3    **Relationship:** The relationship between Davis and Finning is solely that of independent contractors, and nothing in of this Agreement will cause Davis to be considered an agent, employee, joint venturer or legal representative of Finning; nor will Davis hold itself out as an agent, employee, joint venturer or legal representative of Davis. Davis will have no authority to bind or commit Finning in any manner or for any purpose whatsoever and will not undertake any obligation or responsibility, express or implied, on behalf of or in the name of Finning. This Agreement creates no joint ventures, or partnerships or principal/agent relationships between the Parties. Finning will under no circumstances be liable for any acts committed by Davis or his employees, agents, or representatives. Davis will under no circumstances be liable for any acts committed by Finning or its officers, directors, employees, agents or representatives.

16.4    **Time of Essence:** Time will be of the essence of this Agreement and of every part of this Agreement and no extension or variation of this Agreement will operate as a waiver of this provision.

16.5    **Successors and Assigns:** This Agreement will enure to the benefit of and be binding upon the Parties hereto, and their respective heirs, executors, administrators, personal representatives, successors or permitted assigns.

16.6    **No Waiver:** A waiver by either Party of any of its rights hereunder or the performance by the other Party of any obligation hereunder will be without prejudice to all or any of the other rights of the Party hereunder so waiving and will not constitute a waiver of any such other right or, in any other instance, of the right so waived, or a waiver of the performance by the other Party of any other obligations hereunder or the performance, in any other instance, of the obligations so waived.

16.7    **Notice:** Any Notice, consent, authorization, direction or other communication required or permitted to be given hereunder will be in writing and will be delivered either by personal delivery, courier, facsimile or similar telecommunications device and addressed as follows:

(a)    in the case of the Davis, to it at:

Daniel E. Davis
P.O. Box 2427
Harlingen, Texas 78551
Fax: (956) 399-9174

- 18 -

With copies to:

Alton W. Payne
5001 Bissonnet, Suite 200
Bellaire, TX 77401
Fax: (713) 840-8088 / (713) 661-6001

Dennis Sanchez
Sanchez, Whittington, Janis & Zabarte, L.L.P.
100 North Expressway 83
Brownsville, Texas  78521-2284
Fax: (956) 546-3765

(b)    in the case of the Finning, to it at:

Finning International Inc.
16830 – 107th Avenue
Edmonton, Alberta   T5P 4C3

Attention:    Mel Ternan

Fax:  (780) 930-4891

With a copy to:

Finning International Inc.
Suite 1000
Park Place
666 Burrard Street
Vancouver, British Columbia   V6C 2X8

Attention:    John T. Struthers, Corporate Secretary

Fax:  (604) 331-4887

Any Notice, consent, authorization, direction or other communication delivered as aforesaid will be deemed to have been effectively delivered and received, if sent by facsimile or similar telecommunications device on the calendar day next following receipt of such transmission or, if delivered, to have been delivered and received on the date of such delivery provided, however, that if such date is not a Business Day then it will be deemed to have been delivered and received on the Business Day next following such delivery.  Either Party may change its address for service by Notice delivered as aforesaid.

**16.8       Entire Agreement:**  This Agreement and the Security Documents constitute the entire agreement between the Parties hereto pertaining to the subject matter of this Agreement and supersedes all prior and contemporaneous agreement, understandings, negotiation and discussions, whether oral or written (including without limitation, the LOI), of the Parties, and there are no representations, warranties or other agreements between the Parties in connection with the subject matter of this Agreement except as expressly set forth in such agreements.  No supplement, modification, waiver, qualification or termination of this Agreement will be binding unless in writing and executed by the Parties to be bound thereby.

- 19 -

Case 1:03-cv-00206    Document 13    Filed in TXSD on 01/13/2004    Page 50 of 344
07/16/2002  11:49    71384'    9                AL PAYNE PC                    PAGE  02/02

07/16/2002 11:20 FAX                                                          ☒002

16.9        Amendments to Agreement:  This Agreement may be amended only by written instrument executed by all Parties hereto.

16.10       Assignment:  Neither Party may assign or transfer this Agreement or any of his or its rights and obligations hereunder without the prior written consent of the other Party.

16.11       Survival:  Sections 3.6 (Title and Risk of Loss), Articles 7 (Representations, Warranties and Covenants), 9 (Confidentiality), 12 (Events Of Default And Termination) and 16 General), together with all provisions necessary for the enforcement and interpretation thereof, will survive the expiry or termination of this Agreement howsoever caused, and will continue in full force and effect subsequent to and notwithstanding such expiry or termination until they are satisfied or by their nature expire.

16.12       Counterparts:  This Agreement may be executed by the Parties in separate counterparts each of which when so executed and delivered will be an original, but all such counterparts will together constitute one and the same instrument.

            IN WITNESS WHEREOF, the Parties hereto have duly caused of this Agreement to be executed on the date first written above.


SIGNED, SEALED AND DELIVERED by                )
DANIEL E. DAVIS in the presence of:            )
                                               )
                                               )
_____                      )    _____ (seal)
Witness                                        )    DANIEL E. DAVIS



                            FINNING INTERNATIONAL INC.


                            By: _____
                                Authorized Signatory

Document: 1009628:05

## SCHEDULE A

### Product Cost Summary

This Agreement is based on the following estimated cost breakdown. The Parties expect changes during negotiations with suppliers. The intent of both Parties is to eliminate all unnecessary costs, and to cooperate fully to achieve the lowest cost of production, while maintaining a quality product.

These costs are based on the Cost sheets presented to me on May 11, 2002, and on further details developed by Davis and presented on June 9, 2002.

### PRODUCT COST SUMMARY

| PRODUCT LINE | TH63 - 9 TON | 320B - 28 TON | 325B - 38 TON | 325B - 50 TON | 325B - PIPELAYER |
|---|---|---|---|---|---|
| UNIT VOLUME / YEAR | 50 | 12 | 12 | 6 | 12 |
| SELLING PRICE | $150,000 | $310,000 | $385,000 | $525,000 | $425,000 |
| SALES VOLUME | $7,500,000 | $3,720,000 | $4,620,000 | $3,150,000 | $5,100,000 |
| MANUFACTURING COST | | | | | |
| Caterpillar Components | $45,000 | $123,690 | $144,409 | $167,600 | $185,000 |
| Manitex components | $38,500 | $27,492 | $43,594 | nil | nil |
| Other Mfr's | $4,700 | $15,877 | $17,067 | $69,470 | $44,000 |
| Freight | $ 6,500 | $12,792 | $13,392 | $8,500 | $14,000 |
| FINNING | $94,700 | $179,851 | $218,462 | $245,570 | $243,000 |
| SHOP COSTS | | | | | |
| Components | $7,328 | $14,079 | $14,659 | $33,536 | $22,537 |
| Labour | $6,116 | $16,936 | $21,449 | $94,481 | $20,935 |
| Insurance / Warranty | $3,876 | $6,698 | $8,491 | $23,631 | $8,043 |
| Sub Total - DavCrane | $17,320 | $37,713 | $44,599 | $151,648 | $51,515 |
| MFG OVERHEAD | $6,076 | $9,999 | $12,282 | $16,547 | $9,999 |
| DAVCRANE | $23,396 | $47,712 | $56,881 | $168,195 | $61,514 |
| TOTAL | $118,096 | $227,563 | $275,343 | $413,765 | $304,514 |
| ROYALTY - 6% | $7,086 | $13,654 | $16,521 | $24,826 | $18,271 |
| COST TO FINNING | $125,182 | $241,217 | $291,864 | $438,591 | $322,785 |
| Manufacturing Overhead (Annual) | $303,800 | $119,988 | $147,384 | $99,282 | $119,988 |

NOTE: Mfg OH budget is based on these HEX based units only

| | |
|---|---|
| Annual for 42 units | $486,642 |
| Monthly | $40,553.50 |

- 21 -

# SCHEDULE B

## Technology

**CONFIDENTIAL**
**PATENT AND PATENT APPLICATIONS:**

U.S. Patent No. 6,003,252 issued to Daniel E. Davis.

Patent Application entitled Piplayer-Crane- Apparatus and Method.

Patent Application entitled Telehandler-Crane- Apparatus.

Patent Application entitled Universal Excavator Boom Attachment and Method.

Additional patent applications are to be filed.

**CONFIDENTIAL**
**DESIGN AND MANUFACTURING DRAWINGS:**

**9 TON TELEHANDLER DRAWINGS:**
303 drawings bearing drawing numbers 9-2-001 to 9-6-002.
General Arrangement   9T  GA

**28 TON CRANE DRAWINGS:**
301 drawings bearing drawing numbers 28-2-001 to 28-6-009 and 5002668.001 to
5002669-023.
General Arrangement    28T  GA
Adaptor Weldment       Bill of Material #28-5-001
Manitex                Bill of Material #6000740.023
Braden                 Bill of Material #PD12C  (General Dimensions)

**CIPI Group Numbers:**
- 9Q5972            Upper Structure  Bill of Material
    - 1176346       Optional  Third pedal
    - 1263784       Optional  Guard
    - 1204955       Optional  Guard
    - 1263799       Optional  High Ambient Cooling
    - 1114696       Optional  Travel alarm
- 152 8744          VG Lower Bill of Material

## SCHEDULE C

### Davis' Warranty on Distributed Products

DAVCRANE INC. warrants its products to be free from defects to material and workmanship for a period of twelve (12) months from the date of being placed in operation and not exceeding eighteen (18) months from date of delivery of the product to the original Purchaser user. The obligation of DAVCRANE INC. (herein after called the Company) includes any part of the product which in the Company's opinion is defective in material and workmanship. All costs of shipping the product to and from the Company's factory shall be to the Purchaser's account. No claim will be allowed by the Company unless such claim is submitted in writing to the Company within thirty (30) days of the date of discovery of the defect(s).

This warranty shall not apply to products which have been operated in a manner other than recommended by the Company or which has been misused or neglected or damaged through an accident or which has been repaired, altered or modified or used in any manner which in the Company's opinion adversely affects its performance.

This warranty and the Company's obligation hereunder is in lieu of all other warranties, expressed or implied, including without limitation the implied warranties of merchantability and fitness for a particular purpose and all direct, indirect or consequential damages with respect to the sale or use of its products.

No person is authorised to change or otherwise modify this warranty or assume any other liability on behalf of the Company unless such change modification of assumption is made in writing and signed by an officer of this Company.

Any item of the product not manufactured by the Company shall not be covered by this warranty or the implied warranties of merchantability and fitness for a particular purpose of any other warranty from the Company, such items being subject to the warranties of their respective manufacturers.

# NOTICE

(Required by Section 26.02 of Texas Business and Commerce Code)

TO:   DANIEL E. DAVIS, as Guarantor

A.   Effective as of July 15, 2002, you executed and delivered the following documents to evidence, secure and/or in connection with a loan to Davcrane Inc. from Finning International Inc., in the amount of $1,500,000.00:

    (1)   Guaranty Agreement;

    (2)   Security Agreement;

    (3)   UCC-1 Financing Statement;

    (4)   Collateral Assignment and Security Agreement (All Patent Rights);  and

    (5)   Certificate and Indemnification Regarding Hazardous Substances;

TO:   DAVCRANE INC., as Borrower

B.   Effective as of July 15, 2002, you executed and delivered the following document in connection with the above referenced loan:

    (1)   $1,500,000.00 Promissory Note;

    (2)   Deed of Trust;

    (3)   Security Agreement;

    (4)   UCC-1 Financing Statement; and

    (5)   Certificate and Indemnification Regarding Hazardous Substances.

C.   The documents described above constitute a "Loan Agreement" as defined in Section 26.02 of the Texas Business and Commerce Code (the "**Code**") and pursuant to subsection (e) thereof, notice is hereby given that the Code provides:

    (1)   A LOAN AGREEMENT IN WHICH THE AMOUNT EXCEEDS $50,000 IN VALUE IS NOT ENFORCEABLE UNLESS THE AGREEMENT IS IN

WRITING AND SIGNED BY THE PARTY TO BE BOUND OR BY THAT PARTY'S AUTHORIZED REPRESENTATIVE.

(2)     THE RIGHTS AND OBLIGATIONS OF THE PARTIES TO AN AGREEMENT SUBJECT TO SUBSECTION (b) OF SECTION 26.02 OF THE CODE SHALL BE DETERMINED SOLELY FROM THE WRITTEN LOAN AGREEMENT, AND ANY PRIOR ORAL AGREEMENTS BETWEEN THE PARTIES ARE SUPERSEDED BY AND MERGED INTO THE LOAN AGREEMENT.

(3)     THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

(4)     THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.



## SIGNATURE PAGE
## NOTICE

_____

DANIEL E. DAVIS


FINNING INTERNATIONAL INC., a Canadian
    corporation

By: _____
    Name: Chris Haisman
    Title: Controller, Finning (Canada)


DAVCRANE INC., a Texas corporation

By: _____
    Daniel E. Davis, President


FINNING INTERNATIONAL INC., a Canadian
    corporation

By: _____
    Name: ANDY FRASER
    Title: VP, OPERATIONS & CUSTOMER RELATIONS

# PROMISSORY NOTE
## (DAVCRANE INC.)

$1,500,000.00          Houston, Texas          Effective as of
July 15, 2002

FOR VALUE RECEIVED, the undersigned, DAVCRANE INC., a Texas corporation (the "**Borrower**"), hereby promises to pay to the order of FINNING INTERNATIONAL INC., a corporation incorporated under the laws of Canada (the "**Lender**") at its offices at 16830 -- 107th Avenue, Edmonton, Alberta, T5P 4C3, Canada, or at such other location as Lender may designate in writing to Borrower, the original principal sum of ONE MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($1,500,000.00) or such lesser amount as has been advanced hereunder, in immediately available funds. Advances and payments on this Note shall be in accordance with the terms herein.

The principal amount of this Note shall bear interest commencing on July 15, 2007. The unpaid principal balance of this Note shall bear interest during the periods specified above at a floating rate of interest equal to the lesser of:

(a)      The one month London Interbank Offered Rate ("**LIBOR Rate**") reflected as the one month LIBOR Rate on page 5 of the Telerate screen or as published or quoted by such other reputable and nationally recognized rate quoting service or publication selected by Lender plus five percent (5.00%) per annum ("**Loan Rate**"); or

(b)      The maximum rate of nonusurious interest permitted from day to day by applicable law ("**Maximum Rate**"), including as to, but otherwise without limitation, that rate based upon the "indicated rate ceiling" and calculated after taking into account any and all relevant fees, payments and other charges in respect to the Loan Documents, as hereinafter defined, which are deemed to be interest under applicable law.

Lender will advance Borrower funds under the Note in accordance with the terms hereof. Each time Borrower wishes to draw against the Note, he will make a request to Lender in writing specifying the amount and the date on which he wishes Lender to advance him funds under the Note, which date will not be less than 15 business days after the date on which Borrower delivers the request to Lender. Concurrently with Lender making any advance under this Note, Borrower will execute such documents as Lender may reasonably require to evidence the portion of the Note proceeds to be advanced. Notwithstanding the foregoing, Lender will not be required to advance Borrower funds under the Note if:

(a)      Borrower has not executed and delivered to Lender the Loan Documents (as defined herein);

(b)      an Event of Default has been committed;

(c)      in the reasonable opinion of Lender, there has been any material adverse change in the business, assets or financial condition of Borrower or Daniel E. Davis ("**Guarantor**"); or

(d)    there is any action, proceeding or investigation pending or threatened against Borrower, which would in the reasonable opinion of Lender, if successful, have a material adverse effect on Borrower's ability to repay the Note.

Pursuant to the terms of the Distributor Agreement of even date herewith between Guarantor and Lender ("**Distributor Agreement**"), Lender is entitled to retain 60% of the Davis Payment (as defined in Section 5.5(b) of that certain Distributor Agreement) owing by Lender to Guarantor and apply such amount to payment of this Note until the Note is repaid in full.  Prior to an Event of Default, all payments made by Borrower, from the 60% share of any Davis Payment actually collected by Lender or from any other source shall be applied first to reasonable expenses (including attorneys' fees) due to Lender with respect to the Note, and then to any interest due on the Note (if any), with the remaining amounts to be applied against the unpaid principal balance of this Note. Upon the occurrence of an Event of Default (following any applicable notice and cure periods related thereto), Lender shall be authorized to apply payments to that portion of the obligations due by Borrower to Lender under the Loan Documents as Lender deems appropriate, in its sole discretion.   Lender shall maintain records reflecting the date and amount of advances and repayments on the Note.  Lender's records shall be conclusive absent manifest error.

Upon accrual, all interest shall be calculated on a daily basis on the outstanding principal balance of the Note, and the Loan Rate shall change in accordance with the provisions set forth herein, without notice to Borrower; provided that if at any time the Loan Rate exceeds the Maximum Rate, the rate of interest which this Note bears shall be limited to the Maximum Rate, but any subsequent reductions in the Loan Rate shall not reduce the rate of interest which this Note bears below the Maximum Rate until the total interest accrued on this Note equals the amount of interest which would have accrued if the Loan Rate had at all times been in effect.

Interest shall be calculated under this Note using a 360 day year unless use of a 360 day year would result in collection of interest in excess of the Maximum Rate, in which case interest shall be calculated using the actual number of days elapsed in an actual year.

Subject to the right of the holder of this Note to accelerate the maturity hereof as hereinafter described, the unpaid principal balance of the Note, together with accrued but unpaid interest thereon (if any) shall be paid in full in one final balloon payment on July 15, 2012 (the "**Maturity Date**").

Upon an Event of Default (as defined in the Security Agreement ("**Security Agreement**") of even date herewith executed by Borrower in favor of Lender) and after the expiration of any notice and cure periods related thereto, Lender may declare all outstanding principal, any accrued interest and other sums outstanding hereon immediately due and payable, and exercise all rights and remedies as set forth in this Note or any of the Loan Documents.

Borrower shall have the right to prepay, at any time and from time to time without premium or penalty, the entire unpaid principal balance of the Note or any portion thereof, with accrued interest (if any) to the date of prepayment on the amounts prepaid, if any.  Any payments so received

by Lender shall be applied first to any accrued but unpaid interest, if any, and then to the unpaid principal.

Borrower and any and all endorsers, guarantors and sureties jointly and severally except as may be expressly provided in the Security Agreement (i) waive, to the fullest extent it is lawful so to do, presentment, demand, notice of demand, protest, notice of protest, notice of acceleration of maturity, notice of intent to accelerate, notice of nonpayment, notice of dishonor, and all other notices of any kind; (ii) agree and consent to delays, extensions, renewals, modifications or partial payments hereon, to any release of a party liable hereon or of any collateral herefor, in whole or in part, and to taking or refraining to take any action with respect to this Note, before or after maturity, without notice to or consent from said parties, and without discharging any party liable hereunder; (iii) agree that no action, failure to act or failure to exercise any right or remedy on the part of Lender shall in any way affect or impair the obligations of Borrower or be construed as a waiver by Lender of, or otherwise affect, any of Lender's rights under this Note, under any endorsement or guaranty of this Note, or under any Loan Document; and (iv) agree to pay, within ten (10) days after written demand, all costs and expenses of collection of this Note or of any endorsement or guaranty hereof, including, without limitation, reasonable attorney's fees, including fees related to any trial, arbitration, bankruptcy, appeal or other proceeding.

It is the intention of Lender and Borrower and all other parties to the Loan Documents to conform to and contract in strict compliance with applicable usury laws from time-to-time in effect. All agreements between Lender or any other holder of the Note and Borrower (or any other party liable with respect to indebtedness under the Loan Documents) are hereby limited by this provision, which shall control and override all such agreements. In no way, nor in any event or contingency (including, but not limited to, prepayment, default, demand for payment, or the acceleration of maturity of any obligations, or the recharacterization of any application fee, loan commitment fees, additional commitment fees, or origination fees as interest), shall the interest taken, reserved, contracted for, charged or received under the Note, or otherwise, exceed the Maximum Rate. If, from any possible construction of any document, interest would otherwise be payable in excess of the Maximum Rate, any such construction shall be subject to this provision, and such document shall be automatically reformed, and the interest payable shall be automatically reduced to the Maximum Rate permitted under applicable law, without the necessity of the execution of any amendment or new document. If Lender or the holder of the Note shall ever receive any thing of value that is characterized as interest under applicable law and that would, apart from this provision, be in excess of the Maximum Rate, an amount equal to the amount that would have been excessive interest shall, without penalty, be applied to the reduction of the principal amount owing on the Note in the inverse order of its maturity and not to the payment of interest, or refunded to Borrower or the other payor thereof if and to the extent such amount, which would have been excessive, exceeds such unpaid principal. The right to accelerate the maturity of the Note, or any other indebtedness, does not include the right to accelerate any interest that has not otherwise accrued on the date of such acceleration, and the Lender or the holder thereof does not intend to charge or receive any unearned interest in the event of acceleration. All interest paid or agreed to be paid to the Lender or the holder of the Note shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full stated term (including any renewal or extension) of the Note

so that the amount of interest on account of such indebtedness does not exceed the Maximum Rate. As used in this paragraph, the term "applicable law" shall mean the laws of the State of Texas or the federal laws of the United States of America, which ever laws allow the greater interest, as such laws now exist may be changed or amended or come in effect in the future.

All rights and remedies of Lender herein shall be cumulative and may be pursued singly, successively or together, at the option of Lender. The acceptance by Lender of any partial payment shall not constitute a waiver of any default or of any of Lender's rights under this Note. No waiver of any of its rights hereunder, and no modification or amendment of this Note, shall be deemed to be made by Lender unless the same shall be in writing, duly signed on behalf of Lender; and each such waiver, if any, shall apply only with respect to the specific instance involved, and shall in no way impair the rights of Lender or the obligations of Borrower to Lender in any other respect at any other time.

The loan evidenced by this Note is for business, commercial, or investment purposes and none of such proceeds shall be used for personal, consumer, family household or agricultural purposes or for purchasing or carrying margin stock. **THIS NOTE SHALL NOT BE SUBJECT TO CHAPTER 346 OF THE TEXAS FINANCE CODE.**

The unenforceability or invalidity of any provision of this Note shall not affect the enforceability or the validity of any other provision herein and the invalidity or unenforceability of any provision of this Note to any person or circumstance shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances.

This Note shall be binding upon Borrower and its respective successors, assigns and legal representatives, and shall be governed by the laws of the State of Texas.

This Note is secured, inter alia, by (i) the Security Agreement; (ii) the Deed of Trust, Assignment of Rents, Security Agreement and Financing Statement to be executed by Borrower for the benefit of Lender; (iii) the Certificate and Indemnification Regarding Hazardous Substances executed by the Borrower and Guarantor in favor of Lender, (iv) certain Financing Statements executed by the Borrower and/or Guarantor in favor of the Lender; (v) the Collateral Assignment and Security Agreement (All Patent Rights) executed by Guarantor in favor of Lender; (vi) the Guaranty Agreement executed by Guarantor; (vii) the Security Agreement executed by Guarantor in favor of Lender; (viii) all other documents and instruments executed in connection with or as security for the Note or the Distributor Agreement; and (ix) all renewals, extensions and modifications thereof (collectively, the "**Loan Documents**").

THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**SIGNATURE PAGE**
**PROMISSORY NOTE**
**(Davcrane Inc.)**


"BORROWER":

DAVCRANE INC.

By:_____
      Daniel E. Davis, President

**00037424**

## AMENDMENT TO DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FINANCING STATEMENT

This Amendment ("Amendment") is made and entered into this the __7__ day of ~~June~~ *July 2*, 2003, by and between FINNING INTERNATIONAL INC., the "Beneficiary" and DAVCRANE INC., the "Grantor" under that one certain Deed of Trust, Assignment of Rents, Security Agreement and Financing Statement ("Deed of Trust") dated effective July 15, 2002, covering the real property described in Exhibit "A" attached thereto, filed for record under County Clerk's File No. 00042149, Vol. 8235, Page 1, Cameron County, Texas, executed by Grantor for the benefit of Beneficiary. The terms of this Amendment shall amend that Deed of Trust. In the event of a conflict between the terms of this Amendment and the Deed of Trust, the terms of this Amendment shall control. Capitalized terms used in this Amendment which are undefined shall have the same meaning set forth in the Deed of Trust.

1. Beneficiary and Grantor hereby file this Amendment as a correction to the legal description of the real property described on Exhibit "A" to the Deed of Trust. The correct legal description of the real property made the security for the indebtedness referred to in the Deed of Trust is hereby amended to read as follows:

A tract of land containing 4.94 acres out of Lot Number One (1), Block Number One (1), Texas Pipe Bending Subdivision, City of Harlingen, Cameron County, Texas, according to the map recorded in Cabinet 1, Slots 384-A and 384-B, Map Records, Cameron County, Texas, said property being more particularly described on Exhibit "A" attached hereto and made a part hereof.

2. Except as amended hereby, all other terms and conditions of the Deed of Trust shall remain in full force and effect.

3. The terms and provisions of this Amendment shall inure to the benefit of, and shall be binding upon, the heirs, successors, assigns and legal representatives of the parties hereto to the same extent as if such heirs, successors, assigns and legal representatives had joined in the execution hereof.

Executed this the __7ᵗʰ__ day of ~~June~~ *July*, 2003 but effective July 15, 2002.

"BENEFICIARY"

FINNING INTERNATIONAL INC.

BY: *[signature]*

NAME: *CHRIS "HAYMAN*

TITLE: *VP, Controller, Finning (Canada)*

"GRANTOR"

DAVCRANE INC., a Texas corporation

BY: _____

NAME: Daniel E. Davis

TITLE: President


THE STATE OF TEXAS          §
                            §
COUNTY OF CAMERON           §

    This instrument was acknowledged before me on June _10_, 2003 by Daniel E. Davis, President of DAVCRANE INC., a Texas corporation on behalf of said corporation.

_____

Notary Public in and for The State of Texas

Printed Name: Christina Logan

My Commission Expires: 06-14-05

## PROOF OF EXECUTION BY CORPORATION

I CERTIFY that on the ___4___ day of May, 2003, at Edmonton, Alberta, Canada, Christopher Haynen , personally known to me, appeared before me and acknowledged to me that:

(a)    he is the _Vice-President + Controller_ of Finning International Inc.;

(b)    he is the person who subscribed his name as the authorized signatory of Finning International Inc. on the attached Amendment to Deed of Trust, Assignment of Rents, Security Agreement and Financing Statement;

(c)    he was authorized to subscribe his name on behalf of Finning International Inc. on the attached Amendment to Deed of Trust, Assignment of Rents, Security Agreement and Financing Statement; and

(d)    Finning International Inc. existed at the date that the Amendment to Deed of Trust, Assignment of Rents, Security Agreement and Financing Statement was executed by such corporation.

IN TESTIMONY of which I set my hand and seal of office at Edmonton, Alberta, Canada this ___4___ day of June, 2003.

_____
A Commissioner for Taking Affidavits for
Edmonton, Alberta, Canada

SANDRA KINASEWICH
Commissioner For
Oaths, Alta. Sept. 11- _ _ _ 4

AFTER RECORDING RETURN TO:
Nancy F. Martin
Shannon, Martin, Finkelstein & Sayre, P.C.
2400 Two Houston Center, 909 Fannin Street
Houston, Texas  77010

i:\nmartin\1487\0001\AMENDMENT-Deed of Trust.doc

(FT-10/2000)

# EXHIBIT "A"

A tract of land containing 4.94 acres, out of Lot 1, Block 1, TEXAS PIPE BENDING SUBDIVISION, City of Harlingen, Cameron County, Texas, according to the Map recorded in Cabinet 1, Slots 384-A and 384-B, Map Records of Cameron County, Texas, and said 4.94 acre tract being more particularly located and described as follows:

COMMENCING at the Southwest corner of said Lot 1, Block 1, TEXAS PIPE BENDING SUBDIVISION;

THENCE, South 89 degrees 48 minutes 00 seconds West, a distance of 340.58 feet;

THENCE, North 00 degrees 12 minutes 00 seconds West, a distance of 25.43 feet to a ½ inch iron pin set on the North Right-of-Way line of F.M. 106 (Harrison Street) same being the Southwest corner of the tract herein described;

THENCE, North 00 degrees 12 minutes 00 seconds West, a distance of 1059.97 feet to a ½ inch iron pin set for the Northwest corner of this tract;

THENCE, North 89 degrees 48 minutes 00 seconds East, a distance of 237.28 feet to a ½ inch iron pin set for the Northeast corner of this tract;

THENCE, South 00 degrees 12 minutes 00 seconds East, a distance of 260.14 feet to a ½ inch iron pin set for an outside corner of this tract;

THENCE, South 89 degrees 48 minutes 00 seconds West, a distance of 45.56 feet to a ½ inch iron pin set for an inside corner of this tract;

THENCE, South 00 degrees 12 minutes 00 seconds East, a distance of 800.22 feet to a ½ inch iron pin set for the Southeast corner of this tract;

THENCE, South 89 degrees 55 minutes 00 seconds West, along said North Right-of-Way line of F.M. 106 (Harrison Street), a distance of 191.71 feet to the POINT OF BEGINNING, Containing 4.94 acres of land more or less, inclusive of any and all easements, restrictions, exceptions or dedications that might be of record.

NOTE: THIS COMPANY DOES NOT REPRESENT THAT THE ACREAGE AND/OR SQUARE FOOTAGE CALCULATIONS ARE CORRECT.

*Cameron County Title Co*
GF# 2207020

## DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENT
## AND FINANCING STATEMENT

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | KNOW ALL PEOPLE BY THESE PRESENTS: |
| COUNTY OF CAMERON | § | |

THAT DAVCRANE INC., a Texas corporation, whose mailing address is P.O. Box 2427, Harlingen, Texas 78551, Tax Identification Number is **74-2955092**, Organizational Identification Number is 0157717000 ("**Grantor**"), for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, given by Nancy F. Martin, Trustee, of Houston, Texas ("the **Trustee**"), in order to secure the payment of the indebtedness hereinafter referred to and the performance of the obligations, covenants, agreements and undertakings of Grantor hereinafter described, does hereby GRANT, BARGAIN, SELL, CONVEY, TRANSFER, ASSIGN and SET OVER to the Trustee subject to the Permitted Encumbrances (as defined in Section 2.1 herein) all of the real property situated in Cameron County, Texas, and more particularly described in **Exhibit "A"** attached hereto and made a part hereof, together with (i) all the buildings and other improvements now on or that may be placed hereafter on said land during the existence of this lien; (ii) all materials, equipment, fixtures or other property whatsoever now or hereafter attached to, installed in, or used in connection with the buildings and other improvements now erected or hereafter to be erected on said land; (iii) all of Grantor's right, title and interest in and to all easements and rights of way used in connection with any of the foregoing property or as a means of ingress to or egress from said property; (iv) any and all water service and wastewater capacity reservation agreements and security agreements; (v) all interests of Grantor in and to any streets, ways, alleys and/or strips of land adjoining said land or any part thereof; and (vi) all rights, estates, powers and privileges appurtenant or incident to the foregoing (collectively, the "**Mortgaged Property**").

TO HAVE AND TO HOLD the Mortgaged Property unto the Trustee and Trustee's successors or substitutes in this trust and to their successors and assigns, IN TRUST, however, upon the terms, provisions and conditions herein set forth.

In order to secure the payment of the Indebtedness (as defined in Article I hereof) and the performance of the obligations, covenants, agreements and undertakings of Grantor hereinafter described, Grantor hereby grants to the Beneficiary (as defined in Article I hereof) a security interest in all goods, equipment, furnishings, fixtures, furniture, chattels and personal property of whatever nature owned by Grantor now or hereafter attached or affixed to or used in and about the building or buildings now erected or hereafter to be erected on the Mortgaged Property or otherwise located on said lands, all management agreements, utility agreements, maintenance agreements, service contracts, construction contracts, engineering and architect agreements and contracts, and any and all other agreements and contracts affecting the Mortgaged Property, and all fixtures, accessions and appurtenances thereto, and all renewals or replacements of or substitutions for any of the foregoing,

---

*Doc# 00004-2149  Bk OR Vol 8235  Pg 1*

DLS

all building materials and equipment now or hereafter delivered to the Mortgaged Property and intended to be installed therein and all security deposits and advance rentals under lease agreements now or at any time hereafter covering or affecting any of the Mortgaged Property and held by or for the benefit of Grantor, all monetary deposits which Grantor has been required to give to any public or private utility with respect to utility services furnished to the Mortgaged Property, all funds, accounts, instruments, documents, general intangibles (including trademarks, trade names, patents and symbols used in connection therewith) and notes or chattel paper arising from or by virtue of any transactions related to the Mortgaged Property, all as-extracted collateral produced from or allocated to the Mortgaged Property and all products processed or obtained therefrom, the proceeds thereof, all accounts and general intangibles under which such proceeds may arise and all of Grantor's right title and interest in to any permits, licenses, franchises, certificates, and other rights and privileges obtained in connection with the Mortgaged Property (all of the property described in this paragraph hereinafter collectively called the "**Collateral**") and all proceeds of the Collateral. (The Mortgaged Property and the Collateral are hereinafter sometimes collectively called the "**Property**".)

## ARTICLE I.

### Indebtedness

1.1    **Secured Indebtedness**. This Deed of Trust, Mortgage, Security Agreement and Financing Statement (this "**Mortgage**") is made to secure the following obligations, indebtedness, and liabilities:

(a)    The obligations and indebtedness of Grantor to FINNING INTERNATIONAL INC., a corporation incorporated under the laws of Canada (the "**Beneficiary**"), evidenced by that certain recourse promissory note dated of even date herewith, executed by Grantor and payable to the order of the Beneficiary in the original principal amount of ONE MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($1,500,000.00) (the "**Note**");

(b)    The obligations and indebtedness of Grantor to the Beneficiary evidenced by that certain Security Agreement dated of even date herewith, executed by the Grantor in favor of the Beneficiary (the "**Davcrane Security Agreement**");

(c)    The obligations and indebtedness of Daniel E. Davis ("**Guarantor**")to the Beneficiary evidenced by that certain Security Agreement dated of even date herewith, executed by the Guarantor in favor of the Beneficiary (the "**Davis Security Agreement**" and together with the Davcrane Security Agreement, the "**Security Agreements**");

(d)    The obligations of the Grantor and/or Guarantor under any of the Loan Documents (as defined in the Security Agreements);

(e)    All future advances by the Beneficiary to the Grantor pursuant to the Loan

Dt     Bk     Vol     Pg
00u.~2149  OR  8235    3

Documents;

     (f)    All cost and expenses, including without limitation all reasonable attorneys' fees and legal expenses, incurred by the Beneficiary to preserve and maintain the Property, collect the obligations herein described, and enforce this Mortgage; and

     (g)    All extensions, renewals and modifications of any of the foregoing.

    1.2    The indebtedness and obligations referred to in Paragraph 1.1 hereof is herein called the "**Indebtedness**".

## ARTICLE II

### Representations, Warranties and Covenants

    2.1    **Status of Grantor and the Property**. Grantor represents, warrants and covenants that Grantor is now in a solvent condition; that no bankruptcy or insolvency proceedings are pending or contemplated by or to the best of Grantor's knowledge against Grantor; that all reports, statements and other data furnished by Grantor to the Beneficiary in connection with this Mortgage and the Loan Documents are true and correct in all material respects and do not omit to state any fact or circumstance necessary to make the statements contained therein not misleading in any material respect; that Grantor is the lawful owner of good and indefeasible title to the Property and has good right and authority to grant, bargain, sell, transfer, assign and mortgage the Mortgaged Property and to grant a security interest in the Collateral; that the property is free and clear from all liens, security interests and encumbrances except the lien and security interest evidenced hereby and the liens, security interests and encumbrances set forth in **Exhibit "B"** attached hereto and made a part hereof (the "**Permitted Encumbrances**"); that there is no financing statement covering the Property or its proceeds on file in any public office; that the Collateral is located on the property described in **Exhibit "A"** attached hereto and made a part hereof; that the execution and delivery of this Mortgage does not contravene, result in a breach of or constitute a default under any contract or agreement to which Grantor is a party or by which Grantor or any of its properties may be bound and do not violate or contravene any law, order, decree, rule or regulation to which Grantor to the best of Grantor's knowledge is subject; that to the best of Grantor's knowledge, the Property and the intended use thereof by Grantor comply with all applicable restrictive covenants, zoning ordinances and building codes, flood disaster laws, applicable health and environmental laws and regulations and all other applicable laws, rules and regulations; except as have been previously disclosed to Beneficiary in writing, there are no material judicial or administrative actions, suits or proceedings pending or to the best of Grantor's knowledge threatened against or affecting Grantor, or, to the best of Grantor's knowledge, any other person liable, directly or indirectly, for the Indebtedness, or the Property; that the Property is served by electric, gas, sewer, water and other utilities required for the use of the Mortgaged Property thereof as represented by Grantor is available to the Mortgaged Property; that all streets necessary to serve the Property for the use represented by Grantor have been completed and are serviceable and have been dedicated and accepted by applicable governmental authorities; that the Property is free from damage caused by fire or other casualty; that this Mortgage

constitutes the legal, valid and binding obligation of Grantor enforceable in accordance with its terms except as limited by bankruptcy, insolvency, or other laws of general application relating to the enforcement of creditor's rights; that the execution and delivery of, and performance under this Mortgage are within Grantor's powers and have been duly authorized by all requisite action and are not in contravention of law or related documents, or of any indenture, agreement or undertaking to which Grantor is a party or by which it is bound; and that Grantor will warrant and forever defend the title to the Property against the claims of all persons whomsoever claiming or to claim the same or any part hereof subject to the Permitted Encumbrances.

    2.2   **Covenants**. So long as the Indebtedness or any part thereof remains unpaid, Grantor covenants and agrees with the Beneficiary as follows:

    (a)   **Payment of Indebtedness**. Grantor will make prompt payment, as the same becomes due, of each payment due and owing under the Loan Documents and of all installments of interest thereon and of all other Indebtedness.

    (b)   **Payment of Grantor's Taxes**. Grantor will promptly pay prior to delinquency all income, franchise and other taxes owing by Grantor and any other taxes (excluding Beneficiary's income taxes) which may be required to be paid with respect to the Loan Documents, this Mortgage or any other instrument evidencing or securing any of the Indebtedness.

    (c)   **Operation of Property**. Grantor will cause the Property to be maintained and operated in a good and workmanlike manner and in accordance with all applicable laws and rules, regulations and orders promulgated by all duly constituted authorities and will keep the Property occupied so as not to impair the insurance carried thereon. Grantor will not use or occupy, or knowingly allow the use or occupancy of, the Property in any manner which violates any applicable law, rule, regulation or order which constitutes a public or private nuisance or which makes void, voidable or cancelable, or increases the premium of, any insurance then in force with respect thereto. Except with the prior written consent of the Beneficiary, which consent shall not be unreasonably withheld or delayed, Grantor will not initiate or permit any zoning reclassification of the Property or seek any variance under existing zoning ordinances applicable to the Property or use or permit the use of the Property in such a manner which would result in such use becoming a nonconforming use under applicable zoning ordinances or other applicable laws, rules or regulations. Except as contemplated by the Loan Documents, Grantor will not impose any restrictive covenants or encumbrances upon the Property, execute or file any subdivision plat affecting the Property or consent to the annexation of the Property to any municipality, without the prior written consent of the Beneficiary, which consent shall not be unreasonably withheld or delayed. Grantor will not do or suffer to be done any act whereby the value of any part of the Property may be materially lessened. Grantor will allow the Beneficiary or its authorized representative to enter the Property at any reasonable times to inspect the Property and Grantor's books and records pertaining thereto and Grantor will assist the Beneficiary or said representative in whatever way necessary to make such inspection. If Grantor receives notice

Dc    Bk    Vol    Pg
06  :149  OR  8235   5

from any federal, state or other governmental entity that the Property is not in compliance with any applicable law, rule, regulation or order, Grantor will promptly furnish a copy of such notice to the Beneficiary.

(d)     **Payment of Debts and Liabilities**. Grantor will cause all debts and liabilities of any character, including without limitation all debts and liabilities for labor, material and equipment and all debts and charges for utilities servicing the Property, incurred in the maintenance, operation and development of the Property to be promptly paid prior to delinquency; except that Grantor may in good faith, by appropriate proceedings, contest the validity, applicability, or amount of any such debt or liability (other than the Indebtedness or Property Taxes), and pending such contest, Grantor shall not be deemed in default hereunder if prior to the delinquency of the asserted debt or liability, Grantor establishes an escrow, puts up a bond or furnishes other adequate security acceptable to the Beneficiary adequate to cover the payment in full of such debt or liability with interest, costs and penalties and a reasonable additional sum to cover possible costs, interest and penalties (which escrow or other security shall be returned to Grantor upon payment or to permit payment of all such debts or liabilities, interests, costs and penalties), and if Grantor promptly causes to be paid any amount adjudged by a court of competent jurisdiction to be due, with all costs, penalties and interest thereof, promptly after such judgment becomes final.

(e)     **Payment of Property Taxes**. Grantor will cause to be paid prior to delinquency all taxes and assessments heretofore or hereafter levied or assessed against the Property, or any part thereof, or against the Trustee or the Beneficiary (excluding Beneficiary's income taxes) for or on account of the Loan Documents or the Indebtedness or the interest created by this Mortgage and will furnish the Beneficiary with receipts showing payment of such taxes and assessments at least ten (10) days prior to the applicable delinquency date therefor (unless an escrow for payment of such taxes has been established and maintained with Beneficiary pursuant to subparagraph (n) of this Section 2.2); except that Grantor may in good faith, by appropriate proceedings, contest the validity, applicability, or amount of any valuation, asserted tax or assessment, and pending such contest Grantor shall not be deemed in default hereunder if prior to the delinquency of the asserted tax or assessment Grantor establishes an escrow or furnishes other adequate security acceptable to the Beneficiary adequate to cover the payment of such tax or assessment with interest, costs and penalties and a reasonable additional sum to cover possible costs, interest and penalties (which escrow or other security shall be returned to Grantor upon payment or to permit payment of all such taxes, assessments, interests, costs and penalties), and if Grantor promptly causes to be paid any amount adjudged by a court of competent jurisdiction to be due, with all costs, penalties and interest thereof, promptly after such judgment becomes final; provided, however, that in any event, each such contest shall be concluded and the tax, assessment, penalties, interests and costs shall be paid prior to the date any writ or order is issued under which the Property may be sold.

---

I. .2149  Bk  Vol  Pg
6. .2149  OR  8235  6

(f)  **Condition of Property**. Grantor will keep the Property in good order, repair and operating condition, causing all necessary repairs, renewals, replacements, additions and improvements to be promptly made, and will not allow any of the Property to be misused, abused or wasted or to materially deteriorate, except for the ordinary wear and tear of its intended primary use. Grantor will promptly replace all worn-out or obsolete fixtures or personal property covered by this Mortgage with fixtures or personal property comparable to the replaced fixtures or personal property when new, will promptly replace carpets and drapes when needed and will repaint the Property when needed, and will not, without the prior written consent of Beneficiary, remove from the Property any fixtures or personal property covered by this Mortgage except such as is replaced by Grantor by an article of equal suitability and value, owned by Grantor, free and clear of any lien or security interest (except that created by this Mortgage), and will make no structural alterations to the Property or any other alterations thereto which impair the value thereof in any material respect. Grantor has delivered to the Beneficiary or will deliver to Beneficiary upon completion of the improvements to the Mortgaged Property an inventory describing and showing the make, model, serial number and location of all fixtures and personal property used in the management, maintenance and operation of the Property (other than fixtures or personal property expressly excluded from the operation of this Mortgage) with a certification by Grantor that said inventory is a true and complete schedule of all such fixtures and personal property used in the management, maintenance and operation of the Property, that such items specified in the inventory constitute all of the fixtures and personal property required in the management, maintenance and operation of the Property, and that all such items are owned by Grantor free and clear of any lien or security interest (except that created by this Mortgage).

(g)  **Property Insurance**. Grantor will keep the Property insured against loss or damage by fire, explosion, windstorm, hail, flood (if the Property shall at any time be located in an identified "flood prone area" in which flood insurance has been made available pursuant to the Flood Disaster Protection Act of 1973), tornado and such other hazards as may be reasonably required by the Beneficiary by policies of fire, extended coverage and other insurance in such company or companies with a Best rating of at least A+ and a financial size category of at least VII, unless otherwise agreed by the Beneficiary, in such amounts and deductibles, upon such terms and provisions, and with such endorsements, all as may be reasonably acceptable to Beneficiary. Hazards covered, the amounts of such coverage and the carrier providing such coverage must be approved by the Beneficiary in writing. Without limiting the foregoing, the fire and extended coverage policy shall provide coverage for at least the lesser of 100% of the full insurable value of the improvements or the outstanding balance of the Indebtedness. Grantor will also provide such other insurance as the Beneficiary may from time to time reasonably require, including all-builders risk coverage for the construction of the improvements to the Property, comprehensive general liability, rental loss/business interruption (at least 12 months) and professional liability for architects and engineers during the construction phase, with such companies, upon such terms and provisions, in such amounts and deductibles, and with such endorsements, all as are approved by the Beneficiary, which approval shall not be unreasonably withheld. Grantor



further agrees that Grantor will deliver to the Beneficiary the original policies or certificates (with a copy of such original policies) evidencing such insurance and any additional insurance which shall be taken out upon any part of the Property and receipts evidencing the payment of all premiums, and will deliver certificates evidencing all renewals of all such policies of insurance at least thirty (30) days before any such policies are renewed or expire. Any and all insurance policies shall name Beneficiary as loss payee and provide that such policy will not be cancelled or modified in any way without thirty (30) days prior written notice. Without limiting the discretion of the Beneficiary with respect to required endorsements to insurance policies, Grantor further agrees that all such policies shall provide that proceeds thereunder will be payable to the Beneficiary as its interest may appear pursuant and subject to a mortgagee clause (without contribution) of standard form attached to or otherwise made a part of the applicable policy. In the event of foreclosure of this Mortgage, or other transfer of title to the Property in extinguishment in whole or in part of the Indebtedness, all right, title and interest of the Grantor in and to all proceeds payable under all such insurance policies then in force concerning the Property shall thereupon vest in the purchaser at such foreclosure or the Beneficiary or other transferee in the event of such other transfer of title. In the event any of the Property covered by such insurance is destroyed or damaged by fire, explosion, windstorm, hail or by any other casualty against which insurance shall have been required hereunder, (i) the Beneficiary may, but shall not be obligated to, make proof of loss if not made promptly by Grantor, (ii) each insurance company concerned is hereby authorized and directed to make payment for such loss directly to the Beneficiary instead of to Grantor, and (iii) the Beneficiary shall have the right to apply the insurance proceeds first, to reimburse the Beneficiary or the Trustee for all costs and expenses, including reasonable attorneys' fees, incurred in connection with the collection of such proceeds and, the remainder of the insurance proceeds shall be applied, at the discretion of the Beneficiary in payment (without premium or penalty) of the Indebtedness, either in whole or in part, in the order determined by the Beneficiary in its sole discretion, or to the repair, restoration or replacement, either partly or entirely, of the Property so destroyed or damaged. If the proceeds are to be applied to the repair of the Property, they shall be paid by Beneficiary, subject to Beneficiary's receipt, to Grantor for the repair and replacement of the Property, in periodic disbursements and following Beneficiary's receipt and approval of specific disbursement requests itemizing work performed and materials furnished in furtherance of such repairs, for the sole purpose of repairing or replacing the damaged portion of the Property. Any insurance proceeds held by Beneficiary shall be so held without payment or allowance of interest thereon, and shall be paid out from time to time upon compliance by Grantor with such terms, conditions and requirements as may be reasonably imposed by the Beneficiary, including, without limitation, Grantor shall provide Beneficiary with good and sufficient documentation and information necessary and reasonably required by Beneficiary to verify and confirm the exact nature and extent of any damage or destruction to the Property and the amount of funds necessary to properly be expended for such repair or replacement shall not be unreasonably withheld, describing the repair work to be performed and the costs of labor and material for each stage of repair work. Any proceeds not paid to repair or replace the damaged or destroyed portion of the Property shall be applied to the last maturing installment of principal and interest due and owing on

the Indebtedness. In any event, the unpaid portion of the Indebtedness shall remain in full force and effect and Grantor shall not be excused in the payment thereof. If any act or occurrence of any kind or nature (including any casualty on which insurance was not obtained or obtainable) shall result in damage to or loss or destruction of the Property, Grantor shall give immediate notice thereof by mail to the Beneficiary and, unless otherwise so instructed by the Beneficiary, shall promptly, at Grantor's sole cost and expense and regardless of whether the insurance proceeds, if any, shall be sufficient for the purpose, restore, repair, replace and rebuild the Property as nearly as possible to its value, condition and character immediately prior to such damage, loss or destruction in accordance with plans and specifications submitted to and approved by the Beneficiary.

     (h)    **Condemnation.** Promptly, upon obtaining knowledge of the institution of any proceedings for the condemnation of the Property or any portion thereof, or any other proceedings arising out of injury or damage to the Property, or any portion thereof, Grantor will notify the Beneficiary of the pendency of such proceedings. The Beneficiary may participate in any such proceedings, and Grantor shall from time to time deliver to the Beneficiary all instruments requested by it which are in Grantor's possession or are reasonably obtainable by Grantor to permit such participation. Grantor shall, at its expense, diligently prosecute any such proceedings, and shall consult with the Beneficiary, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. All proceeds of condemnation awards or proceeds of sale in lieu of condemnation with respect to the Property and all judgments, decrees and awards for injury or damage to the Property shall be paid to the Beneficiary and shall be applied, first, to reimburse the Beneficiary or the Trustee for all reasonable costs and expenses, including reasonably attorney's fees, incurred in connection with collection of such proceeds and, second, the remainder of said proceeds shall be applied, at the discretion of the Beneficiary, to the payment of the Indebtedness (without premium or penalty) in the order determined by the Beneficiary in its sole discretion or paid out to repair or restore the Property so affected by such condemnation, injury or damage in the same manner as provided in subparagraph (g) of this Paragraph 2.2.

     Grantor hereby assigns and transfers all such proceeds, judgments, decrees and awards to the Beneficiary and agrees to execute such further assignments of all such proceeds, judgments, decrees and awards as the Beneficiary may request. The Beneficiary is hereby authorized, in the name of Grantor, to execute and deliver valid acquittances for, and to appeal from, any such judgment, decree or award. The Beneficiary shall not, in any event or circumstances, be liable or responsible for failure to collect, or exercise diligence in the collection of, any such proceeds, judgments, decrees or awards.

     (i)    **Protection of Lien.** If the validity or priority of this Mortgage or of any rights, titles, liens or security interests created or evidenced hereby with respect to the Property or any part thereof shall be endangered or questioned or shall be attacked directly or indirectly or if any legal proceedings are instituted against Grantor with respect thereto, Grantor will give prompt written notice thereof to the Beneficiary and at Grantor's own cost

and expense will diligently endeavor to cure any defect that may be developed or claimed, and will take all necessary and proper steps for the defense of such legal proceedings, including but not limited to the employment of counsel, the prosecution or defense of litigation and the release or discharge of all adverse claims, and the Trustee and the Beneficiary, or either of them (whether or not named as parties to legal proceedings with respect thereto) are hereby authorized and empowered to take such additional steps as in their judgment and discretion may be necessary or proper for the prosecution of any such legal proceedings or the protection of the validity or priority of this Mortgage and the rights, titles, liens, security interests created or evidenced hereby, including but not limited to the employment of counsel, the prosecution or defense of litigation, the compromise or discharge of any adverse claims made with respect to the Property, the purchase of any tax title and the removal of prior liens or security interests, and all expenses so incurred of every kind and character shall be a demand obligation owing by Grantor and the party incurring such expenses shall be subrogated to all rights of the person receiving such payment.

(j)    **Further Encumbrances**. Grantor will not, without the prior written consent of the Beneficiary, create, place or permit to be created or placed, or through any act or failure to act, acquiesce in the placing of, or allow to remain, any deed of trust, mortgage, voluntary or involuntary lien, whether statutory, constitutional or contractual (except for the lien for ad valorem taxes on the Property which are not delinquent), security interest, encumbrance or charge, or conditional sale, against or covering the Property, or any part thereof, other than the Permitted Encumbrances, regardless of whether the same are expressly or otherwise subordinate to the lien or security interest created in this Mortgage, and should any of the foregoing become attached hereafter in any manner to any part of the Property without the prior written consent of the Beneficiary, Grantor will cause the same to be promptly discharged and released. Grantor will own all parts of the Property and will not acquire any fixtures, equipment or other property forming a part of the Property pursuant to a lease, license or similar agreement, without the prior written consent of the Beneficiary. Notwithstanding the foregoing, should the Beneficiary consent to any of the items prohibited by this subparagraph (j) of Paragraph 2.2, in exchange for such consent, the Beneficiary may require, at its option, (i) an increase in the interest rate payable under the Note or (ii) a reasonable encumbrance fee.

(k)    **Sale or Transfer**. Grantor will not, without the prior written consent of the Beneficiary, (1) further encumber the Property (including the granting of any easements or other matters affecting title to the Property); (2) sell, assign, or otherwise transfer, convey or dispose of ownership of the Property, or any interest therein or any part thereof (except leases/occupancy agreements with tenants of the units in the ordinary course of business), including any assignment for the benefit of creditors or the grant of any mortgage or security interest in all or any part of the Property; or (3) sell, convey, assign, or otherwise transfer of all or substantially all of the assets of Grantor. Notwithstanding the foregoing, should the Beneficiary consent to any item prohibited in this subparagraph (k) of Paragraph 2.2, in exchange for such consent, the Beneficiary may require, at its option, (i) an increase in the interest rate payable under the Note or (ii) a transfer fee.

Dt   Bk   Vol   Pg
00⊍.2149 BR  8235   10

(l)    **Books and Records**. Grantor will keep accurate books and records in accordance with sound accounting principles in which full, true and correct entries shall be promptly made as to all operations on the Property, and will permit all such books and records to be inspected by the Beneficiary and its duly accredited representatives at all times during reasonable business hours, and if, and as often as, reasonably requested by the Beneficiary, Grantor will make reports of operations in such form as the Beneficiary prescribes, setting out full data as to the net revenues from the Property.

(m)    **Financial Statements; Rent Roll**. Grantor will cause to be delivered to the Beneficiary the financial statements, certificates and other information described in the Distributor Agreement upon the terms and conditions described therein.

(n)    **Escrow for Taxes and Insurance**. In order to secure the performance and discharge of Grantor's obligations under subparagraphs (b), (e) and (g) of this Paragraph 2.2, Grantor shall, if required by Beneficiary, deposit with the Beneficiary, on each date when an installment of principal and/or interest is due under the Note, sufficient funds equal to one-twelfth (1/12) of the estimated annual taxes and insurance affecting the Property (as estimated from time to time by the Beneficiary) to permit the Beneficiary to pay, at least fifteen (15) days prior to the due date thereof, the next maturing ad valorem taxes, assessments and charges and premiums for such policies of insurance. The Beneficiary shall have the right to rely upon tax information furnished by applicable taxing authorities in the payment of such taxes or assessments and shall have no obligation to make any protest of any such taxes or assessments. If such escrows are required, any excess over the amounts required for such purposes shall be held by the Beneficiary for future use, or refunded to Grantor, at the Beneficiary's option; and any deficiency in such funds so deposited shall be made up by Grantor upon demand of the Beneficiary. All such funds so deposited shall bear no interest whatsoever, may be mingled with the general funds of the Beneficiary and shall be applied by the Beneficiary toward the payment of such taxes, assessments, charges and premiums when statements therefor are presented to the Beneficiary by Grantor (which statements shall be presented by Grantor to the Beneficiary a reasonable time before the applicable amount is due); provided, however, that, if a default shall have occurred hereunder, such funds may at the Beneficiary's option be applied to the payment of the Indebtedness in the order determined by the Beneficiary in its sole discretion, and that the Beneficiary may at any time, in its discretion, apply all or any part of such funds toward the payment of any such taxes, assessments, charges or premiums which are past due, together with any penalties or late charges with respect thereto. The conveyance or transfer of Grantor's interest in the Property for any reason (including without limitation the foreclosure of a subordinate lien or security interest or a transfer by operation of law) shall constitute an assignment or transfer of Grantor's interest in and rights to any such funds held by the Beneficiary under this subparagraph (n) but subject to the rights of the Beneficiary hereunder.

(o)    **Further Acts**. Grantor will, on the request of the Beneficiary, (i) promptly

Doc
00u  _149  Bk  Vol  Pg
       OR  8235  11

Mortgage or in any other instrument executed in connection therewith or in the execution or acknowledgment thereof; (ii) execute, acknowledge, deliver and record or file such further instruments (including without limitation further deeds of trust, security agreements, financing statements, continuation statements and assignments of rents or leases) and do such further acts as may be necessary, desirable or proper to carry out more effectively the purposes of this Mortgage and such other instruments and subject to the liens and security interests hereof and thereof any property intended by the terms hereof and thereof to be covered hereby and thereby including specifically, but without limitation, any renewals, additions, substitutions, replacements, or appurtenances to the Property; and (iii) execute, acknowledge, deliver, procure and record or file any document or instrument (including specifically any financing statement) deemed reasonably advisable by the Beneficiary to



Mortgage or any other instrument securing the payment of the Indebtedness, or if any of the foregoing statements are untrue, specifying the reasons therefor.

(u)    **Permitted Encumbrances**.  Grantor will comply with and will perform all of the covenants, agreements and obligations imposed upon it or the Property in the Permitted Encumbrances in accordance with their respective terms and provisions. Grantor will not modify or permit any modification of any Permitted Encumbrances, without the prior written consent of the Beneficiary.

(v)    **Grantor's Existence**. Grantor will continuously maintain Grantor's existence in the State of Texas.

2.3    **Subrogation**. Grantor agrees that, if Grantor fails to perform any act or to take any action which hereunder Grantor is required to perform or take, or to pay any money which hereunder Grantor is required to pay, the Beneficiary, in Grantor's name or in Beneficiary's name, may, but shall not be obligated to, perform or cause to be performed such act or take such action or pay such money, and any expenses so incurred by the Beneficiary, and any money so paid by the Beneficiary, shall be a demand obligation owing by Grantor to the Beneficiary, and the Beneficiary, upon making such payment, shall be subrogated to all of the rights of the person, corporation or entity, governmental or otherwise, receiving such payment. Any amounts due and owing by Grantor to the Beneficiary pursuant to this Mortgage shall bear interest from the date such amount becomes due until paid at the rate of interest payable on matured but unpaid principal of or interest under the Note and shall be a part of the Indebtedness and shall be secured by this Mortgage and by any other instrument securing the Indebtedness.

2.4    Purposely Omitted.

2.5    **Assignment of Rents and Profits.** All of the rents, royalties, issues, profits, revenue, income and other benefits derived from the Mortgaged Property or arising from the use or enjoyment of any portion thereof or from any lease or agreement pertaining thereto (hereinafter called the "**Rents and Profits**") are hereby absolutely and unconditionally assigned, transferred, conveyed and set over to Beneficiary to be applied by Beneficiary in accordance with the terms hereof. Prior to the occurrence of any default hereunder, Grantor shall have a license to collect and receive all Rents and Profits as the Trustee for the benefit of Beneficiary and Grantor, and Grantor shall apply the funds so collected first to the payment of the principal and interest and all other sums payable on the Indebtedness and thereafter, so long as no Event of Default hereunder has occurred, the balance shall be distributed to the account of Grantor. Grantor will not (i) execute an assignment of any of its right, title or interest in the Rents and Profits, or (ii) except where the lessee is in default thereunder, terminate or consent to the cancellation or surrender of any lease of the Mortgaged Property or any part thereof, now or hereafter existing, except that any lease may be cancelled, provided that promptly after the cancellation or surrender thereof a new lease is entered into with a new lessee having a credit standing, in the judgment of Beneficiary, at least equivalent to that of the lessee whose lease was cancelled, on substantially the same terms as the terminated or cancelled lease, (iii) modify any lease of the Mortgaged Property or any part thereof so as to shorten the

unexpired term thereof or so as to decrease the amount of rent payable thereunder, or (iv) accept prepayment of any installments of rent to become due under any of such leases in excess of one month, except prepayments in the nature of security for the performance of the lessee thereunder, or (v) in any other manner impair the value of the Mortgaged Property or the security of this Deed of Trust. Grantor will not execute any lease of all or any substantial portion of the Mortgaged Property except for actual occupancy by the lessee thereunder, and will at all times promptly and faithfully perform, or cause to be performed, each covenant, condition and agreement contained in each lease of the Mortgaged Property now or hereafter existing, on the part of lessor thereunder to be kept and performed. Grantor shall furnish to Beneficiary, within ten (10) days after a request by Beneficiary to do so, a written statement containing the names of all lessees of the Mortgaged Property, the terms of their respective leases, the space occupied and the rentals payable thereunder together with copies of any and all written leases then existing which affect or pertain to the Mortgaged Property.

## ARTICLE III.

### Default

3.1    **Events of Default**. The term "default" as used in this Mortgage shall mean the occurrence of any of the events set forth below following the thirty Business Days (defined as any day other than a Saturday, Sunday or statutory holiday) notice of default and opportunity to cure provided for in the Security Agreement:

(a)    The failure to make due and punctual payment of the Indebtedness or of any installment of interest, principal or any other amount required to be paid under the Loan Documents, this Mortgage or any other instrument securing the payment of the Indebtedness, as the same shall become due and payable, whether at maturity or when accelerated pursuant to any power to accelerate contained in the Loan Documents herein; or

(b)    An Event of Default as defined in the Security Agreement and/or the Distributor Agreement occurs or the Grantor defaults under the terms of this Mortgage; or

(c)    The Property or any part thereof is taken on execution or other process of law in any action against Grantor; or

(d)    Grantor abandons all or a portion of the Property; or

(e)    Without the prior written consent of the Beneficiary, (i) Grantor and/or Borrower sells, leases, exchanges, assigns, transfers, conveys or otherwise disposes of all or any part of the Property or any interest therein (except for the disposition of worn-out or obsolete personal property or fixtures under the circumstances described in subparagraph 2.2(f) hereof and except commercial leases to retail tenants of the in the ordinary course of business), or (ii) the title to the Property, or any interest therein, is vested in any other party, in any manner whatsoever, by operation of law or otherwise; or

D\      Bk    Vol    Pg
000+2149  OR  8235    15

(f)     Without the prior written consent of the Beneficiary, Grantor creates, places or permits to be created or placed, or through any act or failure to act, acquiesces in the placing of, or allows to remain, any deed of trust, mortgage, voluntary or involuntary lien, whether statutory, constitutional or contractual (except for the lien for ad valorem taxes on the Property which are not delinquent), security interest, encumbrance or charge, or conditional sale or other title retention document, against or covering the Property, or any part thereof, other than the Permitted Encumbrances, regardless of whether the same are expressly or otherwise subordinate to the lien or security interest created in this Mortgage, or acquires any fixtures, equipment or other property forming a part of the Property pursuant to a lease, license or similar agreement; or

(g)     The holder of any lien or security interest on the Property (without hereby implying the consent of the Beneficiary to the existence or creation of any such lien or security interest) institutes foreclosure or other proceedings for the enforcement of its remedies thereunder; or

(h)     The Property is so demolished, destroyed or damaged that, in the reasonable discretion of the Beneficiary, it cannot be restored or rebuilt with available funds to a profitable condition within a reasonable period of time; or

(i)     So much of the Property is taken in condemnation, or sold in lieu of condemnation, or the Property is so diminished in value due to any injury or damages to the Property, that the remainder thereof cannot, in the sole discretion of the Beneficiary, continue to be operated profitably for the purpose for which it was being used immediately prior to such taking, sale or diminution; or

(j)     Grantor shall fail to discharge within a period of sixty (60) days of the filing of any formal charges under federal or state law for which forfeiture of Grantor's interest in the Property or the granting of a lien against the Property, which lien is or could be superior to any of Beneficiary's liens against the Property, is a potential penalty or remedy.

3.2    **Acceleration of Indebtedness**. Upon the occurrence of a default as described in Section 3.1 foregoing, the Beneficiary shall have the option, without notice, of declaring all Indebtedness in its entirety to be immediately due and payable, and the liens and security interests evidenced hereby shall be subject to foreclosure in any manner provided for herein or provided for by law as the Beneficiary may elect.

3.3    **Right of Possession**. Upon the occurrence of a default which has not been cured as provided for in the Loan Documents, or any event or circumstance which, with the lapse of time or the giving of notice, or both, would constitute a default hereunder, the Grantor's license to collect the Rents and Profits shall automatically terminate, and Beneficiary is authorized prior or subsequent to the institution of any foreclosure proceedings to enter upon the Property, or any part thereof, and to take possession of the Property and of all books, records and accounts relating thereto and to exercise without interference from Grantor any and all rights which Grantor has with respect

to the management, possession, operation, protection or preservation of the Property, including the right to rent the same, to collect all Rents and Profits and to deduct from such Rents and Profits all costs, expenses and liabilities of every character incurred by the Beneficiary in collecting such Rents and Profits and in managing, operating, maintaining, protecting or preserving the Property and to apply the remainder of such Rents and Profits on the Indebtedness in such manner as the Beneficiary may elect. All such costs, expenses and liabilities incurred by the Beneficiary in collecting such Rents and Profits and in managing, operating, maintaining, protecting or preserving the Property, if not paid out of Rents and Profits as hereinabove provided, shall constitute a demand obligation and shall draw interest from the date of expenditure until paid at the rate of interest payable on matured but unpaid principal or interest under the Note, all of which shall constitute a portion of the Indebtedness. If necessary to obtain the possession provided for above, the Beneficiary may invoke any and all legal remedies to dispossess Grantor, including specifically one or more actions for forcible entry and detainer, trespass to try title and restitution. Nothing in this Paragraph 3.3 shall impose any duty, obligation or responsibility upon the Beneficiary for the control, care, management or repair of the Property, nor for the carrying out of any of the terms and conditions of any such lease agreement; nor shall it operate to make the Beneficiary responsible or liable for any waste committed on the Property by the tenants or by any other parties or for any dangerous or defective condition of the Property, or for any negligence in the management, upkeep, repair or control of the Property resulting in loss or injury or death to any tenant, licensee, employee or stranger.

3.4    **Right of Foreclosure**. Upon the occurrence of a default which has not been cured as provided for in the Loan Documents, the Trustee, the Trustee's successor or substitute, is authorized and empowered, and it shall be the Trustee's special duty at the request of the Beneficiary to sell the Mortgaged Property or any part thereof situated in the State of Texas at the courthouse door of any county in the State of Texas in which any part of the Mortgaged Property is situated, at public sale to the highest bidder for cash between the hours of 10:00 o'clock a.m. and 4:00 o'clock p.m. on the first Tuesday in any month after having given notice of such sale in accordance with the statutes of the State of Texas then in force governing sales of real estate under powers conferred by deeds of trust. Any sale made by the Trustee hereunder may be as an entirety or in such parcels as the Beneficiary may request, and any sale may be adjourned by announcement at the time and place appointed for such sale without further notice except as may be required by law. The sale by the Trustee of less than the whole of the Mortgaged Property shall not exhaust the power of sale herein granted, and the Trustee is specifically empowered to make successive sale or sales under such power until the whole of the Mortgaged Property shall be sold; and, if the proceeds of such sale of less than the whole of the Mortgaged Property shall be less than the aggregate of the Indebtedness and the expense of executing this trust as provided herein, this Mortgage and the lien hereof shall remain in full force and effect as to the unsold portion of the Mortgaged Property just as though no sale had been made; provided, however, that Grantor shall never have any right to require the sale of less than the whole of the Mortgaged Property but the Beneficiary shall have the right, at its sole election, to request the Trustee to sell less than the whole of the Mortgaged Property. After each sale, the Trustee shall make to the purchaser or purchasers at such sale good and sufficient conveyances in the name of Grantor, conveying the property so sold to the purchaser or purchasers in fee simple with general warranty of title, and shall receive the proceeds of said sale or sales and apply the same as herein provided. The power of sale granted herein shall not be exhausted by any

sale held hereunder by the Trustee or the Trustee's substitute or successor, and such power of sale may be exercised from time to time and as many times as the Beneficiary may deem necessary until all of the Mortgaged Property has been duly sold and all of the Indebtedness has been fully paid. In the event any sale hereunder is not completed or is defective in the opinion of the Beneficiary, such sale shall not exhaust the power of sale hereunder and the Beneficiary shall have the right to cause a subsequent sale or sales to be made hereunder. Any and all statements of fact or other recitals made in any deed or deeds given by the Trustee or any successor or substitute appointed hereunder as to nonpayment of the Indebtedness, or as to the occurrence of any default, or as to the Beneficiary having declared all of such Indebtedness to be due and payable, or as to the request to sell, or as to notice of time, place and terms of sale and of the properties to be sold having been duly given, or as to the refusal, failure or inability to act of the Trustee or any substitute or successor, or as to the appointment of any substitute or successor trustee, or as to any other act or thing having been duly done by the Beneficiary or by such Trustee, substitute or successor, shall be taken as prima facie evidence of the truth of the facts so stated and recited. The Trustee, the Trustee's successor or substitute, may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by the Trustee, including the posting of notices and the conduct of sale, but in the name and on behalf of the Trustee, the Trustee's successor or substitute.

3.5    **Other Rights and Remedies**. This instrument shall be effective as a mortgage as well as a deed of trust and upon the occurrence of a default which has not been cured as provided for in the Loan Documents may be foreclosed as to any of the Property in any manner permitted by the laws of the State of Texas or of any other state in which any part of the Property is situated, and any foreclosure suit may be brought by the Trustee or by the Beneficiary. In the event a foreclosure hereunder shall be commenced by the Trustee, or the Trustee's substitute or successor, the Beneficiary may at any time before the sale of the Property direct the Trustee to abandon the sale, and may then institute suit for the collection of the Note and the other Indebtedness, and for the foreclosure of this Mortgage. It is agreed that if the Beneficiary should institute a suit for the collection of the Note or any other Indebtedness and for the foreclosure of this Mortgage, the Beneficiary may at any time before the entry of a final judgment in said suit dismiss the same, and require the Trustee, the Trustee's substitute or successor to sell the property in accordance with the provisions of this Mortgage.

3.6    **Appointment of Receiver**. In addition to all other remedies herein provided for, Grantor agrees that upon the occurrence of a default which has not been cured as provided for in the Loan Documents, or any event or circumstance which, with the lapse of time or the giving of notice, or both, would constitute a default hereunder, the Beneficiary shall as a matter of right be entitled to the appointment of a receiver or receivers for all or any part of the Property, whether such receivership be incident to a proposed sale of such Property or otherwise, and without regard to the value of the Property or the solvency of any person or persons liable for the payment of the Indebtedness, and Grantor does hereby consent to the appointment of such receiver or receivers, waives any and all defenses to such appointment and agrees not to oppose any application therefor by the Beneficiary, but nothing herein is to be construed to deprive the Beneficiary of any other right, remedy or privilege it may now have under the law to have a receiver appointed; provided, however, that the appointment of such receiver, trustee or other appointee by virtue of any court

Do   Bk   Vol   Pg
006-149 OR  8235   18

order, statute or regulation shall not impair or in any manner prejudice the rights of the Beneficiary to receive payment of the Rents and Profits pursuant to the assignment of rents herein. Any money advanced by the Beneficiary in connection with any such receivership shall be a demand obligation to the Beneficiary and shall bear interest from the date of making such advancement by the Beneficiary until paid at the rate of interest payable on matured but unpaid principal or interest under the Note and shall be a part of the Indebtedness and shall be secured by this Mortgage and by any other instrument securing the Indebtedness.

3.7   **Application of Proceeds**. The proceeds of any sale held by the Trustee or any receiver or public officer in foreclosure of the liens evidenced hereby shall be applied:

FIRST, to the payment of all necessary reasonable costs and expenses incident to such foreclosure sale, including but not limited to all court costs and charges of every character in the event foreclosed by suit;

SECOND, to the payment in full of the Indebtedness (including specifically without limitation the principal, interest, attorney's fees, late charges and penalties due and unpaid under the Loan Documents and the amounts due and unpaid and owed to the Beneficiary under this Mortgage) in such order as the Beneficiary may elect; and

THIRD, the remainder, if any, shall be paid as otherwise required by law.

3.8   **Beneficiary's Right to Purchase**. The Beneficiary shall have the right to become the purchaser at any sale held by any Trustee or substitute or successor or by any receiver or public officer, and any holder of all or part of the Indebtedness purchasing at any such sale shall have the right to credit against the Indebtedness the amount of the bid made therefor, to the extent necessary to satisfy such bid, or if such holder holds less than all of the Indebtedness, the pro rata part thereof owing to such holder, accounting to all other holders not joining in such bid in cash for the portion of such bid or bids apportionable to such nonbidding holder or holders.

3.9   **Sale of Collateral**. Upon the occurrence of a default which has not been cured as provided for in the Loan Documents, the Beneficiary may exercise its rights of enforcement with respect to the Collateral under the Texas Business and Commerce Code, as amended, and in conjunction with, in addition to or in substitution for those rights and remedies:

(a)   The Beneficiary may enter upon the Property to take Possession of, assemble and collect the Collateral or to render it unusable; and

(b)   The Beneficiary may require Grantor to assemble the Collateral and make it available at a place the Beneficiary designates which is mutually convenient to allow the Beneficiary to take possession or dispose of the Collateral; and

(c)   Written notice mailed to Grantor as provided herein twenty (20) days prior to the date of public sale of the Collateral or prior to the date after which private sale of the Collateral will be made shall constitute commercially reasonable notice; and

(d)    Any sale made pursuant to the provisions of this Section shall be deemed to have been a public sale conducted in a commercially reasonable manner if held contemporaneously with the sale of the Mortgaged Property under power of sale as provided herein upon giving the same notice with respect to the sale of the Collateral hereunder as is required for such sale of the Mortgaged Property under power of sale; and

(e)    In the event of a foreclosure sale, whether made by the Trustee under the terms hereof, or under judgment of a court, the Collateral and the Mortgaged Property may, at the option of the Beneficiary, be sold as a whole; and

(f)    It shall not be necessary that the Beneficiary take possession of the Collateral or any part thereof prior to the time that any sale pursuant to the provisions of this paragraph is conducted, and it shall not be necessary that the Collateral or any part thereof be present at the location of such sale; and

(g)    Prior to application of proceeds of disposition of the Collateral to the Indebtedness, such proceeds shall be applied to the reasonable expenses of retaking, holding, preparing for sale or lease, selling, leasing and the like and the reasonable attorney's fees and legal expenses incurred by the Beneficiary; and

(h)    Any and all statements of fact or other recitals made in any bill of sale or assignment or other instrument evidencing any foreclosure sale hereunder as to nonpayment of the Indebtedness or as to the occurrence of any default, or as to the Beneficiary having declared all of such Indebtedness to be due and payable, or as to notice of time, place and terms of sale and of the properties to be sold having been duly given, or as to any other act or thing having been duly done by the Beneficiary, shall be taken as prima facie evidence of the truth of the facts so stated and recited; and

(i)    The Beneficiary may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by the Beneficiary, including the sending of notices and the conduct of the sale, but in the name and on behalf of the Beneficiary.

3.10    **Foreclosure on Portion of Indebtedness**. In the event of a default in the payment of any part of the Indebtedness which has not been cured as provided for in the Loan Documents, the Beneficiary shall have the right to proceed with foreclosure of the liens and security interests evidenced hereby without declaring the entire Indebtedness due, and in such event any such foreclosure sale may be made subject to the unmatured part of the Indebtedness; and any such sale shall not in any manner affect the unmatured part of the Indebtedness, but as to such unmatured part, of the Indebtedness, this Mortgage shall remain in full force and effect just as though no sale had been made. The proceeds of any such sale shall be applied as provided in Paragraph 3.7 except that the amount paid under subparagraph SECOND thereof shall be only the matured portion of the Indebtedness and any proceeds of such sale in excess of those provided for in subparagraphs FIRST and SECOND (modified as provided above) shall be applied to installments of principal and interest

00042149 BK Vol Pg
OR 8235 20

on the Note in the inverse order of maturity. Several sales may be made hereunder without exhausting the right of sale for any unmatured part of the Indebtedness.

    3.11   **Cumulative Remedies**. All remedies herein expressly provided for are cumulative of any and all other remedies existing at law or in equity and are cumulative of any and all other remedies provided for in any other instrument securing the payment of the Indebtedness, or any part thereof, or otherwise benefitting the Beneficiary, and the Trustee and the Beneficiary shall, in addition to the remedies herein provided, be entitled to avail themselves of all such other remedies as may now or hereafter exist at law or in equity for the collection of the Indebtedness and the enforcement of the covenants herein and the foreclosure of the liens and security interests evidenced hereby, and the resort to any remedy provided for hereunder or under any such other instrument or provided for by law shall not prevent the concurrent or subsequent employment of any other appropriate remedy or remedies.

    3.12   **Non-Waiver of Remedies**. The Beneficiary may resort to any security given by this Mortgage or to any other security now existing or hereafter given to secure the payment of the Indebtedness, in whole or in part, and in such portions and in such order as may seem best to the Beneficiary in its sole and uncontrolled discretion, and any such action shall not in any way be considered as a waiver of any of the rights, benefits, liens or security interests evidenced by this Mortgage.

    3.13   **Waiver by Grantor**. To the full extent Grantor may do so, Grantor agrees that Grantor will not at any time insist upon, plead, claim or take the benefit or advantage of any law now or hereafter in force providing for any appraisement, valuation, stay, extension or redemption, and Grantor, for Grantor and Grantor's successors and assigns, and for any and all persons ever claiming any interest in the Property, to the extent permitted by law, hereby waives and releases all rights of redemption, valuation, appraisement, stay of execution, notice of intention to mature or declare due the whole of the Indebtedness, notice of election to mature or declare due the whole of the Indebtedness and all rights to a marshaling of the assets of Grantor, including the Property, or to a sale in inverse order of alienation in the event of foreclosure of the liens and security interests hereby created. Grantor shall not have or assert any right under any statute or rule of law pertaining to the marshaling of assets, sale in inverse order of alienation, the exemption of homestead, the administration of estates of decedents or other matters whatever to defeat, reduce or affect the right of the Beneficiary under the terms of this Mortgage to a sale of the Property for the collection of the Indebtedness without any prior or different resort for collection, or the right of the Beneficiary under the terms of this Mortgage to the payment of such Indebtedness out of the proceeds of sale of the Property in preference to every other claimant whatever. If any law referred to in this paragraph and now in force, of which Grantor or Grantor's successors and assigns and such other persons claiming any interest in the Property might take advantage despite this paragraph, shall hereafter be repealed or cease to be in force, such law shall not thereafter be deemed to preclude the application of this paragraph.

    3.14   **Calculation of Deficiency**. If all or any portion of the Property is foreclosed upon pursuant to a judicial or nonjudicial foreclosure sale, then notwithstanding the provisions of Sections

51.003, 51.004, and 51.005 of the Texas Property Code (as the same may be amended from time to time), and to the extent permitted by law, Grantor agrees that Beneficiary shall be entitled to seek a deficiency judgment from any party obligated on the Note or a guaranty of such Note equal to the difference between the amount owing on the Note and the total amount for which the property foreclosed ("**Foreclosed Property**") was sold pursuant to judicial or nonjudicial foreclosure sales. Grantor expressly recognizes that this section constitutes a waiver of the above-cited provisions of the Texas Property Code which would otherwise permit Grantor, guarantors and other persons against whom recovery of deficiencies is sought or guarantors independently (even absent the initiation of deficiency proceedings against them) to present competent evidence of the fair market value of the Foreclosed Property as of the date of the applicable foreclosure sale and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than such fair market value. Grantor further recognizes and agrees that this waiver creates an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Foreclosed Property for purposes of calculating deficiencies owed by Grantor, any guarantors, and others against whom recovery of a deficiency is sought.

Alternatively, in the event the waiver provided above is determined by a court of competent jurisdiction to be unenforceable, the following shall be the basis for the finder of fact's determination of the fair market value of the Foreclosed Property as of the date of the foreclosure sale in proceedings governed by Sections 51.003, 51.004, and 51.005 of the Texas Property Code (as amended from time to time);

(1)    The Foreclosed Property shall be valued in an "as is" condition "with all faults" as of the date of the foreclosure sale, without any assumption or expectation that any repairs will be performed in conjunction therewith;

(2)    The valuation shall be based upon an assumption that the foreclosure purchaser desires a prompt resale of the Foreclosed Property for cash promptly (but no later than twelve months) following the foreclosure sale;

(3)    All reasonable closing costs customarily borne by the seller in a commercial real estate transaction shall be deducted from the gross fair market value of the Foreclosed Property, including, without limitation, brokerage commissions, title insurance, a survey of the Foreclosed Property, tax prorations, attorney's fees, and marketing costs;

(4)    The gross fair market value of the Foreclosed Property shall be further discounted to account for any estimated holding costs associated with maintaining the Foreclosed Property pending sale, including, without limitation, utilities expenses, property management fees, taxes and assessments (to the extent not accounted for in paragraph 3 above), and other maintenance expenses; and

(5)    Any expert opinion testimony given or considered in connection with a determination of the fair market value of the Foreclosed Property must be given by persons having at least five years experience in appraising property similar to the Foreclosed

D-
(    2149    Bk    Vol    Pg
OR    8235    22

Property and who have conducted and prepared a complete written appraisal of the Foreclosed Property taking into consideration the factors set forth above.

3.15    **Post-Foreclosure Tenancy**. In the event there is a foreclosure sale hereunder and at the time of such sale Grantor or Grantor's successors or assigns or any other persons claiming any interest in the Property by, through or under Grantor are occupying or using the Property, or any part thereof, each and all shall immediately become the tenant of the purchaser at such sale, which tenancy shall be a tenancy from day-to-day, terminable at the will of either landlord or tenant, at a reasonable rental per day based upon the value of the property occupied, such rental to be due daily to the purchaser. In the event the tenant fails to surrender possession of said property upon demand, the purchaser shall be entitled to institute and maintain an action for forcible entry and detainer of said property in the Justice of the Peace Court in the Justice Precinct in which such property, or any part thereof, is situated.

## ARTICLE IV.

### Miscellaneous

4.1    **Release by Beneficiary**. If all of the Indebtedness is paid as the same becomes due and payable and if all of the covenants, warranties, undertakings and agreements made in this Mortgage are kept and performed, then and in that event only, all rights under this Mortgage shall terminate, and the Property shall become wholly clear of the liens, security interests, conveyances and assignments evidenced hereby, which shall be released by the Beneficiary in due form at Grantor's cost.

4.2    **Substitute Trustee**. The Trustee may resign by an instrument in writing addressed to the Beneficiary, or the Trustee may be removed at any time with or without cause by an instrument in writing executed by the Beneficiary. In case of the death, resignation, removal or disqualification of the Trustee or if for any reason the Beneficiary shall deem it desirable to appoint a substitute or successor trustee to act instead of the Trustee or any substitute or successor trustee, then the Beneficiary shall have the right and is hereby authorized and empowered to appoint a successor trustee, or a substitute trustee, without other formality than appointment and designation in writing executed by the Beneficiary, and the authority hereby conferred shall extend to the appointment of other successor and substitute trustees successively until the Indebtedness has been paid in full or until the Property is sold hereunder. In the event the Indebtedness is owed by more than one person or entity, the holder or holders of not less than a majority in the amount of the Indebtedness shall have the right and authority to make the appointment of a successor or substitute trustee provided for in the preceding sentence. Such appointment and designation by the Beneficiary or by the holder or holders of not less than a majority of the Indebtedness shall be full evidence of the right and authority to make the same and of all facts therein recited. Such appointment shall be conclusively presumed to be executed with authority and shall be valid and sufficient without proof of any action by the board of directors or any superior officer of the corporation. Upon the making of any such appointment and designation, all of the estate and title of the Trustee in the Property

---

shall vest in the named successor or substitute trustee, and such trustee shall thereupon succeed to and shall hold, possess and execute all the rights, powers, privileges, immunities and duties herein conferred upon the Trustee; but nevertheless, upon the written request of the Beneficiary or of the successor or substitute trustee, the trustee ceasing to act shall execute and deliver an instrument transferring to such successor or substitute Trustee all of the estate and title in the Property of the Trustee so ceasing to act, together with all the rights, powers, privileges, immunities and duties herein conferred upon the Trustee, and shall duly assign, transfer and deliver any of the properties and moneys held by said Trustee hereunder to such successor or substitute trustee. All references herein to the Trustee or trustee shall be deemed to refer to the trustee (including any successor or substitute appointed and designated as herein provided) from time to time acting hereunder. Grantor hereby ratifies and confirms any and all acts which the Trustee or the Trustee's successor or successors, substitute or substitutes, in this trust, shall do lawfully by virtue hereof.

4.3    **Liability of Trustee**. The Trustee shall not be liable for any error of judgment or act done by the Trustee in good faith, or be otherwise responsible or accountable under any circumstances whatsoever, except for the Trustee's gross negligence or willful misconduct. The Trustee shall have the right to rely on any instrument, document or signature authorizing or supporting any action taken or proposed to be taken by the Trustee hereunder, believed by the Trustee in good faith to be genuine. All moneys received by the Trustee shall, until used or applied as herein provided, be held in trust for the purpose for which they were received, but need not be segregated in any manner from any other moneys (except to the extent required by law), and the Trustee shall be under no liability for interest on any moneys received by the Trustee hereunder. Grantor will reimburse the Trustee for, and indemnify and save the Trustee harmless against, any and all liability and expenses which may be incurred by the Trustee in the performance of the Trustee's duties hereunder.

4.4    **Permissible Acts By Beneficiary**. The Beneficiary may at any time and from time to time in writing (a) waive compliance by Grantor with any covenant herein made by Grantor to the extent and in the manner specified in such writing; (b) consent to Grantor doing any act which hereunder Grantor is prohibited from doing, or consent to Grantor failing to do any act which hereunder Grantor is required to do, to the extent and in the manner specified in such writing; (c) release any part of the Property, or any interest therein, from the lien and security interest of this Mortgage without the joinder of the Trustee, or (d) release any party liable, either directly or indirectly, for the Indebtedness or for any covenant herein or in any other instrument now or hereafter securing the payment of the Indebtedness, without impairing or releasing the liability of any other party. No such act shall in any way impair or waive the rights of the Beneficiary hereunder except to the extent specifically agreed to by the Beneficiary in such writing.

4.5    **No Impairment**. The lien, security interest and other security rights of the Beneficiary hereunder shall not be impaired by any indulgence, moratorium or release granted by the Beneficiary, including but not limited to: (a) any renewal, extension or modification which the Beneficiary may grant with respect to any Indebtedness; (b) any surrender, compromise, release, renewal, extension, exchange or substitution which the Beneficiary may grant in respect of the

Bk   Vol   Pg
42149 OR  8235   24

Property, or any part thereof or any interest therein; or (c) any release or indulgence granted to any endorser, guarantor or surety of any Indebtedness.

**4.6     Non-Waiver by Beneficiary**. The Beneficiary may waive any default without waiving any other prior or subsequent default. The Beneficiary may remedy any default without waiving the default remedied. Neither the failure by the Beneficiary to exercise, nor the delay by the Beneficiary in exercising, any right, power or remedy upon any default shall be construed as a waiver of such default or as a waiver of the right to exercise any such right, power or remedy at a later date. No single or partial exercise by the Beneficiary of any right, power or remedy hereunder shall exhaust the same or shall preclude any other or further exercise thereof, and every such right, power or remedy hereunder may be exercised at any time and from time to time. No modification or waiver of any provision hereof nor consent to any departure by Grantor therefrom shall in any event be effective unless the same shall be in writing and signed by the Beneficiary, and then such waiver or consent shall be effective only in the specific instances, for the purpose for which given and to the extent therein specified. No notice to nor demand on Grantor in any case shall of itself entitle Grantor to any other or further notice or demand in similar or other circumstances. Acceptance by the Beneficiary of any payment in an amount less than the amount then due on any Indebtedness shall be deemed an acceptance on account only and shall not in any way affect the existence of a default hereunder.

**4.7     Notice to Account Debtors**. The Beneficiary may at any time after default by Grantor notify the account debtors or obligors of any accounts, chattel paper, negotiable instruments or other evidences of indebtedness included in the Collateral to pay the Beneficiary directly.

**4.8     Copy as Financing Statement**. A carbon, photographic or other reproduction of this Mortgage or of any financing statement relating to this Mortgage shall be sufficient as a financing statement.

**4.9     Financing Statement**. This Mortgage shall be effective as a financing statement filed as a fixture filing with respect to all fixtures included within the Property and is to be filed for record in the real estate records in the Office of the County Clerk where the Property (including said fixtures) is situated. This Mortgage shall also be effective as a financing statement covering minerals or the like (including as-extracted collateral) and accounts subject to the Texas Business and Commerce Code, as amended, and is to be filed for record in the real estate records of the county where the Property is situated. The mailing address of Grantor is set forth below opposite the signature of Grantor to this Mortgage and the address of the Beneficiary from which information concerning the security interest may be obtained is the address of the Beneficiary set forth in Section 4.16 of this Mortgage.

**4.10    Recordation**. Grantor will cause this Mortgage and all amendments and supplements thereto and substitutions therefor and all financing statements and continuation statements relating hereto to be recorded, filed, re-recorded and refiled in such manner and in such places as the Trustee or the Beneficiary shall reasonably request, and will pay all such recording, filing, rerecording and refiling taxes, fees and other charges.

4.11    **Successors of Grantor**. In the event the ownership of the Property or any part thereof becomes vested in a person other than Grantor, the Beneficiary may deal with such successor or successors in interest with reference to this Mortgage and to the Indebtedness in the same manner as with Grantor, without in any way vitiating or discharging Grantor's liability hereunder or for the payment of the Indebtedness. No sale of the Property, no forbearance on the part of the Beneficiary and no extension of the time for the payment of the Indebtedness given by the Beneficiary shall operate to release, discharge, modify, change or affect, in whole or in part, the liability of Grantor hereunder or for the payment of the Indebtedness or the liability of any other person hereunder or for the payment of the Indebtedness except as agreed to in writing by the Beneficiary. Notwithstanding anything to the contrary, the provisions of this Paragraph 4.11 shall in no way imply the Beneficiary's consent to any transfer of the ownership of the Property or any portion thereof, which consent of Beneficiary must be obtained in writing prior to any transfer of the Property (pursuant to Paragraph 2.2(k) of this Mortgage).

4.12    **Place of Payment**. The indebtedness evidenced by the Loan Documents and all other Indebtedness which may be owing hereunder at any time by Grantor shall be payable at the place designated in the Note, or if no such designation is made, at the office of the Beneficiary at the address indicated in this Mortgage, or at such other place as the Beneficiary may designate in writing.

4.13    **Subrogation to Prior Indebtedness**. To the extent that proceeds of the Note are used to pay Indebtedness secured by any outstanding lien, security interest, charge or prior encumbrance against the Property, such proceeds have been advanced by the Beneficiary at Grantor's request, and the Beneficiary shall be subrogated to any and all rights, security interests and liens owned by any owner or holder of such outstanding liens, security interests, charges or encumbrances, irrespective of whether said liens, security interests, charges or encumbrances are released, and it is expressly understood that in consideration of the payment of such indebtedness by the Beneficiary, Grantor hereby waives and releases all demands and causes of action for offsets, payments and rentals to, upon and in connection with the said indebtedness.

4.14    **Unsecured Indebtedness Discharge**. If any part of the Indebtedness cannot be lawfully secured by this Mortgage or if any part of the Property cannot be lawfully subject to the lien and security interest hereof to the full extent of the Indebtedness, then all payments made shall be applied on the Indebtedness first in discharge of that portion thereof which is unsecured by this Mortgage.

4.15    **No Usury Intended**. Any provision contained herein or in the Loan Documents or in any other instrument now or hereafter evidencing, securing or otherwise relating to any Indebtedness to the contrary notwithstanding, neither the Beneficiary nor the holder of any other Indebtedness shall be entitled to receive or collect, nor shall Grantor be obligated to pay, interest on any of the Indebtedness in excess of the maximum rate of interest permitted by applicable law, and if any provision herein or in the Loan Documents or in such other instrument shall ever be construed or held to permit the collection or to require the payment of any amount of interest in excess of that permitted by applicable law, the provisions of this Paragraph 4.15 shall control and shall override

any contrary or inconsistent provision herein or in the Loan Documents or in such other instrument. The intention of the parties being to conform strictly to the usury limitations under applicable law, the Loan Documents, this Mortgage and each other instrument now or hereafter evidencing or relating to any Indebtedness shall be held subject to reduction to the amount allowed under said applicable law as now or hereafter construed by the courts having jurisdiction. The term "applicable law" as used in this Mortgage shall mean the laws of the State of Texas or the laws of the United States, whichever laws allow the greater rate of interest, as such laws now exist or may be changed or amended or come into effect in the future.

4.16    **Notice.** Any notice, consent, request, demand or other communication required or permitted to be given hereunder or under any of the Loan Documents to Beneficiary or Grantor must be in writing and shall be deemed sufficiently given or made when (i) delivered in person, (ii) sent by private courier or national overnight delivery service with proof of delivery and courier fees paid by sender, (iii) sent by telecopy with telephonic confirmation of receipt, or (iv) three (3) days after deposit in the United States mail by first class mail, registered or certified, return receipt requested, postage prepaid, as follows:

To Beneficiary:          Finning International Inc.  
                          16830 – 107th Avenue  
                          Edmonton, Alberta   T5P 4C3  
                          Attention:       Mel Ternan  
                          Fax:  (780) 930-4891

With copies to:         Finning International Inc.  
                          Suite 1000  
                          Park Place  
                          666 Burrard Street  
                          Vancouver, BC Canada V6C 2X8  
                          Attention: John T. Struthers, Corporate Secretary  
                          Fax: (604) 331-4887

                          Jonathan K.M. Jeske  
                          1200 Waterfront Centre  
                          200 Burrard Street  
                          P.O. Box 48600  
                          Vancouver, BC  Canada V7X LT2  
                          Telephone: (604) 687-5744  
                          Fax: (604) 687-1415

To Grantor:              P.O. Box 2427  
                          Harlingen, Texas 78551  
                          Fax:  (956) 399-9174

BK    Vol    Pg
42149  OR    8235    27

With copy to:          Dennis Sanchez
                       Sanchez, Whittington, Janis & Zabarte, L.L.P.
                       100 North Expressway 83
                       Brownsville, Texas  78521-2284
                       Fax: (956) 546-3765

or such other address as shall be set forth in a notice from the appropriate party given in compliance with this Section. Notwithstanding anything to the contrary, any notice delivered pursuant to Section 51.002 of the Texas Property Code shall be deemed sufficiently given when deposited in the United States mail by first class mail, registered or certified, return receipt requested, postage prepaid to the address of Grantor as set forth above.

4.17   **Applicable Law; Venue.** This Mortgage and the Loan Documents shall be governed by and construed in accordance with the laws of the State of Texas and the applicable laws of the United States of America. This Mortgage and the Loan Documents have been entered into in Cameron County, Texas, and they shall be performable for all purposes, unless otherwise stated in this Mortgage and the Loan Documents, in Cameron County, Texas. Courts within the State of Texas shall have jurisdiction over any and all disputes between the Grantor and the Beneficiary, whether in law or equity, including, but not limited to, any and all disputes arising out of or relating to this Mortgage or any of the Loan Documents and venue in any such dispute, whether in federal or state court, shall be laid in Cameron County, Texas.

4.18   **Successors and Assigns.** The terms, provisions, covenants and conditions hereof shall be binding upon Grantor, and the successors and assigns of Grantor including all successors in interest of Grantor in and to all or any part of the Property, and shall inure to the benefit of the Trustee and the Beneficiary and their respective heirs, successors, substitutes and assigns and shall constitute covenants running with the land. All references in this Mortgage to Grantor, Trustee or the Beneficiary shall be deemed to include all such heirs, devisees, representatives, successors, substitutes and assigns.

4.19   **Severability.** A determination that any provision of this Mortgage is unenforceable or invalid shall not affect the enforceability or validity of any other provision and any determination that the application of any provision of this Mortgage to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to any other persons or circumstances.

4.20   **Gender References.** Within this Mortgage, words of any gender shall be held and construed to include any other gender, and words in the singular number shall be held and construed to include the plural, unless the context otherwise requires.

4.21   **Mortgage References.** References in this Mortgage to "herein", "hereunder" or "hereby" shall refer to this entire Mortgage unless the context otherwise requires.

---

00042149  Bk  Vol  Pg
OR  8235  28

4.22  **Counterparts.** This Mortgage may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document. All such counterparts shall be construed together and shall constitute one instrument, but in making proof hereof it shall only be necessary to produce one such counterpart.

4.23  **Waiver of Jury Trial.** Grantor hereby expressly waives any right of trial by jury in any action or legal proceeding arising out of or relating to the Loan Documents or the transactions contemplated thereby or hereby.

Doc  Bk  Vol  Pg
00042149 OR 8235 29

## SIGNATURE PAGE
## DEED OF TRUST, ASSIGNMENT OF RENTS,
## SECURITY AGREEMENT AND FINANCING STATEMENT

IN WITNESS WHEREOF, Grantor has executed this Deed of Trust, Assignment of Rents, Security Agreement and Financing Statement effective this 15th day of July, 2002.

**GRANTOR:**

DAVCRANE INC., a Texas corporation

By: _Danl E. Dav_
Daniel E. Davis, President

The address of Grantor is:

P.O. Box 2427
Harlingen, Texas 78551

THE STATE OF TEXAS       §
                         §
COUNTY OF CAMERON        §

This instrument was acknowledged before me on July 26, 2002 by Daniel E. Davis, president of DAVCRANE INC., a Texas corporation on behalf of said corporation.

_Patsy L. Naber_
Notary Public in and for The State of Texas

_Patsy L. Naber_
Printed Name

My Commission Expires: _12-01-04_



D
Q&    2149  OR   8235    30
              Bk    Vol   Pg

## Exhibit "A"

### Real Property

Lot Number One (1), Block Number One (1), Texas Pipe Bending Subdivision, City of Harlingen, Cameron County, Texas according to the Map recorded in Cabinet 1, Pages 384-A and 384-B Map Records of Cameron County, Texas.

Dc                 Bk     Vol     Pg
00042149 OR    8235    31

# EXHIBIT B

## PERMITTED EXCEPTIONS

1.   Standby fees, taxes and assessments by any taxing authority for the year 2002 and subsequent years.

2.   Statutory rights in favor of HARLINGEN IRRIGATION DISTRICT CAMERON COUNTY NO. 1, pursuant to applicable sections of the Texas Water Code.

3.   Easements in favor of HARLINGEN IRRIGATION DISTRICT CAMERON COUNTY NO. 1.

4.   Right of Way Easement dated September 20, 1949 from Fred Langley to Cameron County, recorded in Volume 472, Page 404, Deed Records of Cameron County, Texas.

5.   Right of Way Easement dated February 8, 1951 from Fred Langley to Cameron County, recorded in Volume 509, Page 55, Deed Records of Cameron County, Texas.

6.   Easement dated March 1, 1983 from Texas Pipe Bending Company to City of Harlingen, recorded in Volume 1314, Page 373, Deed Records of Cameron County, Texas.

7.   An undivided ½ mineral interest, the royalties, bonuses and rentals also as set out in instrument dated September 26, 1950 from E. A. Matz, recorded in Volume 500, Page 414, Deed Records of Cameron County, Texas.

8.   1/4th of all oil, gas and other minerals described in deed dated August 18, 1943 from Phoenix Mutual Life Insurance, recorded in Volume 325, Page 155, Deed Records of Cameron County, Texas, together with all rights.

9.   Drainage canal Right-of-Way Easement as shown on the plat of the Subdivision herein referred to.

10.  Road Right-of-Way as shown on the plat of the Subdivision herein referred to.

FILED AND RECORDED
OFFICIAL PUBLIC RECORDS
On: Aug 12,2002 at 04:35P

Document Number:          00042149

          By
Liliana Pizana
Joe G Rivera, County Clerk
Cameron County

00042149 OR  8235   32

# COMMERCIAL SECURITY AGREEMENT

Dated: July 15, 2002

| **Debtor** | **Secured Party** |
|---|---|
| DAVCRANE INC. | FINNING INTERNATIONAL INC. |
| P.O. Box 2427 | 16830-107TH Avenue |
| Harlingen, Texas 78551 | Edmonton, Alberta T5P 4C3 |
| | Canada |
| | |
| (hereinafter "**Debtor**") | (hereinafter "**Secured Party**") |

FOR VALUE RECEIVED, the receipt and sufficiency of which is hereby acknowledged, Debtor grants to Secured Party first priority security interest (and the pledges and assignments as applicable) in, to and under the collateral as hereinafter set forth and agrees with Secured Party as follows:

A.    **OBLIGATIONS SECURED.** The security interest and pledges and assignments as applicable granted hereby are to secure punctual payment and performance of the following: (i) the loan ("**Loan**") represented by that certain promissory note (the "**Note**") of even date herewith in the original principal sum of $1,500,000.00, executed by Debtor and payable to the order of Secured Party, and any and all extensions, renewals, increases, modifications, replacements, and rearrangements thereof; (ii) all indebtedness, liabilities, and obligations whatsoever of the Debtor pursuant to that certain Deed of Trust, Assignment of Rents, Security Agreement and Financing Statement (the "**Deed of Trust**") by Debtor for the benefit of Secured Party and that Security Agreement executed by Daniel E. Davis for the benefit of Secured Party ("**Davis Security Agreement**") and all other collateral and security documents securing or executed in connection with this Commercial Security Agreement ("**Agreement**"), the Note, the Deed of Trust, the Davis Security Agreement (collectively, with this Agreement, the Note, the Deed of Trust, and the Davis Security Agreement, the "**Loan Documents**") and all future advances, renewals, extensions, increases, modifications, amendments, supplements, restatements, and replacements thereof (all of which are herein separately and collectively referred to as the "**Obligations**"). Debtor acknowledges that the security interest (and pledges and assignments as applicable) hereby granted shall secure all future advances made to Debtor by Secured Party whether now in existence or hereafter arising.

B.    **USE OF COLLATERAL.** Debtor represents, warrants and covenants that the Collateral will be used by the Debtor primarily for business use.

C.    **DESCRIPTION OF COLLATERAL.** Debtor hereby grants to Secured Party a security interest in and hereby pledges and assigns and agrees that Secured Party shall continue to have a security interest in and a pledge and assignment of, the following property, to-wit:

**1.     Equipment.** A security interest in all equipment of every nature and description whatsoever, now owned or hereinafter acquired by Debtor, wheresoever located, including all parts, tools and accessories used in connection therewith utilized in connection with the manufacture, production or assembly of the Product Line hereinafter defined or purchased from the proceeds of the Note and including, without limitation, any equipment, tooling and parts used in connection with ownership and operation of the manufacturing plant located on the real property described on **Exhibit A** attached hereto and made a part hereof for all purposes (including any equipment which may constitute a fixture on such real property), and all additions, accessions or substitutions thereto, and contracts with respect thereto and documents of title evidencing or representing any part thereof, and all products and proceeds thereof. For purposes of this Agreement, **"Product Line"** means telehandler all-terrain cranes, lattice and telescopic boomed crawler cranes, excavator based pipelayers and related equipment or products, and includes any current or future similar products, but specifically excludes any marine or offshore products.

**2.     All Fixtures.** A security interest in all of Debtor's fixtures and appurtenances thereto, and such other goods, chattels, fixtures, equipment and personal property affixed or in any manner attached to the real estate and or building(s) or structure(s), including all additions and accessions thereto and replacements thereof and articles in substitution therefore, howsoever attached or affixed, located on the real property described in **Exhibit A** attached hereto and made a part hereof for all purposes. The record owner of the real estate is Debtor

The term "Collateral" as used in this Agreement shall mean and include, and the security interest (and pledge and assignment as applicable) shall cover, all of the foregoing property, as well as any accessions, additions and attachments thereto and the proceeds and products thereof, including without limitation, all cash, depository accounts, general intangibles, accounts, inventory, equipment, fixtures, farm products, notes, drafts, acceptances, securities, instruments, chattel paper, insurance proceeds payable because of loss or damage, or other property, benefits or rights arising therefrom, and in and to all returned or repossessed goods arising from or relating to any of the property described herein or other proceeds of any sale or other disposition of such property.

**D.     REPRESENTATIONS, WARRANTIES AND COVENANTS OF DEBTOR.** Debtor represents and warrants as follows:

**1.     Ownership: No Encumbrances.** Except for the security interest (and pledges and assignments as applicable) granted hereby, the Debtor is, and as to any property acquired after the date hereof which is included within the Collateral, Debtor will be, the owner of all such Collateral free and clear from all charges, liens, security interests, adverse claims and encumbrances of any and every nature whatsoever.

**2.     No Financing Statements.** There are no financing statements or similar filings now on file in any public office covering any part of the Collateral, and Debtor will not execute and there

will not be on file in any public office any financing statement or similar filing except the financing statements filed or to be filed in favor of Secured Party.

3. **Accuracy of Information.** All information furnished to Secured Party concerning Debtor, the Collateral and the Obligations, or otherwise for the purpose of obtaining or maintaining credit, is or will be at the time the same is furnished, accurate and complete in all material respects.

4. **Authority.** Debtor has full right and authority to execute and perform this Agreement and to create the security interest (and pledges and assignment as applicable) created by this Agreement. The making and performance by Debtor of this Agreement will not violate any articles of incorporation, bylaws or agreements of Debtor, any provision of law, any order of court or governmental agency, or any indenture or other agreement to which Debtor is a party, or by which Debtor or any of Debtor's property is bound, or be in conflict with, result in a breach of or constitute (with due notice and/or lapse of time) a default under any such indenture or other agreement, or result in the creation or imposition of any charge, lien, security interest, claim or encumbrance of any and every nature whatsoever upon the Collateral, except as contemplated by this Agreement.

5. **Name and Addresses.** Debtor's exact legal name (as indicated on official records) is as set forth in the first paragraph of this Agreement. Debtor is a Texas corporation and Debtor's organizational identification number is 0157717000. Its Tax Identification Number is 74-2955092. Other than "Davcrane Inc.", Debtor has not used any other name or trade name. Debtor's chief executive office is located in the state of Texas at the address indicated at the beginning of this Agreement. Debtor agrees not to change such address without advance written notice to Secured Party.

6. **Perfection of Security Interests.** Debtor authorizes Secured Party, its counsel or its representative to file Financing Statements (the "Financing Statements") describing the Collateral in any jurisdiction where it may be required or desirable in order to perfect Secured Party's security interest in the Collateral, including any additional Financing Statements covering specific Equipment or Fixtures. Debtor further authorizes Secured Party, its counsel or its representative, at any time and from time to time, to file continuation statements with respect to previously filed Financing Statements. Prior to closing but not later than August 8, 2002, Secured Party shall receive uniform commercial code searches from each jurisdiction where the filing of Financing Statements is necessary to perfect the Secured Party's interest in the Collateral, indicating that the Collateral is free and clear from all other liens and security interests and that the Secured Party's security interest in the Collateral is a first priority security interest.

7. **Certificate of Title.** No item of Collateral is covered by a certificate of title. In the event Debtor acquires any Collateral covered by a certificate of title, it shall reflect the Secured Party as the first and only lienholder on said certificate of title.

E. **GENERAL COVENANTS. Debtor covenants and agrees as follows:**

1.     **Operation of the Collateral.** Debtor agrees to maintain and use the Collateral solely in the conduct of its own business, in a careful and proper manner, and in conformity with all applicable permits or licenses. Debtor has the risk of loss of the Collateral. Debtor shall comply in all respects with all applicable statutes, laws, ordinances and regulations. Debtor shall not use the Collateral in any unlawful manner or for any unlawful purposes, or in any manner or for any purpose that would expose the Collateral to unusual risk, or to penalty, forfeiture or capture, or that would render inoperative any insurance in connection with the Collateral.

2.     **Condition.** Debtor shall maintain, service and repair the Collateral so as to keep it in good operating condition. Debtor shall replace within a reasonable time all parts that may be worn out, lost, destroyed or otherwise rendered unfit for use, with appropriate replacement parts. Debtor shall obtain and maintain in good standing at all times all applicable permits, licenses, registrations and certificates respecting the Collateral.

3.     **Assessments.** Debtor shall promptly pay when due all taxes, assessments, license fees, registration fees, and governmental charges levied or assessed against Debtor or with respect to the Collateral or any part thereof.

4.     **No Encumbrances.** Debtor agrees not to suffer or permit any charge, lien, security interest, adverse claim or encumbrance of any and every nature whatsoever against the Collateral or any part thereof.

5.     **No Removal.** Except as otherwise provided in this Agreement, Debtor shall not remove the Collateral from the county or counties designated at the beginning of this Agreement without Secured Party's prior written consent.

6.     **No Transfer.** Debtor shall not, without the prior written consent of Secured Party, sell, assign, transfer, lease, charter, encumber, hypothecate or dispose of the Collateral, or any part thereof, or interest therein, or offer to do any of the foregoing.

7.     **Notices and Reports.** Debtor shall promptly notify Secured Party in writing of any change in the name, identity or structure of Debtor, any charge, lien, security interest, claim or encumbrance asserted against the Collateral, any litigation against Debtor or the Collateral, any theft, loss, injury or similar incident involving the Collateral, and any other material matter adversely affecting Debtor or the Collateral. Debtor shall furnish such other reports, information and data regarding Debtor's financial condition and operations, the Collateral and such other matters as Secured Party may request from time to time.

8.     **Landlord's Waivers.** Debtor shall furnish to Secured Party, if requested, a landlord's waiver of all liens with respect to any collateral covered by this Agreement that is or may be located upon leased premises, such landlord's waivers to be in form and upon such terms as are acceptable to Secured Party.

**9.    Additional Requirements.** Debtor will from time to time sign, execute, deliver and file, alone or with Secured Party, upon reasonable request, any necessary financing statements, security agreements or other documents; procure any necessary instruments or documents as may be reasonably requested by Secured Party; and take all further action that Secured Party may reasonably request to confirm, perfect, preserve and protect the security interests intended to be granted hereby. At the option of secured Party, a carbon, photographic or other reproduction of this Agreement or of a financing statement covering the Collateral shall be sufficient as a financing statement and may be filed as a financing statement. Upon the request of Secured Party, Debtor shall take or cause to be taken all actions (other than any actions required to be taken by Secured Party) necessary to cause Secured Party to have "control" over any proceeds of the Collateral constituting deposit accounts, electronic chattel paper, or letter-of-credit rights, and Debtor shall promptly notify Secured Party of Debtor's acquisition of any such Collateral.

**10.    Protection of Collateral.** Secured Party, at its option, whether before or after default, but without any obligation whatsoever to do so, may (a) discharge taxes, claims, charges, liens, security interests, assessments or other encumbrances of any and every nature whatsoever at any time levied, placed upon or asserted against the Collateral, (b) place and pay for insurance on the Collateral, including insurance that only protects Secured Party's interest, (c) pay for the repair, improvements, testing, maintenance and preservation of the Collateral, (d) pay any filing, recording, registration, licensing or certification fees or other fees and charges related to the Collateral, or (e) take any other action to preserve and protect the Collateral and Secured Party's rights and remedies under this Agreement as Secured Party may deem reasonably necessary or appropriate. Debtor agrees that Secured Party shall have no duty or obligation whatsoever to take any of the foregoing action. Debtor agrees to promptly reimburse Secured Party upon demand for any payment made or any expense incurred by the Secured Party pursuant to this authorization. These payments and expenditures, together with interest thereon from date incurred until paid by Debtor at the maximum contract rate allowed under applicable laws, which Debtor agrees to pay, shall constitute additional Obligations and shall be secured by and entitled to the benefits of this Agreement.

**11.    Records.** Debtor will keep and maintain at its own cost and expense satisfactory and complete records of the Collateral. For Secured Party's further security, Secured Party shall have a security interest in all of Debtor's books and records pertaining to the Collateral, and Debtor shall turn over any such books and records to Secured Party or to its representatives during normal business hours at the request of Secured Party.

**12.    Further Assurances.** Debtor shall do, make, procure, execute and deliver all such additional and further acts, things, deeds, interests and assurances as Secured Party may reasonably require from time to time to protect, assure and enforce Secured Party's rights and remedies.

**13.    Insurance.** Debtor shall maintain insurance at all time with respect to the Collateral, containing such terms, in such form and amounts and written by such companies as may be satisfactory to Secured Party. If required by Secured Party, the insurance policies shall contain loss payable clauses in favor of Secured Party as its interest may appear, and at the request of Secured Party shall be delivered to and held by it. Further, if required by Secured Party, the insurance

policies shall provide for thirty (30) days written minimum cancellation notice to Secured Party. All right, title and interest of the Debtor in the insurance policies and/or the proceeds of the insurance policies covering the Equipment are hereby assigned to the Secured Party to secure the repayment of the Obligations. Secured Party is hereby authorized to act as attorney in fact for Debtor in obtaining, adjusting, settling and canceling such insurance and endorsing any drafts or instruments. Secured Party shall be authorized to apply the proceeds from any insurance to the Obligations secured hereby whether or not such Obligations are then due and payable.

**14.    Obligations of Secured Party**. Nothing herein contained shall be construed to constitute Debtor as the agent of Secured Party for any purpose whatsoever. Secured Party does not by anything contained herein or in any assignment or otherwise, assume any of Debtor's obligations or any liability under any other agreements assigned to Secured Party, and Secured Party shall not be responsible in any way for the performance by Debtor of any of the terms and conditions thereof.

**15.    No Collection Obligation**. Secured Party has no duty to collect any income accruing on the Collateral or to preserve any rights relating to the Collateral. The powers conferred upon Secured Party by this Agreement are solely to protect the interest of Secured Party in the Collateral and shall not impose any duty upon Secured Party to exercise any such powers. Secured Party shall be under no duty whatsoever to make or give (and Debtor does hereby waive) any presentment, demand for performance, notice of nonperformance, protest, notice of protest, notice of dishonor, or other notice or demand in connection with any Collateral or the Obligations, or to take any steps necessary to preserve any rights against other parties. Secured Party shall not be liable for failure to collect or realize upon any or all of the Obligations or Collateral, or for any delay in so doing and shall have no duty to perform Debtor's obligations.

**F.    EVENTS OF DEFAULT**. The following events ("**Events of Default**") shall constitute Events of Default under this Agreement **if such event or failure remains uncured following thirty (30) Business Days (defined as any day other than  Saturday, Sunday or statutory holiday)** written notice of such default and opportunity to cure from Secured Party to the Debtor:

**1.**    Default shall be made in the payment of any installment of principal or interest upon the Note or any other obligation of Debtor to Secured Party when due and payable; or

**2.**    Default shall be made in the performance of any terms, covenant or agreement contained herein or in any other Loan Document; or

**3.**    Any representation or warranty herein contained in any other Loan Document shall prove to have been materially incorrect or misleading in any material respect when made; or

**4.**    Debtor or any guarantor makes an assignment for the benefit of creditors, admits in writing its inability to pay its debts generally as they become due, files a petition in

bankruptcy, is adjudicated insolvent or bankrupt, petitions or applies to any tribunal for any receiver or any trustee of Debtor or any guarantor or any substantial part of its property, commences any action relating to Debtor or any guarantor under any reorganization, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect, or if there is commenced against Debtor or any guarantor any such action, or Debtor or any guarantor by any act indicates its consent to or approval of any trustee for Debtor or any guarantor of any substantial part of its property, or suffers any such receivership or trustee to continue undischarged;

Upon the occurrence of an Event of Default: (i) the Secured Party, at its option, may declare the Note, and all outstanding principal, accrued interest and other sums outstanding thereon, immediately due and payable without demand, presentment, notice of dishonor, protest, notice of intent to accelerate, notice of acceleration and diligence in collecting sums due hereunder, all of which are waived by Debtor; (ii) proceed to enforce its interest in the Collateral with all proceeds being retained or paid over to Secured Party for application on the Obligations in the order and priority chosen by Secured Party in its sole discretion; and (iii) Secured Party shall have all rights and remedies available to a secured party under the Texas Business and Commerce Code and other applicable law.

## G.    REMEDIES UPON DEFAULT.

1.    **General**  Upon the occurrence and during the continuance of any Event of Default, Secured Party may, by written notice to Debtor, declare the entire unpaid amount (including, if applicable, any unpaid accrued interest) of the Obligations to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest, notice of protest or dishonor, notice of acceleration, notice of intent to accelerate or other notice of any kind, all of which are hereby expressly waived by Debtor, and thereupon take such action as Secured Party may deem desirable.  If any Event of Default shall occur and be continuing Secured Party may, in addition to all other rights and remedies granted to it in this Agreement and in any other instrument or agreement securing, evidencing or relating to the Obligations exercise all rights and remedies of a secured party under the UCC.

2.    **Remedies**.  Upon any Event of Default, Secured Party shall have the right to pursue any of the following remedies separately, successively or simultaneously:

(i)    File suit and obtain judgment and, in conjunction with any action, Secured Party may seek any ancillary remedies provided by law, including levy of attachment and garnishment.

Take possession of any Collateral if not already in its possession without demand and without legal process.  Upon Secured Party's demand, Debtor will assemble and make the Collateral available to Secured Party as it directs. Debtor grants to Secured Party the right, for this purpose, to enter into any premises where Collateral may be located.

1.     Without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon Debtor or any other person (all and each of which demands, defenses, advertisements and notices are hereby waived), Secured Party may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of Secured Party or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk. Secured Party shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in Debtor, which right or equity is hereby waived or released.

## H.    FORECLOSURE PROCEDURES.

    **1.    Waivers.** Secured Party shall not by any act, delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any default or Event of Default or in any breach of any of the terms and conditions hereof. No failure to exercise, nor any delay in exercising, on the part of Secured Party of any right, power or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver by Secured Party of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which Secured Party would otherwise have on any future occasion. The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any rights or remedies provided by law. To the extent permitted by applicable law, Debtor waives all claims, damages and demands it may acquire against Secured Party arising out of the exercise by it of any rights hereunder except to the extent any thereof arise solely from the willful misconduct of Secured Party.

    **2.    Notices.** Secured Party shall give Debtor such notice of any private or public sale as may be required by the UCC. Twenty (20) days notice shall be considered commercially reasonable for any notices given under this Section.

    **3.    Condition of Collateral.** Secured Party has no obligation to prepare the Collateral for sale. Secured Party's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the UCC or otherwise, shall be to deal with it in the same manner as Secured Party deals with similar property for its own account. Neither Secured Party nor any of its directors, officers, members, managers, employees or agents shall be liable for failure to demand, collect or realize upon all or any part of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of Debtor or otherwise.

**4.    No Obligation to Pursue Others.** Secured Party has no obligation to attempt to satisfy the Obligations by collecting them from any other person liable for them and Secured Party may release, modify or waive any Collateral provided by any other person to secure any of the Obligations, all without affecting Secured Party's rights against Debtor. Debtor waives any right it may have to require Secured Party to pursue any third person for any of the Obligations.

**5.    Compliance With Other Laws.** Secured Party may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

**6.    Warranties.** Secured Party may sell the Collateral without giving any warranties as to the Collateral. Secured Party may specifically disclaim any warranties of title or the like. This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

**7.    Sales on Credit.** If Secured Party sells any of the Collateral upon credit, Debtor will be credited only with payments actually made by the purchaser, received by Secured Party and applied to the indebtedness of the purchaser. In the event the purchaser fails to pay for the Collateral, Secured Party may resell the Collateral and Debtor shall be credited with the proceeds of the sale.

**8.    Purchases by Secured Party.** In the event Secured Party purchases any of the Collateral being sold, Secured Party may pay for the Collateral by crediting some or all of the Obligations of the Debtor.

**9.    No Marshaling.** Secured Party shall have no obligation to marshal any assets in favor of Debtor, or against or in payment of any of the Obligations, or any other obligation owed to Secured Party by Debtor or any other person.

**10.    Proceeds of Sale.** Secured Party shall apply the net proceeds of any collection, recovery, receipt, appropriation, realization or sale of the Collateral, after deducting all reasonable costs and expenses of every kind incurred therein or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of Secured Party hereunder, including, without limitation, reasonable attorneys' fees and disbursements, to the payment in whole or in part of the Obligations, in such order as Secured Party may elect, and only after such application and after the payment by Secured Party of any other amount required by any provision of law, including, without limitation, Section 9-615 of the UCC, need Secured Party account for the surplus, if any, to Debtor.

**11.    Deficiency.** Debtor shall remain liable to Secured Party for any unpaid Obligations, advances, costs, charges and expenses, together with interest thereon and shall pay the same immediately to Secured Party at Secured Party's offices.

## I.   OTHER AGREEMENTS.

**1.   Savings Clause.** Notwithstanding any provision to the contrary herein, or in any of the documents evidencing the Obligations or otherwise relating thereto, no such provision shall require the payment or permit the collection of interest in excess of the maximum permitted by applicable usury laws.  If any such excessive interest is provided for, then in such event (i) the provisions of this paragraph shall govern and control, (ii) neither the Debtor nor their respective successors or assigns or any other party liable for the payment thereof, shall be obligated to pay the amount of such interest to the extent that is in excess of the maximum amount permitted by law, (iii) any such excess interest that may have been collected shall be, at the option of the holder of the instrument evidencing the Obligations, either applied as a credit against the then unpaid principal amount thereof or refunded to the maker thereof, and (iv) the effective rate of interest shall be automatically reduced to the maximum lawful rate under applicable usury laws as now or hereafter construed by the courts having jurisdiction.

**2.   Joint and Several Responsibility; References to Debtors.**  If this Security Agreement is executed by more than one Debtor, the obligations of all such Debtors shall be joint and several and references to the Debtor shall mean all Debtors (or any of them).

**3.   Severability.** Any provision hereof found to be invalid by courts having jurisdiction shall be invalid only with respect to such provision (and then only to the extent necessary to avoid such invalidity).  The offending provision shall be modified to the maximum extent possible to confer upon Secured Party the benefits intended thereby.  Such provision as modified and the remaining provisions hereof shall be construed and enforced to the same effect as if such offending provision (or portion thereof) had not been contained herein, to the maximum extent possible.

**4.   Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**5.   Use of Copies.**  Any carbon, photographic or other reproduction of any financing statement signed by Debtor is sufficient as a financing statement for all purposes, including without limitation, filing in any state as may be permitted by the provisions of the Uniform Commercial Code of such state.

**6.   Relationship to Other Agreements.**  This Security Agreement and the security interests (and pledges and assignments as applicable) herein granted are in addition to (and not in substitution, novation or discharge of) any and all prior to contemporaneous security agreements, security interests, pledges, assignments, liens, rights, titles or other interests in favor of Secured Party or assigned to Secured Party by others in connection with the Obligations.  All rights and remedies of Secured Party in all such agreements are cumulative, but in the event of actual conflict in terms and conditions, the terms and conditions of this Agreement shall govern and control.

**7.    Notices.**  Any notice or demand given by Secured Party to Debtor in connection with this Agreement, the Collateral or the Obligations, shall be deemed given and effective upon deposit in the United States mail, postage prepaid, addressed to Debtor at the address of Debtor designated at the beginning of this Agreement.  Actual notice to Debtor shall always be effective no matter how given or received.

**8.    Headings and Gender.**  Paragraph headings in this Agreement are for convenience only and shall be given no meaning or significance in interpreting this Agreement.  All words used herein shall be construed to be of such gender or number as the circumstances require.

**9.    Amendments.**  Neither this Agreement nor any of its provisions may be changed, amended, modified, waived or discharged orally, but only by an instrument in writing signed by the Party against whom enforcement of the change, amendment, modification, wavier or discharge is sought.

**10.    Continuing Agreement.**  The security interest (and pledges and assignments as applicable) hereby granted and all of the terms and provisions in this Agreement shall be deemed a continuing agreement and shall continue in full force and effect until terminated in writing.  Any such revocation or termination shall only be effective if explicitly confirmed in a signed writing issued by Secured Party to such effect and shall in no way impair or affect any transactions entered into or rights created or Obligations incurred or arising prior to such revocation or termination, as to which this Agreement shall be fully operative until same are repaid and discharged in full.  Unless otherwise required by applicable law, Secured Party shall be under no obligation to issue a termination statement or similar documents unless Debtor requests same in writing and, provided further, that all Obligations have been repaid and discharged in full and there are no commitments to make advances, incur any Obligations or otherwise give value.

**11.    Binding Effect.**  The provisions of this Security Agreement shall be binding upon the heirs, personal representatives, successors and assigns of Debtor and the rights, powers and remedies of Secured Party hereunder shall enure to the benefit of the successors and assigns of Secured Party.

**12.    Governing Law.**  This Agreement shall be governed by the law of the State of Texas and applicable federal law.

**13.    Intentionally deleted.**

**14.    Construction.**  The parties hereto acknowledge that each of them has had the benefit of legal counsel of its own choice and has been afforded an opportunity to review this Agreement and the other Loan Documents with its legal counsel.

**15.    Indemnification.**  DEBTOR AGREES TO PAY AND TO SAVE SECURED PARTY HARMLESS FROM ANY AND ALL LIABILITIES AND REASONABLE COSTS AND EXPENSES (INCLUDING, WITHOUT LIMITATION, LEGAL FEES AND EXPENSES), (I) WITH RESPECT TO, OR RESULTING FROM, ANY DELAY IN

PAYING, ANY AND ALL EXCISE, SALES OR OTHER TAXES WHICH MAY BE PAYABLE OR DETERMINED TO BE PAYABLE WITH RESPECT TO ANY OF THE COLLATERAL, (II) WITH RESPECT TO, OR RESULTING FROM, ANY DELAY IN COMPLYING WITH ANY GOVERNMENTAL REQUIREMENTS APPLICABLE TO ANY OF THE COLLATERAL OR (III) IN CONNECTION WITH ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, UNLESS SECURED PARTY IS GROSSLY NEGLIGENT OR ENGAGES IN ANY WILLFUL MISCONDUCT. THIS INDEMNITY IS INTENDED TO COVER SECURED PARTY'S ORDINARY NEGLIGENCE.

    **16.   Expenses.** Debtor will pay to Secured Party at Secured Party's offices, all charges, costs and expenses (including reasonable attorneys' fees and legal expenses) incurred by Secured Party in connection with protecting Secured Party against the claims or interests of any third party against the Collateral, in exercising any right, power or remedy conferred by this Agreement or by law or in equity and/or in protecting and preserving the Collateral. The amount of all such charges, costs and expenses shall be due and payable by Debtor to Secured Party upon demand together with interest thereon at the highest rate allowed by applicable law. Debtor shall reimburse Secured Party for the cost of periodic Uniform Commercial Code conducted by the Secured Party to verify the first lien priority of Secured Party's security interest in the Collateral, and to verify that no other financing statements have been filed against the Collateral.

    **17.   Entire Agreement; Amendment.** THE PARTIES HERETO EXPRESSLY ACKNOWLEDGE AND AGREE, THAT WITH REGARD TO THE SUBJECT MATTER OF THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREIN: (1) THERE ARE NO ORAL AGREEMENTS BETWEEN THE PARTIES HERETO AND (2) THIS AGREEMENT, INCLUDING THE DEFINED TERMS AND ALL EXHIBITS AND ADDENDA, IF ANY, ATTACHED HERETO: (a) EMBODIES THE FINAL AND COMPLETE AGREEMENT BETWEEN THE PARTIES; (b) SUPERSEDES ALL PRIOR AND CONTEMPORANEOUS NEGOTIATIONS, OFFERS, PROPOSALS, AGREEMENTS, COMMITMENTS, PROMISES, ACTS, CONDUCT, COURSE OF DEALING, REPRESENTATIONS, STATEMENTS, ASSURANCES AND UNDERSTANDINGS, WHETHER ORAL OR WRITTEN; AND (c) MAY NOT BE VARIED OR CONTRADICTED BY EVIDENCE OF ANY SUCH PRIOR OR CONTEMPORANEOUS MATTER OR BY EVIDENCE OF ANY SUBSEQUENT ORAL AGREEMENT OF THE PARTIES HERETO.

**SIGNATURE PAGE**
**COMMERCIAL SECURITY AGREEMENT**

EXECUTED this _26th_ day of July, 2002.

DAVCRANE INC.

By:_____
        Daniel E. Davis, President

Exhibit A - Description of Real Property

---

**Exhibit "A"**

**Real Property**

Lot Number One (1), Block Number One (1), Texas Pipe Bending Subdivision, City of Harlingen, Cameron County, Texas according to the Map recorded in Cabinet 1, Pages 384-A and 384-B Map Records of Cameron County, Texas.

# COMMERCIAL SECURITY AGREEMENT

Dated: July 15, 2002

| **Debtor** | **Secured Party** |
|---|---|
| DANIEL E. DAVIS | FINNING INTERNATIONAL INC. |
| San Benito, Texas | 16830-107TH Avenue |
| w/copy to | Edmonton, Alberta T5P 4C3 |
| P.O. Box 2427 | Canada |
| Harlingen, Texas 78551 | |
| (hereinafter "**Debtor**") | (hereinafter "**Secured Party**") |

FOR VALUE RECEIVED, the receipt and sufficiency of which is hereby acknowledged, Debtor grants to Secured Party first priority security interest (and the pledges and assignments as applicable) in, to and under the collateral as hereinafter set forth and agrees with Secured Party as follows:

    **A.**    **OBLIGATIONS SECURED.** The security interest and pledges and assignments as applicable granted hereby are to secure punctual payment and performance of the following: (i) the loan ("**Loan**") represented by that certain promissory note (the "**Note**") of even date herewith in the original principal sum of $1,500,000.00, executed by Davcrane Inc. ("**Davcrane**") and payable to the order of Secured Party, and any and all advances, extensions, renewals, increases, modifications, replacements, and rearrangements thereof; (ii) all indebtedness, liabilities, and obligations whatsoever of the Debtor pursuant to that certain Security Agreement executed by Davcrane in favor of Lender ("**Davcrane Security Agreement**") and that certain Deed of Trust, Assignment of Rents, Security Agreement and Financing Statement (the "**Deed of Trust**") by Davcrane for the benefit of Secured Party, and all other documents securing or executed in connection with this Commercial Security Agreement ("**Agreement**"), the Note, the Deed of Trust and/or the Davcrane Security Agreement (collectively, with this Agreement, the Note, the Davcrane Security Agreement and the Deed of Trust, the "**Loan Documents**") and all future advances, renewals, extensions, increases, modifications, amendments, supplements, restatements, and replacements thereof, (all of which are herein separately and collectively referred to as the "**Obligations**"). Debtor acknowledges that the security interest (and pledges and assignments as applicable) hereby granted shall secure all future advances as well as any and all other indebtedness, liabilities and obligations of Debtor to Secured Party whether now in existence or hereafter arising.

    **B.**    **USE OF COLLATERAL.** Debtor represents, warrants and covenants that the Collateral will be used by the Debtor primarily for business use.

**C.    DESCRIPTION OF COLLATERAL.** Debtor hereby grants to Secured Party a security interest in and hereby pledges and assigns and agrees that Secured Party shall continue to have a security interest in and a pledge and assignment of, the following property, to-wit:

**1.    General Intangibles.** A security interest in and pledge and assignment of all of Debtor's now owned or hereafter acquired or arising general intangibles directly related to the Product Line (as hereinafter defined) or the assembly of the Product Line and payment intangibles related thereto including, without limitation, any interest in the following: all of the property and proprietary know-how, including any patents, patent rights, patent applications, drawings (including assembly drawings), and other intellectual property rights used by Debtor in relation to the Product Line or the assembly of the Product Line, including without limitation the items described in the attached **Exhibit A** and any present or future improvements or enhancements thereto (collectively, the "**Technology**") and all income, proceeds, money, deposits, issues, accounts receivable, payment intangibles, chattel paper and profits arising from or related to (i) the Technology, (ii) any licenses relating to the Technology, including, without limitation, all rights derived from that certain non-exclusive license granted by Assignor to Favelle Favco Cranes (USA) Inc. relating to U.S. Patent No. 6,003,252, and/or (iii) the Distributor Agreement of even date between Debtor and Secured Party ("**Distributor Agreement**"). Debtor expressly pledges and assigns to Secured Party its right to sue for past, present and future infringement relating to the General Intangibles. The term "**Product Line**" as used herein means telehandler all-terrain cranes, lattice and telescopic boomed crawler cranes, excavator based pipelayers and related equipment or products, and includes any current or future similar products, but specifically excludes any maritime or offshore products.

**2.    Royalties and Other Accounts.** A security interest in all of Debtor's now owned or hereafter acquired or arising royalties, income, proceeds, money, deposits, issues, accounts, accounts receivable, payment intangibles, chattel paper and profits arising from or directly related to (i) the Technology, (ii) any licenses relating to the Technology, including, without limitation, all rights derived from that certain non-exclusive license granted by Assignor to Favelle Favco Cranes (USA) Inc. relating to U.S. Patent No. 6,003,252; and (iii) the Distributor Agreement.

The term "Collateral" as used in this Agreement shall mean and include, and the security interest (and pledge and assignment as applicable) shall cover, all of the foregoing property, as well as any accessions, additions and attachments thereto and the proceeds and products thereof, including without limitation, all cash, depository accounts, general intangibles, accounts, inventory, equipment, fixtures, farm products, notes, drafts, acceptances, securities, instruments, chattel paper, insurance proceeds payable because of loss or damage, or other property, benefits or rights arising therefrom, and in and to all returned or repossessed goods arising from or relating to any of the property described herein or other proceeds of any sale or other disposition of such property.

**D.    REPRESENTATIONS, WARRANTIES AND COVENANTS OF DEBTOR.** Debtor represents and warrants as follows:

1.     **Ownership: No Encumbrances.** Except for the security interest (and pledges and assignments as applicable) granted hereby and that certain non-exclusive license granted by Debtor to Favelle Favco Cranes (USA) Inc. relating to U.S. Patent No. 6,003,252 ("**Favelle License**"), the Debtor is, and as to any property acquired after the date hereof which is included within the Collateral, Debtor will be, the owner of all such Collateral free and clear from all charges, liens, security interests, adverse claims and encumbrances of any and every nature whatsoever.

2.     **No Financing Statements.** There are no financing statements or similar filings now on file in any public office covering any part of the Collateral, and Debtor will not execute and there will not be on file in any public office any financing statement or similar filing except the financing statements filed or to be filed in favor of Secured Party.

3.     **Accuracy of Information.** All information furnished to Secured Party concerning Debtor, the Collateral and the Obligations, or otherwise for the purpose of obtaining or maintaining credit, is or will be at the time the same is furnished, accurate and complete in all material respects.

4.     **Authority.** Debtor has full right and authority to execute and perform this Agreement and to create the security interest (and pledges and assignment as applicable) created by this Agreement.   The making and performance by Debtor of this Agreement will not violate any agreements of Debtor, any provision of law, any order of court or governmental agency, or any indenture or other agreement to which Debtor is a party, or by which Debtor or any of Debtor's property is bound, or be in conflict with, result in a breach of or constitute (with due notice and/or lapse of time) a default under any such indenture or other agreement, or result in the creation or imposition of any charge, lien, security interest, claim or encumbrance of any and every nature whatsoever upon the Collateral, except as contemplated by this Agreement.

5.     **Name and Addresses.** Debtor's exact legal name (as indicated on official records) is as set forth in the first paragraph of this Agreement.  Other than "Daniel E. Davis," Debtor has not used any other name or trade name.  The address of Davis designated at the beginning of this Agreement is Debtor's principal residence.  Debtor agrees not to change such address without advance written notice to Secured Party.

6.     **Perfection of Security Interests.** Debtor authorizes Secured Party, its counsel or its representative to file Financing Statements (the "**Financing Statements**") describing the Collateral in any jurisdiction, including in the U.S. Patent & Trademark Office, where it may be required or desirable in order to perfect Secured Party's security interest in the Collateral.  In the event the Debtor obtains patent and other registrations and protections on the Collateral in foreign jurisdictions, Debtor authorizes Secured Party, its counsel or its representative to file any necessary documents in order to perfect Secured Party's security interest in the Collateral in such jurisdiction, and agrees to execute and deliver to Secured Party such documentation as is reasonably necessary to perfect the Secured Party's interest in such jurisdiction. Debtor further authorizes Secured Party, its counsel or its representative, at any time and from time to time, to file continuation statements with respect to previously filed Financing Statements. Prior to closing but not later than August 8, 2002,

Secured Party shall receive uniform commercial code searches from each jurisdiction where the filing of Financing Statements is necessary to perfect the Secured Party's interest in the Collateral, indicating that the Collateral is free and clear from all other liens and security interests and that the Secured Party's security interest in the Collateral is a first priority security interest.

**7.     Limited License.** Upon an Event of Default and subject to the Distributor Agreement, Debtor irrevocably grants Secured Party a non-exclusive license to use all present and future General Intangibles, together with any good will associated therewith, in connection with the maintenance, preservation, preparation, sale, disposition, collection, foreclosure, or other realization of, upon, or with respect to the Collateral. Notwithstanding the foregoing, upon an Event of Default, Secured Party's rights with respect to such license shall be deemed fully prepaid, and no royalties or other compensations shall be payable by Secured Party to Debtor with respect to such license.

**E.     GENERAL COVENANTS. Debtor covenants and agrees as follows:**

**1.     Operation of the Collateral.** Debtor agrees to maintain and use the Collateral solely in the conduct of its own business, in a careful and proper manner, and in conformity with all applicable permits or licenses. Debtor has the risk of loss of the Collateral. Debtor shall comply in all respects with all applicable statutes, laws, ordinances and regulations. Debtor shall not use the Collateral in any unlawful manner or for any unlawful purposes, or in any manner or for any purpose that would expose the Collateral to unusual risk, or to penalty, forfeiture or capture, or that would render inoperative any insurance in connection with the Collateral.

**2.     Condition.** Debtor shall obtain and maintain in good standing at all times all applicable permits, licenses, registrations and certificates respecting the Collateral.

**3.     Assessments.** Debtor shall promptly pay when due all taxes, assessments, license fees, registration fees, and governmental charges levied or assessed against Debtor or with respect to the Collateral or any part thereof.

**4.     No Encumbrances.** Debtor agrees not to suffer or permit any charge, lien, security interest, adverse claim or encumbrance of any and every nature whatsoever against the Collateral or any part thereof.

**5.     Agreement as to Maker of Note.** Debtor hereby acknowledges pursuant to the terms of the Distributor Agreement Secured Party was to make available to Debtor and Debtor was to borrow from Secured Party up to the principal amount of $1,500,000.00. At the request of the Debtor, Secured Party has made the loan to Davcrane as evidenced by the Note executed by Davcrane and payable to Secured Party and Debtor has executed a Guaranty Agreement of even date herewith guaranteeing the Note.

**6.     No Transfer.** Debtor shall not, without the prior written consent of Secured Party, sell, assign, transfer, lease, charter, encumber, hypothecate or dispose of the Collateral, or any part

thereof, or interest therein, or offer to do any of the foregoing. Debtor shall not grant any license to use any of the Collateral except for the existing Favelle License and any license granted to Secured Party.

**7.    Notices and Reports.** Debtor shall promptly notify Secured Party in writing of any change in the name, identity or structure of Debtor, any charge, lien, security interest, claim or encumbrance asserted against the Collateral, any litigation against Debtor or the Collateral, any theft, loss, injury or similar incident involving the Collateral, and any other material matter adversely affecting Debtor or the Collateral. Debtor shall furnish such other reports, information and data regarding Debtor's financial condition and operations, the Collateral and such other matters as Secured Party may request from time to time.

**8.    Intentionally deleted.**

**9.    Additional Requirements.** Debtor will from time to time sign, execute, deliver and file, alone or with Secured Party, upon reasonable request, any necessary financing statements, security agreements or other documents; procure any necessary instruments or documents as may be reasonably requested by Secured Party; and take all further action that Secured Party may reasonably request to confirm, perfect, preserve and protect the security interests intended to be granted hereby. At the option of Secured Party, a carbon, photographic or other reproduction of this Agreement or of a financing statement covering the Collateral shall be sufficient as a financing statement and may be filed as a financing statement. Upon the request of Secured Party, Debtor shall take or cause to be taken all actions (other than any actions required to be taken by Secured Party) necessary to cause Secured Party to have "control" over any proceeds of the Collateral constituting deposit accounts, electronic chattel paper, or letter-of-credit rights, and Debtor shall promptly notify Secured Party of Debtor's acquisition of any such Collateral.

**10.    Protection of Collateral.** Secured Party, at its option, whether before or after default, but without any obligation whatsoever to do so, may (a) discharge taxes, claims, charges, liens, security interests, assessments or other encumbrances of any and every nature whatsoever at any time levied, placed upon or asserted against the Collateral, (b) place and pay for insurance on the Collateral, including insurance that only protects Secured Party's interest, (c) pay for the repair, improvements, testing, maintenance and preservation of the Collateral, (d) pay any filing, recording, registration, licensing or certification fees or other fees and charges related to the Collateral, or (e) take any other action to preserve and protect the Collateral and Secured Party's rights and remedies under this Agreement as Secured Party may deem reasonably necessary or appropriate. Debtor agrees that Secured Party shall have no duty or obligation whatsoever to take any of the foregoing action. Debtor agrees to promptly reimburse Secured Party upon demand for any payment made or any expense incurred by the Secured Party pursuant to this authorization. These payments and expenditures, together with interest thereon from date incurred until paid by Debtor at the maximum contract rate allowed under applicable laws, which Debtor agrees to pay, shall constitute additional Obligations and shall be secured by and entitled to the benefits of this Agreement.

11.    **Records.** Debtor will keep and maintain at its own cost and expense satisfactory and complete records of the Collateral, including, without limitation, a record of all payments received and all credits granted with respect to the Secured Accounts. For Secured Party's further security, Secured Party shall have a security interest in all of Debtor's books and records pertaining to the Collateral, and Debtor shall turn over any such books and records to Secured Party or to its representatives during normal business hours at the request of Secured Party.

12.    **Further Assurances.** Debtor shall do, make, procure, execute and deliver all such additional and further acts, things, deeds, interests and assurances as Secured Party may reasonably require from time to time to protect, assure and enforce Secured Party's rights and remedies.

13.    **Intentionally deleted.**

14.    **Additional Representations and Warranties.** Debtor represents and warrants to Secured Party that the General Intangibles are genuine, valid, legally enforceable, free from default by Debtor, prepayment, counterclaims, offsets, and defenses that would affect any material portion thereof, and Debtor holds all rights thereunder.

15.    **Modifications to General Intangibles.** Debtor shall not, without the prior written consent of Secured Party, (i) reduce or discount any payment required to be made to Debtor under the Favelle License, any other license granted or any other Collateral; (ii) amend, modify, or otherwise change any provision of the General Intangibles or any other Collateral; (iii) waive any condition or obligation, or the performance or observation of any condition or obligation, under the General Intangibles or any other Collateral; or (iv) terminate any ownership interest in the General Intangibles or any other Collateral. In the event Debtor possesses any future inventions and patents related to the Product Line or the assembly of the Product Line, Debtor agrees to notify Secured Party within ten (10) business days of the filing of any patent application and shall execute all necessary documents to reflect the Secured Party's security interest therein.

16.    **Obligations of Secured Party.** Nothing herein contained shall be construed to constitute Debtor as the agent of Secured Party for any purpose whatsoever. Secured Party does not by anything contained herein or in any assignment or otherwise, assume any of Debtor's obligations or any liability under the Contracts or any other agreements assigned to Secured Party, and Secured Party shall not be responsible in any way for the performance by Debtor of any of the terms and conditions thereof.

17.    **No Collection Obligation.** Secured Party has no duty to collect any income accruing on the Collateral or to preserve any rights relating to the Collateral. The powers conferred upon Secured Party by this Agreement are solely to protect the interest of Secured Party in the Collateral and shall not impose any duty upon Secured Party to exercise any such powers. Secured Party shall be under no duty whatsoever to make or give (and Debtor does hereby waive) any presentment, demand for performance, notice of nonperformance, protest, notice of protest, notice of dishonor, or

other notice or demand in connection with any Collateral or the Obligations, or to take any steps necessary to preserve any rights against other parties. Secured Party shall not be liable for failure to collect or realize upon any or all of the Obligations or Collateral, or for any delay in so doing and shall have no duty to perform Debtor's obligations.

    **18.   Debtor Remains Liable.** Subject to the terms of the Distributor Agreement (prior to an Event of Default) and this Agreement, Secured Party shall not have any obligation or liability with respect to any Collateral (or any agreement giving rise thereto) by reason of or arising out of this Agreement or the receipt by Secured Party of any payment relating to any Collateral, nor shall Secured Party be obligated in any manner to perform any of the obligations of Debtor under or pursuant to any Collateral (or any agreement giving rise thereto), to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party under any Collateral (or any agreement giving rise thereto), to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

    **F.     EVENTS OF DEFAULT.** The following events ("**Events of Default**") shall constitute Events of Default under this Agreement if such event or failure remains uncured following thirty (30) Business Days (defined as any day other than Saturday, Sunday or statutory holiday) written notice of such default and opportunity to cure from Secured Party to the Debtor:

    **1.**     Default shall be made in the payment of any installment of principal or interest upon the Note or any other obligation of Debtor to Secured Party when due and payable; or

    **2.**     Default shall be made in the performance of any terms, covenant or agreement contained herein or in any other Loan Document; or

    **3.**     Any representation or warranty herein contained in any other Loan Document shall prove to have been incorrect or misleading in any material respect when made; or

    **4.**     Debtor or any guarantor makes an assignment for the benefit of creditors, admits in writing its inability to pay its debts generally as they become due, files a petition in bankruptcy, is adjudicated insolvent or bankrupt, petitions or applies to any tribunal for any receiver or any trustee of Debtor or any guarantor or any substantial part of its property, commences any action relating to Debtor or any guarantor under any reorganization, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect, or if there is commenced against Debtor or any guarantor any such action, or Debtor or any guarantor by any act indicates its consent to or approval of any trustee for Debtor or any guarantor of any substantial part of its property, or suffers any such receivership or trustee to continue undischarged;

Upon the occurrence of an Event of Default: (i) the Secured Party, at its option, may declare the Note, and all outstanding principal, accrued interest and other sums outstanding thereon,

immediately due and payable without demand, presentment, notice of dishonor, protest, notice of intent to accelerate, notice of acceleration and diligence in collecting sums due hereunder, all of which are waived by Debtor; (ii) proceed to enforce its interest in the Collateral with all proceeds being retained or paid over to Secured Party for application on the Obligations in the order and priority chosen by Secured Party in its sole discretion; and (iii) Secured Party shall have all rights and remedies available to a secured party under the Texas Business and Commerce Code and other applicable law.

## G.    REMEDIES UPON DEFAULT.

1.    **General.**  Upon the occurrence and during the continuance of any Event of Default, Secured Party may, by written notice to Debtor, declare the entire unpaid amount (including, if applicable, any unpaid accrued interest) of the Obligations to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest, notice of protest or dishonor, notice of acceleration, notice of intent to accelerate or other notice of any kind, all of which are hereby expressly waived by Debtor, and thereupon take such action as Secured Party may deem desirable. If any Event of Default shall occur and be continuing Secured Party may, in addition to all other rights and remedies granted to it in this Agreement and in any other instrument or agreement securing, evidencing or relating to the Obligations exercise all rights and remedies of a secured party under the UCC.

2.    **Remedies.**  Upon any Event of Default, Secured Party shall have the right to pursue any of the following remedies separately, successively or simultaneously:

(i)    File suit and obtain judgment and, in conjunction with any action, Secured Party may seek any ancillary remedies provided by law, including levy of attachment and garnishment.

(ii)    Without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon Debtor or any other person (all and each of which demands, defenses, advertisements and notices are hereby waived), Secured Party shall have the following additional rights and remedies:

(a)    to exercise any and all rights as beneficial and legal owner of the Collateral, including, without limitation, any and all consensual rights and powers with respect thereto;

(b)    to sell, assign, make or use or grant a license or franchise to use, or granted a license or franchise to use, any or all of the Collateral, free of all rights and claims of the Debtor therein and thereto on such terms and conditions as the Secured Party may determine but subject to the right of reversion described in Section I, Paragraph 13 hereof;

(c)   the Debtor will promptly (and in any event within three (3) business days) deliver, upon request of the Secured Party, to the Secured Party or its designee an assignment of the Collateral, duly executed by the Debtor.

(iii)   Secured Party (without the necessity of any further consent or authorization from Debtor) and Debtor hereby constitutes, appoints and makes Secured Party as Debtor's true and lawful attorney-in-fact and agent for Debtor and in Debtor's name, place and stead with full power of substitution, in Secured Party's name or Debtor's name or otherwise, for Secured Party's sole use and benefit, but at Debtor's cost and expense, to exercise, without notice, all or any of the following powers at any time with respect to all or any of the Collateral:

(a)   to demand, sue for, collect, receive and give acquittance for any and all monies due or to become due by virtue thereof and otherwise deal with proceeds;

(b)   to receive, take, endorse, assign and deliver any and all checks, notes, drafts, documents and other negotiable and non-negotiable instruments and chattel paper representing proceeds of the Collateral taken or received by Secured Party in connection therewith;

(c)   to settle, compromise, compound, prosecute or defend any action or proceeding with respect thereto;

(d)   to sell, transfer, assign or otherwise deal in or with the same or the proceeds or avails thereof or the relative goods, as fully and effectively as if Secured Party were the absolute owner thereof;

(e)   to extend the time of payment of any or all thereof and to grant waivers and make any allowance or other adjustment with reference thereto; and

(f)   if Debtor fails to comply with its obligations hereof, to pay or discharge taxes and liens levied or placed on or threatened against the Collateral;

(g)   may take any action necessary to obtain, preserve and enforce the liens granted under this Security Agreement and maintain and preserve the Collateral.

provided, however, Secured Party shall be under no obligation or duty to

exercise any of the powers hereby conferred upon it and shall be without liability for any act or failure to act in connection with the collection of, or the preservation of any rights under, any Collateral and otherwise deal with proceeds. Debtor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof. The foregoing power of attorney, and all other authorizations and agencies herein contained with respect to the Collateral, are irrevocable and powers coupled with an interest.

(iv)   Upon written request of the Debtor, Secured Party shall (i) provide written notice of Debtor's rights of reversion (as described in Section I, Paragraph 13 herein) or redemption to any third party with whom Secured Party deals in relation to the Collateral, and (ii) dispose of or deal with the Collateral only subject to Debtor's right of reversion or redemption of such Collateral.

## H.   FORECLOSURE PROCEDURES.

1.   **Waivers.**   Secured Party shall not by any act, delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any default or Event of Default or in any breach of any of the terms and conditions hereof. No failure to exercise, nor any delay in exercising, on the part of Secured Party of any right, power or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver by Secured Party of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which Secured Party would otherwise have on any future occasion. The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any rights or remedies provided by law. To the extent permitted by applicable law, Debtor waives all claims, damages and demands it may acquire against Secured Party arising out of the exercise by it of any rights hereunder except to the extent any thereof arise solely from the willful misconduct of Secured Party.

2.   **Notices.**   Secured Party shall give Debtor such notice of any private or public sale as may be required by the UCC. Twenty (20) days notice shall be considered commercially reasonable for any notices given under this Section.

3.   **Condition of Collateral.**   Secured Party has no obligation to prepare the Collateral for licensing or other disposition. Secured Party's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the UCC or otherwise, shall be to deal with it in the same manner as Secured Party deals with similar property for its own account. Neither Secured Party nor any of its directors, officers, members, managers, employees or agents shall be liable for failure to demand, collect or realize upon all or any part of the Collateral or for any delay in doing so or shall be under any obligation to sell, license or otherwise dispose of any Collateral upon the request of Debtor or otherwise.

4.   **No Obligation to Pursue Others.**   Secured Party has no obligation to attempt to

satisfy the Obligations by collecting them from any other person liable for them and Secured Party may release, modify or waive any Collateral provided by any other person to secure any of the Obligations, all without affecting Secured Party's rights against Debtor. Debtor waives any right it may have to require Secured Party to pursue any third person for any of the Obligations.

5.    **Compliance With Other Laws.**  Secured Party may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

6.    **Warranties.**  Secured Party may sell or license the Collateral (subject to the right of reversion) without giving any warranties as to the Collateral. Secured Party may specifically disclaim any warranties of title or the like. This procedure will not be considered to adversely affect the commercial reasonableness of any license of the Collateral.

7.    **Licensing on Credit.**  If Secured Party sells or licenses any of the Collateral (subject to the right of reversion) upon credit, Debtor will be credited only with payments actually made by the purchaser, received by Secured Party and applied to the indebtedness of the purchaser. In the event the purchaser fails to pay for the Collateral, Secured Party may resell or relicense the Collateral (subject to the right of reversion) and Debtor shall be credited with the proceeds thereof.

8.    **Purchases by Secured Party.**  In the event Secured Party purchases any of the Collateral being transferred, Secured Party may pay for the Collateral by crediting some or all of the Obligations of the Debtor.

9.    **No Marshaling.**  Secured Party shall have no obligation to marshal any assets in favor of Debtor, or against or in payment of any of the Obligations, or any other obligation owed to Secured Party by Debtor or any other person.

10.    **Proceeds of Sale.**  Secured Party shall apply the net proceeds of any collection, recovery, receipt, appropriation, realization, sale or license of the Collateral, after deducting all reasonable costs and expenses of every kind incurred therein or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of Secured Party hereunder, including, without limitation, reasonable attorneys' fees and disbursements, to the payment in whole or in part of the Obligations, in such order as Secured Party may elect, and only after such application and after the payment by Secured Party of any other amount required by any provision of law, including, without limitation, Section 9-615 of the UCC, need Secured Party account for the surplus, if any, to Debtor.

11.    **Deficiency.**  Debtor shall remain liable to Secured Party for any unpaid Obligations, advances, costs, charges and expenses, together with interest thereon and shall pay the same immediately to Secured Party at Secured Party's offices.

## I.    OTHER AGREEMENTS.

**1.    Savings Clause.** Notwithstanding any provision to the contrary herein, or in any of the documents evidencing the Obligations or otherwise relating thereto, no such provision shall require the payment or permit the collection of interest in excess of the maximum permitted by applicable usury laws. If any such excessive interest is provided for, then in such event (i) the provisions of this paragraph shall govern and control, (ii) neither the Debtor nor its respective successors or assigns or any other party liable for the payment thereof, shall be obligated to pay the amount of such interest to the extent that is in excess of the maximum amount permitted by law, (iii) any such excess interest that may have been collected shall be, at the option of the holder of the instrument evidencing the Obligations, either applied as a credit against the then unpaid principal amount thereof or refunded to the maker thereof, and (iv) the effective rate of interest shall be automatically reduced to the maximum lawful rate under applicable usury laws as now or hereafter construed by the courts having jurisdiction.

**2.    Joint and Several Responsibility; References to Debtors.** If this Security Agreement is executed by more than one Debtor, the obligations of all such Debtors shall be joint and several and references to the Debtor shall mean all Debtors (or any of them).

**3.    Severability.** Any provision hereof found to be invalid by courts having jurisdiction shall be invalid only with respect to such provision (and then only to the extent necessary to avoid such invalidity). The offending provision shall be modified to the maximum extent possible to confer upon Secured Party the benefits intended thereby. Such provision as modified and the remaining provisions hereof shall be construed and enforced to the same effect as if such offending provision (or portion thereof) had not been contained herein, to the maximum extent possible.

**4.    Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**5.    Use of Copies.** Any carbon, photographic or other reproduction of any financing statement signed by Debtor is sufficient as a financing statement for all purposes, including without limitation, filing in any state as may be permitted by the provisions of the Uniform Commercial Code of such state.

**6.    Relationship to Other Agreements.** This Security Agreement and the security interests (and pledges and assignments as applicable) herein granted are in addition to (and not in substitution, novation or discharge of) any and all prior to contemporaneous security agreements, security interests, pledges, assignments, liens, rights, titles or other interests in favor of Secured Party or assigned to Secured Party by others in connection with the Obligations. All rights and remedies of Secured Party in all such agreements are cumulative, but in the event of actual conflict in terms and conditions, the terms and conditions of this Agreement shall govern and control.

7.    **Notices.** Any notice or demand given by Secured Party to Debtor in connection with this Agreement, the Collateral or the Obligations, shall be deemed given and effective upon deposit in the United States mail, postage prepaid, addressed to Debtor at the address of Debtor designated at the beginning of this Agreement. Actual notice to Debtor shall always be effective no matter how given or received.

8.    **Headings and Gender.** Paragraph headings in this Agreement are for convenience only and shall be given no meaning or significance in interpreting this Agreement. All words used herein shall be construed to be of such gender or number as the circumstances require.

9.    **Amendments.** Neither this Agreem.nt nor any of its provisions may be changed, amended, modified, waived or discharged orally, but only by an instrument in writing signed by the Party against whom enforcement of the change, amendment, modification, wavier or discharge is sought.

10.    **Continuing Agreement.** The security interest (and pledges and assignments as applicable) hereby granted and all of the terms and provisions in this Agreement shall be deemed a continuing agreement and shall continue in full force and effect until terminated in writing. Any such revocation or termination shall only be effective if explicitly confirmed in a signed writing issued by Secured Party to such effect and shall in no way impair or affect any transactions entered into or rights created or Obligations incurred or arising prior to such revocation or termination, as to which this Agreement shall be fully operative until same are repaid and discharged in full. Unless otherwise required by applicable law, Secured Party shall be under no obligation to issue a termination statement or similar documents unless Debtor requests same in writing and, provided further, that all Obligations have been repaid and discharged in full and there are no commitments to make advances, incur any Obligations or otherwise give value.

11.    **Binding Effect.** The provisions of this Security Agreement shall be binding upon the heirs, personal representatives, successors and assigns of Debtor (and each of them) and the rights, powers and remedies of Secured Party hereunder shall enure to the benefit of the successors and assigns of Secured Party.

12.    **Governing Law.** This Agreement shall be governed by the law of the State of Texas and applicable federal law.

13.    **Right of Reversion.** In the Event of Default and in the event Secured Party takes any action whatsoever in relation to the Technology or has foreclosed or has otherwise alienated or transferred all or any part of the Technology, Debtor shall have an ongoing automatic right of reversion as to the Technology (only) which shall be effective for a period of 10 years from the date of the Event of Default or earlier if the Debtor satisfies the Obligations in full ("**Reversion Period**") under the terms and conditions herein set forth. If at any time during the Reversion Period, Debtor satisfies the Obligations in full, the exclusive license, ownership and/or exclusive use of the Technology (only) will automatically revert to Davis. Secured Party agrees to execute such

documents and take further steps as may be reasonably required to perfect this reversion of ownership at that time. This reversion right shall not apply to any other Collateral and may not be assigned. If at any time during the Reversion Period Debtor fails to satisfy the Obligations in full and Secured Party exercises any rights as Secured Party in relation to the Technology (only), the exclusive ownership and exclusive use of the Technology (only) will nevertheless automatically revert to Davis upon the end of the Reversion Period subject to and in accordance with the Distributor Agreement. In the event of a conflict between this Section 13 and Section 6.7(a)(ii) of the Distributor Agreement, the terms of this Section 13 shall control.

14.    **Construction.** The parties hereto acknowledge that each of them has had the benefit of legal counsel of its own choice and has been afforded an opportunity to review this Agreement and the other Loan Documents with its legal counsel.

15.    **Indemnification. DEBTOR AGREES TO PAY AND TO SAVE SECURED PARTY HARMLESS FROM ANY AND ALL LIABILITIES AND REASONABLE COSTS AND EXPENSES (INCLUDING, WITHOUT LIMITATION, LEGAL FEES AND EXPENSES), (I) WITH RESPECT TO, OR RESULTING FROM, ANY DELAY IN PAYING, ANY AND ALL EXCISE, SALES OR OTHER TAXES WHICH MAY BE PAYABLE OR DETERMINED TO BE PAYABLE WITH RESPECT TO ANY OF THE COLLATERAL, (II) WITH RESPECT TO, OR RESULTING FROM, ANY DELAY IN COMPLYING WITH ANY GOVERNMENTAL REQUIREMENTS APPLICABLE TO ANY OF THE COLLATERAL OR (III) IN CONNECTION WITH ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, UNLESS SECURED PARTY IS GROSSLY NEGLIGENT OR ENGAGES IN ANY WILLFUL MISCONDUCT. THIS INDEMNITY IS INTENDED TO COVER SECURED PARTY'S ORDINARY NEGLIGENCE.**

16.    **Expenses.** Debtor will pay to Secured Party at Secured Party's offices, all charges, costs and expenses (including reasonable attorneys' fees and legal expenses) incurred by Secured Party in connection with protecting Secured Party against the claims or interests of any third party against the Collateral, in exercising any right, power or remedy conferred by this Agreement or by law or in equity and/or in protecting and preserving the Collateral. The amount of all such charges, costs and expenses shall be due and payable by Debtor to Secured Party upon demand together with interest thereon at the highest rate allowed by applicable law. Debtor shall reimburse Secured Party for the cost of periodic Uniform Commercial Code and patent searches conducted by the Secured Party to verify the first lien priority of Secured Party's security interest in the Collateral, and to verify that no other financing statements have been filed against the Collateral.

17.    **Entire Agreement; Amendment.** THE PARTIES HERETO EXPRESSLY ACKNOWLEDGE AND AGREE, THAT WITH REGARD TO THE SUBJECT MATTER OF THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREIN: (1) THERE ARE NO ORAL AGREEMENTS BETWEEN THE PARTIES HERETO AND (2) THIS AGREEMENT, INCLUDING THE DEFINED TERMS AND ALL EXHIBITS AND ADDENDA, IF ANY, ATTACHED HERETO: (a) EMBODIES THE FINAL AND COMPLETE AGREEMENT BETWEEN THE PARTIES; (b) SUPERSEDES ALL PRIOR AND CONTEMPORANEOUS NEGOTIATIONS, OFFERS, PROPOSALS, AGREEMENTS, COMMITMENTS, PROMISES,

ACTS, CONDUCT, COURSE OF DEALING, REPRESENTATIONS, STATEMENTS, ASSURANCES AND UNDERSTANDINGS, WHETHER ORAL OR WRITTEN; AND (c) MAY NOT BE VARIED OR CONTRADICTED BY EVIDENCE OF ANY SUCH PRIOR OR CONTEMPORANEOUS MATTER OR BY EVIDENCE OF ANY SUBSEQUENT ORAL AGREEMENT OF THE PARTIES HERETO.

SIGNATURE PAGE
COMMERCIAL SECURITY AGREEMENT

EXECUTED this _____ day of July, 2002.

_____
DANIEL E. DAVIS

Exhibit A -  Description of Technology

**Exhibit "A"**

**Technology**

U.S. PATENT NO. 6,003,252 ISSUED TO DANIEL E. DAVIS FOR THE PRODUCT LINE AS DEFINED IN THE DISTRIBUTOR AGREEMENT

PATENT APPLICATION ENTITLED PIPELAYER CRANE APPARATUS FOR THE PRODUCT LINE AS DEFINED IN THE DISTRIBUTOR AGREEMENT

Serial No. 60/362,675
Filing Date: March 8, 2002
Provisional Application

PATENT APPLICATION ENTITLED TELEHANDLER CRANE APPARATUS FOR THE PRODUCT LINE AS DEFINED IN THE DISTRIBUTOR AGREEMENT

Serial No. 10/094,341
Filing Date: March 8, 2002
Utility Application

PATENT APPLICATION ENTITLED UNIVERSAL EXCAVATOR BOOM ATTACHMENT FOR THE PRODUCT LINE AS DEFINED IN THE DISTRIBUTOR AGREEMENT.
Serial No. 60/365,574
Filing Date: March 19, 2002
Provisional Application

CRANE APPARATUS AND METHOD FOR THE PRODUCT LINE AS DEFINED IN THE DISTRIBUTOR AGREEMENT

Not filed; still being prepared.

**CONFIDENTIAL DESIGN AND MANUFACTURING DRAWINGS:**

**9 TON TELEHANDLER DRAWINGS:**
303 drawings bearing drawing numbers 9-2-001 to 9-6-002.
General Arrangement    9T  GA

**28 TON CRANE DRAWINGS:**
301 drawings bearing drawing numbers 28-2-001 to 28-6-009 and 5002668-001 to 5002669-023.
General Arrangement    28T  GA
Adaptor Weldment    Bill of Material    #28-5-001

| Manitex | Bill of Material | #6000740.023 |
| Braden | Bill of Material | #PD12C  (General Dimensions) |

**CIPI Group Numbers:**
- 9Q5972          Upper Structure  Bill of Material
    - 1176346        Optional  Third pedal
    - 1263784        Optional  Guard
    - 1204955        Optional  Guard
    - 1263799        Optional  High Ambient Cooling
    - 1114696        Optional  Travel alarm
- 152 8744        VG Lower Bill of Material

**38 TON CRANE DRAWINGS:**
16 drawings bearing
drawing numbers 38-4-011 to 38-5-159 and B5303.001.
General Arrangement   38T  GA

| Adaptor Weldment | Bill of Material | #38-5-100 |
| | | #38-5-130 |
| | | #38-5-129 |
| | | #38-5-142 |
| Manitex | Bill of Material | #6000740.021 |
| Braden | Bill of Material | #PD15   (General Dimensions) |

**CIPI Group Number:**
- 9Q5973          Upper Structure  Bill of Material

- 152 8744        VG Lower Bill of Material

**SIDE-BOOM (PIPELAYER) DRAWINGS:**
Same 317 drawings listed for 28/38 Ton Cranes plus additional drawings for the
A-frame and relate components.

**60 TON CRANE DRAWINGS:**
211 drawings bearing drawing numbers 20.0001.000-00 to 64.1100.000-00 and
9001.000.000-00 to 99.3000.502-000 and 9901.000.000 to 9904.000.000.
General Arrangement   5911.50.000.001.000

| Adaptor Weldment | Bill of Material | #5911.40.1100.000 |
| Braden | Bill of Material | #CH185   (General Dimensions) |

**CIPI Group Number:**
- 9Q5964          Upper Structure  Bill of Material

- 9Q5965          VG Lower Bill of Material
  (Includes 163-4828)

## UNIFORM COMMERCIAL CODE FINANCING STATEMENT
### (Texas Secretary of State)

This instrument is prepared as, and intended to be, a Financing Statement complying with the formal requirements therefor, as set forth in the Texas Uniform Commercial Code Secured Transactions.

1.    The name and address of the debtor ("Debtor") is:

>   DANIEL E. DAVIS
>   San Benito, Texas
>   P.O. Box 2427
>   Harlingen, Texas 78551

2.    The name and address of the secured party ("Secured Party") is:

>   FINNING INTERNATIONAL INC.
>   16830-107TH Avenue
>   Edmonton, Alberta T5P 4C3  Canada

3.    This Financing Statement covers the following types (or items) of property as follows:

**A.    General Intangibles**.  A security interest in and pledge and assignment of all of Debtor's now owned or hereafter acquired or arising general intangibles directly related to the Product Line or the assembly thereof and payment intangibles related thereto including, without limitation, any interest in the following:  all of the property and proprietary know-how, including any patents, patent rights, patent applications, drawings (including assembly drawings), and other intellectual property rights used by Debtor in relation to the Product Line or the assembly of the Product Line, including without limitation the items described in the attached **Exhibit A** and any present or future improvements or enhancements thereto (collectively, the "**Technology**") and all income, proceeds, money, deposits, issues, accounts receivable, payment intangibles, chattel paper and profits arising from or related to (i) the Technology, (ii) any  licenses relating to the Technology, including, without limitation, all rights derived from that certain non-exclusive license granted by Assignor to Favelle Favco Cranes (USA) Inc. relating to U.S. Patent No. 6,003,252, and/or (iii) the Distributor Agreement of even date between Davis and Secured Party ("**Distributor Agreement**"). Debtor expressly pledges and assigns to Secured Party its right to sue for past, present and future infringement relating to the General Intangibles. The term "**Product Line**" as used herein means telehandler all-terrain cranes, lattice and telescopic boomed crawler cranes, excavator based pipelayers and related equipment or products, and includes any current or future similar products, but specifically excludes any maritime or offshore products.

**B.    Royalties and Other Accounts**. A security interest in all of Debtor's now owned or hereafter acquired or arising royalties, income, proceeds, money, deposits, issues, accounts, accounts receivable, payment intangibles, chattel paper and profits arising from or directly related to (i) the Technology, (ii) any  licenses relating to the Technology, including, without limitation, all rights

**SIGNATURE PAGE**
**UNIFORM COMMERCIAL CODE FINANCING STATEMENT**
(Texas Secretary of State)

_____
DANIEL E. DAVIS

Exhibit "A"

Technology

U.S. PATENT NO. 6,003,252 ISSUED TO DANIEL E. DAVIS FOR THE PRODUCT LINE AS DEFINED IN THE DISTRIBUTOR AGREEMENT.

PATENT APPLICATION ENTITLED PIPELAYER CRANE APPARATUS FOR THE PRODUCT LINE AS DEFINED IN THE DISTRIBUTOR AGREEMENT.
Serial No. 60/362,675
Filing Date: March 8, 2002
Provisional Application

PATENT APPLICATION ENTITLED TELEHANDLER CRANE APPARATUS FOR THE PRODUCT LINE AS DEFINED IN THE DISTRIBUTOR AGREEMENT.
Serial No. 10/094,341
Filing Date: March 8, 2002
Utility Application

PATENT APPLICATION ENTITLED UNIVERSAL EXCAVATOR BOOM ATTACHMENT FOR THE PRODUCT LINE AS DEFINED IN THE DISTRIBUTOR AGREEMENT.
Serial No. 60/365,574
Filing Date: March 19, 2002
Provisional Application

CRANE APPARATUS AND METHOD FOR THE PRODUCT LINE AS DEFINED IN THE DISTRIBUTOR AGREEMENT.
Not filed; still being prepared.

CONFIDENTIAL DESIGN AND MANUFACTURING DRAWINGS:

9 TON TELEHANDLER DRAWINGS:
303 drawings bearing drawing numbers 9-2-001 to 9-6-002.
General Arrangement   9T  GA

28 TON CRANE DRAWINGS:
301 drawings bearing drawing numbers 28-2-001 to 28-6-009 and 5002668.001 to 5002669-023.

| General Arrangement | 28T  GA | |
| Adaptor Weldment | Bill of Material | #28-5-001 |
| Manitex | Bill of Material | #6000740.023 |
| Braden | Bill of Material | #PD12C  (General Dimensions) |

**CIPI Group Numbers:**
- 9Q5972            Upper Structure  Bill of Material
    - 1176346        Optional  Third pedal
    - 1263784        Optional  Guard
    - 1204955        Optional  Guard
    - 1263799        Optional  High Ambient Cooling
    - 1114696        Optional  Travel alarm
- 152 8744          VG Lower Bill of Material

## 38 TON CRANE DRAWINGS:

16 drawings bearing drawing numbers 38-4-011 to 38-5-159 and B5303.001.
General Arrangement  38T GA
Adaptor Weldment      Bill of Material        #38-5-100
                                              #38-5-130
                                              #38-5-129
                                              #38-5-142
Manitex                    Bill of Material        #6000740.021
Braden                 Bill of Material      #PD15   (General Dimensions)

**CIPI Group Number:**
- 9Q5973            Upper Structure  Bill of Material

- 152 8744          VG Lower Bill of Material

## SIDE-BOOM (PIPELAYER) DRAWINGS:

Same 317 drawings listed for 28/38 Ton Cranes plus additional drawings for the
A-frame and relate components.

## 60 TON CRANE DRAWINGS:

211 drawings bearing drawing numbers 20.0001.000-00 to 64.1100.000-00 and
9001.000.000-00 to 99.3000.502-000 and 9901.000.000 to 9904.000.000.
General Arrangement   5911.50.000.001.000
Adaptor Weldment    Bill of Material      #5911.40.1100.000
Braden                 Bill of Material      #CH185   (General Dimensions)

**CIPI Group Number:**
- 9Q5964            Upper Structure  Bill of Material
- 9Q5965            VG Lower Bill of Material
  (Includes 163-4828)

# UNIFORM COMMERCIAL CODE FINANCING STATEMENT
## (Secretary of State – Facility)

This instrument is prepared as, and intended to be, a Financing Statement complying with the formal requirements therefor, as set forth in the Texas Uniform Commercial Code Secured Transactions.

1.  The name and address of the debtor ("Debtor") is:

    DAVCRANE INC.
    A Texas Corporation
    Tax Identification Number: 74-2955092
    Organizational Identification Number: 0157717000
    P.O. Box 2427
    Harlingen, Texas 78551

2.  The name and address of the secured party ("Secured Party") is:

    FINNING INTERNATIONAL INC.
    16830-107TH Avenue
    Edmonton, Alberta T5P 4C3  Canada

3.  This Financing Statement covers the following types (or items) of property as follows:

    (a)    All goods, equipment, furnishings, fixtures, furniture, chattels and personal property of whatever nature owned by Debtor now or hereafter attached or affixed to or used in and about the building or buildings now erected or hereafter to be erected on the property more particularly described on Exhibit "A", attached hereto and hereby made a part hereof for all purposes (the "Mortgaged Property"), or otherwise located on said lands, all leases now existing or hereafter made affecting the Mortgaged Property, including, without limitation, those made by Debtor or any managing agent or affiliate of Debtor, as the same may have been or may from time to time be modified, extended and renewed (the "Leases"), all management agreements, utility agreements, maintenance agreements, service contracts, wastewater capacity reservations, construction contracts, architect and engineer agreements and contracts, and other agreements and contracts affecting the Mortgaged Property, and all fixtures, accessions and appurtenances thereto, and all renewals or replacements of or substitutions for any of the foregoing, all building materials and equipment now or hereafter delivered to the Mortgaged Property and intended to be installed therein, all funds, accounts, instruments, documents, general intangibles (including trademarks, trade names, patents and symbols used in connection therewith) and notes or chattel paper arising from or by virtue of any transactions related to the Mortgaged Property, all permits,

offshore products.

(i)     All of Debtor's fixtures and appurtenances thereto, and such other goods, chattels, fixtures, equipment and personal property affixed or in any manner attached to the real estate and or building(s) or structure(s), including all additions and accessions thereto and replacements thereof and articles in substitution therefore, howsoever attached or affixed, located on the Mortgaged Property.

4.     Proceeds of the above are also covered.

5.     The instruments executed in connection with this Financing Statement prohibit any further encumbrances against the Mortgaged Property or any other property described herein.

**SIGNATURE PAGE**
**UNIFORM COMMERCIAL CODE FINANCING STATEMENT**
(Secretary of State – Facility)

DAVCRANE INC.

By: _____
        Daniel E. Davis, President

## Exhibit "A"

**Real Property**

Lot Number One (1), Block Number One (1), Texas Pipe Bending Subdivision, City of Harlingen, Cameron County, Texas according to the Map recorded in Cabinet 1, Pages 384-A and 384-B Map Records of Cameron County, Texas.

## COLLATERAL ASSIGNMENT AND SECURITY AGREEMENT (PATENTS)
## (ALL PATENT RIGHTS)

This COLLATERAL ASSIGNMENT AND SECURITY AGREEMENT (PATENTS) (this "**Agreement**") is executed effective July 15, 2002 by DANIEL E. DAVIS ("**Assignor**") in favor of FINNING INTERNATIONAL INC., a Canadian corporation (the "**Secured Party**").

### PRELIMINARY STATEMENT

A.    Assignor is executing a Security Agreement (the "**Security Agreement**") dated as of the date hereof in favor of Secured Party.

B.    It is a condition precedent to Secured Party making the financial accommodations to Davcrane Inc. contemplated by the Security Agreement that Assignor enter into this Agreement.

NOW, THEREFORE, in consideration of the premises and to induce Secured Party to loan monies or extend financial accommodations to or for the account of Assignor, and at the special instance and request of Secured Party, Assignor hereby covenants and agrees with Secured Party, as follows:

1.    <u>Defined Terms</u>.

(a)    All capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Security Agreement.

(b)    "**Patent Right**" means any written agreement now or hereafter in existence granting to Assignor any right to use any Patent for the Product Line or the assembly of the Product Line, including, without limitation, the patents listed on <u>Schedule 1</u> attached hereto.

(c)    "**Patents**" means all of the following: (i) all patents for the Product Line or the assembly of the Product Line now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or in any other country or any political subdivision thereof, including, without limitation, those Patents and patent applications listed on <u>Schedule 1</u> attached hereto, together with all the rights, benefits and privileges derived therefrom and the associated goodwill of the business, if any, symbolized thereby, (ii) all reissues, extensions or renewals thereof and any present or future improvements and enhancements to the patents for the Product Line or the assembly of the Product Line now existing or hereafter adopted or acquired and (iii) all proceeds of the foregoing.

(d)    "**Product Line**" as used herein means telehandler all-terrain cranes, lattice and telescopic boomed crawler cranes, excavator based pipelayers and related equipment or products,

and includes any current or future similar or related products, but specifically excludes any marine or offshore products.

2.      **Security Interest and Collateral Assignment**.  As security for the Obligations, Assignor hereby grants and conveys a security interest to Secured Party in, and collaterally assigns to Secured Party, all of its right, title and interest in, to and under the following (collectively, the "**Property**"):

(a)      Each Patent for the Product Line or the assembly of the Product Line now or hereafter owned by Assignor or in which Assignor now has or hereafter acquires rights, wherever located and the associated goodwill of the business of Assignor relating thereto or represented thereby, including, without limitation, each Patent for the Product Line referred to in Schedule 1 hereto and any renewals of registrations thereof; and

(b)      Each Patent Right for the Product Line or the assembly of the Product Line now or hereafter held by Assignor or in which Assignor now has or hereafter acquires rights, wherever located, including, without limitation, the Patent Rights for the Product Line or the assembly of the Product Line, if any, referred to in Schedule 1 hereto; and

(c)      All products and proceeds of the foregoing, including, without limitation, any claim by Assignor against third parties for past, present or future infringement of any Patent or breach of Patent Right, if any, including, without limitation, any Patent or Patent Right referred to in Schedule 1 hereto.

Notwithstanding the foregoing or anything else contained in this Agreement to the contrary, unless and until Secured Party exercises the rights and remedies accorded to it under the Security Agreement or by law with respect to the realization upon its security interest in and collateral assignment of the Property, Assignor shall own, and may use and enjoy the Property in connection with its business operations, including the granting of rights and use in the ordinary course of Assignor's business, but with respect to all Property usable in Assignor's business, only in a manner consistent with the preservation of the current substance, validity, registration and the security interest and collateral assignment herein granted in such Property.

3.      Incorporation of the Security Agreement.  Assignor does hereby acknowledge and affirm that the representations, warranties and covenants of Assignor with respect to the Property and the rights and remedies of Secured Party with respect to the security interest in and collateral assignment of the Property made and granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.  Should a conflict arise between the terms and provisions set forth in this Agreement and the Security Agreement, the terms and provisions of the Security Agreement shall control.

4.      Future Rights.  If Assignor shall obtain or acquire rights to any new Patent or Patent Right for the Product Line or the assembly of the Product Line, the provisions of Section 2 of this Agreement shall automatically apply thereto and Assignor authorizes Secured Party to modify this

Agreement by amending <u>Schedule 1</u> to include any future Patents and Patent Rights covered by Section 2 of this Agreement or by this Section 4.

     5.    <u>Choice of Laws</u>. This Agreement shall be construed under, and governed by, the laws of the State of Texas, excluding, however, its choice of law rules.

## SIGNATURE PAGE
## COLLATERAL ASSIGNMENT (All Patent Rights)

IN WITNESS WHEREOF, the Assignor has caused this Agreement to be duly executed as of the date set forth hereinabove.

ASSIGNOR:

_____
DANIEL E. DAVIS

THE STATE OF TEXAS          §
                            §
COUNTY OF _____         §

This instrument was acknowledged before me on July 26, 2002, by DANIEL E. DAVIS.

_____
Notary Public in and for the State of Texas

_____
Printed Name

My Commission Expires: _____

## SCHEDULE 1

U.S. PATENT NO. 6,003,252 ISSUED TO DANIEL E. DAVIS FOR THE PRODUCT LINE AS DEFINED


PATENT APPLICATION ENTITLED PIPELAYER CRANE APPARATUS FOR THE PRODUCT LINE AS DEFINED
Serial No. 60/362,675
Filing Date: March 8, 2002
Provisional Application

PATENT APPLICATION ENTITLED TELEHANDLER CRANE APPARATUS FOR THE PRODUCT LINE AS DEFINED
Serial No. 10/094,341
Filing Date: March 8, 2002
Utility Application

PATENT APPLICATION ENTITLED UNIVERSAL EXCAVATOR BOOM ATTACHMENT FOR THE PRODUCT LINE AS DEFINED
Serial No. 60/365,574
Filing Date: March 19, 2002
Provisional Application


CRANE APPARATUS AND METHOD FOR THE PRODUCT LINE AS DEFINED
Not filed; still being prepared.

08-29-2002

| Form PTO-1595 (Rev. 03/01) OMB No. 0651-0027 (exp. 5/31/2002) Tab settings ⇒ ⇒ ⇒ | F ‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖ 102205243 | U.S. DEPARTMENT OF COMMERCE U.S. Patent and Trademark Office |

To the Honorable Commissioner of Patents and Trademarks: Please record the attached original documents or copy thereof.

**1. Name of conveying party(ies):**

Daniel E. Davis
P.O. Box 2427
Harlingen, TX 78551

*8 26 02*

Additional name(s) of conveying party(ies) attached? ☐ Yes ☒ No

**2. Name and address of receiving party(ies)**

Name: <u>Finning International  Inc.</u>

Internal Address: <u>Attn:  Mel Ternan</u>

Street Address: <u>16830-107th Avenue</u>

City: <u>Edmonton</u>    State: <u>Alberta</u> Zip: <u>V6C 2X8</u>
Canada

Additional name(s) & address(es) attached? ☐ Yes ☒ No

**3. Nature of conveyance:**

☒ Assignment    ☐ Merger

☐ Security Agreement    ☐ Change of Name

☐ Other_____

Execution Date: <u>July 15, 2002</u>

**4. Application number(s) or patent number(s):**

If this document is being filed together with a new application, the execution date of the application is: <u>n/a</u>

A. Patent Application No.(s)
60/362,675
107/094,341
60/365,574

B. Patent No.(s)
6,003,252

Additional numbers attached? ☐ Yes ☒ No

**5. Name and address of party to whom correspondence concerning document should be mailed:**

Name: <u>Elizabeth F. York</u>

Internal Address:_____

<u>Shannon, Martin, Finkelstein & Sayre</u>

Street Address: <u>909 Fannin, Suite 2400</u>

City: <u>Houston</u>    State: <u>TX</u>    Zip: <u>77010</u>

**6. Total number of applications and patents involved:** ☐ 4

**7. Total fee (37 CFR 3.41)..............$ 160.00**

☒ Enclosed

☐ Authorized to be charged to deposit account

**8. Deposit account number:**

N/A

(Attach duplicate copy of this page if paying by deposit account)

08/28/2002 TDIAZ1  00000048 60362675
01 FC:581          160.00 OP

**DO NOT USE THIS SPACE**

**9. Statement and signature.**

*To the best of my knowledge and belief, the foregoing information is true and correct and any attached copy is a true copy of the original document.*

<u>Elizabeth F. York</u>
Name of Person Signing

*Elizabeth F. York*
Signature

*August 20, 2002*
Date

Total number of pages including cover sheet, attachments, and documents: ☐ 6

Mail documents to be recorded with required cover sheet information to:
Commissioner of Patents & Trademarks, Box Assignments
Washington, D.C. 20231.

## COLLATERAL ASSIGNMENT AND SECURITY AGREEMENT (PATENTS)
## (ALL PATENT RIGHTS)

This COLLATERAL ASSIGNMENT AND SECURITY AGREEMENT (PATENTS) (this "**Agreement**") is executed effective July 15, 2002 by DANIEL E. DAVIS ("**Assignor**") in favor of FINNING INTERNATIONAL INC., a Canadian corporation (the "**Secured Party**").

### PRELIMINARY STATEMENT

A.    Assignor is executing a Security Agreement (the "**Security Agreement**") dated as of the date hereof in favor of Secured Party.

B.    It is a condition precedent to Secured Party making the financial accommodations to Davcrane Inc. contemplated by the Security Agreement that Assignor enter into this Agreement.

NOW, THEREFORE, in consideration of the premises and to induce Secured Party to loan monies or extend financial accommodations to or for the account of Assignor, and at the special instance and request of Secured Party, Assignor hereby covenants and agrees with Secured Party, as follows:

1.    Defined Terms.

(a)    All capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Security Agreement.

(b)    "**Patent Right**" means any written agreement now or hereafter in existence granting to Assignor any right to use any Patent for the Product Line or the assembly of the Product Line, including, without limitation, the patents listed on Schedule 1 attached hereto.

(c)    "**Patents**" means all of the following: (i) all patents for the Product Line or the assembly of the Product Line now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or in any other country or any political subdivision thereof, including, without limitation, those Patents and patent applications listed on Schedule 1 attached hereto, together with all the rights, benefits and privileges derived therefrom and the associated goodwill of the business, if any, symbolized thereby, (ii) all reissues, extensions or renewals thereof and any present or future improvements and enhancements to the patents for the Product Line or the assembly of the Product Line now existing or hereafter adopted or acquired and (iii) all proceeds of the foregoing.

(d)    "**Product Line**" as used herein means telehandler all-terrain cranes, lattice and telescopic boomed crawler cranes, excavator based pipelayers and related equipment or products.

and includes any current or future similar or related products, but specifically excludes any marine or offshore products.

2.    **Security Interest and Collateral Assignment**.  As security for the Obligations, Assignor hereby grants and conveys a security interest to Secured Party in, and collaterally assigns to Secured Party, all of its right, title and interest in, to and under the following (collectively, the "**Property**"):

(a)    Each Patent for the Product Line or the assembly of the Product Line now or hereafter owned by Assignor or in which Assignor now has or hereafter acquires rights, wherever located and the associated goodwill of the business of Assignor relating thereto or represented thereby, including, without limitation, each Patent for the Product Line referred to in Schedule 1 hereto and any renewals of registrations thereof; and

(b)    Each Patent Right for the Product Line or the assembly of the Product Line now or hereafter held by Assignor or in which Assignor now has or hereafter acquires rights, wherever located, including, without limitation, the Patent Rights for the Product Line or the assembly of the Product Line, if any, referred to in Schedule 1 hereto; and

(c)    All products and proceeds of the foregoing, including, without limitation, any claim by Assignor against third parties for past, present or future infringement of any Patent or breach of Patent Right, if any, including, without limitation, any Patent or Patent Right referred to in Schedule 1 hereto.

Notwithstanding the foregoing or anything else contained in this Agreement to the contrary, unless and until Secured Party exercises the rights and remedies accorded to it under the Security Agreement or by law with respect to the realization upon its security interest in and collateral assignment of the Property, Assignor shall own, and may use and enjoy the Property in connection with its business operations, including the granting of rights and use in the ordinary course of Assignor's business, but with respect to all Property usable in Assignor's business, only in a manner consistent with the preservation of the current substance, validity, registration and the security interest and collateral assignment herein granted in such Property.

3.    Incorporation of the Security Agreement.  Assignor does hereby acknowledge and affirm that the representations, warranties and covenants of Assignor with respect to the Property and the rights and remedies of Secured Party with respect to the security interest in and collateral assignment of the Property made and granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.  Should a conflict arise between the terms and provisions set forth in this Agreement and the Security Agreement, the terms and provisions of the Security Agreement shall control.

4.    Future Rights.  If Assignor shall obtain or acquire rights to any new Patent or Patent Right for the Product Line or the assembly of the Product Line, the provisions of Section 2 of this Agreement shall automatically apply thereto and Assignor authorizes Secured Party to modify this

Agreement by amending Schedule 1 to include any future Patents and Patent Rights covered by Section 2 of this Agreement or by this Section 4.

     5.     <u>Choice of Laws</u>.  This Agreement shall be construed under, and governed by, the laws of the State of Texas, excluding, however, its choice of law rules.

## SIGNATURE PAGE
## COLLATERAL ASSIGNMENT (All Patent Rights)

IN WITNESS WHEREOF, the Assignor has caused this Agreement to be duly executed as of the date set forth hereinabove.

**ASSIGNOR:**

_____

DANIEL E. DAVIS

THE STATE OF TEXAS            §
                             §
COUNTY OF _____        §

This instrument was acknowledged before me on July 26, 2002, by DANIEL E. DAVIS.

_____
Notary Public in and for the State of Texas

_____
Printed Name

My Commission Expires: _____

## SCHEDULE 1

U.S. PATENT NO. 6,003,252 ISSUED TO DANIEL E. DAVIS FOR THE PRODUCT LINE AS DEFINED

PATENT APPLICATION ENTITLED PIPELAYER CRANE APPARATUS FOR THE PRODUCT LINE AS DEFINED
Serial No. 60/362,675
Filing Date: March 8, 2002
Provisional Application

PATENT APPLICATION ENTITLED TELEHANDLER CRANE APPARATUS FOR THE PRODUCT LINE AS DEFINED
Serial No. 10/094,341
Filing Date: March 8, 2002
Utility Application

PATENT APPLICATION ENTITLED UNIVERSAL EXCAVATOR BOOM ATTACHMENT FOR THE PRODUCT LINE AS DEFINED
Serial No. 60/365,574
Filing Date: March 19, 2002
Provisional Application

CRANE APPARATUS AND METHOD FOR THE PRODUCT LINE AS DEFINED
Not filed; still being prepared.

## GUARANTY AGREEMENT
### (DANIEL E. DAVIS)

WHEREAS, the execution of this Guaranty Agreement ("**Guaranty Agreement**") is a condition to DAVCRANE INC., a Texas corporation ("**Borrower**"), borrowing money from FINNING INTERNATIONAL INC., a Canadian corporation ("**Lender**"), in the aggregate principal amount of ONE MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($1,500,000.00), evidenced by that certain promissory note described below.

NOW, THEREFORE, for valuable consideration, the receipt and adequacy of which are hereby acknowledged, DANIEL E. DAVIS whose mailing address is P.O. Box 2427, Harlingen, Texas 78557 (the "**Guarantor**"), hereby irrevocably and unconditionally guarantees to Lender, the prompt payment and performance of the Guaranteed Obligations (hereinafter defined), this Guaranty Agreement being upon the following terms:

1.     The term "**Guaranteed Obligations**" as used herein, includes: (a) that certain Note ("**Note**") of even date herewith, in the original principal amount of $1,500,000.00, executed by Borrower and payable to the order of Lender; (b) interest on any of the indebtedness described in (a) preceding; (c) any renewal or extension of the indebtedness described in (a) through (b) preceding, or any part thereof; (d) all obligations under the Deed of Trust, Assignment of Rents, Security Agreement and Financing Statement ("**Deed of Trust**") securing the Note; (e) all obligations under the Commercial Security Agreement ("**Security Agreement**") securing the Note and (f) all other obligations of Borrower and Guarantor to Lender under all other documents and instruments executed contemporaneously herewith as security for or otherwise in connection with the Note, and all renewals, extensions and modifications thereof (herein the Note, the Deed of Trust, the Security Agreement and other documents shall be collectively called the "**Loan Documents**").

2.     This instrument shall be an absolute, continuing, irrevocable, and unconditional guaranty of payment and performance and not a guaranty of collection, and Guarantor shall remain liable on its obligations hereunder until the payment and performance in full of the Guaranteed Obligations.

3.     In the event of default by Borrower in payment or performance of the Guaranteed Obligations, or any part thereof, when such Guaranteed Obligations becomes due, whether by its terms, by acceleration, or otherwise, Guarantor shall promptly pay the amount due thereon to Lender upon written demand in lawful money of the United States and it shall not be necessary for Lender, in order to enforce such payment by Guarantor, first to institute suit or exhaust its remedies against Borrower or others liable on such Guaranteed Obligations, or to enforce any rights against any collateral which shall ever have been given to secure such Guaranteed Obligations.

4.     Guarantor hereby agrees that its obligations under this Guaranty Agreement shall not be released, diminished, impaired, reduced, or affected by the occurrence of any reason or event, including, without limitation, one or more of the following events, whether or not with notice to or the consent of Guarantor:  (a) the taking or accepting of collateral as security for any or all of the

Guaranteed Obligations or the release, surrender, exchange, or subordination of any collateral now or hereafter securing any or all of the Guaranteed Obligations; (b) any partial release of the liability of Borrower or the release of any other guarantor from liability for any or all of the Guaranteed Obligations; (c) any disability of Borrower, or the dissolution, insolvency, or bankruptcy of Borrower, Guarantor, or any party at any time liable for the payment of any or all of the Guaranteed Obligations; (d) any renewal, extension, modification, waiver, amendment, or rearrangement of any or all of the Guaranteed Obligations or any instrument, document, or agreement evidencing, securing, or otherwise relating to any or all of the Guaranteed Obligations; (e) any adjustment, indulgence, forbearance, waiver, or compromise that may be granted or given by Lender to Borrower, Guarantor, or any other party ever liable for any or all of the Guaranteed Obligations; (f) any neglect, delay, omission, failure, or refusal of Lender to take or prosecute any action for the collection of any of the Guaranteed Obligations or to foreclose or take or prosecute any action in connection with any instrument, document, or agreement evidencing, securing, or otherwise relating to any or all of the Guaranteed Obligations; (g) the unenforceability or invalidity of any or all of the Guaranteed Obligations or any instrument, document, or agreement evidencing, securing, or otherwise relating to any or all of the Guaranteed Obligations; (h) any payment by Borrower to Lender is determined by a court to constitute a preference under the bankruptcy laws or if for any other reason Lender is required to refund such payment or pay the amount thereof to someone else; (i) the settlement or compromise of any of the Guaranteed Obligations; (j) the failure of Lender to perfect or continue any security interest or lien securing any or all of the Guaranteed Obligations; or (k) the failure of Lender to preserve, protect, maintain, or insure any collateral securing any or all of the Guaranteed Obligations.

5.    Guarantor represents and warrants to Lender as follows:

(a)    Guarantor has the power and authority to execute, deliver and perform its obligations under this Guaranty Agreement, and this Guaranty Agreement constitutes the legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms, except as limited by bankruptcy, insolvency, or other laws of general application relating to the enforcement of creditor's rights.

(b)    The execution, delivery, and performance by Guarantor of this Guaranty Agreement do not and will not violate any law or any order of any court, governmental authority or arbitrator and do not and will not conflict with, result in a breach of, or constitute a default under, or result in the imposition of any lien upon any assets of Guarantor pursuant to the provisions of any indenture, mortgage, deed of trust, security agreement, franchise, permit, license, or other instrument or agreement to which Guarantor or its properties is bound.

(c)    No authorization, approval, or consent of, and no filing or registration with, any court, governmental authority, or third party is necessary for the execution, delivery, or performance by Guarantor of this Guaranty Agreement or the validity or enforceability thereof.

6.    All present and future indebtedness of Borrower to Guarantor is hereby subordinated

to the Guaranteed Obligations.

7.    No amendment or waiver of any provision of this Guaranty Agreement nor consent to any departure by the Guarantor therefrom shall in any event be effective unless the same shall be in writing and signed by Lender.  No failure on the part of Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise hereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

8.    Guarantor recognizes that Lender is relying upon this Guaranty Agreement and the undertaking of Guarantor hereunder in making a loan to Borrower under the Loan Documents and further recognizes that the execution and delivery of this Guaranty Agreement is a material inducement to Lender in entering into the Loan Documents (as defined in the Note).

9.    Guarantor shall cause to be paid on demand all reasonable attorneys' fees and all other costs and expenses incurred by Lender in connection with the enforcement, or collection of this Guaranty Agreement.

10.    Except as herein provided, Guarantor hereby waives promptness, diligence, demand of payment, notice of acceptance of this Guaranty Agreement, presentment, notice of protest, notice of dishonor, notice of the incurring by Borrower of additional obligations, and all other notices and demands with respect to the Guaranteed Obligations and this Guaranty Agreement.

11.    Guarantor acknowledges that this Guaranty Agreement is executed in connection with the Note, Deed of Trust, Security Agreement and other Loan Documents and that Guarantor is aware of the obligations of Borrower and the terms thereunder.  Guarantor agrees that Lender may exercise any and all rights granted to it under the Loan Documents without affecting the validity or enforceability of this Guaranty Agreement.

12.    Guarantor waives all rights of reimbursement, exoneration, indemnification and/or contribution from Borrower for any payment by Guarantor under this Guaranty Agreement and

waives all right of subrogation to the claims of Lender which may otherwise arise from such payment.

13.    Guarantor hereby expressly waives any right to trial by jury in any action or legal proceeding arising out of or relating to the Loan Documents on the transactions contemplated

15.    Notwithstanding the provisions of Sections 51.003, 51.004, and 51.005 of the Texas Property Code (as same may be amended from time to time), and to the extent permitted by law and the Arbitration provisions hereof, Guarantor agrees that Lender shall be entitled to seek a deficiency judgment from Borrower and Guarantor and any other party obligated on the Note or guaranty of the Note equal to the difference between the amount owing on the Note and the amount for which the property foreclosed upon ("**Foreclosed Property**") was sold pursuant to a judicial or nonjudicial foreclosure sale (if Lender elects to foreclose the Foreclosed Property).

Guarantor expressly recognizes that this Section shall constitute a waiver of the above cited provisions of the Texas Property Code which would otherwise permit Borrower and Guarantor and other persons against whom recovery of the deficiency is sought or Guarantor independently (even absent the initiation of deficiency proceedings against him) to present competent evidence of the fair market value of the Foreclosed Property as of the date of foreclosure and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than the fair market value.

Guarantor further recognizes and agrees that this waiver will create an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Foreclosed Property for purposes of calculating deficiencies owed by the Borrower and Guarantor, other borrowers on the Note, guarantors and others against whom recovery of a deficiency is sought.

Alternatively, in the event this Section is determined by a court of competent jurisdiction to be unenforceable, the following shall be the basis for the finder of fact's determination of fair market value of the Foreclosed Property as of the date of foreclosure sale in proceedings governed by Sections 51.003, 51.004, and 51.005 of the Texas Property Code (as amended from time to time):

(a)    The Foreclosed Property shall be valued in an "as is" condition as of the date of the foreclosure sale, without any assumption or expectation that any repairs will be performed in conjunction therewith;

(b)    The valuation shall be based upon an assumption that the foreclosure purchaser desires a prompt resale of the Foreclosed Property for cash promptly (but no later than twelve months) following the foreclosure sale;

(c)    All reasonable closing costs customarily borne by the seller in a commercial real estate transaction should be deducted from the gross fair market value of the Foreclosed Property, including, without limitation, brokerage commissions, title insurance, a survey of the Foreclosed Property, tax prorations, attorney's fees, and marketing costs;

(d)    The gross fair market value of the Foreclosed Property shall be further discounted to account for any estimated holding costs associated with maintaining the Foreclosed Property pending sale, including, without limitation, utilities expenses, property management fees, taxes, and assessments (to the extent not accounted for in (c) above) and other maintenance fees; and

(e)     Any expert opinion testimony given or considered with a determination of the fair market value of the Foreclosed Property must be given by persons having at least five years experience in appraising Foreclosed Property similar to the Foreclosed Property and who have conducted and prepared a complete written appraisal of the Foreclosed Property taking into consideration the factors set forth above.

**SIGNATURE PAGE**
**GUARANTY AGREEMENT**

EXECUTED effective July 15, 2002.

_____
DANIEL E. DAVIS

JUN-02-2003 MON 02:08 PM C                    FAX NO. 956    174                    P. 02

*Cameron County Title C___*
*QF# 2207050*

## WARRANTY DEED

**Date:**          August 9, 2002

**Grantor:**       METEX ENTERPRISES, INC., a Texas corporation (f.k.a. STEELTEK ENTERPRISES, INC.)

**Grantor's Mailing Address (including county):**

          502 North Expressway 77
          Harlingen, Texas 78550
          Cameron County

**Grantee:**       DAVCRANE, INC., a Texas corporation

**Grantee's Mailing Address (including County):**

          P. O. Box 2427
          Harlingen, Texas 78551-2427
          Cameron County

**Consideration:**     TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration and the further consideration of a note in the principal amount of $1,500,000.00, dated July 15, 2002 executed by Grantee, payable to Finning International, Inc. The note is secured by a Vendor's Lien retained in favor of Finning International, Inc. in this deed and by Deed of Trust of even date herewith, from Grantee to NANCY F. MARTIN Trustee, without recourse on Grantor.

**Property (including any and all improvements):**

          A tract of land containing 4.94 acres out of Lot Number One (1), Block Number One (1), Texas Pipe Bending Subdivision, City of Harlingen, Cameron County, Texas according to the map recorded in Cabinet 1, Slots 384-A and 384-B, Map Records, Cameron County, Texas, said property being more particularly described in Exhibit "A" attached hereto and made a part hereof.

**Property Subject to Lien:**     same as above.

**Reservations From And Exceptions to Conveyance And Warranty:**

          This conveyance is made and accepted subject to those restrictions, covenants, conditions, easements, mineral and royalty reservations which are reflected on Exhibit "B" attached hereto.

          Grantor, for the consideration, receipt of which is acknowledged, and subject to the reservations from and exceptions to conveyance and warranty, grants, sells and conveys to Grantee the property, together with all and singular the rights and appurtenances thereto in anywise belonging, to have and hold it to Grantee, Grantee's administrators, successors or assigns forever. Grantor binds Grantor and Grantor's heirs, executors, administrators and successors to warrant and forever defend all and singular the property to Grantee and Grantee's administrators, successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof, except as to the reservations from and exceptions to conveyance and warranty.

          When the context requires, singular nouns and pronouns include the plural.

                         METEX ENTERPRISES, INC., a Texas corporation
                         (f.k.a. STEELTEK ENTERPRISES, INC.)

                         By: _____
                              Cesar Maldonado, President
                                     VICE

JUN-02-2003 MON 02:09 PM CC                    FAX NO. 956      74                    P. 03

## ACKNOWLEDGMENT

STATE OF TEXAS                    )
                                 )
COUNTY OF CAMERON                 )

This instrument was acknowledged before me on the ___9___ day of August, 2002, by
CESAR MALDONADO, as president of METEX ENTERPRISES, INC., a Texas corporation (f.k.a.
STEELTEK ENTERPRISES, INC.).

_Mary Ann Taylor_
Notary Public, State of Texas

My Commission Expires:_____

> MARY ANN TAYLOR
> NOTARY PUBLIC
> STATE OF TEXAS
> My Commission Expires 08-18-2004

AFTER RECORDING RETURN TO:

Mr. Dennis Sanchez
SANCHEZ, WHITTINGTON, JANIS &
    ZABARTE, L.L.P.
100 North Expressway 83
Brownsville, TX 78521

PREPARED IN THE LAW OFFICES OF:

SANCHEZ, WHITTINGTON, JANIS &
    ZABARTE, L.L.P.
100 North Expressway 83
Brownsville, Texas 78521

JUN-02-2003 MON 02:10 PM (                        FAX NO. 95(   ?174                    P. 04

(FT-10/2000)                                    EXHIBIT 'A'

A tract of land containing 4.94 acres, out of Lot 1, Block 1, TEXAS PIPE BENDING SUBDIVISION, City of Harlingen, Cameron County, Texas, according to the Map recorded in Cabinet 1, Slots 384-A and 384-B, Map Records of Cameron County, Texas, and said 4.94 acre tract being more particularly located and described as follows:

COMMENCING at the Southwest corner of said Lot 1, Block 1, TEXAS PIPE BENDING SUBDIVISION;

THENCE, South 89 degrees 48 minutes 00 seconds West, a distance of 340.58 feet;

THENCE, North 00 degrees 12 minutes 00 seconds West, a distance of 25.43 feet to a ½ inch iron pin set on the North Right-of-Way line of F.M. 106 (Harrison Street) same being the Southwest corner of the tract herein described;

THENCE, North 00 degrees 12 minutes 00 seconds West, a distance of 1059.97 feet to a ½ inch iron pin set for the Northwest corner of this tract;

THENCE, North 89 degrees 48 minutes 00 seconds East, a distance of 237.28 feet to a ½ inch iron pin set for the Northeast corner of this tract;

THENCE, South 00 degrees 12 minutes 00 seconds East, a distance of 260.14 feet to a ½ inch iron pin set for an outside corner of this tract;

THENCE, South 89 degrees 48 minutes 00 seconds West, a distance of 45.56 feet to a ½ inch iron pin set for an inside corner of this tract;

THENCE, South 00 degrees 12 minutes 00 seconds East, a distance of 800.22 feet to a ½ inch iron pin set for the Southeast corner of this tract;

THENCE, South 89 degrees 55 minutes 00 seconds West, along said North Right-of-Way line of F.M. 106 (Harrison Street), a distance of 191.71 feet to the POINT OF BEGINNING, Containing 4.94 acres of land more or less, inclusive of any and all easements, restrictions, exceptions or dedications that might be of record.

NOTE:  THIS COMPANY DOES NOT REPRESENT THAT THE ACREAGE AND/OR SQUARE FOOTAGE CALCULATIONS ARE CORRECT.

JUN-02-2003 MON 02:10 PM C                    FAX NO. 95F    174                    P. 05

## EXHIBIT B

## PERMITTED EXCEPTIONS

1.  Standby fees, taxes and assessments by any taxing authority for the year 2002 and subsequent years.

2.  Statutory rights in favor of HARLINGEN IRRIGATION DISTRICT CAMERON COUNTY NO. 1, pursuant to applicable sections of the Texas Water Code.

3.  Easements in favor of HARLINGEN IRRIGATION DISTRICT CAMERON COUNTY NO. 1.

4.  Right of Way Easement dated September 20, 1949 from Fred Langley to Cameron County, recorded in Volume 472, Page 404, Deed Records of Cameron County, Texas.

5.  Right of Way Easement dated February 8, 1951 from Fred Langley to Cameron County, recorded in Volume 509, Page 55, Deed Records of Cameron County, Texas.

6.  Easement dated March 1, 1983 from Texas Pipe Bending Company to City of Harlingen, recorded in Volume 1314, Page 373, Deed Records of Cameron County, Texas.

7.  An undivided ½ mineral interest, the royalties, bonuses and rentals also as set out in instrument dated September 26, 1950 from E. A. Matz, recorded in Volume 500, Page 414, Deed Records of Cameron County, Texas.

8.  1/4th of all oil, gas and other minerals described in deed dated August 18, 1943 from Phoenix Mutual Life Insurance, recorded in Volume 325, Page 155, Deed Records of Cameron County, Texas, together with all rights.

9.  Drainage canal Right-of-Way Easement as shown on the plat of the Subdivision herein referred to.

10. Road Right-of-Way as shown on the plat of the Subdivision herein referred to.

08/21/2003 11:00 FAX 604 640    )    ☐ 027

LAW OFFICES OF

# ALTON W. PAYNE, J.D., Ph.D.

*Attorneys at Law*

5001 BISSONNET, SUITE 200

BELLAIRE, TEXAS 77401

August 5, 2003

TELEPHONE (713) 840-8008
TELEFAX (713) 840-8088
EMAIL alwpayne@earthlink.net

INTELLECTUAL PROPERTY AND
TECHNOLOGY-RELATED LAW
MEDIATION-ARBITRATION

Mr. Mel Ternan
General Manager
Construction and Pipeline Division
FINNING (CANADA)
16830- 107TH Avenue
Edmonton, Alberta, Canada
T5P 4C3
Via EMAIL mternan@finning.ca
TELEFAX 780-930-4891 and Certified Mail

Mr. John T. Struthers
Corporate Secretary
Finning International Inc.
Park Place, 666 Burrard Street, Suite 1000
Vancouver, British Columbia
V6C 2X8
Via TELEFAX 604-331-4887
and Certified Mail

Re:    Distributor Agreement dated July 15, 2002

Dear Mel:

As we discussed last week, DavCrane Inc. and Daniel Davis are in the process of winding down their business under the Distributorship Agreement with Finning International Inc. ("Finning"). It is with great disappointment that I have to notify Finning of its default pursuant to section 12.2 of the Distributor Agreement.

Finning has failed to use reasonable commercial efforts to market and sell the Distributed Products as required by, at least, section 7.2(k) of the Distributor Agreement. Further, Finning has failed to pay the aggregate Manufacturing Overhead Costs as required by section 5.3 of the Distributor Agreement.

Please be advised that if Finning fails to cure these events of default within 30 days, the Distributor Agreement will terminate in its entirety without prejudice to any rights Mr. Davis has against Finning for damages that have and will continue to accrue due to the cited breaches by Finning.

Further please consider this letter as the notice and demand for arbitration pursuant to section 14.1, Dispute Resolution/Remedies, of the Distributor Agreement.

We would welcome opening a new dialogue concerning ways to resolve these matters. However, due to the urgency of getting these matters resolved, no delays in the default or dispute provisions can be entertained.

Yours very truly,

Alton W. Payne, J.D., Ph.D.

cc:    Dennis Sanchez
       Daniel E. Davis

EXHIBIT
**B**



**BORDEN
LADNER
GERVAIS**

Borden Ladner Gervais LLP
Lawyers • Patent & Trade-Mark Agents
1200 Waterfront Centre
200 Burrard Street, P.O. Box 48600
Vancouver, B.C., Canada V7X 1T2
tel: (604) 687-5744    fax: (604) 687-1415
www.blgcanada.com

September 18, 2003

FILE NO: 501177/019363

## COPY

GERALD W. GHIKAS, Q.C.
direct tel: (604) 640-4112
direct fax: (604) 622-5812
email: gghikas@blgcanada.com

**VIA FAX: (956) 399-9174**
**Original VIA COURIER**

Daniel E. Davis
P.O. Box 2427
Harlingen, Texas
78551 USA

Dear Sirs/Mesdames:

RE:    **In the Matter of an International Commercial**
**Arbitration**
**Between Finning International Inc. (Finning)**
**and Daniel E. Davis (Davis)**
**pursuant to the International Arbitration Rules**
**of the American Arbitration Association**

We enclose for delivery to you pursuant to Article 14.1 of the Agreement, a notice of arbitration that we have filed with the American Arbitration Association at their Dallas, Texas Case Management Centre with a request that it commence administration of this arbitration.

We assume that you will appoint counsel. As required by the Agreement we are delivering copies of this communication and enclosures to Alton W. Payne and Dennis Sanchez. We have assume that Mr. Payne will represent you as your attorney for the purposes of this arbitration. If you intend to appoint another attorney, please provide us with that attorney's contact particulars.

Yours truly,

Borden Ladner Gervais LLP

By:

Gerald W. Ghikas

GWG/mm
Enclosure

Document: 1172578.01
Borden Ladner Gervais LLP is an Ontario Limited Liability Partnership

VANCOUVER • TORONTO • OTTAWA • MONTREAL • CALGARY

**EXHIBIT**

**C**

cc    Alton W. Payne (by fax with enclosures)
5001 Bissonnet, suite 200
Bellaire, Texas
77401  USA

Dennis Sanchez (by fax with enclosures)
Sanchez, Whittington, Janis & Zabarte, LLP
100 North Expressway 83
Brownsville, Texas
78521-2284  USA

cc    Mark Finkelstein
Shannon, Martin, Finkelstein & Sayre, P.C.
2400 Two Houston Centre
909 Fannin Street
Houston, Texas
USA 77010

## IN THE MATTER OF AN INTERNATIONAL COMMERCIAL ARBITRATION

BETWEEN:

FINNING INTERNATIONAL INC. (FINNING)

CLAIMANT

AND:

DANIEL E. DAVIS (DAVIS)

RESPONDENT

## NOTICE OF ARBITRATION

PURSUANT TO THE INTERNATIONAL ARBITRATION RULES
OF THE AMERICAN ARBITRATION ASSOCIATION

The Claimant, Finning, a party to an arbitration agreement contained in a written contract dated July 15, 2002 and providing for arbitration under the *International Arbitration Rules* of the American Arbitration Association, hereby demands arbitration thereunder.

### THE NAMES AND ADDRESSES OF THE PARTIES:

**Claimant:**
Finning International Inc.
16830 – 107th Avenue
Edmonton, Alberta,
T5P 4C3  Canada

| Telephone: | (780) 930 4878 |
| Fax: | (780) 930-4891 |

**Respondent:**
Daniel E. Davis
P.O. Box 2427
Harlingen, Texas
78551  USA

| Telephone: | |
| Fax: | (956) 399-9174 |

**Claimant's Representatives:**
Canadian Counsel:  Gerald W. Ghikas, Q.C.
Borden Ladner Gervais LLP
1200 Waterfront Centre
200 Burrard Street
P.O. Box 48600
Vancouver, British Columbia
V7X 1T2  Canada

| Telephone: | (604) 640-4112 |
| Fax: | (604) 622-5812 |

**Respondent's Representatives**
Dennis Sanchez
Sanchez, Whittington, Janis & Zabarte, LLP
100 North Expressway 83
Brownsville, Texas
78521-2284 USA

| Telephone: | (956) 546-3731 |
| Fax: | (956) 546-3765 |

Texas Counsel: Mark S. Finkelstein
Shannon, Martin, Finkelstein & Sayre, P.C.
2400 Two Houston Center
909 Fannin Street
Houston, Texas   77010  USA

| Telephone: | (713) 646-5503 |
| Fax: | (713) 752-0337 |

Alton W. Payne
5001 Bissonnet, Suite 200
Bellaire, Texas
77401  USA

| Telephone: | (713) 840-8008 |
| Fax: | (713) 840-8088 |

- 1 -

Document: 1172180:01

## DESCRIPTION OF THE CLAIM AND SUPPORTING FACTS:

1.     The claimant, Finning, is a company incorporated under the laws of Canada having an address at 16830 – 107th Avenue, Edmonton, Alberta, Canada.

2.     The respondent, Davis, is a businessperson having an address at P.O. Box 2427 Harlingen, Texas, U.S.A.

3.     Davis and Finning entered into a Distributor Agreement (the "Agreement") dated July 15, 2002.

4.     In and by the Agreement, Davis agreed to manufacture and assemble from components supplied in part by Finning certain cranes and related products (the "Distributed Products") and agreed that Finning was to have the exclusive right to market, distribute and sell throughout the world.

5.     The Agreement further provided:

(a)     That Davis would manufacture and assemble the Distributed Products in a prompt, timely and efficient manner and would produce Distributed Products to meet Finning's demand for same;

(b)     That title to Distributed Products at all times would remain with Finning, its suppliers or its customers;

(c)     That Davis would deliver completed Distributed Products to the person, at the location and on the date specified by Finning;

(d)     That all Distributed Products would be manufactured and assembled by Davis in a prompt, efficient, skilful and careful manner in accordance with North American industry standards for the manufacture and assembly of similar equipment and in compliance with all applicable laws.

6.     Davis has wrongfully breached and repudiated the Agreement. Without limitation, the breaches and repudiations of Davis include:

(a)     Davis has failed to manufacture and assemble the Distributed Products in a prompt, timely and efficient manner and produce Distributed Products to meet Finning's demand for same;

(b)     Davis has failed to deliver completed Distributed Products belonging to Finning to Finning or to the person, at the location and on the date specified by Finning;

(c)     Davis has failed to have all Distributed Products manufactured and assembled in a prompt, efficient, skilful and careful manner in accordance with North American industry

- 2 -

standards for the manufacture and assembly of similar equipment and in compliance with all applicable laws.

7.    Davis has, without justification, delivered to Finning a purported Notice of Default stating that, unless Finning cures the certain alleged "defaults" the Agreement will be terminated within 30 days, and has otherwise clearly evinced his intention to bring the Agreement to an end and not to perform his obligations thereunder.

8.    The Agreement provides that any breach by Davis of any covenant representation or warranty made by him under the Agreement, or any failure of Davis to perform any of his obligations under the Agreement or related Security Documents, is an Event of Default. The Agreement further provides that if Davis commits an event of default and fails to cure such event of default within 30 Business Days of Finning delivering notice of same to Davis, Finning may do any or all of the following:

    (a)    Terminate the Agreement forthwith in its entirety without prejudice to any rights it may have against Davis arising prior to termination;

    (b)    Declare the outstanding balance of the Facility Loan to be immediately due and payable by Davis and exercise any and all rights Finning may have at law, in equity or pursuant to the Agreement or the Security Documents; and

    (c)    Take possession of the "Facility", "Technology", "Major Components", "Minor Components" and Distributed Products (all as defined in the Agreement) and conduct manufacturing and assembly of the "Distributed Products" itself.

9.    The Agreement further provides that the rights and remedies provided thereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

10.    By virtue of the breaches and repudiation of the Agreement, on August 11, 2003 Finning delivered a Notice of Default to Davis. Finning has not yet made an election to terminate the Agreement or to accept Davis' repudiation of the Agreement.

11.    As a result of Davis' breaches of the contract and his wrongful repudiation thereof, Finning has suffered and will continue to suffer loss, damages and expense.

**RELIEF OR REMEDY SOUGHT AND AMOUNT CLAIMED:**

12.    Finning claims against Davis for an Award:

    (a)    Declaring that Davis has wrongfully breached and repudiated the Agreement; and

- 3 -

Document: 1172180:01

(b)    Directing Davis to deliver all completed Distributed Products to Finning in accordance with the Agreement;

(c)    Requiring Davis to account to Finning for all monies received by Davis from Finning under the Agreement and all expenses purported to be incurred by Davis for reimbursement by Finning under the Agreement;

(d)    Should Davis fail to cure his defaults under the Agreement within 30 Business Days of Finning's Notice of Default, and should Finning thereafter elect to seek such remedy:

    (i)    Declaring that the Agreement is terminated in its entirety without prejudice to any rights Finning may have against Davis arising prior to termination; and, or alternatively,

    (ii)    Declaring that the outstanding balance of the Facility Loan is due and payable by Davis and directing Davis to pay to Finning the full outstanding balance of the Facility Loan, and interest; and, or alternatively,

    (iii)    Declaring that Finning is entitled to take possession of the "Facility, Technology, Major Components, Minor Components and Distributed Products" and to conduct manufacturing and assembly of the Distributed Product itself, and order Davis to deliver up possession to Finning accordingly, and to take such other steps as may reasonably be required to that end;

(e)    Further, or alternatively, such interim measures of protection as may be appropriate and such further or other awards as may be appropriate.

13.    The amount claimed by Finning against Davis is US$10 million.


**OTHER MATTERS:**


14.    Attached to and forming part of this notice of arbitration is a true copy of the Agreement, Article 14.1 of which is the agreement of Finning and Davis to arbitrate any dispute or controversy arising out of or in connection with the Agreement or its performance. The Agreement requires that disputes be resolved by a single arbitrator and that the place of arbitration will be Houston, Texas.

        Davis is hereby notified that copies of the arbitration agreement and this demand are being filed with the American Arbitration Association at its Houston, Texas case management centre with a request that it commence administration of the arbitration. Under the Rules, you may file an answering statement within the time frame specified in the Rules, after notice from the administrator.

Document: 1172180:01

- 4 -

DATED at the City of Vancouver, British Columbia, this 16 day of September, 2003.

Gerald W. Ghikas, Q.C.
Canadian Counsel and Representative
for the Claimant, Finning International Inc.

- 5 -

Document 1172180:01



**I C D R** International Centre for Dispute Resolution

Luis M. Martinez, Esq.  *Vice President*

1633 Broadway  Floor 10  New York, NY  10019-6708
Tel: 212.484.4181  Fax: 212.246.7274  www.icdr.org

September 23, 2003

<u>VIA FEDERAL EXPRESS</u>

Mark S. Finkelstein, Esq.
Shannon, Martin, Finkelstein & Sayre
2400 Two Houston Center
909 Fannin Street
Houston, TX  77010

Gerald W. Ghikas, Q.C.
1200 Waterfront Centre
200 Burrard Street, P.O. Box 48600
Vancouver, B.C. V7X 1T2

Dennis Sanchez, Esq.
Sanchez Whittington, Janis & Zabarte, LLP
100 N. Expressway 83
Bronxville, TX  78521-2284

Alton W. Payne
5001 Bissonnet, Suite 200
Bellaire, TX  77401

Re: 50 T 181 00451 03
    Finning International Inc.
    vs
    Daniel E. Davis

Dear Parties:

This will acknowledge receipt by the International Centre for Dispute Resolution on September 22, 2003 from Claimant of a Demand for Arbitration dated September 16, 2003 of a controversy arising out of a contract between the above-captioned parties, containing a clause providing for administration by this Association. We understand that a copy was sent to Respondent. A copy of our International Arbitration Rules is enclosed.

Pursuant to Article 3, within thirty days of the date of this letter, a Respondent shall file a statement of defense in writing with the Claimant and this Association. If Respondent wishes to counterclaim, file three copies of same with the appropriate administrative fee and send a copy directly to Claimant.

Claimant has requested that the hearing be held in **Houston, Texas, USA.** Please review Article 13 of the Rules regarding the locale of hearings.

This will also serve to confirm your participation in an Administrative Conference Call on **October 1, 2003 at 3:00pm EDT, New York.** The purpose of this call is to address matters that will assist the Association in administering your case as efficiently and expeditiously as possible. The Association has found that such calls greatly improve the administrative process. Please be prepared to discuss the following items.

Whether mediation or other methods of dispute resolution might be appropriate.

A Division of the American Arbitration Association

**EXHIBIT**
**D**

As an option for resolution of this dispute, we propose mediation, as outlined in the enclosed Commercial Mediation Rules. It is our experience that mediation is expeditious, cost saving and highly successful. No additional administrative fee will be required for this process in the event the Parties desire to first attempt to mediate this dispute. Please note that the process is non-binding and the Parties must consent to these procedures.

Please provide a brief description of the case, the specification of the claims and the anticipated length of hearing.

Briefly comment on what type of arbitrator expertise you believe would be most valuable for this type of dispute and to discuss the number of arbitrators for this matter and the method of their appointment.

Parties are advised to consider the information to be exchanged during the arbitral proceedings. Please note that at this stage all discovery will be voluntary and any difficulties that may arise will be decided by the arbitrator(s) once appointed.

Parties are also encouraged to prepare a stipulation for uncontested facts, which will be reviewed by the arbitrator(s) again, once appointed.

Please limit your discussions to the administrative process. Any discussions regarding issues of arbitrability or the merits of the dispute should be reserved for the arbitrator(s). Once appointed we will schedule the preliminary hearing where all substantive matters will be brought to the attention of the arbitrator(s). It should be noted that failure to participate in the arbitral proceedings will not prevent the arbitrator(s) from issuing an arbitration award that may be enforced pursuant to the New York Convention.

The call will be initiated by our office on that date. If the Parties are not able to participate on the scheduled date of the call, we kindly request that the parties mutually agree on an alternate date and advise the undersigned so that the call may be scheduled accordingly.

The Association encloses herewith to each Party a form entitled 'Checklist for Conflicts' and requests that each Party fill out the document with the required information and return it to this office by **October 23, 2003**. It will be treated as confidential information, and not required to be exchanged by the Parties, unless the Parties agree otherwise. This is only a preliminary list to identify potential witnesses and for the arbitrator to perform a conflict's check. It will not commit the Parties at this point.

This matter is now being administered by the International Centre for Dispute Resolution of the American Arbitration Association in New York City, and has been assigned to **Tom Simotas (212-484-4086)**. Please address all future correspondence to him. In the event I can be of assistance throughout the administration of this matter and to respond to any questions or issues that may arise, regarding the administrative process, please feel free to contact me directly. My contact information is set forth below. Please note that all our case administrators are supervised by multilingual attorneys trained in international arbitration and mediation. We look forward to working with you and to providing you with assistance during your participation in the arbitral process.

Thank you for selecting the International Centre for Dispute Resolution, a leader in worldwide alternative dispute resolution.

Sincerely,

Michael Namias
ICDR Team Leader
International Centre for Dispute Resolution
212-484-4170
Namiasm@adr.org

(FT-10/2000)

## EXHIBIT "A"

A tract of land containing 4.94 acres, out of Lot 1, Block 1, TEXAS PIPE BENDING SUBDIVISION, City of Harlingen, Cameron County, Texas, according to the Map recorded in Cabinet 1, Slots 384-A and 384-B, Map Records of Cameron County, Texas, and said 4.94 acre tract being more particularly located and described as follows:

COMMENCING at the Southwest corner of said Lot 1, Block 1, TEXAS PIPE BENDING SUBDIVISION;

THENCE, South 89 degrees 48 minutes 00 seconds West, a distance of 340.58 feet;

THENCE, North 00 degrees 12 minutes 00 seconds West, a distance of 25.43 feet to a ½ inch iron pin set on the North Right-of-Way line of F.M. 106 (Harrison Street) same being the Southwest corner of the tract herein described;

THENCE, North 00 degrees 12 minutes 00 seconds West, a distance of 1059.97 feet to a ½ inch iron pin set for the Northwest corner of this tract;

THENCE, North 89 degrees 48 minutes 00 seconds East, a distance of 237.28 feet to a ½ inch iron pin set for the Northeast corner of this tract;

THENCE, South 00 degrees 12 minutes 00 seconds East, a distance of 260.14 feet to a ½ inch iron pin set for an outside corner of this tract;

THENCE, South 89 degrees 48 minutes 00 seconds West, a distance of 45.56 feet to a ½ inch iron pin set for an inside corner of this tract;

THENCE, South 00 degrees 12 minutes 00 seconds East, a distance of 800.22 feet to a ½ inch iron pin set for the Southeast corner of this tract;

THENCE, South 89 degrees 55 minutes 00 seconds West, along said North Right-of-Way line of F.M. 106 (Harrison Street), a distance of 191.71 feet to the POINT OF BEGINNING, Containing 4.94 acres of land more or less, inclusive of any and all easements, restrictions, exceptions or dedications that might be of record.

NOTE: THIS COMPANY DOES NOT REPRESENT THAT THE ACREAGE AND/OR SQUARE FOOTAGE CALCULATIONS ARE CORRECT.

Any and all property and equipment located on the real property identified on the prior page, including but not limited to:

**30T Crawler Crane**
C20-30   DavCrane Serial No. 3000 - Cat Serial No.OEM00484 - Finning Stock No. 500001

**40T Crawler Crane**
C25-40 - DavCrane Serial No. 4001 - Cat Serial No.OEM00483 - Finning Stock No. 500003
C25-40 - DavCrane Serial No. 4002 - Cat Serial No.OEM00508 - Finning Stock No. 500004
C25-40 - DavCrane Serial No. 4003 - Cat Serial No.OEM00509 - Finning Stock No. 500005

**9T Rough Terrain Industrial Crane**
TH62 - DavCrane Serial No. 9004 - Cat Serial No.4TM04482 - Finning Stock No. 500006
TH62 - DavCrane Serial No. 9005 - Cat Serial No.4TM04477 - Finning Stock No. 500007

TH63 - DavCrane Serial No. 9001 - Cat Serial No.5WM02242 - Finning Stock No. 500009
TH63 - DavCrane Serial No. 9002 - Cat Serial No.5WM02799 - Finning Stock No. 500013
TH63 - DavCrane Serial No. 9003 - Cat Serial No.5WM03084 - Finning Stock No. 500014

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DANIEL E. DAVIS AND | § | |
| DAVCRANE, INC. | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-03-206 |
| | § | |
| FINNING INTERNATIONAL, INC. | § | |

### ORDER GRANTING FINNING INTERNATIONAL, INC.'S
### MOTION TO STAY SUIT PENDING ARBITRATION;
### (1) MOTION TO STAY OR DISMISS DUE TO PRIOR-FILED ACTION;
### (2) MOTION TO DISMISS FOR INSUFFICIENT SERVICE OF PROCESS;
### AND, SUBJECT THERETO,
### (4) MOTION TO TRANSFER VENUE

Upon hearing of the Motion of Finning International, Inc. to stay, dismiss, or to transfer venue of this suit, the Court finds the Motion should be granted. It is therefore ORDERED that this suit is dismissed without prejudice.

Signed this ___ day of _____, 2003.

_____
UNITED STATES DISTRICT COURT JUDGE

# EXHIBIT 2

UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

NOV - 5 2003

Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| FINNING INTERNATIONAL INC., | § | **H-03 -5080** |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. _____ |
| | § | |
| DANIEL E. DAVIS and | § | |
| DAVCRANE, INC., | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Finning International Inc., Plaintiff, complaining of Daniel E. Davis and Davcrane, Inc.,

Defendants, files this Original Complaint, and for cause of action shows the following:

## PARTIES

1.      Finning International Inc. ("Finning") is a corporation incorporated under the

laws of Canada, with its principal place of business in Vancouver, British Columbia.  Finning

has qualified as a foreign corporation licensed to do business in the state of Texas.

2.      Daniel E. Davis ("Davis") is an individual domiciled in the state of Texas.  Davis

may be served with process at his business office, at 115 East Van Buren Avenue, Harlingen,

Texas  78550.

3.      Davcrane, Inc. ("Davcrane") is a Texas corporation with its principal place of

business in Harlingen, Cameron County, Texas.  Davcrane has appointed Daniel E. Davis as its



EXHIBIT
**2**

agent for service of process.  Davcrane may be served with process at 115 East Van Buren Avenue, Harlingen, Texas  78550.

       4.      The Court's Procedures and Order for Conference are also being served herewith upon each Defendant.

## JURISDICTION AND VENUE

       5.      This Court has subject matter jurisdiction over Finning's claims under 9 U.S.C. §203 because this suit involves an arbitration conducted in accordance with the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, pursuant to 9 U.S.C. § 201, *et seq*. This Court also has jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and is between a citizen of a foreign state and a citizen of the forum state.  The Court also has jurisdiction because the matter involves an international arbitration and alienage jurisdiction, under 28 U.S.C. § 1332(a)(2). Further, the matter involves, among other things, patent rights and therefore involves federal question jurisdiction under 28 U.S.C. § 1338.

       6.      .This Court has personal jurisdiction over each of the Defendants because Finning's causes of action. arise from or are connected with acts of each of the Defendants purposely done in Texas, and/or transactions consummated by them in Texas.

       7.      Venue is proper in this district pursuant to 9 U.S.C. § 204, because the parties have entered into a written contract providing for arbitration in this district.  Venue is also proper in this district by 28 U.S.C. § 1391(a)(2) by virtue of the fact that the transactions made the basis of this suit were accomplished, and a substantial part of the events or omissions giving rise to the claims occurred, in this judicial district.

## FACTS

8.    **The Parties.** Finning is a company that sells, rents, finances and provides support services for heavy equipment bearing the Caterpiller brand. Davis and Davcrane are engaged in the manufacture of cranes and lifting equipment. Davis is the president of Davcrane. As a part of its business, Finning serves as the exclusive worldwide dealer of DCI cranes and lifting equipment. The DCI cranes and equipment are built by Davcrane based upon Caterpiller equipment supplied by Finning to Davcrane.

9.    **The Parties' Contracts.** On July 15, 2002, Davis entered into a Distributor Agreement with Finning (the "Agreement.") The Agreement granted Finning the exclusive right to market, distribute and sell the product lines that are generally referred to as the DCI cranes and lifting equipment, which were to be manufactured by the Defendants utilizing patented technology held by Davis. Finning agreed, among other things, to supply the major Caterpiller crane components involved in the manufacture of the DCI equipment, and to front Davis $1.5 million dollars in the form of a facilities loan. Davis and Davcrane agreed, among other things, to manufacture the DCI cranes and to turn them over to Finning upon completion. Davis and Davcrane further agreed to various security provisions so that title to much of the equipment is held by Finning. Further, as part of its rights, Finning has the right to possession and ownership of the equipment, the patent technology, and the manufacturing facility if Davis commits an event of default under the Agreement and such default is not timely cured. A true and correct copy of the Agreement, with the related security agreements and ancillary documents, is attached as Exhibit A to this Complaint.

10.    **The Defaults by the Defendants.** Under the Agreement, Davis is required, among other things, to: (a) control the manufacturing costs that will be borne by Finning,

including providing an estimate of overhead costs in advance of each manufacturing period; (b) assemble the equipment in a timely fashion; and (c) maintain solvent operations.

11.     Davis is in breach of these obligations under the Agreement.  In a letter from Davis' counsel it is further acknowledged that Davis plans to "wind down" the business, in a blatant default of yet other obligations under the Agreement.  A true and correct copy of this notice from Davis' counsel is attached as Exhibit B.

12.     In an attempt to limit the scope of the parties' dispute, Finning and the Defendants agreed, on an interim basis, for the Defendants to turn over two of the cranes to Finning in exchange for Finning remitting additional funds to the Defendants.   Finning made such remittance but the Defendants have reneged on this supplemental interim agreement, in further breach of their contractual obligations.  Similarly, a supplemental agreement was made whereby one fully functional crane would be delivered for use by Finning at a trade show, in exchange for remittance of $50,000 by Finning to the Defendants (with a reservation of all rights).  While the crane was released from the Defendants, it was far from functional, with a resulting negative effect at the trade show.  The Defendants have subsequently admitted that significant additional work was needed to make the crane functional.

13.     **The Arbitration Proceeding.**  Under the Agreement, and pursuant to both federal and Texas law, Finning has invoked the contractual arbitration provision.  Attached as Exhibit C is a copy of the Notice of Arbitration sent by counsel for Finning to the Defendants and their counsel.   Attached as Exhibit D is the notice issued by the American Arbitration Association in furtherance of the arbitration.

14.     While the arbitration proceeding is pending, the cranes and related property that are in Davis' and Davcrane's possession should be safeguarded, if not simply turned over to

Finning.  Pursuant to Tex. Civ. Prac. & Rem. Code § 172.175, this Court has authority to issue orders to protect the property that is the subject of the arbitration.  Further, pursuant to Article 21(3) of the International Arbitration Rules of the American Arbitration Association, adopted by the parties by virtue of the Agreement, a request for interim measures by the Court is compatible with the agreement to arbitrate and is not a waiver of the right to arbitrate.  Attached as Exhibit E is a list of the property that is in Davis and Davcrane's custody, but which should be turned over to Finning or at a minimum protected from harm or disposition by Davis and Davcrane.

15.    If possession of the property is not returned to Finning, then a Court order should issue requiring that the equipment be maintained safely in a facility that is subject to Finning's periodic inspection.  On information and belief, the Defendants have sold some of the equipment to a third party, and further disposition of the equipment should be halted.

## COUNT 1 - APPLICATION FOR AID OF ARBITRATION

16.    Finning repeats and incorporates by reference all of its allegations in paragraphs 1 through 15.

17.    Finning requests that this Court take jurisdiction to compel the arbitration and to confirm and enforce any award of the arbitration when such is rendered.

## COUNT 2 - APPLICATION FOR INTERIM RELIEF
## PENDING ARBITRATION

18.    Finning repeats and incorporates by reference all of its allegations in paragraphs 1 through 17.

19.    Finning requests this Court to issue an injunction, prohibiting Davis and Davcrane, and its or their representative and affiliates, and any persons acting in concert with them, from interfering with Finning's repossession of the DCI equipment.  In the alternative, Finning requests that the Court order the same parties to maintain the equipment in a segregated location, with free access by Finning representatives upon advance notice of at least 24 hours, during the pendency of the arbitration.

20.    It is extremely likely that Finning will succeed on its claims, because Davis and Davcrane's actions are in direct breach of the Agreement and their supplemental contractual agreements.  Further, if the Defendants do not allow Finning access to the equipment, Finning is exposed to imminent harm and irreparable injury, because title to much of the equipment has remained in Finning and none of the equipment should be exposed to waste or attempted seizure by other creditors.  Further, there is no adequate remedy at law, because the prospect of recovery of monetary damages is unknown given the incalculable value of the equipment when turned over to Finning and marketed properly.  Finning has also been informed by the Defendants that they are winding down their operations, and therefore Defendants obviously do not need the equipment in conducting current operations.  Therefore any injury faced by Finning outweighs the injury, if any, that would be sustained by the Defendants if the injunctive relief is granted.

## **RESERVATION OF RIGHTS**

21.    Finning repeats and incorporates all of its allegations in paragraphs 1 through 20 by reference.

22.    Pursuant to the Agreement and the ancillary security documents, Finning has the

right to non-judicial foreclosure of its security interests. Finning reserves its right to conduct such non-judicial proceedings, either separate from or in conjunction with any judicial foreclosure of such security interests. Finning reserves its right to pursue any additional relief and specifically does not hereby elect an exclusive remedy and does not waive its right to seek other or additional relief.

## CONDITIONS PRECEDENT

23.    Finning has performed all conditions precedent for recovery on its claims, or all such conditions have been satisfied.

## PRAYER

24.    Finning prays that each of the Defendants be cited to appear and answer and that Finning have judgment against each of the Defendants, jointly and severally, for enforcement of the arbitration award, when rendered, and in the interim for injunctive relief, restraining the Defendants and their representatives and affiliates from hindering or otherwise interfering with Finning's possession of the facilities, equipment, and technology that are the subject of the parties' Agreement, or in the alternative, requiring that such property be safely maintained and segregated by the Defendants in a location that provides Finning with free inspection of the equipment on 24 hours notice. Finning additionally prays for such further relief, both general and special, at law and in equity, to which it may be justly entitled.

Respectfully submitted,

Jeffery R. Koch
Texas Bar No. 11645250
2400 Two Houston Center
909 Fannin Street
Houston, Texas 77010
(713) 646-5503 (Telephone)
(713) 752-0337 (Facsimile)

ATTORNEY FOR PLAINTIFF

OF COUNSEL:

SHANNON, MARTIN, FINKELSTEIN & SAYRE
A Professional Corporation
Mark S. Finkelstein
Texas Bar No. 07015100
S.D. Tex. No. 5543
2400 Two Houston Center
909 Fannin Street
Houston, Texas 77010
(713) 646-5503 (Telephone)
(713) 752-0337 (Facsimile)

| **Exhibits:** | A | Distributor Agreement, with ancillary documents. |
| | B | Letter from Defendant's counsel. |
| | C | Letter from Finning's counsel initiating arbitration. |
| | D | Notice from American Arbitration Association. |
| | E | List of property subject to Finning's possessory or security rights. |

## DISTRIBUTOR AGREEMENT

**THIS DISTRIBUTOR AGREEMENT** dated July 15 2002, is made between **DANIEL E. DAVIS,** businessperson having an address at P.O. Box 2427, Harlingen, Texas, 78551, USA (**"Davis"**) and **FINNING INTERNATIONAL INC.**, a corporation incorporated under the laws of Canada, having an address at 16830 – 107ᵗʰ Avenue, Edmonton, Alberta, T5P 4C3, Canada (**"Finning"**).

**WHEREAS:**

A.          Davis had developed and owns the Technology (defined below) regarding the special assembly of the Product Lines (defined below);

B.          Finning, either directly or indirectly through its affiliates and subsidiaries, has the infrastructure to sell and distribute the Distributed Products (defined below) to end-user customers;

C.          Davis and Finning entered into a Letter of Intent dated June 18, 2002, regarding the grant by Davis to Finning of exclusive distribution rights to the Product Lines using the Technology and other related matters (the "LOI"); and

D.          Davis and Finning now wish to enter into this Agreement to supersede and replace the LOI;

**NOW, THEREFORE THIS AGREEMENT WITNESS** that in consideration of the premises, mutual covenants and agreements contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is acknowledged by the parties hereto (the **"Parties"**), the Parties covenant and agree as follows:

**1.          INTERPRETATION**

1.1          **Definitions:** As used in this Agreement, the term:

**"Agreement," "this Agreement," "the Agreement," "hereto," "herein," "hereby," "hereunder"** and similar expressions mean or refer to this Agreement as amended from time to time and any indenture, agreement or instrument supplemental or ancillary hereto and the expressions "Article," "Section" and "Schedule" followed by a number or letter mean and refer to the specified Article, Section or Schedule of this Agreement;

**"Assignment of Royalties"** has the meaning ascribed thereto in Section 6.7(c);

**"Books and Records"** means, with respect to each Party, the books and records of that Party relating to the Distributed Products and costs associated therewith, including financial, operations and sales books, books of account, sales and purchase records, lists of customers, business reports and plans;

**"Business Day"** means any day, other than a Saturday, Sunday or a statutory holiday anywhere in Canada or the United States of America;

**"Claim"** means any claim, demand, action, cause of action, damage, loss, costs, liability or expense, including reasonable professional fees and all costs incurred in investigating or pursuing any of the foregoing or any proceeding relating to any of the foregoing;

- 1 -

EXHIBIT
A

"**Confidential Information**" means all information provided by one Party (the "**Disclosing Party**") to the other Party (the "**Receiving Party**") in connection with this Agreement and includes, but is not limited to, specifications, designs, drawings, sketches, models, test results, current and forecasted data, reports, records, discoveries, ideas, inventions, concepts, techniques, methods, source code, project code, source listings, program listings, documentation, diagrams, flow charts, research and development data, processes, procedures, formulas, know how, marketing techniques, customer and supplier lists and other proprietary rights, communicated in any medium. Confidential Information also includes the existence of any terms of the LOI and this Agreement. Confidential Information does not include information that:

(i)     is already known to the Receiving Party from a source which is not prohibited from disclosure as evidenced by written or other dated tangible records;

(ii)    is in the public domain at the time it is disclosed or becomes publicly available after disclosure, other than by breach of this Agreement;

(iii)   is independently and lawfully developed by the Receiving Party completely without reference to the Confidential Information, or with respect to Finning, the Technology, as evidenced by written or other tangible records; or

(iv)    is disclosed without restriction to the Receiving Party in good faith by a third party (other than Caterpillar or its affiliates) who is in lawful possession of the information and who has the right to make the disclosure, or is disclosed by the Receiving Party after receiving written approval from the Disclosing Party;

"**Davis Costs**" means the actual costs paid by Davis to his suppliers and employees for the Minor Components and the assembly of the Major and Minor Components as evidenced by the Books and Records of Davis;

"**Davis Insolvency Event**" has the meaning ascribed thereto in Section 7.1(c);

"**Davis Payment**" has the meaning ascribed thereto in Section 5.5(b);

"**Distributed Products**" means Product Lines manufactured and assembled using, containing or incorporating the Technology;

"**Distribution and Licensing Fee**" has the meaning ascribed thereto in Section 5.1;

"**Due Diligence Completion Date**" has the meaning ascribed thereto in Article 15;

"**Encumbrance**" has the meaning ascribed thereto in Section 7.1(e);

"**Estimated Manufacturing Overhead Costs**" has the meaning ascribed thereto in Section 5.3;

"**Estimated Production Quantity**" has the meaning ascribed thereto in Section 5.3;

"**Event of Default**" means the breach by a Party of any covenant, representation or warranty made by that Party under this Agreement or the Security Documents, or the failure of that Party to perform any of his or its obligations under this Agreement or the Security Documents;

"**Facility**" has the meaning ascribed thereto in Section 3.1;

"**Facility Loan**" has the meaning ascribed thereto in Section 6.1;

"**Favelle Licence**" means the non-exclusive licence granted by Davis to Favelle Favco Cranes (USA) Inc. relating to U.S. Patent No. 6,003,252;

"**Fee Refund**" has the meaning ascribed thereto in Section 5.1;

"**Finning Costs**" means the actual costs paid by Finning to its suppliers, as evidenced by the Books and Records of Finning, for the Major Components;

"**Finning Insolvency Event**" has the meaning ascribed thereto in Section 7.2(c);

"**Force Majeure**" means an event or circumstances that is beyond the reasonable control of a Party and that prevents or delays that Party in the performance or observance of any of, or all, its obligations under of this Agreement, including without limitation, acts or omissions of the other or a third party, acts of civil of military authority, strikes, lockouts, embargoes, insurrections or acts of God;

"**Governmental Authorities**" means any government, regulatory authority, governmental department, agency, commission, board, tribunal, or court or other law, rule or regulation-making entity having or purporting to have jurisdiction on behalf of any nation, state or other subdivision of this Agreement or any municipality, district or other subdivision of this Agreement;

"**Gross Margin**" has the meaning ascribed thereto in Section 5.5;

"**Initial Term**" has the meaning ascribed thereto in Section 2.3;

"**Intellectual Property Rights**" will include all intangible, intellectual, proprietary and industrial property rights of any nature and all intangible embodiments and derivative works thereof, including without limitation, (i) all trade-marks, trade names, slogans, domain names, URLs or logos; (ii) all copyrights, moral rights and other rights in works of authorship; (iii) all patents and patent applications, patentable ideas, algorithms, developments, discoveries, inventions, improvements, innovations; (iv) all know-how and trade secrets; and (v) all registrations, applications, renewals, extensions, continuations, divisions or reissues thereof now or hereafter in force (including any rights in any of the foregoing);

"**Landed Dealer Cost**" means the sum of the Product Cost, Running Royalty and unrecovered freight and transportation costs applicable to each Distributed Product, including without limitation shipping, delivery, transportation and insurance costs pursuant to Sections 4.2 and 4.3;

"**Laws**" means all applicable laws, by-laws, rules, regulations, orders, ordinances, and judgements or other requirements of any Governmental Authority that in each case, have legally binding effect;

"**LIBOR**" means the London InterBank Offered Rate as published by the British Bankers' Association from time to time;

"**LOI**" has the meaning ascribed thereto in Recital C;

"**Major Components**" means, with respect to each Distributed Product, all significant physical parts for the Distributed Products that are purchased by Finning;

"**Manufacturing Overhead Costs**" means Davis' reasonable overhead and administration costs pertaining to the manufacture or assembly of the Distributed Products, including without limitation,

- 3 -

determine the price at which it sells any Distributed Product, provided however, that Finning will endeavour to maximize the Sale Price for all Distributed Products.

## 4.         ORDERS AND DELIVERY OF DISTRIBUTED PRODUCTS

**4.1            Orders for Distributed Products:**  Finning will, from time to time, deliver to Davis written orders for Distributed Products, specifying the type and quantity of Distributed Products ordered, the Person and location to which the Distributed Products are to be delivered upon completion, the required delivery date for the Distributed Products, and such other details reasonably required to process and fulfil such an order.  Upon Finning delivering an order to Davis for Distributed Products, Finning will arrange for all Major Components related to that order to be delivered to Davis at the Facility.  Upon receipt of such Major Components by Davis at the Facility, Davis will manufacture and assemble the Distributed Products specified in that order in accordance with that order and will promptly notify Finning upon the completion of the Distributed Products.

**4.2            Delivery of Distributed Product:**  At Finning's cost, Davis will deliver completed Distributed Products to the Person, at the location and on the date specified by Finning in each order, provided however, that the specified delivery date will not be less than 60 calendar days from the date on which the Major Components related to that order were delivered to Davis at the Facility.  The Parties will cooperate and coordinate the order and delivery of Distributed Products, Major Components and Minor Components in order to efficiently fulfil Finning's demand for Distributed Products in a timely and cost-effective manner.

**4.3            Transportation, Insurance and Shipping Documents:**  At Finning's cost, Davis will be responsible for arranging all transportation for Distributed Products from the Facility to the delivery location specified in each order and will also procure insurance for the Distributed Products against the risks of transportation with a well-rated insurance company approved by Finning acting reasonably. Davis will be responsible for preparing or causing to be prepared all documents and invoices necessary for transportation of the Distributed Products.

## 5.         PAYMENTS

**5.1            Distribution and Licensing Fee:**  Upon Finning's obligations under this Section 5.1 commencing and becoming of full force and effect pursuant to Article 15, and in consideration of Davis granting Finning the rights in Section 2.1, Finning will pay Davis US$1,500,000 (the "**Distribution and Licensing Fee**") by initiating a wire transfer of the Distribution and Licensing Fee to an account specified by Davis.  Davis will refund one third of the Distribution and Licensing Fee (US$500,000) to Finning by Davis directing Finning to retain 50% of the Running Royalty in accordance with Section 5.4 (the "**Fee Refund**").  Davis will use a portion of the Distribution and Licensing Fee to protect the Technology for the benefit of Finning and to further develop the Technology and the Distributed Products.

**5.2            Davis Costs:**  Finning will pay Davis the Davis Costs applicable to each Distributed Product within 15 Business Days of Davis advising Finning that the Distributed Product is fully manufactured and assembled in accordance with this Agreement, conforms to the Specifications and is ready to be shipped to a customer.  In the event Davis does not have sufficient operating capital to finance the Davis Costs, upon the request of Davis, Finning will consider advancing funds to Davis for this purpose upon such terms as the Parties may from time to time agree, provided that nothing in this Section 5.2 will be construed as requiring Finning to advance any funds to Davis.

- 8 -

**5.3**       **Manufacturing Overhead Costs:** Before the start of each calendar quarter during the Term or before the start of such other period of time as the Parties may agree (each, a "**Period**"), the Parties will agree upon the estimated Manufacturing Overhead Costs for that Period (the "**Estimated Manufacturing Overhead Costs**") together with the estimated number of Distributed Products to be manufactured and assembled by Davis during that Period (the "**Estimated Production Quantity**"). Each time Finning orders a Distributed Product, Finning will pay Davis the Estimated Manufacturing Overhead Costs divided by the Estimated Production Quantity (the "**Per Unit EMOC**"). As soon as reasonably practicable after the end of each Period, the Parties will calculate the actual Manufacturing Overhead Costs for that Period. The Parties will adjust the Per Unit EMOC for each Period up or down by the amount by which the aggregate Per Unit EMOC paid by Finning to Davis during the immediately previous Period is less than or exceeds the actual Manufacturing Overhead Costs for that Period, respectively. It is the intention of the Parties that the Per Unit EMOC will be adjusted each Period pursuant to this Section 5.3 so that the aggregate Per Unit EMOC paid by Finning to Davis throughout the Term is equal to the aggregate Manufacturing Overhead Costs throughout the Term, on a Period by Period basis.

**5.4**       **Running Royalty:** Within 10 Business Days of Finning receiving the Sale Price in full from a customer with respect to the initial sale of a Distributed Product, Finning will pay Davis a running royalty equal to six percent (6%) of the Product Cost for that Distributed Product (the "**Running Royalty**"). Notwithstanding the foregoing, Davis irrevocably directs Finning to withhold 50% of the Running Royalty and credit it towards the Fee Refund until Davis has paid Finning the Fee Refund in full totalling $500,000. For greater certainty, the Parties agree that Davis will only receive a Running Royalty with respect to the first sale of each particular Distributed Product to a customer, and will not be entitled to, and Finning will not pay Davis, any Running Royalty with respect to the resale or any subsequent sale of that particular Distributed Product by the customer, Finning or any other Person, whether or not that particular Distributed Product becomes a Returned Product.

**5.5**       **Marketing Fee:** To the extent that the price for which Finning sells a Distributed Product to a customer (the "**Sale Price**") exceeds the Landed Dealer Cost for that Distributed Product (the difference being the "**Gross Margin**"):

      (a)     Finning will retain that portion of the Gross Margin up to an amount equal to 20% of the Sale Price (the "**Marketing Fee**"); and

      (b)     Finning will pay Davis within 15 Business Days of Finning receiving the Sale Price in full from the customer, 75% of any portion of the Gross Margin remaining after Finning has retained the Marketing Fee (the "**Davis Payment**"). At any and all times while there is an outstanding balance under the Facility Loan, Davis hereby irrevocably directs Finning to retain 60% of the Davis Payment owing by Finning to Davis in accordance with this Section 5.5 and apply such amount to payment by Davis of the Facility Loan until the Facility Loan is repaid in full.

**5.6**       **Referral Commission:** In addition to other amounts contemplated in this Agreement, Finning will pay Davis a referral commission equal to 5% of the Sales Price for each Distributed Product or Replacement Product sold by Finning arising from a Referral within 6 months of Davis making the Referral, provided that all such sales must arise independent from any pre-existing relationship that any such customer had with Finning, as evidenced in Finning's Books and Records, for each product in the Product Lines (the "**Referral Commission**"). In order for Davis to be eligible for a Referral Commission with respect to any Distributed Product, Davis or his marketing agents must complete and deliver to Finning the sales order and all other sales documents required by Finning to finalise the sale of that

-9-

Distributed Product. Finning will pay Davis the Referral Commission applicable to each Distributed Product sold within 15 Business Days of Finning rendering an invoice to the customer with respect to that Distributed Product.

**5.7        Reversal of Sales:**  Notwithstanding any other provision of this Agreement, if a customer reverses the purchase of a Distributed Product from Finning and returns that Distributed Product to Finning or its agents (each, a **"Returned Product"**), Davis will not be entitled to the Referral Commission, if applicable, with respect to that Returned Product. If Finning has paid Davis the Referral Commission with respect to a Returned Product, Davis will refund the Referral Commission so paid by Finning with respect to that Returned Product within 15 Business Days of Finning advising Davis that the customer has returned that Returned Product, by either paying Finning such Referral Commission or by issuing Finning a credit equal to the amount of such Referral Commission, as Finning may direct in its discretion.

**6.        FINNING FINANCING**

**6.1        Facility Loan:**  Finning will make available to Davis, and Davis will borrow from Finning, up to the principal amount of US$1,500,000 (the **"Facility Loan"**), upon the terms and conditions set out in this Agreement. The Facility Loan will not bear interest from the date of advance until July 15, 2007. The Facility Loan will bear interest after July 15, 2007 in accordance with Section 6.5.

**6.2        Purpose:**  Davis will use the Facility Loan exclusively for the purposes of building, acquiring or equipping the Facility and for no other purpose.

**6.3        Advance of Funds:**  Davis may draw against the Facility Loan and Finning will advance Davis funds under the Facility Loan only in accordance with the provisions of Article 6. Each time Davis wishes to draw against the Facility Loan, he will make a request to Finning in writing specifying the amount and the date on which he wishes Finning to advance him funds under the Facility Loan, which date will not be less than 15 Business Days after the date on which Davis delivers the request to Finning. Concurrently with Finning making any advance under the Facility Loan, Davis will execute such documents as Finning may reasonably require to evidence the portion of the Facility Loan to be advanced. Notwithstanding the foregoing, Finning will not be required to advance Davis funds under the Facility Loan if:

(a)    Davis has not executed and delivered to Finning the Security Documents in accordance with Section 6.7;

(b)    Davis has committed an Event of Default;

(c)    in the reasonable opinion of Finning, there has been any material adverse change in the business, assets or financial condition of Davis; or

(d)    there is any action, proceeding or investigation pending or threatened against Davis, which would in the reasonable opinion of Finning, if successful, have a material adverse effect on Davis' ability to repay the Facility Loan under the terms of this Agreement.

**6.4        Acknowledgement of Previous Advance:**  Davis acknowledges that Finning previously advanced Davis US$100,000 on June 18, 2002, pursuant to the LOI. Davis agrees that this US$100,000

- 10 -

will be deemed to be an advance under the Facility Loan and will be subject to the provisions of this Agreement.

6.5      **Repayment of Facility Loan:** Subject to Sections 5.5, 6.6, 11.1, 12.1 and Article 15, the outstanding balance of the Facility Loan will become immediately due and payable, and Davis will pay Finning the outstanding balance of the Facility Loan in full, on or before July 15, 2007; and if the Facility Loan is not paid to Finning in full on or before July 15, 2007, then interest will accrue at an interest rate equal to LIBOR + 5% on the outstanding balance of the Facility Loan from July 15, 2007 until the Facility Loan and interest are paid in full.

6.6      **Prepayment:** Notwithstanding Section 6.5, Davis may at any time repay Finning the whole or from time to time any part of the outstanding balance of the Facility Loan without notice, bonus or penalty. Any payments so received by Finning will be applied firstly to any accrued and unpaid interest, and secondly to the unpaid balance of the principal then outstanding.

6.7      **Security:** As security for repayment of the Facility Loan, Finning will, as soon as reasonably practicable after the date of this Agreement, deliver to Davis for his approval the documents listed in this Section 6.7, and upon such approval, Davis will:

      (a)      execute and deliver to Finning a security agreement (the "**Security Agreement**") granting Finning a first charge security interest over:

            (i)      all of Davis' equipment and tooling to be purchased with the proceeds of the Facility Loan; and

            (ii)      the Technology (and Finning acknowledges that the Technology, by its definition, does not relate to the special assembly of any marine or offshore products);

            in a form acceptable to Finning, provided that the security interest granted to Finning in the Technology will be subject to an ongoing automatic right of reversion in favour of Davis for a period of 10 years commencing from the date of the Security Agreement. If at any time during this 10 year period Davis pays Finning in full the outstanding balance of the Facility Loan (including all accrued interest thereon, if any), the ownership of the Technology will automatically revert to Davis. Finning agrees to execute such documents and take further steps as may be reasonably required to perfect this reversion of ownership at that time;

      (b)      immediately upon the later of Davis acquiring the Facility or executing this Agreement, Davis will execute and deliver to Finning a mortgage, in a registrable form acceptable to Finning, together with all other related documents Finning determines are necessary for registering the same, granting Finning a first mortgage over the Facility (the "**Mortgage**"); and

      (c)      execute and deliver to Finning a collateral assignment of all royalties and income to be derived by Davis from the Technology or the Distributed Products, in a form acceptable to Finning (the "**Assignment of Royalties**", together with the Security Agreement and Mortgage, the "**Security Documents**").

- 11 -

**6.8**        **Compliance with Finning's Policies:**  Davis will comply promptly with any and all reasonable policies and other guidelines of Finning with respect to Distributed Products of which Finning will give Davis upon execution of this Agreement.

**6.9**        **Initial Advance of Funds:**  The Parties will use reasonable commercial efforts to complete and execute the Security Documents as soon as reasonably practicable, but in any event not later than August 1, 2002.  Subject to Section 6.3, Finning will advance US$750,000 under the Facility Loan to Davis by initiating a wire transfer of such funds to an account specified by Davis not later than August 1, 2002.

**7.**        <u>**REPRESENTATIONS, WARRANTIES AND COVENANTS**</u>

**7.1**        **Davis Representations, Warranties and Covenants:**  Davis represents, warrants and covenants to and with Finning, with the intention that Finning is relying upon these representations, warranties and covenants in entering into this Agreement, that except as otherwise expressly provided for in this Agreement, now and at all times throughout the Term:

> (a)     Davis has the requisite power, authority and approvals to enter into, execute and deliver this Agreement, the Security Documents and to perform his respective obligations under this Agreement and the Security Documents;

> (b)     the execution and delivery of this Agreement and the Security Documents and the performance by Davis of his obligations under this Agreement and the Security Documents will not conflict with or constitute a breach of or default under any outstanding contract, commitment or agreement to which Davis is a party or to which the Technology or Distributed Products are subject, or limit, restrict or impair the rights granted to Finning under this Agreement and the Security Documents;

> (c)     Davis is not bankrupt or insolvent, no receiver, receiver-manager, receiver and manager, or liquidator has been appointed over any part of the property of Davis, no proceeding has been commenced by or against Davis under any bankruptcy, arrangement, reorganization, dissolution, liquidation, insolvency or similar law for the relief of or otherwise affecting creditors of Davis, or by or against any guarantor or surety for Davis, and no writ of execution, warrant, attachment, sequestration, levy, third party demand, notice of intention to enforce security or garnishment or similar process has been issued against Davis or any of Davis' property (each, a **"Davis Insolvency Event"**);

> (d)     Davis is not aware of any basis for a Davis Insolvency Event to occur;

> (e)     Davis is the sole and exclusive legal and beneficial owner of the Technology, free and clear of all mortgages, assignments of rents, leases, licenses, charges, security interests, hypothecs, liens, options to acquire any interest in, claims, judgments or any other form of encumbrance (each, an **"Encumbrance"**) other than the Favelle Licence and any security or rights granted to Finning pursuant to this Agreement;

> (f)     other than the Favelle Licence, Davis has not granted and no third party has any rights or anything capable of becoming a right, to use the Technology or to distribute, market or sell the Distributed Products;

- 12 -

(g) to the best of Davis' knowledge after making due enquiry, the Technology does not infringe any Intellectual Property Rights of any Person;

(h) upon executing and delivering the Mortgage in accordance with Section 6.7, Davis will be the registered and beneficial owner of the Facility, free and clear of all financial Encumbrances other than the Mortgage;

(i) the Major Components, Minor Components and Technology, together with Davis' skills and all drawings, specifications, engineering and related materials in his possession, are sufficient to enable him to manufacture or assemble the Distributed Products in a safe and competent manner;

(j) all Distributed Products will be manufactured and assembled by Davis in a prompt, efficient, skilful and careful manner in accordance with North American industry standards for the manufacture and assembly of similar equipment, and in compliance with all applicable Laws;

(k) upon being delivered by Davis to Finning or its customers in accordance with Article 4, all Distributed Products will conform to the Specifications, will be new (except to the extent that the Major Components, when delivered to Davis by Finning, are not new), of merchantable quality and will be fit for their intended purpose;

(l) Davis will only use the Technology for the purposes of manufacturing and assembling the Product Lines;

(m) Davis will not grant any license or other rights in the Technology for the Product Lines to any Person without Finning's prior written consent;

(n) Davis will not permit any Encumbrance to exist on any of its property or assets, including the Facility, Technology and Minor Components, except as expressly contemplated in this Agreement or as otherwise approved by Finning in writing; and

(o) Davis will obtain and maintain in full force and effect throughout the Term, at its own expense, any and all permits, approvals and licenses required by any Governmental Authorities relating to the manufacture and assembly of the Distributed Products at the Facility.

7.2 **Finning Representations, Warranties and Covenants:** Finning represents, warrants and covenants to and with Davis, with the intention that Davis is relying upon these representations, warranties and covenants in entering into this Agreement, that except as otherwise expressly provided for in this Agreement, now and at all times throughout the Term:

(a) Finning has the requisite power, authority and approvals to enter into, execute and deliver this Agreement and to perform its respective obligations under this Agreement;

(b) the execution and delivery of this Agreement and the performance by Finning of its obligations under this Agreement will not conflict with or constitute a breach of or default under any outstanding contract, commitment or agreement to which Finning is a party, or limit, restrict or impair the rights granted to Davis under this Agreement;

- 13 -

(c)     Finning is not bankrupt or insolvent, no receiver, receiver-manager, receiver and manager, or liquidator has been appointed over any part of the property of Finning, no proceeding has been commenced by or against Finning under any bankruptcy, arrangement, reorganization, dissolution, liquidation, insolvency or similar law for the relief of or otherwise affecting creditors of Finning, or by or against any guarantor or surety for Finning, and no writ of execution, warrant, attachment, sequestration, levy, third party demand, notice of intention to enforce security or garnishment or similar process has been issued against Finning or any of Finning's property (each, a "**Finning Insolvency Event**");

(d)     Finning is not aware of any basis for a Finning Insolvency Event to occur;

(e)     Finning will not grant any rights in this Agreement to any Person without Davis' prior written consent;

(f)     Finning will not permit any Encumbrance to exist on or with respect to this Agreement;

(g)     Finning will obtain and maintain in full force and effect throughout the Term, at its own expense, any and all permits, approvals and licenses required by any Governmental Authorities relating to the sale or distribution of the Distributed Products;

(h)     Subject to Sections 6.7, 12.1 and the Security Documents, Finning acknowledges that Davis is the sole and exclusive owner of the Technology and that Finning will not challenge, in any forum, Davis' right of ownership over the Technology;

(i)     Any improvement or enhancement to the Technology will be the sole and exclusive property of Davis;

(j)     Finning will use reasonable commercial efforts to complete the sale for all referrals received from Davis or his agent; and

(k)     Finning will use reasonable commercial efforts to market and sell the Distributed Products within the Product Lines throughout the world.

**8.      DISTRIBUTED PRODUCT WARRANTIES**

The Parties will cooperate and use reasonable commercial efforts to cause all warranties offered by manufacturers of the Major Components to be passed on to and for the benefit of Finning's end-use customers. Davis will, at its own expense, provide or cause DAVCRANE Inc. to provide, all customers who purchase a Distributed Product through Finning with a warranty that the manufacturing and assembling performed by Davis will be free from defects in accordance with the provisions in the attached Schedule C.

**9.      CONFIDENTIALITY**

**9.1      Confidentiality:** Unless otherwise agreed upon in writing between the Parties or as required by law or stock exchange requirements, a Receiving Party will keep all Confidential Information which is disclosed to it by a Disclosing Party under this Agreement confidential and will not disclose the Confidential Information to any third party. The Receiving Party will not reproduce any Confidential Information supplied to it in any form except as required to accomplish the purpose of and in accordance with the terms of this Agreement. The Receiving Party will provide the same care to avoid disclosure or

- 14 -

unauthorized use of Confidential Information as it provides to protect its own similar proprietary information but in no event will the Receiving Party fail to use reasonable commercial efforts and take reasonable care under the circumstances to avoid disclosure or unauthorized use of Confidential Information. Confidential Information, unless otherwise specified in writing: (a) will remain the property of the Disclosing Party; (b) will be used by the Receiving Party only for the purposes of any work under this Agreement; and (c) which is in tangible form, including all copies of such information, will be returned to the Disclosing Party or destroyed (as the Disclosing Party may direct) after the Receiving Party's need for it has expired or upon request of the Disclosing Party, and, in any event, upon termination or expiry of this Agreement.

9.2        **Disclosure Required By Law:**  The Receiving Party will not be in breach of its obligation not to disclose Confidential Information of the Disclosing Party if that disclosure is required by law, a court order or a stock exchange having authority over the Receiving Party, provided that the Receiving Party gives the Disclosing Party as much Notice as is reasonably in the circumstances prior to disclosing any Confidential Information and the Receiving Party co-operates with the Disclosing Party in any application, proceedings or other action the Disclosing Party may undertake to obtain a protective order or other means of protecting the confidentiality of the Confidential Information required to be disclosed.

## 10.        INTELLECTUAL PROPERTY RIGHTS

10.1        **Protection of Intellectual Property Rights:**  Davis will obtain patent and other Intellectual Property Rights' registrations and protections in each additional country as reasonably requested by Finning for the Technology. The Parties agree to share equally in the cost of expanding protection of the Intellectual Property Rights included in the Distributed Products in additional countries, and to consult with each other to formulate a plan and effect the optimal protection at reasonable expense. Nothing in this paragraph will be interpreted to require Finning to participate, support or financially contribute in any way in or to the defence or opposition to any Claim that may be made by any Person against the Technology and/or against Davis in respect of his rights in the Technology.

10.2        **Notification of Intellectual Property Disputes:**  The Parties will promptly notify each other of any existing, expected or threatened dispute with any third Person, which comes to their attention regarding the Technology, or any Intellectual Property Rights relating to the Distributed Products, or of any act or event which may negatively affect the Parties or the sale of the Distributed Products.

10.3        **Notice of Infringements by Third Parties:**  Finning will promptly inform Davis of all instances of which it may have knowledge which constitute or could constitute an infringement of the Technology.

## 11.        DISPOSITION OF TECHNOLOGY

11.1        **Prohibition / Facility Loan:**  Davis will not sell, license, assign, transfer, encumber or otherwise dispose of any of his rights in or to the Technology or the Distributed Products to any Person, including any sale, license, assignment, transfer, encumbrance or disposition made pursuant to Section 11.2, while there is any outstanding balance owing to Finning under the Facility Loan.

11.2        **Right of First Refusal:**  If Davis wishes to sell, license, assign, transfer, encumber or otherwise dispose of any of his rights in or to the Technology or the Distributed Products to any Person other than Finning, Davis will, in writing, first offer Finning to acquire such rights on the same terms being offered to or by that other Person. If within 30 calendar days of receiving such an offer from Davis,

- 15 -

Finning does not deliver to Davis written Notice of its intention to acquire such rights on such terms, Davis will be free to dispose of such rights, subject to Finning's rights in and to the Technology and the Distributed Products under this Agreement, within 30 calendar days on such terms to the other Person upon paying Finning 25% of the proceeds of such disposition as a distributorship cancellation fee. Notwithstanding the foregoing, the Parties may, by mutual agreement, dispose of all or any portion of the Technology or the Distributed Products.

## 12.     EVENTS OF DEFAULT AND TERMINATION

**12.1       Event of Default by Davis:**  If Davis has committed an Event of Default and fails to cure such Event of Default within 30 Business Days of Finning delivering Notice of the same to Davis, Finning may do any or all of the following:

(a)     terminate this Agreement forthwith in its entirety without prejudice, however, to any rights it may have against Davis arising prior to termination;

(b)     declare the outstanding balance of the Facility Loan to be immediately due and payable by Davis and exercise any and all rights Finning may have at law, in equity or pursuant to this Agreement or the Security Documents; and

(c)     take possession of the Facility, Technology, Major Components, Minor Components and Distributed Products and conduct manufacturing and assembly of the Distributed Products itself.

**12.2       Event of Default by Finning:**  If Finning has committed an Event of Default and fails to cure such Event of Default within 30 Business Days of Davis delivering Notice of the same to Finning, Davis may terminate this Agreement forthwith in its entirety without prejudice, however, to any rights it may have against Finning arising prior to termination.

## 13.     FORCE MAJEURE

**13.1       Relief:**  If a Party is prevented or delayed in performing or observing its obligations under of this Agreement by Force Majeure, the time for performance of those obligations is deferred for the duration of the event or circumstance of Force Majeure.

**13.2       Notice:**  A Party that is prevented or delayed by Force Majeure and that seeks relief under this Article 13 must give written Notice to the other Party as soon as possible after the event or circumstance of Force Majeure is known to the first Party, and in any event not later than two (2) Business Days after the date when that event or circumstance is known to the first Party. A Party that has given Notice of an event or circumstance of Force Majeure will give Notice to the other Party of the cessation of that event or circumstance promptly after cessation is known to the first Party.

**13.3       Mitigation:**  If Notice is given by either Party of an event or circumstance of Force Majeure, each Party will exercise reasonable commercial efforts to avoid, or minimize any delay occasioned thereby, provided that a Party prevented or delayed by a strike, lockout or labour disturbance or slowdown will not be required to settle that matter other than on terms acceptable to it in its discretion. The Parties will meet promptly after any Notice is given under Section 13.2, and from time to time thereafter during the continuance of any event or circumstance of Force Majeure, to discuss and endeavour in good faith to agree upon measures to be taken by either or both Parties to avoid, or minimize any delay, occasioned by that event or circumstance of Force Majeure.

- 16 -

**13.4        Resumption of Performance:** A Party that is prevented or delayed in the performance or observance of its obligations under of this Agreement by Force Majeure will resume promptly the performance and observance of those obligations after cessation of the event or circumstance of Force Majeure.

## 14.        DISPUTE RESOLUTION/REMEDIES

**14.1        Dispute:** Any dispute or controversy arising out of or in connection with this Agreement or its performance, including without limitation the validity, scope, meaning, construction, interpretation or application of this Agreement or any provision of this Agreement will be submitted to final and binding arbitration by a single arbitrator. The arbitration will be administered by the American Arbitration Association in accordance with its International Arbitration Rules. The place of arbitration will be Houston, Texas. The Parties will instruct the arbitrator that the Parties desire any arbitration proceedings to be completed as expeditiously as possible. A Party may enter any judgment rendered by the arbitrator in and by any court having jurisdiction. Notwithstanding any provision in this Agreement, neither Party will be entitled to claim, and the arbitrator will not award, punitive, special or other damages in excess of actual damages sustained by a Party. The arbitrator may award costs for reasonable attorney's fees.

**14.2        Equitable Remedies:** Nothing in the Agreement is intended to prevent or limit a Party's access to injunction or other equitable or mandatory relief before the arbitrator. Each of the Parties acknowledges and agrees that any breach by the other Party of any of its obligations under of this Agreement may result in immediate and irreparable harm to the other Party, and that in the event of such a breach, the other Party will be entitled to interim and interlocutory injunctive relief without being required to prove irreparable harm or to post security.

**14.3        Damages:** Subject to the limitations contained in Section 14.1, nothing else in this Agreement will be construed so as to prevent or restrict either Party from exercising any right to claim damages against the other Party by reason of any breach of or default under of this Agreement by the other Party.

**14.4        Remedies Non-Exclusive:** All rights and remedies provided hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

## 15.        DUE DILIGENCE

The rights and obligations of the Parties under this Agreement will not commence and will be of no force and effect unless and until Finning has completed due diligence on the Technology as it deems necessary, which Finning will do on or before July 22, 2002 (the "**Due Diligence Completion Date**"), and Finning is satisfied, in its sole discretion, as to the composition, status and integrity of the Technology. If Finning is, in its sole discretion, not satisfied as to the composition, status and integrity of the Technology, Finning may terminate this Agreement by delivering a written Notice of termination to Davis on or before the Due Diligence Completion Date, whereupon this Agreement will terminate and the US$100,000 advanced by Finning to Davis pursuant to the LOI will be applied as a credit against future purchases by Finning of products from Davis or an affiliate of Davis. If Finning does not deliver a written Notice of termination to Davis on or before the Due Diligence Completion Date, the rights and obligations of the Parties under this Agreement will commence and will be of full force and effect at 12:01 a.m. Pacific Daylight Time on July 23, 2002.

- 17 -

16.          **GENERAL**

16.1          **Further Assurances:**  The Parties agree that they or their respective heirs, executors, administrators, personal representatives, successors or permitted assigns will execute and deliver such further and other instruments, agreements and writings and will cause such meetings to be held, resolutions passed and by-laws enacted, exercise their vote and influence, do and perform and cause to be done and performed, such further and other acts and things that may be necessary or desirable in order to give full effect to of this Agreement and every part of it.

16.2          **Withholdings:**  Notwithstanding any provision in this Agreement, each Party will deduct from and remit to the appropriate Governmental Authorities within the time required by Law, all amounts that the Party is required to withhold and remit pursuant to all applicable Laws with respect to any payment made under this Agreement.

16.3          **Relationship:**  The relationship between Davis and Finning is solely that of independent contractors, and nothing in of this Agreement will cause Davis to be considered an agent, employee, joint venturer or legal representative of Finning; nor will Davis hold itself out as an agent, employee, joint venturer or legal representative of Davis.  Davis will have no authority to bind or commit Finning in any manner or for any purpose whatsoever and will not undertake any obligation or responsibility, express or implied, on behalf of or in the name of Finning.  This Agreement creates no joint ventures, or partnerships or principal/agent relationships between the Parties.  Finning will under no circumstances be liable for any acts committed by Davis or his employees, agents, or representatives.  Davis will under no circumstances be liable for any acts committed by Finning or its officers, directors, employees, agents or representatives.

16.4          **Time of Essence:**  Time will be of the essence of this Agreement and of every part of this Agreement and no extension or variation of this Agreement will operate as a waiver of this provision.

16.5          **Successors and Assigns:**  This Agreement will enure to the benefit of and be binding upon the Parties hereto, and their respective heirs, executors, administrators, personal representatives, successors or permitted assigns.

16.6          **No Waiver:**  A waiver by either Party of any of its rights hereunder or the performance by the other Party of any obligation hereunder will be without prejudice to all or any of the other rights of the Party hereunder so waiving and will not constitute a waiver of any such other right or, in any other instance, of the right so waived, or a waiver of the performance by the other Party of any other obligations hereunder or the performance, in any other instance, of the obligations so waived.

16.7          **Notice:**  Any Notice, consent, authorization, direction or other communication required or permitted to be given hereunder will be in writing and will be delivered either by personal delivery, courier, facsimile or similar telecommunications device and addressed as follows:

(a)          in the case of the Davis, to it at:

Daniel E. Davis
P.O. Box 2427
Harlingen, Texas 78551
Fax: (956) 399-9174

- 18 -

With copies to:

Alton W. Payne
5001 Bissonnet, Suite 200
Bellaire, TX 77401
Fax: (713) 840-8088 / (713) 661-6001

Dennis Sanchez
Sanchez, Whittington, Janis & Zabarte, L.L.P.
100 North Expressway 83
Brownsville, Texas  78521-2284
Fax: (956) 546-3765

(b)     in the case of the Finning, to it at:

Finning International Inc.
16830 – 107th Avenue
Edmonton, Alberta   T5P 4C3

Attention:     Mel Ternan

Fax:  (780) 930-4891

With a copy to:

Finning International Inc.
Suite 1000
Park Place
666 Burrard Street
Vancouver, British Columbia   V6C 2X8

Attention:     John T. Struthers, Corporate Secretary

Fax:  (604) 331-4887

Any Notice, consent, authorization, direction or other communication delivered as aforesaid will be deemed to have been effectively delivered and received, if sent by facsimile or similar telecommunications device on the calendar day next following receipt of such transmission or, if delivered, to have been delivered and received on the date of such delivery provided, however, that if such date is not a Business Day then it will be deemed to have been delivered and received on the Business Day next following such delivery.  Either Party may change its address for service by Notice delivered as aforesaid.

16.8     **Entire Agreement:**  This Agreement and the Security Documents constitute the entire agreement between the Parties hereto pertaining to the subject matter of this Agreement and supersedes all prior and contemporaneous agreement, understandings, negotiation and discussions, whether oral or written (including without limitation, the LOI), of the Parties, and there are no representations, warranties or other agreements between the Parties in connection with the subject matter of this Agreement except as expressly set forth in such agreements.  No supplement, modification, waiver, qualification or termination of this Agreement will be binding unless in writing and executed by the Parties to be bound thereby.

- 19 -

07/15/2002  11:49    7138·    38              AL PAYNE PC                    PAGE  02/02
07/16/2002 11:20 FAX                                                        ☑002

16.9        **Amendments to Agreement:**  This Agreement may be amended only by written instrument executed by all Parties hereto.

16.10       **Assignment:**  Neither Party may assign or transfer this Agreement or any of his or its rights and obligations hereunder without the prior written consent of the other Party.

16.11       **Survival:**  Sections 3.6 (Title and Risk of Loss), Articles 7 (Representations, Warranties and Covenants), 9 (Confidentiality), 12 (Events Of Default And Termination) and 16 General), together with all provisions necessary for the enforcement and interpretation thereof, will survive the expiry or termination of this Agreement howsoever caused, and will continue in full force and effect subsequent to and notwithstanding such expiry or termination until they are satisfied or by their nature expire.

16.12       **Counterparts:**  This Agreement may be executed by the Parties in separate counterparts each of which when so executed and delivered will be an original, but all such counterparts will together constitute one and the same instrument.

            **IN WITNESS WHEREOF,** the Parties hereto have duly caused of this Agreement to be executed on the date first written above.

SIGNED, SEALED AND DELIVERED by          )
DANIEL E. DAVIS in the presence of:      )
                                         )
                                         )
_____        )      _____ (seal)
Witness                                  )      DANIEL E. DAVIS


FINNING INTERNATIONAL INC.


By: _____
    Authorized Signatory

Document: 1005622:05

## SCHEDULE A

### Product Cost Summary

This Agreement is based on the following estimated cost breakdown. The Parties expect changes during negotiations with suppliers. The intent of both Parties is to eliminate all unnecessary costs, and to cooperate fully to achieve the lowest cost of production, while maintaining a quality product.

These costs are based on the Cost sheets presented to me on May 11, 2002, and on further details developed by Davis and presented on June 9, 2002.

### PRODUCT COST SUMMARY

| PRODUCT LINE | TH63 - 9 TON | 320B - 28 TON | 325B - 38 TON | 325B - 50 TON | 325B - PIPELAYER |
|---|---|---|---|---|---|
| UNIT VOLUME / YEAR | 50 | 12 | 12 | 6 | 12 |
| SELLING PRICE | $150,000 | $310,000 | $385,000 | $525,000 | $425,000 |
| SALES VOLUME | $7,500,000 | $3,720,000 | $4,620,000 | $3,150,000 | $5,100,000 |
| MANUFACTURING COST | | | | | |
| Caterpillar Components | $45,000 | $123,690 | $144,409 | $167,600 | $185,000 |
| Manitex components | $38,500 | $27,492 | $43,594 | nil | nil |
| Other Mfr's | $4,700 | $15,877 | $17,067 | $69,470 | $44,000 |
| Freight | $    6,500 | $12,792 | $13,392 | $8,500 | $14,000 |
| FINNING | $94,700 | $179,851 | $218,462 | $245,570 | $243,000 |
| SHOP COSTS | | | | | |
| Components | $7,328 | $14,079 | $14,659 | $33,536 | $22,537 |
| Labour | $6,116 | $16,936 | $21,449 | $94,481 | $20,935 |
| Insurance / Warranty | $3,876 | $6,698 | $8,491 | $23,631 | $8,043 |
| Sub Total - DavCrane | $17,320 | $37,713 | $44,599 | $151,648 | $51,515 |
| MFG OVERHEAD | $6,076 | $9,999 | $12,282 | $16,547 | $9,999 |
| DAVCRANE | $23,396 | $47,712 | $56,881 | $168,195 | $61,514 |
| TOTAL | $118,096 | $227,563 | $275,343 | $413,765 | $304,514 |
| ROYALTY - 6% | $7,086 | $13,654 | $16,521 | $24,826 | $18,271 |
| COST TO FINNING | $125,182 | $241,217 | $291,864 | $438,591 | $322,785 |
| Manufacturing Overhead (Annual) | $303,800 | $119,988 | $147,384 | $99,282 | $119,988 |

| | | |
|---|---|---|
| NOTE: Mfg OH budget is based on these HEX based units only | Annual for 42 units | $486,642 |
| | Monthly | $40,553.50 |

- 21 -

## SCHEDULE B

### Technology

**CONFIDENTIAL**
**PATENT AND PATENT APPLICATIONS:**

U.S. Patent No. 6,003,252 issued to Daniel E. Davis.

Patent Application entitled Piplayer-Crane- Apparatus and Method.

Patent Application entitled Telehandler-Crane- Apparatus.

Patent Application entitled Universal Excavator Boom Attachment and Method.

Additional patent applications are to be filed.

**CONFIDENTIAL**
**DESIGN AND MANUFACTURING DRAWINGS:**

**9 TON TELEHANDLER DRAWINGS:**
303 drawings bearing drawing numbers 9-2-001 to 9-6-002.
General Arrangement    9T  GA

**28 TON CRANE DRAWINGS:**
301 drawings bearing drawing numbers 28-2-001 to 28-6-009 and 5002668.001 to
5002669-023.
General Arrangement    28T  GA
Adaptor Weldment        Bill of Material #28-5-001
Manitex                 Bill of Material #6000740.023
Braden                  Bill of Material #PD12C  (General Dimensions)

**CIPI Group Numbers:**
- 9Q5972                Upper Structure  Bill of Material
    - 1176346           Optional  Third pedal
    - 1263784           Optional  Guard
    - 1204955           Optional  Guard
    - 1263799           Optional  High Ambient Cooling
    - 1114696           Optional  Travel alarm
- 152 8744              VG Lower Bill of Material

Document: 1005628:01

**38 TON CRANE DRAWINGS:**
16 drawings bearing
drawing numbers 38-4-011 to 38-5-159 and B5303.001.
General Arrangement    38T GA
Adaptor Weldment       Bill of Material #38-5-100
                                      #38-5-130
                                      #38-5-129
                                      #38-5-142
Manitex                Bill of Material #6000740.021
Braden                 Bill of Material #PD15   (General Dimensions)

**CIPI Group Number:**
- 9Q5973               Upper Structure Bill of Material

- 152 8744             VG Lower Bill of Material


**SIDE-BOOM (PIPELAYER) DRAWINGS:**
Same 317 drawings listed for 28/38 Ton Cranes plus additional drawings for the
A-frame and relate components.


**60 TON CRANE DRAWINGS:**
211 drawings bearing drawing numbers 20.0001.000-00 to 64.1100.000-00 and
9001.000.000-00 to 99.3000.502-000 and 9901.000.000 to 9904.000.000.
General Arrangement    5911.50.000.001.000
Adaptor Weldment       Bill of Material #5911.40.1100.000
Braden                 Bill of Material #CH185   (General Dimensions)

**CIPI Group Number:**
- 9Q5964               Upper Structure Bill of Material

- 9Q5965               VG Lower Bill of Material
  (Includes 163-4828)

- 23 -

## SCHEDULE C

### Davis' Warranty on Distributed Products

DAVCRANE INC. warrants its products to be free from defects to material and workmanship for a period of twelve (12) months from the date of being placed in operation and not exceeding eighteen (18) months from date of delivery of the product to the original Purchaser user. The obligation of DAVCRANE INC. (herein after called the Company) includes any part of the product which in the Company's opinion is defective in material and workmanship. All costs of shipping the product to and from the Company's factory shall be to the Purchaser's account. No claim will be allowed by the Company unless such claim is submitted in writing to the Company within thirty (30) days of the date of discovery of the defect(s).

This warranty shall not apply to products which have been operated in a manner other than recommended by the Company or which has been misused or neglected or damaged through an accident or which has been repaired, altered or modified or used in any manner which in the Company's opinion adversely affects its performance.

This warranty and the Company's obligation hereunder is in lieu of all other warranties, expressed or implied, including without limitation the implied warranties of merchantability and fitness for a particular purpose and all direct, indirect or consequential damages with respect to the sale or use of its products.

No person is authorised to change or otherwise modify this warranty or assume any other liability on behalf of the Company unless such change modification of assumption is made in writing and signed by an officer of this Company.

Any item of the product not manufactured by the Company shall not be covered by this warranty or the implied warranties of merchantability and fitness for a particular purpose of any other warranty from the Company, such items being subject to the warranties of their respective manufacturers.

# NOTICE

(Required by Section 26.02 of Texas Business and Commerce Code)

TO:    DANIEL E. DAVIS, as Guarantor

     A.    Effective as of July 15, 2002, you executed and delivered the following documents to evidence, secure and/or in connection with a loan to Davcrane Inc. from Finning International Inc., in the amount of $1,500,000.00:

         (1)    Guaranty Agreement;

         (2)    Security Agreement;

         (3)    UCC-1 Financing Statement;

         (4)    Collateral Assignment and Security Agreement (All Patent Rights);  and

         (5)    Certificate and Indemnification Regarding Hazardous Substances;

TO:    DAVCRANE INC., as Borrower

     B.    Effective as of July 15, 2002, you executed and delivered the following document in connection with the above referenced loan:

         (1)    $1,500,000.00 Promissory Note;

         (2)    Deed of Trust;

         (3)    Security Agreement;

         (4)    UCC-1 Financing Statement; and

         (5)    Certificate and Indemnification Regarding Hazardous Substances.

     C.    The documents described above constitute a "Loan Agreement" as defined in Section 26.02 of the Texas Business and Commerce Code (the "**Code**") and pursuant to subsection (e) thereof, notice is hereby given that the Code provides:

         (1)    A LOAN AGREEMENT IN WHICH THE AMOUNT EXCEEDS $50,000 IN VALUE IS NOT ENFORCEABLE UNLESS THE AGREEMENT IS IN

WRITING AND SIGNED BY THE PARTY TO BE BOUND OR BY THAT PARTY'S AUTHORIZED REPRESENTATIVE.

(2)    THE RIGHTS AND OBLIGATIONS OF THE PARTIES TO AN AGREEMENT SUBJECT TO SUBSECTION (b) OF SECTION 26.02 OF THE CODE SHALL BE DETERMINED SOLELY FROM THE WRITTEN LOAN AGREEMENT, AND ANY PRIOR ORAL AGREEMENTS BETWEEN THE PARTIES ARE SUPERSEDED BY AND MERGED INTO THE LOAN AGREEMENT.

(3)    THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

(4)    THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**SIGNATURE PAGE**
**NOTICE**

DANIEL E. DAVIS

FINNING INTERNATIONAL INC., a Canadian
    corporation

By: _____
    Name: Chris Raizman
    Title: Controller, Finning (Canada)

DAVCRANE INC., a Texas corporation

By: _____
    Daniel E. Davis, President

FINNING INTERNATIONAL INC., a Canadian
    corporation
By: _____
    Name: ANDY FRASER
    Title: VP, OPERATIONS & CUSTOMER RELATIONS

L:\D19\19871\Final Documents\NOTICE3.wpd                                    Page 3 of 3

# PROMISSORY NOTE
## (DAVCRANE INC.)

**$1,500,000.00**                    Houston, Texas

Effective as of
July 15, 2002

FOR VALUE RECEIVED, the undersigned, DAVCRANE INC., a Texas corporation (the "**Borrower**"), hereby promises to pay to the order of FINNING INTERNATIONAL INC., a corporation incorporated under the laws of Canada (the "**Lender**") at its offices at 16830 -- 107th Avenue, Edmonton, Alberta, T5P 4C3, Canada, or at such other location as Lender may designate in writing to Borrower, the original principal sum of ONE MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($1,500,000.00) or such lesser amount as has been advanced hereunder, in immediately available funds. Advances and payments on this Note shall be in accordance with the terms herein.

The principal amount of this Note shall bear interest commencing on July 15, 2007. The unpaid principal balance of this Note shall bear interest during the periods specified above at a floating rate of interest equal to the lesser of:

(a)    The one month London Interbank Offered Rate ("**LIBOR Rate**") reflected as the one month LIBOR Rate on page 5 of the Telerate screen or as published or quoted by such other reputable and nationally recognized rate quoting service or publication selected by Lender plus five percent (5.00%) per annum ("**Loan Rate**"); or

(b)    The maximum rate of nonusurious interest permitted from day to day by applicable law ("**Maximum Rate**"), including as to, but otherwise without limitation, that rate based upon the "indicated rate ceiling" and calculated after taking into account any and all relevant fees, payments and other charges in respect to the Loan Documents, as hereinafter defined, which are deemed to be interest under applicable law.

Lender will advance Borrower funds under the Note in accordance with the terms hereof. Each time Borrower wishes to draw against the Note, he will make a request to Lender in writing specifying the amount and the date on which he wishes Lender to advance him funds under the Note, which date will not be less than 15 business days after the date on which Borrower delivers the request to Lender. Concurrently with Lender making any advance under this Note, Borrower will execute such documents as Lender may reasonably require to evidence the portion of the Note proceeds to be advanced. Notwithstanding the foregoing, Lender will not be required to advance Borrower funds under the Note if:

(a)    Borrower has not executed and delivered to Lender the Loan Documents (as defined herein);

(b)    an Event of Default has been committed;

(c)    in the reasonable opinion of Lender, there has been any material adverse change in the business, assets or financial condition of Borrower or Daniel E. Davis ("**Guarantor**"); or

---

      (d)     there is any action, proceeding or investigation pending or threatened against Borrower, which would in the reasonable opinion of Lender, if successful, have a material adverse effect on Borrower's ability to repay the Note.

Pursuant to the terms of the Distributor Agreement of even date herewith between Guarantor and Lender ("**Distributor Agreement**"), Lender is entitled to retain 60% of the Davis Payment (as defined in Section 5.5(b) of that certain Distributor Agreement) owing by Lender to Guarantor and apply such amount to payment of this Note until the Note is repaid in full.  Prior to an Event of Default, all payments made by Borrower, from the 60% share of any Davis Payment actually collected by Lender or from any other source shall be applied first to reasonable expenses (including attorneys' fees) due to Lender with respect to the Note, and then to any interest due on the Note (if any), with the remaining amounts to be applied against the unpaid principal balance of this Note. Upon the occurrence of an Event of Default (following any applicable notice and cure periods related thereto), Lender shall be authorized to apply payments to that portion of the obligations due by Borrower to Lender under the Loan Documents as Lender deems appropriate, in its sole discretion.  Lender shall maintain records reflecting the date and amount of advances and repayments on the Note.  Lender's records shall be conclusive absent manifest error.

Upon accrual, all interest shall be calculated on a daily basis on the outstanding principal balance of the Note, and the Loan Rate shall change in accordance with the provisions set forth herein, without notice to Borrower; provided that if at any time the Loan Rate exceeds the Maximum Rate, the rate of interest which this Note bears shall be limited to the Maximum Rate, but any subsequent reductions in the Loan Rate shall not reduce the rate of interest which this Note bears below the Maximum Rate until the total interest accrued on this Note equals the amount of interest which would have accrued if the Loan Rate had at all times been in effect.

Interest shall be calculated under this Note using a 360 day year unless use of a 360 day year would result in collection of interest in excess of the Maximum Rate, in which case interest shall be calculated using the actual number of days elapsed in an actual year.

Subject to the right of the holder of this Note to accelerate the maturity hereof as hereinafter described, the unpaid principal balance of the Note, together with accrued but unpaid interest thereon (if any) shall be paid in full in one final balloon payment on July 15, 2012 (the "**Maturity Date**").

Upon an Event of Default (as defined in the Security Agreement ("**Security Agreement**") of even date herewith executed by Borrower in favor of Lender) and after the expiration of any notice and cure periods related thereto, Lender may declare all outstanding principal, any accrued interest and other sums outstanding hereon immediately due and payable, and exercise all rights and remedies as set forth in this Note or any of the Loan Documents.

Borrower shall have the right to prepay, at any time and from time to time without premium or penalty, the entire unpaid principal balance of the Note or any portion thereof, with accrued interest (if any) to the date of prepayment on the amounts prepaid, if any.  Any payments so received

by Lender shall be applied first to any accrued but unpaid interest, if any, and then to the unpaid principal.

Borrower and any and all endorsers, guarantors and sureties jointly and severally except as may be expressly provided in the Security Agreement (i) waive, to the fullest extent it is lawful so to do, presentment, demand, notice of demand, protest, notice of protest, notice of acceleration of maturity, notice of intent to accelerate, notice of nonpayment, notice of dishonor, and all other notices of any kind; (ii) agree and consent to delays, extensions, renewals, modifications or partial payments hereon, to any release of a party liable hereon or of any collateral herefor, in whole or in part, and to taking or refraining to take any action with respect to this Note, before or after maturity, without notice to or consent from said parties, and without discharging any party liable hereunder; (iii) agree that no action, failure to act or failure to exercise any right or remedy on the part of Lender shall in any way affect or impair the obligations of Borrower or be construed as a waiver by Lender of, or otherwise affect, any of Lender's rights under this Note, under any endorsement or guaranty of this Note, or under any Loan Document; and (iv) agree to pay, within ten (10) days after written demand, all costs and expenses of collection of this Note or of any endorsement or guaranty hereof, including, without limitation, reasonable attorney's fees, including fees related to any trial, arbitration, bankruptcy, appeal or other proceeding.

It is the intention of Lender and Borrower and all other parties to the Loan Documents to conform to and contract in strict compliance with applicable usury laws from time-to-time in effect. All agreements between Lender or any other holder of the Note and Borrower (or any other party liable with respect to indebtedness under the Loan Documents) are hereby limited by this provision, which shall control and override all such agreements. In no way, nor in any event or contingency (including, but not limited to, prepayment, default, demand for payment, or the acceleration of maturity of any obligations, or the recharacterization of any application fee, loan commitment fees, additional commitment fees, or origination fees as interest), shall the interest taken, reserved, contracted for, charged or received under the Note, or otherwise, exceed the Maximum Rate. If, from any possible construction of any document, interest would otherwise be payable in excess of the Maximum Rate, any such construction shall be subject to this provision, and such document shall be automatically reformed, and the interest payable shall be automatically reduced to the Maximum Rate permitted under applicable law, without the necessity of the execution of any amendment or new document. If Lender or the holder of the Note shall ever receive any thing of value that is characterized as interest under applicable law and that would, apart from this provision, be in excess of the Maximum Rate, an amount equal to the amount that would have been excessive interest shall, without penalty, be applied to the reduction of the principal amount owing on the Note in the inverse order of its maturity and not to the payment of interest, or refunded to Borrower or the other payor thereof if and to the extent such amount, which would have been excessive, exceeds such unpaid principal. The right to accelerate the maturity of the Note, or any other indebtedness, does not include the right to accelerate any interest that has not otherwise accrued on the date of such acceleration, and the Lender or the holder thereof does not intend to charge or receive any unearned interest in the event of acceleration. All interest paid or agreed to be paid to the Lender or the holder of the Note shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full stated term (including any renewal or extension) of the Note

so that the amount of interest on account of such indebtedness does not exceed the Maximum Rate. As used in this paragraph, the term "applicable law" shall mean the laws of the State of Texas or the federal laws of the United States of America, which ever laws allow the greater interest, as such laws now exist may be changed or amended or come in effect in the future.

All rights and remedies of Lender herein shall be cumulative and may be pursued singly, successively or together, at the option of Lender. The acceptance by Lender of any partial payment shall not constitute a waiver of any default or of any of Lender's rights under this Note. No waiver of any of its rights hereunder, and no modification or amendment of this Note, shall be deemed to be made by Lender unless the same shall be in writing, duly signed on behalf of Lender; and each such waiver, if any, shall apply only with respect to the specific instance involved, and shall in no way impair the rights of Lender or the obligations of Borrower to Lender in any other respect at any other time.

The loan evidenced by this Note is for business, commercial, or investment purposes and none of such proceeds shall be used for personal, consumer, family household or agricultural purposes or for purchasing or carrying margin stock. **THIS NOTE SHALL NOT BE SUBJECT TO CHAPTER 346 OF THE TEXAS FINANCE CODE.**

The unenforceability or invalidity of any provision of this Note shall not affect the enforceability or the validity of any other provision herein and the invalidity or unenforceability of any provision of this Note to any person or circumstance shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances.

This Note shall be binding upon Borrower and its respective successors, assigns and legal representatives, and shall be governed by the laws of the State of Texas.

This Note is secured, inter alia, by (i) the Security Agreement; (ii) the Deed of Trust, Assignment of Rents, Security Agreement and Financing Statement to be executed by Borrower for the benefit of Lender; (iii) the Certificate and Indemnification Regarding Hazardous Substances executed by the Borrower and Guarantor in favor of Lender, (iv) certain Financing Statements executed by the Borrower and/or Guarantor in favor of the Lender; (v) the Collateral Assignment and Security Agreement (All Patent Rights) executed by Guarantor in favor of Lender; (vi) the Guaranty Agreement executed by Guarantor; (vii) the Security Agreement executed by Guarantor in favor of Lender; (viii) all other documents and instruments executed in connection with or as security for the Note or the Distributor Agreement; and (ix) all renewals, extensions and modifications thereof (collectively, the "**Loan Documents**").

THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**SIGNATURE PAGE**
**PROMISSORY NOTE**
**(Davcrane Inc.)**


"BORROWER":

DAVCRANE INC.

By:_____
         Daniel E. Davis, President

00037424

## AMENDMENT TO DEED OF TRUST, ASSIGNMENT OF RENTS,
## SECURITY AGREEMENT AND FINANCING STATEMENT

This Amendment ("Amendment") is made and entered into this the ___7___ day of ~~June~~, *July 8*
2003, by and between FINNING INTERNATIONAL INC., the "Beneficiary" and DAVCRANE INC., the "Grantor" under that one certain Deed of Trust, Assignment of Rents, Security Agreement and Financing Statement ("Deed of Trust") dated effective July 15, 2002, covering the real property described in Exhibit "A" attached thereto, filed for record under County Clerk's File No. 00042149, Vol. 8235, Page 1, Cameron County, Texas, executed by Grantor for the benefit of Beneficiary. The terms of this Amendment shall amend that Deed of Trust. In the event of a conflict between the terms of this Amendment and the Deed of Trust, the terms of this Amendment shall control. Capitalized terms used in this Amendment which are undefined shall have the same meaning set forth in the Deed of Trust.

1. Beneficiary and Grantor hereby file this Amendment as a correction to the legal description of the real property described on Exhibit "A" to the Deed of Trust. The correct legal description of the real property made the security for the indebtedness referred to in the Deed of Trust is hereby amended to read as follows:

A tract of land containing 4.94 acres out of Lot Number One (1), Block Number One (1), Texas Pipe Bending Subdivision, City of Harlingen, Cameron County, Texas, according to the map recorded in Cabinet 1, Slots 384-A and 384-B, Map Records, Cameron County, Texas, said property being more particularly described on Exhibit "A" attached hereto and made a part hereof.

2. Except as amended hereby, all other terms and conditions of the Deed of Trust shall remain in full force and effect.

3. The terms and provisions of this Amendment shall inure to the benefit of, and shall be binding upon, the heirs, successors, assigns and legal representatives of the parties hereto to the same extent as if such heirs, successors, assigns and legal representatives had joined in the execution hereof.

Executed this the ___7__th___ day of ~~June~~ *July*, 2003 but effective July 15, 2002.

"BENEFICIARY"

FINNING INTERNATIONAL INC.

BY: *[signature]*
NAME: *CHRIS HAYMAN*
TITLE: *VP. Controller, Finning (Canada)*

"GRANTOR"

DAVCRANE INC., a Texas corporation

BY: _____

NAME: Daniel E. Davis
TITLE: President


THE STATE OF TEXAS          §
                            §
COUNTY OF CAMERON           §

    This instrument was acknowledged before me on June _10_, 2003 by Daniel E. Davis, President of DAVCRANE INC., a Texas corporation on behalf of said corporation.

_____
Notary Public in and for The State of Texas
Printed Name: _Christina Logan_____
My Commission Expires: _06-14-05_____

## PROOF OF EXECUTION BY CORPORATION

I CERTIFY that on the _4_ day of ~~May,~~ 2003, at Edmonton, Alberta, Canada, _Christopher Hayman_ , personally known to me, appeared before me and acknowledged to me that:

(a) he is the _Vice President_ of Finning International Inc.;
    _+ Controller_

(b) he is the person who subscribed his name as the authorized signatory of Finning International Inc. on the attached Amendment to Deed of Trust, Assignment of Rents, Security Agreement and Financing Statement;

(c) he was authorized to subscribe his name on behalf of Finning International Inc. on the attached Amendment to Deed of Trust, Assignment of Rents, Security Agreement and Financing Statement; and

(d) Finning International Inc. existed at the date that the Amendment to Deed of Trust, Assignment of Rents, Security Agreement and Financing Statement was executed by such corporation.

IN TESTIMONY of which I set my hand and seal of office at Edmonton, Alberta, Canada this _4_ day of ~~June,~~ 2003.

_____
A Commissioner for Taking Affidavits for
Edmonton, Alberta, Canada

SANDRA KINASEWICH
Commissioner For
Oaths, Alta. Sept. 11- _ _

AFTER RECORDING RETURN TO:
Nancy F. Martin
Shannon, Martin, Finkelstein & Sayre, P.C.
2400 Two Houston Center, 909 Fannin Street
Houston, Texas 77010

(FT-10/2000)

# EXHIBIT "A"

A tract of land containing 4.94 acres, out of Lot 1, Block 1, TEXAS PIPE BENDING SUBDIVISION, City of Harlingen, Cameron County, Texas, according to the Map recorded in Cabinet 1, Slots 384-A and 384-B, Map Records of Cameron County, Texas, and said 4.94 acre tract being more particularly located and described as follows:

COMMENCING at the Southwest corner of said Lot 1, Block 1, TEXAS PIPE BENDING SUBDIVISION;

THENCE, South 89 degrees 48 minutes 00 seconds West, a distance of 340.58 feet;

THENCE, North 00 degrees 12 minutes 00 seconds West, a distance of 25.43 feet to a ½ inch iron pin set on the North Right-of-Way line of F.M. 106 (Harrison Street) same being the Southwest corner of the tract herein described;

THENCE, North 00 degrees 12 minutes 00 seconds West, a distance of 1059.97 feet to a ½ inch iron pin set for the Northwest corner of this tract;

THENCE, North 89 degrees 48 minutes 00 seconds East, a distance of 237.28 feet to a ½ inch iron pin set for the Northeast corner of this tract;

THENCE, South 00 degrees 12 minutes 00 seconds East, a distance of 260.14 feet to a ½ inch iron pin set for an outside corner of this tract;

THENCE, South 89 degrees 48 minutes 00 seconds West, a distance of 45.56 feet to a ½ inch iron pin set for an inside corner of this tract;

THENCE, South 00 degrees 12 minutes 00 seconds East, a distance of 800.22 feet to a ½ inch iron pin set for the Southeast corner of this tract;

THENCE, South 89 degrees 55 minutes 00 seconds West, along said North Right-of-Way line of F.M. 106 (Harrison Street), a distance of 191.71 feet to the POINT OF BEGINNING, Containing 4.94 acres of land more or less, inclusive of any and all easements, restrictions, exceptions or dedications that might be of record.

NOTE: THIS COMPANY DOES NOT REPRESENT THAT THE ACREAGE AND/OR SQUARE FOOTAGE CALCULATIONS ARE CORRECT.

*Cameron County Title Co*
GF# 2207020

# DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENT
## AND FINANCING STATEMENT

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | KNOW ALL PEOPLE BY THESE PRESENTS: |
| COUNTY OF CAMERON | § | |

THAT DAVCRANE INC., a Texas corporation, whose mailing address is P.O. Box 2427, Harlingen, Texas 78551, Tax Identification Number is **74-2955092**, Organizational Identification Number is 0157717000 (**"Grantor"**), for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, given by Nancy F. Martin, Trustee, of Houston, Texas ("the **Trustee**"), in order to secure the payment of the indebtedness hereinafter referred to and the performance of the obligations, covenants, agreements and undertakings of Grantor hereinafter described, does hereby GRANT, BARGAIN, SELL, CONVEY, TRANSFER, ASSIGN and SET OVER to the Trustee subject to the Permitted Encumbrances (as defined in Section 2.1 herein) all of the real property situated in Cameron County, Texas, and more particularly described in **Exhibit "A"** attached hereto and made a part hereof, together with (i) all the buildings and other improvements now on or that may be placed hereafter on said land during the existence of this lien; (ii) all materials, equipment, fixtures or other property whatsoever now or hereafter attached to, installed in, or used in connection with the buildings and other improvements now erected or hereafter to be erected on said land; (iii) all of Grantor's right, title and interest in and to all easements and rights of way used in connection with any of the foregoing property or as a means of ingress to or egress from said property; (iv) any and all water service and wastewater capacity reservation agreements and security agreements; (v) all interests of Grantor in and to any streets, ways, alleys and/or strips of land adjoining said land or any part thereof; and (vi) all rights, estates, powers and privileges appurtenant or incident to the foregoing (collectively, the "**Mortgaged Property**").

TO HAVE AND TO HOLD the Mortgaged Property unto the Trustee and Trustee's successors or substitutes in this trust and to their successors and assigns, IN TRUST, however, upon the terms, provisions and conditions herein set forth.

In order to secure the payment of the Indebtedness (as defined in Article I hereof) and the performance of the obligations, covenants, agreements and undertakings of Grantor hereinafter described, Grantor hereby grants to the Beneficiary (as defined in Article I hereof) a security interest in all goods, equipment, furnishings, fixtures, furniture, chattels and personal property of whatever nature owned by Grantor now or hereafter attached or affixed to or used in and about the building or buildings now erected or hereafter to be erected on the Mortgaged Property or otherwise located on said lands, all management agreements, utility agreements, maintenance agreements, service contracts, construction contracts, engineering and architect agreements and contracts, and any and all other agreements and contracts affecting the Mortgaged Property, and all fixtures, accessions and appurtenances thereto, and all renewals or replacements of or substitutions for any of the foregoing,

---

Doc 0004214149   Bk OR   Vol 8235   Pg 1

ДИсS

Dc      Bk      Vol      Pg
00042149  OR      8235      2

all building materials and equipment now or hereafter delivered to the Mortgaged Property and intended to be installed therein and all security deposits and advance rentals under lease agreements now or at any time hereafter covering or affecting any of the Mortgaged Property and held by or for the benefit of Grantor, all monetary deposits which Grantor has been required to give to any public or private utility with respect to utility services furnished to the Mortgaged Property, all funds, accounts, instruments, documents, general intangibles (including trademarks, trade names, patents and symbols used in connection therewith) and notes or chattel paper arising from or by virtue of any transactions related to the Mortgaged Property, all as-extracted collateral produced from or allocated to the Mortgaged Property and all products processed or obtained therefrom, the proceeds thereof, all accounts and general intangibles under which such proceeds may arise and all of Grantor's right title and interest in to any permits, licenses, franchises, certificates, and other rights and privileges obtained in connection with the Mortgaged Property (all of the property described in this paragraph hereinafter collectively called the "**Collateral**") and all proceeds of the Collateral. (The Mortgaged Property and the Collateral are hereinafter sometimes collectively called the "**Property**".)

## ARTICLE I.

### Indebtedness

1.1    **Secured Indebtedness**. This Deed of Trust, Mortgage, Security Agreement and Financing Statement (this "**Mortgage**") is made to secure the following obligations, indebtedness, and liabilities:

(a)    The obligations and indebtedness of Grantor to FINNING INTERNATIONAL INC., a corporation incorporated under the laws of Canada (the "**Beneficiary**"), evidenced by that certain recourse promissory note dated of even date herewith, executed by Grantor and payable to the order of the Beneficiary in the original principal amount of ONE MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($1,500,000.00) (the "**Note**");

(b)    The obligations and indebtedness of Grantor to the Beneficiary evidenced by that certain Security Agreement dated of even date herewith, executed by the Grantor in favor of the Beneficiary (the "**Davcrane Security Agreement**");

(c)    The obligations and indebtedness of Daniel E. Davis ("**Guarantor**")to the Beneficiary evidenced by that certain Security Agreement dated of even date herewith, executed by the Guarantor in favor of the Beneficiary (the "**Davis Security Agreement**" and together with the Davcrane Security Agreement, the "**Security Agreements**");

(d)    The obligations of the Grantor and/or Guarantor under any of the Loan Documents (as defined in the Security Agreements);

(e)    All future advances by the Beneficiary to the Grantor pursuant to the Loan

Documents;

(f)    All cost and expenses, including without limitation all reasonable attorneys' fees and legal expenses, incurred by the Beneficiary to preserve and maintain the Property, collect the obligations herein described, and enforce this Mortgage; and

(g)    All extensions, renewals and modifications of any of the foregoing.

1.2    The indebtedness and obligations referred to in Paragraph 1.1 hereof is herein called the "**Indebtedness**".

## ARTICLE II

## Representations, Warranties and Covenants

2.1    **Status of Grantor and the Property**. Grantor represents, warrants and covenants that Grantor is now in a solvent condition; that no bankruptcy or insolvency proceedings are pending or contemplated by or to the best of Grantor's knowledge against Grantor; that all reports, statements and other data furnished by Grantor to the Beneficiary in connection with this Mortgage and the Loan Documents are true and correct in all material respects and do not omit to state any fact or circumstance necessary to make the statements contained therein not misleading in any material respect; that Grantor is the lawful owner of good and indefeasible title to the Property and has good right and authority to grant, bargain, sell, transfer, assign and mortgage the Mortgaged Property and to grant a security interest in the Collateral; that the property is free and clear from all liens, security interests and encumbrances except the lien and security interest evidenced hereby and the liens, security interests and encumbrances set forth in **Exhibit "B"** attached hereto and made a part hereof (the "**Permitted Encumbrances**"); that there is no financing statement covering the Property or its proceeds on file in any public office; that the Collateral is located on the property described in **Exhibit "A"** attached hereto and made a part hereof; that the execution and delivery of this Mortgage does not contravene, result in a breach of or constitute a default under any contract or agreement to which Grantor is a party or by which Grantor or any of its properties may be bound and do not violate or contravene any law, order, decree, rule or regulation to which Grantor to the best of Grantor's knowledge is subject; that to the best of Grantor's knowledge, the Property and the intended use thereof by Grantor comply with all applicable restrictive covenants, zoning ordinances and building codes, flood disaster laws, applicable health and environmental laws and regulations and all other applicable laws, rules and regulations; except as have been previously disclosed to Beneficiary in writing, there are no material judicial or administrative actions, suits or proceedings pending or to the best of Grantor's knowledge threatened against or affecting Grantor, or, to the best of Grantor's knowledge, any other person liable, directly or indirectly, for the Indebtedness, or the Property; that the Property is served by electric, gas, sewer, water and other utilities required for the use of the Mortgaged Property thereof as represented by Grantor is available to the Mortgaged Property; that all streets necessary to serve the Property for the use represented by Grantor have been completed and are serviceable and have been dedicated and accepted by applicable governmental authorities; that the Property is free from damage caused by fire or other casualty; that this Mortgage

D
0L 42149    Bk    Vol    Pg
OR    8235    4

constitutes the legal, valid and binding obligation of Grantor enforceable in accordance with its terms except as limited by bankruptcy, insolvency, or other laws of general application relating to the enforcement of creditor's rights; that the execution and delivery of, and performance under this Mortgage are within Grantor's powers and have been duly authorized by all requisite action and are not in contravention of law or related documents, or of any indenture, agreement or undertaking to which Grantor is a party or by which it is bound; and that Grantor will warrant and forever defend the title to the Property against the claims of all persons whomsoever claiming or to claim the same or any part hereof subject to the Permitted Encumbrances.

2.2    **Covenants**. So long as the Indebtedness or any part thereof remains unpaid, Grantor covenants and agrees with the Beneficiary as follows:

(a)    **Payment of Indebtedness**. Grantor will make prompt payment, as the same becomes due, of each payment due and owing under the Loan Documents and of all installments of interest thereon and of all other Indebtedness.

(b)    **Payment of Grantor's Taxes**. Grantor will promptly pay prior to delinquency all income, franchise and other taxes owing by Grantor and any other taxes (excluding Beneficiary's income taxes) which may be required to be paid with respect to the Loan Documents, this Mortgage or any other instrument evidencing or securing any of the Indebtedness.

(c)    **Operation of Property**. Grantor will cause the Property to be maintained and operated in a good and workmanlike manner and in accordance with all applicable laws and rules, regulations and orders promulgated by all duly constituted authorities and will keep the Property occupied so as not to impair the insurance carried thereon. Grantor will not use or occupy, or knowingly allow the use or occupancy of, the Property in any manner which violates any applicable law, rule, regulation or order which constitutes a public or private nuisance or which makes void, voidable or cancelable, or increases the premium of, any insurance then in force with respect thereto. Except with the prior written consent of the Beneficiary, which consent shall not be unreasonably withheld or delayed, Grantor will not initiate or permit any zoning reclassification of the Property or seek any variance under existing zoning ordinances applicable to the Property or use or permit the use of the Property in such a manner which would result in such use becoming a nonconforming use under applicable zoning ordinances or other applicable laws, rules or regulations. Except as contemplated by the Loan Documents, Grantor will not impose any restrictive covenants or encumbrances upon the Property, execute or file any subdivision plat affecting the Property or consent to the annexation of the Property to any municipality, without the prior written consent of the Beneficiary, which consent shall not be unreasonably withheld or delayed. Grantor will not do or suffer to be done any act whereby the value of any part of the Property may be materially lessened. Grantor will allow the Beneficiary or its authorized representative to enter the Property at any reasonable times to inspect the Property and Grantor's books and records pertaining thereto and Grantor will assist the Beneficiary or said representative in whatever way necessary to make such inspection. If Grantor receives notice

from any federal, state or other governmental entity that the Property is not in compliance with any applicable law, rule, regulation or order, Grantor will promptly furnish a copy of such notice to the Beneficiary.

(d)     **Payment of Debts and Liabilities**. Grantor will cause all debts and liabilities of any character, including without limitation all debts and liabilities for labor, material and equipment and all debts and charges for utilities servicing the Property, incurred in the maintenance, operation and development of the Property to be promptly paid prior to delinquency; except that Grantor may in good faith, by appropriate proceedings, contest the validity, applicability, or amount of any such debt or liability (other than the Indebtedness or Property Taxes), and pending such contest, Grantor shall not be deemed in default hereunder if prior to the delinquency of the asserted debt or liability, Grantor establishes an escrow, puts up a bond or furnishes other adequate security acceptable to the Beneficiary adequate to cover the payment in full of such debt or liability with interest, costs and penalties and a reasonable additional sum to cover possible costs, interest and penalties (which escrow or other security shall be returned to Grantor upon payment or to permit payment of all such debts or liabilities, interests, costs and penalties), and if Grantor promptly causes to be paid any amount adjudged by a court of competent jurisdiction to be due, with all costs, penalties and interest thereof, promptly after such judgment becomes final.

(e)     **Payment of Property Taxes**. Grantor will cause to be paid prior to delinquency all taxes and assessments heretofore or hereafter levied or assessed against the Property, or any part thereof, or against the Trustee or the Beneficiary (excluding Beneficiary's income taxes) for or on account of the Loan Documents or the Indebtedness or the interest created by this Mortgage and will furnish the Beneficiary with receipts showing payment of such taxes and assessments at least ten (10) days prior to the applicable delinquency date therefor (unless an escrow for payment of such taxes has been established and maintained with Beneficiary pursuant to subparagraph (n) of this Section 2.2); except that Grantor may in good faith, by appropriate proceedings, contest the validity, applicability, or amount of any valuation, asserted tax or assessment, and pending such contest Grantor shall not be deemed in default hereunder if prior to the delinquency of the asserted tax or assessment Grantor establishes an escrow or furnishes other adequate security acceptable to the Beneficiary adequate to cover the payment of such tax or assessment with interest, costs and penalties and a reasonable additional sum to cover possible costs, interest and penalties (which escrow or other security shall be returned to Grantor upon payment or to permit payment of all such taxes, assessments, interests, costs and penalties), and if Grantor promptly causes to be paid any amount adjudged by a court of competent jurisdiction to be due, with all costs, penalties and interest thereof, promptly after such judgment becomes final; provided, however, that in any event, each such contest shall be concluded and the tax, assessment, penalties, interests and costs shall be paid prior to the date any writ or order is issued under which the Property may be sold.

(f)     **Condition of Property**. Grantor will keep the Property in good order, repair and operating condition, causing all necessary repairs, renewals, replacements, additions and improvements to be promptly made, and will not allow any of the Property to be misused, abused or wasted or to materially deteriorate, except for the ordinary wear and tear of its intended primary use. Grantor will promptly replace all worn-out or obsolete fixtures or personal property covered by this Mortgage with fixtures or personal property comparable to the replaced fixtures or personal property when new, will promptly replace carpets and drapes when needed and will repaint the Property when needed, and will not, without the prior written consent of Beneficiary, remove from the Property any fixtures or personal property covered by this Mortgage except such as is replaced by Grantor by an article of equal suitability and value, owned by Grantor, free and clear of any lien or security interest (except that created by this Mortgage), and will make no structural alterations to the Property or any other alterations thereto which impair the value thereof in any material respect. Grantor has delivered to the Beneficiary or will deliver to Beneficiary upon completion of the improvements to the Mortgaged Property an inventory describing and showing the make, model, serial number and location of all fixtures and personal property used in the management, maintenance and operation of the Property (other than fixtures or personal property expressly excluded from the operation of this Mortgage) with a certification by Grantor that said inventory is a true and complete schedule of all such fixtures and personal property used in the management, maintenance and operation of the Property, that such items specified in the inventory constitute all of the fixtures and personal property required in the management, maintenance and operation of the Property, and that all such items are owned by Grantor free and clear of any lien or security interest (except that created by this Mortgage).

(g)     **Property Insurance**. Grantor will keep the Property insured against loss or damage by fire, explosion, windstorm, hail, flood (if the Property shall at any time be located in an identified "flood prone area" in which flood insurance has been made available pursuant to the Flood Disaster Protection Act of 1973), tornado and such other hazards as may be reasonably required by the Beneficiary by policies of fire, extended coverage and other insurance in such company or companies with a Best rating of at least A+ and a financial size category of at least VII, unless otherwise agreed by the Beneficiary, in such amounts and deductibles, upon such terms and provisions, and with such endorsements, all as may be reasonably acceptable to Beneficiary. Hazards covered, the amounts of such coverage and the carrier providing such coverage must be approved by the Beneficiary in writing. Without limiting the foregoing, the fire and extended coverage policy shall provide coverage for at least the lesser of 100% of the full insurable value of the improvements or the outstanding balance of the Indebtedness. Grantor will also provide such other insurance as the Beneficiary may from time to time reasonably require, including all-builders risk coverage for the construction of the improvements to the Property, comprehensive general liability, rental loss/business interruption (at least 12 months) and professional liability for architects and engineers during the construction phase, with such companies, upon such terms and provisions, in such amounts and deductibles, and with such endorsements, all as are approved by the Beneficiary, which approval shall not be unreasonably withheld. Grantor

D'          Bk     Vol        Pg
00042149    OR     8235       7

further agrees that Grantor will deliver to the Beneficiary the original policies or certificates (with a copy of such original policies) evidencing such insurance and any additional insurance which shall be taken out upon any part of the Property and receipts evidencing the payment of all premiums, and will deliver certificates evidencing all renewals of all such policies of insurance at least thirty (30) days before any such policies are renewed or expire. Any and all insurance policies shall name Beneficiary as loss payee and provide that such policy will not be cancelled or modified in any way without thirty (30) days prior written notice. Without limiting the discretion of the Beneficiary with respect to required endorsements to insurance policies, Grantor further agrees that all such policies shall provide that proceeds thereunder will be payable to the Beneficiary as its interest may appear pursuant and subject to a mortgagee clause (without contribution) of standard form attached to or otherwise made a part of the applicable policy. In the event of foreclosure of this Mortgage, or other transfer of title to the Property in extinguishment in whole or in part of the Indebtedness, all right, title and interest of the Grantor in and to all proceeds payable under all such insurance policies then in force concerning the Property shall thereupon vest in the purchaser at such foreclosure or the Beneficiary or other transferee in the event of such other transfer of title. In the event any of the Property covered by such insurance is destroyed or damaged by fire, explosion, windstorm, hail or by any other casualty against which insurance shall have been required hereunder, (i) the Beneficiary may, but shall not be obligated to, make proof of loss if not made promptly by Grantor, (ii) each insurance company concerned is hereby authorized and directed to make payment for such loss directly to the Beneficiary instead of to Grantor, and (iii) the Beneficiary shall have the right to apply the insurance proceeds first, to reimburse the Beneficiary or the Trustee for all costs and expenses, including reasonable attorneys' fees, incurred in connection with the collection of such proceeds and, the remainder of the insurance proceeds shall be applied, at the discretion of the Beneficiary in payment (without premium or penalty) of the Indebtedness, either in whole or in part, in the order determined by the Beneficiary in its sole discretion, or to the repair, restoration or replacement, either partly or entirely, of the Property so destroyed or damaged. If the proceeds are to be applied to the repair of the Property, they shall be paid by Beneficiary, subject to Beneficiary's receipt, to Grantor for the repair and replacement of the Property, in periodic disbursements and following Beneficiary's receipt and approval of specific disbursement requests itemizing work performed and materials furnished in furtherance of such repairs, for the sole purpose of repairing or replacing the damaged portion of the Property.  Any insurance proceeds held by Beneficiary shall be so held without payment or allowance of interest thereon, and shall be paid out from time to time upon compliance by Grantor with such terms, conditions and requirements as may be reasonably imposed by the Beneficiary, including, without limitation, Grantor shall provide Beneficiary with good and sufficient documentation and information necessary and reasonably required by Beneficiary to verify and confirm the exact nature and extent of any damage or destruction to the Property and the amount of funds necessary to properly be expended for such repair or replacement shall not be unreasonably withheld, describing the repair work to be performed and the costs of labor and material for each stage of repair work. Any proceeds not paid to repair or replace the damaged or destroyed portion of the Property shall be applied to the last maturing installment of principal and interest due and owing on

the Indebtedness. In any event, the unpaid portion of the Indebtedness shall remain in full force and effect and Grantor shall not be excused in the payment thereof. If any act or occurrence of any kind or nature (including any casualty on which insurance was not obtained or obtainable) shall result in damage to or loss or destruction of the Property, Grantor shall give immediate notice thereof by mail to the Beneficiary and, unless otherwise so instructed by the Beneficiary, shall promptly, at Grantor's sole cost and expense and regardless of whether the insurance proceeds, if any, shall be sufficient for the purpose, restore, repair, replace and rebuild the Property as nearly as possible to its value, condition and character immediately prior to such damage, loss or destruction in accordance with plans and specifications submitted to and approved by the Beneficiary.

(h)    **Condemnation**. Promptly, upon obtaining knowledge of the institution of any proceedings for the condemnation of the Property or any portion thereof, or any other proceedings arising out of injury or damage to the Property, or any portion thereof, Grantor will notify the Beneficiary of the pendency of such proceedings. The Beneficiary may participate in any such proceedings, and Grantor shall from time to time deliver to the Beneficiary all instruments requested by it which are in Grantor's possession or are reasonably obtainable by Grantor to permit such participation. Grantor shall, at its expense, diligently prosecute any such proceedings, and shall consult with the Beneficiary, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. All proceeds of condemnation awards or proceeds of sale in lieu of condemnation with respect to the Property and all judgments, decrees and awards for injury or damage to the Property shall be paid to the Beneficiary and shall be applied, first, to reimburse the Beneficiary or the Trustee for all reasonable costs and expenses, including reasonably attorney's fees, incurred in connection with collection of such proceeds and, second, the remainder of said proceeds shall be applied, at the discretion of the Beneficiary, to the payment of the Indebtedness (without premium or penalty) in the order determined by the Beneficiary in its sole discretion or paid out to repair or restore the Property so affected by such condemnation, injury or damage in the same manner as provided in subparagraph (g) of this Paragraph 2.2.

Grantor hereby assigns and transfers all such proceeds, judgments, decrees and awards to the Beneficiary and agrees to execute such further assignments of all such proceeds, judgments, decrees and awards as the Beneficiary may request. The Beneficiary is hereby authorized, in the name of Grantor, to execute and deliver valid acquittances for, and to appeal from, any such judgment, decree or award. The Beneficiary shall not, in any event or circumstances, be liable or responsible for failure to collect, or exercise diligence in the collection of, any such proceeds, judgments, decrees or awards.

(i)    **Protection of Lien**. If the validity or priority of this Mortgage or of any rights, titles, liens or security interests created or evidenced hereby with respect to the Property or any part thereof shall be endangered or questioned or shall be attacked directly or indirectly or if any legal proceedings are instituted against Grantor with respect thereto, Grantor will give prompt written notice thereof to the Beneficiary and at Grantor's own cost

Doc　　Bk　　Vol　　Pg
00042149 OR　8235　　9

and expense will diligently endeavor to cure any defect that may be developed or claimed, and will take all necessary and proper steps for the defense of such legal proceedings, including but not limited to the employment of counsel, the prosecution or defense of litigation and the release or discharge of all adverse claims, and the Trustee and the Beneficiary, or either of them (whether or not named as parties to legal proceedings with respect thereto) are hereby authorized and empowered to take such additional steps as in their judgment and discretion may be necessary or proper for the defense of any such legal proceedings or the protection of the validity or priority of this Mortgage and the rights, titles, liens, security interests created or evidenced hereby, including but not limited to the employment of counsel, the prosecution or defense of litigation, the compromise or discharge of any adverse claims made with respect to the Property, the purchase of any tax title and the removal of prior liens or security interests, and all expenses so incurred of every kind and character shall be a demand obligation owing by Grantor and the party incurring such expenses shall be subrogated to all rights of the person receiving such payment.

(j)　　**Further Encumbrances**. Grantor will not, without the prior written consent of the Beneficiary, create, place or permit to be created or placed, or through any act or failure to act, acquiesce in the placing of, or allow to remain, any deed of trust, mortgage, voluntary or involuntary lien, whether statutory, constitutional or contractual (except for the lien for ad valorem taxes on the Property which are not delinquent), security interest, encumbrance or charge, or conditional sale, against or covering the Property, or any part thereof, other than the Permitted Encumbrances, regardless of whether the same are expressly or otherwise subordinate to the lien or security interest created in this Mortgage, and should any of the foregoing become attached hereafter in any manner to any part of the Property without the prior written consent of the Beneficiary, Grantor will cause the same to be promptly discharged and released. Grantor will own all parts of the Property and will not acquire any fixtures, equipment or other property forming a part of the Property pursuant to a lease, license or similar agreement, without the prior written consent of the Beneficiary. Notwithstanding the foregoing, should the Beneficiary consent to any of the items prohibited by this subparagraph (j) of Paragraph 2.2, in exchange for such consent, the Beneficiary may require, at its option, (i) an increase in the interest rate payable under the Note or (ii) a reasonable encumbrance fee.

(k)　　**Sale or Transfer**. Grantor will not, without the prior written consent of the Beneficiary, (1) further encumber the Property (including the granting of any easements or other matters affecting title to the Property); (2) sell, assign, or otherwise transfer, convey or dispose of ownership of the Property, or any interest therein or any part thereof (except leases/occupancy agreements with tenants of the units in the ordinary course of business), including any assignment for the benefit of creditors or the grant of any mortgage or security interest in all or any part of the Property; or (3) sell, convey, assign, or otherwise transfer of all or substantially all of the assets of Grantor. Notwithstanding the foregoing, should the Beneficiary consent to any item prohibited in this subparagraph (k) of Paragraph 2.2, in exchange for such consent, the Beneficiary may require, at its option, (i) an increase in the interest rate payable under the Note or (ii) a transfer fee.

(l)   **Books and Records**. Grantor will keep accurate books and records in accordance with sound accounting principles in which full, true and correct entries shall be promptly made as to all operations on the Property, and will permit all such books and records to be inspected by the Beneficiary and its duly accredited representatives at all times during reasonable business hours, and if, and as often as, reasonably requested by the Beneficiary, Grantor will make reports of operations in such form as the Beneficiary prescribes, setting out full data as to the net revenues from the Property.

(m)   **Financial Statements; Rent Roll**. Grantor will cause to be delivered to the Beneficiary the financial statements, certificates and other information described in the Distributor Agreement upon the terms and conditions described therein.

(n)   **Escrow for Taxes and Insurance**. In order to secure the performance and discharge of Grantor's obligations under subparagraphs (b), (e) and (g) of this Paragraph 2.2, Grantor shall, if required by Beneficiary, deposit with the Beneficiary, on each date when an installment of principal and/or interest is due under the Note, sufficient funds equal to one-twelfth (1/12) of the estimated annual taxes and insurance affecting the Property (as estimated from time to time by the Beneficiary) to permit the Beneficiary to pay, at least fifteen (15) days prior to the due date thereof, the next maturing ad valorem taxes, assessments and charges and premiums for such policies of insurance. The Beneficiary shall have the right to rely upon tax information furnished by applicable taxing authorities in the payment of such taxes or assessments and shall have no obligation to make any protest of any such taxes or assessments. If such escrows are required, any excess over the amounts required for such purposes shall be held by the Beneficiary for future use, or refunded to Grantor, at the Beneficiary's option; and any deficiency in such funds so deposited shall be made up by Grantor upon demand of the Beneficiary. All such funds so deposited shall bear no interest whatsoever, may be mingled with the general funds of the Beneficiary and shall be applied by the Beneficiary toward the payment of such taxes, assessments, charges and premiums when statements therefor are presented to the Beneficiary by Grantor (which statements shall be presented by Grantor to the Beneficiary a reasonable time before the applicable amount is due); provided, however, that, if a default shall have occurred hereunder, such funds may at the Beneficiary's option be applied to the payment of the Indebtedness in the order determined by the Beneficiary in its sole discretion, and that the Beneficiary may at any time, in its discretion, apply all or any part of such funds toward the payment of any such taxes, assessments, charges or premiums which are past due, together with any penalties or late charges with respect thereto. The conveyance or transfer of Grantor's interest in the Property for any reason (including without limitation the foreclosure of a subordinate lien or security interest or a transfer by operation of law) shall constitute an assignment or transfer of Grantor's interest in and rights to any such funds held by the Beneficiary under this subparagraph (n) but subject to the rights of the Beneficiary hereunder.

(o)   **Further Acts**. Grantor will, on the request of the Beneficiary, (i) promptly correct any defect, error or omission which may be discovered in the contents of this

Mortgage or in any other instrument executed in connection therewith or in the execution or acknowledgment thereof; (ii) execute, acknowledge, deliver and record or file such further instruments (including without limitation further deeds of trust, security agreements, financing statements, continuation statements and assignments of rents or leases) and do such further acts as may be necessary, desirable or proper to carry out more effectively the purposes of this Mortgage and such other instruments and subject to the liens and security interests hereof and thereof any property intended by the terms hereof and thereof to be covered hereby and thereby including specifically, but without limitation, any renewals, additions, substitutions, replacements, or appurtenances to the Property; and (iii) execute, acknowledge, deliver, procure and record or file any document or instrument (including specifically any financing statement) deemed reasonably advisable by the Beneficiary to protect the lien or the security interest hereunder against the rights or interests of third persons, and Grantor will pay all costs connected with any of the foregoing.

(p)    **Reimbursement**. Grantor will pay all appraisal fees, recording fees, taxes, brokerage fees and commissions, abstract fees, title policy fees, uniform commercial code search fees, escrow fees, attorney's fees, and all other costs and expenses of every character incurred by Grantor or the Beneficiary in connection with the execution, delivery and recordations of this Mortgage or otherwise attributable or chargeable to Grantor as owner of the Property, and will reimburse the Beneficiary for all such costs and expenses incurred by it. Grantor shall pay all expenses and reimburse the Beneficiary for any expenditures, including reasonable attorney's fees and legal expenses, incurred or expended in connection with (i) the breach by Grantor of any covenant herein or in any other instrument securing the payment of the Indebtedness, or (ii) the Beneficiary's exercise of any of its rights and remedies hereunder or under the Security Agreement or any other instrument securing the payment of the Indebtedness or the Beneficiary's protection of the Property and its lien and security interest therein. Any amount to be paid hereunder by Grantor to the Beneficiary shall be a demand obligation owing by Grantor to the Beneficiary.

(q)    **Liability Insurance**. Grantor shall maintain Comprehensive General Liability Insurance against claims for bodily injury or death and property damage occurring in or upon or resulting from the Property, in such amounts and in a form acceptable to Beneficiary and with such insurance company or companies with a Best rating of at least A+ and a financial size category of at least VII, unless otherwise agreed by Lender. Such Comprehensive General Liability Insurance shall include Blanket Contractual Liability coverage which insures contractual liability under the indemnification of the Beneficiary and the Trustee by Grantor set forth in this Mortgage (but such coverage or the amount thereof shall in no way limit such indemnification). Grantor shall maintain with respect to each policy or agreement evidencing such Comprehensive General Liability Insurance such reasonably obtainable endorsements as may be reasonably required by the Beneficiary and shall at all times deliver and maintain with the Beneficiary a certificate with respect to such insurance in form satisfactory to the Beneficiary. Any and all insurance policies shall name Beneficiary as loss payee and provide that such policy will not be cancelled or modified in any way without thirty (30) days prior written notice. Not less than thirty (30) days prior to the expiration date

Doc
00    149    Bk    Vol    Pg
        OR    8235    12

of each policy of insurance required of Grantor pursuant to this subparagraph 2.2 (q), Grantor shall deliver to the Beneficiary a renewal policy or policies marked "premium paid" or accompanied by other evidence of payment satisfactory to the Beneficiary. In the event of a foreclosure of this Mortgage, the purchaser of the Property shall succeed to all the rights of Grantor in and to all proceeds payable under all such policies of insurance, and Grantor hereby authorizes the Beneficiary to notify any or all insurance carriers of this assignment. Grantor will provide certificates to Beneficiary from such insurance companies satisfactory to Beneficiary showing that Grantor and Grantor's general contractor are covered by public liability and worker's compensation insurance satisfactory to Beneficiary.

(r)  **Enactment of Law**. In the event of the enactment after this date of any law of the State of Texas or of any other governmental entity deducting from the value of property for the purpose of taxation any lien or security interest thereon, or imposing upon the Beneficiary the payment of the whole or any part of the taxes or assessments or charges or liens herein required to be paid by Grantor, or changing in any way the laws relating to the taxation of deeds of trust or mortgages or security agreements or debts secured by deeds of trust or mortgages or security agreements or the interest of the mortgagee or secured party in the property covered thereby, or the manner of collection of such taxes, so as to affect this Mortgage or the Indebtedness or the Beneficiary, then, and in any such event, Grantor, upon demand by the Beneficiary, shall pay such taxes assessments, charges or liens, or reimburse the Beneficiary therefor; provided, however, that if in the opinion of counsel for the Beneficiary (i) it is unlawful to require Grantor to make such payment or (ii) the making of such payment would result in the imposition of interest beyond the maximum amount permitted by law, then and in such event, the Beneficiary may elect, by notice in writing given to Grantor, to declare all of the Indebtedness to be and become due and payable one hundred twenty (120) days from the giving of such notice.

(s)  **Proceeds of Collateral**. Grantor shall account fully and faithfully for and, if the Beneficiary so elect(s), shall promptly pay or turn over to the Beneficiary the proceeds in whatever form received from disposition in any manner of any of the Collateral, except as otherwise specifically authorized herein. Grantor shall at all times keep accurate and complete records of the Collateral and its proceeds.

(t)  **Estoppel**. Grantor shall at any time and from time to time furnish promptly upon request by the Beneficiary a written statement in such form as may be reasonably required by the Beneficiary stating that the Loan Documents, this Mortgage and the other instruments securing the payment of the Indebtedness are valid and binding obligations of Grantor, enforceable against Grantor in accordance with their terms except as limited by bankruptcy, insolvency, or other laws of general application relating to the enforcement of creditor's rights; the unpaid principal balance of the Note; the date to which interest on the Indebtedness is paid; that the Loan Documents, this Mortgage and the other instruments securing the payment of the Indebtedness, have not been released, subordinated or modified; and that there are no offsets or defenses against the enforcement of the Loan Documents, this

*DMS*

D.    Bk    Vol    Pg
00042149  OR   8235   13

Mortgage or any other instrument securing the payment of the Indebtedness, or if any of the foregoing statements are untrue, specifying the reasons therefor.

(u)    **Permitted Encumbrances**. Grantor will comply with and will perform all of the covenants, agreements and obligations imposed upon it or the Property in the Permitted Encumbrances in accordance with their respective terms and provisions. Grantor will not modify or permit any modification of any Permitted Encumbrances, without the prior written consent of the Beneficiary.

(v)    **Grantor's Existence**. Grantor will continuously maintain Grantor's existence in the State of Texas.

2.3    **Subrogation**. Grantor agrees that, if Grantor fails to perform any act or to take any action which hereunder Grantor is required to perform or take, or to pay any money which hereunder Grantor is required to pay, the Beneficiary, in Grantor's name or in Beneficiary's name, may, but shall not be obligated to, perform or cause to be performed such act or take such action or pay such money, and any expenses so incurred by the Beneficiary, and any money so paid by the Beneficiary, shall be a demand obligation owing by Grantor to the Beneficiary, and the Beneficiary, upon making such payment, shall be subrogated to all of the rights of the person, corporation or entity, governmental or otherwise, receiving such payment. Any amounts due and owing by Grantor to the Beneficiary pursuant to this Mortgage shall bear interest from the date such amount becomes due until paid at the rate of interest payable on matured but unpaid principal of or interest under the Note and shall be a part of the Indebtedness and shall be secured by this Mortgage and by any other instrument securing the Indebtedness.

2.4    Purposely Omitted.

2.5    **Assignment of Rents and Profits.** All of the rents, royalties, issues, profits, revenue, income and other benefits derived from the Mortgaged Property or arising from the use or enjoyment of any portion thereof or from any lease or agreement pertaining thereto (hereinafter called the **"Rents and Profits"**) are hereby absolutely and unconditionally assigned, transferred, conveyed and set over to Beneficiary to be applied by Beneficiary in accordance with the terms hereof. Prior to the occurrence of any default hereunder, Grantor shall have a license to collect and receive all Rents and Profits as the Trustee for the benefit of Beneficiary and Grantor, and Grantor shall apply the funds so collected first to the payment of the principal and interest and all other sums payable on the Indebtedness and thereafter, so long as no Event of Default hereunder has occurred, the balance shall be distributed to the account of Grantor. Grantor will not (i) execute an assignment of any of its right, title or interest in the Rents and Profits, or (ii) except where the lessee is in default thereunder, terminate or consent to the cancellation or surrender of any lease of the Mortgaged Property or any part thereof, now or hereafter existing, except that any lease may be cancelled, provided that promptly after the cancellation or surrender thereof a new lease is entered into with a new lessee having a credit standing, in the judgment of Beneficiary, at least equivalent to that of the lessee whose lease was cancelled, on substantially the same terms as the terminated or cancelled lease, (iii) modify any lease of the Mortgaged Property or any part thereof so as to shorten the

D          Bk      Vol      Pg
00642149   OR      8235     14

unexpired term thereof or so as to decrease the amount of rent payable thereunder, or (iv) accept prepayment of any installments of rent to become due under any of such leases in excess of one month, except prepayments in the nature of security for the performance of the lessee thereunder, or (v) in any other manner impair the value of the Mortgaged Property or the security of this Deed of Trust. Grantor will not execute any lease of all or any substantial portion of the Mortgaged Property except for actual occupancy by the lessee thereunder, and will at all times promptly and faithfully perform, or cause to be performed, each covenant, condition and agreement contained in each lease of the Mortgaged Property now or hereafter existing, on the part of lessor thereunder to be kept and performed. Grantor shall furnish to Beneficiary, within ten (10) days after a request by Beneficiary to do so, a written statement containing the names of all lessees of the Mortgaged Property, the terms of their respective leases, the space occupied and the rentals payable thereunder together with copies of any and all written leases then existing which affect or pertain to the Mortgaged Property.

## ARTICLE III.

## Default

3.1    **Events of Default**. The term "default" as used in this Mortgage shall mean the occurrence of any of the events set forth below following the thirty Business Days (defined as any day other than a Saturday, Sunday or statutory holiday) notice of default and opportunity to cure provided for in the Security Agreement:

(a)    The failure to make due and punctual payment of the Indebtedness or of any installment of interest, principal or any other amount required to be paid under the Loan Documents, this Mortgage or any other instrument securing the payment of the Indebtedness, as the same shall become due and payable, whether at maturity or when accelerated pursuant to any power to accelerate contained in the Loan Documents herein; or

(b)    An Event of Default as defined in the Security Agreement and/or the Distributor Agreement occurs or the Grantor defaults under the terms of this Mortgage; or

(c)    The Property or any part thereof is taken on execution or other process of law in any action against Grantor; or

(d)    Grantor abandons all or a portion of the Property; or

(e)    Without the prior written consent of the Beneficiary, (i) Grantor and/or Borrower sells, leases, exchanges, assigns, transfers, conveys or otherwise disposes of all or any part of the Property or any interest therein (except for the disposition of worn-out or obsolete personal property or fixtures under the circumstances described in subparagraph 2.2(f) hereof and except commercial leases to retail tenants of the in the ordinary course of business), or (ii) the title to the Property, or any interest therein, is vested in any other party, in any manner whatsoever, by operation of law or otherwise; or

Dc        Bk    Vol    Pg
00042149  OR    8235   15

(f)    Without the prior written consent of the Beneficiary, Grantor creates, places or permits to be created or placed, or through any act or failure to act, acquiesces in the placing of, or allows to remain, any deed of trust, mortgage, voluntary or involuntary lien, whether statutory, constitutional or contractual (except for the lien for ad valorem taxes on the Property which are not delinquent), security interest, encumbrance or charge, or conditional sale or other title retention document, against or covering the Property, or any part thereof, other than the Permitted Encumbrances, regardless of whether the same are expressly or otherwise subordinate to the lien or security interest created in this Mortgage, or acquires any fixtures, equipment or other property forming a part of the Property pursuant to a lease, license or similar agreement; or

(g)    The holder of any lien or security interest on the Property (without hereby implying the consent of the Beneficiary to the existence or creation of any such lien or security interest) institutes foreclosure or other proceedings for the enforcement of its remedies thereunder; or

(h)    The Property is so demolished, destroyed or damaged that, in the reasonable discretion of the Beneficiary, it cannot be restored or rebuilt with available funds to a profitable condition within a reasonable period of time; or

(i)    So much of the Property is taken in condemnation, or sold in lieu of condemnation, or the Property is so diminished in value due to any injury or damages to the Property, that the remainder thereof cannot, in the sole discretion of the Beneficiary, continue to be operated profitably for the purpose for which it was being used immediately prior to such taking, sale or diminution; or

(j)    Grantor shall fail to discharge within a period of sixty (60) days of the filing of any formal charges under federal or state law for which forfeiture of Grantor's interest in the Property or the granting of a lien against the Property, which lien is or could be superior to any of Beneficiary's liens against the Property, is a potential penalty or remedy.

3.2    **Acceleration of Indebtedness**. Upon the occurrence of a default as described in Section 3.1 foregoing, the Beneficiary shall have the option, without notice, of declaring all Indebtedness in its entirety to be immediately due and payable, and the liens and security interests evidenced hereby shall be subject to foreclosure in any manner provided for herein or provided for by law as the Beneficiary may elect.

3.3    **Right of Possession**. Upon the occurrence of a default which has not been cured as provided for in the Loan Documents, or any event or circumstance which, with the lapse of time or the giving of notice, or both, would constitute a default hereunder, the Grantor's license to collect the Rents and Profits shall automatically terminate, and Beneficiary is authorized prior or subsequent to the institution of any foreclosure proceedings to enter upon the Property, or any part thereof, and to take possession of the Property and of all books, records and accounts relating thereto and to exercise without interference from Grantor any and all rights which Grantor has with respect

to the management, possession, operation, protection or preservation of the Property, including the right to rent the same, to collect all Rents and Profits and to deduct from such Rents and Profits all costs, expenses and liabilities of every character incurred by the Beneficiary in collecting such Rents and Profits and in managing, operating, maintaining, protecting or preserving the Property and to apply the remainder of such Rents and Profits on the Indebtedness in such manner as the Beneficiary may elect. All such costs, expenses and liabilities incurred by the Beneficiary in collecting such Rents and Profits and in managing, operating, maintaining, protecting or preserving the Property, if not paid out of Rents and Profits as hereinabove provided, shall constitute a demand obligation and shall draw interest from the date of expenditure until paid at the rate of interest payable on matured but unpaid principal or interest under the Note, all of which shall constitute a portion of the Indebtedness. If necessary to obtain the possession provided for above, the Beneficiary may invoke any and all legal remedies to dispossess Grantor, including specifically one or more actions for forcible entry and detainer, trespass to try title and restitution. Nothing in this Paragraph 3.3 shall impose any duty, obligation or responsibility upon the Beneficiary for the control, care, management or repair of the Property, nor for the carrying out of any of the terms and conditions of any such lease agreement; nor shall it operate to make the Beneficiary responsible or liable for any waste committed on the Property by the tenants or by any other parties or for any dangerous or defective condition of the Property, or for any negligence in the management, upkeep, repair or control of the Property resulting in loss or injury or death to any tenant, licensee, employee or stranger.

    3.4  **Right of Foreclosure**. Upon the occurrence of a default which has not been cured as provided for in the Loan Documents, the Trustee, the Trustee's successor or substitute, is authorized and empowered, and it shall be the Trustee's special duty at the request of the Beneficiary to sell the Mortgaged Property or any part thereof situated in the State of Texas at the courthouse door of any county in the State of Texas in which any part of the Mortgaged Property is situated, at public sale to the highest bidder for cash between the hours of 10:00 o'clock a.m. and 4:00 o'clock p.m. on the first Tuesday in any month after having given notice of such sale in accordance with the statutes of the State of Texas then in force governing sales of real estate under powers conferred by deeds of trust. Any sale made by the Trustee hereunder may be as an entirety or in such parcels as the Beneficiary may request, and any sale may be adjourned by announcement at the time and place appointed for such sale without further notice except as may be required by law. The sale by the Trustee of less than the whole of the Mortgaged Property shall not exhaust the power of sale herein granted, and the Trustee is specifically empowered to make successive sale or sales under such power until the whole of the Mortgaged Property shall be sold; and, if the proceeds of such sale of less than the whole of the Mortgaged Property shall be less than the aggregate of the Indebtedness and the expense of executing this trust as provided herein, this Mortgage and the lien hereof shall remain in full force and effect as to the unsold portion of the Mortgaged Property just as though no sale had been made; provided, however, that Grantor shall never have any right to require the sale of less than the whole of the Mortgaged Property but the Beneficiary shall have the right, at its sole election, to request the Trustee to sell less than the whole of the Mortgaged Property. After each sale, the Trustee shall make to the purchaser or purchasers at such sale good and sufficient conveyances in the name of Grantor, conveying the property so sold to the purchaser or purchasers in fee simple with general warranty of title, and shall receive the proceeds of said sale or sales and apply the same as herein provided. The power of sale granted herein shall not be exhausted by any

sale held hereunder by the Trustee or the Trustee's substitute or successor, and such power of sale may be exercised from time to time and as many times as the Beneficiary may deem necessary until all of the Mortgaged Property has been duly sold and all of the Indebtedness has been fully paid. In the event any sale hereunder is not completed or is defective in the opinion of the Beneficiary, such sale shall not exhaust the power of sale hereunder and the Beneficiary shall have the right to cause a subsequent sale or sales to be made hereunder. Any and all statements of fact or other recitals made in any deed or deeds given by the Trustee or any successor or substitute appointed hereunder as to nonpayment of the Indebtedness, or as to the occurrence of any default, or as to the Beneficiary having declared all of such Indebtedness to be due and payable, or as to the request to sell, or as to notice of time, place and terms of sale and of the properties to be sold having been duly given, or as to the refusal, failure or inability to act of the Trustee or any substitute or successor, or as to the appointment of any substitute or successor trustee, or as to any other act or thing having been duly done by the Beneficiary or by such Trustee, substitute or successor, shall be taken as prima facie evidence of the truth of the facts so stated and recited. The Trustee, the Trustee's successor or substitute, may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by the Trustee, including the posting of notices and the conduct of sale, but in the name and on behalf of the Trustee, the Trustee's successor or substitute.

   3.5   **Other Rights and Remedies**. This instrument shall be effective as a mortgage as well as a deed of trust and upon the occurrence of a default which has not been cured as provided for in the Loan Documents may be foreclosed as to any of the Property in any manner permitted by the laws of the State of Texas or of any other state in which any part of the Property is situated, and any foreclosure suit may be brought by the Trustee or by the Beneficiary. In the event a foreclosure hereunder shall be commenced by the Trustee, or the Trustee's substitute or successor, the Beneficiary may at any time before the sale of the Property direct the Trustee to abandon the sale, and may then institute suit for the collection of the Note and the other Indebtedness, and for the foreclosure of this Mortgage. It is agreed that if the Beneficiary should institute a suit for the collection of the Note or any other Indebtedness and for the foreclosure of this Mortgage, the Beneficiary may at any time before the entry of a final judgment in said suit dismiss the same, and require the Trustee, the Trustee's substitute or successor to sell the property in accordance with the provisions of this Mortgage.

   3.6   `Appointment of Receiver`. In addition to all other remedies herein provided for, Grantor agrees that upon the occurrence of a default which has not been cured as provided for in the Loan Documents, or any event or circumstance which, with the lapse of time or the giving of notice, or both, would constitute a default hereunder, the Beneficiary shall as a matter of right be entitled to the appointment of a receiver or receivers for all or any part of the Property, whether such receivership be incident to a proposed sale of such Property or otherwise, and without regard to the value of the Property or the solvency of any person or persons liable for the payment of the Indebtedness, and Grantor does hereby consent to the appointment of such receiver or receivers, waives any and all defenses to such appointment and agrees not to oppose any application therefor by the Beneficiary, but nothing herein is to be construed to deprive the Beneficiary of any other right, remedy or privilege it may now have under the law to have a receiver appointed; provided, however, that the appointment of such receiver, trustee or other appointee by virtue of any court

Doc
006-2149  Bk      Vol     Pg
          OR      8235    18

order, statute or regulation shall not impair or in any manner prejudice the rights of the Beneficiary to receive payment of the Rents and Profits pursuant to the assignment of rents herein. Any money advanced by the Beneficiary in connection with any such receivership shall be a demand obligation to the Beneficiary and shall bear interest from the date of making such advancement by the Beneficiary until paid at the rate of interest payable on matured but unpaid principal or interest under the Note and shall be a part of the Indebtedness and shall be secured by this Mortgage and by any other instrument securing the Indebtedness.

    3.7    **Application of Proceeds**. The proceeds of any sale held by the Trustee or any receiver or public officer in foreclosure of the liens evidenced hereby shall be applied:

        FIRST, to the payment of all necessary reasonable costs and expenses incident to such foreclosure sale, including but not limited to all court costs and charges of every character in the event foreclosed by suit;

        SECOND, to the payment in full of the Indebtedness (including specifically without limitation the principal, interest, attorney's fees, late charges and penalties due and unpaid under the Loan Documents and the amounts due and unpaid and owed to the Beneficiary under this Mortgage) in such order as the Beneficiary may elect; and

        THIRD, the remainder, if any, shall be paid as otherwise required by law.

    3.8    **Beneficiary's Right to Purchase**. The Beneficiary shall have the right to become the purchaser at any sale held by any Trustee or substitute or successor or by any receiver or public officer, and any holder of all or part of the Indebtedness purchasing at any such sale shall have the right to credit against the Indebtedness the amount of the bid made therefor, to the extent necessary to satisfy such bid, or if such holder holds less than all of the Indebtedness, the pro rata part thereof owing to such holder, accounting to all other holders not joining in such bid in cash for the portion of such bid or bids apportionable to such nonbidding holder or holders.

    3.9    **Sale of Collateral**. Upon the occurrence of a default which has not been cured as provided for in the Loan Documents, the Beneficiary may exercise its rights of enforcement with respect to the Collateral under the Texas Business and Commerce Code, as amended, and in conjunction with, in addition to or in substitution for those rights and remedies:

        (a)    The Beneficiary may enter upon the Property to take Possession of, assemble and collect the Collateral or to render it unusable; and

        (b)    The Beneficiary may require Grantor to assemble the Collateral and make it available at a place the Beneficiary designates which is mutually convenient to allow the Beneficiary to take possession or dispose of the Collateral; and

        (c)    Written notice mailed to Grantor as provided herein twenty (20) days prior to the date of public sale of the Collateral or prior to the date after which private sale of the Collateral will be made shall constitute commercially reasonable notice; and

---



Dc '         Bk    Vol      Pg
00042149  DR   8235     19

(d)     Any sale made pursuant to the provisions of this Section shall be deemed to have been a public sale conducted in a commercially reasonable manner if held contemporaneously with the sale of the Mortgaged Property under power of sale as provided herein upon giving the same notice with respect to the sale of the Collateral hereunder as is required for such sale of the Mortgaged Property under power of sale; and

(e)     In the event of a foreclosure sale, whether made by the Trustee under the terms hereof, or under judgment of a court, the Collateral and the Mortgaged Property may, at the option of the Beneficiary, be sold as a whole; and

(f)     It shall not be necessary that the Beneficiary take possession of the Collateral or any part thereof prior to the time that any sale pursuant to the provisions of this paragraph is conducted, and it shall not be necessary that the Collateral or any part thereof be present at the location of such sale; and

(g)     Prior to application of proceeds of disposition of the Collateral to the Indebtedness, such proceeds shall be applied to the reasonable expenses of retaking, holding, preparing for sale or lease, selling, leasing and the like and the reasonable attorney's fees and legal expenses incurred by the Beneficiary; and

(h)     Any and all statements of fact or other recitals made in any bill of sale or assignment or other instrument evidencing any foreclosure sale hereunder as to nonpayment of the Indebtedness or as to the occurrence of any default, or as to the Beneficiary having declared all of such Indebtedness to be due and payable, or as to notice of time, place and terms of sale and of the properties to be sold having been duly given, or as to any other act or thing having been duly done by the Beneficiary, shall be taken as prima facie evidence of the truth of the facts so stated and recited; and

(i)     The Beneficiary may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by the Beneficiary, including the sending of notices and the conduct of the sale, but in the name and on behalf of the Beneficiary.

3.10    **Foreclosure on Portion of Indebtedness**. In the event of a default in the payment of any part of the Indebtedness which has not been cured as provided for in the Loan Documents, the Beneficiary shall have the right to proceed with foreclosure of the liens and security interests evidenced hereby without declaring the entire Indebtedness due, and in such event any such foreclosure sale may be made subject to the unmatured part of the Indebtedness; and any such sale shall not in any manner affect the unmatured part of the Indebtedness, but as to such unmatured part, of the Indebtedness, this Mortgage shall remain in full force and effect just as though no sale had been made. The proceeds of any such sale shall be applied as provided in Paragraph 3.7 except that the amount paid under subparagraph SECOND thereof shall be only the matured portion of the Indebtedness and any proceeds of such sale in excess of those provided for in subparagraphs FIRST and SECOND (modified as provided above) shall be applied to installments of principal and interest

on the Note in the inverse order of maturity. Several sales may be made hereunder without exhausting the right of sale for any unmatured part of the Indebtedness.

3.11   **Cumulative Remedies**. All remedies herein expressly provided for are cumulative of any and all other remedies existing at law or in equity and are cumulative of any and all other remedies provided for in any other instrument securing the payment of the Indebtedness, or any part thereof, or otherwise benefitting the Beneficiary, and the Trustee and the Beneficiary shall, in addition to the remedies herein provided, be entitled to avail themselves of all such other remedies as may now or hereafter exist at law or in equity for the collection of the Indebtedness and the enforcement of the covenants herein and the foreclosure of the liens and security interests evidenced hereby, and the resort to any remedy provided for hereunder or under any such other instrument or provided for by law shall not prevent the concurrent or subsequent employment of any other appropriate remedy or remedies.

3.12   **Non-Waiver of Remedies**. The Beneficiary may resort to any security given by this Mortgage or to any other security now existing or hereafter given to secure the payment of the Indebtedness, in whole or in part, and in such portions and in such order as may seem best to the Beneficiary in its sole and uncontrolled discretion, and any such action shall not in any way be considered as a waiver of any of the rights, benefits, liens or security interests evidenced by this Mortgage.

3.13   **Waiver by Grantor**. To the full extent Grantor may do so, Grantor agrees that Grantor will not at any time insist upon, plead, claim or take the benefit or advantage of any law now or hereafter in force providing for any appraisement, valuation, stay, extension or redemption, and Grantor, for Grantor and Grantor's successors and assigns, and for any and all persons ever claiming any interest in the Property, to the extent permitted by law, hereby waives and releases all rights of redemption, valuation, appraisement, stay of execution, notice of intention to mature or declare due the whole of the Indebtedness, notice of election to mature or declare due the whole of the Indebtedness and all rights to a marshaling of the assets of Grantor, including the Property, or to a sale in inverse order of alienation in the event of foreclosure of the liens and security interests hereby created. Grantor shall not have or assert any right under any statute or rule of law pertaining to the marshaling of assets, sale in inverse order of alienation, the exemption of homestead, the administration of estates of decedents or other matters whatever to defeat, reduce or affect the right of the Beneficiary under the terms of this Mortgage to a sale of the Property for the collection of the Indebtedness without any prior or different resort for collection, or the right of the Beneficiary under the terms of this Mortgage to the payment of such Indebtedness out of the proceeds of sale of the Property in preference to every other claimant whatever. If any law referred to in this paragraph and now in force, of which Grantor or Grantor's successors and assigns and such other persons claiming any interest in the Property might take advantage despite this paragraph, shall hereafter be repealed or cease to be in force, such law shall not thereafter be deemed to preclude the application of this paragraph.

3.14   **Calculation of Deficiency**. If all or any portion of the Property is foreclosed upon pursuant to a judicial or nonjudicial foreclosure sale, then notwithstanding the provisions of Sections

51.003, 51.004, and 51.005 of the Texas Property Code (as the same may be amended from time to time), and to the extent permitted by law, Grantor agrees that Beneficiary shall be entitled to seek a deficiency judgment from any party obligated on the Note or a guaranty of such Note equal to the difference between the amount owing on the Note and the total amount for which the property foreclosed ("**Foreclosed Property**") was sold pursuant to judicial or nonjudicial foreclosure sales. Grantor expressly recognizes that this section constitutes a waiver of the above-cited provisions of the Texas Property Code which would otherwise permit Grantor, guarantors and other persons against whom recovery of deficiencies is sought or guarantors independently (even absent the initiation of deficiency proceedings against them) to present competent evidence of the fair market value of the Foreclosed Property as of the date of the applicable foreclosure sale and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than such fair market value. Grantor further recognizes and agrees that this waiver creates an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Foreclosed Property for purposes of calculating deficiencies owed by Grantor, any guarantors, and others against whom recovery of a deficiency is sought.

Alternatively, in the event the waiver provided above is determined by a court of competent jurisdiction to be unenforceable, the following shall be the basis for the finder of fact's determination of the fair market value of the Foreclosed Property as of the date of the foreclosure sale in proceedings governed by Sections 51.003, 51.004, and 51.005 of the Texas Property Code (as amended from time to time);

(1)    The Foreclosed Property shall be valued in an "as is" condition "with all faults" as of the date of the foreclosure sale, without any assumption or expectation that any repairs will be performed in conjunction therewith;

(2)    The valuation shall be based upon an assumption that the foreclosure purchaser desires a prompt resale of the Foreclosed Property for cash promptly (but no later than twelve months) following the foreclosure sale;

(3)    All reasonable closing costs customarily borne by the seller in a commercial real estate transaction shall be deducted from the gross fair market value of the Foreclosed Property, including, without limitation, brokerage commissions, title insurance, a survey of the Foreclosed Property, tax prorations, attorney's fees, and marketing costs;

(4)    The gross fair market value of the Foreclosed Property shall be further discounted to account for any estimated holding costs associated with maintaining the Foreclosed Property pending sale, including, without limitation, utilities expenses, property management fees, taxes and assessments (to the extent not accounted for in paragraph 3 above), and other maintenance expenses; and

(5)    Any expert opinion testimony given or considered in connection with a determination of the fair market value of the Foreclosed Property must be given by persons having at least five years experience in appraising property similar to the Foreclosed

Property and who have conducted and prepared a complete written appraisal of the Foreclosed Property taking into consideration the factors set forth above.

3.15     **Post-Foreclosure Tenancy**. In the event there is a foreclosure sale hereunder and at the time of such sale Grantor or Grantor's successors or assigns or any other persons claiming any interest in the Property by, through or under Grantor are occupying or using the Property, or any part thereof, each and all shall immediately become the tenant of the purchaser at such sale, which tenancy shall be a tenancy from day-to-day, terminable at the will of either landlord or tenant, at a reasonable rental per day based upon the value of the property occupied, such rental to be due daily to the purchaser. In the event the tenant fails to surrender possession of said property upon demand, the purchaser shall be entitled to institute and maintain an action for forcible entry and detainer of said property in the Justice of the Peace Court in the Justice Precinct in which such property, or any part thereof, is situated.

## ARTICLE IV.

### Miscellaneous

4.1     **Release by Beneficiary**. If all of the Indebtedness is paid as the same becomes due and payable and if all of the covenants, warranties, undertakings and agreements made in this Mortgage are kept and performed, then and in that event only, all rights under this Mortgage shall terminate, and the Property shall become wholly clear of the liens, security interests, conveyances and assignments evidenced hereby, which shall be released by the Beneficiary in due form at Grantor's cost.

4.2     **Substitute Trustee**. The Trustee may resign by an instrument in writing addressed to the Beneficiary, or the Trustee may be removed at any time with or without cause by an instrument in writing executed by the Beneficiary. In case of the death, resignation, removal or disqualification of the Trustee or if for any reason the Beneficiary shall deem it desirable to appoint a substitute or successor trustee to act instead of the Trustee or any substitute or successor trustee, then the Beneficiary shall have the right and is hereby authorized and empowered to appoint a successor trustee, or a substitute trustee, without other formality than appointment and designation in writing executed by the Beneficiary, and the authority hereby conferred shall extend to the appointment of other successor and substitute trustees successively until the Indebtedness has been paid in full or until the Property is sold hereunder. In the event the Indebtedness is owed by more than one person or entity, the holder or holders of not less than a majority in the amount of the Indebtedness shall have the right and authority to make the appointment of a successor or substitute trustee provided for in the preceding sentence. Such appointment and designation by the Beneficiary or by the holder or holders of not less than a majority of the Indebtedness shall be full evidence of the right and authority to make the same and of all facts therein recited. Such appointment shall be conclusively presumed to be executed with authority and shall be valid and sufficient without proof of any action by the board of directors or any superior officer of the corporation. Upon the making of any such appointment and designation, all of the estate and title of the Trustee in the Property

DMS

Doc
00042149   Bk
OR   Vol
8235   Pg
23

shall vest in the named successor or substitute trustee, and such trustee shall thereupon succeed to and shall hold, possess and execute all the rights, powers, privileges, immunities and duties herein conferred upon the Trustee; but nevertheless, upon the written request of the Beneficiary or of the successor or substitute trustee, the trustee ceasing to act shall execute and deliver an instrument transferring to such successor or substitute Trustee all of the estate and title in the Property of the Trustee so ceasing to act, together with all the rights, powers, privileges, immunities and duties herein conferred upon the Trustee, and shall duly assign, transfer and deliver any of the properties and moneys held by said Trustee hereunder to such successor or substitute trustee. All references herein to the Trustee or trustee shall be deemed to refer to the trustee (including any successor or substitute appointed and designated as herein provided) from time to time acting hereunder. Grantor hereby ratifies and confirms any and all acts which the Trustee or the Trustee's successor or successors, substitute or substitutes, in this trust, shall do lawfully by virtue hereof.

4.3   **Liability of Trustee**. The Trustee shall not be liable for any error of judgment or act done by the Trustee in good faith, or be otherwise responsible or accountable under any circumstances whatsoever, except for the Trustee's gross negligence or willful misconduct. The Trustee shall have the right to rely on any instrument, document or signature authorizing or supporting any action taken or proposed to be taken by the Trustee hereunder, believed by the Trustee in good faith to be genuine. All moneys received by the Trustee shall, until used or applied as herein provided, be held in trust for the purpose for which they were received, but need not be segregated in any manner from any other moneys (except to the extent required by law), and the Trustee shall be under no liability for interest on any moneys received by the Trustee hereunder. Grantor will reimburse the Trustee for, and indemnify and save the Trustee harmless against, any and all liability and expenses which may be incurred by the Trustee in the performance of the Trustee's duties hereunder.

4.4   **Permissible Acts By Beneficiary**. The Beneficiary may at any time and from time to time in writing (a) waive compliance by Grantor with any covenant herein made by Grantor to the extent and in the manner specified in such writing; (b) consent to Grantor doing any act which hereunder Grantor is prohibited from doing, or consent to Grantor failing to do any act which hereunder Grantor is required to do, to the extent and in the manner specified in such writing; (c) release any part of the Property, or any interest therein, from the lien and security interest of this Mortgage without the joinder of the Trustee, or (d) release any party liable, either directly or indirectly, for the Indebtedness or for any covenant herein or in any other instrument now or hereafter securing the payment of the Indebtedness, without impairing or releasing the liability of any other party. No such act shall in any way impair or waive the rights of the Beneficiary hereunder except to the extent specifically agreed to by the Beneficiary in such writing.

4.5   **No Impairment**. The lien, security interest and other security rights of the Beneficiary hereunder shall not be impaired by any indulgence, moratorium or release granted by the Beneficiary, including but not limited to: (a) any renewal, extension or modification which the Beneficiary may grant with respect to any Indebtedness; (b) any surrender, compromise, release, renewal, extension, exchange or substitution which the Beneficiary may grant in respect of the

Property, or any part thereof or any interest therein; or (c) any release or indulgence granted to any endorser, guarantor or surety of any Indebtedness.

4.6     **Non-Waiver by Beneficiary**. The Beneficiary may waive any default without waiving any other prior or subsequent default. The Beneficiary may remedy any default without waiving the default remedied. Neither the failure by the Beneficiary to exercise, nor the delay by the Beneficiary in exercising, any right, power or remedy upon any default shall be construed as a waiver of such default or as a waiver of the right to exercise any such right, power or remedy at a later date. No single or partial exercise by the Beneficiary of any right, power or remedy hereunder shall exhaust the same or shall preclude any other or further exercise thereof, and every such right, power or remedy hereunder may be exercised at any time and from time to time. No modification or waiver of any provision hereof nor consent to any departure by Grantor therefrom shall in any event be effective unless the same shall be in writing and signed by the Beneficiary, and then such waiver or consent shall be effective only in the specific instances, for the purpose for which given and to the extent therein specified. No notice to nor demand on Grantor in any case shall of itself entitle Grantor to any other or further notice or demand in similar or other circumstances. Acceptance by the Beneficiary of any payment in an amount less than the amount then due on any Indebtedness shall be deemed an acceptance on account only and shall not in any way affect the existence of a default hereunder.

4.7     **Notice to Account Debtors**. The Beneficiary may at any time after default by Grantor notify the account debtors or obligors of any accounts, chattel paper, negotiable instruments or other evidences of indebtedness included in the Collateral to pay the Beneficiary directly.

4.8     **Copy as Financing Statement**. A carbon, photographic or other reproduction of this Mortgage or of any financing statement relating to this Mortgage shall be sufficient as a financing statement.

4.9     **Financing Statement**. This Mortgage shall be effective as a financing statement filed as a fixture filing with respect to all fixtures included within the Property and is to be filed for record in the real estate records in the Office of the County Clerk where the Property (including said fixtures) is situated. This Mortgage shall also be effective as a financing statement covering minerals or the like (including as-extracted collateral) and accounts subject to the Texas Business and Commerce Code, as amended, and is to be filed for record in the real estate records of the county where the Property is situated. The mailing address of Grantor is set forth below opposite the signature of Grantor to this Mortgage and the address of the Beneficiary from which information concerning the security interest may be obtained is the address of the Beneficiary set forth in Section 4.16 of this Mortgage.

4.10     **Recordation**. Grantor will cause this Mortgage and all amendments and supplements thereto and substitutions therefor and all financing statements and continuation statements relating hereto to be recorded, filed, re-recorded and refiled in such manner and in such places as the Trustee or the Beneficiary shall reasonably request, and will pay all such recording, filing, rerecording and refiling taxes, fees and other charges.

Bk    Vol    Pg
+2149  OR   8235   25

4.11    **Successors of Grantor**. In the event the ownership of the Property or any part thereof becomes vested in a person other than Grantor, the Beneficiary may deal with such successor or successors in interest with reference to this Mortgage and to the Indebtedness in the same manner as with Grantor, without in any way vitiating or discharging Grantor's liability hereunder or for the payment of the Indebtedness. No sale of the Property, no forbearance on the part of the Beneficiary and no extension of the time for the payment of the Indebtedness given by the Beneficiary shall operate to release, discharge, modify, change or affect, in whole or in part, the liability of Grantor hereunder or for the payment of the Indebtedness or the liability of any other person hereunder or for the payment of the Indebtedness except as agreed to in writing by the Beneficiary. Notwithstanding anything to the contrary, the provisions of this Paragraph 4.11 shall in no way imply the Beneficiary's consent to any transfer of the ownership of the Property or any portion thereof, which consent of Beneficiary must be obtained in writing prior to any transfer of the Property (pursuant to Paragraph 2.2(k) of this Mortgage).

4.12    **Place of Payment**. The indebtedness evidenced by the Loan Documents and all other Indebtedness which may be owing hereunder at any time by Grantor shall be payable at the place designated in the Note, or if no such designation is made, at the office of the Beneficiary at the address indicated in this Mortgage, or at such other place as the Beneficiary may designate in writing.

4.13    **Subrogation to Prior Indebtedness**. To the extent that proceeds of the Note are used to pay Indebtedness secured by any outstanding lien, security interest, charge or prior encumbrance against the Property, such proceeds have been advanced by the Beneficiary at Grantor's request, and the Beneficiary shall be subrogated to any and all rights, security interests and liens owned by any owner or holder of such outstanding liens, security interests, charges or encumbrances, irrespective of whether said liens, security interests, charges or encumbrances are released, and it is expressly understood that in consideration of the payment of such indebtedness by the Beneficiary, Grantor hereby waives and releases all demands and causes of action for offsets, payments and rentals to, upon and in connection with the said indebtedness.

4.14    **Unsecured Indebtedness Discharge**. If any part of the Indebtedness cannot be lawfully secured by this Mortgage or if any part of the Property cannot be lawfully subject to the lien and security interest hereof to the full extent of the Indebtedness, then all payments made shall be applied on the Indebtedness first in discharge of that portion thereof which is unsecured by this Mortgage.

4.15    **No Usury Intended**. Any provision contained herein or in the Loan Documents or in any other instrument now or hereafter evidencing, securing or otherwise relating to any Indebtedness to the contrary notwithstanding, neither the Beneficiary nor the holder of any other Indebtedness shall be entitled to receive or collect, nor shall Grantor be obligated to pay, interest on any of the Indebtedness in excess of the maximum rate of interest permitted by applicable law, and if any provision herein or in the Loan Documents or in such other instrument shall ever be construed or held to permit the collection or to require the payment of any amount of interest in excess of that permitted by applicable law, the provisions of this Paragraph 4.15 shall control and shall override

any contrary or inconsistent provision herein or in the Loan Documents or in such other instrument. The intention of the parties being to conform strictly to the usury limitations under applicable law, the Loan Documents, this Mortgage and each other instrument now or hereafter evidencing or relating to any Indebtedness shall be held subject to reduction to the amount allowed under said applicable law as now or hereafter construed by the courts having jurisdiction. The term "applicable law" as used in this Mortgage shall mean the laws of the State of Texas or the laws of the United States, whichever laws allow the greater rate of interest, as such laws now exist or may be changed or amended or come into effect in the future.

4.16    **Notice.** Any notice, consent, request, demand or other communication required or permitted to be given hereunder or under any of the Loan Documents to Beneficiary or Grantor must be in writing and shall be deemed sufficiently given or made when (i) delivered in person, (ii) sent by private courier or national overnight delivery service with proof of delivery and courier fees paid by sender, (iii) sent by telecopy with telephonic confirmation of receipt, or (iv) three (3) days after deposit in the United States mail by first class mail, registered or certified, return receipt requested, postage prepaid, as follows:

| | |
|---|---|
| To Beneficiary: | Finning International Inc.<br>16830 – 107th Avenue<br>Edmonton, Alberta   T5P 4C3<br>Attention:      Mel Ternan<br>Fax:  (780) 930-4891 |
| With copies to: | Finning International Inc.<br>Suite 1000<br>Park Place<br>666 Burrard Street<br>Vancouver, BC Canada V6C 2X8<br>Attention: John T. Struthers, Corporate Secretary<br>Fax: (604) 331-4887 |
| | Jonathan K.M. Jeske<br>1200 Waterfront Centre<br>200 Burrard Street<br>P.O. Box 48600<br>Vancouver, BC  Canada V7X LT2<br>Telephone: (604) 687-5744<br>Fax: (604) 687-1415 |
| To Grantor: | P.O. Box 2427<br>Harlingen, Texas 78551<br>Fax:  (956) 399-9174 |

With copy to:                Dennis Sanchez
                             Sanchez, Whittington, Janis & Zabarte, L.L.P.
                             100 North Expressway 83
                             Brownsville, Texas   78521-2284
                             Fax: (956) 546-3765

or such other address as shall be set forth in a notice from the appropriate party given in compliance with this Section.  Notwithstanding anything to the contrary, any notice delivered pursuant to Section 51.002 of the Texas Property Code shall be deemed sufficiently given when deposited in the United States mail by first class mail, registered or certified, return receipt requested, postage prepaid to the address of Grantor as set forth above.

    4.17    **Applicable Law; Venue**. This Mortgage and the Loan Documents shall be governed by and construed in accordance with the laws of the State of Texas and the applicable laws of the United States of America. This Mortgage and the Loan Documents have been entered into in Cameron County, Texas, and they shall be performable for all purposes, unless otherwise stated in this Mortgage and the Loan Documents, in Cameron County, Texas. Courts within the State of Texas shall have jurisdiction over any and all disputes between the Grantor and the Beneficiary, whether in law or equity, including, but not limited to, any and all disputes arising out of or relating to this Mortgage or any of the Loan Documents and venue in any such dispute, whether in federal or state court, shall be laid in Cameron County, Texas.

    4.18    **Successors and Assigns**. The terms, provisions, covenants and conditions hereof shall be binding upon Grantor, and the successors and assigns of Grantor including all successors in interest of Grantor in and to all or any part of the Property, and shall inure to the benefit of the Trustee and the Beneficiary and their respective heirs, successors, substitutes and assigns and shall constitute covenants running with the land. All references in this Mortgage to Grantor, Trustee or the Beneficiary shall be deemed to include all such heirs, devisees, representatives, successors, substitutes and assigns.

    4.19    **Severability**. A determination that any provision of this Mortgage is unenforceable or invalid shall not affect the enforceability or validity of any other provision and any determination that the application of any provision of this Mortgage to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to any other persons or circumstances.

    4.20    **Gender References**. Within this Mortgage, words of any gender shall be held and construed to include any other gender, and words in the singular number shall be held and construed to include the plural, unless the context otherwise requires.

    4.21    **Mortgage References**. References in this Mortgage to "herein", "hereunder" or "hereby" shall refer to this entire Mortgage unless the context otherwise requires.



L
00042149  Bk    Vol    Pg
         OR    8235    28

4.22    **Counterparts.** This Mortgage may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document. All such counterparts shall be construed together and shall constitute one instrument, but in making proof hereof it shall only be necessary to produce one such counterpart.

4.23    **Waiver of Jury Trial.** Grantor hereby expressly waives any right of trial by jury in any action or legal proceeding arising out of or relating to the Loan Documents or the transactions contemplated thereby or hereby.

---



Dc       Bk      Vol    Pg
00042149  OR   8235   29

### SIGNATURE PAGE
### DEED OF TRUST, ASSIGNMENT OF RENTS,
### SECURITY AGREEMENT AND FINANCING STATEMENT

IN WITNESS WHEREOF, Grantor has executed this Deed of Trust, Assignment of Rents, Security Agreement and Financing Statement effective this 15th day of July, 2002.

**GRANTOR:**

DAVCRANE INC., a Texas corporation

By: _Danf E. Dw_
Daniel E. Davis, President

The address of Grantor is:

P.O. Box 2427
Harlingen, Texas 78551

THE STATE OF TEXAS        §
                          §
COUNTY OF CAMERON         §

This instrument was acknowledged before me on July 26, 2002 by Daniel E. Davis, president of DAVCRANE INC., a Texas corporation on behalf of said corporation.

_Patsy L. Naber_
Notary Public in and for The State of Texas

_Patsy L. Naber_
Printed Name

My Commission Expires: _12-01-04_



_DMS_

Bk    Vol    Pg
2149  OR  8235    30

**Exhibit "A"**

**Real Property**

Lot Number One (1), Block Number One (1), Texas Pipe Bending Subdivision, City of Harlingen, Cameron County, Texas according to the Map recorded in Cabinet 1, Pages 384-A and 384-B Map Records of Cameron County, Texas.

QM 5

C            Bk    Vol    Pg
00042149 OR   8235    31

## EXHIBIT B

## PERMITTED EXCEPTIONS

1.   Standby fees, taxes and assessments by any taxing authority for the year 2002 and subsequent years.

2.   Statutory rights in favor of HARLINGEN IRRIGATION DISTRICT CAMERON COUNTY NO. 1, pursuant to applicable sections of the Texas Water Code.

3.   Easements in favor of HARLINGEN IRRIGATION DISTRICT CAMERON COUNTY NO. 1.

4.   Right of Way Easement dated September 20, 1949 from Fred Langley to Cameron County, recorded in Volume 472, Page 404, Deed Records of Cameron County, Texas.

5.   Right of Way Easement dated February 8, 1951 from Fred Langley to Cameron County, recorded in Volume 509, Page 55, Deed Records of Cameron County, Texas.

6.   Easement dated March 1, 1983 from Texas Pipe Bending Company to City of Harlingen, recorded in Volume 1314, Page 373, Deed Records of Cameron County, Texas.

7.   An undivided ½ mineral interest, the royalties, bonuses and rentals also as set out in instrument dated September 26, 1950 from E. A. Matz, recorded in Volume 500, Page 414, Deed Records of Cameron County, Texas.

8.   1/4[th] of all oil, gas and other minerals described in deed dated August 18, 1943 from Phoenix Mutual Life Insurance, recorded in Volume 325, Page 155, Deed Records of Cameron County, Texas, together with all rights.

9.   Drainage canal Right-of-Way Easement as shown on the plat of the Subdivision herein referred to.

10.   Road Right-of-Way as shown on the plat of the Subdivision herein referred to.

D
Div

FILED AND RECORDED
OFFICIAL PUBLIC RECORDS
On: Aug 12,2002 at 04:35P

Document Number:   -   00042149

By
Liliana Pizana
Joe G Rivera, County Clerk
Cameron County

DOC       BK   Vol
00042149  OR   8235   Pg
                       32

# COMMERCIAL SECURITY AGREEMENT

Dated: July 15, 2002

| **Debtor** | **Secured Party** |
|---|---|
| DAVCRANE INC. | FINNING INTERNATIONAL INC. |
| P.O. Box 2427 | 16830-107TH Avenue |
| Harlingen, Texas 78551 | Edmonton, Alberta T5P 4C3 |
| | Canada |

(hereinafter "**Debtor**")          (hereinafter "**Secured Party**")

FOR VALUE RECEIVED, the receipt and sufficiency of which is hereby acknowledged, Debtor grants to Secured Party first priority security interest (and the pledges and assignments as applicable) in, to and under the collateral as hereinafter set forth and agrees with Secured Party as follows:

**A.     OBLIGATIONS SECURED.** The security interest and pledges and assignments as applicable granted hereby are to secure punctual payment and performance of the following: (i) the loan ("**Loan**") represented by that certain promissory note (the "**Note**") of even date herewith in the original principal sum of $1,500,000.00, executed by Debtor and payable to the order of Secured Party, and any and all extensions, renewals, increases, modifications, replacements, and rearrangements thereof; (ii) all indebtedness, liabilities, and obligations whatsoever of the Debtor pursuant to that certain Deed of Trust, Assignment of Rents, Security Agreement and Financing Statement (the "**Deed of Trust**") by Debtor for the benefit of Secured Party and that Security Agreement executed by Daniel E. Davis for the benefit of Secured Party ("**Davis Security Agreement**") and all other collateral and security documents securing or executed in connection with this Commercial Security Agreement ("**Agreement**"), the Note, the Deed of Trust, the Davis Security Agreement (collectively, with this Agreement, the Note, the Deed of Trust, and the Davis Security Agreement, the "**Loan Documents**") and all future advances, renewals, extensions, increases, modifications, amendments, supplements, restatements, and replacements thereof (all of which are herein separately and collectively referred to as the "**Obligations**"). Debtor acknowledges that the security interest (and pledges and assignments as applicable) hereby granted shall secure all future advances made to Debtor by Secured Party whether now in existence or hereafter arising.

**B.     USE OF COLLATERAL.** Debtor represents, warrants and covenants that the Collateral will be used by the Debtor primarily for business use.

**C.     DESCRIPTION OF COLLATERAL.** Debtor hereby grants to Secured Party a security interest in and hereby pledges and assigns and agrees that Secured Party shall continue to have a security interest in and a pledge and assignment of, the following property, to-wit:

**1.     Equipment.** A security interest in all equipment of every nature and description whatsoever, now owned or hereinafter acquired by Debtor, wheresoever located, including all parts, tools and accessories used in connection therewith utilized in connection with the manufacture, production or assembly of the Product Line hereinafter defined or purchased from the proceeds of the Note and including, without limitation, any equipment, tooling and parts used in connection with ownership and operation of the manufacturing plant located on the real property described on **Exhibit A** attached hereto and made a part hereof for all purposes (including any equipment which may constitute a fixture on such real property), and all additions, accessions or substitutions thereto, and contracts with respect thereto and documents of title evidencing or representing any part thereof, and all products and proceeds thereof. For purposes of this Agreement, **"Product Line"** means telehandler all-terrain cranes, lattice and telescopic boomed crawler cranes, excavator based pipelayers and related equipment or products, and includes any current or future similar products, but specifically excludes any marine or offshore products.

**2.     All Fixtures.** A security interest in all of Debtor's fixtures and appurtenances thereto, and such other goods, chattels, fixtures, equipment and personal property affixed or in any manner attached to the real estate and or building(s) or structure(s), including all additions and accessions thereto and replacements thereof and articles in substitution therefore, howsoever attached or affixed, located on the real property described on **Exhibit A** attached hereto and made a part hereof for all purposes. The record owner of the real estate is Debtor

The term "Collateral" as used in this Agreement shall mean and include, and the security interest (and pledge and assignment as applicable) shall cover, all of the foregoing property, as well as any accessions, additions and attachments thereto and the proceeds and products thereof, including without limitation, all cash, depository accounts, general intangibles, accounts, inventory, equipment, fixtures, farm products, notes, drafts, acceptances, securities, instruments, chattel paper, insurance proceeds payable because of loss or damage, or other property, benefits or rights arising therefrom, and in and to all returned or repossessed goods arising from or relating to any of the property described herein or other proceeds of any sale or other disposition of such property.

**D.     REPRESENTATIONS, WARRANTIES AND COVENANTS OF DEBTOR.** Debtor represents and warrants as follows:

**1.     Ownership: No Encumbrances.** Except for the security interest (and pledges and assignments as applicable) granted hereby, the Debtor is, and as to any property acquired after the date hereof which is included within the Collateral, Debtor will be, the owner of all such Collateral free and clear from all charges, liens, security interests, adverse claims and encumbrances of any and every nature whatsoever.

**2.     No Financing Statements.** There are no financing statements or similar filings now on file in any public office covering any part of the Collateral, and Debtor will not execute and there

---

will not be on file in any public office any financing statement or similar filing except the financing statements filed or to be filed in favor of Secured Party.

**3.    Accuracy of Information.** All information furnished to Secured Party concerning Debtor, the Collateral and the Obligations, or otherwise for the purpose of obtaining or maintaining credit, is or will be at the time the same is furnished, accurate and complete in all material respects.

**4.    Authority.** Debtor has full right and authority to execute and perform this Agreement and to create the security interest (and pledges and assignment as applicable) created by this Agreement. The making and performance by Debtor of this Agreement will not violate any articles of incorporation, bylaws or agreements of Debtor, any provision of law, any order of court or governmental agency, or any indenture or other agreement to which Debtor is a party, or by which Debtor or any of Debtor's property is bound, or be in conflict with, result in a breach of or constitute (with due notice and/or lapse of time) a default under any such indenture or other agreement, or result in the creation or imposition of any charge, lien, security interest, claim or encumbrance of any and every nature whatsoever upon the Collateral, except as contemplated by this Agreement.

**5.    Name and Addresses.** Debtor's exact legal name (as indicated on official records) is as set forth in the first paragraph of this Agreement. Debtor is a Texas corporation and Debtor's organizational identification number is 0157717000. Its Tax Identification Number is 74-2955092. Other than "Davcrane Inc.", Debtor has not used any other name or trade name. Debtor's chief executive office is located in the state of Texas at the address indicated at the beginning of this Agreement. Debtor agrees not to change such address without advance written notice to Secured Party.

**6.    Perfection of Security Interests.** Debtor authorizes Secured Party, its counsel or its representative to file Financing Statements (the "Financing Statements") describing the Collateral in any jurisdiction where it may be required or desirable in order to perfect Secured Party's security interest in the Collateral, including any additional Financing Statements covering specific Equipment or Fixtures. Debtor further authorizes Secured Party, its counsel or its representative, at any time and from time to time, to file continuation statements with respect to previously filed Financing Statements. Prior to closing but not later than August 8, 2002, Secured Party shall receive uniform commercial code searches from each jurisdiction where the filing of Financing Statements is necessary to perfect the Secured Party's interest in the Collateral, indicating that the Collateral is free and clear from all other liens and security interests and that the Secured Party's security interest in the Collateral is a first priority security interest.

**7.    Certificate of Title.** No item of Collateral is covered by a certificate of title. In the event Debtor acquires any Collateral covered by a certificate of title, it shall reflect the Secured Party as the first and only lienholder on said certificate of title.

**E.    GENERAL COVENANTS.** Debtor covenants and agrees as follows:

1.    **Operation of the Collateral.** Debtor agrees to maintain and use the Collateral solely in the conduct of its own business, in a careful and proper manner, and in conformity with all applicable permits or licenses. Debtor has the risk of loss of the Collateral. Debtor shall comply in all respects with all applicable statutes, laws, ordinances and regulations. Debtor shall not use the Collateral in any unlawful manner or for any unlawful purposes, or in any manner or for any purpose that would expose the Collateral to unusual risk, or to penalty, forfeiture or capture, or that would render inoperative any insurance in connection with the Collateral.

2.    **Condition.** Debtor shall maintain, service and repair the Collateral so as to keep it in good operating condition. Debtor shall replace within a reasonable time all parts that may be worn out, lost, destroyed or otherwise rendered unfit for use, with appropriate replacement parts. Debtor shall obtain and maintain in good standing at all times all applicable permits, licenses, registrations and certificates respecting the Collateral.

3.    **Assessments.** Debtor shall promptly pay when due all taxes, assessments, license fees, registration fees, and governmental charges levied or assessed against Debtor or with respect to the Collateral or any part thereof.

4.    **No Encumbrances.** Debtor agrees not to suffer or permit any charge, lien, security interest, adverse claim or encumbrance of any and every nature whatsoever against the Collateral or any part thereof.

5.    **No Removal.** Except as otherwise provided in this Agreement, Debtor shall not remove the Collateral from the county or counties designated at the beginning of this Agreement without Secured Party's prior written consent.

6.    **No Transfer.** Debtor shall not, without the prior written consent of Secured Party, sell, assign, transfer, lease, charter, encumber, hypothecate or dispose of the Collateral, or any part thereof, or interest therein, or offer to do any of the foregoing.

7.    **Notices and Reports.** Debtor shall promptly notify Secured Party in writing of any change in the name, identity or structure of Debtor, any charge, lien, security interest, claim or encumbrance asserted against the Collateral, any litigation against Debtor or the Collateral, any theft, loss, injury or similar incident involving the Collateral, and any other material matter adversely affecting Debtor or the Collateral. Debtor shall furnish such other reports, information and data regarding Debtor's financial condition and operations, the Collateral and such other matters as Secured Party may request from time to time.

8.    **Landlord's Waivers.** Debtor shall furnish to Secured Party, if requested, a landlord's waiver of all liens with respect to any collateral covered by this Agreement that is or may be located upon leased premises, such landlord's waivers to be in form and upon such terms as are acceptable to Secured Party.

**9.    Additional Requirements.** Debtor will from time to time sign, execute, deliver and file, alone or with Secured Party, upon reasonable request, any necessary financing statements, security agreements or other documents; procure any necessary instruments or documents as may be reasonably requested by Secured Party; and take all further action that Secured Party may reasonably request to confirm, perfect, preserve and protect the security interests intended to be granted hereby. At the option of secured Party, a carbon, photographic or other reproduction of this Agreement or of a financing statement covering the Collateral shall be sufficient as a financing statement and may be filed as a financing statement. Upon the request of Secured Party, Debtor shall take or cause to be taken all actions (other than any actions required to be taken by Secured Party) necessary to cause Secured Party to have "control" over any proceeds of the Collateral constituting deposit accounts, electronic chattel paper, or letter-of-credit rights, and Debtor shall promptly notify Secured Party of Debtor's acquisition ot any such Collateral.

**10.    Protection of Collateral.** Secured Party, at its option, whether before or after default, but without any obligation whatsoever to do so, may (a) discharge taxes, claims, charges. liens, security interests, assessments or other encumbrances of any and every nature whatsoever at any time levied, placed upon or asserted against the Collateral, (b) place and pay for insurance on the Collateral, including insurance that only protects Secured Party's interest, (c) pay for the repair. improvements, testing, maintenance and preservation of the Collateral, (d) pay any filing, recording. registration, licensing or certification fees or other fees and charges related to the Collateral, or (e) take any other action to preserve and protect the Collateral and Secured Party's rights and remedies under this Agreement as Secured Party may deem reasonably necessary or appropriate. Debtor agrees that Secured Party shall have no duty or obligation whatsoever to take any of the foregoing action. Debtor agrees to promptly reimburse Secured Party upon demand for any payment made or any expense incurred by the Secured Party pursuant to this authorization. These payments and expenditures, together with interest thereon from date incurred until paid by Debtor at the maximum contract rate allowed under applicable laws, which Debtor agrees to pay, shall constitute additional Obligations and shall be secured by and entitled to the benefits of this Agreement.

**11.    Records.** Debtor will keep and maintain at its own cost and expense satisfactory and complete records of the Collateral. For Secured Party's further security, Secured Party shall have a security interest in all of Debtor's books and records pertaining to the Collateral, and Debtor shall turn over any such books and records to Secured Party or to its representatives during normal business hours at the request of Secured Party.

**12.    Further Assurances.** Debtor shall do, make, procure, execute and deliver all such additional and further acts, things, deeds, interests and assurances as Secured Party may reasonably require from time to time to protect, assure and enforce Secured Party's rights and remedies.

**13.    Insurance.** Debtor shall maintain insurance at all time with respect to the Collateral, containing such terms, in such form and amounts and written by such companies as may be satisfactory to Secured Party. If required by Secured Party, the insurance policies shall contain loss payable clauses in favor of Secured Party as its interest may appear, and at the request of Secured Party shall be delivered to and held by it. Further, if required by Secured Party, the insurance

policies shall provide for thirty (30) days written minimum cancellation notice to Secured Party. All right, title and interest of the Debtor in the insurance policies and/or the proceeds of the insurance policies covering the Equipment are hereby assigned to the Secured Party to secure the repayment of the Obligations. Secured Party is hereby authorized to act as attorney in fact for Debtor in obtaining, adjusting, settling and canceling such insurance and endorsing any drafts or instruments. Secured Party shall be authorized to apply the proceeds from any insurance to the Obligations secured hereby whether or not such Obligations are then due and payable.

**14.    Obligations of Secured Party.** Nothing herein contained shall be construed to constitute Debtor as the agent of Secured Party for any purpose whatsoever. Secured Party does not by anything contained herein or in any assignment or otherwise, assume any of Debtor's obligations or any liability under any other agreements assigned to Secured Party, and Secured Party shall not be responsible in any way for the performance by Debtor of any of the terms and conditions thereof.

**15.    No Collection Obligation.** Secured Party has no duty to collect any income accruing on the Collateral or to preserve any rights relating to the Collateral. The powers conferred upon Secured Party by this Agreement are solely to protect the interest of Secured Party in the Collateral and shall not impose any duty upon Secured Party to exercise any such powers. Secured Party shall be under no duty whatsoever to make or give (and Debtor does hereby waive) any presentment, demand for performance, notice of nonperformance, protest, notice of protest, notice of dishonor, or other notice or demand in connection with any Collateral or the Obligations, or to take any steps necessary to preserve any rights against other parties. Secured Party shall not be liable for failure to collect or realize upon any or all of the Obligations or Collateral, or for any delay in so doing and shall have no duty to perform Debtor's obligations.

**F.    EVENTS OF DEFAULT.** The following events ("**Events of Default**") shall constitute Events of Default under this Agreement **if such event or failure remains uncured following thirty (30) Business Days (defined as any day other than Saturday, Sunday or statutory holiday)** written notice of such default and opportunity to cure from Secured Party to the Debtor:

**1.**    Default shall be made in the payment of any installment of principal or interest upon the Note or any other obligation of Debtor to Secured Party when due and payable; or

**2.**    Default shall be made in the performance of any terms, covenant or agreement contained herein or in any other Loan Document; or

**3.**    Any representation or warranty herein contained in any other Loan Document shall prove to have been materially incorrect or misleading in any material respect when made; or

**4.**    Debtor or any guarantor makes an assignment for the benefit of creditors, admits in writing its inability to pay its debts generally as they become due, files a petition in

bankruptcy, is adjudicated insolvent or bankrupt, petitions or applies to any tribunal for any receiver or any trustee of Debtor or any guarantor or any substantial part of its property, commences any action relating to Debtor or any guarantor under any reorganization, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect, or if there is commenced against Debtor or any guarantor any such action, or Debtor or any guarantor by any act indicates its consent to or approval of any trustee for Debtor or any guarantor of any substantial part of its property, or suffers any such receivership or trustee to continue undischarged;

Upon the occurrence of an Event of Default: (i) the Secured Party, at its option, may declare the Note, and all outstanding principal, accrued interest and other sums outstanding thereon, immediately due and payable without demand, presentment, notice of dishonor, protest, notice of intent to accelerate, notice of acceleration and diligence in collecting sums due hereunder, all of which are waived by Debtor; (ii) proceed to enforce its interest in the Collateral with all proceeds being retained or paid over to Secured Party for application on the Obligations in the order and priority chosen by Secured Party in its sole discretion; and (iii) Secured Party shall have all rights and remedies available to a secured party under the Texas Business and Commerce Code and other applicable law.

## G.    REMEDIES UPON DEFAULT.

1.    **General**.  Upon the occurrence and during the continuance of any Event of Default, Secured Party may, by written notice to Debtor, declare the entire unpaid amount (including, if applicable, any unpaid accrued interest) of the Obligations to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest, notice of protest or dishonor, notice of acceleration, notice of intent to accelerate or other notice of any kind, all of which are hereby expressly waived by Debtor, and thereupon take such action as Secured Party may deem desirable.  If any Event of Default shall occur and be continuing Secured Party may, in addition to all other rights and remedies granted to it in this Agreement and in any other instrument or agreement securing, evidencing or relating to the Obligations exercise all rights and remedies of a secured party under the UCC.

2.    **Remedies**.  Upon any Event of Default, Secured Party shall have the right to pursue any of the following remedies separately, successively or simultaneously:

(i)    File suit and obtain judgment and, in conjunction with any action, Secured Party may seek any ancillary remedies provided by law, including levy of attachment and garnishment.

Take possession of any Collateral if not already in its possession without demand and without legal process.  Upon Secured Party's demand, Debtor will assemble and make the Collateral available to Secured Party as it directs.  Debtor grants to Secured Party the right, for this purpose, to enter into any premises where Collateral may be located.

l.    Without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon Debtor or any other person (all and each of which demands, defenses, advertisements and notices are hereby waived), Secured Party may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of Secured Party or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk. Secured Party shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in Debtor, which right or equity is hereby waived or released.

## H.    FORECLOSURE PROCEDURES.

1.    **Waivers.**  Secured Party shall not by any act, delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any default or Event of Default or in any breach of any of the terms and conditions hereof. No failure to exercise, nor any delay in exercising, on the part of Secured Party of any right, power or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver by Secured Party of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which Secured Party would otherwise have on any future occasion. The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any rights or remedies provided by law. To the extent permitted by applicable law, Debtor waives all claims, damages and demands it may acquire against Secured Party arising out of the exercise by it of any rights hereunder except to the extent any thereof arise solely from the willful misconduct of Secured Party.

2.    **Notices.**  Secured Party shall give Debtor such notice of any private or public sale as may be required by the UCC. Twenty (20) days notice shall be considered commercially reasonable for any notices given under this Section.

3.    **Condition of Collateral.**  Secured Party has no obligation to prepare the Collateral for sale. Secured Party's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the UCC or otherwise, shall be to deal with it in the same manner as Secured Party deals with similar property for its own account. Neither Secured Party nor any of its directors, officers, members, managers, employees or agents shall be liable for failure to demand, collect or realize upon all or any part of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of Debtor or otherwise.

**4.    No Obligation to Pursue Others**. Secured Party has no obligation to attempt to satisfy the Obligations by collecting them from any other person liable for them and Secured Party may release, modify or waive any Collateral provided by any other person to secure any of the Obligations, all without affecting Secured Party's rights against Debtor. Debtor waives any right it may have to require Secured Party to pursue any third person for any of the Obligations.

**5.    Compliance With Other Laws**. Secured Party may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

**6.    Warranties**. Secured Party may sell the Collateral without giving any warranties as to the Collateral. Secured Party may specifically disclaim any warranties of title or the like. This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

**7.    Sales on Credit**. If Secured Party sells any of the Collateral upon credit, Debtor will be credited only with payments actually made by the purchaser, received by Secured Party and applied to the indebtedness of the purchaser. In the event the purchaser fails to pay for the Collateral, Secured Party may resell the Collateral and Debtor shall be credited with the proceeds of the sale.

**8.    Purchases by Secured Party**. In the event Secured Party purchases any of the Collateral being sold, Secured Party may pay for the Collateral by crediting some or all of the Obligations of the Debtor.

**9.    No Marshaling**. Secured Party shall have no obligation to marshal any assets in favor of Debtor, or against or in payment of any of the Obligations, or any other obligation owed to Secured Party by Debtor or any other person.

**10.    Proceeds of Sale**. Secured Party shall apply the net proceeds of any collection, recovery, receipt, appropriation, realization or sale of the Collateral, after deducting all reasonable costs and expenses of every kind incurred therein or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of Secured Party hereunder, including, without limitation, reasonable attorneys' fees and disbursements, to the payment in whole or in part of the Obligations, in such order as Secured Party may elect, and only after such application and after the payment by Secured Party of any other amount required by any provision of law, including, without limitation, Section 9-615 of the UCC, need Secured Party account for the surplus, if any, to Debtor.

**11.    Deficiency**. Debtor shall remain liable to Secured Party for any unpaid Obligations, advances, costs, charges and expenses, together with interest thereon and shall pay the same immediately to Secured Party at Secured Party's offices.

## I.     OTHER AGREEMENTS.

**1.     Savings Clause.** Notwithstanding any provision to the contrary herein, or in any of the documents evidencing the Obligations or otherwise relating thereto, no such provision shall require the payment or permit the collection of interest in excess of the maximum permitted by applicable usury laws.  If any such excessive interest is provided for, then in such event (i) the provisions of this paragraph shall govern and control, (ii) neither the Debtor nor their respective successors or assigns or any other party liable for the payment thereof, shall be obligated to pay the amount of such interest to the extent that is in excess of the maximum amount permitted by law, (iii) any such excess interest that may have been collected shall be, at the option of the holder of the instrument evidencing the Obligations, either applied as a credit against the then unpaid principal amount thereof or refunded to the maker thereof, and (iv) the effective rate of interest shall be automatically reduced to the maximum lawful rate under applicable usury laws as now or hereafter construed by the courts having jurisdiction.

**2.     Joint and Several Responsibility; References to Debtors.**  If this Security Agreement is executed by more than one Debtor, the obligations of all such Debtors shall be joint and several and references to the Debtor shall mean all Debtors (or any of them).

**3.     Severability.** Any provision hereof found to be invalid by courts having jurisdiction shall be invalid only with respect to such provision (and then only to the extent necessary to avoid such invalidity).  The offending provision shall be modified to the maximum extent possible to confer upon Secured Party the benefits intended thereby.  Such provision as modified and the remaining provisions hereof shall be construed and enforced to the same effect as if such offending provision (or portion thereof) had not been contained herein, to the maximum extent possible.

**4.     Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**5.     Use of Copies.**  Any carbon, photographic or other reproduction of any financing statement signed by Debtor is sufficient as a financing statement for all purposes, including without limitation, filing in any state as may be permitted by the provisions of the Uniform Commercial Code of such state.

**6.     Relationship to Other Agreements.**  This Security Agreement and the security interests (and pledges and assignments as applicable) herein granted are in addition to (and not in substitution, novation or discharge of) any and all prior to contemporaneous security agreements, security interests, pledges, assignments, liens, rights, titles or other interests in favor of Secured Party or assigned to Secured Party by others in connection with the Obligations.  All rights and remedies of Secured Party in all such agreements are cumulative, but in the event of actual conflict in terms and conditions, the terms and conditions of this Agreement shall govern and control.

7.   **Notices.** Any notice or demand given by Secured Party to Debtor in connection with this Agreement, the Collateral or the Obligations, shall be deemed given and effective upon deposit in the United States mail, postage prepaid, addressed to Debtor at the address of Debtor designated at the beginning of this Agreement. Actual notice to Debtor shall always be effective no matter how given or received.

8.   **Headings and Gender.** Paragraph headings in this Agreement are for convenience only and shall be given no meaning or significance in interpreting this Agreement. All words used herein shall be construed to be of such gender or number as the circumstances require.

9.   **Amendments.** Neither this Agreement nor any of its provisions may be changed, amended, modified, waived or discharged orally, but only by an instrument in writing signed by the Party against whom enforcement of the change, amendment, modification, wavier or discharge is sought.

10.   **Continuing Agreement.** The security interest (and pledges and assignments as applicable) hereby granted and all of the terms and provisions in this Agreement shall be deemed a continuing agreement and shall continue in full force and effect until terminated in writing. Any such revocation or termination shall only be effective if explicitly confirmed in a signed writing issued by Secured Party to such effect and shall in no way impair or affect any transactions entered into or rights created or Obligations incurred or arising prior to such revocation or termination, as to which this Agreement shall be fully operative until same are repaid and discharged in full. Unless otherwise required by applicable law, Secured Party shall be under no obligation to issue a termination statement or similar documents unless Debtor requests same in writing and, provided further, that all Obligations have been repaid and discharged in full and there are no commitments to make advances, incur any Obligations or otherwise give value.

11.   **Binding Effect.** The provisions of this Security Agreement shall be binding upon the heirs, personal representatives, successors and assigns of Debtor and the rights, powers and remedies of Secured Party hereunder shall enure to the benefit of the successors and assigns of Secured Party.

12.   **Governing Law.** This Agreement shall be governed by the law of the State of Texas and applicable federal law.

13.   **Intentionally deleted.**

14.   **Construction.** The parties hereto acknowledge that each of them has had the benefit of legal counsel of its own choice and has been afforded an opportunity to review this Agreement and the other Loan Documents with its legal counsel.

15.   **Indemnification.** DEBTOR AGREES TO PAY AND TO SAVE SECURED PARTY HARMLESS FROM ANY AND ALL LIABILITIES AND REASONABLE COSTS AND EXPENSES (INCLUDING, WITHOUT LIMITATION, LEGAL FEES AND EXPENSES), (I) WITH RESPECT TO, OR RESULTING FROM, ANY DELAY IN

PAYING, ANY AND ALL EXCISE, SALES OR OTHER TAXES WHICH MAY BE PAYABLE OR DETERMINED TO BE PAYABLE WITH RESPECT TO ANY OF THE COLLATERAL, (II) WITH RESPECT TO, OR RESULTING FROM, ANY DELAY IN COMPLYING WITH ANY GOVERNMENTAL REQUIREMENTS APPLICABLE TO ANY OF THE COLLATERAL OR (III) IN CONNECTION WITH ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, UNLESS SECURED PARTY IS GROSSLY NEGLIGENT OR ENGAGES IN ANY WILLFUL MISCONDUCT. THIS INDEMNITY IS INTENDED TO COVER SECURED PARTY'S ORDINARY NEGLIGENCE.

**16.    Expenses.** Debtor will pay to Secured Party at Secured Party's offices, all charges, costs and expenses (including reasonable attorneys' fees and legal expenses) incurred by Secured Party in connection with protecting Secured Party against the claims or interests of any third party against the Collateral, in exercising any right, power or remedy conferred by this Agreement or by law or in equity and/or in protecting and preserving the Collateral. The amount of all such charges, costs and expenses shall be due and payable by Debtor to Secured Party upon demand together with interest thereon at the highest rate allowed by applicable law. Debtor shall reimburse Secured Party for the cost of periodic Uniform Commercial Code conducted by the Secured Party to verify the first lien priority of Secured Party's security interest in the Collateral, and to verify that no other financing statements have been filed against the Collateral.

**17.    Entire Agreement; Amendment.**  THE PARTIES HERETO EXPRESSLY ACKNOWLEDGE AND AGREE, THAT WITH REGARD TO THE SUBJECT MATTER OF THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREIN: (1) THERE ARE NO ORAL AGREEMENTS BETWEEN THE PARTIES HERETO AND (2) THIS AGREEMENT, INCLUDING THE DEFINED TERMS AND ALL EXHIBITS AND ADDENDA, IF ANY, ATTACHED HERETO: (a) EMBODIES THE FINAL AND COMPLETE AGREEMENT BETWEEN THE PARTIES; (b) SUPERSEDES ALL PRIOR AND CONTEMPORANEOUS NEGOTIATIONS, OFFERS, PROPOSALS, AGREEMENTS, COMMITMENTS, PROMISES, ACTS, CONDUCT, COURSE OF DEALING, REPRESENTATIONS, STATEMENTS, ASSURANCES AND UNDERSTANDINGS, WHETHER ORAL OR WRITTEN; AND (c) MAY NOT BE VARIED OR CONTRADICTED BY EVIDENCE OF ANY SUCH PRIOR OR CONTEMPORANEOUS MATTER OR BY EVIDENCE OF ANY SUBSEQUENT ORAL AGREEMENT OF THE PARTIES HERETO.

**SIGNATURE PAGE**
**COMMERCIAL SECURITY AGREEMENT**

EXECUTED this _26 th_ day of July, 2002.

DAVCRANE INC.

By:_____
        Daniel E. Davis, President

Exhibit A - Description of Real Property



**Exhibit "A"**

**Real Property**

Lot Number One (1), Block Number One (1), Texas Pipe Bending Subdivision, City of Harlingen, Cameron County, Texas according to the Map recorded in Cabinet 1, Pages 384-A and 384-B Map Records of Cameron County, Texas.

# COMMERCIAL SECURITY AGREEMENT

### Dated: July 15, 2002

| **Debtor** | **Secured Party** |
|---|---|
| DANIEL E. DAVIS | FINNING INTERNATIONAL INC. |
| San Benito, Texas | 16830-107TH Avenue |
| w/copy to | Edmonton, Alberta T5P 4C3 |
| P.O. Box 2427 | Canada |
| Harlingen, Texas 78551 | |
| (hereinafter "**Debtor**") | (hereinafter "**Secured Party**") |

FOR VALUE RECEIVED, the receipt and sufficiency of which is hereby acknowledged, Debtor grants to Secured Party first priority security interest (and the pledges and assignments as applicable) in, to and under the collateral as hereinafter set forth and agrees with Secured Party as follows:

      **A.**    **OBLIGATIONS SECURED.** The security interest and pledges and assignments as applicable granted hereby are to secure punctual payment and performance of the following: (i) the loan ("**Loan**") represented by that certain promissory note (the "**Note**") of even date herewith in the original principal sum of $1,500,000.00, executed by Davcrane Inc. ("**Davcrane**") and payable to the order of Secured Party, and any and all advances, extensions, renewals, increases, modifications, replacements, and rearrangements thereof; (ii) all indebtedness, liabilities, and obligations whatsoever of the Debtor pursuant to that certain Security Agreement executed by Davcrane in favor of Lender ("**Davcrane Security Agreement**") and that certain Deed of Trust, Assignment of Rents, Security Agreement and Financing Statement (the "**Deed of Trust**") by Davcrane for the benefit of Secured Party, and all other documents securing or executed in connection with this Commercial Security Agreement ("**Agreement**"), the Note, the Deed of Trust and/or the Davcrane Security Agreement (collectively, with this Agreement, the Note, the Davcrane Security Agreement and the Deed of Trust, the "**Loan Documents**") and all future advances, renewals, extensions, increases, modifications, amendments, supplements, restatements, and replacements thereof, (all of which are herein separately and collectively referred to as the "**Obligations**"). Debtor acknowledges that the security interest (and pledges and assignments as applicable) hereby granted shall secure all future advances as well as any and all other indebtedness, liabilities and obligations of Debtor to Secured Party whether now in existence or hereafter arising.

      **B.**    **USE OF COLLATERAL.** Debtor represents, warrants and covenants that the Collateral will be used by the Debtor primarily for business use.

**C.    DESCRIPTION OF COLLATERAL.** Debtor hereby grants to Secured Party a security interest in and hereby pledges and assigns and agrees that Secured Party shall continue to have a security interest in and a pledge and assignment of, the following property, to-wit:

1.    **General Intangibles.** A security interest in and pledge and assignment of all of Debtor's now owned or hereafter acquired or arising general intangibles directly related to the Product Line (as hereinafter defined) or the assembly of the Product Line and payment intangibles related thereto including, without limitation, any interest in the following: all of the property and proprietary know-how, including any patents, patent rights, patent applications, drawings (including assembly drawings), and other intellectual property rights used by Debtor in relation to the Product Line or the assembly of the Product Line, including without limitation the items described in the attached **Exhibit A** and any present or future improvements or enhancements thereto (collectively, the "**Technology**") and all income, proceeds, money, deposits, issues, accounts receivable, payment intangibles, chattel paper and profits arising from or related to (i) the Technology, (ii) any licenses relating to the Technology, including, without limitation, all rights derived from that certain non-exclusive license granted by Assignor to Favelle Favco Cranes (USA) Inc. relating to U.S. Patent No. 6,003,252, and/or (iii) the Distributor Agreement of even date between Debtor and Secured Party ("**Distributor Agreement**"). Debtor expressly pledges and assigns to Secured Party its right to sue for past, present and future infringement relating to the General Intangibles. The term "**Product Line**" as used herein means telehandler all-terrain cranes, lattice and telescopic boomed crawler cranes, excavator based pipelayers and related equipment or products, and includes any current or future similar products, but specifically excludes any maritime or offshore products.

2.    **Royalties and Other Accounts.** A security interest in all of Debtor's now owned or hereafter acquired or arising royalties, income, proceeds, money, deposits, issues, accounts, accounts receivable, payment intangibles, chattel paper and profits arising from or directly related to (i) the Technology, (ii) any licenses relating to the Technology, including, without limitation, all rights derived from that certain non-exclusive license granted by Assignor to Favelle Favco Cranes (USA) Inc. relating to U.S. Patent No. 6,003,252; and (iii) the Distributor Agreement.

    The term "Collateral" as used in this Agreement shall mean and include, and the security interest (and pledge and assignment as applicable) shall cover, all of the foregoing property, as well as any accessions, additions and attachments thereto and the proceeds and products thereof, including without limitation, all cash, depository accounts, general intangibles, accounts, inventory, equipment, fixtures, farm products, notes, drafts, acceptances, securities, instruments, chattel paper, insurance proceeds payable because of loss or damage, or other property, benefits or rights arising therefrom, and in and to all returned or repossessed goods arising from or relating to any of the property described herein or other proceeds of any sale or other disposition of such property.

    **D.    REPRESENTATIONS, WARRANTIES AND COVENANTS OF DEBTOR.** Debtor represents and warrants as follows:

1.     **Ownership: No Encumbrances.** Except for the security interest (and pledges and assignments as applicable) granted hereby and that certain non-exclusive license granted by Debtor to Favelle Favco Cranes (USA) Inc. relating to U.S. Patent No. 6,003,252 ("**Favelle License**"), the Debtor is, and as to any property acquired after the date hereof which is included within the Collateral, Debtor will be, the owner of all such Collateral free and clear from all charges, liens, security interests, adverse claims and encumbrances of any and every nature whatsoever.

2.     **No Financing Statements.** There are no financing statements or similar filings now on file in any public office covering any part of the Collateral, and Debtor will not execute and there will not be on file in any public office any financing statement or similar filing except the financing statements filed or to be filed in favor of Secured Party.

3.     **Accuracy of Information.** All information furnished to Secured Party concerning Debtor, the Collateral and the Obligations, or otherwise for the purpose of obtaining or maintaining credit, is or will be at the time the same is furnished, accurate and complete in all material respects.

4.     **Authority.** Debtor has full right and authority to execute and perform this Agreement and to create the security interest (and pledges and assignment as applicable) created by this Agreement. The making and performance by Debtor of this Agreement will not violate any agreements of Debtor, any provision of law, any order of court or governmental agency, or any indenture or other agreement to which Debtor is a party, or by which Debtor or any of Debtor's property is bound, or be in conflict with, result in a breach of or constitute (with due notice and/or lapse of time) a default under any such indenture or other agreement, or result in the creation or imposition of any charge, lien, security interest, claim or encumbrance of any and every nature whatsoever upon the Collateral, except as contemplated by this Agreement.

5.     **Name and Addresses.** Debtor's exact legal name (as indicated on official records) is as set forth in the first paragraph of this Agreement. Other than "Daniel E. Davis," Debtor has not used any other name or trade name. The address of Davis designated at the beginning of this Agreement is Debtor's principal residence. Debtor agrees not to change such address without advance written notice to Secured Party.

6.     **Perfection of Security Interests.** Debtor authorizes Secured Party, its counsel or its representative to file Financing Statements (the "**Financing Statements**") describing the Collateral in any jurisdiction, including in the U.S. Patent & Trademark Office, where it may be required or desirable in order to perfect Secured Party's security interest in the Collateral. In the event the Debtor obtains patent and other registrations and protections on the Collateral in foreign jurisdictions, Debtor authorizes Secured Party, its counsel or its representative to file any necessary documents in order to perfect Secured Party's security interest in the Collateral in such jurisdiction, and agrees to execute and deliver to Secured Party such documentation as is reasonably necessary to perfect the Secured Party's interest in such jurisdiction. Debtor further authorizes Secured Party, its counsel or its representative, at any time and from time to time, to file continuation statements with respect to previously filed Financing Statements. Prior to closing but not later than August 8, 2002,

Secured Party shall receive uniform commercial code searches from each jurisdiction where the filing of Financing Statements is necessary to perfect the Secured Party's interest in the Collateral, indicating that the Collateral is free and clear from all other liens and security interests and that the Secured Party's security interest in the Collateral is a first priority security interest.

7.     **Limited License.** Upon an Event of Default and subject to the Distributor Agreement, Debtor irrevocably grants Secured Party a non-exclusive license to use all present and future General Intangibles, together with any good will associated therewith, in connection with the maintenance, preservation, preparation, sale, disposition, collection, foreclosure, or other realization of, upon, or with respect to the Collateral. Notwithstanding the foregoing, upon an Event of Default, Secured Party's rights with respect to such license shall be deemed fully prepaid, and no royalties or other compensations shall be payable by Secured Party to Debtor with respect to such license.

E.     **GENERAL COVENANTS. Debtor covenants and agrees as follows:**

1.     **Operation of the Collateral.** Debtor agrees to maintain and use the Collateral solely in the conduct of its own business, in a careful and proper manner, and in conformity with all applicable permits or licenses. Debtor has the risk of loss of the Collateral. Debtor shall comply in all respects with all applicable statutes, laws, ordinances and regulations. Debtor shall not use the Collateral in any unlawful manner or for any unlawful purposes, or in any manner or for any purpose that would expose the Collateral to unusual risk, or to penalty, forfeiture or capture, or that would render inoperative any insurance in connection with the Collateral.

2.     **Condition.** Debtor shall obtain and maintain in good standing at all times all applicable permits, licenses, registrations and certificates respecting the Collateral.

3.     **Assessments.** Debtor shall promptly pay when due all taxes, assessments, license fees, registration fees, and governmental charges levied or assessed against Debtor or with respect to the Collateral or any part thereof.

4.     **No Encumbrances.** Debtor agrees not to suffer or permit any charge, lien, security interest, adverse claim or encumbrance of any and every nature whatsoever against the Collateral or any part thereof.

5.     **Agreement as to Maker of Note.** Debtor hereby acknowledges pursuant to the terms of the Distributor Agreement Secured Party was to make available to Debtor and Debtor was to borrow from Secured Party up to the principal amount of $1,500,000.00. At the request of the Debtor, Secured Party has made the loan to Davcrane as evidenced by the Note executed by Davcrane and payable to Secured Party and Debtor has executed a Guaranty Agreement of even date herewith guaranteeing the Note.

6.     **No Transfer.** Debtor shall not, without the prior written consent of Secured Party, sell, assign, transfer, lease, charter, encumber, hypothecate or dispose of the Collateral, or any part

thereof, or interest therein, or offer to do any of the foregoing. Debtor shall not grant any license to use any of the Collateral except for the existing Favelle License and any license granted to Secured Party.

**7.    Notices and Reports.** Debtor shall promptly notify Secured Party in writing of any change in the name, identity or structure of Debtor, any charge, lien, security interest, claim or encumbrance asserted against the Collateral, any litigation against Debtor or the Collateral, any theft, loss, injury or similar incident involving the Collateral, and any other material matter adversely affecting Debtor or the Collateral. Debtor shall furnish such other reports, information and data regarding Debtor's financial condition and operations, the Collateral and such other matters as Secured Party may request from time to time.

**8.    Intentionally deleted.**

**9.    Additional Requirements.** Debtor will from time to time sign, execute, deliver and file, alone or with Secured Party, upon reasonable request, any necessary financing statements, security agreements or other documents; procure any necessary instruments or documents as may be reasonably requested by Secured Party; and take all further action that Secured Party may reasonably request to confirm, perfect, preserve and protect the security interests intended to be granted hereby. At the option of Secured Party, a carbon, photographic or other reproduction of this Agreement or of a financing statement covering the Collateral shall be sufficient as a financing statement and may be filed as a financing statement. Upon the request of Secured Party, Debtor shall take or cause to be taken all actions (other than any actions required to be taken by Secured Party) necessary to cause Secured Party to have "control" over any proceeds of the Collateral constituting deposit accounts, electronic chattel paper, or letter-of-credit rights, and Debtor shall promptly notify Secured Party of Debtor's acquisition of any such Collateral.

**10.    Protection of Collateral.** Secured Party, at its option, whether before or after default, but without any obligation whatsoever to do so, may (a) discharge taxes, claims, charges, liens, security interests, assessments or other encumbrances of any and every nature whatsoever at any time levied, placed upon or asserted against the Collateral, (b) place and pay for insurance on the Collateral, including insurance that only protects Secured Party's interest, (c) pay for the repair, improvements, testing, maintenance and preservation of the Collateral, (d) pay any filing, recording, registration, licensing or certification fees or other fees and charges related to the Collateral, or (e) take any other action to preserve and protect the Collateral and Secured Party's rights and remedies under this Agreement as Secured Party may deem reasonably necessary or appropriate. Debtor agrees that Secured Party shall have no duty or obligation whatsoever to take any of the foregoing action. Debtor agrees to promptly reimburse Secured Party upon demand for any payment made or any expense incurred by the Secured Party pursuant to this authorization. These payments and expenditures, together with interest thereon from date incurred until paid by Debtor at the maximum contract rate allowed under applicable laws, which Debtor agrees to pay, shall constitute additional Obligations and shall be secured by and entitled to the benefits of this Agreement.

**11.    Records.** Debtor will keep and maintain at its own cost and expense satisfactory and complete records of the Collateral, including, without limitation, a record of all payments received and all credits granted with respect to the Secured Accounts. For Secured Party's further security, Secured Party shall have a security interest in all of Debtor's books and records pertaining to the Collateral, and Debtor shall turn over any such books and records to Secured Party or to its representatives during normal business hours at the request of Secured Party.

**12.    Further Assurances.** Debtor shall do, make, procure, execute and deliver all such additional and further acts, things, deeds, interests and assurances as Secured Party may reasonably require from time to time to protect, assure and enforce Secured Party's rights and remedies.

**13.    Intentionally deleted.**

**14.    Additional Representations and Warranties.** Debtor represents and warrants to Secured Party that the General Intangibles are genuine, valid, legally enforceable, free from default by Debtor, prepayment, counterclaims, offsets, and defenses that would affect any material portion thereof, and Debtor holds all rights thereunder.

**15.    Modifications to General Intangibles.** Debtor shall not, without the prior written consent of Secured Party, (i) reduce or discount any payment required to be made to Debtor under the Favelle License, any other license granted or any other Collateral; (ii) amend, modify, or otherwise change any provision of the General Intangibles or any other Collateral; (iii) waive any condition or obligation, or the performance or observation of any condition or obligation, under the General Intangibles or any other Collateral; or (iv) terminate any ownership interest in the General Intangibles or any other Collateral. In the event Debtor possesses any future inventions and patents related to the Product Line or the assembly of the Product Line, Debtor agrees to notify Secured Party within ten (10) business days of the filing of any patent application and shall execute all necessary documents to reflect the Secured Party's security interest therein.

**16.    Obligations of Secured Party.** Nothing herein contained shall be construed to constitute Debtor as the agent of Secured Party for any purpose whatsoever. Secured Party does not by anything contained herein or in any assignment or otherwise, assume any of Debtor's obligations or any liability under the Contracts or any other agreements assigned to Secured Party, and Secured Party shall not be responsible in any way for the performance by Debtor of any of the terms and conditions thereof.

**17.    No Collection Obligation.** Secured Party has no duty to collect any income accruing on the Collateral or to preserve any rights relating to the Collateral. The powers conferred upon Secured Party by this Agreement are solely to protect the interest of Secured Party in the Collateral and shall not impose any duty upon Secured Party to exercise any such powers. Secured Party shall be under no duty whatsoever to make or give (and Debtor does hereby waive) any presentment, demand for performance, notice of nonperformance, protest, notice of protest, notice of dishonor, or

other notice or demand in connection with any Collateral or the Obligations, or to take any steps necessary to preserve any rights against other parties. Secured Party shall not be liable for failure to collect or realize upon any or all of the Obligations or Collateral, or for any delay in so doing and shall have no duty to perform Debtor's obligations.

18.    **Debtor Remains Liable.** Subject to the terms of the Distributor Agreement (prior to an Event of Default) and this Agreement, Secured Party shall not have any obligation or liability with respect to any Collateral (or any agreement giving rise thereto) by reason of or arising out of this Agreement or the receipt by Secured Party of any payment relating to any Collateral, nor shall Secured Party be obligated in any manner to perform any of the obligations of Debtor under or pursuant to any Collateral (or any agreement giving rise thereto), to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party under any Collateral (or any agreement giving rise thereto), to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

F.    **EVENTS OF DEFAULT.** The following events ("**Events of Default**") shall constitute Events of Default under this Agreement if such event or failure remains uncured following thirty (30) Business Days (defined as any day other than Saturday, Sunday or statutory holiday) written notice of such default and opportunity to cure from Secured Party to the Debtor:

1.    Default shall be made in the payment of any installment of principal or interest upon the Note or any other obligation of Debtor to Secured Party when due and payable; or

2.    Default shall be made in the performance of any terms, covenant or agreement contained herein or in any other Loan Document; or

3.    Any representation or warranty herein contained in any other Loan Document shall prove to have been incorrect or misleading in any material respect when made; or

4.    Debtor or any guarantor makes an assignment for the benefit of creditors, admits in writing its inability to pay its debts generally as they become due, files a petition in bankruptcy, is adjudicated insolvent or bankrupt, petitions or applies to any tribunal for any receiver or any trustee of Debtor or any guarantor or any substantial part of its property, commences any action relating to Debtor or any guarantor under any reorganization, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect, or if there is commenced against Debtor or any guarantor any such action, or Debtor or any guarantor by any act indicates its consent to or approval of any trustee for Debtor or any guarantor of any substantial part of its property, or suffers any such receivership or trustee to continue undischarged;

Upon the occurrence of an Event of Default: (i) the Secured Party, at its option, may declare the Note, and all outstanding principal, accrued interest and other sums outstanding thereon,

immediately due and payable without demand, presentment, notice of dishonor, protest, notice of intent to accelerate, notice of acceleration and diligence in collecting sums due hereunder, all of which are waived by Debtor; (ii) proceed to enforce its interest in the Collateral with all proceeds being retained or paid over to Secured Party for application on the Obligations in the order and priority chosen by Secured Party in its sole discretion; and (iii) Secured Party shall have all rights and remedies available to a secured party under the Texas Business and Commerce Code and other applicable law.

### G.     REMEDIES UPON DEFAULT.

1.     **General**.  Upon the occurrence and during the continuance of any Event of Default, Secured Party may, by written notice to Debtor, declare the entire unpaid amount (including, if applicable, any unpaid accrued interest) of the Obligations to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest, notice of protest or dishonor, notice of acceleration, notice of intent to accelerate or other notice of any kind, all of which are hereby expressly waived by Debtor, and thereupon take such action as Secured Party may deem desirable.  If any Event of Default shall occur and be continuing Secured Party may, in addition to all other rights and remedies granted to it in this Agreement and in any other instrument or agreement securing, evidencing or relating to the Obligations exercise all rights and remedies of a secured party under the UCC.

2.     **Remedies**.  Upon any Event of Default, Secured Party shall have the right to pursue any of the following remedies separately, successively or simultaneously:

(i)     File suit and obtain judgment and, in conjunction with any action, Secured Party may seek any ancillary remedies provided by law, including levy of attachment and garnishment.

(ii)     Without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon Debtor or any other person (all and each of which demands, defenses, advertisements and notices are hereby waived), Secured Party shall have the following additional rights and remedies:

(a)     to exercise any and all rights as beneficial and legal owner of the Collateral, including, without limitation, any and all consensual rights and powers with respect thereto;

(b)     to sell, assign, make or use or grant a license or franchise to use, or granted a license or franchise to use, any or all of the Collateral, free of all rights and claims of the Debtor therein and thereto on such terms and conditions as the Secured Party may determine but subject to the right of reversion described in Section I, Paragraph 13, hereof;

I  U MARTIN 1487 0001 SECURITY AGREEMENTS-DAVIS DOC                - 8 -

(c)    the Debtor will promptly (and in any event within three (3) business days) deliver, upon request of the Secured Party, to the Secured Party or its designee an assignment of the Collateral, duly executed by the Debtor.

(iii)    Secured Party (without the necessity of any further consent or authorization from Debtor) and Debtor hereby constitutes, appoints and makes Secured Party as Debtor's true and lawful attorney-in-fact and agent for Debtor and in Debtor's name, place and stead with full power of substitution, in Secured Party's name or Debtor's name or otherwise, for Secured Party's sole use and benefit, but at Debtor's cost and expense, to exercise, without notice, all or any of the following powers at any time with respect to all or any of the Collateral:

(a)    to demand, sue for, collect, receive and give acquittance for any and all monies due or to become due by virtue thereof and otherwise deal with proceeds;

(b)    to receive, take, endorse, assign and deliver any and all checks, notes, drafts, documents and other negotiable and non-negotiable instruments and chattel paper representing proceeds of the Collateral taken or received by Secured Party in connection therewith;

(c)    to settle, compromise, compound, prosecute or defend any action or proceeding with respect thereto;

(d)    to sell, transfer, assign or otherwise deal in or with the same or the proceeds or avails thereof or the relative goods, as fully and effectively as if Secured Party were the absolute owner thereof;

(e)    to extend the time of payment of any or all thereof and to grant waivers and make any allowance or other adjustment with reference thereto; and

(f)    if Debtor fails to comply with its obligations hereof, to pay or discharge taxes and liens levied or placed on or threatened against the Collateral;

(g)    may take any action necessary to obtain, preserve and enforce the liens granted under this Security Agreement and maintain and preserve the Collateral.

provided, however, Secured Party shall be under no obligation or duty to

exercise any of the powers hereby conferred upon it and shall be without liability for any act or failure to act in connection with the collection of, or the preservation of any rights under, any Collateral and otherwise deal with proceeds. Debtor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof. The foregoing power of attorney, and all other authorizations and agencies herein contained with respect to the Collateral, are irrevocable and powers coupled with an interest.

(iv)    Upon written request of the Debtor, Secured Party shall (i) provide written notice of Debtor's rights of reversion (as described in Section I, Paragraph 13 herein) or redemption to any third party with whom Secured Party deals in relation to the Collateral, and (ii) dispose of or deal with the Collateral only subject to Debtor's right of reversion or redemption of such Collateral.

## H.    FORECLOSURE PROCEDURES.

1.    **Waivers.**    Secured Party shall not by any act, delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any default or Event of Default or in any breach of any of the terms and conditions hereof. No failure to exercise, nor any delay in exercising, on the part of Secured Party of any right, power or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver by Secured Party of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which Secured Party would otherwise have on any future occasion. The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any rights or remedies provided by law. To the extent permitted by applicable law, Debtor waives all claims, damages and demands it may acquire against Secured Party arising out of the exercise by it of any rights hereunder except to the extent any thereof arise solely from the willful misconduct of Secured Party.

2.    Notices.    Secured Party shall give Debtor such notice of any private or public sale as may be required by the UCC. Twenty (20) days notice shall be considered commercially reasonable for any notices given under this Section.

3.    **Condition of Collateral.**    Secured Party has no obligation to prepare the Collateral for licensing or other disposition. Secured Party's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the UCC or otherwise, shall be to deal with it in the same manner as Secured Party deals with similar property for its own account. Neither Secured Party nor any of its directors, officers, members, managers, employees or agents shall be liable for failure to demand, collect or realize upon all or any part of the Collateral or for any delay in doing so or shall be under any obligation to sell, license or otherwise dispose of any Collateral upon the request of Debtor or otherwise.

4.    **No Obligation to Pursue Others.**    Secured Party has no obligation to attempt to

satisfy the Obligations by collecting them from any other person liable for them and Secured Party may release, modify or waive any Collateral provided by any other person to secure any of the Obligations, all without affecting Secured Party's rights against Debtor. Debtor waives any right it may have to require Secured Party to pursue any third person for any of the Obligations.

5. **Compliance With Other Laws**. Secured Party may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

6. **Warranties**. Secured Party may sell or license the Collateral (subject to the right of reversion) without giving any warranties as to the Collateral. Secured Party may specifically disclaim any warranties of title or the like. This procedure will not be considered to adversely affect the commercial reasonableness of any license of the Collateral.

7. **Licensing on Credit**. If Secured Party sells or licenses any of the Collateral (subject to the right of reversion) upon credit, Debtor will be credited only with payments actually made by the purchaser, received by Secured Party and applied to the indebtedness of the purchaser. In the event the purchaser fails to pay for the Collateral, Secured Party may resell or relicense the Collateral (subject to the right of reversion) and Debtor shall be credited with the proceeds thereof.

8. **Purchases by Secured Party**. In the event Secured Party purchases any of the Collateral being transferred, Secured Party may pay for the Collateral by crediting some or all of the Obligations of the Debtor.

9. **No Marshaling**. Secured Party shall have no obligation to marshal any assets in favor of Debtor, or against or in payment of any of the Obligations, or any other obligation owed to Secured Party by Debtor or any other person.

10. **Proceeds of Sale**. Secured Party shall apply the net proceeds of any collection, recovery, receipt, appropriation, realization, sale or license of the Collateral, after deducting all reasonable costs and expenses of every kind incurred therein or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of Secured Party hereunder, including, without limitation, reasonable attorneys' fees and disbursements, to the payment in whole or in part of the Obligations, in such order as Secured Party may elect, and only after such application and after the payment by Secured Party of any other amount required by any provision of law, including, without limitation, Section 9-615 of the UCC, need Secured Party account for the surplus, if any, to Debtor.

11. **Deficiency**. Debtor shall remain liable to Secured Party for any unpaid Obligations, advances, costs, charges and expenses, together with interest thereon and shall pay the same immediately to Secured Party at Secured Party's offices.

## I.    OTHER AGREEMENTS.

**1.    Savings Clause.** Notwithstanding any provision to the contrary herein, or in any of the documents evidencing the Obligations or otherwise relating thereto, no such provision shall require the payment or permit the collection of interest in excess of the maximum permitted by applicable usury laws. If any such excessive interest is provided for, then in such event (i) the provisions of this paragraph shall govern and control, (ii) neither the Debtor nor its respective successors or assigns or any other party liable for the payment thereof, shall be obligated to pay the amount of such interest to the extent that is in excess of the maximum amount permitted by law, (iii) any such excess interest that may have been collected shall be, at the option of the holder of the instrument evidencing the Obligations, either applied as a credit against the then unpaid principal amount thereof or refunded to the maker thereof, and (iv) the effective rate of interest shall be automatically reduced to the maximum lawful rate under applicable usury laws as now or hereafter construed by the courts having jurisdiction.

**2.    Joint and Several Responsibility; References to Debtors.** If this Security Agreement is executed by more than one Debtor, the obligations of all such Debtors shall be joint and several and references to the Debtor shall mean all Debtors (or any of them).

**3.    Severability.** Any provision hereof found to be invalid by courts having jurisdiction shall be invalid only with respect to such provision (and then only to the extent necessary to avoid such invalidity). The offending provision shall be modified to the maximum extent possible to confer upon Secured Party the benefits intended thereby. Such provision as modified and the remaining provisions hereof shall be construed and enforced to the same effect as if such offending provision (or portion thereof) had not been contained herein, to the maximum extent possible.

**4.    Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**5.    · Use of Copies.** Any carbon, photographic or other reproduction of any financing statement signed by Debtor is sufficient as a financing statement for all purposes, including without limitation, filing in any state as may be permitted by the provisions of the Uniform Commercial Code of such state.

**6.    Relationship to Other Agreements.** This Security Agreement and the security interests (and pledges and assignments as applicable) herein granted are in addition to (and not in substitution, novation or discharge of) any and all prior to contemporaneous security agreements, security interests, pledges, assignments, liens, rights, titles or other interests in favor of Secured Party or assigned to Secured Party by others in connection with the Obligations. All rights and remedies of Secured Party in all such agreements are cumulative, but in the event of actual conflict in terms and conditions, the terms and conditions of this Agreement shall govern and control.

7.     **Notices.** Any notice or demand given by Secured Party to Debtor in connection with this Agreement, the Collateral or the Obligations, shall be deemed given and effective upon deposit in the United States mail, postage prepaid, addressed to Debtor at the address of Debtor designated at the beginning of this Agreement. Actual notice to Debtor shall always be effective no matter how given or received.

8.     **Headings and Gender.** Paragraph headings in this Agreement are for convenience only and shall be given no meaning or significance in interpreting this Agreement. All words used herein shall be construed to be of such gender or number as the circumstances require.

9.     **Amendments.** Neither this Agreem nt nor any of its provisions may be changed, amended, modified, waived or discharged orally, but only by an instrument in writing signed by the Party against whom enforcement of the change, amendment, modification, wavier or discharge is sought.

10.     **Continuing Agreement.** The security interest (and pledges and assignments as applicable) hereby granted and all of the terms and provisions in this Agreement shall be deemed a continuing agreement and shall continue in full force and effect until terminated in writing. Any such revocation or termination shall only be effective if explicitly confirmed in a signed writing issued by Secured Party to such effect and shall in no way impair or affect any transactions entered into or rights created or Obligations incurred or arising prior to such revocation or termination, as to which this Agreement shall be fully operative until same are repaid and discharged in full. Unless otherwise required by applicable law, Secured Party shall be under no obligation to issue a termination statement or similar documents unless Debtor requests same in writing and, provided further, that all Obligations have been repaid and discharged in full and there are no commitments to make advances, incur any Obligations or otherwise give value.

11.     **Binding Effect.** The provisions of this Security Agreement shall be binding upon the heirs, personal representatives, successors and assigns of Debtor (and each of them) and the rights, powers and remedies of Secured Party hereunder shall enure to the benefit of the successors and assigns of Secured Party.

12.     **Governing Law.** This Agreement shall be governed by the law of the State of Texas and applicable federal law.

13.     **Right of Reversion.** In the Event of Default and in the event Secured Party takes any action whatsoever in relation to the Technology or has foreclosed or has otherwise alienated or transferred all or any part of the Technology, Debtor shall have an ongoing automatic right of reversion as to the Technology (only) which shall be effective for a period of 10 years from the date of the Event of Default or earlier if the Debtor satisfies the Obligations in full ("**Reversion Period**") under the terms and conditions herein set forth. If at any time during the Reversion Period, Debtor satisfies the Obligations in full, the exclusive license, ownership and/or exclusive use of the Technology (only) will automatically revert to Davis. Secured Party agrees to execute such

documents and take further steps as may be reasonably required to perfect this reversion of ownership at that time. This reversion right shall not apply to any other Collateral and may not be assigned. If at any time during the Reversion Period Debtor fails to satisfy the Obligations in full and Secured Party exercises any rights as Secured Party in relation to the Technology (only), the exclusive ownership and exclusive use of the Technology (only) will nevertheless automatically revert to Davis upon the end of the Reversion Period subject to and in accordance with the Distributor Agreement. In the event of a conflict between this Section 13 and Section 6.7(a)(ii) of the Distributor Agreement, the terms of this Section 13 shall control.

14. **Construction.** The parties hereto acknowledge that each of them has had the benefit of legal counsel of its own choice and has been afforded an opportunity to review this Agreement and the other Loan Documents with its legal counsel.

15. **Indemnification.** DEBTOR AGREES TO PAY AND TO SAVE SECURED PARTY HARMLESS FROM ANY AND ALL LIABILITIES AND REASONABLE COSTS AND EXPENSES (INCLUDING, WITHOUT LIMITATION, LEGAL FEES AND EXPENSES), (I) WITH RESPECT TO, OR RESULTING FROM, ANY DELAY IN PAYING, ANY AND ALL EXCISE, SALES OR OTHER TAXES WHICH MAY BE PAYABLE OR DETERMINED TO BE PAYABLE WITH RESPECT TO ANY OF THE COLLATERAL, (II) WITH RESPECT TO, OR RESULTING FROM, ANY DELAY IN COMPLYING WITH ANY GOVERNMENTAL REQUIREMENTS APPLICABLE TO ANY OF THE COLLATERAL OR (III) IN CONNECTION WITH ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, UNLESS SECURED PARTY IS GROSSLY NEGLIGENT OR ENGAGES IN ANY WILLFUL MISCONDUCT. THIS INDEMNITY IS INTENDED TO COVER SECURED PARTY'S ORDINARY NEGLIGENCE.

16. **Expenses.** Debtor will pay to Secured Party at Secured Party's offices, all charges, costs and expenses (including reasonable attorneys' fees and legal expenses) incurred by Secured Party in connection with protecting Secured Party against the claims or interests of any third party against the Collateral, in exercising any right, power or remedy conferred by this Agreement or by law or in equity and/or in protecting and preserving the Collateral. The amount of all such charges, costs and expenses shall be due and payable by Debtor to Secured Party upon demand together with interest thereon at the highest rate allowed by applicable law. Debtor shall reimburse Secured Party for the cost of periodic Uniform Commercial Code and patent searches conducted by the Secured Party to verify the first lien priority of Secured Party's security interest in the Collateral, and to verify that no other financing statements have been filed against the Collateral.

17. **Entire Agreement; Amendment.** THE PARTIES HERETO EXPRESSLY ACKNOWLEDGE AND AGREE, THAT WITH REGARD TO THE SUBJECT MATTER OF THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREIN: (1) THERE ARE NO ORAL AGREEMENTS BETWEEN THE PARTIES HERETO AND (2) THIS AGREEMENT, INCLUDING THE DEFINED TERMS AND ALL EXHIBITS AND ADDENDA, IF ANY, ATTACHED HERETO: (a) EMBODIES THE FINAL AND COMPLETE AGREEMENT BETWEEN THE PARTIES; (b) SUPERSEDES ALL PRIOR AND CONTEMPORANEOUS NEGOTIATIONS, OFFERS, PROPOSALS, AGREEMENTS, COMMITMENTS, PROMISES,

ACTS, CONDUCT, COURSE OF DEALING, REPRESENTATIONS, STATEMENTS, ASSURANCES AND UNDERSTANDINGS, WHETHER ORAL OR WRITTEN; AND (c) MAY NOT BE VARIED OR CONTRADICTED BY EVIDENCE OF ANY SUCH PRIOR OR CONTEMPORANEOUS MATTER OR BY EVIDENCE OF ANY SUBSEQUENT ORAL AGREEMENT OF THE PARTIES HERETO.

**SIGNATURE PAGE**
**COMMERCIAL SECURITY AGREEMENT**

EXECUTED this _____ day of July, 2002.


_____
DANIEL E. DAVIS


Exhibit A - Description of Technology

Exhibit "A"

Technology

U.S. PATENT NO. 6,003,252 ISSUED TO DANIEL E. DAVIS FOR THE PRODUCT LINE AS DEFINED IN THE DISTRIBUTOR AGREEMENT

PATENT APPLICATION ENTITLED PIPELAYER CRANE APPARATUS FOR THE PRODUCT LINE AS DEFINED IN THE DISTRIBUTOR AGREEMENT

Serial No. 60/362,675
Filing Date: March 8, 2002
Provisional Application

PATENT APPLICATION ENTITLED TELEHANDLER CRANE APPARATUS FOR THE PRODUCT LINE AS DEFINED IN THE DISTRIBUTOR AGREEMENT

Serial No. 10/094,341
Filing Date: March 8, 2002
Utility Application

PATENT APPLICATION ENTITLED UNIVERSAL EXCAVATOR BOOM ATTACHMENT FOR THE PRODUCT LINE AS DEFINED IN THE DISTRIBUTOR AGREEMENT.
Serial No. 60/365,574
Filing Date: March 19, 2002
Provisional Application

CRANE APPARATUS AND METHOD FOR THE PRODUCT LINE AS DEFINED IN THE DISTRIBUTOR AGREEMENT

Not filed; still being prepared.

**CONFIDENTIAL DESIGN AND MANUFACTURING DRAWINGS:**

**9 TON TELEHANDLER DRAWINGS:**
303 drawings bearing drawing numbers 9-2-001 to 9-6-002.
General Arrangement    9T  GA

**28 TON CRANE DRAWINGS:**
301 drawings bearing drawing numbers 28-2-001 to 28-6-009 and 5002668.001 to 5002669-023.
General Arrangement    28T  GA
Adaptor Weldment    Bill of Material    #28-5-001

| Manitex | Bill of Material | #6000740.023 |
| Braden | Bill of Material | #PD12C  (General Dimensions) |

**CIPI Group Numbers:**

| - 9Q5972 | Upper Structure  Bill of Material |
| - 1176346 | Optional  Third pedal |
| - 1263784 | Optional  Guard |
| - 1204955 | Optional  Guard |
| - 1263799 | Optional  High Ambient Cooling |
| - 1114696 | Optional  Travel alarm |
| - 152 8744 | VG Lower Bill of Material |

**38 TON CRANE DRAWINGS:**

16 drawings bearing
drawing numbers 38-4-011 to 38-5-159 and B5303.001.

| General Arrangement | 38T  GA | |
| Adaptor Weldment | Bill of Material | #38-5-100 |
| | | #38-5-130 |
| | | #38-5-129 |
| | | #38-5-142 |
| Manitex | Bill of Material | #6000740.021 |
| Braden | Bill of Material | #PD15  (General Dimensions) |

**CIPI Group Number:**

| - 9Q5973 | Upper Structure  Bill of Material |
| - 152 8744 | VG Lower Bill of Material |

**SIDE-BOOM (PIPELAYER) DRAWINGS:**

Same 317 drawings listed for 28/38 Ton Cranes plus additional drawings for the A-frame and relate components.

**60 TON CRANE DRAWINGS:**

211 drawings bearing drawing numbers 20.0001.000-00 to 64.1100.000-00 and 9001.000.000-00 to 99.3000.502-000 and 9901.000.000 to 9904.000.000.

| General Arrangement | 5911.50.000.001.000 | |
| Adaptor Weldment | Bill of Material | #5911.40.1100.000 |
| Braden | Bill of Material | #CH185    (General Dimensions) |

**CIPI Group Number:**

| - 9Q5964 | Upper Structure  Bill of Material |

- 9Q5965          VG Lower Bill of Material
(Includes 163-4828)

# UNIFORM COMMERCIAL CODE FINANCING STATEMENT
### (Texas Secretary of State)

This instrument is prepared as, and intended to be, a Financing Statement complying with the formal requirements therefor, as set forth in the Texas Uniform Commercial Code Secured Transactions.

1.    The name and address of the debtor ("Debtor") is:

> DANIEL E. DAVIS
> San Benito, Texas
> P.O. Box 2427
> Harlingen, Texas 78551

2.    The name and address of the secured party ("Secured Party") is:

> FINNING INTERNATIONAL INC.
> 16830-107TH Avenue
> Edmonton, Alberta T5P 4C3  Canada

3.    This Financing Statement covers the following types (or items) of property as follows:

**A.    General Intangibles.** A security interest in and pledge and assignment of all of Debtor's now owned or hereafter acquired or arising general intangibles directly related to the Product Line or the assembly thereof and payment intangibles related thereto including, without limitation, any interest in the following:  all of the property and proprietary know-how, including any patents, patent rights, patent applications, drawings (including assembly drawings), and other intellectual property rights used by Debtor in relation to the Product Line or the assembly of the Product Line, including without limitation the items described in the attached **Exhibit A** and any present or future improvements or enhancements thereto (collectively, the "**Technology**") and all income, proceeds, money, deposits, issues, accounts receivable, payment intangibles, chattel paper and profits arising from or related to (i) the Technology, (ii) any  licenses relating to the Technology, including, without limitation, all rights derived from that certain non-exclusive license granted by Assignor to Favelle Favco Cranes (USA) Inc. relating to U.S. Patent No. 6,003,252, and/or (iii) the Distributor Agreement of even date between Davis and Secured Party ("**Distributor Agreement**"). Debtor expressly pledges and assigns to Secured Party its right to sue for past, present and future infringement relating to the General Intangibles. The term "**Product Line**" as used herein means telehandler all-terrain cranes, lattice and telescopic boomed crawler cranes, excavator based pipelayers and related equipment or products, and includes any current or future similar products, but specifically excludes any maritime or offshore products.

**B.    Royalties and Other Accounts.** A security interest in all of Debtor's now owned or hereafter acquired or arising royalties, income, proceeds, money, deposits, issues, accounts, accounts receivable, payment intangibles, chattel paper and profits arising from or directly related to (i) the Technology, (ii) any  licenses relating to the Technology, including, without limitation, all rights

derived from that certain non-exclusive license granted by Assignor to Favelle Favco Cranes (USA) Inc. relating to U.S. Patent No. 6,003,252; and (iii) the Distributor Agreement.

The term "Collateral" as used in this Agreement shall mean and include, and the security interest (and pledge and assignment as applicable) shall cover, all of the foregoing property, as well as any accessions, additions and attachments thereto and the proceeds and products thereof, including without limitation, all cash, depository accounts, general intangibles, accounts, inventory, equipment, fixtures, farm products, notes, drafts, acceptances, securities, instruments, chattel paper, insurance proceeds payable because of loss or damage, or other property, benefits or rights arising therefrom, and in and to all returned or repossessed goods arising from or relating to any of the property described herein or other proceeds of any sale or other disposition of such property.

**SIGNATURE PAGE**
**UNIFORM COMMERCIAL CODE FINANCING STATEMENT**
(Texas Secretary of State)

DANIEL E. DAVIS

Exhibit "A"

Technology

U.S. PATENT NO. 6,003,252 ISSUED TO DANIEL E. DAVIS FOR THE PRODUCT LINE AS DEFINED IN THE DISTRIBUTOR AGREEMENT.

PATENT APPLICATION ENTITLED PIPELAYER CRANE APPARATUS FOR THE PRODUCT LINE AS DEFINED IN THE DISTRIBUTOR AGREEMENT.
Serial No. 60/362,675
Filing Date: March 8, 2002
Provisional Application

PATENT APPLICATION ENTITLED TELEHANDLER CRANE APPARATUS FOR THE PRODUCT LINE AS DEFINED IN THE DISTRIBUTOR AGREEMENT.
Serial No. 10/094,341
Filing Date: March 8, 2002
Utility Application

PATENT APPLICATION ENTITLED UNIVERSAL EXCAVATOR BOOM ATTACHMENT FOR THE PRODUCT LINE AS DEFINED IN THE DISTRIBUTOR AGREEMENT.
Serial No. 60/365,574
Filing Date: March 19, 2002
Provisional Application

CRANE APPARATUS AND METHOD FOR THE PRODUCT LINE AS DEFINED IN THE DISTRIBUTOR AGREEMENT.
Not filed; still being prepared.

CONFIDENTIAL DESIGN AND MANUFACTURING DRAWINGS:

9 TON TELEHANDLER DRAWINGS:
303 drawings bearing drawing numbers 9-2-001 to 9-6-002.
General Arrangement    9T  GA

28 TON CRANE DRAWINGS:
301 drawings bearing drawing numbers 28-2-001 to 28-6-009 and 5002668.001 to 5002669-023.
General Arrangement    28T  GA
Adaptor Weldment      Bill of Material      #28-5-001
Manitex               Bill of Material      #6000740.023
Braden                Bill of Material      #PD12C  (General Dimensions)

## UNIFORM COMMERCIAL CODE FINANCING STATEMENT
### (Secretary of State – Facility)

This instrument is prepared as, and intended to be, a Financing Statement complying with the formal requirements therefor, as set forth in the Texas Uniform Commercial Code Secured Transactions.

1.      The name and address of the debtor ("Debtor") is:

        DAVCRANE INC.
        A Texas Corporation
        Tax Identification Number: 74-2955092
        Organizational Identification Number: 0157717000
        P.O. Box  2427
        Harlingen, Texas 78551

2.      The name and address of the secured party ("Secured Party") is:

        FINNING INTERNATIONAL INC.
        16830-107TH Avenue
        Edmonton, Alberta T5P 4C3  Canada

3.      This Financing Statement covers the following types (or items) of property as follows:

    (a)     All goods, equipment, furnishings, fixtures, furniture, chattels and personal property of whatever nature owned by Debtor now or hereafter attached or affixed to or used in and about the building or buildings now erected or hereafter to be erected on the property more particularly described on Exhibit "A", attached hereto and hereby made a part hereof for all purposes (the "Mortgaged Property"), or otherwise located on said lands, all leases now existing or hereafter made and affecting the Mortgaged Property, including, without limitation, those made by Debtor or any managing agent or affiliate of Debtor, as the same may have been or may from time to time be modified, extended and renewed (the "Leases"), all management agreements, utility agreements, maintenance agreements, service contracts, wastewater capacity reservations, construction contracts, architect and engineer agreements and contracts, and other agreements and contracts affecting the Mortgaged Property, and all fixtures, accessions and appurtenances thereto, and all renewals or replacements of or substitutions for any of the foregoing, all building materials and equipment now or hereafter delivered to the Mortgaged Property and intended to be installed therein, all funds, accounts, instruments, documents, general intangibles (including trademarks, trade names, patents and symbols used in connection therewith) and notes or chattel paper arising from or by virtue of any transactions related to the Mortgaged Property, all permits,

licenses, franchises, certificates, and other rights and privileges obtained in connection with the Mortgaged Property, all as-extracted collateral produced from or allocated to the Mortgaged Property and all products processed or obtained therefrom, the proceeds thereof, and all accounts and general intangibles under which such proceeds may arise.

(b)    All rents, issues and profits arising from or related to the Mortgaged Property and all improvements and any other property, whether real, personal or mixed, located on the Mortgaged Property;

(c)    All tenants' security deposits, advance rentals and other amounts due and becoming due under the Leases now existing or hereafter made and affecting the Mortgaged Property;

(d)    All guarantees of the Leases, including guarantees of tenant performance;

(e)    All insurance proceeds, including rental loss coverage and business interruption coverage with respect to the Mortgaged Property and the Leases;

(f)    All judgments or settlements of claims in favor of Debtor and arising from the Leases and any court proceeding, including, without limitation, any bankruptcy, reorganization, insolvency or debtor proceeding or case, or otherwise; and

(g)    All deposits relating to the operation of the Mortgaged Property, including, without limitation, deposits made pursuant to management agreements, utility agreements, maintenance agreements, service contracts and other agreements and contracts affecting the Mortgaged Property, including, without limitation, all deposits made with providers of utilities to the Mortgaged Property.

(h)    All equipment of every nature and description whatsoever, now owned or hereinafter acquired by Debtor, wheresoever located, including all parts, tools and accessories used in connection therewith utilized in connection with the manufacture, production or assembly of the Product Line hereinafter defined or purchased from the proceeds of the proceeds of the $1,500,000 note from Debtor payable to the order of Secured Party dated July 15, 2002 and including, without limitation, any equipment, tooling and parts used in connection with ownership and operation of the manufacturing plant located on the Mortgaged Property (including any equipment which may constitute a fixture on the Mortgaged Property), and all additions, accessions or substitutions thereto, and contracts with respect thereto and documents of title evidencing or representing any part thereof, and all products and proceeds thereof. For purposes hereof, **"Product Line"** means telehandler all-terrain cranes, lattice and telescopic boomed crawler cranes, excavator based pipelayers and related equipment or products, and includes any current or future similar products, but specifically excludes any marine or

offshore products.

    (i)    All of Debtor's fixtures and appurtenances thereto, and such other goods, chattels, fixtures, equipment and personal property affixed or in any manner attached to the real estate and or building(s) or structure(s), including all additions and accessions thereto and replacements thereof and articles in substitution therefore, howsoever attached or affixed, located on the Mortgaged Property.

4.    Proceeds of the above are also covered.

5.    The instruments executed in connection with this Financing Statement prohibit any further encumbrances against the Mortgaged Property or any other property described herein.

**SIGNATURE PAGE**
**UNIFORM COMMERCIAL CODE FINANCING STATEMENT**
(Secretary of State – Facility)

DAVCRANE INC.

By: _____

Daniel E. Davis, President

Exhibit "A"

**Real Property**

Lot Number One (1), Block Number One (1), Texas Pipe Bending Subdivision, City of Harlingen, Cameron County, Texas according to the Map recorded in Cabinet 1, Pages 384-A and 384-B Map Records of Cameron County, Texas.

## COLLATERAL ASSIGNMENT AND SECURITY AGREEMENT (PATENTS)
### (ALL PATENT RIGHTS)

This COLLATERAL ASSIGNMENT AND SECURITY AGREEMENT (PATENTS) (this "**Agreement**") is executed effective July 15, 2002 by DANIEL E. DAVIS ("**Assignor**") in favor of FINNING INTERNATIONAL INC., a Canadian corporation (the "**Secured Party**").

### PRELIMINARY STATEMENT

A.     Assignor is executing a Security Agreement (the "**Security Agreement**") dated as of the date hereof in favor of Secured Party.

B.     It is a condition precedent to Secured Party making the financial accommodations to Davcrane Inc. contemplated by the Security Agreement that Assignor enter into this Agreement.

NOW, THEREFORE, in consideration of the premises and to induce Secured Party to loan monies or extend financial accommodations to or for the account of Assignor, and at the special instance and request of Secured Party, Assignor hereby covenants and agrees with Secured Party, as follows:

1.     Defined Terms.

(a)     All capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Security Agreement.

(b)     "**Patent Right**" means any written agreement now or hereafter in existence granting to Assignor any right to use any Patent for the Product Line or the assembly of the Product Line, including, without limitation, the patents listed on Schedule 1 attached hereto.

(c)     "**Patents**" means all of the following: (i) all patents for the Product Line or the assembly of the Product Line now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or in any other country or any political subdivision thereof, including, without limitation, those Patents and patent applications listed on Schedule 1 attached hereto, together with all the rights, benefits and privileges derived therefrom and the associated goodwill of the business, if any, symbolized thereby, (ii) all reissues, extensions or renewals thereof and any present or future improvements and enhancements to the patents for the Product Line or the assembly of the Product Line now existing or hereafter adopted or acquired and (iii) all proceeds of the foregoing.

(d)     "**Product Line**" as used herein means telehandler all-terrain cranes, lattice and telescopic boomed crawler cranes, excavator based pipelayers and related equipment or products,

and includes any current or future similar or related products, but specifically excludes any marine or offshore products.

2.    <u>**Security Interest and Collateral Assignment**</u>.  As security for the Obligations, Assignor hereby grants and conveys a security interest to Secured Party in, and collaterally assigns to Secured Party, all of its right, title and interest in, to and under the following (collectively, the "**Property**"):

(a)    Each Patent for the Product Line or the assembly of the Product Line now or hereafter owned by Assignor or in which Assignor now has or hereafter acquires rights, wherever located and the associated goodwill of the business of Assignor relating thereto or represented thereby, including, without limitation, each Patent for the Product Line referred to in <u>Schedule 1</u> hereto and any renewals of registrations thereof; and

(b)    Each Patent Right for the Product Line or the assembly of the Product Line now or hereafter held by Assignor or in which Assignor now has or hereafter acquires rights, wherever located, including, without limitation, the Patent Rights for the Product Line or the assembly of the Product Line, if any, referred to in <u>Schedule 1</u> hereto; and

(c)    All products and proceeds of the foregoing, including, without limitation, any claim by Assignor against third parties for past, present or future infringement of any Patent or breach of Patent Right, if any, including, without limitation, any Patent or Patent Right referred to in <u>Schedule 1</u> hereto.

Notwithstanding the foregoing or anything else contained in this Agreement to the contrary, unless and until Secured Party exercises the rights and remedies accorded to it under the Security Agreement or by law with respect to the realization upon its security interest in and collateral assignment of the Property, Assignor shall own, and may use and enjoy the Property in connection with its business operations, including the granting of rights and use in the ordinary course of Assignor's business, but with respect to all Property usable in Assignor's business, only in a manner consistent with the preservation of the current substance, validity, registration and the security interest and collateral assignment herein granted in such Property.

3.    <u>Incorporation of the Security Agreement</u>.  Assignor does hereby acknowledge and affirm that the representations, warranties and covenants of Assignor with respect to the Property and the rights and remedies of Secured Party with respect to the security interest in and collateral assignment of the Property made and granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.  Should a conflict arise between the terms and provisions set forth in this Agreement and the Security Agreement, the terms and provisions of the Security Agreement shall control.

4.    <u>Future Rights</u>.  If Assignor shall obtain or acquire rights to any new Patent or Patent Right for the Product Line or the assembly of the Product Line, the provisions of Section 2 of this Agreement shall automatically apply thereto and Assignor authorizes Secured Party to modify this

Agreement by amending <u>Schedule 1</u> to include any future Patents and Patent Rights covered by Section 2 of this Agreement or by this Section 4.

     5.     <u>Choice of Laws</u>. This Agreement shall be construed under, and governed by, the laws of the State of Texas, excluding, however, its choice of law rules.

**SIGNATURE PAGE**
**COLLATERAL ASSIGNMENT (All Patent Rights)**

IN WITNESS WHEREOF, the Assignor has caused this Agreement to be duly executed as of the date set forth hereinabove.

**ASSIGNOR:**

_____
DANIEL E. DAVIS

THE STATE OF TEXAS          §
                            §
COUNTY OF _____   §

This instrument was acknowledged before me on July 26, 2002, by DANIEL E. DAVIS.

_____
Notary Public in and for the State of Texas

_____
Printed Name

My Commission Expires: _____

## SCHEDULE 1

U.S. PATENT NO. 6,003,252 ISSUED TO DANIEL E. DAVIS FOR THE PRODUCT LINE AS DEFINED


PATENT APPLICATION ENTITLED PIPELAYER CRANE APPARATUS FOR THE PRODUCT LINE AS DEFINED
Serial No. 60/362,675
Filing Date: March 8, 2002
Provisional Application

PATENT APPLICATION ENTITLED TELEHANDLER CRANE APPARATUS FOR THE PRODUCT LINE AS DEFINED
Serial No. 10/094,341
Filing Date: March 8, 2002
Utility Application

PATENT APPLICATION ENTITLED UNIVERSAL EXCAVATOR BOOM ATTACHMENT FOR THE PRODUCT LINE AS DEFINED
Serial No. 60/365,574
Filing Date: March 19, 2002
Provisional Application


CRANE APPARATUS AND METHOD FOR THE PRODUCT LINE AS DEFINED
Not filed; still being prepared.

08-29-2002

| | | |
|---|---|---|
| Form PTO-1595<br>(Rev. 03/01)<br>OMB No. 0651-0027 (exp. 5/31/2002) | F ‖‖‖‖‖‖‖‖‖‖‖<br>102205243 | U.S. DEPARTMENT OF COMMERCE<br>U.S. Patent and Trademark Office |

Tab settings ⇨ ⇨ ⇨ ▼          ▼          ▼          ▼          ▼          ▼          ▼

To the Honorable Commissioner of Patents and Trademarks: Please record the attached original documents or copy thereof.

| 1. Name of conveying party(ies): | 2. Name and address of receiving party(ies) |
|---|---|
| Daniel E. Davis          *8·26·02*<br>P.O. Box 2427<br>Harlingen, TX 78551 | Name: Finning International Inc.<br><br>Internal Address: Attn: Mel Ternan |
| Additional name(s) of conveying party(ies) attached? ☐ Yes ☒ No | Street Address: 16830-107th Avenue |

| 3. Nature of conveyance: | |
|---|---|
| ☒ Assignment | ☐ Merger |
| ☐ Security Agreement | ☐ Change of Name |
| ☐ Other_____ | |

City: Edmonton     State: Alberta Zip: V6C 2X8
Canada
Additional name(s) & address(es) attached? ☐ Yes ☒ No

Execution Date: July 15, 2002

4. Application number(s) or patent number(s):

If this document is being filed together with a new application, the execution date of the application is: _n/a_

| A. Patent Application No.(s)<br>60/362,675<br>10/094,341<br>60/365,574 | B. Patent No.(s)<br>6,003,252 |
|---|---|
| | Additional numbers attached? ☐ Yes ☒ No |

| 5. Name and address of party to whom correspondence concerning document should be mailed: | 6. Total number of applications and patents involved: ☒ 4 |
|---|---|
| Name: Elizabeth F. York | 7. Total fee (37 CFR 3.41)............$ 160.00 |
| Internal Address:_____ | ☒ Enclosed |
| Shannon, Martin, Finkelstein & Sayre | ☐ Authorized to be charged to deposit account |
| Street Address: 909 Fannin, Suite 2400 | 8. Deposit account number: |
| | N/A |
| City: Houston   State: TX   Zip: 77010 | (Attach duplicate copy of this page if paying by deposit account) |

08/28/2002 TDIAZ1  00000048 60362675
01 FC:581                    160.00 OP

DO NOT USE THIS SPACE

9. Statement and signature.

*To the best of my knowledge and belief, the foregoing information is true and correct and any attached copy is a true copy of the original document.*

| Elizabeth F. York | | August 26, 20__ |
|---|---|---|
| Name of Person Signing | Signature | Date |

Total number of pages including cover sheet, attachments, and documents: ☐ 6

**Mail documents to be recorded with required cover sheet information to:**
Commissioner of Patents & Trademarks  Box Assignments
Washington, D.C. 20231

## COLLATERAL ASSIGNMENT AND SECURITY AGREEMENT (PATENTS)
## (ALL PATENT RIGHTS)

This COLLATERAL ASSIGNMENT AND SECURITY AGREEMENT (PATENTS) (this "**Agreement**") is executed effective July 15, 2002 by DANIEL E. DAVIS ("**Assignor**") in favor of FINNING INTERNATIONAL INC., a Canadian corporation (the "**Secured Party**").

### PRELIMINARY STATEMENT

A.     Assignor is executing a Security Agreement (the "**Security Agreement**") dated as of the date hereof in favor of Secured Party.

B.     It is a condition precedent to Secured Party making the financial accommodations to Davcrane Inc. contemplated by the Security Agreement that Assignor enter into this Agreement.

NOW, THEREFORE, in consideration of the premises and to induce Secured Party to loan monies or extend financial accommodations to or for the account of Assignor, and at the special instance and request of Secured Party, Assignor hereby covenants and agrees with Secured Party, as follows:

1.     Defined Terms.

(a)     All capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Security Agreement.

(b)     "**Patent Right**" means any written agreement now or hereafter in existence granting to Assignor any right to use any Patent for the Product Line or the assembly of the Product Line, including, without limitation, the patents listed on Schedule 1 attached hereto.

(c)     "**Patents**" means all of the following: (i) all patents for the Product Line or the assembly of the Product Line now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or in any other country or any political subdivision thereof, including, without limitation, those Patents and patent applications listed on Schedule 1 attached hereto, together with all the rights, benefits and privileges derived therefrom and the associated goodwill of the business, if any, symbolized thereby, (ii) all reissues, extensions or renewals thereof and any present or future improvements and enhancements to the patents for the Product Line or the assembly of the Product Line now existing or hereafter adopted or acquired and (iii) all proceeds of the foregoing.

(d)     "**Product Line**" as used herein means telehandler all-terrain cranes, lattice and telescopic boomed crawler cranes, excavator based pipelayers and related equipment or products.

and includes any current or future similar or related products, but specifically excludes any marine or offshore products.

2.    **Security Interest and Collateral Assignment**.  As security for the Obligations, Assignor hereby grants and conveys a security interest to Secured Party in, and collaterally assigns to Secured Party, all of its right, title and interest in, to and under the following (collectively, the "**Property**"):

(a)    Each Patent for the Product Line or the assembly of the Product Line now or hereafter

the associated goodwill of the business of Assignor relating thereto or represented thereby, including, without limitation, each Patent for the Product Line referred to in Schedule 1 hereto and

Agreement by amending <u>Schedule 1</u> to include any future Patents and Patent Rights covered by Section 2 of this Agreement or by this Section 4.

5.    <u>Choice of Laws</u>. This Agreement shall be construed under, and governed by, the laws of the State of Texas, excluding, however, its choice of law rules.

**SIGNATURE PAGE**
**COLLATERAL ASSIGNMENT (All Patent Rights)**

IN WITNESS WHEREOF, the Assignor has caused this Agreement to be duly executed as of the date set forth hereinabove.

**ASSIGNOR:**

_____
DANIEL E. DAVIS

THE STATE OF TEXAS          §
                           §
COUNTY OF _____   §

This instrument was acknowledged before me on July 26, 2002, by DANIEL E. DAVIS.

_____
Notary Public in and for the State of Texas

_____
Printed Name

My Commission Expires: _____

## SCHEDULE 1

U.S. PATENT NO. 6,003,252 ISSUED TO DANIEL E. DAVIS FOR THE PRODUCT LINE AS DEFINED


PATENT APPLICATION ENTITLED PIPELAYER CRANE APPARATUS FOR THE PRODUCT LINE AS DEFINED
Serial No. 60/362,675
Filing Date: March 8, 2002
Provisional Application

PATENT APPLICATION ENTITLED TELEHANDLER CRANE APPARATUS FOR THE PRODUCT LINE AS DEFINED
Serial No. 10/094,341
Filing Date: March 8, 2002
Utility Application

PATENT APPLICATION ENTITLED UNIVERSAL EXCAVATOR BOOM ATTACHMENT FOR THE PRODUCT LINE AS DEFINED
Serial No. 60/365,574
Filing Date: March 19, 2002
Provisional Application


CRANE APPARATUS AND METHOD FOR THE PRODUCT LINE AS DEFINED
Not filed; still being prepared.

# GUARANTY AGREEMENT
## (DANIEL E. DAVIS)

WHEREAS, the execution of this Guaranty Agreement ("**Guaranty Agreement**") is a condition to DAVCRANE INC., a Texas corporation ("**Borrower**"), borrowing money from FINNING INTERNATIONAL INC., a Canadian corporation ("**Lender**"), in the aggregate principal amount of ONE MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($1,500,000.00), evidenced by that certain promissory note described below.

NOW, THEREFORE, for valuable consideration, the receipt and adequacy of which are hereby acknowledged, DANIEL E. DAVIS whose mailing address is P.O. Box 2427, Harlingen, Texas 78557 (the "**Guarantor**"), hereby irrevocably and unconditionally guarantees to Lender, the prompt payment and performance of the Guaranteed Obligations (hereinafter defined), this Guaranty Agreement being upon the following terms:

1.    The term "**Guaranteed Obligations**" as used herein, includes: (a) that certain Note ("**Note**") of even date herewith, in the original principal amount of $1,500,000.00, executed by Borrower and payable to the order of Lender; (b) interest on any of the indebtedness described in (a) preceding; (c) any renewal or extension of the indebtedness described in (a) through (b) preceding, or any part thereof; (d) all obligations under the Deed of Trust, Assignment of Rents, Security Agreement and Financing Statement ("**Deed of Trust**") securing the Note; (e) all obligations under the Commercial Security Agreement ("**Security Agreement**") securing the Note and (f) all other obligations of Borrower and Guarantor to Lender under all other documents and instruments executed contemporaneously herewith as security for or otherwise in connection with the Note, and all renewals, extensions and modifications thereof (herein the Note, the Deed of Trust, the Security Agreement and other documents shall be collectively called the "**Loan Documents**").

2.    This instrument shall be an absolute, continuing, irrevocable, and unconditional guaranty of payment and performance and not a guaranty of collection, and Guarantor shall remain liable on its obligations hereunder until the payment and performance in full of the Guaranteed Obligations.

3.    In the event of default by Borrower in payment or performance of the Guaranteed Obligations, or any part thereof, when such Guaranteed Obligations becomes due, whether by its terms, by acceleration, or otherwise, Guarantor shall promptly pay the amount due thereon to Lender upon written demand in lawful money of the United States and it shall not be necessary for Lender, in order to enforce such payment by Guarantor, first to institute suit or exhaust its remedies against Borrower or others liable on such Guaranteed Obligations, or to enforce any rights against any collateral which shall ever have been given to secure such Guaranteed Obligations.

4.    Guarantor hereby agrees that its obligations under this Guaranty Agreement shall not be released, diminished, impaired, reduced, or affected by the occurrence of any reason or event, including, without limitation, one or more of the following events, whether or not with notice to or the consent of Guarantor:  (a) the taking or accepting of collateral as security for any or all of the

Guaranteed Obligations or the release, surrender, exchange, or subordination of any collateral now or hereafter securing any or all of the Guaranteed Obligations; (b) any partial release of the liability of Borrower or the release of any other guarantor from liability for any or all of the Guaranteed Obligations; (c) any disability of Borrower, or the dissolution, insolvency, or bankruptcy of Borrower, Guarantor, or any party at any time liable for the payment of any or all of the Guaranteed Obligations; (d) any renewal, extension, modification, waiver, amendment, or rearrangement of any or all of the Guaranteed Obligations or any instrument, document, or agreement evidencing, securing, or otherwise relating to any or all of the Guaranteed Obligations; (e) any adjustment, indulgence, forbearance, waiver, or compromise that may be granted or given by Lender to Borrower, Guarantor, or any other party ever liable for any or all of the Guaranteed Obligations; (f) any neglect, delay, omission, failure, or refusal of Lender to take or prosecute any action for the collection of any of the Guaranteed Obligations or to foreclose or take or prosecute any action in connection with any instrument, document, or agreement evidencing, securing, or otherwise relating to any or all of the Guaranteed Obligations; (g) the unenforceability or invalidity of any or all of the Guaranteed Obligations or any instrument, document, or agreement evidencing, securing, or otherwise relating to any or all of the Guaranteed Obligations; (h) any payment by Borrower to Lender is determined by a court to constitute a preference under the bankruptcy laws or if for any other reason Lender is required to refund such payment or pay the amount thereof to someone else; (i) the settlement or compromise of any of the Guaranteed Obligations; (j) the failure of Lender to perfect or continue any security interest or lien securing any or all of the Guaranteed Obligations; or (k) the failure of Lender to preserve, protect, maintain, or insure any collateral securing any or all of the Guaranteed Obligations.

    5.    Guarantor represents and warrants to Lender as follows:

    (a)    Guarantor has the power and authority to execute, deliver and perform its obligations under this Guaranty Agreement, and this Guaranty Agreement constitutes the legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms, except as limited by bankruptcy, insolvency, or other laws of general application relating to the enforcement of creditor's rights.

    (b)    The execution, delivery, and performance by Guarantor of this Guaranty Agreement do not and will not violate any law or any order of any court, governmental authority or arbitrator and do not and will not conflict with, result in a breach of, or constitute a default under, or result in the imposition of any lien upon any assets of Guarantor pursuant to the provisions of any indenture, mortgage, deed of trust, security agreement, franchise, permit, license, or other instrument or agreement to which Guarantor or its properties is bound.

    (c)    No authorization, approval, or consent of, and no filing or registration with, any court, governmental authority, or third party is necessary for the execution, delivery, or performance by Guarantor of this Guaranty Agreement or the validity or enforceability thereof.

    6.    All present and future indebtedness of Borrower to Guarantor is hereby subordinated

to the Guaranteed Obligations.

7.    No amendment or waiver of any provision of this Guaranty Agreement nor consent to any departure by the Guarantor therefrom shall in any event be effective unless the same shall be in writing and signed by Lender.  No failure on the part of Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise hereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

8.    Guarantor recognizes that Lender is relying upon this Guaranty Agreement and the undertaking of Guarantor hereunder in making a loan to Borrower under the Loan Documents and further recognizes that the execution and delivery of this Guaranty Agreement is a material inducement to Lender in entering into the Loan Documents (as defined in the Note).

9.    Guarantor shall cause to be paid on demand all reasonable attorneys' fees and all other costs and expenses incurred by Lender in connection with the enforcement, or collection of this Guaranty Agreement.

10.    Except as herein provided, Guarantor hereby waives promptness, diligence, demand of payment, notice of acceptance of this Guaranty Agreement, presentment, notice of protest, notice of dishonor, notice of the incurring by Borrower of additional obligations, and all other notices and demands with respect to the Guaranteed Obligations and this Guaranty Agreement.

11.    Guarantor acknowledges that this Guaranty Agreement is executed in connection with the Note, Deed of Trust, Security Agreement and other Loan Documents and that Guarantor is aware of the obligations of Borrower and the terms thereunder.  Guarantor agrees that Lender may exercise any and all rights granted to it under the Loan Documents without affecting the validity or enforceability of this Guaranty Agreement.

12.    Guarantor waives all rights of reimbursement, exoneration, indemnification and/or contribution from Borrower for any payment by Guarantor under this Guaranty Agreement and waives all right of subrogation to the claims of Lender which may otherwise arise from such payment.

13.    Guarantor hereby expressly waives any right to trial by jury in any action or legal proceeding arising out of or relating to the Loan Documents on the transactions contemplated thereby or hereby.

14.    Guarantor acknowledges and agrees that the value of the consideration received and to be received by Guarantor as a result of Borrower and Lender entering into the Loan Documents and Guarantor executing and delivering this Guaranty Agreement is reasonably worth at least as much as the liability and obligation of Guarantor hereunder, and such liability and obligation and the Loan Documents has benefitted or may reasonably be expected to benefit Guarantor directly or indirectly.

15.     Notwithstanding the provisions of Sections 51.003, 51.004, and 51.005 of the Texas Property Code (as same may be amended from time to time), and to the extent permitted by law and the Arbitration provisions hereof, Guarantor agrees that Lender shall be entitled to seek a deficiency judgment from Borrower and Guarantor and any other party obligated on the Note or guaranty of the Note equal to the difference between the amount owing on the Note and the amount for which the property foreclosed upon ("**Foreclosed Property**") was sold pursuant to a judicial or nonjudicial foreclosure sale (if Lender elects to foreclose the Foreclosed Property).

Guarantor expressly recognizes that this Section shall constitute a waiver of the above cited provisions of the Texas Property Code which would otherwise permit Borrower and Guarantor and other persons against whom recovery of the deficiency is sought or Guarantor independently (even absent the initiation of deficiency proceedings against him) to present competent evidence of the fair market value of the Foreclosed Property as of the date of foreclosure and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than the fair market value.

Guarantor further recognizes and agrees that this waiver will create an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Foreclosed Property for purposes of calculating deficiencies owed by the Borrower and Guarantor, other borrowers on the Note, guarantors and others against whom recovery of a deficiency is sought.

Alternatively, in the event this Section is determined by a court of competent jurisdiction to be unenforceable, the following shall be the basis for the finder of fact's determination of fair market value of the Foreclosed Property as of the date of foreclosure sale in proceedings governed by Sections 51.003, 51.004, and 51.005 of the Texas Property Code (as amended from time to time):

(a)     The Foreclosed Property shall be valued in an "as is" condition as of the date of the foreclosure sale, without any assumption or expectation that any repairs will be performed in conjunction therewith;

(b)     The valuation shall be based upon an assumption that the foreclosure purchaser desires a prompt resale of the Foreclosed Property for cash promptly (but no later than twelve months) following the foreclosure sale;

(c)     All reasonable closing costs customarily borne by the seller in a commercial real estate transaction should be deducted from the gross fair market value of the Foreclosed Property, including, without limitation, brokerage commissions, title insurance, a survey of the Foreclosed Property, tax prorations, attorney's fees, and marketing costs;

(d)     The gross fair market value of the Foreclosed Property shall be further discounted to account for any estimated holding costs associated with maintaining the Foreclosed Property pending sale, including, without limitation, utilities expenses, property management fees, taxes, and assessments (to the extent not accounted for in (c) above) and other maintenance fees; and

(e)     Any expert opinion testimony given or considered with a determination of the fair market value of the Foreclosed Property must be given by persons having at least five years experience in appraising Foreclosed Property similar to the Foreclosed Property and who have conducted and prepared a complete written appraisal of the Foreclosed Property taking into consideration the factors set forth above.

**SIGNATURE PAGE**
**GUARANTY AGREEMENT**

EXECUTED effective July 15, 2002.

_Danl E. Davs_
DANIEL E. DAVIS

*Cameron County Title C...*
GF# 2207020

## WARRANTY DEED

**Date:**          August 9, 2002

**Grantor:**       METEX ENTERPRISES, INC., a Texas corporation (f.k.a. STEELTEK
                   ENTERPRISES, INC.)

**Grantor's Mailing Address (including county):**

                   502 North Expressway 77
                   Harlingen, Texas 78550
                   Cameron County

**Grantee:**       DAVCRANE, INC., a Texas corporation

**Grantee's Mailing Address (including County):**

                   P. O. Box 2427
                   Harlingen, Texas 78551-2427
                   Cameron County

**Consideration:** TEN AND NO/100 DOLLARS ($10.00) and other good and valuable
                   consideration and the further consideration of a note in the principal amount
                   of $1,500,000.00, dated July 15, 2002 executed by Grantee, payable to
                   Finning International, Inc. The note is secured by a Vendor's Lien retained
                   in favor of Finning International, Inc. in this deed and by Deed of Trust of
                   even date herewith, from Grantee to NANCY F. MARTIN Trustee, without
                   recourse on Grantor.

**Property (including any and all improvements):**

                   A tract of land containing 4.94 acres out of Lot Number One (1),
                   Block Number One (1), Texas Pipe Bending Subdivision, City of
                   Harlingen, Cameron County, Texas according to the map recorded in
                   Cabinet 1, Slots 384-A and 384-B, Map Records, Cameron County,
                   Texas, said property being more particularly described in Exhibit "A"
                   attached hereto and made a part hereof.

**Property Subject to Lien:**     same as above.

**Reservations From And Exceptions to Conveyance And Warranty:**

       This conveyance is made and accepted subject to those restrictions, covenants,
       conditions, easements, mineral and royalty reservations which are reflected on
       Exhibit "B" attached hereto.

       Grantor, for the consideration, receipt of which is acknowledged, and subject to the
reservations from and exceptions to conveyance and warranty, grants, sells and conveys to Grantee
the property, together with all and singular the rights and appurtenances thereto in anywise
belonging, to have and hold it to Grantee, Grantee's administrators, successors or assigns forever.
Grantor binds Grantor and Grantor's heirs, executors, administrators and successors to warrant and
forever defend all and singular the property to Grantee and Grantee's administrators, successors and
assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof,
except as to the reservations from and exceptions to conveyance and warranty.

       When the context requires, singular nouns and pronouns include the plural.

                              METEX ENTERPRISES, INC., a Texas corporation
                              (f.k.a. STEELTEK ENTERPRISES, INC.)

                              By: _____
                                   Cesar Maldonado, President
                                        VICE

## ACKNOWLEDGMENT

STATE OF TEXAS         )
                                 )

COUNTY OF CAMERON   )

This instrument was acknowledged before me on the ___9___ day of August, 2002, by
CESAR MALDONADO, as president of METEX ENTERPRISES, INC., a Texas corporation (f.k.a.
STEELTEK ENTERPRISES, INC.).

_Mary Ann Taylor_
Notary Public, State of Texas

My Commission Expires:_____

MARY ANN TAYLOR
NOTARY PUBLIC
STATE OF TEXAS
My Commission Expires 09-18-2004

AFTER RECORDING RETURN TO:

Mr. Dennis Sanchez
SANCHEZ, WHITTINGTON, JANIS &
    ZABARTE, L.L.P.
100 North Expressway 83
Brownsville, TX 78521

PREPARED IN THE LAW OFFICES OF:

SANCHEZ, WHITTINGTON, JANIS &
ZABARTE, L.L.P.
100 North Expressway 83
Brownsville, Texas 78521

(FT-10/2000)

**EXHIBIT 'A'**

A tract of land containing 4.94 acres, out of Lot 1, Block 1, TEXAS PIPE BENDING SUBDIVISION, City of Harlingen, Cameron County, Texas, according to the Map recorded in Cabinet 1, Slots 384-A and 384-B, Map Records of Cameron County, Texas, and said 4.94 acre tract being more particularly located and described as follows:

COMMENCING at the Southwest corner of said Lot 1, Block 1, TEXAS PIPE BENDING SUBDIVISION;

THENCE, South 89 degrees 48 minutes 00 seconds West, a distance of 340.58 feet;

THENCE, North 00 degrees 12 minutes 00 seconds West, a distance of 25.43 feet to a ½ inch iron pin set on the North Right-of-Way line of F.M. 106 (Harrison Street) same being the Southwest corner of the tract herein described;

THENCE, North 00 degrees 12 minutes 00 seconds West, a distance of 1059.97 feet to a ½ inch iron pin set for the Northwest corner of this tract;

THENCE, North 89 degrees 48 minutes 00 seconds East, a distance of 237.28 feet to a ½ inch iron pin set for the Northeast corner of this tract;

THENCE, South 00 degrees 12 minutes 00 seconds East, a distance of 260.14 feet to a ½ inch iron pin set for an outside corner of this tract;

THENCE, South 89 degrees 48 minutes 00 seconds West, a distance of 45.56 feet to a ½ inch iron pin set for an inside corner of this tract;

THENCE, South 00 degrees 12 minutes 00 seconds East, a distance of 800.22 feet to a ½ inch iron pin set for the Southeast corner of this tract;

THENCE, South 89 degrees 55 minutes 00 seconds West, along said North Right-of-Way line of F.M. 106 (Harrison Street), a distance of 191.71 feet to the POINT OF BEGINNING, Containing 4.94 acres of land more or less, inclusive of any and all easements, restrictions, exceptions or dedications that might be of record.

NOTE:  THIS COMPANY DOES NOT REPRESENT THAT THE ACREAGE AND/OR SQUARE FOOTAGE CALCULATIONS ARE CORRECT.

## EXHIBIT B

## PERMITTED EXCEPTIONS

1. Standby fees, taxes and assessments by any taxing authority for the year 2002 and subsequent years.

2. Statutory rights in favor of HARLINGEN IRRIGATION DISTRICT CAMERON COUNTY NO. 1, pursuant to applicable sections of the Texas Water Code.

3. Easements in favor of HARLINGEN IRRIGATION DISTRICT CAMERON COUNTY NO. 1.

4. Right of Way Easement dated September 20, 1949 from Fred Langley to Cameron County, recorded in Volume 472, Page 404, Deed Records of Cameron County, Texas.

5. Right of Way Easement dated February 8, 1951 from Fred Langley to Cameron County, recorded in Volume 509, Page 55, Deed Records of Cameron County, Texas.

6. Easement dated March 1, 1983 from Texas Pipe Bending Company to City of Harlingen, recorded in Volume 1314, Page 373, Deed Records of Cameron County, Texas.

7. An undivided ½ mineral interest, the royalties, bonuses and rentals also as set out in instrument dated September 26, 1950 from E. A. Matz, recorded in Volume 500, Page 414, Deed Records of Cameron County, Texas.

8. 1/4th of all oil, gas and other minerals described in deed dated August 18, 1943 from Phoenix Mutual Life Insurance, recorded in Volume 325, Page 155, Deed Records of Cameron County, Texas, together with all rights.

9. Drainage canal Right-of-Way Easement as shown on the plat of the Subdivision herein referred to.

10. Road Right-of-Way as shown on the plat of the Subdivision herein referred to.

LAW OFFICES OF

## ALTON W. PAYNE, J.D., PH.D.
*Attorneys at Law*
5001 BISSONNET, SUITE 200
BELLAIRE, TEXAS 77401

August 5, 2003

TELEPHONE (713) 840-8008
TELEFAX (713) 840-8088
EMAIL alwpayne@earthlink.net

INTELLECTUAL PROPERTY AND
TECHNOLOGY-RELATED LAW
MEDIATION-ARBITRATION

Mr. Mel Ternan
General Manager
Construction and Pipeline Division
FINNING (CANADA)
16830- 107TH Avenue
Edmonton, Alberta, Canada
T5P 4C3
Via EMAIL, mternan@finning.ca
TELEFAX 780-930-4891 and Certified Mail

Mr. John T. Struthers
Corporate Secretary
Finning International Inc.
Park Place, 666 Burrard Street, Suite 1000
Vancouver, British Columbia
V6C 2X8
Via TELEFAX 604-331-4887
and Certified Mail

Re: Distributor Agreement dated July 15, 2002

Dear Mel:

As we discussed last week, DavCrane Inc. and Daniel Davis are in the process of winding down their business under the Distributorship Agreement with Finning International Inc. ("Finning"). It is with great disappointment that I have to notify Finning of its default pursuant to section 12.2 of the Distributor Agreement.

Finning has failed to use reasonable commercial efforts to market and sell the Distributed Products as required by, at least, section 7.2(k) of the Distributor Agreement. Further, Finning has failed to pay the aggregate Manufacturing Overhead Costs as required by section 5.3 of the Distributor Agreement.

Please be advised that if Finning fails to cure these events of default within 30 days, the Distributor Agreement will terminate in its entirety without prejudice to any rights Mr. Davis has against Finning for damages that have and will continue to accrue due to the cited breaches by Finning.

Further please consider this letter as the notice and demand for arbitration pursuant to section 14.1, Dispute Resolution/Remedies, of the Distributor Agreement.

We would welcome opening a new dialogue concerning ways to resolve these matters. However, due to the urgency of getting these matters resolved, no delays in the default or dispute provisions can be entertained.

Yours very truly,

Alton W. Payne, J.D., Ph.D.

cc:    Dennis Sanchez
       Daniel E. Davis

EXHIBIT
B



**BORDEN**
**LADNER**
**GERVAIS**
—

Borden Ladner Gervais LLP
Lawyers • Patent & Trade-Mark Agents
1200 Waterfront Centre
200 Burrard Street, P.O. Box 48600
Vancouver, B.C., Canada V7X 1T2
tel: (604) 687-5744   fax: (604) 687-1415
www.blgcanada.com

September 18, 2003

FILE NO: 501177/019363

**COPY**

GERALD W. GHIKAS, Q.C.
direct tel: (604) 640-4112
direct fax: (604) 622-5812
email: gghikas@blgcanada.com

**VIA FAX: (956) 399-9174**
**Original VIA COURIER**

Daniel E. Davis
P.O. Box 2427
Harlingen, Texas
78551 USA

Dear Sirs/Mesdames:

　　　　RE:　　**In the Matter of an International Commercial**
　　　　　　　**Arbitration**
　　　　　　　**Between Finning International Inc. (Finning)**
　　　　　　　**and Daniel E. Davis (Davis)**
　　　　　　　**pursuant to the International Arbitration Rules**
　　　　　　　**of the American Arbitration Association**

　　　　　　We enclose for delivery to you pursuant to Article 14.1 of the Agreement, a notice of arbitration that we have filed with the American Arbitration Association at their Dallas, Texas Case Management Centre with a request that it commence administration of this arbitration.

　　　　　　We assume that you will appoint counsel. As required by the Agreement we are delivering copies of this communication and enclosures to Alton W. Payne and Dennis Sanchez. We have assume that Mr. Payne will represent you as your attorney for the purposes of this arbitration. If you intend to appoint another attorney, please provide us with that attorney's contact particulars.

　　　　　　　　　Yours truly,

　　　　　　　　　Borden Ladner Gervais LLP

　　　　　　　　　By:　Gerald W. Ghikas

GWG/mm
Enclosure

Document: 1172578:01
Borden Ladner Gervais LLP is an Ontario Limited Liability Partnership

VANCOUVER • TORONTO • OTTAWA • MONTREAL • CALGARY



EXHIBIT
**C**

cc    Alton W. Payne (by fax with enclosures)
5001 Bissonnet, suite 200
Bellaire, Texas
77401  USA

Dennis Sanchez (by fax with enclosures)
Sanchez, Whittington, Janis & Zabarte, LLP
100 North Expressway 83
Brownsville, Texas
78521-2284  USA

cc    Mark Finkelstein
Shannon, Martin, Finkelstein & Sayre, P.C.
2400 Two Houston Centre
909 Fannin Street
Houston, Texas
USA 77010

Document: 1172578:01

# IN THE MATTER OF AN INTERNATIONAL COMMERCIAL ARBITRATION

BETWEEN:

FINNING INTERNATIONAL INC. (FINNING)

CLAIMANT

AND:

DANIEL E. DAVIS (DAVIS)

RESPONDENT

## NOTICE OF ARBITRATION
### PURSUANT TO THE INTERNATIONAL ARBITRATION RULES
### OF THE AMERICAN ARBITRATION ASSOCIATION

The Claimant, Finning, a party to an arbitration agreement contained in a written contract dated July 15, 2002 and providing for arbitration under the *International Arbitration Rules* of the American Arbitration Association, hereby demands arbitration thereunder.

### THE NAMES AND ADDRESSES OF THE PARTIES:

**Claimant:**
Finning International Inc.
16830 – 107th Avenue
Edmonton, Alberta,
T5P 4C3  Canada

Telephone:     (780) 930 4878
Fax:            (780) 930-4891

**Respondent:**
Daniel E. Davis
P.O. Box 2427
Harlingen, Texas
78551  USA

Telephone:
Fax:            (956) 399-9174

**Claimant's Representatives:**
Canadian Counsel:  Gerald W. Ghikas, Q.C.
Borden Ladner Gervais LLP
1200 Waterfront Centre
200 Burrard Street
P.O. Box 48600
Vancouver, British Columbia
V7X 1T2  Canada

Telephone:     (604) 640-4112
Fax:            (604) 622-5812

Texas Counsel: Mark S. Finkelstein
Shannon, Martin, Finkelstein & Sayre, P.C.
2400 Two Houston Center
909 Fannin Street
Houston, Texas    77010  USA

Telephone:     (713) 646-5503
Fax:            (713) 752-0337

**Respondent's Representatives**
Dennis Sanchez
Sanchez, Whittington, Janis & Zabarte, LLP
100 North Expressway 83
Brownsville, Texas
78521-2284 USA

Telephone:     (956) 546-3731
Fax:            (956) 546-3765

Alton W. Payne
5001 Bissonnet, Suite 200
Bellaire, Texas
77401  USA

Telephone:     (713) 840-8008
Fax:            (713) 840-8088

- 1 -

Document: 1172180:01

## DESCRIPTION OF THE CLAIM AND SUPPORTING FACTS:

1.    The claimant, Finning, is a company incorporated under the laws of Canada having an address at 16830 – 107th Avenue, Edmonton, Alberta, Canada.

2.    The respondent, Davis, is a businessperson having an address at P.O. Box 2427 Harlingen, Texas, U.S.A.

3.    Davis and Finning entered into a Distributor Agreement (the "Agreement") dated July 15, 2002.

4.    In and by the Agreement, Davis agreed to manufacture and assemble from components supplied in part by Finning certain cranes and related products (the "Distributed Products") and agreed that Finning was to have the exclusive right to market, distribute and sell throughout the world.

5.    The Agreement further provided:
    (a)    That Davis would manufacture and assemble the Distributed Products in a prompt, timely and efficient manner and would produce Distributed Products to meet Finning's demand for same;
    (b)    That title to Distributed Products at all times would remain with Finning, its suppliers or its customers;
    (c)    That Davis would deliver completed Distributed Products to the person, at the location and on the date specified by Finning;
    (d)    That all Distributed Products would be manufactured and assembled by Davis in a prompt, efficient, skilful and careful manner in accordance with North American industry standards for the manufacture and assembly of similar equipment and in compliance with all applicable laws.

6.    Davis has wrongfully breached and repudiated the Agreement.  Without limitation, the breaches and repudiations of Davis include:
    (a)    Davis has failed to manufacture and assemble the Distributed Products in a prompt, timely and efficient manner and produce Distributed Products to meet Finning's demand for same;
    (b)    Davis has failed to deliver completed Distributed Products belonging to Finning to Finning or to the person, at the location and on the date specified by Finning;
    (c)    Davis has failed to have all Distributed Products manufactured and assembled in a prompt, efficient, skilful and careful manner in accordance with North American industry

- 2 -

Document: 1172180:01

standards for the manufacture and assembly of similar equipment and in compliance with all applicable laws.

7.    Davis has, without justification, delivered to Finning a purported Notice of Default stating that, unless Finning cures the certain alleged "defaults" the Agreement will be terminated within 30 days, and has otherwise clearly evinced his intention to bring the Agreement to an end and not to perform his obligations thereunder.

8.    The Agreement provides that any breach by Davis of any covenant representation or warranty made by him under the Agreement, or any failure of Davis to perform any of his obligations under the Agreement or related Security Documents, is an Event of Default. The Agreement further provides that if Davis commits an event of default and fails to cure such event of default within 30 Business Days of Finning delivering notice of same to Davis, Finning may do any or all of the following:

    (a)    Terminate the Agreement forthwith in its entirety without prejudice to any rights it may have against Davis arising prior to termination;

    (b)    Declare the outstanding balance of the Facility Loan to be immediately due and payable by Davis and exercise any and all rights Finning may have at law, in equity or pursuant to the Agreement or the Security Documents; and

    (c)    Take possession of the "Facility", "Technology", "Major Components", "Minor Components" and Distributed Products (all as defined in the Agreement) and conduct manufacturing and assembly of the "Distributed Products" itself.

9.    The Agreement further provides that the rights and remedies provided thereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

10.    By virtue of the breaches and repudiation of the Agreement, on August 11, 2003 Finning delivered a Notice of Default to Davis. Finning has not yet made an election to terminate the Agreement or to accept Davis' repudiation of the Agreement.

11.    As a result of Davis' breaches of the contract and his wrongful repudiation thereof, Finning has suffered and will continue to suffer loss, damages and expense.

## RELIEF OR REMEDY SOUGHT AND AMOUNT CLAIMED:

12.    Finning claims against Davis for an Award:

    (a)    Declaring that Davis has wrongfully breached and repudiated the Agreement; and

- 3 -

Document: 1172180:01

(b)     Directing Davis to deliver all completed Distributed Products to Finning in accordance with the Agreement;

(c)     Requiring Davis to account to Finning for all monies received by Davis from Finning under the Agreement and all expenses purported to be incurred by Davis for reimbursement by Finning under the Agreement;

(d)     Should Davis fail to cure his defaults under the Agreement within 30 Business Days of Finning's Notice of Default, and should Finning thereafter elect to seek such remedy:

     (i)     Declaring that the Agreement is terminated in its entirety without prejudice to any rights Finning may have against Davis arising prior to termination; and, or alternatively,

     (ii)     Declaring that the outstanding balance of the Facility Loan is due and payable by Davis and directing Davis to pay to Finning the full outstanding balance of the Facility Loan, and interest; and, or alternatively,

     (iii)     Declaring that Finning is entitled to take possession of the "Facility, Technology, Major Components, Minor Components and Distributed Products" and to conduct manufacturing and assembly of the Distributed Product itself, and order Davis to deliver up possession to Finning accordingly, and to take such other steps as may reasonably be required to that end;

(e)     Further, or alternatively, such interim measures of protection as may be appropriate and such further or other awards as may be appropriate.

13.     The amount claimed by Finning against Davis is US$10 million.


**OTHER MATTERS:**


14.     Attached to and forming part of this notice of arbitration is a true copy of the Agreement, Article 14.1 of which is the agreement of Finning and Davis to arbitrate any dispute or controversy arising out of or in connection with the Agreement or its performance. The Agreement requires that disputes be resolved by a single arbitrator and that the place of arbitration will be Houston, Texas.

       Davis is hereby notified that copies of the arbitration agreement and this demand are being filed with the American Arbitration Association at its Houston, Texas case management centre with a request that it commence administration of the arbitration. Under the Rules, you may file an answering statement within the time frame specified in the Rules, after notice from the administrator.

- 4 -

DATED at the City of Vancouver, British Columbia, this ___16___ day of September, 2003.

_____
Gerald W. Ghikas, Q.C.
Canadian Counsel and Representative
for the Claimant, Finning International Inc.

- 5 -

**I C**
**D R** International Centre
for Dispute Resolution

⸻ ⸻ ⸻ *Vice President*

1633 Broadway  Floor 10  New York, NY  10019-6708
Tel  212 484.4181   Fax: 212 246.7274   www.icdr.org

September 23, 2003

<u>VIA FEDERAL EXPRESS</u>

Mark S. Finkelstein, Esq.
Shannon, Martin, Finkelstein & Sayre
2400 Two Houston Center
909 Fannin Street
Houston, TX  77010

Gerald W. Ghikas, Q.C.
1200 Waterfront Centre
200 Burrard Street, P.O. Box 48600
Vancouver, B.C. V7X 1T2

Dennis Sanchez, Esq.
Sanchez Whittington, Janis & Zabarte, LLP
100 N. Expressway 83
Bronxville, TX  78521-2284

Alton W. Payne
5001 Bissonnet, Suite 200
Bellaire, TX  77401

Re: 50 T 181 00451 03
     Finning International Inc.
     vs
     Daniel E. Davis

Dear Parties:

This will acknowledge receipt by the International Centre for Dispute Resolution on September 22, 2003 from Claimant of a Demand for Arbitration dated September 16, 2003 of a controversy arising out of a contract between the above-captioned parties, containing a clause providing for administration by this Association. We understand that a copy was sent to Respondent. A copy of our International Arbitration Rules is enclosed.

Pursuant to Article 3, within thirty days of the date of this letter, a Respondent shall file a statement of defense in writing with the Claimant and this Association. If Respondent wishes to counterclaim, file three copies of same with the appropriate administrative fee and send a copy directly to Claimant.

Claimant has requested that the hearing be held in **Houston, Texas, USA**. Please review Article 13 of the Rules regarding the locale of hearings.

This will also serve to confirm your participation in an Administrative Conference Call on **October 1, 2003 at 3:00pm EDT, New York**. The purpose of this call is to address matters that will assist the Association in administering your case as efficiently and expeditiously as possible. The Association has found that such calls greatly improve the administrative process. Please be prepared to discuss the following items.

Whether mediation or other methods of dispute resolution might be appropriate.

**EXHIBIT**

**D**

As an option for resolution of this dispute, we propose mediation, as outlined in the enclosed Commercial Mediation Rules. It is our experience that mediation is expeditious, cost saving and highly successful. No additional administrative fee will be required for this process in the event the Parties desire to first attempt to mediate this dispute. Please note that the process is non-binding and the Parties must consent to these procedures.

Please provide a brief description of the case, the specification of the claims and the anticipated length of hearing.

Briefly comment on what type of arbitrator expertise you believe would be most valuable for this type of dispute and to discuss the number of arbitrators for this matter and the method of their appointment.

Parties are advised to consider the information to be exchanged during the arbitral proceedings. Please note that at this stage all discovery will be voluntary and any difficulties that may arise will be decided by the arbitrator(s) once appointed.

Parties are also encouraged to prepare a stipulation for uncontested facts, which will be reviewed by the arbitrator(s) again, once appointed.

Please limit your discussions to the administrative process. Any discussions regarding issues of arbitrability or the merits of the dispute should be reserved for the arbitrator(s). Once appointed we will schedule the preliminary hearing where all substantive matters will be brought to the attention of the arbitrator(s). It should be noted that failure to participate in the arbitral proceedings will not prevent the arbitrator(s) from issuing an arbitration award that may be enforced pursuant to the New York Convention.

The call will be initiated by our office on that date. If the Parties are not able to participate on the scheduled date of the call, we kindly request that the parties mutually agree on an alternate date and advise the undersigned so that the call may be scheduled accordingly.

The Association encloses herewith to each Party a form entitled 'Checklist for Conflicts' and requests that each Party fill out the document with the required information and return it to this office by **October 23, 2003**. It will be treated as confidential information, and not required to be exchanged by the Parties, unless the Parties agree otherwise. This is only a preliminary list to identify potential witnesses and for the arbitrator to perform a conflict's check. It will not commit the Parties at this point.

This matter is now being administered by the International Centre for Dispute Resolution of the American Arbitration Association in New York City, and has been assigned to **Tom Simotas (212-484-4086)**. Please address all future correspondence to him. In the event I can be of assistance throughout the administration of this matter and to respond to any questions or issues that may arise, regarding the administrative process, please feel free to contact me directly. My contact information is set forth below. Please note that all our case administrators are supervised by multilingual attorneys trained in international arbitration and mediation. We look forward to working with you and to providing you with assistance during your participation in the arbitral process.

Thank you for selecting the International Centre for Dispute Resolution, a leader in worldwide alternative dispute resolution.

Sincerely,

Michael Namias
ICDR Team Leader
International Centre for Dispute Resolution
212-484-4170
Namiasm@adr.org

## SCHEDULE B

### Technology

**CONFIDENTIAL**
**PATENT AND PATENT APPLICATIONS:**

U.S. Patent No. 6,003,252 issued to Daniel E. Davis.

Patent Application entitled Piplayer-Crane- Apparatus and Method.

Patent Application entitled Telehandler-Crane- Apparatus.

Patent Application entitled Universal Excavator Boom Attachment and Method.

Additional patent applications are to be filed.

**CONFIDENTIAL**
**DESIGN AND MANUFACTURING DRAWINGS:**

**9 TON TELEHANDLER DRAWINGS:**
303 drawings bearing drawing numbers 9-2-001 to 9-6-002.
General Arrangement    9T GA

**28 TON CRANE DRAWINGS:**
301 drawings bearing drawing numbers 28-2-001 to 28-6-009 and 5002668.001 to 5002669-023.

| | |
|---|---|
| General Arrangement | 28T GA |
| Adaptor Weldment | Bill of Material #28-5-001 |
| Manitex | Bill of Material #6000740.023 |
| Braden | Bill of Material #PD12C  (General Dimensions) |

**CIPI Group Numbers:**

| | |
|---|---|
| - 9Q5972 | Upper Structure  Bill of Material |
| - 1176346 | Optional  Third pedal |
| - 1263784 | Optional  Guard |
| - 1204955 | Optional  Guard |
| - 1263799 | Optional  High Ambient Cooling |
| - 1114696 | Optional  Travel alarm |
| - 152 8744 | VG Lower Bill of Material |

- 22 -



EXHIBIT
**E**



(FT-10/2000)

# EXHIBIT "A"

A tract of land containing 4.94 acres, out of Lot 1, Block 1, TEXAS PIPE BENDING SUBDIVISION, City of Harlingen, Cameron County, Texas, according to the Map recorded in Cabinet 1, Slots 384-A and 384-B, Map Records of Cameron County, Texas, and said 4.94 acre tract being more particularly located and described as follows:

COMMENCING at the Southwest corner of said Lot 1, Block 1, TEXAS PIPE BENDING SUBDIVISION;

THENCE, South 89 degrees 48 minutes 00 seconds West, a distance of 340.58 feet;

THENCE, North 00 degrees 12 minutes 00 seconds West, a distance of 25.43 feet to a ½ inch iron pin set on the North Right-of-Way line of F.M. 106 (Harrison Street) same being the Southwest corner of the tract herein described;

THENCE, North 00 degrees 12 minutes 00 seconds West, a distance of 1059.97 feet to a ½ inch iron pin set for the Northwest corner of this tract;

THENCE, North 89 degrees 48 minutes 00 seconds East, a distance of 237.28 feet to a ½ inch iron pin set for the Northeast corner of this tract;

THENCE, South 00 degrees 12 minutes 00 seconds East, a distance of 260.14 feet to a ½ inch iron pin set for an outside corner of this tract;

THENCE, South 89 degrees 48 minutes 00 seconds West, a distance of 45.56 feet to a ½ inch iron pin set for an inside corner of this tract;

THENCE, South 00 degrees 12 minutes 00 seconds East, a distance of 800.22 feet to a ½ inch iron pin set for the Southeast corner of this tract;

THENCE, South 89 degrees 55 minutes 00 seconds West, along said North Right-of-Way line of F.M. 106 (Harrison Street), a distance of 191.71 feet to the POINT OF BEGINNING, Containing 4.94 acres of land more or less, inclusive of any and all easements, restrictions, exceptions or dedications that might be of record.

NOTE: THIS COMPANY DOES NOT REPRESENT THAT THE ACREAGE AND/OR SQUARE FOOTAGE CALCULATIONS ARE CORRECT.

Any and all property and equipment located on the real property identified on the prior page, including but not limited to:

**30T Crawler Crane**
C20-30   DavCrane Serial No. 3000 - Cat Serial No.OEM00484 - Finning Stock No. 500001

**40T Crawler Crane**
C25-40 - DavCrane Serial No. 4001 - Cat Serial No.OEM00483 - Finning Stock No. 500003
C25-40 - DavCrane Serial No. 4002 - Cat Serial No.OEM00508 - Finning Stock No. 500004
C25-40 - DavCrane Serial No. 4003 - Cat Serial No.OEM00509 - Finning Stock No. 500005

**9T Rough Terrain Industrial Crane**
TH62 - DavCrane Serial No. 9004 - Cat Serial No.4TM04482 - Finning Stock No. 500006
TH62 - DavCrane Serial No. 9005 - Cat Serial No.4TM04477 - Finning Stock No. 500007

TH63 - DavCrane Serial No. 9001 - Cat Serial No.5WM02242 - Finning Stock No. 500009
TH63 - DavCrane Serial No. 9002 - Cat Serial No.5WM02799 - Finning Stock No. 500013
TH63 - DavCrane Serial No. 9003 - Cat Serial No.5WM03084 - Finning Stock No. 500014

# EXHIBIT 3

United States District Court
Southern District of Texas
FILED

NOV - 7 2003

Michael N. Milby
Clerk of Court

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | |
|---|---|
| DANIEL E. DAVIS AND DAVCRANE, INC. § | |
| VS. § | CIVIL ACTION |
| § | |
| FINNING INTERNATIONAL INC. § | NO. B-03- 206 |

### PLAINTIFFS' PETITION FOR TEMPORARY INJUNCTION
### AND ORGINAL COMPLAINT

COME NOW, Daniel E. Davis and DavCrane, Inc., hereinafter referred to as

Plaintiffs complaining of the Defendant Finning International, Inc. hereinafter also

referred to as Defendant, and for cause of action would respectfully show this Court the

following:

### I.

### PARTIES

1.1     Plaintiffs are residents of Cameron County, Texas and are citizens of the

State of Texas.

1.2     Defendant Finning International, Inc . is a foreign corporation

incorporated under the laws of Canada, doing business in the United States Southern

District of the State of Texas and deriving substantial profits from its business in the

U.S. Southern District in the State of Texas.  Finning International, Inc. may be served

with process by serving Mr. Mel Ternan at 16830 – 107th Avenue, Edmonton, Alberto,

T5 4C3 Canada, fax number  (780) 930-4891 or Mr. John T. Struthers, Corporate

Secretary at Finning International, Inc., Suite 1000, Park Place, 666 Burred Street,

Vancouver, British Columbia  V6C2X8, fax number (604) 331-4887.  Additionally,

defendant Finning International, Inc. maintains Texas counsel, Mr. Mark S. Finkelstein,

1

EXHIBIT
3

Shannon, Martin, Finkelstein & Sayre, P.C., 2400 Two Houston Center, 909 Fannin Street, Houston, Texas 77010. His telephone number is (713) 646-5503 and fax number is (713) 752-0337. Citation will also be issued as to defendant through their counsel and served as well as an immediate courtesy copy of this petition and complaint so that defendant may receive any notice regarding the hearing on temporary injunction.

## II.

## JURISDICTION AND VENUE

2.1     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a), because this action, has an amount in controversy in excess of $75,000 and is between citizens of different states.

2.2     This Court has personal jurisdiction over Finning International, Inc. because they do business in the United States Southern District of Texas, including business with Daniel E. Davis and DavCrane, Inc. which is located in Harlingen, Texas, and have sufficient contacts with the U.S. Southern District of Texas, both generally and with regard to this specific action, so that the exercise of personal jurisdiction over them is proper.

2.3     This is a proper venue, pursuant to 28 U.S.C. § 1391(a), because it is the District in which a substantial part of the events or omissions giving rise to the claim occurred in that the events happened in Cameron County, Texas which is within the Southern District of Texas, Brownsville Division.

## III.

## TEMPORARY INJUNCTION

3.1     Daniel E. Davis and DavCrane Inc. are in the business of designing, developing and manufacturing telehandler all-terrain cranes, lattice and telescopic boom crawler cranes, excavator based pipe layers and their related equipment, and

2

have designed, developed and manufactured the cranes and pipelayers. Defendant

Finning International, Inc. has bound itself to pay the overhead for such

manufacturing operations, along with other responsibilities. Daniel E. Davis is in

possession of four units of its manufactured heavy equipment which are located in

Harlingen, Texas. Those machines are manufactured and are ready for sale. These

machines are manufactured on a no profit basis by Plaintiffs. Because of defendant

Finning's ongoing refusal to pay the continuing overhead for the continued

manufacture of the heavy equipment machines, it is necessary that those machines in

inventory be immediately sold and the sale proceeds put back into the manufacturing

operations so as to prevent the manufacturing operations from failing to meet its

ongoing overhead and financial obligations. Further, Daniel E. Davis is in possession of

five all-terrain crane units that are partially complete. The five all-terrain cranes vary in

completion from 75% to 95%. But Daniel E. Davis and DavCrane, Inc. cannot complete

the units because of defendant Finning's ongoing refusal to pay the continuing

overhead.

     3.2    Daniel E. Davis and DavCrane, Inc. will suffer irreparable harm if

defendant Finning International, Inc. is not enjoined during the pendency of this

lawsuit from interfering with the reasonable sale of the existing inventory with the

proceeds of such sale to be returned to the manufacturing operations. Because Finning

International, Inc. has failed to continue paying the overhead of the manufacturing

operations, injury is ongoing and eminent in affecting the manufacturing plant from

meeting its overhead and financial obligations. A failure to meet such financial

obligations and ongoing overhead expense will cause irreparable harm to Davis and

DavCrane, Inc. and probably lead to its insolvency. Absent the granting of a temporary

injunction by this court, there is no adequate remedy at law to protect Daniel E. Davis

3

and DavCrane, Inc. in the manufacturing operations and thus, the temporary injunction order sought is both necessary and equitable.

3.3     There is a substantial likelihood that plaintiffs will prevail on the merits because the defendant has caused torts to be committed against Daniel E. Davis and DavCrane, Inc. as well as breaches of terms of the contract existing between Daniel E. Davis and Finning International, Inc..

3.4     The harm faced by Daniel E. Davis and DavCrane, Inc. outweighs the harm that would be sustained by Finning International, Inc. if the preliminary injunction were granted allowing the sale of the now existing inventory.  Daniel E. Davis and DavCrane, Inc.  will submit a full and detailed accounting of such sales to Finning International, Inc. and if appropriate to this court, within ten (10) business days of the sale.  Additionally, the proceeds of the sale of the inventory will only be used to meet the continuing overhead and debt service of the manufacturing operations during the pendency of the injunction.

3.5     Issuance of a preliminary injunction would not adversely affect public interest and public policy because such an injunction prohibiting interference with sale of the now existing inventory would allow the manufacturing facility to maintain its payroll and keep people employed, when it is in fact the acts of the Defendant Finning International, Inc. in tort and in breach of contract that have put this business operation in immediate irreparable risk of harm.   Injunctive relief is sought so that justice may be done and to preserve the status quo both in the interim and after final trial; injunctive relief is not sought to injure Finning International, Inc.

3.6     Daniel E. Davis and DavCrane Co., Inc. is willing to post a bond that is appropriate as to the value of such inventory to be sold, with the conditions set out by

WATTS LAW FIRM

11/10/03 MON 13:17 FAX 956 542 0255

Ø016

the court for the immediate and proper accounting for any sale of the deemed inventory.

3.7 Plaintiffs ask the court to set their application for preliminary injunction for hearing at the earliest possible time and, after hearing the request, issue a preliminary injunction against defendant Finning International, Inc.

3.8 Plaintiffs Daniel E. Davis and DavCrane Co., Inc. additionally seek the temporary injunction order from this Honorable Court prohibiting Finning International, Inc. from:

1. Threatening to interfere with Plaintiffs' sale of the now existing inventory;

2. Instituting any action in this or any other county or court attempting to obtain temporary or permanent order(s) concerning this litigation;

3. Molesting or disturbing the peace of the plaintiffs by continuing to attempt to prevent Daniel E. Davis and DavCrane, Inc. from selling at reasonable prices the now existing inventory;

4. Engaging in unreasonable or unnecessary acts intending to interfere with the reasonable sale of the now existing inventory; and,

5. Doing anything calculated to embarrass, harass, molest, and/or injure plaintiffs' rights or humiliate plaintiffs.

## TORT CLAIMS

## IV.

### Statutory Fraud

4.1 Daniel E. Davis, DavCrane, Inc. and Finning International, Inc. entered into a Letter of Intent dated June 18, 2002, regarding the grant by Daniel E. Davis to Finning International, Inc. of exclusive distribution rights to certain products known as telehandler all-terrain cranes, lattice and telescopic boom crawler cranes, excavator

5

based pipe layers and their related equipment using Davis' property and proprietary know-how, including any patents, patent applications, drawings (including assembly drawings), copyrights and other intellectual property rights. Attached hereto as Exhibit 1 is the Letter of Intent.   In such Letter of Intent the defendant Finning International, Inc. made false representations and/or promises for the purpose of inducing plaintiff Daniel E. Davis and DavCrane, Inc. to enter into a contract.   Defendant Finning International, Inc. intended that Daniel E. Davis and/or DavCrane, Inc. would rely on the false representations contained in the Letter of Intent.

4.2     Such misrepresentations included but were not limited to, that Finning International, Inc. was to use its best efforts and exclusively market and sell worldwide the products described above. Additionally, Finning International, Inc. misrepresented that it would pay all overhead costs to the plaintiffs Daniel E. Davis and/or DavCrane, Inc. for the manufacturing facility of the above-described products. The Defendant either intended or had reason to expect that the plaintiffs would enter into a contract in reliance on the above-described misrepresentations. In fact, plaintiffs reasonably relied upon defendant Finning's false representations and/or promises by entering into a contract with Finning dated July 15, 2002.

4.3     Such statutory fraud in the inducement is violative of Texas Business and Commerce Code Section 27.01 (a)(1)(A) and (B), (a)(2)(C) and (D).   These false representations and/or promises caused plaintiffs injuries and plaintiff sues for his actual damages as a result of such false representations and/or promises inducing plaintiffs to enter into the contract.  Such actual damages are permitted pursuant to Texas Business and Commerce Code Section 27.01 (b).

4.4     Additionally, plaintiffs seek exemplary damages from Defendant Fininning International, Inc. who made such false representation and/or promises

6

because of defendant's actual awareness of the falsity of such representations and/or promises. In that regard, plaintiff would show that defendant Finining International, Inc. had actual awareness not only in knowing what it was doing but knowing that it was doing things that were false, deceptive, and/or unfair and deciding to proceed with such false representations and/or promises. Plaintiff would show by clear and convincing evidence that defendant Finning International, Inc.'s objective manifestations show that it acted with actual awareness all in violation of Texas Business and Commerce Code Section 27.01 (c).

## V.

### Common law Fraud

5.1     Plaintiff Daniel E. Davis and DavCrane, Inc. additionally plead common law fraud, in that defendant Finning International, Inc. made fraudulent misrepresentations that Finning International, Inc. intended for the plaintiffs to rely on such misrepresentations. Defendant Finning International, Inc. either intended or had reason to expect that the plaintiffs would act or refrain from acting in reliance of those representations. The defendant Finning International Inc. desired to cause the consequences of its acts to be that Davis would be excluded from participating in the profitability of its property or property rights as they were incorporated into the manufacture of heavy equipment for sale to the public. Alternatively, defendant Finning International, Inc. believed that the above described consequences were substantially certain to result from its fraudulent misrepresentations. More specifically, the defendant Finning International, Inc. had information from which a reasonable person would conclude the results described above would follow.

5.2     As expected the plaintiffs Daniel E. Davis and DavCrane, Inc. relied on the false representations to their detriment. Plaintiff would show that their reliance was

7

both actual and justifiable. Based upon the representations of the defendant, plaintiffs acted on such representations because they believed such false representations and acted upon it by entering into a contract dated July 15, 2002, as hereinafter referred to. Plaintiff would further show that they in their experience as business people acted as reasonable business people and would reasonably enter into such contractual agreement.

5.3    However, such misrepresentations as described above changed plaintiffs' position for the worse and caused them injury. As such it was reasonably foreseeable by defendants that plaintiffs would suffer direct damages as a result of the defendant's wrongful acts and such is presumed by the law.    Additionally, plaintiffs seek consequential damages and would show that the fraud perpetrated upon plaintiffs proximately caused its damages. Additionally plaintiffs would show that the fraud by defendant was a substantial factor in bringing about such damages, without which the damages would not have occurred, and that such was reasonably foreseeable to defendant as an entity of ordinary intelligence would have foreseen that the damages might result from their fraud.

5.4    Additionally plaintiff Daniel E. Davis sues for the mental anguish damages occasioned by such fraud by the defendants. Plaintiffs also seek to recover exemplary damages and would prove such right by clear and convincing evidence.

## VI.

## TORTIOUS INTERFERENCE WITH EXISTING CONTRACT

6.1    Plaintiff Daniel E. Davis and DavCrane, Inc. would show that they had valid existing contracts for the sale of the products described above and that defendant Finning International Inc. willfully and intentionally interfered with such contracts. As a result of such interference by such defendant, plaintiffs were caused to suffer injury

and incurred actual damages and/or losses. Plaintiff would show that the defendant Finning International, Inc. either had actual knowledge of the contracts and of the plaintiffs' interest in them or, had knowledge of such facts and circumstances that would lead a reasonable person to believe that there were contracts in which the plaintiffs had an interest. Plaintiff would further show that defendant Finning International, Inc. tortiously interfered with such contracts and that such acts were intentional in that the defendant wanted to cause the consequences of Davis losing its ability to manufacture for sale and to market its designs, patents and/or property rights and/or that the defendant knew that such consequences were substantially certain to result from the defendant's tortious acts.

6.2     The plaintiffs would show that the defendant Finning International, Inc.'s conduct constitutes a knowing inducement and/or hinderance. The defendant Finning International, Inc.'s tortious interference was occasioned by the defendant occasioning interference with the plaintiffs' performance of its contract either by preventing the performance or making plaintiffs' performance impossible or more burdensome, difficult, or expensive.

6.3     Such tortious interference by defendants caused plaintiffs actual damage and/or loss and as such Defendant Finning International, Inc. is liable for the pecuniary loss of the contracts tortiously interfered with, and as such the plaintiff is entitled to be placed in the same economic position the plaintiffs would have been in, had the contracts not been breached by defendant's tortious interference. Additionally plaintiffs seek to recover those damages including mental anguish, injury to reputation, as well as any lost profits.

## VII.

### TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTS

9

7.1    Plaintiffs would show that there was a reasonable probability that they would have entered into other business relationships with third persons and that the defendant intentionally interfered with such relationship. Such conduct by defendant Finning International, Inc. is independently tortious and/or unlawful which proximately caused injury to the plaintiffs in that they suffered actual damages and/or losses.

7.2    Plaintiff would show that they had business relations that had not been reduced to contracts and/or continuing business relations that were not yet formalized by written contracts. It was reasonably probable considering all the facts and circumstances relating to these prospective contracts to have been made but for the tortious interference of the defendant Finning International, Inc.

7.3    Such acts by defendants intentionally interfered with the prospective contracts with plaintiffs in that defendant Finning International, Inc. desired to bring about the interference and/or it knew that its interference was certain or substantially certain to occur as a result of its misconduct. As such, the tortious interference by defendant with the prospective contracts have caused plaintiffs to suffer actual damages and/or losses including but not limited to damages for lost benefits of the contracts; damages for personal injury including mental anguish and injury to reputation; and plaintiffs lost profits.

## VIII.

## CIVIL CONSPIRACY

8.1    The plaintiffs would show that the defendant Finning International, Inc. has engaged in a civil conspiracy to affect plaintiffs rights as well as rights of others similarly situated. Defendant Finning International, Inc. as well as other manufacturers of heavy equipment, have large and valuable inventories of heavy equipment that

10

would become obsolete or greatly diminish in value should plaintiff Daniel E. Davis and/or DavCrane, Inc. patent, design and/or intellectual property continue to be successfully produced.  In essence, plaintiffs' designs and patents as well as its intellectual property, allowed the use of one power plant for heavy equipment to do the functions of two separate pieces of heavy equipment.  This efficiency and economies of scale were realized by defendant and others, and as such, defendant Finning International, Inc. conspired with others to thwart the introduction of these new designs, patents and intellectual property by committing fraudulent acts and misrepresentations inducing plaintiff Daniel E. Davis and DavCrane, Inc. to enter into contract.  The defendant Finning International, Inc. knew that the continued production of the successful designs were dependent upon them providing the overhead cost for production.  Finning International Inc. in furtherance of this conspiracy withdrew its continued provision of overhead cost for production so as to prevent Plaintiffs' designs, patents and/or intellectual property from entering the market successfully, to the benefit of Finning International Inc. and others by preserving their market share and a profitability of their existing products.

8.2    Additionally, plaintiffs would show that in fact the models now being produced by defendant Finning International Inc. and others, which would become obsolete and/or greatly diminished in value should plaintiffs Daniel E. Davis and DavCrane, Inc.'s designs, patents and intellectual property continue in production, failed to meet the industry standards for safety.  On the other hand, the current designs, patents and/or intellectual property of Daniel E. Davis and DavCrane, Inc. have met and exceeded the industry standards for safety.  The civil conspiracy between Finning International, Inc. and others is intentionally preventing the implementation and use of

11

heavy equipment that meets industry safety standards which works for the good and benefit of all those using such machines and to the public in general.

8.3     The Plaintiffs would show that the heavy equipment industry has a history of resisting proposed safety standards and effectively utilizing the political process and their economic power to minimize the resulting economic cost that adoption of realistic minimum safety standards would naturally entail.

8.4     Profit has had priority over safety during the heavy equipment industry's years of operation. The priority has been reflected by the deliberate pattern of conduct by the Defendant for many years.

8.5     The Defendant's lack of safety is the direct result of a conspiracy by said heavy equipment companies to control the adoption of the minimum regulatory standards and to act in concert to restrict, delay, or defeat proposals for stronger standards that provide the public safe use of heavy equipment to enhance survivability and insure reduction of catastrophic injuries and death to the public.

8.6     Said covert and overt conspiracy is and has been manifested by, but is not limited to, some of the following particulars:

(a)     Organizing and actively joint venturing in seizing and maintaining control over the industry trade organizations by various methods including control of grants and other influencing acts.

(b)     Actively influencing the Regulatory Agencies by asserting political pressure on elected, appointed or employed officials to achieve the conspiratorial goals.

(c)     By acting in concert with other heavy equipment companies to ensure appointment of sympathetic political appointees to the regulatory

12

agencies charged with adopting minimum safety standards related to proper use of heavy equipment.

(d)     In recruiting and employing members of Regulatory Agencies to assist in the goal of obstruction and opposing adoption of new and more stringent standards, or to delay the adoption of such standards, and/or minimize any meaningful changes to existing standards.

(e)     By having trade organizations they control act in concert with said defendant company and others whether covertly or overtly, in recommending and submitting to the regulatory agencies reasons for delay for adopting new standards, for changes, modifications or adoptions of existing minimum standards.

(f)     By actively delaying, obstructing, and opposing litigation discovery efforts by victims who have been injured as a result of the dangerous conditions who seek redress in the courts. This has been virtually universal to all heavy equipment cases in litigation for a number of years. These tactics frustrate the process of discovery, make the cost of litigation prohibitive, and furthers the aims and economic objectives of the conspirators.

(g)     Concealing from their own employees, the public, from injured persons, and from governmental entities information regarding accidents all in violation of their common law duty to act with reasonable care.

(h)     Concealment of several thousand pages of evaluation, statistics, information, and documents regarding the lack of safety of heavy equipment.

(i)     Engaging in advertising, informational and propaganda programs which expressly and by implication misrepresent that their heavy equipment is safe and not deadly.

13

8.7    The conspiracy (among otherwise vigorous competitors) was predicated solely on economic self-interest whereon profit was a priority over safety to the public. The actions of the conspirators, including the Defendant herein, has been successful in influencing the standards adopted, as well as delaying adoption of standards addressing Defendant's own knowledge of long standing known deficiencies and dangerous conditions constituting unnecessary hazardous risks to the public.

8.8    Such conspiracy was a proximate cause of the injuries to Daniel E. Davis and DavCrane, Inc. and of the damages suffered by Plaintiffs.

## IX.

### Willful Acts or Omissions, Gross Neglect, and Malice

9.1    Finning International, Inc. committed willful acts or omissions, gross neglect, fraud, and/or malice, which were a proximate cause of injuries to Plaintiffs and the damages of Plaintiffs, and for which Plaintiffs are entitled to recover punitive damages, pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code.

## X.

### OUTRAGE

10.1    The conduct of defendants and their agents, set out above, were carried out wilfully, maliciously, oppressively, and constituted such an entire want of care as to constitute a conscious indifference to the rights or welfare of these plaintiffs. Such conduct was outrageous as defined by Texas common law, and Plaintiffs are hereby entitled to recover exemplary damages to deter such cruel and undignified procedures by the defendants and defendant's agents in the future. In this connection, Plaintiffs will show that their treatment by the defendant caused their suffering of immeasurable dimensions.

14

10.2   The total want of care and the utter disregard of duty, while the Defendant knew of its intentional, fraudulent, misrepresentative, tortious and/or conspiratorial acts exhibits and reflects a total want of care, and a conscious and willful indifference to Daniel E. Davis, DavCrane, Inc. and others similarly situated.  The nature, scope and extent of the operation of Defendant Finning International, Inc. and others manufacturers, exporters, importers, distributors, sellers, and deliverers of heavy equipment require a significant award of punitive and/or exemplary damages if said Defendant Finning International, Inc. and other similarly entities are to take heed and be influenced by said award, to conduct their business with due regard and concern.

10.3   Even though, previous litigation of claims against manufacturers, exporters, importers, distributors, sellers and/or deliverers of heavy equipment have resulted in the awarding of tens of millions of dollars in punitive and/or exemplary damages for such intentional, fraudulent, misrepresentative, tortious and/or conspiratorial acts, such manufacturers, exporters, importers, distributors, sellers, and/or deliverers continue to ignore the safety of humans and such companies continue to place profits over the lives of people.  Thus even greater sums must be assessed against this Defendant to change its conscious indifference in promoting and persisting to conduct themselves in such an intentional, fraudulent, misrepresentative, tortious and/or conspiratorial manner.

10.4   Accordingly, plaintiffs request that exemplary damages be awarded against the defendant in amounts which exceed the minimum jurisdictional requirements of this Court, and asks the jury to consider the following facts in awarding exemplary damages:   awarding damages for punishment of the defendants; to compensate for inconvenience, to compensate for attorney's fees; for expenses of litigation; and, to serve as an example to others.

15

# XI.

## CONTRACTUAL CLAIMS

11.1    The parties entered into a contract on July 15, 2002, attached hereto as Exhibit 2.    The contract described the parties as follows:    "DANIEL E. DAVIS businessperson having an address at P. O. Box 2427, Harlingen, Texas 78551, USA ("Davis") and FINNING INTERNATIONAL, INC. a corporation incorporated under the laws of Canada, having an address at 16830 - 107th Avenue, Edmonton, Alberta, T5P 4C3, Canada ("Finning")."  The parties admitted that Davis had developed and owns all of the property and proprietary know-how, including any patents, patent applications, drawings (including assembly drawings), copyrights and other intellectual property rights used by Davis in relation to the special assembly of the telehandler all-terrain cranes, lattice and telescopic boom crawler cranes, excavator based pipelayers and their related equipment.   Defendant Finning International, Inc. admitted it, either directly or indirectly through its affiliates and subsidiaries, has the infrastructure to sell and distribute the products worldwide manufactured and assembled as described above.

11.2    The parties admitted that there was mutual consideration for the contract and therefore all conditions precedent have been met.   The parties also agreed that the contract shall be governed and interpreted with the laws in force within the State of Texas. The contract provided for a minimum term of ten (10) years with the possibility of renewals.  Relevant portions of the contract required Plaintiffs Daniel E. Davis and DavCrane, Inc. to obtain and/or build a facility and manufacture and assemble the above described heavy equipment products to meet the demand of the parties.  The manufactured product demand was set out as 92 separate produced units annually such terms were contained in and referred to as Schedule A to the contract.

16

11.3    Because of its position, as the world's largest Caterpillar distributor, defendant Finning International, Inc. was required to provide all the major components for the manufactured products. Additionally, the defendant Finning International, Inc. was to provide amongst other things, all overhead costs for the production of the equipment, marketing and distribution. During the year of 2002, Defendant Finning International, Inc. fully paid the overhead production costs. However, Defendant Finning International, Inc. breached the contract by withholding during the year of 2003 such overhead production costs to the extent that plaintiff Daniel E. Davis and DavCrane, Inc. can no longer continue production. However, there are four completed units ready for sale at this time.

11.4    In addition to the pre-contract fraudulent, intentional, misrepresentative, tortious and conspiratorial acts of defendant Finning International Inc preceding and inducing plaintiffs' entry into the above-described contract, defendants breached the terms of the contract and have caused additional damages to plaintiffs as to the value of the contract between the parties itself. Those breaches include but are not limited to failing to pay the overhead cost and failing to use its best and/or reasonable efforts to distribute and promote the new heavy equipment products worldwide.

11.5    The damages include the overhead cost of the initial ten year term, marketing promotion, and  distribution cost of the product over such term, as well as, any contracted for profit sharing, royalties, and commissions.

## XII.

## PUNITIVE DAMAGES

12.1    Because Defendant is guilty of gross neglect and malice, said Defendant should have punitive damages assessed against it in an amount deemed appropriate by the jury.

17

## XIII.

### PRE-JUDGMENT AND POST-JUDGMENT INTEREST

13.1    Plaintiffs seek pre-judgment and post-judgment interest as provided by law.

## XIV.

### CONSTITUTIONAL ALLEGATIONS

14.1    Plaintiffs alleges that the provision within Section 41.008(b) of the Texas Civil Practice and Remedies Code limiting the amount of exemplary damages assessed against a defendant to two times the amount of economic damages plus an amount equal to any non-economic damages found by the jury, not to exceed $750,000, or $200,000, whichever is greater, is unconstitutional, as it is in violation of (1) Section One of the Fourteenth Amendment of the Constitution of the United States, which guarantees due process and equal protection of the laws; (2) Article I, Section 3 of the Texas Constitution, which guarantees equal protection of the laws; (3) Article I, Section 13 of the Texas Constitution, which guarantees access to open courts for every person for an injury done him, and that each such person shall have remedy by due course of law; (4) Article I, Section 19 of the Texas Constitution, which guarantees due course of the law; (5) Article II, Section 1 of the Texas Constitution, which prohibits any one of the three branches of government from exercising any power properly attached to either of the others, specifically, prohibiting the legislature from exercising power properly attached to the judiciary; (6) Article III, Section 56 of the Texas Constitution, which prohibits the legislature from passing any local or special law authorizing limitation of civil actions; and (7) Article I, Section 515 and Article V, Section 10 of the Texas Constitution, which guarantee the right to a trial in civil cases.

## XV.

18

## CONDITIONS PRECEDENT

15.1   All conditions precedent to Plaintiffs' right to recover herein and to Defendant's liability have been performed or have occurred.

### XVI.

### JURY DEMAND

16.1   Plaintiffs request a trial by jury.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs request that the Defendant be duly cited in terms of law to appear and answer herein and that upon trial hereof plaintiffs have judgment against said Defendant in an amount in excess of the minimum jurisdictional limits of this court with pre-judgment interest and interest thereof at the legal rate in addition thereto, plaintiffs seek exemplary and/or punitive damages against the defendant together with post judgment interest on said judgment at the highest legal rate until paid, attorneys fees, for costs of court in their behalf expended, and for such other and further relief, special and general, at law and/or in equity, to which they may show themselves justly entitled.

19

Respectfully submitted this the _____ 7 _____ day of November, 2003.

WATTS LAW FIRM, L.L.P.
1926 E. Elizabeth
Brownsville, Texas 78520
(956) 544-0500
(956) 541-0255 FAX


MIKAL C. WATTS
State Bar No. 20981820
Federal I.D. No. 12419

RAY R. MARCHAN
State Bar No. 12969050
Federal I.D. No. 9522
For the Firm


ALTON W. PAYNE
State Bar No. 15649450
Federal I.D. No. 2025
5001 Bissonnet, Suite 200
Bellaire, TX 77401
(713)840-8008
(713)840-8088

Counsel for Plaintiffs *Daniel E. Davis and DavCrane, Inc*

20

## VERIFICATION

STATE OF TEXAS          §
                               §
COUNTY OF CAMERON    §

BEFORE ME, the undersigned Notary Public, on this day personally appeared Daniel B. Davis who, after being by me first duly sworn, deposed and stated that:

"I am the Plaintiff in the above-styled and numbered cause;

I am over the age of 18 years of age and not disqualified by law to make this affidavit.

I have read the foregoing Plaintiff's Petition for Temporary Injunction and Original Complaint; and that the statements contained therein are true and correct to my personal knowledge.

The copy of the documents attached hereto as Exhibit "1" and Exhibit "2" are authentic true and correct copies of the original.

_____
DANIEL E. DAVIS

SUBSCRIBED AND SWORN TO before me this ___7___ day of November, 2003.

_____
Notary Public, State of Texas

YESENIA AGUIRRE
Notary Public, State of Texas
My Commission Expires
February 17, 2004