

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

United States District Court
Southern District of Texas
FILED

FEB 0 2 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| DANIEL E. DAVIS AND | § | |
| DAVCRANE, INC. | § | |
| | § | |
| vs. | § | Civil Action No. H-03-5080 |
| | § | |
| FINNING INTERNATIONAL, INC. | § | |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| DANIEL E. DAVIS AND | § | |
| DAVCRANE, INC. | § | |
| | § | |
| vs. | § | Civil Action No. B-03-206 |
| | § | |
| FINNING INTERNATIONAL, INC. | § | |

**DANIEL E. DAVIS'S AND DAVCRANE, INC.'S**
**RESPONSE TO MOTION TO CONSOLIDATE AND ALTERNATIVE**
**MOTION FOR THE HOUSTON COURT TO STAY ITS PROCEEDINGS**

TO THE HONORABLE JUDGES OF SAID COURTS:

    Daniel E. Davis and Davcrane, Inc. (referred to collectively as "Davis") files this Response to the Motion to Consolidate filed by Finning International, Inc. ("Finning") and alternatively requests the Houston Court stay its proceedings in favor of the Brownsville Court.

**I.**
**BACKGROUND**

    1.1    Finning and Davis entered into a distributorship agreement in July 2002. Under the agreement, Davis assembles machinery and equipment that are then sold on

the market.  Finning has failed and refused to perform under the distributorship agreement, including its failure to pay more than $750,000 required under the agreement, and has committed tortious conduct that has caused Davis to suffer damages.

1.2     Around the beginning of November 2003, Finning knew that Davis was about to file a lawsuit against it.  In what it admits was an anticipatory lawsuit meant to secure venue in the Houston Division of the Southern District of Texas, Finning raced to the courthouse to file suit first.

1.3     On November 5, 2003, Finning filed suit in the Houston Division.  Making itself the Plaintiff in that action, Finning has requested the district court compel arbitration, preserve the property held by Davis, and enforce any arbitration award rendered regarding its breach of the distributorship agreement.  Although Finning has expressed a claim regarding preservation of property (i.e., the equipment that is ready to be sold on the market and could be utilized to fund the operations of the parties), it has not requested an injunction hearing.

1.4     Two days later, on November 7, 2003, not knowing that Finning had filed suit in Houston, Davis filed an action in the Brownsville District Court.  The Brownsville action seeks recovery against Finning for the damages it caused Davis and seeks injunctive relief regarding the ability to sell the machinery and equipment that is ready for sale, so that Davis can use the funds to maintain its going business operations.

1.5     The Brownsville Court held a hearing in December on Davis's request for injunctive relief.  The Court ordered the parties to mediate.  Despite good faith efforts, the mediation was unsuccessful.

1.6     Finning has now moved these Courts to consolidate the two actions under the Houston action.

## II.
### SUMMARY RESPONSE

2.1    Davis agrees with Finning that these two actions should be consolidated. It believes, however, that the appropriate court for consolidation is the Brownsville District Court.  In the alternative, if the Courts do not consolidate the cases, Davis requests the Houston Court stay its proceedings in favor of the Brownsville Court.

2.2    Generally, when cases are consolidated, they are consolidated into the case in which the action was first filed.  Although the Houston action was filed first, that action was brought by Finning in anticipation of the Brownsville action being filed by Davis.  Consequently, the first-to-file doctrine does not apply to the Houston action, so that the actions should be consolidated under the Brownsville action.

2.3    Further, the facts of this case demonstrate that all of the relevant conduct and property at issue in the dispute between these parties is centered in Cameron County.  All the equipment and machinery at issue (i.e., including all of the machinery Finning is asking these Courts to protect) is located in Cameron County.  All property, offices, employees, and facilities at issue in this matter are located in Cameron County. All investments and business transactions at issue in this matter took place in Cameron County.  All acts and omissions of the parties took place in Cameron County.  The only connection with Houston is the location of the arbitrator.  Because the conduct and property at issue in this case is centered in the Brownsville Court's area, the Brownsville Court is the more convenient and more logical Court for consolidation and the first-to-file doctrine should be disregarded as a basis for consolidating in the Houston Court.

2.4    Finally, Finning argues that the Brownsville Court would need to stay the trial if it compels arbitration.  The arbitration rules, however, do not provide disparate treatment between the Brownsville and Houston Courts.  Regardless of which Court

takes control over these actions, the abilities of the Court and the application of the arbitration rules will apply equally to either Court. In other words, if the Brownsville Court would need to stay trial, so would the Houston Court. Although Davis disagrees with Finning as to what actions the Court needs to take, those actions will be guided by the same arguments, claims, evidence, and rules regardless of whether they are taken by the Houston Court or the Brownsville Court. Consequently, Finning's attempt to distinguish the Brownsville Court as having less authority over these matters is incorrect and not a basis for consolidation in the Houston Court.

2.5    Davis requests the actions be consolidated in the Brownsville Court. Alternatively, Davis requests the Houston Court stay its proceedings in favor of the Brownsville Court taking control over the proceedings.

## III.
### THE FIRST-TO-FILE DOCTRINE

3.1    Although Finning does not specifically refer to the "first-to-file" doctrine as the basis for request for consolidation in the Houston Court, that doctrine appears to be the underlying rationale for its request. The Fifth Circuit has adopted the rule that when two parties file substantially the same suit against each other in different jurisdictions, the court that generally has priority is the one in which suit was filed first. *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 728-29 (5th Cir. 1985).

3.2    The first-to-file doctrine, however, is not applied rigidly or mechanically. *See Mission Ins. Co. v. Puritan Fashions Corp.*, 706 F.2d 599, 602 n.3 (5th Cir. 1983) (holding the district court was within its discretion in dismissing the first-filed lawsuit because it had been filed as a means of forum shopping in anticipation of the later-filed action). There are several exceptions to the first-to-file presumption. One of these exceptions – the anticipatory suit exception –applies in this case.

---

3.3    Several circuits, including the Fifth Circuit, have recognized that the first-to-filed doctrine will not apply if the plaintiff that filed suit first did so in anticipation of being sued, so as to set the venue. *Mission Ins. Co.*, 706 F.2d at 602, n.3; *EEOC v. University of Pennsylvania*, 850 F.2d 969, 971-72 (3rd Cir. 1988) (holding the court was within its discretion in declining the invoke the first-to-file rule when the University filed the suit first when it knew the EEOC action was imminent); *Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.*, 819 F.2d 746, 749-50 (7th Cir. 1987); *Pacific Employers Ins. Co. v. M/V W.D. Cargill*, 751 F.2d 801, 804 (5th Cir. 1985); *Guthy-Renker Fitness, L.L.C. v. Icon Health & Fitness, Inc.*, 179 F.R.D. 264, 271 (C.D. Cal. 1998) (citing *Mission Ins. Co.* for the proposition that the anticipatory suit exception eliminates the "race to the courthouse door in an attempt to preempt a later suit in another forum").

3.4    The reasoning behind this exception is two-fold.  First, a plaintiff should not lose his traditional choice of forum because the defendant anticipated the impending suit and preemptively struck by filing suit first in a different court.  *Texas Instruments Inc. v. Micron Semiconductor, Inc.*, 815 F.Supp. 994, 998 (E.D. Tex. 1998).  A party should not be allowed to switch from defendant to plaintiff not to pursue a claim but solely to pick the forum from which it wishes to fight.

3.5    The second basis for the anticipatory suit exception is that it discourages a party from creating wasteful litigation and conflict.  Because the first-to-file doctrine is based on comity and equity, it should not apply when the potential conflict between the courts was purposefully created by the party who raced to the courthouse to file first. *EEOC*, 850 F.2d at 978.  A general rule of equity is that it is not available to a party who does not come to the court with clean hands. *New York Football Giants, Inc. v. Los Angeles Chargers Football*, 291 F.2d 471, 473 (5th Cir. 1961) (this is "a self-imposed ordinance that

closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief.").

3.6　　In this case, Finning has judicially admitted that it filed the first lawsuit as an anticipatory lawsuit. It stated in its Rule 12(b) motion to the Brownsville Court "in anticipation that Plaintiff might file suit to try to avoid arbitration, Finning filed suit to compel arbitration in federal court in the Southern District of Texas, Houston Division, prior to the filing of the present suit." Motion of Finning, pp. 1-2.

3.7　　Additionally, during the temporary injunction hearing on December 11, 2003, before the Honorable Andrew S. Hanen, counsel for Finning again judicially admitted that their initiation of litigation was in anticipation by a lawsuit being filed by Plaintiffs. At Exhibit 1, page 7, line 10 to line 20:

> MR. KOCH: There were a number of events. Apparently after the arbitration was commenced, the parties actually had some settlement talks. And there was a bit of a time, I believe it was a matter of weeks, where the parties said, 'Look, let's just hold off on everything, see if we can work something out.' It didn't get worked out. Both sides, I think, went away *feeling like something imminent was going to happen*, and we actually, through the discussions, my law firm was told that the *plaintiffs were about to hire what they said was contingency counsel to file a lawsuit*. So we wanted to make sure that the arbitration went forward." (emphasis ours)

Co-counsel for defendant Finning further stated at Exhibit 1, page 11, line 16 to line 20:

> "And because *I was pushing to file the lawsuit*, I thought you should know that the reason *we were pushing to file the lawsuit* was because there was no response in the arbitration proceeding, *and we knew something else had to be afoot.*" (emphasis ours)

Additionally, counsel for Finning admitted that they filed the anticipatory litigation trying to establish venue. Page 7, line 21 to Page 8, line 6:

> "The other thing that's important, Your Honor, is that the arbitration provision references an arbitration in Houston. And under the arbitration rules and venue provisions, even if you have a lawsuit to compel arbitration or to preserve assets

while an arbitration is going on, that should be the venue. *So we were concerned that a different venue was going to come up,* and we also wanted to do something to preserve the assets, so that's why we went ahead and filed when we did. We didn't know exactly if they were going to file or not, but we felt like it was proper for us to file in Houston because we did want to have some preservation of the assets." (Emphasis ours)

3.8    Because Finning filed its lawsuit in anticipation of the Brownsville lawsuit, it is not entitled to rely on the first-to-file doctrine as a means of setting venue and giving the Houston court priority over that action in which it is the plaintiff. The anticipatory lawsuit exception was created to prevent the exact conduct and arguments of Finning. It should not be allowed to come to the Courts seeking equity when its hands are soiled by its purposeful creation of the conflict for which it now seeks relief. The conduct of Finning was so blatant and has been judicially admitted by Finning so that these Courts can disregard the first-to-file doctrine with regard to these actions.

## IV.
### BALANCING CONVENIENCES – THE CONDUCT AND PROPERTY ARE CENTERED IN CAMERON COUNTY

4.1    Another exception to the first-to-file rule is based on a balancing of conveniences. *Gunthy-Renker Fitness, L.L.C.,* 179 F.R.D. at 270. This equitable exception will apply if the forum of the first-filed suit is not as convenient as the forum of the later-filed suit.

4.2    All the conduct and property at issue in these actions is centered in Cameron County, Texas. All of the equipment and machinery at issue is located in Cameron County. See Exhibit 1. Page 8, line 7 to line 25.

THE COURT:    The assets that we're talking about are these cranes that exist, and where are they? Are they here in Harlingen?

MR. KOCH: Physically in Harlingen, yes, Your Honor.

MR. MARCHAN:   If I may, I handed the court a notebook of potential exhibits. And under Exhibit 2 is an actual photograph of the property, being the cranes at the location.   And I have provided defense counsel with copies of what I submitted to the court.

THE COURT:       Now, are these the -- Mr. Marchan, are these the kind of pieces of equipment we're talking about?

MR. MARCHAN:   Those are the pieces of equipment we're talking about.

THE COURT:       Oh, okay.

MR. KOCH:        Yes, Your Honor.

THE COURT:       Not only like it, they're just like it, exactly like it.  Okay.

MR. KOCH:        We agree with that, your Honor."

In fact, the machinery that Finning has requested the Houston Court protect is located in Cameron County.   Please see attached exhibit 2 which are two photographs of the cranes in question as well as the physical plant and offices.  Also please see exhibit 3 which is the warranty deed describing the physical location of the property as being in Cameron County, Texas which is described as follows:

"A tract of land containing 4.94 acres out of Lot Number One (1), Block Number One (1), Texas Pipe Bending Subdivision, City of Harlingen, Cameron County, Texas according to the map recorded in Cabinet 1, Slots 384-A and 384-B, Map Records, Cameron County, Texas, said property being more particularly described in Exhibit "A" attached hereto and made a part hereof."

None of the machinery or equipment is located in Harris County.  All of Davis's facilities, offices, and officers and employees at issue in this action are located in Cameron County, please see Exhibit 4.  None are located in Harris County.

4.3       All of the acts by Finning and Davis at issue in these actions took place in Cameron County.  None took place in Houston.  All of the business transactions and investments at issue in these cases took place in and affected businesses and personnel

in Cameron County. None were related to Harris County. See attached Exhibit 5, the Distributor Agreement identifying that Davis is from Harlingen, Texas and that Finning is from Alberta, Canada also specifying that any notices between the parties must be sent to those addresses and not Houston, Texas. Additionally, please see Exhibit 6, the Commercial Security Agreement also identifying the debtor DavCrane, Inc. as being from Harlingen, Texas and the secured party, Finning as being from Alberta, Canada. Also please refer to Exhibit 7, the filing of the request for arbitration by counsel from Canada defendant Finning directed to Danny D. Davis in Harlingen, Texas.

4.4    The only relationship these actions have with Harris County, is that the parties agreed to use an arbitrator who is located in Houston, Texas. The arbitrator himself, however, is not a party to and is not involved in these cases.

4.5    Based on the exception to the first-to-file rule for convenience to the parties, witnesses, and court, the Courts should disregard the first-to-file rule in this matter. Because all of the conduct and property at issue in these actions is centered in Cameron County, it will be more convenient to have these actions consolidated under the Brownsville action.

## V.
### AFTER CONSOLIDATION, THE POSTURE OF THE COURTS WOULD BE THE SAME

5.1    Finning argues that one reason these actions should be consolidated in the Houston Court is because the Brownsville Court would be required to stay the trial once it compels arbitration. The problem with this argument is that regardless of which Court takes control of the actions, that Court will be subject to the same claims, arguments, evidence, and rules as the other Court would have been if it had taken control. For example, if the cases are consolidated in the Houston Court, that Court will be required to make an initial determination of whether the claims being made are

subject to arbitration.  Likewise, if the cases are consolidated in the Brownsville Court, that Court will be required to make the same initial determination of whether the claims are subject to arbitration, guided by the same pleadings, the same evidence, and the same arbitration rules.

5.2    Consequently, Finning's argument – that the Brownsville Court would somehow be less entitled to rule on these actions than would the Houston Court – has no basis.  Although Davis and Finning disagree as to how the Court of consolidation should rule on these matters concerning arbitration and the claims for relief, neither Court would be prohibited by the arbitration rules from making such rulings.

## VI.
### PRAYER

6.1    Davis agrees with Finning that these cases are subject to consolidation. Davis requests the Courts consolidate these cases, however, in the Brownsville District Court.

6.2    If the Courts do not consolidate these matters, Davis requests the Houston Court stay its proceedings in favor of the Brownsville Court.

Respectfully submitted this 29th day of January, 2004.

WATTS LAW FIRM, L.L.P.
1926 E. Elizabeth
Brownsville, Texas  78520
(956) 544-0500
(956) 541-0255  FAX


_____
Ray R. Marchan
Attorney for Plaintiff
State Bar No. 12969050
Federal I.D. No. 9522

## CERTIFICATE OF SERVICE

On this 29th day of January 2004, a true and correct copy of the foregoing instrument was forwarded to opposing counsel via hand-delivery or by certified mail, return receipt requested.

RAY R. MARCHAN

## AFFIDAVIT OF AUTHENTICITY

STATE OF TEXAS       )
                              )
COUNTY OF CAMERON  )

BEFORE ME, the undersigned Notary Public, on this day personally appeared RAY R. MARCHAN, known to me, and first being by me duly sworn according to law upon his oath deposed and stated as follows:

"My name is RAY R. MARCHAN, I am a licensed attorney engaged in the general practice of law in Brownsville, Cameron County, Texas. I am attorney with WATTS LAW FIRM, L.L.P., 1926 E. Elizabeth, Brownsville, Texas. The law firm of Watts Law Firm, L.L.P., has been retained by Plaintiffs in connection with the above-referenced lawsuit.

I am of sound mind, capable of making this affidavit, and I have personal knowledge of each and every statement stated below.

I hereby certify that the facts stated in the foregoing Daniel E. Davis's and DavCrane, Inc.'s Response to Motion to Consolidate and Alternative Motion for the Houston Court to Stay its Proceedings are true and correct to my knowledge. Additionally, I hereby certify that the copies attached hereto are true and correct copies of the originals as follows:

**Exhibit "1"** Certified Copy of transcript of Temporary Injunction Hearing Before the Honorable Andrew S. Hanen, December 11, 2003;

**Exhibit "2"** Two photographs of the cranes in question as well as the physical plant and offices;

**Exhibit "3"** Warranty Deed describing the physical location of the property;

**Exhibit "4"** Photographs of facilities, offices, and officers and employees;

**Exhibit "5"** Distributor Agreement;

**Exhibit "6"** Commercial Security Agreement; and,

---

**Exhibit "7"**    Request for arbitration by counsel from Canada defendant Finning directed to Danny D. Davis in Harlingen, Texas.

Further affiant sayeth not.



RAY R. MARCHAN

SWORN TO AND SUBSCRIBED before me, the undersigned authority, by the said RAY R. MARCHAN, on the __30__ day of January, 2004, to certify which witness my hand and seal of office.

NOTARY PUBLIC, STATE OF TEXAS

YADIRA VILLARREAL
Notary Public, State of Texas
My Commission Exp. 10-07-2008

---

1

```
 1                IN THE UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF TEXAS
 2                     BROWNSVILLE DIVISION

 3      _____)
                                       )
        DANIEL E. DAVIS AND DAVCRANE,  )
 4      INC.                           )
                                       )
 5                                     ) CIVIL ACTION NO.
        VS.                            ) B-03-206
 6                                     )
        FINNING INTERNATIONAL, INC.    )
 7      _____)

 8

 9                  TEMPORARY INJUNCTION HEARING
              BEFORE THE HONORABLE ANDREW S. HANEN
10                     DECEMBER 11, 2003

11      APPEARANCES:

12      For the Plaintiff:          MR. RAY MARCHAN
                                    Watts Law Firm
13                                  1326 East Elizabeth
                                    Brownsville, Texas
14
        For the Defendant:          MR. JEFFERY R. KOCH
15                                  MR. MARK S. FINKELSTEIN
                                    Shannon, Martin, Finkelstein & Sayre
16                                  2400 Two Houston Center
                                    909 Fannin Street
17                                  Houston, Texas   77010

18
        Transcribed by:             BARBARA BARNARD
19                                  Official Court Reporter
                                    600 E. Harrison, Box 301
20                                  Brownsville, Texas   78520
                                    (956)548-2591
21

22

23
                        CERTIFIED
24
                          COPY
25
```



PLAINTIFF'S
EXHIBIT

1        THE COURT:  All right.  Let me call Davis versus -- is

2   it Finning or Fining?

3        MR. KOCH:  Finning.

4        THE COURT:  Finning International, B-03-206.  And if you

5   will, introduce yourself for the record, please.

6        MR. MARCHAN:  Ray Marchan for Daniel Davis and Davcrane.

7        MR. KOCH:  Jeff Koch representing Finning.  With me is

8   Mark Finkelstein.

9        THE COURT:  All right.  Mr. Koch, let me get you to lead

10  off, if you will, on this, because basically you're here to tell

11  me why you shouldn't be here.

12        MR. KOCH:  Yes, Your Honor, that's correct.  Your Honor,

13  if I, I guess, can start with the last filed motion, which is

14  our motion to continue or stay this proceeding, this hearing of

15  today, and the basis of that is several things.  First of all,

16  Finning was served with this lawsuit improperly, we believe.  We

17  don't believe we even have proper service yet, and we would like

18  to reserve our rights to contest that.  But much more

19  importantly --

20        THE COURT:  Let me just point out, that may be the

21  court's doing, in that Mr. Marchan was asking for temporary

22  relief, and I don't like to give ex parte temporary relief; and

23  so I told him send a copy of this to the lawyers representing

24  the defendants because I'm not going to consider your ex parte

25  motion.  So that may be -- I don't know if that's the case, but

1    that --

2        MR. MARCHAN:  And just for clarification, I know that

3    they're not waiving any right to be served properly.  When we

4    filed our petition, because we did make a request for relief,

5    temporary injunction, as a courtesy, because I was aware of the

6    parties and their counsel, we did, you know, fax those over.

7    But we are going through the hoops with a professional service

8    to get the Canadian company in Canada through the Hague

9    Convention.

10        THE COURT:  All right.

11        MR. MARCHAN:  And that is in the works.

12        MR. KOCH:  Basically I just wanted to reserve our rights

13    on that issue.

14        More to the point today, we filed a number of motions in

15    response to plaintiff's complaint; a motion to stay the case

16    pending the court's determination of whether an arbitration

17    provision should require the whole case to be referred to

18    arbitration; in addition, a motion to stay or to transfer venue

19    to Houston where Finning filed a lawsuit a couple of days prior

20    to the initiation of this lawsuit.

21        We filed all of that in response to the plaintiff's

22    complaint, even though we weren't sure that we needed to, having

23    not yet been served, but we wanted to get it to the court's

24    attention.

25        Shortly after that, we received the order setting this

1    hearing, and we contacted Mr. Marchan.  We were hopeful that we

2    could have a couple of weeks prior to this hearing so that the

3    court could take on the threshold issues of whether or not we

4    should be here today.

5        We don't know -- we didn't really receive -- and I don't

6    know if Mr. Marchan filed a response to our motion to continue.

7    We assumed that he's believing there's some exigent

8    circumstances that require us to go forward right now as opposed

9    to a couple of weeks from now.

10        THE COURT:  Well, and that may be what I deal with

11    today, quite frankly, is finding out what that is.  And if

12    there's a temporary solution --

13        MR. KOCH:  Yes, Your Honor.

14        THE COURT:  -- to straighten out who's -- you know, to

15    keep things in the status quo, which is what a TRO or an

16    injunction is anyway, pending resolution of whether you're here

17    or whether you're in Judge Atlas' court in Houston, which is one

18    of the reasons when you -- when you basically filed your

19    motions, that I said okay, let's take it up here, because I want

20    to resolve --

21        MR. KOCH:  I understand.

22        THE COURT:  -- if I can resolve temporarily.  Now, you

23    have asked for some kind of temporary relief in Houston, have

24    you not?

25        MR. KOCH:  We have, Your Honor.  And I think all of this

1    revolves around the -- not only the contract between the

2    parties, but the assets, being cranes in this case, that are

3    subject to the agreement of the parties.  We have asked in the

4    Houston proceeding that there be temporary relief to protect the

5    assets while the arbitration that we've asked for can be held.

6    I believe that Mr. Marchan is asking that those assets be sold,

7    what we think is a form of mandatory injunction, so that they

8    can have the proceeds of those assets to continue operating

9    their business.

10        To backstep on the chronology just very briefly of this

11    whole dispute, the parties entered into a distributorship

12    agreement about a year and a half ago, and part of that

13    agreement involved my client, Finning, providing an upfront loan

14    of a million, a million five dollars to the plaintiffs, as well

15    as providing them with Caterpillar equipment from Finning's

16    facilities in Canada.  The plaintiffs would then take that

17    equipment, assemble some of their components onto it, with the

18    idea that they would then return it to Finning to be sold out on

19    the market.

20        The distributorship agreement states that the equipment

21    is -- the title to the equipment is held by Finning at all

22    times.  We think this -- the equipment they want to sell, we

23    think Finning has title.  Finning certainly has security to it

24    because there were all kinds of financing statements and

25    security agreements entered into at the same time as this

1    initial loan.

2        The parties worked under their agreement for a while.  Last

3    summer in August of 19 -- of this year, August of 2003, the

4    plaintiffs, through other counsel, Mr. Al Payne, who's also here

5    today from Houston, wrote Finning a notice saying they thought

6    Finning wasn't properly paying overhead costs.  Finning wrote

7    back saying it thought it was doing just fine and that the

8    plaintiffs weren't performing under the agreement.

9        Since that date of August 5th, the parties have had a

10    continuum of attempts to have their dispute go forward.

11    Finning, in September, initiated an arbitration pursuant to --

12    there's a very clear arbitration provision in the

13    distributorship agreement.  Finning, being an international

14    company, initiated under the international rule of the American

15    Arbitration Association, we filed, as part of our motion to stay

16    this hearing, an affidavit of Canadian counsel, Mr. Gerald

17    Ghikas out of Vancouver.

18        Initially Mr. Payne responded to the arbitration.  He

19    subsequently said no.  From that point forward, he was not

20    authorized to represent the plaintiffs in the arbitration.

21        So, you know, here we are some five months later or so with

22    a request for immediate -- immediate help from this court.  We,

23    Finning, view this as a normal commercial dispute centered on

24    this contract between the parties.  We think they've got a claim

25    really for money damages.  But more to the point, we want this

1    court to have the opportunity to consider our motions where we

2    say the case should be stayed so it can go to arbitration or, at

3    a minimum, the case should be transferred to the Houston court

4    where Finning filed suit first to compel arbitration and to

5    preserve the assets.

6         THE COURT:  What -- I mean, was there any event, and

7    maybe it was Mr. Payne's letter, that -- I just thought it was

8    ironic that you filed in Houston; and like 24 hours later, they

9    file here, and --

10        MR. KOCH:  There were a number of events.  Apparently

11   after the arbitration was commenced, the parties actually had

12   some settlement talks.  And there was a bit of a time, I believe

13   it was a matter of weeks, where the parties said, "Look, let's

14   just hold off on everything, see if we can work something out."

15   It didn't get worked out.  Both sides, I think, went away

16   feeling like something imminent was going to happen, and we

17   actually, through the discussions, my law firm was told that the

18   plaintiffs were about to hire what they said was contingency

19   counsel to file a lawsuit.  So we wanted to make sure that the

20   arbitration went forward.

21        The other thing that's important, Your Honor, is that the

22   arbitration provision references an arbitration in Houston.  And

23   under the arbitration rules and venue provisions, even if you

24   have a lawsuit to compel arbitration or to preserve assets while

25   an arbitration is going on, that should be the venue.  So we

```
 1    were concerned that a different venue was going to come up, and

 2    we also wanted to do something to preserve the assets, so that's

 3    why we went ahead and filed when we did.  We didn't know exactly

 4    if they were going to file or not, but we felt like it was

 5    proper for us to file in Houston because we did want to have

 6    some preservation of the assets.

 7              THE COURT:  The assets that we're talking about are

 8    these cranes that exist, and where are they?  Are they here in

 9    Harlingen?

10              MR. KOCH:  Physically in Harlingen, yes, Your Honor.

11              THE COURT:  And are there many of them or --

12              MR. MARCHAN:  If I may, I handed the court a notebook of

13    potential exhibits.  And under Exhibit 2 is an actual photograph

14    of the property, being the cranes at the location.  And I have

15    provided defense counsel with copies of what I submitted to the

16    court.

17              THE COURT:  Now, are these the -- Mr. Marchan, are these

18    the kind of pieces of equipment we're talking about?

19              MR. MARCHAN:  Those are the pieces of equipment we're

20    talking about.

21              THE COURT:  Oh, okay.

22              MR. KOCH:  Yes, Your Honor.

23              THE COURT:  Not only like it, they're just like it,

24    exactly like it.  Okay.

25              MR. KOCH:  We agree with that, Your Honor.
```

1          THE COURT:  Okay.

2          MR. KOCH:  So you're looking at some fairly expensive

3    heavy equipment.  We just don't see the immediacy of having the

4    hearing today on the injunction itself when the dispute has been

5    simmering for five months or so.  Their requested injunctive

6    relief is based on Finning not paying overhead costs that they

7    allege Finning was required to under the parties' agreement.  It

8    goes to money damages.  But more than that, it goes to getting

9    mandatory relief to sell equipment owned by Finning to satisfy

10   those money damages.  We just think it's very unusual.

11         THE COURT:  Well, in the normal course of business, no

12   disputes, assuming there wasn't a dispute, Davcrane would put

13   its accessories on the crane and then give it back to you, and

14   then your client would sell it?

15         MR. KOCH:  Yes, Your Honor.  Finning has a -- Finning

16   manufactures and distributes heavy equipment worldwide, so it's

17   got a very large sales organization.  It has a -- the basis of

18   this contract and what you're going to is Finning would start

19   with the major components, the major crane components.  Davcrane

20   and Davis would assemble some of their equipment onto that to

21   make it particularly suited to certain purposes, return it to

22   Finning for sale and distribution, and then there would be some

23   royalty that Davis and Davcrane would get from the sales.  But

24   it was an exclusive distributorship agreement so that this

25   product could be effectively marketed worldwide.

1          THE COURT:  Now, these are big pieces of machinery.  Are

2    they already preordered or is -- I mean, do you --

3          MR. KOCH:  Finning has a market for them, but part of

4    Finning's problem in this case is it has not received the

5    completed units that it was waiting for.  Now at this juncture,

6    we believe that some of the units are completed, at least those

7    three that you saw in the photo; but plaintiffs contend that

8    because Finning owes overhead costs, it shouldn't have to

9    release those cranes to Finning for the sale.

10      And just to complete the story, Your Honor, both sides now,

11   under the distributorship agreement, there is a termination

12   provision.  Both sides have sent notices to the other saying the

13   agreement is terminated because the other side has breached it.

14      The impact of that for today's hearing is that there can't

15   be any continuing contractual overhead costs in the future that

16   Finning would owe to the plaintiffs.  They can say there's

17   contract damages, but you -- you know, any continuing

18   obligation -- there's only a few provisions that survive the

19   termination of the distributorship agreement.

20          THE COURT:  Well, let me ask you this:  Part of their

21   injunction or requested injunctive relief is to sell these

22   pieces of equipment.  I mean, why wouldn't it be in both sides'

23   best interest to sell this equipment?

24          MR. KOCH:  It's not so much the --

25          THE COURT:  I mean, now, it depends who gets the money,

1    and I realize that that's, you know, obviously the sticking

2    point, but wouldn't it -- I mean, I would think it's in both

3    sides' best interest to sell these for the maximum amount you

4    could possibly sell them.

5        I mean, Mr. Marchan, isn't that -- tell me why I'm wrong

6    about that.

7            MR. MARCHAN:  I haven't said that word yet.

8            THE COURT:  Okay.  Counsel?

9            MR. FINKELSTEIN:  May I, Your Honor?

10           THE COURT:  Yes.

11           MR. FINKELSTEIN:  Mark Finkelstein.  Should I come to

12   the podium?

13           THE COURT:  No, that's all right.

14           MR. FINKELSTEIN:  Just one little point to interject,

15   and that is that there was an answer due in the arbitration

16   proceeding of October 23rd.  And because I was pushing to file

17   the lawsuit, I thought you should know that the reason we were

18   pushing to file the lawsuit was because there was no response in

19   the arbitration proceeding, and we knew something else had to be

20   afoot.  So that was why we filed the lawsuit, to compel the

21   arbitration in Houston.

22       With respect to the question you just asked, Finning has

23   paid for the release of certain cranes to it for the purpose of

24   presenting one at a trade show.  And Davcrane did release a

25   crane, and Finning was quite embarrassed when it was taken to

1    the trade show and didn't perform as it was -- it represented it

2    would.

3        So one of the problems that Finning has with these cranes

4    being sold is they may not perform up to Finning's requirements,

5    standards, or the standards of the customer.  Since Finning

6    doesn't have access to the cranes that it's paid for, it remains

7    concerned that these cranes may besmirch its worldwide

8    reputation for delivering quality cranes under its warranties.

9        So, sure, if we've got working cranes, I don't see how

10   anybody is hurt if someone pays a fair price for them.  If bad

11   cranes are sold into the marketplace, it can hurt Finning.

12       THE COURT:  I think it would hurt Davcrane too, I would

13   think, wouldn't it?

14       MR. MARCHAN:  It would, Your Honor.  And I've gotten a

15   little bit more intimate with the case, and I've come to learn

16   that the crane that he's alluding to that they're complaining

17   about was actually a remedial type of operation that Finning

18   asked us to do.  They sent us over old cranes to refurbish and

19   remanufacture.  And they did want one.  It was a 9-ton crane,

20   nothing that you see in that picture there -- and I do have a

21   picture of the 9-ton cranes -- in the used condition, the

22   refurbished condition.  And we were told it was a static show,

23   and the crane was put up on its supports and the boom extended.

24   So far as it was necessary for a static show, it was ready.  But

25   this refurbishing of used cranes was not contemplated by this

1    original contract.  They tried to lessen our damages by sending

2    us some work, ordering some cranes, but to be redone.

3        The cranes in the photograph that you see are new pieces of

4    equipment, which was intended by the contract to be sent by

5    Finning, other parts manufacturers, put together as a new

6    product.

7        There is a lot more to the story, but I just wanted to point

8    out the distinction between the crane that they had a complaint

9    about and what you're seeing there in front of you.

10        THE COURT:  Let me hear from you, Mr. Marchan, just for

11    a minute, if I may, about obviously the --

12        MR. MARCHAN:  Sure.

13        THE COURT:  -- Finning folks are saying, "We filed

14    first."  You know, and I'm sure while they're not conceding that

15    even if that didn't matter, secondly, even if it didn't matter,

16    we've got an arbitration clause sitting here.  This whole thing

17    ought to be arbitrated under the Triple A rules or whatever.

18        MR. MARCHAN:  Sensing the demeanor of this court in the

19    few times that I've appeared before this court, I placed a phone

20    call Monday to defense counsel to let them know that we agree

21    that the purely contractual matters of this case should be

22    arbitrated, and we agreed to do so.  And I think that that's

23    what the court would want to know, is, "What have you done to

24    resolve this issue before you've gotten here, Mr. Marchan?"

25        Second, we believe that we have made proper extracontractual

1    claims that we should hopefully, while we're in arbitration, be

2    allowed to conduct some discovery, because we do have some

3    initial evidence that's very disturbing about why this event is

4    taking place.

5        We asked for temporary relief through the means of

6    injunction, just as they did in their Houston lawsuit, because

7    the arbitration agreement says that is not incongruent with the

8    arbitration agreement, though it does not specify that the

9    injunctive or equitable relief must only be sought by or through

10   arbitration.  And I guess their trying to do it through the

11   Houston court shows that we're not doing it wrong either.

12       Our problem with this business deal is as follows:  As time

13   went on, Davcrane was supposed to be reimbursed timely by

14   Finning.  That's why they're in the deal.  They're the money

15   partner.  Mr. Davis had to underwrite this until they wanted to

16   pay their money.  This went on for another four or five months.

17   So, in essence, during this year and a half that this contract

18   has been in place, Mr. Davis, out of his personal funds, has

19   been having to subsidize and underwrite this operation, with

20   them staying constantly in a negative balance as far as

21   overhead.

22       We have provided proper accounting to them, such that they

23   have paid us overhead in the past.  There has been some

24   complaints that, "Oh, your overhead is too high.  You're not

25   making proper accounting."  But yet, with the proper accounting

1   they have paid us, and that same method of accounting has

2   continued.

3       On September 30th of this year, a complete accounting in the

4   same format that had been accepted previously was forwarded to

5   them for all overhead costs that were due up until the last day

6   of August of 2003.  That outstanding balance -- and I have the

7   documents to back this up if we need to put on hard evidence and

8   witnesses -- is $755,000 approximately.  That's a lot of money

9   to this operation.  And because he's in the hole as of that date

10  $755,000, he may have to shut operations.  He hasn't since this

11  dispute remained idle.

12      He has the rights under the contract to try to secure more

13  business, and he has done so; and we are prepared to demonstrate

14  to the court some contracts in the future that may come to

15  fruition in the near future.  So long as he can post his

16  performance and payment bond, he may avoid catastrophic injury

17  to this company and firing of these employees here.  And that's

18  why we're here claiming there's irreparable harm.

19      THE COURT:  Well, let me ask, isn't there an amount

20  that's not in question that Davcrane is owed, assuming these

21  cranes sell and they're in good shape and they all work and, you

22  know, like they're supposed to work?

23      MR. MARCHAN:  If I may, Your Honor, maybe toot our own

24  position for just a moment here.  We made an agreement in the

25  recent past with the -- with Finning to have our accounting

1  system audited by a neutral third party; and, in fact, it's a

2  party that they contract with regularly, Caterpillar.  On

3  December 9th, we received the completed audit from Caterpillar

4  indicating that all costs by Daniel Davis and Davcrane were

5  reasonable.

6          THE COURT:  Caterpillar like Caterpillar tractor?

7          MR. MARCHAN:  Caterpillar.

8          MR. KOCH:  Yes, Your Honor.

9          MR. MARCHAN:  They're the largest distributor of that

10  product in the world.  And so our figures are not only right,

11  but they've been audited prior to us coming to court.

12          THE COURT:  No.  But, I mean, not just audited, you

13  know, because I know people can say, "Well, this auditor said

14  this; this other auditor may look at it differently," or

15  whatever.  But what I'm really asking, and I'm asking both of

16  you this, I mean, all right.  We think that, arguably, Davcrane

17  has $100,000 worth of paint, you know; and it's red paint, and

18  everybody knows these are always painted yellow; therefore, it's

19  wrong costs.  We shouldn't have to pay for that.  But other than

20  that, we agree they're owed X.  I mean, there's got to be, I

21  would think, an amount that everybody thinks they're owed, you

22  know, that is without objection.

23          MR. KOCH:  Your Honor, if I understand your question,

24  you're really asking, well, even if the parties disagree to a

25  million dollars of costs, are there $200,000 of costs that both

1    parties agree is owed --

2         THE COURT:  Right.

3         MR. KOCH:   -- Finning to Davcrane?

4         THE COURT:  Exactly.

5         MR. KOCH:  The answer regrettably right now is no, Your

6    Honor, and I'll tell you why.  Two things really I wanted to

7    say.  One was that the costs are many different types of costs.

8    There's direct costs that Davis and Davcrane spend by

9    themselves.  There's costs associated with purchases from third

10   party vendors.  But mostly, there's these overhead costs which

11   right now are three times at least greater than what was

12   estimated before the parties entered into their agreement.  The

13   agreement provides for budgets of cost to be talked about ahead

14   of time before the costs are expended.  That did not happen.

15   And so Finning feels like basically Davis and Davcrane have been

16   running with sort of thinking they have a blank check on these

17   overhead costs.  So Finning is not able right now to say, "We

18   think X dollars are owed."

19        But the other point, if I may just respond to one item of

20   what Mr. Marchan said earlier.  He started off explaining that

21   he had made a phone call to me that they would, I believe,

22   stipulate that the contract claims in this case should be

23   arbitrated.  I believe where he's going with this lawsuit is

24   trying to say, well, some of their tort claims aren't so

25   intertwined that those couldn't be separately determined.

```
 1          What I wanted to bring to the court's attention is that all
 2     of the injunctive relief that we're here on today relate to the
 3     contract claims.  It relates to the failure, their alleged --
 4     they're alleging that Finning failed to pay overhead costs.
 5     That's what it says in their complaint.  "Because of Defendant
 6     Finning's ongoing refusal to pay the continuing overhead for the
 7     continued manufacture of the heavy equipment," then they say,
 8     "Davis and Davcrane will suffer irreparable harm."
 9          So we just think their stipulation that those kinds of
10     issues should be arbitrated is just one more reason that the
11     court should at least give us a few weeks to fully brief the
12     motions to stay that Finning had filed previously.
13          THE COURT:  Well, let me -- you know, I realize you can
14     make these cases as simple or as complicated as you want to make
15     them, but -- and this is maybe a -- just maybe I've had a bad
16     experience in the past or a different experience than some
17     people have, but it's always been my thought, and it's backed up
18     by my personal experience, that businessmen include arbitration
19     agreements because they think it's faster and cheaper and it
20     resolves disputes quickly.  And then in practice, that never
21     happens.  What happens is, you know, you end up doing the same
22     discovery, taking a zillion depositions, running up gazillion
23     dollars worth of attorneys' fees, and you might as well have
24     been in court.
25          I mean, what is your thought as to -- let's assume the court
```

1    says, "Go arbitrate this," how soon can you arbitrate it?  I

2    mean, if he's sitting there with an audit, and I'm not holding

3    y'all to this because you may or may not have seen it or may --

4    you know, if you're like me, I would need somebody to interpret

5    the audit for me.

6         MR. MARCHAN:  They actually agreed to it, and it was

7    done jointly.

8         THE COURT:  No, I understand.  But, I mean, that doesn't

9    mean as the lawyers sitting here that they know what it says.  I

10   mean, but there ought to be some way of accelerating this

11   process.  And perhaps -- I mean, you're sitting here

12   complaining -- not complaining, but raising the fact that

13   perhaps this ought to be in Judge Atlas' court, I mean, I think,

14   you know, obviously the Houston lawyers know that Judge Atlas is

15   a former mediator.  She will be the first one, I think, to say

16   why haven't we sat down with a mediator and tried to work this

17   out?  Or why don't we fast track this arbitration to where

18   the -- Davcrane is not in a position where they're looking at

19   going out of business and you guys are not out your cranes.

20        MR. KOCH:  Your Honor, we would be happy to fast track

21   the arbitration.  We've tried.  We've sent notices.  And

22   Mr. Ghikas' affidavit shows the notices requesting the

23   arbitration to proceed.  Right now plaintiffs don't have counsel

24   who has agreed to represent them in the arbitration.  Because of

25   that, the Triple A rules require that notice be sent out with a

1    list of arbitrators to the parties.  That's happened.

2    Mr. Ghikas has selected names off of that list.  That's

3    happened.  We're ready to go.

4         THE COURT:  Mr. Marchan, who's going to represent -- I

5    mean, you represented to the court today that you were willing

6    to participate in the arbitration.  Who's going to represent Mr.

7    Davis?

8         MR. MARCHAN:  We will.  I do think, though, that getting

9    an arbitration set up and actually getting a date for hearing is

10   the problem.  The precursors we don't have any problem

11   cooperating with, but when will the arbitration committee give

12   us that?  We'd love to go soon, no doubt.

13        THE COURT:  Three person arbitration?

14        MR. MARCHAN:  Three person.

15        MR. FINKELSTEIN:  Single.  Single arbitrator, Your

16   Honor.

17        MR. MARCHAN:  They have sent over a list.  We think

18   we've been organizing our stuff that we could go very quickly on

19   the contractual claims.

20        THE COURT:  Who's the -- have y'all picked an

21   arbitrator?  What's the rule on picking it in your contract?

22        MR. FINKELSTEIN:  The parties were trying to find a

23   common arbitrator that they could both consent to.  They didn't

24   succeed about the time Mr. Payne withdrew.  And then the Triple

25   A issued a strike and -- I forget the term, Your Honor.

1    Basically strike and move forward list, so that if you --

2    whatever names were not struck, they would pick from one of

3    those and find out availability.  The names that I know are

4    still on the list from our perspective are Linda Addison, whom I

5    suppose you know, and Crain, Alan Crain, who are both on the

6    list of available arbitrators.  I don't know their true

7    availability in terms of when they can conduct a hearing.

8    Obviously there's a prospect that the parties will bog

9    themselves down in discovery, as they might in court, but we --

10   we have done everything we can to move the arbitration forward

11   with all deliberate speed, including filing a lawsuit in Houston

12   to compel our opponent to proceed with the arbitration of the

13   contract claims.

14       I wanted to return to one question you asked earlier about

15   what amount of money is not in dispute.  Our history -- I don't

16   know anything about the audit.  I did know it was being

17   conducted, but I haven't seen it.  But our history is that

18   Finning had paid $40,000 for each of two cranes; $80,000 within

19   recent months, with the understanding, based on an invoice, that

20   Mr. Davis would release those two cranes in exchange for payment

21   of $40,000 each, and those two cranes would then be sold.  And

22   the 40 -- the $80,000 was paid, and those cranes have not been

23   released.

24       Now, if Finning felt like there was a price of that nature

25   that it could pay to enable the crane to be sold, perhaps these

1    parties could reach an agreement for the sale of some cranes.

2    But we've been burned three times, both with the trade show and

3    with the two cranes that were supposed to be released against

4    the $40,000 payments, and so Finning's trust right now is not

5    there.

6           MR. MARCHAN:  If I may, Your Honor, in the exhibit book,

7    we -- under Exhibit 10 is our accounting about the 755,000 that

8    was turned over by September 30th to the defendants.  Exhibit 11

9    is actually a pro forma statement prepared by the CPA to show

10   what financial effect the sale of the four cranes would have,

11   leaving a net amount.  That's Exhibit 11.

12       The Exhibit 9 is the independent audit conducted indicating

13   that the expenses were reasonable.  And we do have e-mails

14   between the parties confirming that it was, as they put it,

15   "This review will establish the overhead costs clearly, and we

16   must both agree to live with the result of that audit."  And

17   that audit showed reasonableness in the charges.

18           THE COURT:  But I hear Mr. Finkelstein telling me he's

19   not even seen the audit.  So, I mean, it's --

20           MR. MARCHAN:  I just provided it today.

21           THE COURT:  I know, I know.  But, I mean, you know, they

22   can't sit there --

23           MR. MARCHAN:  Finning did receive it.

24           THE COURT:  -- off the top of their head.  Well, here's

25   what I think.

```
 1          MR. MARCHAN:  And we're prepared on many more issues.

 2          THE COURT:  It can't do both sides any good to fight

 3     over this and churn up attorney's fees, not that when I was

 4     practicing law, I was very much in favor of attorney's fees.

 5     But this is going to drive your company crazy, and it's going

 6     to -- may drive them out of business, you know, one way or the

 7     other.  And I think this case ought to be mediated, and I think

 8     it ought to be mediated ASAP with a neutral third person that

 9     comes up with an enforceable agreement so there's none of this,

10     "You promised X, you promised Y," and whether it's me that

11     enforces that agreement or Judge Atlas that enforces that

12     agreement.  But I think, for instance, Mr. Davis and the people

13     with the plaintiffs need to take a hard look at some of those

14     overhead costs.  People with Finning need to look at this audit.

15     I mean, if they've basically said they're going to live and die

16     with this audit, they ought to look at the audit and say, well,

17     I mean, if Caterpillar, who's a neutral third party, thinks this

18     is good, maybe it is right.

19          But -- and I know as I'm saying this that we're sitting here

20     bumping up against the Christmas holidays, but I think this

21     really should take some precedent as far as speed and getting it

22     done.

23          MR. MARCHAN:  Your Honor, I can promise you that the

24     holidays versus the -- this company living, we're willing to

25     work, whether it be Christmas day.  It's that important.  I've
```

1    put in an exhibit list the names of all of the employees, their

2    payroll, as well as all of their children that they support.

3         MR. KOCH:  Your Honor, we would -- I'm sure the Finning

4    folks know this is important too, and I'm sure they would move

5    very quickly, so --

6         THE COURT:  Well, gentlemen, let me ask you, do you have

7    your calendars present?  I don't want to leave here without a

8    mediation set.

9         MR. MARCHAN:  I have no problem.  I do have a calendar,

10   if I'm allowed to open up my computer.

11        THE COURT:  Yeah, go ahead.  Go ahead.

12      What I want is a couple days from you; and then maybe I'll

13   ask you, counsel, and me to go back into chambers, and we'll

14   figure out a mediator.

15        MR. KOCH:  That will be great, Your Honor.

16        THE COURT:  As many of you know who have appeared in my

17   court before, I don't normally order mediation, but I think this

18   is a case where the exception may be worth it for the well-being

19   of both sides.

20        MR. MARCHAN:  While this warms up, I did want to make

21   one comment.  We did receive in this back and forth flurry of

22   papers a notice of intent to accelerate, and that is the loan

23   that they provided for the building with the right to cure first

24   part of January.  And we were going to ask for additional relief

25   from the court to issue an injunction on that matter.

1    This concerns us because we believe the reason why Finning

2    wanted to make a deal with Danny Davis is that he has some

3    original patents that allow, in essence, the economies of scale

4    that might effect their inventory and equipment.  And this

5    patent, as part of being able -- him wanting to get his ideas

6    off the ground and financed was pledged as security on this

7    building that was paid for by Finning.  And we feel that in our

8    tortious claims, that that is really their intent, is to get at

9    his patents and cut him out of the deal.

10    THE COURT:  Is the building in question the one that's

11    behind the cranes in the picture?

12    MR. MARCHAN:  Yes.  And I believe it's exhibit -- I have

13    a full plot there.

14    THE COURT:  That's all right.  I've seen it.  I know

15    what it is.

16    MR. MARCHAN:  It's there at the Port of Harlingen.  But

17    we're very concerned about losing this, and we feel that it's

18    incongruous to allow them to default on overhead and, therefore,

19    force him to default and reap the benefits of his patent.

20    THE COURT:  No, I understand what the allegation is.

21    Gentlemen, what about that?  I don't want anything foreclosed on

22    while we're mediating.

23    MR. KOCH:  Your Honor, if we can -- you know, we don't

24    have a Finning representative here; but I think I can in good

25    faith say that I could -- I could confirm very quickly that

1    there's no intent to take some action on that, you know, if

2    we're talking about a mediation in the next couple of weeks or

3    something.

4            THE COURT:  Absolutely.  I'm talking about --

5            MR. KOCH:  That's what I thought, Your Honor.  No, I

6    don't think Finning would be trying to do anything before that.

7            THE COURT:  Yeah.  No, I'm talking about between now and

8    the end of the year or first week in January, as close and as

9    fast as we can get this.

10           MR. MARCHAN:  Your Honor, I could -- I could commence

11   mediations as soon as Saturday, Sunday, the 13th or 14th.  I do

12   have on the -- on another shrimp dip case depositions in England

13   that will keep me out of the country all of next week.  I can do

14   it Saturday and Sunday, the 20th and 21st, as well as the 22nd,

15   Monday.

16           THE COURT:  All right.  Well, let's do this.  Gentlemen,

17   I'm going to ask the attorneys to step back in my chambers where

18   I can talk on the phone and we can find a mediator that we can

19   all agree on.  Bring your calendars with you.

20       Mr. Davis, if you need to come, you're welcome to come with

21   me, come back with Mr. Marchan, because you obviously are going

22   to have to be attending too.

23           MR. DAVIS:  Thank you, Your Honor.

24           THE COURT:  Let's step back in my chambers.  Let's go

25   off the record, Barbara.

1          (Recess taken from 11:07 to 11:51)

2          THE COURT:  All right.  Be seated, please.

3      What did we find out, gentlemen?

4          MR. KOCH:  Your Honor, we talked to two individuals.

5      Gerry Ghikas, who signed this affidavit.  He's Finning's normal

6      counsel.  He is acting as an arbitrator that will run through

7      the date of the 22nd.  He is available the 29th and the 30th.

8          The business person who is in Edmonton is available any of

9      those days.  So our preference would be the 29th and 30th, and

10     we think it would be more likely to result in a resolution if we

11     have their primary counsel.  Mr. Finkelstein and I are here

12     because this came up right away.  But -- so we would ask for the

13     29th and 30th.  If we need to go forward on the 22nd, we will,

14     but --

15         THE COURT:  Well, let's do the 29th.  I mean, I know

16     that's inconvenient for Mr. Marchan, but, you know, I want the

17     people with authority to make a decision there.

18         MR. MARCHAN:  Absolutely.

19         THE COURT:  I hadn't said that before, but I assumed you

20     knew that, but let me go ahead and say it for the record.  I

21     want decision makers there.

22         MR. KOCH:  That's what we would be able to have on the

23     29th.

24         MR. MARCHAN:  Maybe a minute entry or something would be

25     helpful.

```
 1          THE COURT:  Let's do it on the 29th, and I'm just going

 2    to issue a little order.  And when I step off the bench when

 3    we're done, I'm going to call Trey Bergman's office and confirm

 4    the 29th to him and tell him that you gentlemen will be

 5    contacting him with all the details.

 6          MR. FINKELSTEIN:  I mediate cases myself, so I'm --

 7    we're glad to be going forward with this process; but please

 8    understand, we're preserving all of our challenges.

 9          THE COURT:  No, I understand.  I understand.  And

10    Mr. Marchan is reserving his objection to Houston, even though

11    he's willing to mediate there.

12          MR. KOCH:  And we appreciate that.

13          THE COURT:  And I understand that.  And by me

14    encouraging this mediation or if I enter an order ordering the

15    mediation, I'm not by any means ruling on either side's motions.

16    This is not to be considered an implied ruling on your motion to

17    get back to Houston or on the arbitration or on Mr. Marchan's

18    motion for temporary relief, all right?

19          MR. KOCH:  Thank you, Your Honor.

20          THE COURT:  All right.  I'm going to call Mr. Bergman.

21    Y'all get in touch with him as soon as you can.

22          MR. MARCHAN:  I have a plane to catch.  May I be

23    excused?

24          THE COURT:  Yeah, we're done.  We're adjourned.

25        (Court adjourned)
```

1                              *  *  *

2          (End of requested transcript)

3                              -oOo-

4      I certify that the foregoing is a correct transcript from

5  the record of proceedings in the above matter.

6

7  Date:  December 15, 2003

8

9

10  _____
   Signature of Court Reporter
   Barbara Barnard

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



PLAINTIFF'S
EXHIBIT



*Cameron County Title C*
GF# 2207020

# WARRANTY DEED

**Date:**  August 9, 2002

**Grantor:**  METEX ENTERPRISES, INC., a Texas corporation (f.k.a. STEELTEK ENTERPRISES, INC.)

**Grantor's Mailing Address (including county):**

    502 North Expressway 77
    Harlingen, Texas 78550
    Cameron County

**Grantee:**  DAVCRANE, INC., a Texas corporation

**Grantee's Mailing Address (including County):**

    P. O. Box 2427
    Harlingen, Texas 78551-2427
    Cameron County

**Consideration:**  TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration and the further consideration of a note in the principal amount of $1,500,000.00, dated July 15, 2002 executed by Grantee, payable to Finning International, Inc. The note is secured by a Vendor's Lien retained in favor of Finning International, Inc. in this deed and by Deed of Trust of even date herewith, from Grantee to NANCY F. MARTIN Trustee, without recourse on Grantor.

**Property (including any and all improvements):**

    A tract of land containing 4.94 acres out of Lot Number One (1), Block Number One (1), Texas Pipe Bending Subdivision, City of Harlingen, Cameron County, Texas according to the map recorded in Cabinet 1, Slots 384-A and 384-B, Map Records, Cameron County, Texas, said property being more particularly described in Exhibit "A" attached hereto and made a part hereof.

**Property Subject to Lien:**  same as above.

**Reservations From And Exceptions to Conveyance And Warranty:**

  This conveyance is made and accepted subject to those restrictions, covenants, conditions, easements, mineral and royalty reservations which are reflected on Exhibit "B" attached hereto.

  Grantor, for the consideration, receipt of which is acknowledged, and subject to the reservations from and exceptions to conveyance and warranty, grants, sells and conveys to Grantee the property, together with all and singular the rights and appurtenances thereto in anywise belonging, to have and hold it to Grantee, Grantee's administrators, successors or assigns forever. Grantor binds Grantor and Grantor's heirs, executors, administrators and successors to warrant and forever defend all and singular the property to Grantee and Grantee's administrators, successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof, except as to the reservations from and exceptions to conveyance and warranty.

  When the context requires, singular nouns and pronouns include the plural.

PLAINTIFF'S EXHIBIT 3

METEX ENTERPRISES, INC., a Texas corporation
(f.k.a. STEELTEK ENTERPRISES, INC.)

By: _____
  Cesar Maldonado, President
    VICE.

Case 1:03-cv-00206   Document 20   Filed in TXSD on 02/02/2004   Page 46 of 98

## ACKNOWLEDGMENT

STATE OF TEXAS            )
                                   )

COUNTY OF CAMERON     )

    This instrument was acknowledged before me on the ___9___ day of August, 2002, by CESAR MALDONADO, as president of METEX ENTERPRISES, INC., a Texas corporation (f.k.a. STEELTEK ENTERPRISES, INC.).

_Mary Ann Taylor_
Notary Public, State of Texas



My Commission Expires:_____

MARY ANN TAYLOR
NOTARY PUBLIC
STATE OF TEXAS
My Commission Expires 08-18-2004

AFTER RECORDING RETURN TO:

Mr. Dennis Sanchez
SANCHEZ, WHITTINGTON, JANIS &
    ZABARTE, L.L.P.
100 North Expressway 83
Brownsville, TX 78521

PREPARED IN THE LAW OFFICES OF:

SANCHEZ, WHITTINGTON, JANIS &
ZABARTE, L.L.P.
100 North Expressway 83
Brownsville, Texas 78521

(FT-10/2000)

**EXHIBIT 'A'**

A tract of land containing 4.94 acres, out of Lot 1, Block 1, TEXAS PIPE BENDING SUBDIVISION, City of Harlingen, Cameron County, Texas, according to the Map recorded in Cabinet 1, Slots 384-A and 384-B, Map Records of Cameron County, Texas, and said 4.94 acre tract being more particularly located and described as follows:

COMMENCING at the Southwest corner of said Lot 1, Block 1, TEXAS PIPE BENDING SUBDIVISION;

— THENCE, South 89 degrees 48 minutes 00 seconds West, a distance of 340.58 feet;

THENCE, North 00 degrees 12 minutes 00 seconds West, a distance of 25.43 feet to a ½ inch iron pin set on the North Right-of-Way line of F.M. 106 (Harrison Street) same being the Southwest corner of the tract herein described;

THENCE, North 00 degrees 12 minutes 00 seconds West, a distance of 1059.97 feet to a ½ inch iron pin set for the Northwest corner of this tract;

THENCE, North 89 degrees 48 minutes 00 seconds East, a distance of 237.28 feet to a ½ inch iron pin set for the Northeast corner of this tract;

THENCE, South 00 degrees 12 minutes 00 seconds East, a distance of 260.14 feet to a ½ inch iron pin set for an outside corner of this tract;

THENCE, South 89 degrees 48 minutes 00 seconds West, a distance of 45.56 feet to a ½ inch iron pin set for an inside corner of this tract;

THENCE, South 00 degrees 12 minutes 00 seconds East, a distance of 800.22 feet to a ½ inch iron pin set for the Southeast corner of this tract;

THENCE, South 89 degrees 55 minutes 00 seconds West, along said North Right-of-Way line of F.M. 106 (Harrison Street), a distance of 191.71 feet to the POINT OF BEGINNING, Containing 4.94 acres of land more or less, inclusive of any and all easements, restrictions, exceptions or dedications that might be of record.

NOTE: THIS COMPANY DOES NOT REPRESENT THAT THE ACREAGE AND/OR SQUARE FOOTAGE CALCULATIONS ARE CORRECT.

## EXHIBIT B

## PERMITTED EXCEPTIONS

1.   Standby fees, taxes and assessments by any taxing authority for the year 2002 and subsequent years.

2.   Statutory rights in favor of HARLINGEN IRRIGATION DISTRICT CAMERON COUNTY NO. 1, pursuant to applicable sections of the Texas Water Code.

3.   Easements in favor of HARLINGEN IRRIGATION DISTRICT CAMERON COUNTY NO. 1.

4.   Right of Way Easement dated September 20, 1949 from Fred Langley to Cameron County, recorded in Volume 472, Page 404, Deed Records of Cameron County, Texas.

5.   Right of Way Easement dated February 8, 1951 from Fred Langley to Cameron County, recorded in Volume 509, Page 55, Deed Records of Cameron County, Texas.

6.   Easement dated March 1, 1983 from Texas Pipe Bending Company to City of Harlingen, recorded in Volume 1314, Page 373, Deed Records of Cameron County, Texas.

7.   An undivided ½ mineral interest, the royalties, bonuses and rentals also as set out in instrument dated September 26, 1950 from E. A. Matz, recorded in Volume 500, Page 414, Deed Records of Cameron County, Texas.

8.   1/4th of all oil, gas and other minerals described in deed dated August 18, 1943 from Phoenix Mutual Life Insurance, recorded in Volume 325, Page 155, Deed Records of Cameron County, Texas, together with all rights.

9.   Drainage canal Right-of-Way Easement as shown on the plat of the Subdivision herein referred to.

10.  Road Right-of-Way as shown on the plat of the Subdivision herein referred to.













# DISTRIBUTOR AGREEMENT

**THIS DISTRIBUTOR AGREEMENT** dated July 15 2002, is made between **DANIEL E. DAVIS**, businessperson having an address at P.O. Box 2427, Harlingen, Texas, 78551, USA ("**Davis**") and **FINNING INTERNATIONAL INC.**, a corporation incorporated under the laws of Canada, having an address at 16830 – 107th Avenue, Edmonton, Alberta, T5P 4C3, Canada ("**Finning**").

**WHEREAS:**

A.        Davis had developed and owns the Technology (defined below) regarding the special assembly of the Product Lines (defined below);

B.        Finning, either directly or indirectly through its affiliates and subsidiaries, has the infrastructure to sell and distribute the Distributed Products (defined below) to end-user customers;

C.        Davis and Finning entered into a Letter of Intent dated June 18, 2002, regarding the grant by Davis to Finning of exclusive distribution rights to the Product Lines using the Technology and other related matters (the "**LOI**"); and

D.        Davis and Finning now wish to enter into this Agreement to supersede and replace the LOI;

**NOW, THEREFORE THIS AGREEMENT WITNESS** that in consideration of the premises, mutual covenants and agreements contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is acknowledged by the parties hereto (the "**Parties**"), the Parties covenant and agree as follows:

1.        **INTERPRETATION**

1.1        **Definitions:** As used in this Agreement, the term:

"**Agreement**," "**this Agreement**," "**the Agreement**," "**hereto**," "**herein**," "**hereby**," "**hereunder**" and similar expressions mean or refer to this Agreement as amended from time to time and any indenture, agreement or instrument supplemental or ancillary hereto and the expressions "Article," "Section" and "Schedule" followed by a number or letter mean and refer to the specified Article, Section or Schedule of this Agreement;

"**Assignment of Royalties**" has the meaning ascribed thereto in Section 6.7(c);

"**Books and Records**" means, with respect to each Party, the books and records of that Party relating to the Distributed Products and costs associated therewith, including financial, operations and sales books, books of account, sales and purchase records, lists of customers, business reports and plans;

"**Business Day**" means any day, other than a Saturday, Sunday or a statutory holiday anywhere in Canada or the United States of America;

"**Claim**" means any claim, demand, action, cause of action, damage, loss, costs, liability or expense, including reasonable professional fees and all costs incurred in investigating or pursuing any of the foregoing or any proceeding relating to any of the foregoing;

- 1 -





EXHIBIT

A

"**Confidential Information**" means all information provided by one Party (the "**Disclosing Party**") to the other Party (the "**Receiving Party**") in connection with this Agreement and includes, but is not limited to, specifications, designs, drawings, sketches, models, test results, current and forecasted data, reports, records, discoveries, ideas, inventions, concepts, techniques, methods, source code, project code, source listings, program listings, documentation, diagrams, flow charts, research and development data, processes, procedures, formulas, know how, marketing techniques, customer and supplier lists and other proprietary rights, communicated in any medium. Confidential Information also includes the existence of any terms of the LOI and this Agreement. Confidential Information does not include information that:

(i)     is already known to the Receiving Party from a source which is not prohibited from disclosure as evidenced by written or other dated tangible records;

(ii)    is in the public domain at the time it is disclosed or becomes publicly available after disclosure, other than by breach of this Agreement;

(iii)   is independently and lawfully developed by the Receiving Party completely without reference to the Confidential Information, or with respect to Finning, the Technology, as evidenced by written or other tangible records; or

(iv)    is disclosed without restriction to the Receiving Party in good faith by a third party (other than Caterpillar or its affiliates) who is in lawful possession of the information and who has the right to make the disclosure, or is disclosed by the Receiving Party after receiving written approval from the Disclosing Party;

"**Davis Costs**" means the actual costs paid by Davis to his suppliers and employees for the Minor Components and the assembly of the Major and Minor Components as evidenced by the Books and Records of Davis;

"**Davis Insolvency Event**" has the meaning ascribed thereto in Section 7.1(c);

"**Davis Payment**" has the meaning ascribed thereto in Section 5.5(b);

"**Distributed Products**" means Product Lines manufactured and assembled using, containing or incorporating the Technology;

"**Distribution and Licensing Fee**" has the meaning ascribed thereto in Section 5.1;

"**Due Diligence Completion Date**" has the meaning ascribed thereto in Article 15;

"**Encumbrance**" has the meaning ascribed thereto in Section 7.1(e);

"**Estimated Manufacturing Overhead Costs**" has the meaning ascribed thereto in Section 5.3;

"**Estimated Production Quantity**" has the meaning ascribed thereto in Section 5.3;

"**Event of Default**" means the breach by a Party of any covenant, representation or warranty made by that Party under this Agreement or the Security Documents, or the failure of that Party to perform any of his or its obligations under this Agreement or the Security Documents;

"**Facility**" has the meaning ascribed thereto in Section 3.1;

- 2 -

"**Facility Loan**" has the meaning ascribed thereto in Section 6.1;

"**Favelle Licence**" means the non-exclusive licence granted by Davis to Favelle Favco Cranes (USA) Inc. relating to U.S. Patent No. 6,003,252;

"**Fee Refund**" has the meaning ascribed thereto in Section 5.1;

"**Finning Costs**" means the actual costs paid by Finning to its suppliers, as evidenced by the Books and Records of Finning, for the Major Components;

"**Finning Insolvency Event**" has the meaning ascribed thereto in Section 7.2(c);

"**Force Majeure**" means an event or circumstances that is beyond the reasonable control of a Party and that prevents or delays that Party in the performance or observance of any of, or all, its obligations under of this Agreement, including without limitation, acts or omissions of the other or a third party, acts of civil of military authority, strikes, lockouts, embargoes, insurrections or acts of God;

"**Governmental Authorities**" means any government, regulatory authority, governmental department, agency, commission, board, tribunal, or court or other law, rule or regulation-making entity having or purporting to have jurisdiction on behalf of any nation, state or other subdivision of this Agreement or any municipality, district or other subdivision of this Agreement;

"**Gross Margin**" has the meaning ascribed thereto in Section 5.5;

"**Initial Term**" has the meaning ascribed thereto in Section 2.3;

"**Intellectual Property Rights**" will include all intangible, intellectual, proprietary and industrial property rights of any nature and all intangible embodiments and derivative works thereof, including without limitation, (i) all trade-marks, trade names, slogans, domain names, URLs or logos; (ii) all copyrights, moral rights and other rights in works of authorship; (iii) all patents and patent applications, patentable ideas, algorithms, developments, discoveries, inventions, improvements, innovations; (iv) all know-how and trade secrets; and (v) all registrations, applications, renewals, extensions, continuations, divisions or reissues thereof now or hereafter in force (including any rights in any of the foregoing);

"**Landed Dealer Cost**" means the sum of the Product Cost, Running Royalty and unrecovered freight and transportation costs applicable to each Distributed Product, including without limitation shipping, delivery, transportation and insurance costs pursuant to Sections 4.2 and 4.3;

"**Laws**" means all applicable laws, by-laws, rules, regulations, orders, ordinances, and judgements or other requirements of any Governmental Authority that in each case, have legally binding effect;

"**LIBOR**" means the London InterBank Offered Rate as published by the British Bankers' Association from time to time;

"**LOI**" has the meaning ascribed thereto in Recital C;

"**Major Components**" means, with respect to each Distributed Product, all significant physical parts for the Distributed Products that are purchased by Finning;

"**Manufacturing Overhead Costs**" means Davis' reasonable overhead and administration costs pertaining to the manufacture or assembly of the Distributed Products, including without limitation,

- 3 -

utilities, costing, engineering services, insurance, interest, drafting and accounting services, but will not include capital costs;

"Marketing Fee" has the meaning ascribed thereto in Section 5.5(a);

"Minor Components" means all necessary parts, equipment and services other than the Major Components, necessary to transform the Major Components into Distributed Products and to deliver such Distributed Products to Finning or its customers, and will include without limitation, labour, insurance, warranty allowances and transportation costs, but will not include any costs comprising Manufacturing Overhead Costs;

"Mortgage" has the meaning ascribed thereto in Section 6.7(b);

"Notice" means a notice given in the manner required by Section 16.7 of this Agreement;

"Per Unit EMOC" has the meaning ascribed thereto in Section 5.3;

"Period" has the meaning ascribed thereto in Section 5.3;

"Person" means an individual, corporation, partnership, venture, association, unincorporated organization, other entity or group, or Governmental Authority;

"Product Lines" means telehandler all-terrain cranes, lattice and telescopic boomed crawler cranes, excavator based pipelayers and related equipment or products, and includes any current or future similar products, but specifically excludes any marine or offshore products;

"Product Cost" means the sum of the Finning Costs, Davis Costs and the Manufacturing Overhead Costs applicable to each Distributed Product, or the analogous calculation for any Replacement Product;

"Referral" has the meaning ascribed thereto in Section 2.2;

"Referral Commission" has the meaning ascribed thereto in Section 5.6;

"Renewal Term" has the meaning ascribed thereto in Section 2.3;

"Replacement Product" means any product sold by Finning, anywhere other than in Canada, England and Chile, in place of a Distributed Product to a Person referred by Davis or his agent to Finning;

"Returned Product" has the meaning ascribed thereto in Section 5.7;

"Running Royalty" has the meaning ascribed thereto in Section 5.4;

"Sale Price" has the meaning ascribed thereto in Section 5.5;

"Security Agreement" has the meaning ascribed thereto in Section 6.7(a);

"Security Documents" has the meaning ascribed thereto in Section 6.7(c);

"Specifications" means, with respect to any Distributed Product, any specifications provided by or to Davis, to or by the manufacturer of any Major Components or Minor Components related to that Distributed Product;

- 4 -

"**Technology**" means all of the property and proprietary know-how, including any patents, patent applications, drawings (including assembly drawings), copyrights and other intellectual property rights used by Davis in relation to the special assembly of the Product Lines, including without limitation the items described in the attached Schedule B and any present or future improvements or enhancements thereto; and

"**Term**" means the Initial Term and any Renewal Terms described in Section 2.3.

**1.2    Schedules:**   The following Schedules are incorporated into and form part of this Agreement:

| Schedule | | Description |
|----------|---|-------------|
| Schedule A | - | Product Cost Summary |
| Schedule B | - | Technology |
| Schedule C | - | Davis' Warranty on Distributed Products |

**1.3    Division, Headings:**   The division of this Agreement into Articles, Sections and Subsections and the insertion of headings are for convenience of reference only and will not affect the construction or interpretation of this Agreement.

**1.4    Gender and Number:**   Unless the context otherwise requires, words importing the singular include the plural and vice versa and words importing gender include all genders.

**1.5    Invalidity of Provisions:**   The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of any other provision of this Agreement and any such invalid or unenforceable provisions will be deemed to be severable. If any provision is declared to be invalid or unenforceable, the Parties agree to meet within thirty (30) days after any declaration of invalidity to renegotiate in good faith a valid amendment of the Agreement representing, as much as reasonably possible, the original intentions of the Parties.

**1.6    Currency:**   Unless otherwise stated, all amounts in this Agreement are stated in United States' Dollars (US$).

**1.7    Accounting Principles:**   In the absence of a specific provision in of this Agreement providing otherwise (expressly or by implication), financial or accounting determinations and calculations will be made in accordance with generally accepted accounting principles applicable in the United States.

**1.8    Calculation of Time:**   Unless otherwise specified, time periods within or following which any act is to be done will be calculated by excluding the day on which the period commences and including the day on which the period ends.

**1.9    Business Day:**   In the event that any action to be taken under this agreement falls on a day that is not a Business Day, then such action will be taken on the next succeeding Business Day.

**1.10    Inclusion:**   Where the words "including" or "includes" appear in of this Agreement, they mean "including (or includes) without limitation".

**1.11** **Governing Law:** This Agreement will be governed by and interpreted and construed in accordance with the laws in force in the State of Texas USA.

**2.** **DISTRIBUTORSHIP AND TERM**

**2.1** **Grant of Distributorship:** Subject to Sections 2.2, 5.1, Article 15 and the Favelle Licence, Davis hereby grants to Finning the exclusive right to market, distribute and sell the Distributed Products throughout the world, and Finning hereby agrees to act as the exclusive distributor of Davis with respect to the Distributed Products, in accordance with the terms and conditions set forth in of this Agreement.

**2.2** **Reservation of Rights / Referrals:** Notwithstanding Section 2.1, Davis may, by himself or through his agents, market the Distributed Products throughout the world. Davis or his agents will refer to Finning all prospective distributions and sales of Distributed Products that Davis or his agents solicit or procure (each, a "Referral"). Davis or his agents will prepare all sales orders and sales documents required by Finning in order for Finning to complete a sale from a Referral. Finning will use reasonable commercial efforts to complete all possible sales of Distributed Products from each Referral. Notwithstanding the foregoing, Davis will not, by himself or through his agents, conclude any sale for any Distributed Product, hold himself out as an agent of Finning, purport to have authority to bind Finning contractually or otherwise, or actually have authority to bind Finning contractually or otherwise. In consideration of Davis or his agents making Referrals, Finning will pay Davis the Referral Commission in accordance with Section 5.6.

**2.3** **Term:** This Agreement will commence on the day and year first above written and will subsist for an initial term of 10 years (the "Initial Term"). Upon the expiry of the Initial Term or any Renewal Term, this Agreement will automatically renew for successive 5 year terms (each, a "Renewal Term") unless either Party delivers to the other Party written Notice of non-renewal not less than 60 days prior to the expiry of then current Initial Term or Renewal Term, as applicable. This Agreement will not be terminated except as provided in Articles 12 and 15.

**3.** **PRODUCTION OF DISTRIBUTED PRODUCTS**

**3.1** **Facility:** Davis will build as soon as reasonably practicable or acquire the Tex-Steel facility located in Harlingen, Texas not later than August 12, 2002, or another manufacturing facility as soon as reasonably practicable (the "Facility") capable of accommodating in an efficient and effective manner:

(a) the manufacture and assembly of the Distributed Products by Davis in a quantity sufficient to meet the projected demand of the parties and the quality control requirements mandated by manufacturers and suppliers of the Major Components;

(b) the performance by Davis of ongoing testing and quality assurance of the Distributed Products; and

(c) the researching further developments and improvements to the Technology, the Distributed Products and related technology and products.

**3.2** **Supply of Major Components:** Finning will purchase for its own account and deliver to Davis, FOB Harlingen, Cameron County, Texas, all Major Components from Caterpillar or other suppliers as may be mutually agreed between the Parties from time to time, for use in the manufacture

Document: 1005628:05

and assembly of the Distributed Products by Davis. The Parties will cooperate and use reasonable commercial efforts to assist Finning in obtaining the Major Components at the lowest price possible, using the targeted amounts described in the attached Schedule A as a guide. Finning will coordinate with Davis the purchase and delivery of the Major Components in accordance with Article 4. As between the Parties, Davis will be the original equipment manufacturer of record for the Distributed Products.

**3.3      Supply of Minor Components:** Davis will purchase or provide for its own account all Minor Components at the lowest possible price obtainable by Davis though reasonable commercial efforts, using the amounts described in the attached Schedule A as a guide. Davis will coordinate with Finning the purchase and provision of the Minor Components in accordance with Article 4.

**3.4      Minimizing Costs:** The Parties will periodically review the Product Costs and will cooperate and use reasonable commercial efforts to minimize the Product Costs and to obtain the most cost effective method of manufacturing and assembling the Distributed Products.

**3.5      Manufacturing and Assembly:** Subject to Article 4, upon receipt of Major Components from Finning or its suppliers, Davis will manufacture and assemble the Distributed Products to which the Major Components pertain. Davis will manufacture and assemble the Distributed Products in a prompt, timely and efficient manner and will produce such Distributed Products to meet Finning's demand for the same, provided that Davis will have no obligation to manufacture and assemble any Distributed Product unless and until Finning, or its suppliers, have delivered to Davis the Major Components for that Distributed Product.

**3.6      Title and Risk of Loss:** Title to all Major Components and Distributed Products will at all times remain with Finning, its suppliers or its customers. Risk of loss to all Major Components will pass to Davis upon Finning or its suppliers delivering the Major Components to Davis and will remain with Davis until the Major Components are either:

(a)      manufactured and assembled into Distributed Products and such Distributed Products are delivered by Davis to Finning or Finning's customers in accordance with Article 4; or

(b)      the Major Components are returned to Finning or its suppliers on such terms as the Parties may agree from time to time.

Davis will purchase and maintain throughout the Term such insurance to protect against risk of loss to the Major Components and the Distributed Products as Finning may reasonably require from time to time. All insurance coverage that Finning requires Davis to maintain will be carried with insurer(s) reasonably acceptable to Finning. Davis will submit policies and/or certificates of insurance evidencing the required insurance coverage (which will include an agreement by the insurer not to cancel or alter its coverage except upon thirty (30) days prior written Notice to Finning) to Finning for its approval before entering into performance of this Agreement. The insurance coverage secured by Davis under this Agreement will be primary and non-contributing with any similar insurance that may be maintained or provided by Finning, and any certificate furnished by Davis will be endorsed to so state.

**3.7      Pricing:** The Parties periodically will consult with each other to establish a range of prices at which Finning will endeavour to sell the Distributed Products having regard to applicable market

determine the price at which it sells any Distributed Product, provided however, that Finning will endeavour to maximize the Sale Price for all Distributed Products.

## 4.      ORDERS AND DELIVERY OF DISTRIBUTED PRODUCTS

**4.1      Orders for Distributed Products:** Finning will, from time to time, deliver to Davis written orders for Distributed Products, specifying the type and quantity of Distributed Products ordered, the Person and location to which the Distributed Products are to be delivered upon completion, the required delivery date for the Distributed Products, and such other details reasonably required to process and fulfil such an order. Upon Finning delivering an order to Davis for Distributed Products, Finning will arrange for all Major Components related to that order to be delivered to Davis at the Facility. Upon receipt of such Major Components by Davis at the Facility, Davis will manufacture and assemble the Distributed Products specified in that order in accordance with that order and will promptly notify Finning upon the completion of the Distributed Products.

**4.2      Delivery of Distributed Product:** At Finning's cost, Davis will deliver completed Distributed Products to the Person, at the location and on the date specified by Finning in each order, provided however, that the specified delivery date will not be less than 60 calendar days from the date on which the Major Components related to that order were delivered to Davis at the Facility. The Parties will cooperate and coordinate the order and delivery of Distributed Products, Major Components and Minor Components in order to efficiently fulfil Finning's demand for Distributed Products in a timely and cost-effective manner.

**4.3      Transportation, Insurance and Shipping Documents:** At Finning's cost, Davis will be responsible for arranging all transportation for Distributed Products from the Facility to the delivery location specified in each order and will also procure insurance for the Distributed Products against the risks of transportation with a well-rated insurance company approved by Finning acting reasonably. Davis will be responsible for preparing or causing to be prepared all documents and invoices necessary for transportation of the Distributed Products.

## 5.      PAYMENTS

**5.1      Distribution and Licensing Fee:** Upon Finning's obligations under this Section 5.1 commencing and becoming of full force and effect pursuant to Article 15, and in consideration of Davis granting Finning the rights in Section 2.1, Finning will pay Davis US$1,500,000 (the "**Distribution and Licensing Fee**") by initiating a wire transfer of the Distribution and Licensing Fee to an account specified by Davis. Davis will refund one third of the Distribution and Licensing Fee (US$500,000) to Finning by Davis directing Finning to retain 50% of the Running Royalty in accordance with Section 5.4 (the "**Fee Refund**"). Davis will use a portion of the Distribution and Licensing Fee to protect the Technology for the benefit of Finning and to further develop the Technology and the Distributed Products.

**5.2      Davis Costs:** Finning will pay Davis the Davis Costs applicable to each Distributed Product within 15 Business Days of Davis advising Finning that the Distributed Product is fully manufactured and assembled in accordance with this Agreement, conforms to the Specifications and is ready to be shipped to a customer. In the event Davis does not have sufficient operating capital to finance the Davis Costs, upon the request of Davis, Finning will consider advancing funds to Davis for this purpose upon such terms as the Parties may from time to time agree, provided that nothing in this Section 5.2 will be construed as requiring Finning to advance any funds to Davis.

**5.3**     **Manufacturing Overhead Costs:**  Before the start of each calendar quarter during the Term or before the start of such other period of time as the Parties may agree (each, a "**Period**"), the Parties will agree upon the estimated Manufacturing Overhead Costs for that Period (the "**Estimated Manufacturing Overhead Costs**") together with the estimated number of Distributed Products to be manufactured and assembled by Davis during that Period (the "**Estimated Production Quantity**").  Each time Finning orders a Distributed Product, Finning will pay Davis the Estimated Manufacturing Overhead Costs divided by the Estimated Production Quantity (the "**Per Unit EMOC**").  As soon as reasonably practicable after the end of each Period, the Parties will calculate the actual Manufacturing Overhead Costs for that Period.  The Parties will adjust the Per Unit EMOC for each Period up or down by the amount by which the aggregate Per Unit EMOC paid by Finning to Davis during the immediately previous Period is less than or exceeds the actual Manufacturing Overhead Costs for that Period, respectively.  It is the intention of the Parties that the Per Unit EMOC will be adjusted each Period pursuant to this Section 5.3 so that the aggregate Per Unit EMOC paid by Finning to Davis throughout the Term is equal to the aggregate Manufacturing Overhead Costs throughout the Term, on a Period by Period basis.

**5.4**     **Running Royalty:**  Within 10 Business Days of Finning receiving the Sale Price in full from a customer with respect to the initial sale of a Distributed Product, Finning will pay Davis a running royalty equal to six percent (6%) of the Product Cost for that Distributed Product (the "**Running Royalty**").  Notwithstanding the foregoing, Davis irrevocably directs Finning to withhold 50% of the Running Royalty and credit it towards the Fee Refund until Davis has paid Finning the Fee Refund in full totalling $500,000.  For greater certainty, the Parties agree that Davis will only receive a Running Royalty with respect to the first sale of each particular Distributed Product to a customer, and will not be entitled to, and Finning will not pay Davis, any Running Royalty with respect to the resale or any subsequent sale of that particular Distributed Product by the customer, Finning or any other Person, whether or not that particular Distributed Product becomes a Returned Product.

**5.5**     **Marketing Fee:**  To the extent that the price for which Finning sells a Distributed Product to a customer (the "**Sale Price**") exceeds the Landed Dealer Cost for that Distributed Product (the difference being the "**Gross Margin**"):

(a)     Finning will retain that portion of the Gross Margin up to an amount equal to 20% of the Sale Price (the "**Marketing Fee**"); and

(b)     Finning will pay Davis within 15 Business Days of Finning receiving the Sale Price in full from the customer, 75% of any portion of the Gross Margin remaining after Finning has retained the Marketing Fee (the "**Davis Payment**").  At any and all times while there is an outstanding balance under the Facility Loan, Davis hereby irrevocably directs Finning to retain 60% of the Davis Payment owing by Finning to Davis in accordance with this Section 5.5 and apply such amount to payment by Davis of the Facility Loan until the Facility Loan is repaid in full.

**5.6**     **Referral Commission:**  In addition to other amounts contemplated in this Agreement, Finning will pay Davis a referral commission equal to 5% of the Sales Price for each Distributed Product or Replacement Product sold by Finning arising from a Referral within 6 months of Davis making the Referral, provided that all such sales must arise independent from any pre-existing relationship that any such customer had with Finning, as evidenced in Finning's Books and Records, for each product in the Product Lines (the "**Referral Commission**").  In order for Davis to be eligible for a Referral Commission with respect to any Distributed Product, Davis or his marketing agents must complete and deliver to Finning the sales order and all other sales documents required by Finning to finalise the sale of that

-9-

Distributed Product. Finning will pay Davis the Referral Commission applicable to each Distributed Product sold within 15 Business Days of Finning rendering an invoice to the customer with respect to that Distributed Product.

5.7       **Reversal of Sales:**  Notwithstanding any other provision of this Agreement, if a customer reverses the purchase of a Distributed Product from Finning and returns that Distributed Product to Finning or its agents (each, a **"Returned Product"**), Davis will not be entitled to the Referral Commission, if applicable, with respect to that Returned Product. If Finning has paid Davis the Referral Commission with respect to a Returned Product, Davis will refund the Referral Commission so paid by Finning with respect to that Returned Product within 15 Business Days of Finning advising Davis that the customer has returned that Returned Product, by either paying Finning such Referral Commission or by issuing Finning a credit equal to the amount of such Referral Commission, as Finning may direct in its discretion.

6.        **FINNING FINANCING**

6.1       **Facility Loan:**  Finning will make available to Davis, and Davis will borrow from Finning, up to the principal amount of US$1,500,000 (the **"Facility Loan"**), upon the terms and conditions set out in this Agreement. The Facility Loan will not bear interest from the date of advance until July 15, 2007. The Facility Loan will bear interest after July 15, 2007 in accordance with Section 6.5.

6.2       **Purpose:**  Davis will use the Facility Loan exclusively for the purposes of building, acquiring or equipping the Facility and for no other purpose.

6.3       **Advance of Funds:**  Davis may draw against the Facility Loan and Finning will advance Davis funds under the Facility Loan only in accordance with the provisions of Article 6. Each time Davis wishes to draw against the Facility Loan, he will make a request to Finning in writing specifying the amount and the date on which he wishes Finning to advance him funds under the Facility Loan, which date will not be less than 15 Business Days after the date on which Davis delivers the request to Finning. Concurrently with Finning making any advance under the Facility Loan, Davis will execute such documents as Finning may reasonably require to evidence the portion of the Facility Loan to be advanced. Notwithstanding the foregoing, Finning will not be required to advance Davis funds under the Facility Loan if:

(a)       Davis has not executed and delivered to Finning the Security Documents in accordance with Section 6.7;

(b)       Davis has committed an Event of Default;

(c)       in the reasonable opinion of Finning, there has been any material adverse change in the business, assets or financial condition of Davis; or

(d)       there is any action, proceeding or investigation pending or threatened against Davis, which would in the reasonable opinion of Finning, if successful, have a material adverse effect on Davis' ability to repay the Facility Loan under the terms of this Agreement.

6.4       **Acknowledgement of Previous Advance:**  Davis acknowledges that Finning previously advanced Davis US$100,000 on June 18, 2002, pursuant to the LOI. Davis agrees that this US$100,000

- 10 -

will be deemed to be an advance under the Facility Loan and will be subject to the provisions of this Agreement.

**6.5**     **Repayment of Facility Loan:** Subject to Sections 5.5, 6.6, 11.1, 12.1 and Article 15, the outstanding balance of the Facility Loan will become immediately due and payable, and Davis will pay Finning the outstanding balance of the Facility Loan in full, on or before July 15, 2007; and if the Facility Loan is not paid to Finning in full on or before July 15, 2007, then interest will accrue at an interest rate equal to LIBOR + 5% on the outstanding balance of the Facility Loan from July 15, 2007 until the Facility Loan and interest are paid in full.

**6.6**     **Prepayment:** Notwithstanding Section 6.5, Davis may at any time repay Finning the whole or from time to time any part of the outstanding balance of the Facility Loan without notice, bonus or penalty. Any payments so received by Finning will be applied firstly to any accrued and unpaid interest, and secondly to the unpaid balance of the principal then outstanding.

**6.7**     **Security:** As security for repayment of the Facility Loan, Finning will, as soon as reasonably practicable after the date of this Agreement, deliver to Davis for his approval the documents listed in this Section 6.7, and upon such approval, Davis will:

    (a)     execute and deliver to Finning a security agreement (the "**Security Agreement**") granting Finning a first charge security interest over:

        (i)     all of Davis' equipment and tooling to be purchased with the proceeds of the Facility Loan; and

        (ii)     the Technology (and Finning acknowledges that the Technology, by its definition, does not relate to the special assembly of any marine or offshore products);

    in a form acceptable to Finning, provided that the security interest granted to Finning in the Technology will be subject to an ongoing automatic right of reversion in favour of Davis for a period of 10 years commencing from the date of the Security Agreement. If at any time during this 10 year period Davis pays Finning in full the outstanding balance of the Facility Loan (including all accrued interest thereon, if any), the ownership of the Technology will automatically revert to Davis. Finning agrees to execute such documents and take further steps as may be reasonably required to perfect this reversion of ownership at that time;

    (b)     immediately upon the later of Davis acquiring the Facility or executing this Agreement, Davis will execute and deliver to Finning a mortgage, in a registrable form acceptable to Finning, together with all other related documents Finning determines are necessary for registering the same, granting Finning a first mortgage over the Facility (the "**Mortgage**"); and

    (c)     execute and deliver to Finning a collateral assignment of all royalties and income to be derived by Davis from the Technology or the Distributed Products, in a form acceptable to Finning (the "**Assignment of Royalties**", together with the Security Agreement and Mortgage, the "**Security Documents**").

Document: 1005628:05

6.8        **Compliance with Finning's Policies:**  Davis will comply promptly with any and all reasonable policies and other guidelines of Finning with respect to Distributed Products of which Finning will give Davis upon execution of this Agreement.

6.9        **Initial Advance of Funds:**  The Parties will use reasonable commercial efforts to complete and execute the Security Documents as soon as reasonably practicable, but in any event not later than August 1, 2002.  Subject to Section 6.3, Finning will advance US$750,000 under the Facility Loan to Davis by initiating a wire transfer of such funds to an account specified by Davis not later than August 1, 2002.

7.        <u>**REPRESENTATIONS, WARRANTIES AND COVENANTS**</u>

7.1        **Davis Representations, Warranties and Covenants:**   Davis represents, warrants and covenants to and with Finning, with the intention that Finning is relying upon these representations, warranties and covenants in entering into this Agreement, that except as otherwise expressly provided for in this Agreement, now and at all times throughout the Term:

     (a)        Davis has the requisite power, authority and approvals to enter into, execute and deliver this Agreement, the Security Documents and to perform his respective obligations under this Agreement and the Security Documents;

     (b)        the execution and delivery of this Agreement and the Security Documents and the performance by Davis of his obligations under this Agreement and the Security Documents will not conflict with or constitute a breach of or default under any outstanding contract, commitment or agreement to which Davis is a party or to which the Technology or Distributed Products are subject, or limit, restrict or impair the rights granted to Finning under this Agreement and the Security Documents;

     (c)        Davis is not bankrupt or insolvent, no receiver, receiver-manager, receiver and manager, or liquidator has been appointed over any part of the property of Davis, no proceeding has been commenced by or against Davis under any bankruptcy, arrangement, reorganization, dissolution, liquidation, insolvency or similar law for the relief of or otherwise affecting creditors of Davis, or by or against any guarantor or surety for Davis, and no writ of execution, warrant, attachment, sequestration, levy, third party demand, notice of intention to enforce security or garnishment or similar process has been issued against Davis or any of Davis' property (each, a "**Davis Insolvency Event**");

     (d)        Davis is not aware of any basis for a Davis Insolvency Event to occur;

     (e)        Davis is the sole and exclusive legal and beneficial owner of the Technology, free and clear of all mortgages, assignments of rents, leases, licenses, charges, security interests, hypothecs, liens, options to acquire any interest in, claims, judgments or any other form of encumbrance (each, an "**Encumbrance**") other than the Favelle Licence and any security or rights granted to Finning pursuant to this Agreement;

     (f)        other than the Favelle Licence, Davis has not granted and no third party has any rights or anything capable of becoming a right, to use the Technology or to distribute, market or sell the Distributed Products;

- 12 -

(g)    to the best of Davis' knowledge after making due enquiry, the Technology does not infringe any Intellectual Property Rights of any Person;

(h)    upon executing and delivering the Mortgage in accordance with Section 6.7, Davis will be the registered and beneficial owner of the Facility, free and clear of all financial Encumbrances other than the Mortgage;

(i)    the Major Components, Minor Components and Technology, together with Davis' skills and all drawings, specifications, engineering and related materials in his possession, are sufficient to enable him to manufacture or assemble the Distributed Products in a safe and competent manner;

(j)    all Distributed Products will be manufactured and assembled by Davis in a prompt, efficient, skilful and careful manner in accordance with North American industry standards for the manufacture and assembly of similar equipment, and in compliance with all applicable Laws;

(k)    upon being delivered by Davis to Finning or its customers in accordance with Article 4, all Distributed Products will conform to the Specifications, will be new (except to the extent that the Major Components, when delivered to Davis by Finning, are not new), of merchantable quality and will be fit for their intended purpose;

(l)    Davis will only use the Technology for the purposes of manufacturing and assembling the Product Lines;

(m)    Davis will not grant any license or other rights in the Technology for the Product Lines to any Person without Finning's prior written consent;

(n)    Davis will not permit any Encumbrance to exist on any of its property or assets, including the Facility, Technology and Minor Components, except as expressly contemplated in this Agreement or as otherwise approved by Finning in writing; and

(o)    Davis will obtain and maintain in full force and effect throughout the Term, at its own expense, any and all permits, approvals and licenses required by any Governmental Authorities relating to the manufacture and assembly of the Distributed Products at the Facility.

7.2    **Finning Representations, Warranties and Covenants:**  Finning represents, warrants and covenants to and with Davis, with the intention that Davis is relying upon these representations, warranties and covenants in entering into this Agreement, that except as otherwise expressly provided for in this Agreement, now and at all times throughout the Term:

(a)    Finning has the requisite power, authority and approvals to enter into, execute and deliver this Agreement and to perform its respective obligations under this Agreement;

(b)    the execution and delivery of this Agreement and the performance by Finning of its obligations under this Agreement will not conflict with or constitute a breach of or default under any outstanding contract, commitment or agreement to which Finning is a party, or limit, restrict or impair the rights granted to Davis under this Agreement;

- 13 -

(c)     Finning is not bankrupt or insolvent, no receiver, receiver-manager, receiver and manager, or liquidator has been appointed over any part of the property of Finning, no proceeding has been commenced by or against Finning under any bankruptcy, arrangement, reorganization, dissolution, liquidation, insolvency or similar law for the relief of or otherwise affecting creditors of Finning, or by or against any guarantor or surety for Finning, and no writ of execution, warrant, attachment, sequestration, levy, third party demand, notice of intention to enforce security or garnishment or similar process has been issued against Finning or any of Finning's property (each, a "**Finning Insolvency Event**");

(d)     Finning is not aware of any basis for a Finning Insolvency Event to occur;

(e)     Finning will not grant any rights in this Agreement to any Person without Davis' prior written consent;

(f)     Finning will not permit any Encumbrance to exist on or with respect to this Agreement;

(g)     Finning will obtain and maintain in full force and effect throughout the Term, at its own expense, any and all permits, approvals and licenses required by any Governmental Authorities relating to the sale or distribution of the Distributed Products;

(h)     Subject to Sections 6.7, 12.1 and the Security Documents, Finning acknowledges that Davis is the sole and exclusive owner of the Technology and that Finning will not challenge, in any forum, Davis' right of ownership over the Technology;

(i)     Any improvement or enhancement to the Technology will be the sole and exclusive property of Davis;

(j)     Finning will use reasonable commercial efforts to complete the sale for all referrals received from Davis or his agent; and

(k)     Finning will use reasonable commercial efforts to market and sell the Distributed Products within the Product Lines throughout the world.

8.     **DISTRIBUTED PRODUCT WARRANTIES**

The Parties will cooperate and use reasonable commercial efforts to cause all warranties offered by manufacturers of the Major Components to be passed on to and for the benefit of Finning's end-use customers.  Davis will, at its own expense, provide or cause DAVCRANE Inc. to provide, all customers who purchase a Distributed Product through Finning with a warranty that the manufacturing and assembling performed by Davis will be free from defects in accordance with the provisions in the attached Schedule C.

9.     **CONFIDENTIALITY**

9.1     **Confidentiality:**  Unless otherwise agreed upon in writing between the Parties or as required by law or stock exchange requirements, a Receiving Party will keep all Confidential Information which is disclosed to it by a Disclosing Party under this Agreement confidential and will not disclose the Confidential Information to any third party.  The Receiving Party will not reproduce any Confidential Information supplied to it in any form except as required to accomplish the purpose of and in accordance with the terms of this Agreement.  The Receiving Party will provide the same care to avoid disclosure or

- 14 -

unauthorized use of Confidential Information as it provides to protect its own similar proprietary information but in no event will the Receiving Party fail to use reasonable commercial efforts and take reasonable care under the circumstances to avoid disclosure or unauthorized use of Confidential Information. Confidential Information, unless otherwise specified in writing: (a) will remain the property of the Disclosing Party; (b) will be used by the Receiving Party only for the purposes of any work under this Agreement; and (c) which is in tangible form, including all copies of such information, will be returned to the Disclosing Party or destroyed (as the Disclosing Party may direct) after the Receiving Party's need for it has expired or upon request of the Disclosing Party, and, in any event, upon termination or expiry of this Agreement.

9.2        **Disclosure Required By Law:**  The Receiving Party will not be in breach of its obligation not to disclose Confidential Information of the Disclosing Party if that disclosure is required by law, a court order or a stock exchange having authority over the Receiving Party, provided that the Receiving Party gives the Disclosing Party as much Notice as is reasonably in the circumstances prior to disclosing any Confidential Information and the Receiving Party co-operates with the Disclosing Party in any application, proceedings or other action the Disclosing Party may undertake to obtain a protective order or other means of protecting the confidentiality of the Confidential Information required to be disclosed.

10.        **INTELLECTUAL PROPERTY RIGHTS**

10.1        **Protection of Intellectual Property Rights:**  Davis will obtain patent and other Intellectual Property Rights' registrations and protections in each additional country as reasonably requested by Finning for the Technology.  The Parties agree to share equally in the cost of expanding protection of the Intellectual Property Rights included in the Distributed Products in additional countries, and to consult with each other to formulate a plan and effect the optimal protection at reasonable expense. Nothing in this paragraph will be interpreted to require Finning to participate, support or financially contribute in any way in or to the defence or opposition to any Claim that may be made by any Person against the Technology and/or against Davis in respect of his rights in the Technology.

10.2        **Notification of Intellectual Property Disputes:**  The Parties will promptly notify each other of any existing, expected or threatened dispute with any third Person, which comes to their attention regarding the Technology, or any Intellectual Property Rights relating to the Distributed Products, or of any act or event which may negatively affect the Parties or the sale of the Distributed Products.

10.3        **Notice of Infringements by Third Parties:**  Finning will promptly inform Davis of all instances of which it may have knowledge which constitute or could constitute an infringement of the Technology.

11.        **DISPOSITION OF TECHNOLOGY**

11.1        **Prohibition / Facility Loan:**  Davis will not sell, license, assign, transfer, encumber or otherwise dispose of any of his rights in or to the Technology or the Distributed Products to any Person, including any sale, license, assignment, transfer, encumbrance or disposition made pursuant to Section 11.2, while there is any outstanding balance owing to Finning under the Facility Loan.

11.2        **Right of First Refusal:**  If Davis wishes to sell, license, assign, transfer, encumber or otherwise dispose of any of his rights in or to the Technology or the Distributed Products to any Person other than Finning, Davis will, in writing, first offer Finning to acquire such rights on the same terms being offered to or by that other Person. If within 30 calendar days of receiving such an offer from Davis,

- 15 -

Finning does not deliver to Davis written Notice of its intention to acquire such rights on such terms, Davis will be free to dispose of such rights, subject to Finning's rights in and to the Technology and the Distributed Products under this Agreement, within 30 calendar days on such terms to the other Person upon paying Finning 25% of the proceeds of such disposition as a distributorship cancellation fee. Notwithstanding the foregoing, the Parties may, by mutual agreement, dispose of all or any portion of the Technology or the Distributed Products.

## 12.   EVENTS OF DEFAULT AND TERMINATION

**12.1**   **Event of Default by Davis:**  If Davis has committed an Event of Default and fails to cure such Event of Default within 30 Business Days of Finning delivering Notice of the same to Davis, Finning may do any or all of the following:

    (a)   terminate this Agreement forthwith in its entirety without prejudice, however, to any rights it may have against Davis arising prior to termination;

    (b)   declare the outstanding balance of the Facility Loan to be immediately due and payable by Davis and exercise any and all rights Finning may have at law, in equity or pursuant to this Agreement or the Security Documents; and

    (c)   take possession of the Facility, Technology, Major Components, Minor Components and Distributed Products and conduct manufacturing and assembly of the Distributed Products itself.

**12.2**   **Event of Default by Finning:**  If Finning has committed an Event of Default and fails to cure such Event of Default within 30 Business Days of Davis delivering Notice of the same to Finning, Davis may terminate this Agreement forthwith in its entirety without prejudice, however, to any rights it may have against Finning arising prior to termination.

## 13.   FORCE MAJEURE

**13.1**   **Relief:**  If a Party is prevented or delayed in performing or observing its obligations under of this Agreement by Force Majeure, the time for performance of those obligations is deferred for the duration of the event or circumstance of Force Majeure.

**13.2**   **Notice:**  A Party that is prevented or delayed by Force Majeure and that seeks relief under this Article 13 must give written Notice to the other Party as soon as possible after the event or circumstance of Force Majeure is known to the first Party, and in any event not later than two (2) Business Days after the date when that event or circumstance is known to the first Party. A Party that has given Notice of an event or circumstance of Force Majeure will give Notice to the other Party of the cessation of that event or circumstance promptly after cessation is known to the first Party.

**13.3**   **Mitigation:**  If Notice is given by either Party of an event or circumstance of Force Majeure, each Party will exercise reasonable commercial efforts to avoid, or minimize any delay occasioned thereby, provided that a Party prevented or delayed by a strike, lockout or labour disturbance or slowdown will not be required to settle that matter other than on terms acceptable to it in its discretion. The Parties will meet promptly after any Notice is given under Section 13.2, and from time to time thereafter during the continuance of any event or circumstance of Force Majeure, to discuss and endeavour in good faith to agree upon measures to be taken by either or both Parties to avoid, or minimize any delay, occasioned by that event or circumstance of Force Majeure.

- 16 -

**13.4**      **Resumption of Performance:** A Party that is prevented or delayed in the performance or observance of its obligations under of this Agreement by Force Majeure will resume promptly the performance and observance of those obligations after cessation of the event or circumstance of Force Majeure.

## 14.      DISPUTE RESOLUTION/REMEDIES

**14.1**      **Dispute:** Any dispute or controversy arising out of or in connection with this Agreement or its performance, including without limitation the validity, scope, meaning, construction, interpretation or application of this Agreement or any provision of this Agreement will be submitted to final and binding arbitration by a single arbitrator. The arbitration will be administered by the American Arbitration Association in accordance with its International Arbitration Rules. The place of arbitration will be Houston, Texas. The Parties will instruct the arbitrator that the Parties desire any arbitration proceedings to be completed as expeditiously as possible. A Party may enter any judgment rendered by the arbitrator in and by any court having jurisdiction. Notwithstanding any provision in this Agreement, neither Party will be entitled to claim, and the arbitrator will not award, punitive, special or other damages in excess of actual damages sustained by a Party. The arbitrator may award costs for reasonable attorney's fees.

**14.2**      **Equitable Remedies:** Nothing in the Agreement is intended to prevent or limit a Party's access to injunction or other equitable or mandatory relief before the arbitrator. Each of the Parties acknowledges and agrees that any breach by the other Party of any of its obligations under of this Agreement may result in immediate and irreparable harm to the other Party, and that in the event of such a breach, the other Party will be entitled to interim and interlocutory injunctive relief without being required to prove irreparable harm or to post security.

**14.3**      **Damages:** Subject to the limitations contained in Section 14.1, nothing else in this Agreement will be construed so as to prevent or restrict either Party from exercising any right to claim damages against the other Party by reason of any breach of or default under of this Agreement by the other Party.

**14.4**      **Remedies Non-Exclusive:** All rights and remedies provided hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

## 15.      DUE DILIGENCE

The rights and obligations of the Parties under this Agreement will not commence and will be of no force and effect unless and until Finning has completed due diligence on the Technology as it deems necessary, which Finning will do on or before July 22, 2002 (the "Due Diligence Completion Date"), and Finning is satisfied, in its sole discretion, as to the composition, status and integrity of the Technology. If Finning is, in its sole discretion, not satisfied as to the composition, status and integrity of the Technology, Finning may terminate this Agreement by delivering a written Notice of termination to Davis on or before the Due Diligence Completion Date, whereupon this Agreement will terminate and the US$100,000 advanced by Finning to Davis pursuant to the LOI will be applied as a credit against future purchases by Finning of products from Davis or an affiliate of Davis. If Finning does not deliver a written Notice of termination to Davis on or before the Due Diligence Completion Date, the rights and obligations of the Parties under this Agreement will commence and will be of full force and effect at 12:01 a.m. Pacific Daylight Time on July 23, 2002.

Document: 1005628:05

16.        **GENERAL**

16.1        **Further Assurances:** The Parties agree that they or their respective heirs, executors, administrators, personal representatives, successors or permitted assigns will execute and deliver such further and other instruments, agreements and writings and will cause such meetings to be held, resolutions passed and by-laws enacted, exercise their vote and influence, do and perform and cause to be done and performed, such further and other acts and things that may be necessary or desirable in order to give full effect to of this Agreement and every part of it.

16.2        **Withholdings:** Notwithstanding any provision in this Agreement, each Party will deduct from and remit to the appropriate Governmental Authorities within the time required by Law, all amounts that the Party is required to withhold and remit pursuant to all applicable Laws with respect to any payment made under this Agreement.

16.3        **Relationship:** The relationship between Davis and Finning is solely that of independent contractors, and nothing in of this Agreement will cause Davis to be considered an agent, employee, joint venturer or legal representative of Finning; nor will Davis hold itself out as an agent, employee, joint venturer or legal representative of Davis. Davis will have no authority to bind or commit Finning in any manner or for any purpose whatsoever and will not undertake any obligation or responsibility, express or implied, on behalf of or in the name of Finning. This Agreement creates no joint ventures, or partnerships or principal/agent relationships between the Parties. Finning will under no circumstances be liable for any acts committed by Davis or his employees, agents, or representatives. Davis will under no circumstances be liable for any acts committed by Finning or its officers, directors, employees, agents or representatives.

16.4        **Time of Essence:** Time will be of the essence of this Agreement and of every part of this Agreement and no extension or variation of this Agreement will operate as a waiver of this provision.

16.5        **Successors and Assigns:** This Agreement will enure to the benefit of and be binding upon the Parties hereto, and their respective heirs, executors, administrators, personal representatives, successors or permitted assigns.

16.6        **No Waiver:** A waiver by either Party of any of its rights hereunder or the performance by the other Party of any obligation hereunder will be without prejudice to all or any of the other rights of the Party hereunder so waiving and will not constitute a waiver of any such other right or, in any other instance, of the right so waived, or a waiver of the performance by the other Party of any other obligations hereunder or the performance, in any other instance, of the obligations so waived.

16.7        **Notice:** Any Notice, consent, authorization, direction or other communication required or permitted to be given hereunder will be in writing and will be delivered either by personal delivery, courier, facsimile or similar telecommunications device and addressed as follows:

(a)        in the case of the Davis, to it at:

Daniel E. Davis
P.O. Box 2427
Harlingen, Texas 78551
Fax: (956) 399-9174

- 18 -

Document: 1005628:05

With copies to:

Alton W. Payne
5001 Bissonnet, Suite 200
Bellaire, TX 77401
Fax: (713) 840-8088 / (713) 661-6001

Dennis Sanchez
Sanchez, Whittington, Janis & Zabarte, L.L.P.
100 North Expressway 83
Brownsville, Texas   78521-2284
Fax: (956) 546-3765

(b)    in the case of the Finning, to it at:

Finning International Inc.
16830 – 107th Avenue
Edmonton, Alberta   T5P 4C3

Attention:    Mel Ternan

Fax:  (780) 930-4891

With a copy to:

Finning International Inc.
Suite 1000
Park Place
666 Burrard Street
Vancouver, British Columbia   V6C 2X8

Attention:    John T. Struthers, Corporate Secretary

Fax:  (604) 331-4887

Any Notice, consent, authorization, direction or other communication delivered as aforesaid will be deemed to have been effectively delivered and received, if sent by facsimile or similar telecommunications device on the calendar day next following receipt of such transmission or, if delivered, to have been delivered and received on the date of such delivery provided, however, that if such date is not a Business Day then it will be deemed to have been delivered and received on the Business Day next following such delivery.  Either Party may change its address for service by Notice delivered as aforesaid.

16.8    **Entire Agreement:**  This Agreement and the Security Documents constitute the entire agreement between the Parties hereto pertaining to the subject matter of this Agreement and supersedes all prior and contemporaneous agreement, understandings, negotiation and discussions, whether oral or written (including without limitation, the LOI), of the Parties, and there are no representations, warranties or other agreements between the Parties in connection with the subject matter of this Agreement except as expressly set forth in such agreements.  No supplement, modification, waiver, qualification or termination of this Agreement will be binding unless in writing and executed by the Parties to be bound thereby.

- 19 -

07/16/2002 11:49   71384    AL PAYNE PC           PAGE 02/02
07/16/2002 11:20 FAX                                        ☒002

16.9      Amendments to Agreement:  This Agreement may be amended only by written instrument executed by all Parties hereto.

16.10     Assignment:  Neither Party may assign or transfer this Agreement or any of his or its rights and obligations hereunder without the prior written consent of the other Party.

16.11     Survival:  Sections 3.6 (Title and Risk of Loss), Articles 7 (Representations, Warranties and Covenants), 9 (Confidentiality), 12 (Events Of Default And Termination) and 16 General), together with all provisions necessary for the enforcement and interpretation thereof, will survive the expiry or termination of this Agreement howsoever caused, and will continue in full force and effect subsequent to and notwithstanding such expiry or termination until they are satisfied or by their nature expire.

16.12     Counterparts:  This Agreement may be executed by the Parties in separate counterparts each of which when so executed and delivered will be an original, but all such counterparts will together constitute one and the same instrument.

          IN WITNESS WHEREOF, the Parties hereto have duly caused of this Agreement to be executed on the date first written above.


SIGNED, SEALED AND DELIVERED by          )
DANIEL E. DAVIS in the presence of:      )
                                         )
_____         )    _____  (seal)
Witness                                  )    DANIEL E. DAVIS



                    FINNING INTERNATIONAL INC.

                    By: _____
                         Authorized Signatory


                              - 20 -

Document: 1005528:05

### SCHEDULE A

#### Product Cost Summary

This Agreement is based on the following estimated cost breakdown. The Parties expect changes during negotiations with suppliers. The intent of both Parties is to eliminate all unnecessary costs, and to cooperate fully to achieve the lowest cost of production, while maintaining a quality product.

These costs are based on the Cost sheets presented to me on May 11, 2002, and on further details developed by Davis and presented on June 9, 2002.

### PRODUCT COST SUMMARY

| PRODUCT LINE | TH63 - 9 TON | 320B - 28 TON | 325B - 38 TON | 325B - 50 TON | 325B - PIPELAYER |
|---|---|---|---|---|---|
| UNIT VOLUME / YEAR | 50 | 12 | 12 | 6 | 12 |
| SELLING PRICE | $150,000 | $310,000 | $385,000 | $525,000 | $425,000 |
| SALES VOLUME | $7,500,000 | $3,720,000 | $4,620,000 | $3,150,000 | $5,100,000 |
| MANUFACTURING COST | | | | | |
| Caterpillar Components | $45,000 | $123,690 | $144,409 | $167,600 | $185,000 |
| Manitex components | $38,500 | $27,492 | $43,594 | nil | nil |
| Other Mfr's | $4,700 | $15,877 | $17,067 | $69,470 | $44,000 |
| Freight | $ 6,500 | $12,792 | $13,392 | $8,500 | $14,000 |
| FINNING | $94,700 | $179,851 | $218,462 | $245,570 | $243,000 |
| SHOP COSTS | | | | | |
| Components | $7,328 | $14,079 | $14,659 | $33,536 | $22,537 |
| Labour | $6,116 | $16,936 | $21,449 | $94,481 | $20,935 |
| Insurance / Warranty | $3,876 | $6,698 | $8,491 | $23,631 | $8,043 |
| Sub Total - DavCrane | $17,320 | $37,713 | $44,599 | $151,648 | $51,515 |
| MFG OVERHEAD | $6,076 | $9,999 | $12,282 | $16,547 | $9,999 |
| DAVCRANE | $23,396 | $47,712 | $56,881 | $168,195 | $61,514 |
| TOTAL | $118,096 | $227,563 | $275,343 | $413,765 | $304,514 |
| ROYALTY - 6% | $7,086 | $13,654 | $16,521 | $24,826 | $18,271 |
| COST TO FINNING | $125,182 | $241,217 | $291,864 | $438,591 | $322,785 |
| Manufacturing Overhead (Annual) | $303,800 | $119,988 | $147,384 | $99,282 | $119,988 |

NOTE: Mfg OH budget is based on these HEX based units only

| | |
|---|---|
| Annual for 42 units | $486,642 |
| Monthly | $40,553.50 |

- 21 -

## SCHEDULE B

### Technology

**CONFIDENTIAL**
**PATENT AND PATENT APPLICATIONS:**

U.S. Patent No. 6,003,252 issued to Daniel E. Davis.

Patent Application entitled Piplayer-Crane- Apparatus and Method.

Patent Application entitled Telehandler-Crane- Apparatus.

Patent Application entitled Universal Excavator Boom Attachment and Method.

Additional patent applications are to be filed.

**CONFIDENTIAL**
**DESIGN AND MANUFACTURING DRAWINGS:**

**9 TON TELEHANDLER DRAWINGS:**
303 drawings bearing drawing numbers 9-2-001 to 9-6-002.
General Arrangement    9T  GA

**28 TON CRANE DRAWINGS:**
301 drawings bearing drawing numbers 28-2-001 to 28-6-009 and 5002668.001 to 5002669-023.

| | |
|---|---|
| General Arrangement | 28T  GA |
| Adaptor Weldment | Bill of Material #28-5-001 |
| Manitex | Bill of Material #6000740.023 |
| Braden | Bill of Material #PD12C  (General Dimensions) |

**CIPI Group Numbers:**

| | |
|---|---|
| - 9Q5972 | Upper Structure  Bill of Material |
| - 1176346 | Optional  Third pedal |
| - 1263784 | Optional  Guard |
| - 1204955 | Optional  Guard |
| - 1263799 | Optional  High Ambient Cooling |
| - 1114696 | Optional  Travel alarm |
| - 152 8744 | VG Lower Bill of Material |

- 2 -

**38 TON CRANE DRAWINGS:**
16 drawings bearing
drawing numbers 38-4-011 to 38-5-159 and B5303.001.
General Arrangement    38T GA
Adaptor Weldment        Bill of Material #38-5-100
                                            #38-5-130
                                            #38-5-129
                                            #38-5-142
Manitex            _    .        Bill of Material #6000740.021
Braden            Bill of Material #PD15    (General Dimensions)

**CIPI Group Number:**
- 9Q5973                . Upper Structure  Bill of Material

- 152 8744              VG Lower Bill of Material


**SIDE-BOOM (PIPELAYER) DRAWINGS:**
Same 317 drawings listed for 28/38 Ton Cranes plus additional drawings for the
A-frame and relate components.


**60 TON CRANE DRAWINGS:**
211 drawings bearing drawing numbers 20.0001.000-00 to 64.1100.000-00 and
9001.000.000-00 to 99.3000.502-000 and 9901.000.000 to 9904.000.000.
General Arrangement    5911.50.000.001.000
Adaptor Weldment        Bill of Material #5911.40.1100.000
Braden            .        Bill of Material #CH185    (General Dimensions)

**CIPI Group Number:**
- 9Q5964              Upper Structure  Bill of Material

- 9Q5965              VG Lower Bill of Material
  (Includes 163-4828)

- 23 -

# COMMERCIAL SECURITY AGREEMENT

### Dated: July 15, 2002

| | |
|---|---|
| **Debtor** | **Secured Party** |
| DAVCRANE INC.<br>P.O. Box 2427<br>Harlingen, Texas 78551 | FINNING INTERNATIONAL INC.<br>16830-107TH Avenue<br>Edmonton, Alberta T5P 4C3<br>Canada |
| (hereinafter "**Debtor**") | (hereinafter "**Secured Party**") |

FOR VALUE RECEIVED, the receipt and sufficiency of which is hereby acknowledged, Debtor grants to Secured Party first priority security interest (and the pledges and assignments as applicable) in, to and under the collateral as hereinafter set forth and agrees with Secured Party as follows:

    **A.**    **OBLIGATIONS SECURED.** The security interest and pledges and assignments as applicable granted hereby are to secure punctual payment and performance of the following: (i) the loan ("**Loan**") represented by that certain promissory note (the "**Note**") of even date herewith in the original principal sum of $1,500,000.00, executed by Debtor and payable to the order of Secured Party, and any and all extensions, renewals, increases, modifications, replacements, and rearrangements thereof; (ii) all indebtedness, liabilities, and obligations whatsoever of the Debtor pursuant to that certain Deed of Trust, Assignment of Rents, Security Agreement and Financing Statement (the "**Deed of Trust**") by Debtor for the benefit of Secured Party and that Security Agreement executed by Daniel E. Davis for the benefit of Secured Party ("**Davis Security Agreement**") and all other collateral and security documents securing or executed in connection with this Commercial Security Agreement ("**Agreement**"), the Note, the Deed of Trust, the Davis Security Agreement (collectively, with this Agreement, the Note, the Deed of Trust, and the Davis Security Agreement, the "**Loan Documents**") and all future advances, renewals, extensions, increases, modifications, amendments, supplements, restatements, and replacements thereof (all of which are herein separately and collectively referred to as the "**Obligations**"). Debtor acknowledges that the security interest (and pledges and assignments as applicable) hereby granted shall secure all future advances made to Debtor by Secured Party whether now in existence or hereafter arising.

    **B.**    **USE OF COLLATERAL.** Debtor represents, warrants and covenants that the Collateral will be used by the Debtor primarily for business use.

    **C.**    **DESCRIPTION OF COLLATERAL.** Debtor hereby grants to Secured Party a security interest in and hereby pledges and assigns and agrees that Secured Party shall continue to have a security interest in and a pledge and assignment of, the following property, to-wit:

1.     **Equipment.**  A security interest in all equipment of every nature and description whatsoever, now owned or hereinafter acquired by Debtor, wheresoever located, including all parts, tools and accessories used in connection therewith utilized in connection with the manufacture, production or assembly of the Product Line hereinafter defined or purchased from the proceeds of the Note and including, without limitation, any equipment, tooling and parts used in connection with ownership and operation of the manufacturing plant located on the real property described on **Exhibit A** attached hereto and made a part hereof for all purposes (including any equipment which may constitute a fixture on such real property), and all additions, accessions or substitutions thereto, and contracts with respect thereto and documents of title evidencing or representing any part thereof, and all products and proceeds thereof.  For purposes of this Agreement, **"Product Line"** means telehandler all-terrain cranes, lattice and telescopic boomed crawler cranes, excavator based pipelayers and related equipment or products, and includes any current or future similar products, but specifically excludes any marine or offshore products.

2.     **All Fixtures.**  A security interest in all of Debtor's fixtures and appurtenances thereto, and such other goods, chattels, fixtures, equipment and personal property affixed or in any manner attached to the real estate and or building(s) or structure(s), including all additions and accessions thereto and replacements thereof and articles in substitution therefore, howsoever attached or affixed, located on the real property described in **Exhibit A** attached hereto and made a part hereof for all purposes.  The record owner of the real estate is Debtor

The term "Collateral" as used in this Agreement shall mean and include, and the security interest (and pledge and assignment as applicable) shall cover, all of the foregoing property, as well as any accessions, additions and attachments thereto and the proceeds and products thereof, including without limitation, all cash, depository accounts, general intangibles, accounts, inventory, equipment, fixtures, farm products, notes, drafts, acceptances, securities, instruments, chattel paper, insurance proceeds payable because of loss or damage, or other property, benefits or rights arising therefrom, and in and to all returned or repossessed goods arising from or relating to any of the property described herein or other proceeds of any sale or other disposition of such property.

**D.     REPRESENTATIONS, WARRANTIES AND COVENANTS OF DEBTOR.**
Debtor represents and warrants as follows:

1.     **Ownership: No Encumbrances.**  Except for the security interest (and pledges and assignments as applicable) granted hereby, the Debtor is, and as to any property acquired after the date hereof which is included within the Collateral, Debtor will be, the owner of all such Collateral free and clear from all charges, liens, security interests, adverse claims and encumbrances of any and every nature whatsoever.

2.     **No Financing Statements.**  There are no financing statements or similar filings now on file in any public office covering any part of the Collateral, and Debtor will not execute and there

will not be on file in any public office any financing statement or similar filing except the financing statements filed or to be filed in favor of Secured Party.

3.     **Accuracy of Information.** All information furnished to Secured Party concerning Debtor, the Collateral and the Obligations, or otherwise for the purpose of obtaining or maintaining credit, is or will be at the time the same is furnished, accurate and complete in all material respects.

4.     **Authority.** Debtor has full right and authority to execute and perform this Agreement and to create the security interest (and pledges and assignment as applicable) created by this Agreement. The making and performance by Debtor of this Agreement will not violate any articles of incorporation, bylaws or agreements of Debtor, any provision of law, any order of court or governmental agency, or any indenture or other agreement to which Debtor is a party, or by which Debtor or any of Debtor's property is bound, or be in conflict with, result in a breach of or constitute (with due notice and/or lapse of time) a default under any such indenture or other agreement, or result in the creation or imposition of any charge, lien, security interest, claim or encumbrance of any and every nature whatsoever upon the Collateral, except as contemplated by this Agreement.

5.     **Name and Addresses.** Debtor's exact legal name (as indicated on official records) is as set forth in the first paragraph of this Agreement. Debtor is a Texas corporation and Debtor's organizational identification number is 0157717000. Its Tax Identification Number is 74-2955092. Other than "Davcrane Inc.", Debtor has not used any other name or trade name. Debtor's chief executive office is located in the state of Texas at the address indicated at the beginning of this Agreement. Debtor agrees not to change such address without advance written notice to Secured Party.

6.     **Perfection of Security Interests.** Debtor authorizes Secured Party, its counsel or its representative to file Financing Statements (the "Financing Statements") describing the Collateral in any jurisdiction where it may be required or desirable in order to perfect Secured Party's security interest in the Collateral, including any additional Financing Statements covering specific Equipment or Fixtures. Debtor further authorizes Secured Party, its counsel or its representative, at any time and from time to time, to file continuation statements with respect to previously filed Financing Statements. Prior to closing but not later than August 8, 2002, Secured Party shall receive uniform commercial code searches from each jurisdiction where the filing of Financing Statements is necessary to perfect the Secured Party's interest in the Collateral, indicating that the Collateral is free and clear from all other liens and security interests and that the Secured Party's security interest in the Collateral is a first priority security interest.

7.     **Certificate of Title.** No item of Collateral is covered by a certificate of title. In the event Debtor acquires any Collateral covered by a certificate of title, it shall reflect the Secured Party as the first and only lienholder on said certificate of title.

E.     **GENERAL COVENANTS. Debtor covenants and agrees as follows:**

1.     **Operation of the Collateral.** Debtor agrees to maintain and use the Collateral solely in the conduct of its own business, in a careful and proper manner, and in conformity with all applicable permits or licenses. Debtor has the risk of loss of the Collateral. Debtor shall comply in all respects with all applicable statutes, laws, ordinances and regulations. Debtor shall not use the Collateral in any unlawful manner or for any unlawful purposes, or in any manner or for any purpose that would expose the Collateral to unusual risk, or to penalty, forfeiture or capture, or that would render inoperative any insurance in connection with the Collateral.

2.     **Condition.** Debtor shall maintain, service and repair the Collateral so as to keep it in good operating condition. Debtor shall replace within a reasonable time all parts that may be worn out, lost, destroyed or otherwise rendered unfit for use, with appropriate replacement parts. Debtor shall obtain and maintain in good standing at all times all applicable permits, licenses, registrations and certificates respecting the Collateral.

3.     **Assessments.** Debtor shall promptly pay when due all taxes, assessments, license fees, registration fees, and governmental charges levied or assessed against Debtor or with respect to the Collateral or any part thereof.

4.     **No Encumbrances.** Debtor agrees not to suffer or permit any charge, lien, security interest, adverse claim or encumbrance of any and every nature whatsoever against the Collateral or any part thereof.

5.     **No Removal.** Except as otherwise provided in this Agreement, Debtor shall not remove the Collateral from the county or counties designated at the beginning of this Agreement without Secured Party's prior written consent.

6.     **No Transfer.** Debtor shall not, without the prior written consent of Secured Party, sell, assign, transfer, lease, charter, encumber, hypothecate or dispose of the Collateral, or any part thereof, or interest therein, or offer to do any of the foregoing.

7.     **Notices and Reports.** Debtor shall promptly notify Secured Party in writing of any change in the name, identity or structure of Debtor, any charge, lien, security interest, claim or encumbrance asserted against the Collateral, any litigation against Debtor or the Collateral, any theft, loss, injury or similar incident involving the Collateral, and any other material matter adversely affecting Debtor or the Collateral. Debtor shall furnish such other reports, information and data regarding Debtor's financial condition and operations, the Collateral and such other matters as Secured Party may request from time to time.

8.     **Landlord's Waivers.** Debtor shall furnish to Secured Party, if requested, a landlord's waiver of all liens with respect to any collateral covered by this Agreement that is or may be located upon leased premises, such landlord's waivers to be in form and upon such terms as are acceptable to Secured Party.

9.    **Additional Requirements.** Debtor will from time to time sign, execute, deliver and file, alone or with Secured Party, upon reasonable request, any necessary financing statements, security agreements or other documents; procure any necessary instruments or documents as may be reasonably requested by Secured Party; and take all further action that Secured Party may reasonably request to confirm, perfect, preserve and protect the security interests intended to be granted hereby. At the option of secured Party, a carbon, photographic or other reproduction of this Agreement or of a financing statement covering the Collateral shall be sufficient as a financing statement and may be filed as a financing statement. Upon the request of Secured Party, Debtor shall take or cause to be taken all actions (other than any actions required to be taken by Secured Party) necessary to cause Secured Party to have "control" over any proceeds of the Collateral constituting deposit accounts, electronic chattel paper, or letter-of-credit rights, and Debtor shall promptly notify Secured Party of Debtor's acquisition of any such Collateral.

10.    **Protection of Collateral.** Secured Party, at its option, whether before or after default, but without any obligation whatsoever to do so, may (a) discharge taxes, claims, charges, liens, security interests, assessments or other encumbrances of any and every nature whatsoever at any time levied, placed upon or asserted against the Collateral, (b) place and pay for insurance on the Collateral, including insurance that only protects Secured Party's interest, (c) pay for the repair, improvements, testing, maintenance and preservation of the Collateral, (d) pay any filing, recording, registration, licensing or certification fees or other fees and charges related to the Collateral, or (e) take any other action to preserve and protect the Collateral and Secured Party's rights and remedies under this Agreement as Secured Party may deem reasonably necessary or appropriate. Debtor agrees that Secured Party shall have no duty or obligation whatsoever to take any of the foregoing action. Debtor agrees to promptly reimburse Secured Party upon demand for any payment made or any expense incurred by the Secured Party pursuant to this authorization. These payments and expenditures, together with interest thereon from date incurred until paid by Debtor at the maximum contract rate allowed under applicable laws, which Debtor agrees to pay, shall constitute additional Obligations and shall be secured by and entitled to the benefits of this Agreement.

11.    **Records.** Debtor will keep and maintain at its own cost and expense satisfactory and complete records of the Collateral. For Secured Party's further security, Secured Party shall have a security interest in all of Debtor's books and records pertaining to the Collateral, and Debtor shall turn over any such books and records to Secured Party or to its representatives during normal business hours at the request of Secured Party.

12.    **Further Assurances.** Debtor shall do, make, procure, execute and deliver all such additional and further acts, things, deeds, interests and assurances as Secured Party may reasonably require from time to time to protect, assure and enforce Secured Party's rights and remedies.

13.    **Insurance.** Debtor shall maintain insurance at all time with respect to the Collateral, containing such terms, in such form and amounts and written by such companies as may be satisfactory to Secured Party. If required by Secured Party, the insurance policies shall contain loss payable clauses in favor of Secured Party as its interest may appear, and at the request of Secured Party shall be delivered to and held by it. Further, if required by Secured Party, the insurance

policies shall provide for thirty (30) days written minimum cancellation notice to Secured Party. All right, title and interest of the Debtor in the insurance policies and/or the proceeds of the insurance policies covering the Equipment are hereby assigned to the Secured Party to secure the repayment of the Obligations. Secured Party is hereby authorized to act as attorney in fact for Debtor in obtaining, adjusting, settling and canceling such insurance and endorsing any drafts or instruments. Secured Party shall be authorized to apply the proceeds from any insurance to the Obligations secured hereby whether or not such Obligations are then due and payable.

**14.    Obligations of Secured Party.** Nothing herein contained shall be construed to constitute Debtor as the agent of Secured Party for any purpose whatsoever. Secured Party does not by anything contained herein or in any assignment or otherwise, assume any of Debtor's obligations or any liability under any other agreements assigned to Secured Party, and Secured Party shall not be responsible in any way for the performance by Debtor of any of the terms and conditions thereof.

**15.    No Collection Obligation.** Secured Party has no duty to collect any income accruing on the Collateral or to preserve any rights relating to the Collateral. The powers conferred upon Secured Party by this Agreement are solely to protect the interest of Secured Party in the Collateral and shall not impose any duty upon Secured Party to exercise any such powers. Secured Party shall be under no duty whatsoever to make or give (and Debtor does hereby waive) any presentment, demand for performance, notice of nonperformance, protest, notice of protest, notice of dishonor, or other notice or demand in connection with any Collateral or the Obligations, or to take any steps necessary to preserve any rights against other parties. Secured Party shall not be liable for failure to collect or realize upon any or all of the Obligations or Collateral, or for any delay in so doing and shall have no duty to perform Debtor's obligations.

**F.    EVENTS OF DEFAULT.** The following events ("**Events of Default**") shall constitute Events of Default under this Agreement **if such event or failure remains uncured following thirty (30) Business Days (defined as any day other than  Saturday, Sunday or statutory holiday)** written notice of such default and opportunity to cure from Secured Party to the Debtor:

**1.**    Default shall be made in the payment of any installment of principal or interest upon the Note or any other obligation of Debtor to Secured Party when due and payable; or

**2.**    Default shall be made in the performance of any terms, covenant or agreement contained herein or in any other Loan Document; or

**3.**    Any representation or warranty herein contained in any other Loan Document shall prove to have been materially incorrect or misleading in any material respect when made; or

**4.**    Debtor or any guarantor makes an assignment for the benefit of creditors, admits in writing its inability to pay its debts generally as they become due, files a petition in

bankruptcy, is adjudicated insolvent or bankrupt, petitions or applies to any tribunal for any receiver or any trustee of Debtor or any guarantor or any substantial part of its property, commences any action relating to Debtor or any guarantor under any reorganization, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect, or if there is commenced against Debtor or any guarantor any such action, or Debtor or any guarantor by any act indicates its consent to or approval of any trustee for Debtor or any guarantor of any substantial part of its property, or suffers any such receivership or trustee to continue undischarged;

Upon the occurrence of an Event of Default: (i) the Secured Party, at its option, may declare the Note, and all outstanding principal, accrued interest and other sums outstanding thereon, immediately due and payable without demand, presentment, notice of dishonor, protest, notice of intent to accelerate, notice of acceleration and diligence in collecting sums due hereunder, all of which are waived by Debtor; (ii) proceed to enforce its interest in the Collateral with all proceeds being retained or paid over to Secured Party for application on the Obligations in the order and priority chosen by Secured Party in its sole discretion; and (iii) Secured Party shall have all rights and remedies available to a secured party under the Texas Business and Commerce Code and other applicable law.

### G.    REMEDIES UPON DEFAULT.

1.    **General** Upon the occurrence and during the continuance of any Event of Default, Secured Party may, by written notice to Debtor, declare the entire unpaid amount (including, if applicable, any unpaid accrued interest) of the Obligations to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest, notice of protest or dishonor, notice of acceleration, notice of intent to accelerate or other notice of any kind, all of which are hereby expressly waived by Debtor, and thereupon take such action as Secured Party may deem desirable. If any Event of Default shall occur and be continuing Secured Party may, in addition to all other rights and remedies granted to it in this Agreement and in any other instrument or agreement securing, evidencing or relating to the Obligations exercise all rights and remedies of a secured party under the UCC.

2.    **Remedies**. Upon any Event of Default, Secured Party shall have the right to pursue any of the following remedies separately, successively or simultaneously:

(i)    File suit and obtain judgment and, in conjunction with any action, Secured Party may seek any ancillary remedies provided by law, including levy of attachment and garnishment.

Take possession of any Collateral if not already in its possession without demand and without legal process. Upon Secured Party's demand, Debtor will assemble and make the Collateral available to Secured Party as it directs. Debtor grants to Secured Party the right, for this purpose, to enter into any premises where Collateral may be located.

1.    Without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon Debtor or any other person (all and each of which demands, defenses, advertisements and notices are hereby waived), Secured Party may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of Secured Party or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk. Secured Party shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in Debtor, which right or equity is hereby waived or released.

## H.    FORECLOSURE PROCEDURES.

**1.    Waivers.** Secured Party shall not by any act, delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any default or Event of Default or in any breach of any of the terms and conditions hereof. No failure to exercise, nor any delay in exercising, on the part of Secured Party of any right, power or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver by Secured Party of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which Secured Party would otherwise have on any future occasion. The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any rights or remedies provided by law. To the extent permitted by applicable law, Debtor waives all claims, damages and demands it may acquire against Secured Party arising out of the exercise by it of any rights hereunder except to the extent any thereof arise solely from the willful misconduct of Secured Party.

**2.    Notices.** Secured Party shall give Debtor such notice of any private or public sale as may be required by the UCC. Twenty (20) days notice shall be considered commercially reasonable for any notices given under this Section.

**3.    Condition of Collateral.** Secured Party has no obligation to prepare the Collateral for sale. Secured Party's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the UCC or otherwise, shall be to deal with it in the same manner as Secured Party deals with similar property for its own account. Neither Secured Party nor any of its directors, officers, members, managers, employees or agents shall be liable for failure to demand, collect or realize upon all or any part of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of Debtor or otherwise.

4.     **No Obligation to Pursue Others**.  Secured Party has no obligation to attempt to satisfy the Obligations by collecting them from any other person liable for them and Secured Party may release, modify or waive any Collateral provided by any other person to secure any of the Obligations, all without affecting Secured Party's rights against Debtor.  Debtor waives any right it may have to require Secured Party to pursue any third person for any of the Obligations.

5.     **Compliance With Other Laws**.  Secured Party may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

6.     **Warranties**.  Secured Party may sell the Collateral without giving any warranties as to the Collateral.  Secured Party may specifically disclaim any warranties of title or the like.  This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

7.     **Sales on Credit**.  If Secured Party sells any of the Collateral upon credit, Debtor will be credited only with payments actually made by the purchaser, received by Secured Party and applied to the indebtedness of the purchaser.  In the event the purchaser fails to pay for the Collateral, Secured Party may resell the Collateral and Debtor shall be credited with the proceeds of the sale.

8.     **Purchases by Secured Party**.  In the event Secured Party purchases any of the Collateral being sold, Secured Party may pay for the Collateral by crediting some or all of the Obligations of the Debtor.

9.     **No Marshaling**.  Secured Party shall have no obligation to marshal any assets in favor of Debtor, or against or in payment of any of the Obligations, or any other obligation owed to Secured Party by Debtor or any other person.

10.     **Proceeds of Sale**.  Secured Party shall apply the net proceeds of any collection, recovery, receipt, appropriation, realization or sale of the Collateral, after deducting all reasonable costs and expenses of every kind incurred therein or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of Secured Party hereunder, including, without limitation, reasonable attorneys' fees and disbursements, to the payment in whole or in part of the Obligations, in such order as Secured Party may elect, and only after such application and after the payment by Secured Party of any other amount required by any provision of law, including, without limitation, Section 9-615 of the UCC, need Secured Party account for the surplus, if any, to Debtor.

11.     **Deficiency**. Debtor shall remain liable to Secured Party for any unpaid Obligations, advances, costs, charges and expenses, together with interest thereon and shall pay the same immediately to Secured Party at Secured Party's offices.

## I.    OTHER AGREEMENTS.

**1.    Savings Clause.** Notwithstanding any provision to the contrary herein, or in any of the documents evidencing the Obligations or otherwise relating thereto, no such provision shall require the payment or permit the collection of interest in excess of the maximum permitted by applicable usury laws. If any such excessive interest is provided for, then in such event (i) the provisions of this paragraph shall govern and control, (ii) neither the Debtor nor their respective successors or assigns or any other party liable for the payment thereof, shall be obligated to pay the amount of such interest to the extent that is in excess of the maximum amount permitted by law, (iii) any such excess interest that may have been collected shall be, at the option of the holder of the instrument evidencing the Obligations, either applied as a credit against the then unpaid principal amount thereof or refunded to the maker thereof, and (iv) the effective rate of interest shall be automatically reduced to the maximum lawful rate under applicable usury laws as now or hereafter construed by the courts having jurisdiction.

**2.    Joint and Several Responsibility; References to Debtors.** If this Security Agreement is executed by more than one Debtor, the obligations of all such Debtors shall be joint and several and references to the Debtor shall mean all Debtors (or any of them).

**3.    Severability.** Any provision hereof found to be invalid by courts having jurisdiction shall be invalid only with respect to such provision (and then only to the extent necessary to avoid such invalidity). The offending provision shall be modified to the maximum extent possible to confer upon Secured Party the benefits intended thereby. Such provision as modified and the remaining provisions hereof shall be construed and enforced to the same effect as if such offending provision (or portion thereof) had not been contained herein, to the maximum extent possible.

**4.    Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**5.    Use of Copies.** Any carbon, photographic or other reproduction of any financing statement signed by Debtor is sufficient as a financing statement for all purposes, including without limitation, filing in any state as may be permitted by the provisions of the Uniform Commercial Code of such state.

**6.    Relationship to Other Agreements.** This Security Agreement and the security interests (and pledges and assignments as applicable) herein granted are in addition to (and not in substitution, novation or discharge of) any and all prior to contemporaneous security agreements, security interests, pledges, assignments, liens, rights, titles or other interests in favor of Secured Party or assigned to Secured Party by others in connection with the Obligations. All rights and remedies of Secured Party in all such agreements are cumulative, but in the event of actual conflict in terms and conditions, the terms and conditions of this Agreement shall govern and control.

7. **Notices.** Any notice or demand given by Secured Party to Debtor in connection with this Agreement, the Collateral or the Obligations, shall be deemed given and effective upon deposit in the United States mail, postage prepaid, addressed to Debtor at the address of Debtor designated at the beginning of this Agreement. Actual notice to Debtor shall always be effective no matter how given or received.

8. **Headings and Gender.** Paragraph headings in this Agreement are for convenience only and shall be given no meaning or significance in interpreting this Agreement. All words used herein shall be construed to be of such gender or number as the circumstances require.

9. **Amendments.** Neither this Agreement nor any of its provisions may be changed, amended, modified, waived or discharged orally, but only by an instrument in writing signed by the Party against whom enforcement of the change, amendment, modification, wavier or discharge is sought.

10. **Continuing Agreement.** The security interest (and pledges and assignments as applicable) hereby granted and all of the terms and provisions in this Agreement shall be deemed a continuing agreement and shall continue in full force and effect until terminated in writing. Any such revocation or termination shall only be effective if explicitly confirmed in a signed writing issued by Secured Party to such effect and shall in no way impair or affect any transactions entered into or rights created or Obligations incurred or arising prior to such revocation or termination, as to which this Agreement shall be fully operative until same are repaid and discharged in full. Unless otherwise required by applicable law, Secured Party shall be under no obligation to issue a termination statement or similar documents unless Debtor requests same in writing and, provided further, that all Obligations have been repaid and discharged in full and there are no commitments to make advances, incur any Obligations or otherwise give value.

11. **Binding Effect.** The provisions of this Security Agreement shall be binding upon the heirs, personal representatives, successors and assigns of Debtor and the rights, powers and remedies of Secured Party hereunder shall enure to the benefit of the successors and assigns of Secured Party.

12. **Governing Law.** This Agreement shall be governed by the law of the State of Texas and applicable federal law.

13. **Intentionally deleted.**

14. **Construction.** The parties hereto acknowledge that each of them has had the benefit of legal counsel of its own choice and has been afforded an opportunity to review this Agreement and the other Loan Documents with its legal counsel.

15. **Indemnification.** DEBTOR AGREES TO PAY AND TO SAVE SECURED PARTY HARMLESS FROM ANY AND ALL LIABILITIES AND REASONABLE COSTS AND EXPENSES (INCLUDING, WITHOUT LIMITATION, LEGAL FEES AND EXPENSES), (I) WITH RESPECT TO, OR RESULTING FROM, ANY DELAY IN

PAYING, ANY AND ALL EXCISE, SALES OR OTHER TAXES WHICH MAY BE PAYABLE OR DETERMINED TO BE PAYABLE WITH RESPECT TO ANY OF THE COLLATERAL, (II) WITH RESPECT TO, OR RESULTING FROM, ANY DELAY IN COMPLYING WITH ANY GOVERNMENTAL REQUIREMENTS APPLICABLE TO ANY OF THE COLLATERAL OR (III) IN CONNECTION WITH ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, UNLESS SECURED PARTY IS GROSSLY NEGLIGENT OR ENGAGES IN ANY WILLFUL MISCONDUCT. THIS INDEMNITY IS INTENDED TO COVER SECURED PARTY'S ORDINARY NEGLIGENCE.

     **16.**    **Expenses.** Debtor will pay to Secured Party at Secured Party's offices, all charges, costs and expenses (including reasonable attorneys' fees and legal expenses) incurred by Secured Party in connection with protecting Secured Party against the claims or interests of any third party against the Collateral, in exercising any right, power or remedy conferred by this Agreement or by law or in equity and/or in protecting and preserving the Collateral. The amount of all such charges, costs and expenses shall be due and payable by Debtor to Secured Party upon demand together with interest thereon at the highest rate allowed by applicable law. Debtor shall reimburse Secured Party for the cost of periodic Uniform Commercial Code conducted by the Secured Party to verify the first lien priority of Secured Party's security interest in the Collateral, and to verify that no other financing statements have been filed against the Collateral.

     **17.**    **Entire Agreement; Amendment.**  THE PARTIES HERETO EXPRESSLY ACKNOWLEDGE AND AGREE, THAT WITH REGARD TO THE SUBJECT MATTER OF THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREIN: (1) THERE ARE NO ORAL AGREEMENTS BETWEEN THE PARTIES HERETO AND (2) THIS AGREEMENT, INCLUDING THE DEFINED TERMS AND ALL EXHIBITS AND ADDENDA, IF ANY, ATTACHED HERETO: (a) EMBODIES THE FINAL AND COMPLETE AGREEMENT BETWEEN THE PARTIES; (b) SUPERSEDES ALL PRIOR AND CONTEMPORANEOUS NEGOTIATIONS, OFFERS, PROPOSALS, AGREEMENTS, COMMITMENTS, PROMISES, ACTS, CONDUCT, COURSE OF DEALING, REPRESENTATIONS, STATEMENTS, ASSURANCES AND UNDERSTANDINGS, WHETHER ORAL OR WRITTEN; AND (c) MAY NOT BE VARIED OR CONTRADICTED BY EVIDENCE OF ANY SUCH PRIOR OR CONTEMPORANEOUS MATTER OR BY EVIDENCE OF ANY SUBSEQUENT ORAL AGREEMENT OF THE PARTIES HERETO.

**SIGNATURE PAGE**
**COMMERCIAL SECURITY AGREEMENT**

EXECUTED this _26 th_ day of July, 2002.

DAVCRANE INC.

By: _____
       Daniel E. Davis, President

Exhibit A - Description of Real Property

## Exhibit "A"

## Real Property

Lot Number One (1), Block Number One (1), Texas Pipe Bending Subdivision, City of Harlingen, Cameron County, Texas according to the Map recorded in Cabinet 1, Pages 384-A and 384-B Map Records of Cameron County, Texas.



Borden Ladner Gervais LLP
Lawyers • Patent & Trade-Mark Agents
1200 Waterfront Centre
200 Burrard Street, P.O. Box 48600
Vancouver, B.C., Canada V7X 1T2
tel: (604) 687-5744　fax: (604) 687-1415
www.blgcanada.com

**BORDEN
LADNER
GERVAIS**

September 18, 2003

FILE NO: 501177/019363

# COPY

GERALD W. GHIKAS, Q.C.
direct tel: (604) 640-4112
direct fax: (604) 622-5812
email: gghikas@blgcanada.com

**VIA FAX: (956) 399-9174
Original VIA COURIER**

Daniel E. Davis
P.O. Box 2427
Harlingen, Texas
78551 USA

Dear Sirs/Mesdames:

RE:　In the Matter of an International Commercial
Arbitration
Between Finning International Inc. (Finning)
and Daniel E. Davis (Davis)
pursuant to the International Arbitration Rules
of the American Arbitration Association

We enclose for delivery to you pursuant to Article 14.1 of the Agreement, a notice of arbitration that we have filed with the American Arbitration Association at their Dallas, Texas Case Management Centre with a request that it commence administration of this arbitration.

We assume that you will appoint counsel. As required by the Agreement we are delivering copies of this communication and enclosures to Alton W. Payne and Dennis Sanchez. We have assume that Mr. Payne will represent you as your attorney for the purposes of this arbitration. If you intend to appoint another attorney, please provide us with that attorney's contact particulars.

Yours truly,

Borden Ladner Gervais LLP

By: Gerald W. Ghikas

GWG/mm
Enclosure



EXHIBIT
**C**

Document 1172578:01
Borden Ladner Gervais LLP is an Ontario Limited Liability Partnership

VANCOUVER • TORONTO • OTTAWA • MONTRÉAL • CALGARY

cc    Alton W. Payne (by fax with enclosures)
5001 Bissonnet, suite 200
Bellaire, Texas
77401  USA

Dennis Sanchez (by fax with enclosures)
Sanchez, Whittington, Janis & Zabarte, LLP
100 North Expressway 83
Brownsville, Texas
78521-2284  USA

cc    Mark Finkelstein
Shannon, Martin, Finkelstein & Sayre, P.C.
2400 Two Houston Centre
909 Fannin Street
Houston, Texas
USA 77010

## IN THE MATTER OF AN INTERNATIONAL COMMERCIAL ARBITRATION

BETWEEN:

FINNING INTERNATIONAL INC. (FINNING)

CLAIMANT

AND:

DANIEL E. DAVIS (DAVIS)

RESPONDENT

## NOTICE OF ARBITRATION
PURSUANT TO THE INTERNATIONAL ARBITRATION RULES
OF THE AMERICAN ARBITRATION ASSOCIATION

The Claimant, Finning, a party to an arbitration agreement contained in a written contract dated July 15, 2002 and providing for arbitration under the *International Arbitration Rules* of the American Arbitration Association, hereby demands arbitration thereunder.

### THE NAMES AND ADDRESSES OF THE PARTIES:

| Claimant: | Respondent: |
|---|---|
| Finning International Inc. | Daniel E. Davis |
| 16830 – 107th Avenue | P.O. Box 2427 |
| Edmonton, Alberta, | Harlingen, Texas |
| T5P 4C3  Canada | 78551  USA |

| Telephone: | (780) 930 4878 | Telephone: | |
| Fax: | (780) 930-4891 | Fax: | (956) 399-9174 |

| Claimant's Representatives: | Respondent's Representatives |
|---|---|
| Canadian Counsel:  Gerald W. Ghikas, Q.C. | Dennis Sanchez |
| Borden Ladner Gervais LLP | Sanchez, Whittington, Janis & Zabarte, LLP |
| 1200 Waterfront Centre | 100 North Expressway 83 |
| 200 Burrard Street | Brownsville, Texas |
| P.O. Box 48600 | 78521-2284 USA |
| Vancouver, British Columbia | |
| V7X 1T2  Canada | |

| Telephone: | (604) 640-4112 | Telephone: | (956) 546-3731 |
| Fax: | (604) 622-5812 | Fax: | (956) 546-3765 |

| Texas Counsel: Mark S. Finkelstein | Alton W. Payne |
|---|---|
| Shannon, Martin, Finkelstein & Sayre, P.C. | 5001 Bissonnet, Suite 200 |
| 2400 Two Houston Center | Bellaire, Texas |
| 909 Fannin Street | 77401  USA |
| Houston, Texas   77010  USA | |

| Telephone: | (713) 646-5503 | Telephone: | (713) 840-8008 |
| Fax: | (713) 752-0337 | Fax: | (713) 840-8088 |

- 1 -

Document 1172180:01

## DESCRIPTION OF THE CLAIM AND SUPPORTING FACTS:

1.    The claimant, Finning, is a company incorporated under the laws of Canada having an address at 16830 – 107th Avenue, Edmonton, Alberta, Canada.

2.    The respondent, Davis, is a businessperson having an address at P.O. Box 2427 Harlingen, Texas, U.S.A.

3.    Davis and Finning entered into a Distributor Agreement (the "Agreement") dated July 15, 2002.

4.    In and by the Agreement, Davis agreed to manufacture and assemble from components supplied in part by Finning certain cranes and related products (the "Distributed Products") and agreed that Finning was to have the exclusive right to market, distribute and sell throughout the world.

5.    The Agreement further provided:

    (a)    That Davis would manufacture and assemble the Distributed Products in a prompt, timely and efficient manner and would produce Distributed Products to meet Finning's demand for same;

    (b)    That title to Distributed Products at all times would remain with Finning, its suppliers or its customers;

    (c)    That Davis would deliver completed Distributed Products to the person, at the location and on the date specified by Finning;

    (d)    That all Distributed Products would be manufactured and assembled by Davis in a prompt, efficient, skilful and careful manner in accordance with North American industry standards for the manufacture and assembly of similar equipment and in compliance with all applicable laws.

6.    Davis has wrongfully breached and repudiated the Agreement. Without limitation, the breaches and repudiations of Davis include:

    (a)    Davis has failed to manufacture and assemble the Distributed Products in a prompt, timely and efficient manner and produce Distributed Products to meet Finning's demand for same;

    (b)    Davis has failed to deliver completed Distributed Products belonging to Finning to Finning or to the person, at the location and on the date specified by Finning;

    (c)    Davis has failed to have all Distributed Products manufactured and assembled in a prompt, efficient, skilful and careful manner in accordance with North American industry

- 2 -

standards for the manufacture and assembly of similar equipment and in compliance with all applicable laws.

7.    Davis has, without justification, delivered to Finning a purported Notice of Default stating that, unless Finning cures the certain alleged "defaults" the Agreement will be terminated within 30 days, and has otherwise clearly evinced his intention to bring the Agreement to an end and not to perform his obligations thereunder.

8.    The Agreement provides that any breach by Davis of any covenant representation or warranty made by him under the Agreement, or any failure of Davis to perform any of his obligations under the Agreement or related Security Documents, is an Event of Default.  The Agreement further provides that if Davis commits an event of default and fails to cure such event of default within 30 Business Days of Finning delivering notice of same to Davis, Finning may do any or all of the following:

(a)    Terminate the Agreement forthwith in its entirety without prejudice to any rights it may have against Davis arising prior to termination;

(b)    Declare the outstanding balance of the Facility Loan to be immediately due and payable by Davis and exercise any and all rights Finning may have at law, in equity or pursuant to the Agreement or the Security Documents; and

(c)    Take possession of the "Facility", "Technology", "Major Components", "Minor Components" and Distributed Products (all as defined in the Agreement) and conduct manufacturing and assembly of the "Distributed Products" itself.

9.    The Agreement further provides that the rights and remedies provided thereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

10.    By virtue of the breaches and repudiation of the Agreement, on August 11, 2003 Finning delivered a Notice of Default to Davis.  Finning has not yet made an election to terminate the Agreement or to accept Davis' repudiation of the Agreement.

11.    As a result of Davis' breaches of the contract and his wrongful repudiation thereof, Finning has suffered and will continue to suffer loss, damages and expense.

**RELIEF OR REMEDY SOUGHT AND AMOUNT CLAIMED:**

12.    Finning claims against Davis for an Award:

(a)    Declaring that Davis has wrongfully breached and repudiated the Agreement; and

- 3 -

(b)    Directing Davis to deliver all completed Distributed Products to Finning in accordance with the Agreement;

(c)    Requiring Davis to account to Finning for all monies received by Davis from Finning under the Agreement and all expenses purported to be incurred by Davis for reimbursement by Finning under the Agreement;

(d)    Should Davis fail to cure his defaults under the Agreement within 30 Business Days of Finning's Notice of Default, and should Finning thereafter elect to seek such remedy:

    (i)    Declaring that the Agreement is terminated in its entirety without prejudice to any rights Finning may have against Davis arising prior to termination; and, or alternatively,

    (ii)    Declaring that the outstanding balance of the Facility Loan is due and payable by Davis and directing Davis to pay to Finning the full outstanding balance of the Facility Loan, and interest; and, or alternatively,

    (iii)    Declaring that Finning is entitled to take possession of the "Facility, Technology, Major Components, Minor Components and Distributed Products" and to conduct manufacturing and assembly of the Distributed Product itself, and order Davis to deliver up possession to Finning accordingly, and to take such other steps as may reasonably be required to that end;

(e)    Further, or alternatively, such interim measures of protection as may be appropriate and such further or other awards as may be appropriate.

13.    The amount claimed by Finning against Davis is US$10 million.


**OTHER MATTERS:**

14.    Attached to and forming part of this notice of arbitration is a true copy of the Agreement, Article 14.1 of which is the agreement of Finning and Davis to arbitrate any dispute or controversy arising out of or in connection with the Agreement or its performance. The Agreement requires that disputes be resolved by a single arbitrator and that the place of arbitration will be Houston, Texas.

    Davis is hereby notified that copies of the arbitration agreement and this demand are being filed with the American Arbitration Association at its Houston, Texas case management centre with a request that it commence administration of the arbitration. Under the Rules, you may file an answering statement within the time frame specified in the Rules, after notice from the administrator.

Document: 1172180:01

- 4 -

DATED at the City of Vancouver, British Columbia, this 16 day of September, 2003.

Gerald W. Ghikas, Q.C.
Canadian Counsel and Representative
for the Claimant, Finning International Inc.

Document: 1172180:01